UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Criminal Action |
| v. | ) No. 13-10200-GAO |
|  | ) |
| DZHOKHAR A. TSARNAEV, also | ) |
| known as Jahar Tsarni, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**STATUS CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, April 9, 2015
9:37 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad and William W. Fick, Federal Public
10             Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  All rise for the Court.

3          (The Court enters the courtroom at 9:37 a.m.)

4          THE CLERK:  For a conference in U.S. versus Tsarnaev.

5    Be seated.

6          THE COURT:  Good morning.

7          COUNSEL IN UNISON:  Good morning, your Honor.

8          THE COURT:  First let's deal with old business.  I

9    just want to -- because some of the preparations for the

00:00 10   submission of the case to the jury were sort of not officially

11   recorded on the record, I just want to note that the parties

12   had advance copies of the jury instructions.  I think they were

13   provided on the Sunday.  And they varied a little bit after

14   that but not substantially.  Similarly, the verdict slip the

15   parties had reviewed on Monday, and the redactions to the

16   indictment also were reviewed by the parties -- I'm not sure

17   any of that was formally on the record -- all before the

18   submission.

19          I did want to note also that for what it's worth the

00:01 20   practices with respect to the attendance of the alternates,

21   they were in a -- after they were separated, they were brought

22   to another jury room elsewhere in the building where they were

23   together, but there was a representative of the jury clerk

24   present with them to be sure that there was no discussion of

25   the case throughout.  They got lunch separately.  They didn't

1    mingle with the deliberating jury to get their lunch or

2    anything like that.  And they were also transported separately

3    in the vans.  There were actually two runs instead of the

4    common runs that were being done before.  So all of that was

5    being done to make sure there was no contact between

6    deliberating jurors and the alternates.  And as far as I know,

7    that was successful.

8         So there are still some pending motions.  Notably, I

9    think the Rule 29 motion is still formally unruled on, and

00:02 10   perhaps there are others.  But why don't we start with that.  I

11   don't know if Mr. Bruck or Ms. Clarke or anybody.  Ms. Conrad?

12        MS. CONRAD:  Your Honor, we just rest on our papers

13   and renew our motion including the request for election of

14   counts with respect to the multiple counts of the indictment.

15        THE COURT:  Okay.  The motion is denied in all

16   respects.  With respect to the 924(c) issue, if I could call it

17   that, it's clear from the cases that the government cited,

18   *Garcia-Ortiz* and *Hansen*, that it's a settled issue.

19        And with respect to the issue about Count Seven and

00:03 20   the foreign victim, a couple of things:  First, as I indicated

21   briefly, I regard it, having reviewed analogous cases -- none

22   directly on point -- I regard it as an affirmative defense to

23   be raised by the defense, which it was not.  To the extent it

24   was raised as a defense by the motion, the government was given

25   the opportunity to meet that by the stipulation that I

1    permitted them to offer after they had closed.  And I think

2    that's consistent with case management to permit that, and that

3    negative -- the exemption, even if it were an issue.  I think

4    there is some question as to whether we should regard it as an

5    issue, but if it were an issue, I think it was resolved

6    correctly so that the exemption did not apply.

7         As to other points, I think the jury was within the

8    bounds of what was rational to come out as they did on some of

9    the counts, like the robbery and the carjacking, even though

00:04 10   those results were not necessarily compelled by the evidence.

11   So the motion is denied.

12        So I want to get a general idea from you first, I

13   guess, about what you conceive the next phase will look like.

14   Mr. Weinreb had addressed it briefly, but maybe we want to add

15   to that, and then I'll hear from the defense as to what their

16   views are.

17        MR. WEINREB:  Your Honor, the bulk of the government's

18   presentation in the penalty phase and our case-in-chief will be

19   victim-impact testimony --

00:04 20        THE COURT:  Could you move the mic up?

21        MR. WEINREB:  -- and we don't expect that it will last

22   more than a few days -- a few court days.  I think to be safe,

23   we would say three, but we really don't expect it to last --

24        THE COURT:  How many witnesses?

25        MR. WEINREB:  I think approximately 20.  There will be

some -- most of the aggravators, we will rely primarily, if not
entirely, on evidence that was introduced in the guilt phase.
With respect to lack of remorse, we'll have some additional
evidence.  And then we'll have some additional evidence with
respect to grave risk of death, the cruel and heinous nature of
the injuries.

THE COURT:  Is that Dr. King?

MR. WEINREB:  Yes, Dr. King.

And the vulnerable-victim aggravator.  Again, that
will be, in part, expert testimony from Dr. King.

In the rebuttal phase of our -- or the rebuttal part
of the penalty phase, we actually could have equal, if not more
evidence.  A lot of that depends on how much comes in in the
defense case.

We've been informally notified by the defense that
they intend to call up to nine or ten expert witnesses as well
as 15 to 20 civilian witnesses.  They may say something
different now.  I haven't checked with them this morning.  But
if that's the case, then we would envision a robust rebuttal.

THE COURT:  But you don't anticipate any
terrorism-related witness -- expert witnesses like -- there's a
motion that I think is still extant about some terrorism
opinions.  So you don't plan on that in the first part of
your --

MR. WEINREB:  That's correct.  We don't intend to

```
 1    produce any more of that in our case-in-chief, but in rebuttal.

 2              THE COURT:  Right.  But that is what you're referring

 3    to might be in a rebuttal --

 4              MR. WEINREB:  That along with responsive experts.

 5              THE COURT:  And how about exhibits?

 6              (Counsel confer off the record.)

 7              MR. WEINREB:  We don't expect to introduce much in the

 8    way of new evidence.  Primarily, it would be photographs from

 9    the lives of the victims who -- the decedents -- that would

00:07 10   simply illustrate what their lives were like before they died,

11    some video.  And then on -- with respect to lack of remorse, we

12    will have a few more exhibits, but it won't be much.

13              THE COURT:  Just as a technical aside, I'm not sure

14    how technically this jibes with the JERS -- I guess I'll have

15    to see if it -- because I would assume that the body of

16    exhibits in the first phase will still be evidence for the

17    second phase, obviously.  So I don't know whether we can simply

18    add and -- so you might give some thought, if we can -- let's

19    assume that we could do that, that the JERS presentation can be

00:08 20   withdrawn, added to and then reloaded.  I think that's probably

21    what would have to happen -- whether there should be any

22    demarcation of -- or segregation of the second phase from the

23    first phase or not.  Maybe that's just done by numbers.

24              MR. WEINREB:  I suppose we can discuss it with the

25    defense if they have strong views about it.  My reading of the
```

1  statute is that all the evidence in the guilt phase is

2  available in the penalty phase.  And so simply continuing the

3  numbering of exhibits where we left off would make sense, but

4  we're open to discussion about it if there are differing views.

5        THE COURT:  Okay.  All right.  Thank you.

6        Mr. Bruck?

7        MR. BRUCK:  Thank you, your Honor.  As far as the

8  length of our case, there are a great many unsettled questions,

9  but at this point we -- our best estimate is approximately two

00:09 10  weeks, in the neighborhood of eight days, of witnesses and

11  testimony.  I must say that having just heard that the

12  government has additional evidence that they want to present on

13  the constitutionally extremely problematic area of lack of

14  remorse, suggests a whole need for -- since we have no

15  conception of what those witnesses might be or what the nature

16  of that evidence might be, we're going to have to wait for

17  their witness list or else see what they're willing to tell us

18  ahead of time.  But that is another bump in the road.

19        I guess we haven't gotten to the pending motions, but

00:10 20  it's already becoming clear from hearing Mr. Weinreb's summary

21  that there are more motions to be filed, and that

22  includes -- it sounds as if victim impact is indeed expanding

23  well beyond not only what is constitutionally permissible, but

24  perhaps more immediately relevant, what has been noticed.  The

25  government is limited to aggravation for which they have

1    provided notice.

2           To the extent that the government, for example, is

3    proving victim-impact evidence about non-homicide victims,

4    survivors, there's no notice of that in the notice of intent to

5    seek the death penalty, and that raises a pretty serious issue

6    about the admissibility of such evidence.  I'm a little bit

7    limited without knowing exactly what the government intends to

8    do, but I wanted to flag that issue because I know the Court

9    also wants to hear about pending motions.  And I'd hate to --

00:11 10   having just heard the government's summary today, I would hate

11    to leave the Court with the impression that the

12    currently -- current set of motions are all that's pending,

13    because I think we've got new ones coming down the pike.

14           But eight days, is the short answer.

15           THE COURT:  Well, give me just the idea of the kinds

16    of witnesses.  And I think I have some idea from

17    authorizations, but tell me what you expect as a broad outline,

18    if that --

19           MR. BRUCK:  We have -- we do not expect to call nine

00:11 20   expert witnesses.  The government has received notice of that

21    many that we're -- the -- we, of course, tend to re-call the

22    computer expert to finish the evidence that we began to present

23    at the guilt phase, Mr. Spencer.  We intend to call an expert

24    on Chechnya and Russia dealing with the defendant's background

25    and -- his family background and -- I should say dealing with

1    his cultural and historical origins and relating to some of the

2    issues that have already been raised by the government

3    regarding what was on the computers and so forth.  We'll

4    call -- we'll re-call an expert dealing with cell phones,

5    technical testimony.

6         We expect to call an expert that will be responsive to

7    Dr. Levitt dealing with Islam and, to some degree, the boat

8    writings.  We have an expert on radicalization that the

9    government has been noticed of.  There will be a social

00:12 10  historian, and then there will be a teaching witness; that is

11   to say, someone who has not examined the defendant or any of

12   the medical -- any medical or neurological evidence in the

13   case, but a witness to talk about the neurobiology of

14   adolescence, and simply what we know about brain development

15   and the concept of maturity.

16        And then we have a very problematic situation dealing

17   with the Bureau of Prisons.  And we had planned to apprise the

18   Court of this during the discussion of scheduling but I can go

19   into it now.

00:13 20       In October of last year we interviewed a witness who's

21   actually the chief legal counsel at ADX, which is a supermax

22   facility where I think it is generally agreed our client will

23   be sent to serve his sentence if he receives a life sentence,

24   and issued a subpoena on January 5th together with a *Touhy*

25   letter for the attendance of this witness.  This man is a

1    correctional officer and also a lawyer with a comprehensive

2    overview of both the special administrative measures that our

3    client is under and would continue to be under in the Bureau of

4    Prisons unless the attorney general decided otherwise, the

5    physical conditions, the -- all of the safeguards and measures

6    that would prevent our client from posing a future risk to

7    national security or of future -- of violence, period.

8    Obviously, a crucially important issue in a case of this

9    nature.

00:14 10           As I say, the *Touhy* letter and the subpoena was issued

11   on January 5th, and this week -- I should say last week, three

12   months later, we received a letter from the U.S. Attorney's

13   Office declining to provide that witness, the one we had

14   prepared and subpoenaed, and telling us that substitutes would

15   be arranged.

16           We, yesterday, received the name of three substitute

17   witnesses, none of whom we have ever met, know anything about,

18   two of them with the FBI and one of them with the Bureau of

19   Prisons, which we are informed that these witnesses will be

00:15 20   responsive to the range of issues that we had hoped our single

21   witness would be able to testify to.

22           I'm not yet ready to complain about this because we

23   don't know who these people are.  We haven't talked to them.

24   We're advised that we can talk to them, along with the

25   government being present.  And we're in a real crunch to get

1    this done, find out whether these are adequate substitutes or

2    whether we have to apply to the Court for relief to get the

3    attendance of the witness who we actually were prepared to

4    call.  But this is a critically important area of our case

5    which for the reasons I've just stated could fairly be said to

6    be in disarray, although we've done everything we could do to

7    be ready.  That's our last expert on the list.

8              There was an expert that the government has a pending

9    motion to exclude on grounds of inadequate Rule 16 disclosures

00:16 10    who we do not intend to call.

11             THE COURT:  Porterfield?

12             MR. BRUCK:  Porterfield.

13             THE COURT:  Okay.  With respect to non-expert

14    witnesses?

15             MR. BRUCK:  With respect to non-experts, it's -- I

16    would say at this point our count is around 20 lay witnesses.

17    It could -- well --

18             MS. CLARKE:  Plus international.

19             MR. BRUCK:  Twenty domestic witnesses and as many as

00:17 20    nine international witnesses.  So we're in the neighborhood of

21    30 civilian witnesses.

22             THE COURT:  It sounds like there's probably some

23    cumulativeness there, no?

24             MR. BRUCK:  I'm sorry?

25             THE COURT:  I said, it sounds like there's probably

1    some cumulativeness there.

2              MR. BRUCK:  Well, there are --

3              THE COURT:  I know you'd have people that -- to be

4    available because --

5              MR. BRUCK:  Well, for the international witnesses, we

6    certainly had to prepare for the possibility that -- you know.

7    And that's an issue we need to address with the Court today as

8    well, is the timing of that.  And Mr. Fick is prepared to do

9    that.

00:17 10         But we have evidence to present about Tamerlan, we

11   have evidence to present about our own client.  There are

12   various periods and aspects of our client's life, his family's

13   background and his former environment, all of which we intend

14   to prove through witnesses.  It's a very complex story and I

15   think 20 witnesses -- domestic witnesses is a good bet.

16             THE COURT:  Okay.  And how about exhibits?  The

17   experts, I presume, would have some exhibits.

18             MR. BRUCK:  The experts will have some exhibits.  We

19   have been working hard to get our exhibit list.  As I

00:18 20  mentioned, we do not yet have the government's exhibit list.

21   And since the government, it sounds like, will be preceding

22   about a week ahead of us, we had hoped -- we think it

23   reasonable to propose that we provide our exhibit list one week

24   after we receive the government's, that way we each have the

25   same amount of time with the exhibit list prior to the start of

 1    the case.

 2            THE COURT:  Okay.  So overall, if I put those two

 3    estimates together, we're looking at about three weeks, give or

 4    take?

 5            MR. BRUCK:  Three weeks of testimony.

 6            THE COURT:  Testimony.

 7            MR. BRUCK:  Yes.

 8            MR. WEINREB:  Your Honor, I think with the government

 9    going perhaps three trial days, if the defense, in fact, goes

00:19 10   eight trial days, we will have at least an additional four in

11    rebuttal.

12            THE COURT:  I see.  Okay.

13            MR. WEINREB:  So I would think four weeks at a

14    minimum.

15            THE COURT:  Okay.  Yeah, I had not factored in

16    rebuttal.

17            Well, let me address some of the -- what I might call

18    leftover motions that were never addressed with respect to

19    experts.  There had been a government motion to exclude Janet

00:20 20   Vogelsang, but then there was a subsequent -- on the grounds of

21    inadequate disclosure, and then there was a subsequent

22    disclosure.  Is that still a live issue?

23            MR. WEINREB:  Your Honor, the motion that we filed

24    previously, I think, has been superseded, but there will be

25    certain areas of her testimony that we still would seek to

1    exclude on 403 grounds; in particular, both her -- the

2    disclosure that we received and many of the underlying -- or I

3    shouldn't say "many," but several of the underlying exhibits or

4    materials on which she relied relate to the Waltham triple

5    homicide.  And we have a motion pending already that has not

6    been resolved to exclude all reference to, and evidence of,

7    that separate crime on various grounds and will be -- we want

8    it to be known that that motion we -- applies to Ms. Vogelsang

9    too, and to any other witnesses who may testify.

00:21 10         We've noticed that a few of the lay witnesses who have

11   been noticed to us by the defendant are -- were close friends

12   of one of the victims of that triple homicide, and we have no

13   idea what they might be testifying about other than that event.

14   So I think that the resolution of that will be an important

15   step in determining the fate of some other witnesses and

16   exhibits in this case.

17         There may be one or two other areas where we will seek

18   to exclude certain anticipated testimony by Ms. Vogelsang.  And

19   again, largely it relates to other bad acts by Tamerlan

00:22 20   Tsarnaev that don't relate to relative culpability for the

21   offense in this case but simply invite the jury to draw an

22   irrelevant comparison, which is the comparison of -- sort of

23   the character of these two individuals aside from what they did

24   in this case, simply in general in their lives.

25              THE COURT:  Okay.  Yeah?

1          MR. BRUCK:  In connection with that, I think I should

2    apprise the Court, first, that we would like to file something

3    responsive to the Waltham motion the government has filed.  We

4    had earlier advised that we did not intend to go into that at

5    the guilt phase, and of course we didn't attempt to.  We do

6    intend to raise it, if we're permitted to do so, at the penalty

7    phase; and, in fact, plan to submit a *Touhy* request for an FBI

8    agent with knowledge of the confession of the decedent who

9    implicated Tamerlan Tsarnaev.

00:23 10          That there is further motions in limine that the

11   government has with respect to other bad acts of Tamerlan

12   Tsarnaev is news to us.  We think that probably this is going

13   to have to be -- we would like written notice of what it is

14   and -- so that we can respond to it.  Right off the cuff, it is

15   so obvious that the relationship between the older brother and

16   the youngest child in the family is so critical to this story

17   and the question of who Tamerlan Tsarnaev was.  His manner of

18   interacting with the world, his violence, his aggressiveness

19   are all parts of the penalty-phase story of the likely

00:24 20   relationship between our client and his oldest brother.

21          There is also testimony the Court has not yet heard

22   concerning the cultural background to this issue, the special

23   dominance of the oldest brother in a Chechen family that is

24   unfamiliar, and we plan to present expert testimony and also

25   lay testimony on that issue.

1           So to some degree this is not something that can be

2      resolved -- or I think can be best resolved as a pretrial --

3      you know, before the evidence has begun to develop, including

4      our expert and some of our lay testimony that provides the

5      cultural background that one would need to assess relevance and

6      any 403 claim, but it's certainly not something that we can

7      respond to before we know with more precision other than

8      Waltham what it is the government objects to.

9           MR. WEINREB:  So, your Honor, the motions that the

00:25 10   government filed that is still pending was a motion to exclude

11      any reference or evidence of the Waltham triple homicide and

12      any other prior bad acts of Tamerlan Tsarnaev.  So that

13      actually was filed months ago and briefed by the government

14      months ago.  This isn't the first time the defense is hearing

15      about it.

16           We didn't specifically enumerate particular bad acts,

17      but we did, I think, set out our theory of the reason to

18      exclude them, which is both relevance, but largely more the

19      penalty-phase equivalent of 403, that in a case where the

00:25 20   defense is laying a huge amount of emphasis in their mitigation

21      case on both relative culpability for the crimes that were

22      committed and any influence that Tamerlan Tsarnaev may have had

23      on their client, that the risk that the jury will be confused

24      and misled by evidence of prior bad acts by Tamerlan Tsarnaev

25      of which there's no evidence that the defendant had any idea or

influenced him in any way but simply invite the jury to

speculate is extremely high.  So, again, we don't need to

further argue it or resolve it now, but that's simply

background.

THE COURT:  Well, I think what we'll --

MR. WEINREB:  If I may just say one more thing.  With

respect to Ms. Vogelsang, the other thing I wanted to add is

that she was originally noticed as a biopsychosocial expert,

and she's now being cast as a social historian.  When she was a

biopsychosocial expert, we assumed there were going to be

opinions made by her relating to biological and psychological

evidence.  And in particular, since no psychiatrist or

psychologists have been noticed by the defense in light of

their withdrawal of their 12.2 notice, it's unclear to us

whether Ms. Vogelsang now intends to render opinions of a

psychological nature.

We have received no notice of any opinion testimony by

her whatsoever, and we assume, therefore, there will not be and

she will not be standing in for psychologists or psychiatrists

who are not going to testify but she may have consulted with

and spoken to and...

THE COURT:  Can we get a quick answer to that?

MR. BRUCK:  Yes.  Ms. Vogelsang has not met the

client.  She is not going to provide opinion testimony.  She,

in effect, is going to organize so much of the social history

```
 1   and the family history as does not come out through lay
 2   witnesses --
 3              THE COURT:  She's going to be the hearsay witness, in
 4   other words?
 5              MR. BRUCK:  -- as an efficient --
 6              I'm sorry?
 7              THE COURT:  She's going to be the hearsay witness?
 8              MR. BRUCK:  Okay.
 9              (Laughter.)
10              MR. BRUCK:  But she is not going to be testifying to
11   render a professional opinion as a social worker.
12              THE COURT:  Okay.  The other -- what I started to say,
13   we should have a response to the government's motion on the bad
14   acts soon.
15              MR. BRUCK:  Okay.
16              THE COURT:  And we could talk about precise dates.
17              The defendant had a motion directed at Dr. King but --
18              MR. BRUCK:  Yes.
19              THE COURT:  Was that only for the guilt phase?
20              MR. BRUCK:  No, that was for the penalty phase.  And
21   it's -- the initial motion focused particularly on Dr. King's
22   military experience and background.  We were concerned that
23   Dr. King was going to be used as a -- sort of a stand-in for
24   the betrayal of the United States aggravator that the Court
25   struck.  He has a -- step back a moment.
```

1           Dr. King is sort of one of the Boston Marathon bombing

2    heroes.  He is a military surgeon with extensive experience in

3    Iraq and Afghanistan.  He ran the marathon that day and then

4    went home and then quickly repaired to Mass. General where he

5    operated on the wounded.  He took President Obama around the

6    hospital three days later.

7           He is a heroic figure and inspirational figure, and we

8    think that the government, in effect, is wishing to leverage

9    his military background, the connection between the IED wounds

00:29 10    that he saw overseas and the IED wounds that he saw at Mass.

11    General on April 15th for reasons that should not come into

12    this case.  Dr. King did not see any of the --

13           THE COURT:  We're not arguing it now; I just wanted to

14    know if the motion still pertains.  One of the things I would

15    like to do is set up argument on some of these motions.

16           MR. BRUCK:  Oh, okay.  I apologize.

17           THE COURT:  So I just wanted to know if that was

18    limited and therefore no longer applicable, but you've answered

19    that.

00:30 20           MR. BRUCK:  Yes.  And we think it may need to be

21    expanded a little bit on this question of what is responsive to

22    noticed aggravating factors as opposed to other aggravating

23    factors that we think the government is not entitled to prove

24    because we did not -- they were not included in the notice.

25           MR. WEINREB:  Your Honor, it may expedite matters if I

1   give you our list of pending motions that we believe need to be

2   resolved before the penalty phase.

3          There is government's omnibus penalty-phase motion in

4   limine that's still pending.  We filed a motion prior to the

5   guilt phase with respect to four individuals, three of whom are

6   experts, who the defense has now let us know will be testifying

7   in the penalty phase instead.  They are Michael Reynolds, who

8   he is the expert on Chechnya; Bernard Haykel, who is the

9   Islam/terrorism expert; and Mark Spencer, the computer expert.

00:31 10   We don't challenge any of these people on grounds of their

11   expertise and we assume that -- we have no reason to believe

12   yet at this point that anything they say will be outside of

13   what has been noticed to us, but we still do have some

14   objections to their testimony on 401 and 403 grounds.

15          And I don't know whether it would make sense, because

16   our initial motion was focused on the relevance of a lot of

17   that testimony in the guilt phase, whether we should update it

18   to express our concerns about it with respect to the penalty

19   phase.  Again, our concerns are narrowed in the penalty phase

00:32 20   but they haven't been narrowed to nothing, so --

21          THE COURT:  What -- are those -- that's one motion,

22   you said, that addressed several experts?

23          MR. WEINREB:  Yes.

24          THE COURT:  Do you have the number, the docket number?

25          MR. WEINREB:  I don't have the docket number because

1    it was filed under seal.

2         MR. BRUCK:  The motion was directed entirely to the

3    guilt phase.  This was the motion that the Court granted.  It

4    limited what we could do in --

5         THE COURT:  Oh, I see.  Okay.  All right.

6         MR. BRUCK:  So we feel that --

7         THE COURT:  So it has to be remade.

8         MR. WEINREB:  It would have to be renewed.

9         MR. BRUCK:  This is a new motion.

00:32 10       MR. WEINREB:  Right.  It would raise a number of the

11   same things.

12        And then we will be filing motions in limine with

13   respect to several other proposed penalty-phase experts, and

14   we'll do that expeditiously.  With respect to Dr. Giedd --

15        THE COURT:  Dr. --

16        MR. WEINREB:  Giedd, G-I-E-D-D.

17        THE COURT:  Oh, yes.  Okay.

18        MR. WEINREB:  -- who would be testifying about

19   adolescent brain development, we'll have the same motion in

00:33 20   limine with respect to him that essentially we have with

21   respect to Ms. Porterfield, which is that in the absence of

22   testimony that he examined the defendant's brain and can say

23   things about the defendant in particular, that simply

24   testifying in general and then asking the government -- asking

25   the jury to speculate that the defendant falls within the

 1    category of people who have some kind of immature brain

 2    development is inappropriate and should be excluded under 403

 3    grounds.

 4         There are certain defense exhibits that we have seen,

 5    we don't know if the defense actually intends to offer them,

 6    that we would be moving to exclude.  Just as an example, when

 7    the defendant was taken to Beth Israel after being arrested, he

 8    had an operation on his face to repair some damage.  The

 9    operation was documented by the surgeons there so that there

00:34 10    are pictures of him with his face entirely flayed, basically

11    cut open so that the exact tissue could be photographed.  The

12    defense has given those to us as potential exhibits.  They

13    would obviously, in our view, be as prejudicial as if we had

14    put in autopsy photos of the victims in this case flayed, as

15    they were, as part of the autopsy.  We can't imagine what

16    possible relevance that could have, or probative value, that

17    would outweigh the prejudicial nature of it.

18         So until we have an actual exhibit list from the

19    defense, we're not going to be in a position to file any of

00:34 20    these motions in limine.

21         And with respect to setting a schedule for them to be

22    filed, we don't agree with the defense that because we are

23    going first and they are going second, that we should be

24    noticing our witnesses and exhibits one week ahead of theirs.

25    The situation in the penalty phase is essentially reversed from

```
 1    the situation in the guilt phase.  We did give them extreme

 2    advance notice of a large number of the guilt phase -- our

 3    penalty -- essentially, our penalty-phase witnesses and

 4    exhibits because they were also pertinent to guilt or innocence

 5    and, therefore, came in in the guilt phase and there's

 6    extremely little left for us that needs to be done exclusively

 7    in the penalty phase, whereas virtually everything that we're

 8    going to be seeing from the defense is being offered now in the

 9    penalty phase.  And we need the same opportunity they had to
00:35 10    look at these exhibits, to prepare motions in limine.

11         With respect to many of their witnesses, we have no

12    idea what any of these people are going to say.  We've gotten

13    no Jencks with respect to them.  There may not be any Jencks.

14    We -- to the extent that we have been able to figure out who

15    some of them are, for example, the foreign witnesses, or the

16    domestic witnesses, we have no -- we've had no proffer from the

17    defense as to what they're going to be talking about.

18         Simply looking at their 302s, there is large

19    quantities of information that -- here in those 302s that
00:36 20    strikes us as obviously irrelevant, or more prejudicial than

21    probative.  And just as the defense did not want to have to be

22    jumping up every minute in the middle of the trial in front of

23    the jury objecting to things, making it seem as if they were

24    trying to prevent the full story from coming out, we don't want

25    to be in that same position.  We would like the same
```

1    opportunity they had to brief these things ahead of time to the

2    Court so that the appropriate rulings can be made in advance.

3          So we need the earliest possible notice of who -- you

4    know, which witnesses they actually intend to call, some sense

5    of what they're going to say, and what the exhibits are going

6    to be with respect to the lay witnesses.

7          Another thing that we need is a list of mitigating

8    factors.  The defense provided us with a list of seven

9    mitigating factors.  One of them, this -- two of them we

00:37 10   believe are not appropriate mitigating factors although one of

11   them I think we're willing to yield on.  The two that we

12   believe are inappropriate are the risk that the -- giving the

13   defendant the death penalty would create a greater risk of

14   inspiring future terrorists than giving him a sentence of life

15   imprisonment.  Under the Supreme Court's law about what is and

16   is not a mitigating factor, we believe that is plainly not a

17   mitigating factor.  Speculation about how the punishment might

18   affect third parties has nothing to do with the nature of the

19   crime or the character of the defendant.

00:38 20         The other one is his future dangerousness, or to put

21   it in the opposite way, how well the Bureau of Prisons will be

22   able to prevent him from being a danger in the future.  Again,

23   the government has not noticed future dangerousness as an

24   aggravating factor, and even if we had, we would be limited to

25   evidence about the defendant's propensity for being a danger.

1    The defense is not proposing to put on evidence just purely of

2    the defendant's sort of peaceful nature, but evidence, again,

3    that has nothing to do with his -- the nature of the crime or

4    the character of the defendant but simply the capacity of the

5    Bureau of Prisons to keep any prisoner from additional future

6    violence.

7            This is the one I think we're willing to yield on

8    assuming we have an opportunity to rebut their evidence.  But,

9    again, in that letter where they set out their seven mitigating

00:39 10   factors, they said that there might be subsidiary factual

11   mitigators that would also be added.  And if experience is any

12   guide, that list could vastly expand by, you know, factors of

13   ten the number of mitigators they actually intend to propose to

14   the jury.  And we need to see those so that we have an

15   opportunity to...

16           And there may be one or two motions in limine.

17   Another motion that we intend to file today is related to the

18   pending motion to suppress statements by the defendant.  As the

19   Court will no doubt recall, the defendant filed a motion to

00:40 20   suppress statements that he made to law enforcement agents at

21   Beth Israel Hospital in the day or two after he was arrested.

22   The government opposed the motion but stipulated that it did

23   not need to use the statements in either its case-in-chief in

24   the guilt phase or the penalty phase, but would use them to

25   impeach the defendant or in rebuttal if he were to take the

 1    stand and testify.  The Court ruled that under those

 2    circumstances any hearing on the voluntariness of the

 3    statements, which would be a necessary finding for the

 4    government to be able to use them, could be delayed to a future

 5    point.

 6         The point has come.  Because if the defendant intends

 7    to take the stand, he could do so at the last minute.  It's

 8    obviously up to him.  And he might be the last witness the

 9    defense would call, and there really wouldn't be much of an

00:41 10    opportunity to have this hearing at that point.  It makes sense

11    to have it ahead of time.

12         But even if we delayed it to that point, I think that

13    the defense's motion to -- to suppress the statements on the

14    grounds that they were involuntary made reference to his

15    medical records and to the treatment that he received and the

16    condition that he was in at Beth Israel.  The government's

17    opposition, likewise, cited to the medical records and to the

18    treatments he had received.

19         (Pause.)

00:41 20    MR. BRUCK:  Bill, I think we can cut it short.  The

21    defendant does not intend to testify at the penalty phase, so I

22    don't know that we need to belabor this point at this time.

23         MR. WEINREB:  Under those circumstances, I think -- so

24    where I was going was that we were going to file a motion for

25    the opportunity to interview those doctors in preparation for

the hearing.  If the defendant's not going to testify,
obviously that's not necessary, although we do have a motion to
exclude unsworn and uncross-examined allocution by the
defendant to the jury.  That is something that we would propose
we have the right to impeach or rebut if the defendant intends
to offer it.

          (Pause.)

          MR. WEINREB:  That's not happening, either?

          MR. BRUCK:  I think we've already responded in writing
that he does not intend to request allocution.

          MR. WEINREB:  Very well.

          THE COURT:  And those are decisions, I take it, that
you've discussed with him and he concurs with?

          MS. CLARKE:  Yes.

          MR. BRUCK:  Yes.

          MR. WEINREB:  The last thing I'd just offer to the
Court by way of useful information for scheduling has to do
with the parole status of the foreign witnesses that the
defense has noticed.  I think Mr. Chakravarty's more up to date
on that.

          MR. CHAKRAVARTY:  To give an update, and I'm sure
Mr. Fick can elaborate from his perspective, but from what I've
gathered from Homeland Security, the applications for parole
for nine individuals have been effected, I think either
yesterday or the day before, by the defense in the sense of the

1    complete package has been submitted.  HSI is promptly

2    processing those.  As part of that process, they give the

3    application to the FBI for purposes of background.  They are

4    the applicant for the parole.  The FBI is the investigating

5    agency.

6         We anticipate -- this is not an assurance -- the U.S.

7    Attorney's Office is being told what's happening but we're not

8    actually making these executive decisions on it, that they're

9    going to be processed through in due course.

00:43 10        There are two exceptions that might create issues, and

11   one of them is an escort who is not a witness.  And for

12   non-security reasons, but simply because of the significant

13   public benefit quality of the parole -- that's not to say that

14   they will be denied, but it's an issue that the agencies are

15   having to work through.  I think that's something, frankly,

16   that can be overcome; however, the only representation as to

17   the need for that individual is based on the defense submitting

18   the application.  It's not clear what the other reason is that

19   this person needs to attend and accompany or escort other

00:44 20  potential witnesses.

21        The other individual is one that was submitted I think

22   yesterday or on Monday, is somebody who I am told as a preview,

23   it's not a final decision, but there are significant concerns

24   for, and that parole was not likely to be granted even with the

25   security conditions which have been proposed by HSI.  These are

1    mandatory security conditions with which they would say this

2    witness's parole is granted, and they're likely to be granted

3    for the balance of the applicants, then these security

4    provisions need to be complied with.  Those conditions would be

5    insufficient to satisfy their concerns, and I think the FBI's

6    concerns as well, with regard to this one individual.

7         So I've learned that's likely this morning, and so I'm

8    relaying it now to your Honor as well as to the defense.

9         In terms of timing -- sorry.  In terms of timing, what

00:45 10  it means is the other -- at least seven, maybe eight applicants

11   are expeditiously being processed through.  There is a

12   logistical process of both getting the approvals within

13   Washington and back to Boston.  That is a matter of days.  And

14   then there's the transmission to the closest embassy to these

15   foreign witnesses, which I believe was noticed to be Moscow.

16   The State Department there would have to issue the parole.

17        Once that parole is issued, then that can be shown to

18   the airline, essentially, to come over here.  There could -- it

19   could expedite matters by moving to, for example, the

00:45 20  Netherlands -- for traveling from the Netherlands, planning

21   travel from there because that's one less step because they

22   don't need the parole to enter the country.  But assuming the

23   logistics are not practical unless you have parole in hand,

24   then it's a matter of days.

25        That could all, in a perfect scenario, happen as early

1       as next week if we have continued cooperation by the defense

2       and everything gets moved along quickly.  It's more reasonable

3       and likely that the following week is more realistic, but even

4       then it's not assured.  I think two weeks hence is the safest

5       to budget.  And it sounds like, from what we've heard this

6       morning, that that would jibe with where we are.

7               MR. FICK:  Just briefly, I think my first observation

8       is that I think the fact that we're learning a lot of this for

9       the first time from Mr. Chakravarty rather than from Homeland

00:46 10  Security illustrates the need for a firewall, and I think a

11      renewed motion in that regard is likely to be forthcoming.

12              The only -- we have been working as fast as we can to

13      get together all of the information we can to make this happen,

14      including a new requirement that was not present when other

15      colleagues had done this previously, which is that they wanted

16      an individual affidavit from each traveler that was completed

17      in person, so we had somebody within a day of receiving that

18      notice fly over to Russia, travel around to get those together.

19      That's now been done.  I'm happy to hear that HSI thinks that

00:47 20  the packages, so to speak, are complete.

21              What has disturbed us is we got an email from them a

22      few days ago indicating that the conditions under which they

23      intend to hold these people when they are here include 24/7

24      monitoring by not only -- or not by Homeland Security but by

25      the FBI, which is the investigative agency, electronic

1    monitoring bracelets, et cetera, without any real showing as to

2    why that's remotely necessary or appropriate.  That, we think,

3    is likely to have a very intimidating effect on the witnesses,

4    et cetera.  And so we, I think in the next few days, will

5    probably be filing a motion to the Court to see if we can't at

6    least require some showing as to why such conditions are needed

7    and seek some relief from the Court in that regard.

8           As to the timing, I would, concur based on everything

9    I know from our collective prior experience, that the two weeks

00:48 10   would be a very optimistic view of when we might actually get

11   these people over here.  And so at least in that regard I

12   concur.

13          As to anyone who is unable to get parole, and some

14   other folks who we know about who can't travel, we do

15   anticipate a small number of people we would like to bring in

16   by video appearance for this purpose.  And so, you know, we'll

17   be in touch with the Court to arrange those logistics as

18   needed.

19          Oh, the final thing is with regard to the issue of the

00:48 20   escort, a large number of the witnesses are female members of

21   the maternal family.  And the escort, so to speak, is the sort

22   of senior male brother of the defendant's mother; in other

23   words, his senior uncle on the maternal side as sort of the

24   male escort for those female members of the family.  And so

25   that was the reason why his name was included.

1          My understanding is, for example, is in the *Almohandis*

2    case, the one that Ms. Conrad had a number of years ago before

3    Judge Saris, a male family member was similarly paroled, again,

4    as an escort in similar circumstances.  Because culturally, a

5    large number of women from the family, it would not be

6    appropriate for them to travel without a male family member

7    accompanying them.  So that's the reason for that, and I would

8    hope that could be accommodated.

9          MR. WEINREB:  Your Honor, if there are going to be

00:49 10   proposed video interviews of witnesses, we'd like some kind of

11   notice of that and an opportunity to potentially object.

12         MR. FICK:  We're not proposing video interviews; we're

13   proposing live video testimony.  And we indicated in our letter

14   disclosing the foreign witnesses.  But as to anyone we could

15   not get here physically, we would intend to put them on by live

16   video feed.  So in other words, the examination and

17   cross-examination would be conducted from here; the witness

18   would be remote.  There would be an interpreter presumably

19   here, and we could do it that way.

00:50 20         MR. WEINREB:  But the witness wouldn't be under oath

21   or subject to the Court's jurisdiction.  So again, we would

22   like an opportunity -- there may be some witnesses where we

23   don't have real concerns about potential perjury, for example,

24   and some witnesses where we have genuine concerns.  And so that

25   would influence whether we potentially object or not.

1       THE COURT:  Okay.

2       MR. FICK:  I would just note again that was done in

3  the *Almohandis* case.  Again, there were some witnesses brought

4  here, some appeared by video.  So it's not something that's

5  foreign to the Court even in a regular criminal trial where the

6  rules of evidence apply in full measure, which is not of course

7  the case in the penalty phase here.

8       THE COURT:  The let me come back to the Bureau of

9  Prisons issue.  Are you -- well, I heard your part of it.  I

00:50 10  want to see what the government has to say in response to what

11  you said.

12       MR. WEINREB:  So, your Honor, the defense gave the

13  government -- made a *Touhy* request for government testimony on

14  several matters.  One had to do generally with conditions at

15  ADX and what the security there is like, but it also had to do

16  with the imposition of SAMs and what dictates -- what

17  constraints exist under SAMs and the degree to which they can

18  be renewed.  It had to do with a number of things.

19       The response indicated that these -- that can't be

00:51 20  done with a single witness because the whole SAMs process is

21  not a BOP process; it's a DOJ process.  It takes place through

22  other agencies.  BOP accommodates SAMs, and to some degree

23  implements them, but they're not involved in obtaining them or

24  renewing them.  So it wasn't possible to designate the single

25  witness who the defense requested.

1          Furthermore, the witness the defense requested is an

2     attorney, basically like an assistant or associate counsel for

3     BOP.  BOP did not believe that was an appropriate witness.

4     Although that witness was allowed to testify in one case, I

5     think the BOP came to regret that decision, believing that it

6     shouldn't -- it was a bad precedent.  It wasn't appropriate for

7     someone who's a legal counselor to BOP to be taking the witness

8     stand, encountering issues related to -- attorney-client type

9     issues.  So that they wanted to designate a warden or an

00:52 10     assistant warden or somebody who is just a more appropriate

11     witness.

12          I don't think there's going to be any difficulty in

13     the defense speaking with these people in order to prep them,

14     so to speak, or find out what they have to say.  I mean,

15     they're being designated with the understanding that they're

16     going to be witnesses for the defense.  And it's not like

17     they're unwilling witnesses or anything like that.  So I'm not

18     sure -- if there's something particular other than -- the Court

19     wants me to address, I'm happy to do it, but that's the general

00:53 20     background.

21          THE COURT:  Okay.  Well, I mean, let's see how that

22     plays out.  I mean, it may be that -- I mean, I assume from

23     your conversation with whoever you've talked to, you have a

24     sense of what it is you want to elicit.

25          MR. BRUCK:  Yes.

 1          THE COURT:  And so the question is whether you're

 2   able, through these people, to get what you want and --

 3          MR. BRUCK:  Yes.  And the only -- I mean, the first

 4   unknown right now is how long it's going to take.  We started

 5   this process on January the 5th and found out who they were

 6   yesterday, so it creates a timing issue that we would much

 7   rather not have had.

 8          THE COURT:  Okay.  So I'm not sure that there's one

 9   particular time we should set for motions but I want -- there's

00:54 10   at least one motion, I guess, that we need to perhaps resolve

11   before the government's case, and that is the defendant's

12   motion with respect to Dr. King.  And I'm thinking we could

13   have a hearing on that on Monday.  And if there's anything else

14   in that category -- I know that there are other motions,

15   perhaps, that we ought to get to soon, but that might be fairly

16   early in the government's presentation, and we should try to

17   get that resolved.

18          So are there other issues, motions that perhaps we

19   ought to add to a motion hearing on Monday?

00:54 20          MR. WEINREB:  I might be able to pretermit that need

21   for Mr. Bruck to talk about at least one thing, which is the

22   question of victim-impact testimony related to non-decedents.

23          THE COURT:  Oh, okay.  You're right.

24          MR. WEINREB:  So the government does not intend to put

25   on so-called long-term victim-impact testimony about

non-decedents.  And by that we mean, we don't intend to put on
evidence about the economic impact on the lives of people who
were simply wounded, for example, and who are not -- when I say
"decedents," of course I'm including the surviving family
members of the decedents.  With respect to them, I don't think
there's any claim that we can't put on testimony about
long-term economic impact, emotional impact, psychological,
pretty much every kind of impact.

     With respect to people who were simply injured in the
bombing, we intend to put on only evidence related to the
substantial risk-of-death aggravator, which would be evidence
related to the injuries that they suffered at the marathon and
the continuing medical danger they are in as a result of those
injuries.  And that in some cases involves medical conditions
and treatment that are occurring even today.

     Just as an example, Marc Fucarile, who was one of the
people injured in the bombing, there's a piece of metal lodged
in his heart, a piece of shrapnel, which he's been informed by
his doctors could escape at any time, lodge in his lungs and
kill him.  He's at grave risk of death every day because of
this bombing.  We believe that is legitimate kind of testimony.
But we would not be asking him questions, for example, about
how difficult it's made his impending marriage or how, you
know, his economic -- his ability to do the job that he loved
has been affected or anything like that.

1          So it pretty much will be the same kind of testimony

2     that the Court heard in the guilt phase with respect to

3     non-decedents and their family members.

4          THE COURT:  So I take that as -- more or less a

5     concession that -- what you say you don't intend to offer is

6     not properly admissible.

7          MR. WEINREB:  Whether it's a concession as a legal

8     matter or not, it's a stipulation that we don't intend to do

9     it.

00:57 10          THE COURT:  Okay.

11          MR. BRUCK:  We hope it will be that simple.  We do

12     think with respect to the actual victim-impact testimony that

13     has been noticed, that is to say, the victim-impact testimony

14     concerning the decedents, that the only way for the Court to

15     ensure that that testimony is limited to what the Supreme Court

16     described in *Payne* as a brief glimpse of the life that the

17     defendant chose to extinguish, is to receive a detailed proffer

18     from the government in advance.

19          This is testimony that has the capacity to run away

00:57 20     with this trial, and it is very difficult to control once it

21     begins to unfold.  There is no testimony more emotional, more

22     likely to produce a verdict based on passion in a way that

23     would violate the Federal Death Penalty Act and the Eighth

24     Amendment, than this type of testimony.  And that is

25     particularly true, I don't have to tell the Court, in

1    connection with the Richard -- the Martin Richard counts.

2         The way of ensuring that this evidence stays cabined

3    within its constitutional limitations is to get a detailed

4    proffer, either a live proffer from the witnesses or a detailed

5    proffer from counsel, about what this testimony is going to

6    consist of so that the Court can decide in advance, rather than

7    when the jury is already listening, shocked and stunned and

8    weeping, to relatives -- the mother, the father -- of decedents

9    in this case, how to make sure that this case stays under the

00:59 10   Court's control and is not taken over by passion and emotion in

11   a way that the law does not allow.  So we do ask that the Court

12   do that.

13        With respect to the grave risk-of-death witnesses, I

14   take it from Mr. Weinreb's testimony that that means that it

15   will -- the testimony will be limited to the type of example he

16   gave and not simply more victims who were struck by shrapnel

17   and had grievous wounds but without regard to the question of

18   grave risk of death.  This, again, is the sort of testimony

19   that threatens to run away with the penalty phase and render

01:00 20   the jury emotionally ill-equipped to consider the far more

21   nuanced and -- well, I'll say nuanced evidence that the defense

22   presents in mitigation in this or any other case.  So we think

23   it best that the Court get a full proffer of all of that

24   emotionally fraught testimony.

25        Likewise, we've just been notified yesterday that

1   we've received some new discovery showing MRIs or X-rays of BBs

2   in various victims, non-decedent victims, and extremely

3   graphic -- these are not color.  These are X-rays, but it's a

4   little difficult to convey the -- how disturbing these images

5   are.  And I don't understand why we received them so late in

6   the game.  But as a general matter, I think we are dealing with

7   fire here and that the Court ought to review the government's

8   showing before the jury does.

9            Since we're only now getting things that we have never

01:01 10   seen before, it's a little difficult for us to do a

11   comprehensive motion in limine, and we certainly -- we have not

12   attempted to interview the victim-impact witnesses.  And

13   perhaps if it's necessary for us to request to do that, we

14   will, but we don't want to.  We simply want the Court to know

15   what's coming before it's on the stand.

16            MR. WEINREB:  Your Honor, all of the exhibits that

17   were just produced are exhibits that we just got from the

18   victims themselves, so there was no delay in producing them.

19   We produced them as soon as we had them.

01:02 20            With respect to the question about grave risk of

21   death, I don't believe it's appropriate for the government to

22   be limited to some kind of testimony where there's some kind of

23   medical opinion testimony that this falls into a medical grave

24   risk-, or a legal grave risk-of-death category that a doctor

25   wouldn't be qualified to give anyway.  I think it goes without

1    saying somebody who's a double amputee, somebody who has

2    shrapnel lodged in their body, somebody who was subject to

3    multiple surgeries going on into the future, all of those

4    things put people at a grave risk of death.  Anybody who goes

5    in for surgery, anybody who's put under the knife, anybody

6    who's put under anesthesia is told there is a risk of death

7    from those procedures.

8           And, again, I don't think there's any need whatsoever

9    for any kind of proffer from those witnesses about what they're

01:02 10    going to say because we can proffer to the Court that it will

11   be analogous to what the Court heard and allowed during the

12   guilt phase.  And it's even more appropriate here during the

13   penalty phase when guilt or innocence has already been decided

14   and the jury is more narrowly focused on these particular

15   aggravators where the evidence is, you know, really targeted.

16          And with respect to the decedents and their family

17   members, the testimony referring to that, I'm going to defer to

18   Mr. Mellin who has done this many times.

19          MR. MELLIN:  Your Honor, I think the Court can rely on

01:03 20    counsel to do their job.  I mean, the point that Mr. Bruck is

21   making is that we are not experienced, we don't know what we're

22   doing and this is just going to run amuck.  That's not going to

23   happen in this case.  It hasn't happened up to this point, and

24   it's not going to happen in the penalty phase.

25          We are experienced attorneys who understand the

1    issues.  We understand what victim impact is, what it is not.

2    We understand that grave risk-of-death witnesses should not be

3    talking about victim impact.  So all the concerns that

4    Mr. Bruck has raised, are certainly issues that we understand

5    we have an obligation to protect the record.  We will do that

6    in this case.

7            We will ask certain decedents, family members and also

8    friends, to talk about what the impact has been on their life

9    from the fact that either Officer Sean Collier is dead or to

01:04 10   ask Denise Richard or Bill Richard about the impact of Martin's

11   death on their family, things along those lines, which are

12   totally appropriate.

13           And contrary to what Mr. Bruck just said that *Payne*

14   stands for the position that victim impact is very limited, I

15   don't believe that's correct.  I think it will be limited in

16   this case, but is not incredibly limited.  These witnesses are

17   allowed to get up and talk about the impact on their lives.  We

18   will do our best and we will do our job to make sure we don't

19   run afoul of any precedent that is out there about what can and

01:04 20   cannot be said.

21           In addition, we don't want to leave an impression with

22   this jury that we are trying to elicit something that we should

23   not with your Honor.  So that will not happen.  There's no need

24   to have any type of voir dire outside the presence of the jury

25   as to what each of these witnesses have said up to this point.

1          The grave risk-of-death witnesses will be similar to

2     what Jessica Kensky or Rebekah Gregory or the other witnesses

3     testified previously about.  And as the Court knows from the

4     instructions the Court gave, there is a very clear description

5     of what serious bodily injury is in this case, and we will

6     stick to what that description is.

7          MR. BRUCK:  One matter briefly, if I could respond to,

8     with respect to the grave risk of death, the starting point

9     must always be the statute and the notice that has been

01:05 10   provided.  The statutory aggravating factor is intentional

11     engagement in acts of violence knowing that the acts created a

12     grave risk of death to a person.  And the notice proceeds that

13     "The defendant intentionally and specifically engaged in acts

14     of violence knowing that the acts created a grave risk of death

15     to a person or persons other than one of the participants in

16     the offense such that the participation in the acts constituted

17     a reckless disregard for human life and that" -- and then the

18     four decedents are named as the people who died as a result of

19     the act.

01:06 20        The focus of this aggravator is not on the wounds; it

21     is on the intention of the defendant.  So the fact that he

22     exploded a bomb which had this capacity and there were other

23     people around, and that he knew that other people were in the

24     area, is relevant.  It is not a way to sneak in through the

25     back door evidence of the nature of the injuries that for

1    non-decedents that have not been noticed either as a statutory

2    or non-statutory matter.  And I think that's really what the

3    government is attempting to do.

4         The testimony about Mr. Fucarile and the piece of

5    metal in his heart, this is the first time that I heard

6    that -- that we have been noticed that they intend to develop

7    this testimony.  And I may have spoken too quickly by saying

8    that that is -- if so limited, might come within this

9    aggravator because it really doesn't.

01:07 10        The aggravator concerns the mental state of the

11   defendant, not the -- all of the sequelae of the crime.  The

12   point is:  Did he know that this could have happened?  If so,

13   he is more culpable.  That's what they're limited to.  And if

14   it were possible to draft a non-statutory aggravating factor

15   that went further, they didn't do it, and so it's too late to

16   put it in now.

17        MR. MELLIN:  Your Honor, that's just completely

18   incorrect.  Mr. Bruck is reading one portion of that grave

19   risk-of-death factor which talks about the defendant knowingly

01:07 20   doing something, but then the government then has to go on and

21   show that there was a grave risk of death to others.  In fact,

22   we'll submit at some point our jury instructions which says,

23   "To establish the existence of this factor," meaning the grave

24   risk factor, "the government must prove that the defendant

25   knowingly created a grave risk of death to one or more persons

1    in addition to the victims of the offenses in committing the

2    offense.  'Persons in addition to the victims' include innocent

3    bystanders in the zone of danger created by the defendant's

4    acts," but it doesn't include other participants.  "'Grave risk

5    of death' means a significant and considerable possibility that

6    another person might be killed."

7           So, yes, we have to show that the defendant knowingly

8    did that.  We also have to show that there is this grave risk

9    of death to these other people.  That is what we intend to do.

01:08 10           THE COURT:  Okay.  Let me shift to another topic, and

11    that is the opening instructions to the jury.  *Leonard Sand* has

12    an extended version which I've reviewed very quickly, and I

13    just wanted to inquire of you -- more than very quickly --

14    wanted to see if you agreed with my impression that it was a

15    good instruction.

16           Does anybody have a problem if I follow that model?

17           MR. WEINREB:  The government agrees.  We'd only note

18    that this appears to have been written before the decision

19    requiring that the jury find that the defendant be over 18

01:09 20    years of age, so that would have to be added.  And there are

21    two spots where it's logical to add it in which we've marked

22    and we're happy to point out to the Court.

23           THE COURT:  Okay.

24           MR. BRUCK:  I think the Federal Death Penalty Act has

25    always required that the defendant be over the age of 18, even

before it was required constitutionally, so I don't know -- I
think Judge Sand probably left that out because it may not have
been necessary.

        But to answer the Court's question, we agree that
those instructions are appropriate.

        THE COURT:  Okay.  All right.

        MR. BRUCK:  Before we move off the motions -- I don't
want to prolong that too long and maybe this gets into
scheduling -- but we do have another pending motion, which is a
motion for mistrial.

        THE COURT:  Right.

        MR. BRUCK:  And in the alternative, for continuance.
Maybe that folds into --

        THE COURT:  Right.  So in terms of a motion hearing, I
was suggesting Monday.  I was thinking of the Dr. King motion,
the mistrial motion by the defense, and perhaps the
government's omnibus motion in limine.  I think those are the
issues that probably most urgently need resolution.  We could
have a hearing on Monday morning for those matters.

        So let's talk about scheduling.  I know it's part of
the mistrial motion but without -- whatever we say, we can
revisit, I guess.  But as I said yesterday to the jury, I was
focusing on next week.  My -- I don't want to rush things.  I
want things to be done right.  On the other hand, there's a
risk in leaving an active jury idle, and those things play

1    against each other which is why I focused on next week, but

2    not -- I think Monday is out of the question.  Sometime later

3    in the week, perhaps.

4            So I guess subject to revision if I agree with the

5    defense after the motion hearing.

6            MR. WEINREB:  So, your Honor, in light of that, the

7    concerns the Court has just articulated, as well as our

8    prediction about when some of these parole issues may be

9    resolved and so forth, we propose resuming the trial on

01:12 10   Thursday of next week with the expectation that the jury would

11   also sit Friday, having had Monday off.

12           THE COURT:  Yes, that was always the expectation.

13           MR. WEINREB:  Right.  So we think that makes the most

14   sense, gives, you know, a sufficient cushion, I think, to get a

15   number of these issues resolved, but doesn't leave the jury

16   idle longer than necessary.

17           THE COURT:  Well, it may be unfair to ask you to

18   respond since you want it even longer than that.

19           MR. BRUCK:  We need a break.  Yes.  We could -- it's

01:12 20   conceivable that the issues concerning the government's case

21   could be resolved soon enough to be able to resume

22   Monday -- Thursday, and perhaps the government would even

23   finish its case, based on Mr. Weinreb's representation, but

24   it -- we don't -- we are not going to be ready to proceed the

25   following Monday.  I guess it would be -- it would be Marathon

1    Monday, the following Tuesday.

2            And we also think it -- you know, worth reflecting on

3    the fact that this is the anniversary of the bombing, the

4    marathon.  The jury is not sequestered.  They're going to be

5    home, whether they're in court or whether they're in work.  And

6    we think -- you know, with all of the unresolved issues, with

7    the international travel, with our Bureau of Prisons, with so

8    many legal issues as yet unresolved having to do with the

9    government's attempt to limit, or wish to limit our case, if

01:13 10   the government finished and we were given a week to catch our

11   breath and get organized and get our witnesses here from

12   overseas, get this Bureau of Prisons issue resolved, if we can,

13   or else apply for relief to the Court, that seems like the

14   minimum that we're going to need.

15           I'd also point out -- and Ms. Conrad has reminded me,

16   Wednesday is the 15th, the anniversary -- second anniversary of

17   the marathon bombing, is the first ever One Boston Day, which I

18   gather will be a continuing civic event in this community.  The

19   coverage of that will be running on Thursday.  And the jury has

01:14 20   not had really specific notice that they would be sitting on

21   Thursday except -- on Fridays unless -- I think the Court said

22   if Monday is a holiday, which this Monday was not.  So jurors

23   may have already made plans.

24           THE COURT:  I don't think so.  I mean, I think we

25   talked about it back in January with them, that there were two

1    Monday holiday weeks, and they were in February and April.  You

2    know, it's not a federal holiday but --

3         MS. CONRAD:  That's the following Friday, your Honor.

4    That's the problem.  Next Friday --

5         THE COURT:  Oh, I see.

6         MS. CONRAD:  Monday is the 13th.  It's --

7         THE COURT:  You're right.  I'm sorry.

8         MS. CONRAD:  That's what I was talking about.

9         THE COURT:  I got the weeks mixed.  But -- well, okay.

01:15 10   Right.  I see what you're saying.  Okay.

11        MR. BRUCK:  So without notice to the jury, all of

12   which makes us think to get through this time and have the

13   government start their case after Marathon Monday and let us

14   start on April 27th.  We are ahead of schedule in this case in

15   terms of the length of time that you told the jury it was going

16   to take and the length of time it has taken.

17        If the jury is not protecting themselves from

18   publicity, we're in a fix no matter how you slice it, and

19   whether there's a week off or not.  The Court is trusting them,

01:15 20   the system is trusting them.  We've seen cases in which -- I

21   know of one not too long ago where the judge took a six-week

22   break between the guilt phase and the -- also in a case

23   involving international issues.

24        So there's plenty of precedent for much longer breaks

25   than what we're asking for.  And we think that if we are

1    required to go straight through, we're going to be coming to

2    you with every sort of problem to be resolved that may not have

3    arisen had we just had time to catch our breath.

4         MS. CONRAD:  May I just add one thing?  Sorry.

5    Ms. Clarke is rolling her eyes at me.

6         If we were to start on Thursday, it's not just the

7    government starting its evidence on Thursday, the day after One

8    Boston Day, its opening statements for the penalty phase which

9    are going to be highly emotional in an already charged

01:16 10   atmosphere, it seems to me to sit for one day, just that one

11   day that week, seems a little unnecessary.

12        THE COURT:  Okay.

13        MR. WEINREB:  So we would agree that it wouldn't

14   be -- it doesn't make a lot of sense to sit for just one day.

15   My personal sense of the jury is that they're very committed to

16   this case and that if they were told they had to sit on Friday,

17   it wouldn't be a problem for them.  The Court is probably in a

18   better position to know.

19        We're very much not in favor of a schedule that would

01:17 20   involve the government putting on its case and then breaking

21   for a week before the defense puts on its case.  What we would

22   say, though, is that we're fairly confident that if we begin on

23   Thursday, especially given that there will be opening

24   statements and some preliminary instructions from the Court,

25   that the government's case will not conclude until the

1    following Tuesday, since Monday's a holiday.  We wouldn't

2    object --

3              THE COURT:  That's assuming Friday as well.

4              MR. WEINREB:  That's assuming -- right.  Thursday,

5    Friday, we would likely -- we're just estimating we would

6    conclude sometime Tuesday morning.  We wouldn't object to then

7    starting again on Wednesday for -- with the defense.  That

8    would be essentially two weeks from the conclusion of the guilt

9    phase for the defense to get started with its case.

01:18 10         We will expeditiously brief everything that we have

11   raised today that needs to be raised so that there's at least,

12   you know, a reasonable opportunity -- a week's time, let's say,

13   for the defense to respond in writing to any of the

14   government's motions in limine that haven't yet been submitted.

15   There will be time for the Court to decide them, for the

16   parties to adjust with respect to their opening statements and

17   their lineups.

18             But that is assuming that we get adequate notice from

19   the defense as to what their witnesses are going to say and

01:18 20  what their exhibits are going to be.  We can't guarantee a

21   week's notice if we don't get those things for a week, let's

22   say.  But again, you know, as we have, I think, shown in the

23   past, we can brief things quickly if we need to, and we will do

24   so, but we think that the potential harm to the case of having

25   the jury simply be out there for a lengthy period of time

outweighs some of the other concerns that we've heard in that
the schedule can always be adjusted in small ways if needed to
accommodate concerns that arise.  We could end early on a
particular day, we could take a day off.  All of that is
better, we think, than having a very protracted period between
now and the start of the penalty phase.

THE COURT:  Okay.

MR. BRUCK:  The last thing I just want to point out,
underscore something Mr. Weinreb said, which is that this is
our -- this is where we carry the evidentiary burden.  The
government has very little left to go.  I don't doubt that they
have plenty of time to be filing -- writing and filing motions
and responding to legal issues.  We will do our best, but we
are stretched very thin, and it's -- we would not be asking for
this very short break if we didn't need it.

THE COURT:  Okay.  I'll mull it over and try to sketch
out some scheduling ideas.

So for Monday, a motion hearing at ten.  And I suggest
those three motions.  If later you think that should be added
to, later today, notify us if you think there's something else
that should be put on that.

MR. WEINREB:  The Waltham triple homicide and other
bad acts motion has been briefed and is pending.

MR. BRUCK:  We have not briefed it so we need to
respond to that.  And we'll do that as quickly as we can.

 1          THE COURT:  Can you do that so we could put it on the

 2   agenda for Monday?

 3          MR. BRUCK:  Yes.

 4          THE COURT:  It is sort of an important motion in terms

 5   of everybody's planning, I guess.  So either way that it comes

 6   out, it may alter preparations.

 7          MR. BRUCK:  Yes.  I guess we'll get something in over

 8   the weekend to...

 9          (Counsel confer off the record.)

01:21 10          MR. BRUCK:  Saturday?

11          THE COURT:  Fine.  Fine.

12          MR. BRUCK:  And the last thing I -- before I sit

13   down -- should have emphasized is in addition to all the

14   practical problems we face in having our case ready to go in a

15   consistent flow, we really are facing something that we have

16   worried about since discussion of continuance back last fall

17   and it has come to pass, and that is this confluence of the

18   anniversary and Marathon Monday right at the emotional climax

19   of this case.  To the extent that we can let that go and then,

01:22 20   you know, once the whole community exhales and ordinary life

21   resumes, that's the time to try this case, and not in the

22   middle of all of that.

23          MR. WEINREB:  Your Honor, I'd only say that that

24   argument is premised on the assumption that the jury is being

25   affected by what's happening in the news and what's happening

1    in the community.  We've seen absolutely no evidence of that.

2    The jurors have consistently assured the Court that they are

3    studiously avoiding any kind of discussion about the case,

4    contact related to the case or information about the case.  And

5    there's no reason to doubt their honesty or their sincerity.

6         And as the Court has noted on more than one occasion,

7    the jury has been so immersed in the facts of this case that

8    one can trust based not only on their assurances but just on,

9    you know, knowledge of human nature that that has very likely

01:23 10    displaced in importance any epiphenomenal kind of information

11    that may come their way.  And in some respects, having them in

12    the courtroom focused on the evidence that's being put in front

13    of them instead of sitting idly at home, potentially, is a

14    better way of assuring that they remain focused on what's

15    happening in the courtroom and not what's happening outside of

16    it.

17         MR. BRUCK:  Very briefly.  To be clear, we are not so

18    concerned that the jury will receive new information about the

19    case.  What is happening in the community, the marathon, the

01:23 20    Boston One Day, the anniversary, these are not things that the

21    Court has instructed the jury, or could very well instruct the

22    jury to avoid.  You have told them to avoid information about

23    the case.  We are concerned about the overarching community

24    experience.  And, you know, that's a very different matter.

25    That is not something that the jury has been or indeed really

1    could be instructed.

2         It's almost like saying, "For the next three months

3    don't be a citizen of this community because it might affect

4    the trial."  There's no such instruction.  You haven't done it,

5    you couldn't.  This is just not the time to be trying this

6    case.

7              THE COURT:  Okay.  All right.  Thank you very much.

8              THE CLERK:  All rise for the Court.

9              (The Court exits the courtroom at 11:01 a.m.)

01:24  10              THE CLERK:  Court will be in recess.

11              (The proceedings adjourned at 11:01 a.m.)

1              C E R T I F I C A T E

2

3         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12   Date:  11/5/15

13

14

15

16

17

18

19

20

21

22

23

24

25