UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action |
| v. | ) | No. 13-10200-GAO |
| | ) | |
| DZHOKHAR A. TSARNAEV, also | ) | |
| known as Jahar Tsarni, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>MOTION HEARING</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, December 1, 2015
10:02 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         On Behalf of the Government

 6         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
 7             Federal Public Defenders
           51 Sleeper Street
 8         Fifth Floor
           Boston, Massachusetts  02210
 9         - and -
           CLARKE & RICE, APC
10         By: Judy Clarke, Esq.
           1010 Second Avenue
11         Suite 1800
           San Diego, California  92101
12         On Behalf of the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1
2      THE CLERK:  All rise.

3      (The Court enters the courtroom at 10:02 a.m.)

4      THE CLERK:  The United States District Court for the

5  District of Massachusetts.  Court is in session.  Be seated.

6          For a motion hearing in the case of *United States*

7  *versus Dzhokhar Tsarnaev*, 13-10200.  Would counsel identify

8  yourselves for the record.

9      MR. WEINREB:  Good morning, your Honor.  William

00:16 10  Weinreb for the United States.

11      MR. CHAKRAVARTY:  As well as Aloke Chakravarty, your

12  Honor.

13      MS. PELLEGRINI:  Good morning, your Honor.  Nadine

14  Pellegrini for the United States.

15      THE COURT:  Good morning.

16      MS. CLARKE:  Judy Clarke, Miriam Conrad, Bill Fick and

17  Tim Watkins for Mr. Tsarnaev.

18      THE COURT:  Good morning.  We have a number of

19  motions -- or agenda items.  I would like to start with the

00:16 20  motion for judgment of acquittal and/or a new trial.

21          As I indicated in the order setting the hearing, I'm

22  interested only in argument about the so-called *Johnson* issues.

23  There are two *Johnson* cases.  And I think an orderly way to do

24  it would be to hear from you as the issues arise under the

25  statute; that is, first, with respect to the force clause and

1    perhaps the first *Johnson* case -- and I'll hear from both of

2    you -- and then we'll move to the so-called residual clause and

3    the second *Johnson* case, all right?

4             Mr. Fick.

5             MR. FICK:  Thank you, your Honor.

6             So as the Court knows, 15 of the 30 counts of

7    conviction and three of the six counts resulting in a death

8    sentence for violation of Section 924(c) which penalizes the

9    use of a firearm during and in relation to an underlying or

00:17 10   predicate crime of violence -- and so before I really start

11   launching into the two pieces of the definition, the force

12   clause, so-called, and the residual clause, I just -- it's

13   important, I think, to keep in mind that the issue here -- the

14   legal question is not whether the particular conduct involved

15   in the underlying or predicate offense in this case was violent

16   in the common sense of the word, rather, the question is

17   whether the underlying or predicate statutes of conviction

18   categorically qualify as crimes of violence; that is, the

19   question is whether all of the conduct criminalized by the

00:18 20   underlying or predicate statutes necessarily entail the use of

21   violent force.  And so that is the sort of focus, ultimately,

22   of the inquiry.

23             So as the Court invited to start with the force

24   clause, that clause of the armed career criminal -- I'm

25   sorry -- of 924(c) says that a crime of violence means an

1    offense that is a felony and has as an element the use,

2    attempted use or threatened use of physical force against the

3    person or property of another.  And so the question is whether

4    categorically the underlying or predicate statutes of

5    conviction meet that definition in terms of the force clause.

6            So running through each of them in turn, the first

7    addressed in the papers is the convictions under Section 2332a,

8    use of a weapon of mass destruction.  And there, as with all of

9    these statutes really, it's -- as we know in federal practice,

00:19 10   Congress has a tendency to write statutes rather broadly.  They

11   cover a wide variety of criminal conduct.  They can be deployed

12   creatively by prosecutors to cover a wide variety of criminal

13   conduct.

14           And with regard to the use of a weapon of mass

15   destruction statute, the important piece of information, so to

16   speak, to have in mind here is that in addition to activities

17   that qualify as the use of violent physical force, various

18   kinds of conduct that do not entail the use of violent physical

19   force are also actionable under that statute; for example, the

00:19 20   mere deployment of substances or objects that can cause injury

21   in a passive way.

22           And so there's actually a fairly well-developed body

23   of case law even before *Johnson* under the force clause across

24   the circuits.  And I think it's very clear from these circuit

25   decisions that this kind of activity -- those kinds of -- that

1    kind of offense conduct, the mere passive deployment of a

2    substance or an object, would not qualify as the use of violent

3    physical force as required under both of the *Johnson* cases as

4    they operate together.

5            The Fourth Circuit case is called *Torres-Miguel*, the

6    second is -- the Second Circuit case is *Chrzanoski*, and the

7    Tenth Circuit is *Perez-Vargas*.  They're sort of describing --

8    quoted extensively in the papers, and all of them sort of

9    contain very express language to say that various kinds of

00:20 10   conduct that the courts posit as being covered by the statues

11   at issue there, including release of noxious substances,

12   putting down some kind of a barrier that might interfere with

13   the motion of a car, all of those kinds of activities are not

14   violent force, they are actionable under the statutes at issue

15   in those cases, and, therefore, those statutes are not

16   categorically crimes of violence.  Similarly, here the 2332a

17   weapons of mass destruction statute criminalizes expressly

18   things like the passive release of chemicals; therefore, not

19   all of the conduct the statute prohibits or penalizes is a

00:21 20   crime of violence, categorically, therefore, the statute is not

21   a crime of violence and it cannot meet the force clause.

22           THE COURT:  What do you mean by "the passive release"?

23           MR. FICK:  Well, an action -- a physical action that

24   does not actually entail the use of -- or the imposition of

25   violent physical force.  If you open a container that contains

1   a noxious chemical, that would or could violate the statute.

2   That could or would cause serious bodily injury or death.  But

3   that is not violence in the way that both of the *Johnson* cases

4   together have described it and the way that the other circuits

5   in the cases that we cited have interpreted it.

6          What the government does in their opposition here is

7   to really sort of -- to sort of elide or sort of play a little

8   sort of switching of where the violence comes into play.  I

9   think if I can find the language they use, the government

00:22 10   says -- "Use of physical force," the government says, "can

11   include use of matter or energy sufficient to cause pain or

12   injury even if there is no physical violence in deployment of

13   the matter or energy."  And they sort of make up that statement

14   out of whole cloth.

15          That is inconsistent with the *Johnson I* opinion which

16   talks about the actual use of violent physical force, force

17   that can cause injury, and it conflates the principle of the

18   ability to cause injury with the use of violent force.  In

19   other words, it's certainly correct that the ability to cause

00:22 20   injury is a necessary component of violent physical force under

21   *Johnson* and the language of the statute, but it is not alone

22   sufficient because many courts in the multiple sort of litany

23   of cases cited have held that various offenses which have the

24   causation, or the possible causation of physical injury as an

25   element, do not entail the use of violent force, do not meet

the force clause; and, therefore, cannot be predicate offenses

for the Armed Career Criminal Act, 924(c), the pertinent

guideline provision, et cetera.  So that's the core of the

argument with regard to 2332a, the use of weapon of mass

destruction.

The second predicate offense at issue in this case is

Section 2332f, the bombing of a public place.

I'm sorry.  If the Court had questions about the

first --

THE COURT:  No, no, go ahead.  Thank you.

MR. FICK:  There -- again, there are sort of two

reasons or two categories of activity that the statute would

criminalize or penalize that are not force clause -- they don't

meet the force clause under the *Johnson* cases and the language

of the statute.  The first such possible way of violating those

statutes are the mere delivery or placement of some kind of

explosive device.  No violent physical force is employed.

There's not necessarily, to be convicted under the statute, any

requirement that there be an intention to employ the violent

physical force; you merely would have to intentionally place or

deliver the device.  That would violate the statute.  No

violent force is involved; therefore, it cannot categorically

be a crime of violence.

Similarly, a similar argument with regard to the

Subsection A applies here as well because the bombing of a

1    public place also includes the use of a lethal device

2    containing chemicals.  So the same argument about the passive

3    deployment of chemicals or noxious substances would similarly

4    also apply here.  To the extent that kind of conduct is covered

5    under the statute, again, doesn't entail violent force,

6    therefore, the statute covers conduct that is not violent

7    force, it is not categorically a crime of violence.

8         The third predicate at issue is 844(i), the malicious

9    destruction of property statute.  And there are, I guess simply

00:25 10    put, two reasons there why the statute does not categorically

11    qualify as a crime of violence.  The first is, again, the

12    passive deployment of, for example, fire is covered under that

13    statute.  One can light a fire -- has the potential or the

14    actual -- it may actually cause harm or death, it has the

15    potential to do so, but the employment of fire, the deployment

16    of fire, is not in itself the employment of violent force.

17         The second reason why that statute cannot qualify as a

18    predicate is that -- the mens rea element, the mental state

19    element of malicious destruction of property includes not only

00:25 20    intentional acts but also reckless acts.  And so there's,

21    again, a relatively large and well-settled body of case law

22    under the force clauses of the various violent felony

23    crime-of-violence definitions that says statutes that can be

24    violated by reckless means are not categorically crimes of

25    violence.  And so again, for that second reason, 844(i) does

 1    not qualify.

 2           The next category of predicate offenses at issue in

 3    the case are the various conspiracy offenses to commit the

 4    three underlying crimes I just talked about.  For the very

 5    reasons that the underlying crimes are not categorically crimes

 6    of violence, conspiracies to commit those crimes are not

 7    categorically crimes of violence.

 8           In its papers, the government sort of falls back on

 9    the use of the possibility of injury in its argument, and that

00:26  10    sort of devolves back into really the residual clause.  So to

11    the extent that's an issue, that really, I think, weights -- I

12    think better falls under the residual clause argument.  But the

13    bottom line is if the objects of the conspiracy are not crimes

14    of violence, the conspiracies themselves cannot be.

15           THE COURT:  And vice versa?

16           MR. FICK:  And vice versa, right.

17           The fourth predicate at issue here is the carjacking

18    statute.  There the issue is that -- that statute can be

19    violated by mere intimidation, and intimidation can be

00:27  20    performed -- or can be deployed without either a threat of

21    violence or the actual use or threat of violence.

22           The examples in some of the cases that don't deal with

23    the federal carjacking statute but deal with, rather, various

24    analogous state cases talk about, for example, things such as,

25    you know, threatening to interfere with the transit of a

1  vehicle; again, potentially the use of poisons or toxic

2  substances.  One could threaten to use all of those things as a

3  means of intimidating the driver of a vehicle, but those

4  things, those activities, are not -- do not involve the use of

5  violent physical force; therefore, categorically the statute

6  can be violated in non-violent ways and it cannot be

7  categorically deemed a crime of violence.

8         The final predicate at issue in this case are the

9  so-called Hobbs Act robbery --  I think it was -- well, yeah,

00:28 10  the Hobbs Act robbery count.  I think there's just one count,

11  Count Twenty-Two.  And that fails the categorical force clause

12  test for some of the same reasons that I talked about in terms

13  of the other statutes:  Number one, it can be violated by

14  employment of intimidation.  And for the same reasons discussed

15  with regard to the other statutes, that can be done without the

16  threat or use of violence.

17         In addition, the Hobbs Act can be violated by threats

18  to harm and intangible asset.  For example, there are cases

19  under the Hobbs Act where various kinds of fraud or

00:28 20  economic-type activities that might affect the value of a

21  security or a company, those types of activities have been

22  deemed ways in which the Hobbs Act can be violated.  There's

23  obviously no violence involved in those things.  And so for

24  that reason there's -- again, it's a category of activity or a

25  class of activity made criminal under the statute that is not

1    categorically violent.

2          Under the Hobbs Act, the government does cite, I

3    think, one -- or maybe a handful of First Circuit cases from

4    prior years indicating that the Hobbs Act is a categorical

5    crime of violence.  Those cases either predate the whole

6    *Leocal/Johnson* line of Supreme Court decisions that sort of

7    change the landscape here, or in the case of, I think, one of

8    them -- if I can recall the name -- I believe it's

9    *Morales-Machuca*, a 2008 case -- that's a case where the First

00:29 10   Circuit just sort of said, Well, a Hobbs Act robbery is a

11   924(c) predicate, citing an old case.  You go back to the old

12   case, and the old case simply said, Well, in this case we had a

13   924(c) predicate alleged to be a Hobbs Act robbery.  It was

14   never challenged.  So, again, this is just a reflection of the

15   fact that prior to this (c) change in the law brought by the

16   Supreme Court with *Leocal*, *Johnson I*, *Johnson II*, everyone sort

17   of assumed, whether under the force clause or under the

18   residual clause, that a Hobbs Act robbery is categorically a

19   crime of violence.

00:30 20         Now that the Supreme Court, though, has clarified the

21   kind of analysis that has to be conducted and the way in which

22   that analysis is conducted and what "violent physical force"

23   means, you know, those cases really have no further weight to

24   the extent there was any analysis in them in the first place,

25   which there wasn't.

```
 1            So I think that covers all of the actual predicates
 2   that are at issue here.  The sort of bottom line is that given
 3   the number and weight of the 924(c) convictions in the case and
 4   the jury's consideration of aggravating and mitigating factors,
 5   the loss of those convictions would mean that a new penalty
 6   trial should be held as to all counts.
 7            THE COURT:  Why does that follow?
 8            MR. FICK:  Well, half of all of the counts of
 9   convictions --
10            THE COURT:  It's simply a sentencing enhancement for
11   the term of years.
12            MR. FICK:  Well, three of the six death penalty or
13   death verdicts in this cases came on 924(c) counts.  Fifteen of
14   the 30 guilty verdicts in the case as a whole came on 924(c)
15   counts.  So that's a weighty sort of -- a weighty piece of the
16   sort of aggregate of crimes of which the defendant was
17   committed, both in terms of non-death sentences and in terms of
18   death sentences.  And at this point in time it's really
19   impossible to unpack what weight that might have had in the
20   jury's deliberations and their weighing of aggravating and
21   mitigating factors.
22            And to the extent half of the convictions in the case,
23   half of the death sentences in the case are called into
24   question, are really invalidated by Johnson, it really requires
25   a redo of the entire sentencing proceeding because, again, we
```

don't know how the number and nature of the convictions came

together in the jury's analysis of aggravating and mitigating

factors.  There's sort of -- there's no case law directly on

point, obviously, because there's no sort of analogous

circumstance that I'm aware of in the cases, but there are some

sort of related cases that sort of use related principles or

rely on related principles cited in the papers to suggest that

where, you know, some counts of conviction are gone, you need

to look again at the whole package.

00:32    THE COURT:  Let me ask you a question about something

that I haven't seen in the cases and see if you have a view on

it.  The ACCA, the career offender guideline, some of the

immigration statutes that refer to prior convictions, all are

directed to prior convictions that are truly prior; that is to

say, historical.  And the categorical approach was, at least in

part, developed as a matter of convenience and reliability, and

perhaps even *Apprendi* or *Alleyne* type issues.

Structurally, a 924(c) enhancement comes virtually

simultaneously with the conviction by the same jury of the

00:33    predicate offense.  It's a different circumstance in a case

such as this, for example.  We don't have to worry whether the

intimidation under the carjacking statute was by threatening to

post embarrassing pictures on the Internet or by holding a gun

to somebody's head because we know what the evidence was and we

know which crime the jury was thinking of.

1          Isn't that a different circumstance from 924(c) from

2     all the other cases?

3          MR. FICK:  It's a different circumstance, but I would

4     suggest legally it's a distinction without a difference.  I

5     think -- in a way what the Court is describing is a basis on

6     which one might argue that.  Looking at this in the posture

7     we're in now, you might use a kind of as-applied analysis as

8     opposed to a categorical or a facial analysis of the

9     constitutionality of the statutes and the way all of that

00:33 10   works.

11          In *Johnson II*, in the second *Johnson* decision, Justice

12    Alito sort of suggests in his dissent that that's what the

13    court should have done.  He sort of chides them for not doing

14    it.  I mean, again, it was an ACCA case, not a 924(c).  But the

15    court basically says, No, that isn't the question.  The

16    question is:  Was the statute as passed by Congress

17    constitutional?  Is it being properly employed or deployed

18    here, and if it's not, you know, we can't let it stand, right?

19          And that is, I think -- even though there is sort of a

00:34 20   distinction in terms of the posture and what the jury found,

21    what this all sort of devolves back to is what laws that

22    Congress passed.  And Congress passed laws, as the Supreme

23    Court has -- as the case law has sort of evolved out of those

24    laws or interpreting those laws over the years, the analysis is

25    categorical in nature.

And so the question is:  Is a particular underlying crime properly a predicate for a 924(c) -- not an enhancement, really.  I mean, you can call it an enhancement, but it really is a separate crime.  You know, there's a separate count in the indictment for the 924(c) counts, it is a separate crime.  And so we're talking about the crimes as defined by Congress.  And whatever the particular facts in a situation might have been in a case, I mean, that's not the way the law is written.  That's not the way Congress passed the law, that's not the way the counts have interpreted the law.

And I think for the Court to sort of engraft that onto this legal structure, sort of as we have it now, there's really no basis to do that.  It would be sort of a functional way, I guess, to try and save the result, but I think it would be unprincipled in the way the courts have consistently interpreted and applied these statutes in the evolving sort of train of cases that we've had.

THE COURT:  Okay.  We'll hear from the government on this and then we'll come back to the second clause.

MR. WEINREB:  Your Honor, on the first question of whether the statutes in question are, in fact, crimes of violence by force clause under the categorical approach, our argument, simply stated -- we stated it in the brief, and I won't belabor it -- *Johnson I* considered what "violent physical force" means in the context of the ACCA, which is,

1    for purposes -- when it comes to the force clause is

2    essentially identical, you know, considering whether a

3    touching -- an offensive touching could amount to a crime of

4    violence.  And the court said, "Physical in this context

5    'plainly refers to force exerted by and through concrete bodies

6    distinguishing physical force from, for example, intellectual

7    force or emotional force.  And physical force means violent

8    force; that is, force capable of causing physical pain or

9    injury to another person."  That's the definition of "physical

00:36 10    force."

11        And a common sense reading of all of these statutes

12    shows that they do require categorically the use of physical

13    force.  These are not statutes -- use of a weapon of mass

14    destruction against person or property, bombing a place of

15    public use and so on, these are not statutes that can be

16    committed through the use of intellectual force or emotional

17    force; they are statutes that prohibit the use of matter or

18    energy capable of causing physical injury or death to other

19    people.

00:37 20        The interpretation of the statute -- or really, the

21    reading, I should say, of *Johnson I* that the defense proposes,

22    makes no sense.  It would lead to absurd results and can't

23    possibly be what Congress intended.  It's hard to believe that

24    Congress meant a crime -- meant it to be a crime of violence if

25    you hurled a canister of poison gas at somebody and hit them in

1      the head with it before it poisons them, than if you just leave

2      it on the ground, leave open the top and walk away.

3            Under their view, booby-trapping a house by setting it

4      so that as you open the door a gun shoots in your face would

5      not be a crime of violence because all you did was place a gun

6      somewhere and tie a string to it to a doorknob; you didn't

7      actually hurl something.  It makes no sense and there's no

8      cases that would suggest that you -- or there's certainly no

9      Supreme Court cases that would suggest that the use of violent

00:38 10     force does not include any application of force or energy that

11     causes -- or at least is capable of causing serious bodily

12     injury or death.

13            I'll address just one of the -- the only statute where

14     I think there's potentially any question about it would be the

15     Hobbs Act statute which talks about intimidation.  First of

16     all, I should say both the Hobbs Act and carjacking, there are

17     numerous cases that have held that those are categorically

18     crimes of violence under the force clause, but to the extent

19     that those statutes permit a conviction based upon

00:39 20     intimidation, they are talking about intimidation through the

21     threat of physical force.  It's not carjacking to take

22     somebody's car by dint of your superior intellect or by dint of

23     your charming personality or by any other way of intimidating

24     somebody other than threat of physical force.  I don't think

25     you'll find a case that would contradict that proposition.

1          We disagree that even if these cases don't satisfy the

2     force clause or the residual clause and the residual clause is

3     out and, therefore, the 924(c) statutes -- convictions would

4     have to be vacated then a new penalty phase is needed.

5     Particularly in this case, all of the counts on which the jury

6     found that the defendant deserved the death penalty arose from

7     the same underlying conduct.  They may have violated a number

8     of different statutes, but it is the same underlying conduct.

9          There is absolutely no reason to believe that if the

00:40 10     924(c) counts had not even been in the indictment in the first

11     place, the result would have been any different.  And that's

12     particularly true in this case because the addition of the

13     924(c) counts did not open the door to any additional evidence

14     that would have not otherwise been admissible, and the defense

15     has not even claimed that that's the case.  They simply talk

16     about some ineffable effect of having additional counts.

17          But the fact that the jury carefully distinguished/

18     parsed among the different death penalty counts, finding that

19     the defendant deserved the death penalty on some rather than

00:41 20     others, militates against the argument that the sheer number of

21     counts somehow overwhelmed them.  And given in particular that

22     the conduct underlying the 924(c) counts under which the death

23     penalty was imposed essentially duplicated the conduct in the

24     other counts in which the death penalty was imposed, and that

25     the same is true for the non-death penalty 924(c) counts, in

1    each case the -- they were based on underlying crimes of

2    violence that were also charged in the indictment of which the

3    defendant was found guilty, there's no weight to that argument.

4         And then the third issue that the Court raised I think

5    is one that I gave some thought to as well.  I begin by stating

6    that to the extent that there's any question as to whether

7    these statutes violate the force -- satisfy the force clause or

8    not despite the presence within the statutory text of multiple

9    means of committing them, that can be -- any doubt on that

00:42 10   score can be resolved by recourse of *Shepard*-approved documents

11   like the indictment, the jury instructions and the verdict

12   form.  There's no need to find -- that, of course, does require

13   finding that the statutes are divisible, but it is not

14   necessary to find that the particular means of committing the

15   offense are elements in the *Apprendi* sense, meaning that they

16   actually creates separate crimes.

17        There's nothing in the courts' decision in *Descamps* or

18   any of the other cases that address divisibility to suggest

19   that for a means of committing a crime to be -- to meet the

00:43 20   elements test, that it must be an element in the sense that if

21   the -- an element in the sense that the jury must be unanimous

22   that the case was -- that the crime was committed in that

23   manner in a situation where multiple possible manners of

24   committing it were charged.  Let my try to phrase that more

25   clearly.

             1              In a situation with which -- it is necessary for a

             2      crime to meet the elements test, it is necessary to find that

             3      the *Shepard*-approved documents make it clear that the means in

             4      which the crime was committed was by violent means and that the

             5      jury unanimously concluded it was by violent means, but if the

             6      charging documents and the jury instructions and the verdict

             7      form all specify a particular means of committing the crime,

             8      then it is clear that they were unanimous that it was committed

             9      in that particular way.  And the fact that had the crime been

    00:44  10      charged differently, had multiple means been specified in the

            11      indictment, some of which were violent and some of which were

            12      not, and the fact that under those circumstances it would not

            13      satisfy the elements test because under those circumstances you

            14      could not be certain which manner the crime was committed in,

            15      is irrelevant.  In other words, it doesn't matter whether -- as

            16      long as only one means is charged and that's a violent means,

            17      it doesn't matter whether you label it an element or a means.

            18      And *Descamps* actually makes that clear.  Although they use the

            19      word "element," they don't use it in the same way that they've

    00:45  20      used it in other cases.

            21              As for whether you need to limit yourself to

            22      Shepard-approved documents in a situation where the conviction

            23      occurs in the very case that is being -- that you wish -- the

            24      convictions being challenged, I think that there is, I think, a

            25      lot of good sense behind the conclusion that there is no need

1    to limit oneself to *Shepard*-approved documents.  And if you

2    look at the cases that originated that, one of the reasons for

3    limiting it was the concern that there would be -- it was just

4    impractical to have to mine through all the different records

5    of different state courts in trying to look for -- trying to

6    divine exactly what it was that the jury necessarily had to

7    find in order to have convicted the person of the violent way

8    of committing the crime.

9            And it is true, as Mr. Fick says, that in -- is

00:46 10   it -- it was in *Descamps*, that Justice Alito did propose that

11   if you could determine that it was -- that the jury necessarily

12   convicted -- or the pleading document shows that the defendant

13   necessarily admitted that he committed the crime in a violent

14   way, that would be sufficient, and the majority did not adopt

15   that view.  So there is reason to question whether the Supreme

16   Court would allow recourse to him even in the case in which the

17   crime was being tried itself.  But it's not foreclosed by any

18   case that I'm aware of.  I agree.  I've never seen it.  So I

19   think that is an alternative ground, but we would not offer it

00:47 20   as our only ground.

21           THE COURT:  Okay.

22           MR. FICK:  If I could just briefly address the

23   *Descamps* issue which was not part of my initial presentation.

24           So I think the discussion about *Shepard*-approved

25   documents and the whole *Descamps* case analysis is a bit of a

red herring here.  What *Descamps* basically said was a statute

can be either divisible or indivisible.  If a statute is

divisible, it has different elements.  And if you have a

divisible statute where one elemental version of it is violent

and one elemental version of it is non-violent, then you can do

a modified categorical approach, you can get your *Shepard*

documents to figure out what version of the offense the

defendant committed.

     But a divisible statute with different elements is not

what we have going on here.  The court in *Descamps* and in the

progeny of *Descamps* has clearly distinguished statues where

there are multiple versions of different elements from statutes

that are unitary but have multiple ways to commit it.  And so

the government has not argued in its papers, and I don't think

I heard them saying here, that any of the particular predicate

statutes in this case are divisible.

     And, in fact, if you go through all the defense

arguments about why they are not categorically crimes of

violence, they all sort of boil down to essentially the

different ways that the statutes can be committed, the breadth

of the statute, and the fact that many of the ways of possible

commission of the statutes [*sic*] are not inherently violent.

     And so this is not a situation where you would ever be

resorting to *Shepard*-approved documents.  The government has

not argued these statutes are divisible.  And under *Descamps*

1    and its progeny, they're not.  So that whole sort of line of

2    analysis, I would suggest, is really just a red herring.

3         With regard to the issue of additional -- or of the

4    sort of number of counts and what happens if the 924(c) counts

5    all go away, the government here seems to be arguing sort of

6    directly contrary to the way that it argued in its earlier

7    motion to dismiss that the defense filed in this case about how

8    all -- the sort of multiplicity, or the sheer volume of counts

9    in this case are duplicative and essentially prejudicial.

00:49 10         In that litigation about the motion to dismiss, the

11    government went to great lengths to point out how the statutes

12    are different, why they have different elements, why it made

13    sense to have all of these multiple ways in the case to charge

14    essentially the same underlying course of conduct.  The

15    government essentially now wants to have it both ways.  They

16    want to back away from the arguments they made before and sort

17    of avoid having to face the consequences of its choice to

18    charge the underlying conduct in this case 30 different ways to

19    get the death penalty as many different ways as it can.

00:49 20         That's sort of the pitfall of the way Congress has

21    written many statutes over the years and 924(c) in particular.

22    The statutes are incredibly broad, and that breadth, in light

23    of the current Supreme Court decisions, means that the 924(c)

24    convictions can't stand.  And in light of that, the whole

25    penalty question ought to be reconsidered.

1          THE COURT:  Why don't you stay on your feet.

2          MR. WEINREB:  Actually, your Honor, can I say --

3          THE COURT:  Oh, all right.  Okay.  Go ahead.

4          MR. WEINREB:  Just another word on *Descamps* just so

5     our position is clear.  We do argue that all of these statutes

6     are divisible to the extent that they enumerate alternative

7     means of committing the offense.  *Descamps* calls for -- in

8     determining whether a statute is divisible, *Descamps* calls for

9     a textual analysis, not a so-called elements analysis.

00:50 10          It is not necessary under *Descamps* to determine -- to

11    find that a statute, in effect, defines two entirely separate

12    crimes, or three or four entirely different crimes; it's enough

13    to find that it defines one crime, but textually enumerates

14    different ways of committing it.  And if one of those ways of

15    committing it is identified, and that is the one that is

16    alleged in the indictment and on which the jury is instructed

17    that it must be unanimous, then that is sufficient under

18    *Descamps* to satisfy the categorical analysis.  In other words,

19    you're not looking at what the underlying conduct was; you

00:51 20    simply have recourse to these *Shepard*-approved documents.

21          There was no -- nothing in *Descamps* that says that

22    a -- and nothing in the First Circuit, by the way, or in many

23    other circuits that have actually head-on addressed this issue

24    and the weight of *Descamps*, that says that a statute must

25    actually define entirely separate crimes and you combine them

1    in a single statute for it to be divisible.

2          The only indivisible statute is the one that textually

3    simply defines one crime.  Let's say there's a crime to assault

4    another person.  But if the crime -- that would be an

5    indivisible statute.  And even though it's possible to assault

6    somebody by punching them or by offensively touching them,

7    there's nothing to have recourse to, because the indictment is

8    never going to do more than allege assault.  But if it says it

9    shall be a crime to assault somebody by punching them, kicking

00:52 10   them, or offensively touching them, and the indictment

11   specifically alleges assault by kicking, then that is a

12   divisible -- a division of the statute that is -- that

13   satisfies the so-called elements test under *Descamps* and which

14   makes it susceptible of a categorical comparison.

15         MR. FICK:  I would just point out that *Descamps* is

16   completely absent from the government's papers.  To the extent

17   the Court thinks this is important to develop, it's

18   complicated, there are a lot of cases, and we could file a

19   supplemental brief on the matter.

00:52 20         I think the bottom line though, is, the government is

21   wrong in its analysis of *Descamps* and its progeny.  What that

22   collection of cases say is that a statute is divisible if it's

23   got different elements and different crimes which are violent

24   or non-violent.  If it's simply the means that are different,

25   if there are different means, that does not make a statute

1   divisible.  And there's ample, sort of, progeny of *Descamps*

2   that set it out that way.

3           THE COURT:  Okay.

4           MR. FICK:  So I guess moving on to the residual

5   clause, so what *Johnson* ultimately decided was that the

6   residual clause of a very similarly worded statute to 924(c),

7   which is the Armed Career Criminal statute, it found that the

8   residual clause was unconstitutionally vague.  And the residual

9   clause of the ACCA is quite similar to the residual clause of

00:53 10  the 924(c) although they're not identical.

11          The ACCA residual clause describes -- defines as the

12   second category of violent felony as, quote, burglary, arson or

13   extortion involves the use of explosives or otherwise involves

14   conduct that presents a serious potential risk of physical

15   injury to another.  The wording of 924(c) is a little bit

16   different, talking about a crime that by its nature involves a

17   substantial risk that physical force against the person or

18   property of another may be used in committing the offense.  So

19   similar kinds of principles, slightly different language.

00:54 20          The solicitor general of the United States, however,

21   and the courts that have looked at this so far have unanimously

22   said that the analysis -- vagueness analysis of *Johnson*

23   vis-à-vis the Armed Career Criminal Act applies with equal

24   force to 924(c).  The solicitor general said that itself in the

25   government's brief in *Johnson II* with reference to 18 U.S.C.

1   Section 16(b), which is identical to the residual clause

2   language in 924(c).  So the government, the representative of

3   the United States, in *Johnson* said, you know, if the Court goes

4   this way with this analysis, not only are we going to lose the

5   ACCA, we're going to lose Section 16(b) which is identical in

6   language to 924(c).

7         Further, there are beginning to be courts that have

8   found that *Johnson* applies with equal analysis to -- with equal

9   force to 924(c).  The most prominent, perhaps, is the *Dimaya*

00:55 10   case out of the Ninth Circuit.  I think the First Circuit court

11   so found, and that is cited in the papers.

12         And, you know, essentially the government here in

13   trying to beat back this argument sort of tries to raise little

14   distinctions without a difference between the language of the

15   two statutes.  The first argument the government makes

16   essentially is that, Well, one difference between the two

17   residual clauses is that in 924(c) there are a few

18   enumerated -- there are a few enumerated offenses, extortion,

19   use of explosives.  It's not just talking about the risk of use

00:55 20   of force or risk of injury.  So that makes it different.

21         But that really is a distinction without a difference.

22   That if anything cuts against the government's argument

23   suggests that the Armed Career Criminal Act, which actually had

24   more specificity to it, but nevertheless was found to be

25   unconstitutionally vague, if that's vague, then a statute -- a

1    residual clause that has no enumerated offenses is all the more

2    vague.

3            The ultimate kind of analysis the Supreme Court

4    employed in *Johnson* was to say what the residual clause

5    requires is to figure out what the average or the common or the

6    usual case of a particular predicate offense might entail.  And

7    the court sort of scratched its head and thought about this and

8    said, What are you supposed to do?  Are you supposed to use

9    Google?  Are you supposed to do some kind of statistical

00:56 10    analysis of difference cases?  And ultimately, the decision of

11    the court, Justice Scalia's opinion, was to sort of throw up

12    its hands and say, No, that is unprincipled.  It's unlawful.

13    It's vague.  It's, therefore, unconstitutional.  And the effort

14    to suggest that 924(c) is different in any meaningful way, I

15    would suggest, is simply -- it's sophistry.

16            MR. WEINREB:  Your Honor, the differences between the

17    definition of violent crime and the ACCA's residual clause and

18    the 924(c)'s residual clause which Mr. Fick characterizes as a

19    distinction without a difference figured prominently in *Johnson*

00:57 20    *II* in the Supreme Court's opinion.

21            The Supreme Court has long been vexed by the residual

22    clause in the ACCA for three primary reasons:  One was the one

23    Mr. Fick just mentioned.  It requires the -- it requires

24    considering what the prototypical version of the crime is.  And

25    we do concede that that's also true when it comes to 924(c).

1      924(c) says that a crime -- under the residual clause, that

2      it's a crime of violence if it's a crime that by its nature

3      involves the use of physical force.  And it's true that "by its

4      nature" arguably is somewhat narrower than what is required

5      under the ACCA, but it's a similar kind of analysis.

6            But there were two other features of the ACCA's

7      definition of violent crime under the residual clause that

8      posed a lot of difficulties for the court; in fact, fractured

9      its decisions on the meaning of it in case after case, and that

00:58 10   was the introductory list of crimes that appears in the

11     residual clause.  It says, you know, among them, burglary and

12     robbery and others.  And the court said that the -- that

13     preamble, that sort of list of crimes, meant that in judging

14     whether an ACCA crime was, in fact, inherently a violent crime

15     under the residual clause meant it had to pose a commensurate

16     risk of injury to the listed crimes.  And the problem's that

17     the listed crimes seem to have very little to do with each

18     other when it came to risk of harm.

19           And the court could not figure out how to reconcile

00:59 20   that incongruity, couldn't figure out how to take this list,

21     say we're supposed to compare, you know, the prototypical

22     version of crime A with this list of other crimes and ask

23     whether it's the same likelihood of risk and the same magnitude

24     of risk because those crimes don't seem to bear any

25     relationship to each other when it comes to that.  924(c)

1    doesn't suffer from that.  That's true and proper.

2          In addition, the Court was troubled by the fact that

3    the only way that certain crimes -- certain crimes on that list

4    could be deemed sort of inherently violent as if one looked at

5    what might happen in the aftermath of them, not during the

6    commission of them, but at some later time what they might

7    result in.  That also is not -- that problem is not present in

8    924(c).

9          In essence, 924(c) is a narrower, less complicated,

01:00 10    more straightforward version of "crime of violence."  It's

11    therefore not -- it would not be appropriate for courts to

12    invalidate 924(c) on the authority of *Johnson II*.  That's

13    something that should be left for the Supreme Court to do.  No

14    court has -- in the First Circuit -- neither the Supreme Court

15    nor the First Circuit has held that 924(c) -- its residual

16    clause suffers from the same problems that the ACCA's residual

17    clause suffers from.

18          And despite what Mr. Fick may say about the solicitor

19    general's argument in *Johnson II*, although it's true that the

01:00 20    solicitor general pointed out that invalidating the ACCA would

21    put 924(c)'s residual clause in jeopardy as well, it is the

22    position of the United States and this Court and every other

23    court in the nation that 924(c)'s residual clause does not

24    suffer from the same problems that the court identified in

25    *Johnson II*, at least to the -- to such an extent that it would

 1   require the same response.

 2          THE COURT:  All right.  Anything else on that issue?

 3          MR. FICK:  I would just rest on the papers.  I think

 4   they --

 5          THE COURT:  Yeah.  All right.  Let's move to the next

 6   motion, which is the defense motion for an order to maintain

 7   protection of privileged and confidential defense information.

 8          I'm not -- having read the papers on this, I'm not

 9   entirely sure what the controversy is.

01:01 10        MS. CONRAD:  Well, there are two aspects to the

11   controversy, your Honor.  And I would say that -- candidly,

12   that one is more immediate than the other, perhaps.  The two

13   aspects are, one, what the procedure is going forward; but the

14   second is, the government's stated desire to retroactively

15   obtain -- undo the protections that were either ordered by this

16   Court or were agreed to by the government in order to obtain

17   information in the possession of the firewalled AUSA.  And it

18   seems to me that, frankly, there is simply no valid argument

19   that the government has offered or could offer that would

01:02 20   justify that.

21          The Court ordered that -- essentially -- and the

22   government concedes this -- that an agent separate and apart

23   from the government team, prosecution team, be used to monitor

24   what this Court determined were legal visits with the

25   defendant's sisters and a member of the defense team.  The

1   government, again at the direction of the Court, agreed to have

2   a firewalled AUSA, the direction of the Court, from a different

3   district, who would have contact with that person.  And that

4   person was to have no contact with the prosecution team.  The

5   purpose of that was to protect the confidentiality of legally

6   privileged and work-product privilege involved in the

7   preparation of the defense case and meetings among members of

8   the defense team and the defendant.

9        The government now says, Well, now we want -- if any

01:03 10   of that information is in the firewalled prosecutor's file, we

11   have a right to get it.  And the attorney-client privilege

12   under Massachusetts law survives past the death of the client,

13   as held in *In Re Grand Jury* which was the Charles Stewart case

14   which I cited in the papers.  And in *United States versus*

15   *Mastroianni*, the First Circuit held that it was improper and it

16   was error for the government to debrief an informant who had

17   attended joint defense meetings.

18        So for the government to say, Well, it was privileged

19   then but -- or this Court held that it was privileged then, but

01:04 20   now if it happens to be in the file of the firewalled

21   prosecutor, we get to look at it, is simply nonsensical.

22   There's no argument that there's been waiver, there's no

23   argument that there has been any violation of the SAMs.  So

24   that's with respect to the sisters' visits.

25        Going forward on that issue, as soon as there was a

verdict in this case the BOP declined to permit a member of the

defense team to be present during visits with his sister

because they were no longer categorized as preparation of

mitigation evidence for the trial because the trial was over.

We do not, have not challenged that.  We do not at this time

challenge that without prejudice to the possibility that for

some reason in the future appellate counsel or habeas counsel

might have a need to raise that issue.  But with respect to

what this Court already ordered and what information the

firewalled AUSA gained as a result of our reliance on that

order, it seems to me it's -- there's completely no valid

argument for disclosure to the government.

If the Court is going to somehow countenance that, I

think we should be given an opportunity to review that file and

seek further protection before it is disclosed.  But I don't

see a basis -- the government hasn't raised any argument as far

as needing access to that.  Their only argument, in fact, with

respect to need about any of these issues is to say the time

has come for us to administer the SAMs and, therefore, we need

all the information the firewalled AUSA had.

Why?  There's no allegation, there's no argument that

anything that occurred before was somehow ineffective, that

there were any even hints of the violation of the SAMs.  This

is simply a matter of the government wanting to gain access to

information that was part of the defense preparation of this

1    case.

2          There is always the possibility of a retrial, there is

3    always a possibility of a successful appeal or habeas petition,

4    and the government wants to have this information for use

5    should that occur.  And it should not be permitted to do that.

6    And I would cite in particular, as cited in our cases, the

7    Ninth Circuit -- in our memos, rather, the Ninth Circuit case

8    of *Bittaker v. Woodford* [*sic*] which prohibited use in

9    subsequent proceedings of information that was provided to the

01:07 10   prosecution as a result of waiver.  And there is no allegation

11   of waiver here.

12          Now, with respect to the agreement that was reached --

13   and that agreement, first of all, we submit as described in our

14   papers, is a valid contract.  It's a valid contract under

15   Restatement of Contract, it's a valid contract because of

16   detrimental reliance, it's a valid contract because it was made

17   in the shadow of litigation.  And for the government to say,

18   Oh, well, you know, that was just something we agreed to but we

19   don't have to continue to abide by it, calls into question all

01:07 20   the kinds of agreements and contracts that prosecutors and

21   litigants routinely enter into.

22          To say, Oh, it doesn't matter, it was just something

23   we voluntarily agreed to, first of all, it's not true because

24   it agreed to those things in the shadow of litigation about the

25   SAMs and their restrictions and in the shadow of this Court's

1  rulings and request for proposals from the government.  And

2  it's not true because it's legally not true.  Restatement of

3  contract says stipulations in litigation are binding contracts

4  even without consideration.

5        But that agreement did two main things:  One was it

6  established a firewalled AUSA who would review any materials

7  the defense wanted to present to the defendant during its

8  privileged meetings if an issue arose with BOP; and second of

9  all, it said that the firewalled AUSA would approve visitors.

01:08 10  And third, as sort of a subsidiary of the second, it said that

11  if before the government could access logs of visitors for

12  Mr. Tsarnaev, the defense would have an opportunity to redact

13  names of experts.

14        So the government now wants to say going forward that

15  agreement is invalid and retroactively it gets to see all that.

16  Again, on the going-forward part, I think here there is a more

17  compelling need to maintain the status quo of the firewalled

18  prosecutor because unlike what the government pretends, the

19  litigation in this case is far from over.  There will be an

01:09 20  appeal.  There will be a habeas petition.  The statute

21  essentially requires appointment of counsel for 2255 purposes

22  after an unsuccessful appeal.

23        The government -- and I think it's telling that the

24  government first tried to undo this memorandum -- this

25  agreement while the case was still on trial.  The government

1   sent an email in May while the defense was still presenting its

2   case saying, We're withdrawing from this agreement.  There's

3   nothing that permitted them to do that.  There's no changed

4   circumstances.  There's no waiver, there's no -- there's still

5   active litigation.

6          With respect to experts, appellate counsel, habeas

7   counsel may very well have a need at some point to have an

8   expert meet with Mr. Tsarnaev; for example, for evaluation of

9   competency and the like.  The prosecution team has no need and

01:10 10   no right to either be the ones to decide whether that meeting

11   can take place or to have access to that information.  By the

12   same token, appellate counsel, habeas counsel, will no doubt

13   have legal meetings with Mr. Tsarnaev at which they will

14   present or review with him materials such as draft briefs,

15   draft memoranda, exhibits from the trial, and the prosecution

16   should not have the right to judge what documents can be

17   reviewed with Mr. Tsarnaev, what experts can meet with

18   Mr. Tsarnaev.

19          But more important, perhaps, retroactively the

01:11 20   government now apparently wants to know what defense experts

21   met with Mr. Tsarnaev, what documents were shown to

22   Mr. Tsarnaev.  Again, all of this is part of the work-product

23   privilege.  All of this is part of the defense representation

24   of Mr. Tsarnaev.  There is absolutely nothing in the agreement

25   that -- or in this Court's rulings that contemplated that at

1  some point the information that was provided to the firewalled

2  AUSA in reliance on the protections afforded by the agreement

3  would later be revealed.  In fact, what the agreement said was

4  that no information regarding such requests shall be disclosed

5  to the prosecution team.  It doesn't say in parentheses "until

6  after the verdict."  That's the language:  No information shall

7  be disclosed to the prosecution team.

8          And the proposal with respect to -- I just want to

9  backtrack for a second on this -- of the sisters' visits, the

01:12 10  proposal as described to this Court by the government regarding

11  those visits were that the government's agents, quote, will not

12  provide any information to the government, that is, unless

13  there's a reasonable and articulable suspicion that the SAMs

14  has been violated.

15          The government's summary to this Court in August of

16  2014, that's docket entry 448, was that the firewalled AUSA may

17  never at any time become a member of the government team.  But

18  yet the government now says, But we get his file.  Those two

19  things are completely inconsistent.  Their summary further went

01:13 20  on to say, The writings of the firewalled AUSA will be kept in

21  a secure place to which no one on the prosecution team has

22  access.  Again, it doesn't say in parentheses "until after the

23  verdict."

24          And the government says, Well, Mr. Tsarnaev should be

25  treated like any other defendant serving a sentence.  Well,

1    first of all, he's not, because he has a SAMs which allows the

2    government to have veto power, essentially, over what he's

3    shown, whom he communicates with and what experts visit with

4    him.  So that puts him in a very small group of people.

5           Second of all, he's not simply serving a sentence; he

6    is awaiting execution.  And under the statutory scheme, he is

7    entitled to certain legal representation, including as any

8    other defendant appellate counsel, but also habeas counsel.  So

9    to pretend that he is somehow treated like every other

01:14  10    defendant is simply fantasy.  Other defendants do not have an

11    agent sitting in on family visits.  Other agents do not have

12    BOP and prosecutors reviewing what their defense lawyers bring

13    in.  There are far more restrictions on Mr. Tsarnaev than on

14    other defendants.

15           These measures were put in place to make sure that the

16    prosecution did not unduly interfere with the defense function.

17    The defense function is alive and well in this case and the

18    government should no more have the ability to interfere with it

19    going forward than it has to obtain information that it

01:15  20    promised it would not access, looking retrospectively.

21           MR. WEINREB:  Your Honor, starting with the

22    retrospective part of the motion, the government is not

23    interested in seeing any attorney-client privileged or

24    work-product doctrine that might be in the firewalled

25    attorney's file.  We're requesting the file in the belief that

1    there is no privileged or work product protected information in

2    it.  There's no reason to believe there is and the defense has

3    not identified anything that's even likely to be in there that

4    would be privileged.

5              THE COURT:  Well, is that because of your view that

6    the presence of the sisters prevented the privilege from

7    attaching?

8              MR. WEINREB:  Yes.  The Court --

9              THE COURT:  Is there any other reason or is that the

01:16 10   sole reason?

11             MR. WEINREB:  There's a second reason.

12             So the only other thing that might conceivably fall

13   within the work-product protection would be there was a proviso

14   in the agreement that if BOP in its sort of -- the normal

15   review it does -- every time the -- defense attorneys are

16   allowed to bring items in to show to inmates, documents, pieces

17   of evidence, computer material and other things.  And BOP,

18   wholly apart from the existence of SAMs, always

19   reviews -- takes a look through that to make sure that there's

01:17 20   no obvious contraband in there, everything from, you know,

21   literally a file to pornography or something like that.

22             At one point very early on in the case BOP came across

23   a photograph that it felt was not something appropriate to be

24   brought in, was not appropriate to be defense material, and

25   they brought it to our attention as a possible violation of

their own rules and of the SAMs.  Based on that, the defense

wanted a firewalled attorney in place in case that ever

happened again so that the item would be shown to the

firewalled attorney, not to us.  However, there's no evidence

that it did ever happen again and presumably if it

had happened -- definitely if it had happened again the defense

would know about it because that was part of the agreement in

the contract, and if they knew about it, they would have

alleged that it happened in their papers and we would be

01:17  talking about it here today.  So we're pretty confident that it

never happened again.

          So therefore, there is no reason to believe that there

is anything in there that is privileged or work-product

protected.  Indeed, that was never the purpose of this whole

agreement.  The purpose of the agreement was to keep certain

defense information confidential but only because the Court had

set dates for its progressive disclosure and we wanted to honor

those dates by setting up a system where we wouldn't get access

to it prematurely under the Court's scheduling order.  That was

01:18  really the only reason that we entered into this agreement at

all.

          Our view that the -- with respect to the conversations

with the sisters, as the Court will recall, the way that that

issue arose was that the defense was concerned that the sisters

were not being able to engage in candid conversations with the

defendant, and vice versa, because of the intimidating presence

of an overhearing agent.  And so the Court -- we argued that

the sisters could not be there otherwise because it was a

so-called mixed social and legal visit, which BOP does not

permit, again, not under the SAMs but just under their own

regulations.  They don't allow mixed visits.  And the Court

held that for purposes of that provision, they would be

deemed -- they would still be deemed to be a defense visit.

But that did didn't make them part of the defense team

such that everything said to them or in their presence was

attorney-client privileged.  There's nothing in the record to

reflect that the Court went that far and there would be no

reason for the Court to go that far.  And they simply --

they're not lawyers, they weren't paralegals.  Normally, family

members don't jut get to be part of the defense team because

they want to be.  The purpose of that was simply, again, to

permit the candid conversations which, if there were additional

meetings with the sisters we don't even know, they took place

under the circumstances that the Court had created.  So again,

there's absolutely no reason to believe there's anything in

there that is privileged or work protected.

We gave some thought to the prospect of simply saying,

Okay.  The files should be reviewed by the defense team and

they could mark anything that they believe was protected;

however, we also don't know if there are notes in the files or

conversations between the firewall attorney and other people in
DOJ that really are not anything that the defense would
ordinarily be entitled to see and so on.  So we think that if
the Court is inclined to do any kind of review of the file
itself, that it be done by the Court in camera.  If the Court
after that still has questions, it can -- at that point it
could also ask the parties either together, ex parte or
whatever the Court wanted to do to review it.  But we don't
think that's necessary.  The defense has not alleged or created
any reason to believe that there's anything in there that would
violate the attorney-client privilege or the work-product
exception.  The Court could also make an inquiry of the
firewall counsel and ask firewall counsel of his opinion if
there's anything in there that is privileged or protected.
We'd have no objection to that.

          As for the prospective operation -- and by the way,
the claim was made that we have no need for that material.
There's no good reason for us to have it.  And that's simply
not the case.  We are responsible, meaning the prosecution
team, for administering the SAMs going forward.  And in order
to do that, we need to know what's happened.  We need
to know -- people were visiting the defendant, such as Sister
Helen, for example, who were not, according to the defense,
expert witnesses, members of the defense team or any other --
had any other right to visit him.  They weren't people who as

1   far as we know were cleared under the SAMs or had any basis for

2   being there.

3         So that's the kind of -- again, we have no idea how

4   many other people like that there are.  Let's say the defense

5   now wants somebody to visit him.  We won't even know whether

6   there's been problems with that person in the past or not.  And

7   unless the firewall attorney is to remain in place in

8   perpetuity administering these SAMs, we need to know what's

9   happened in the past in order to intelligently administer these

01:22 10  restrictions going forward into the future; otherwise, we might

11  be making representations that we don't even know are true or

12  not with respect to particular individuals.

13        Now, as for prospective enforcement of the agreement,

14  there is absolutely no legal ground for that whatsoever.  And

15  even if you accept that the -- all of the defense's argument

16  that this is a contract -- a binding contract that should be,

17  you know, interpreted under principles of contract law, for one

18  thing, nothing in the contract says that either party can't

19  terminate it at will; secondly, there's been an obvious change

01:23 20  of circumstances.

21        The contract was written during a time when the

22  defendant was preparing his defense and was in pretrial

23  detention.  Now the defendant has been convicted, he's serving

24  a sentence at another prison.  So changed circumstances alone

25  would be a basis for termination of the contract.

1          But beyond that, we -- I won't belabor again the

2     arguments in the motion, but in summary, we don't believe the

3     Court any longer has authority to enforce restrictions or -- I

4     shouldn't say "any longer."  These are voluntary measures that

5     we took here.  There's no basis, in our view, for them to be

6     made legally binding in a court order, don't believe that the

7     Court at this point has authority to tell BOP how to manage

8     these matters, at least absent some kind of very specified need

9     on the part of the defendants that would prevent the exercise

01:24 10    of Sixth Amendment rights.  And if the defense -- if the Court

11    believes that that may not, in fact, be the case and wants

12    briefing on it, then let the defense file a motion seeking an

13    order like this.  And we'll oppose it and the Court can see

14    what the legal arguments are on either side.

15          These arguments about contract law and that we should

16    be held to this bargaining going forward indefinitely into the

17    future are not the right way to address the issue of what the

18    defendant actually needs to protect his constitutional rights

19    in prison.  People in prison -- he's not the only one.  The

01:24 20    defendant is not the only one who may be pursuing an appeal in

21    prison, who may be pursuing a 2255 in prison.  There are

22    probably thousands, tens of thousands of people like that.

23          Many of them argue that their rights are being

24    violated in one way or another, and there are very well

25    established mechanisms for addressing claims of constitutional

1    rights' violations while in prison.  This is not the

2    appropriate way to do it, especially given the circumstances

3    under which this agreement was made which was -- although the

4    defense said it was in the shadow of litigation of the SAMs, I

5    think we've pretty much documented very well in our motion that

6    the defense litigated and litigated about the SAMs, the Court

7    ruled again and again about them, and there were no -- there

8    was no pending litigation that was settled through this

9    contract.  There was no litigation at all at the time.

01:25 10         So we certainly believe that this agreement is not

11    enforceable going forward, and we also believe that the defense

12    simply has not made a case that there's any reason why we

13    should be denied access to information that we need to do our

14    jobs going forward.

15         MS. CONRAD:  Your Honor, first of all, I feel a little

16    bit like Alice going through the looking glass here where the

17    government says this is not the way it should be done, that we

18    should come to the Court and ask for protection when there's an

19    existing agreement and an existing order and the government

01:26 20    twice unilaterally tries to withdraw from it.  The government

21    should have gone to the Court and said, We want to have this

22    modified.  That's usually how you address a court order.  You

23    don't just send an email to counsel saying, We're not abiding

24    by this anymore.

25         So second of all, for the government to say this was

1    not in the shadow of litigation, I count multiple docket

2    entries, the first October 2, 2013, the defense challenged the

3    SAMs, sought to vacate it; February 20, 2014, the defense filed

4    a supplemental proposal -- proposing a taint team for the

5    sisters' visits and for review of the materials.  February 26th

6    the government opposed that.  So that was the shadow of

7    litigation to which I referred.  In our reply, docket entry

8    210, March 5th, we proposed a taint team.  The government

9    refused.

01:27  10    At the April 6, 2014, hearing, the Court ruled that

11   the sisters with the visits -- and I'm going to read the exact

12   language so there doesn't have to be any confusion.  "I would

13   suggest, and I think it is a pretty limited circumstance," et

14   cetera -- "so I would be inclined to do one of two things.  One

15   is, which I think is simpler, is to simply regard it as a legal

16   visit" -- this is at page 12, "and therefore, exempt from the

17   monitoring."  So I don't know how that's not a ruling that it's

18   a legal visit.  "And I don't really think that the safety

19   security issue looms very large on the facts as I can

01:28  20    appreciate them on what I have."

21   And then the Court went on to say, you know, if you

22   think there's an important issue of security that has to be

23   addressed through a taint officer, then make a proposal.  And

24   that's when the government made the proposal to have a

25   taint -- a firewalled agent and a firewalled prosecutor.

1           So that was directly as a result of this Court's

2     ruling.  There is absolutely nothing to suggest that the visits

3     with the sisters are not legal visits, which is what the Court

4     ruled, or at a minimum, work product.  Because the whole reason

5     to do this was in preparation for the defense.  If the

6     government wanted to come to our offices and rummage through

7     our trial preparation and say, Well, the trial's over so it's

8     no longer privileged, that's just wrong.

9           THE COURT:  Do you have a position on whether an in

01:28 10     camera review of the materials might be done?

11           MS. CONRAD:  Well, our position on the in camera

12     review -- although we wouldn't object to the in camera review,

13     we would object to any relief subsequent to the in camera

14     review, so I'm not sure what the point of it would be because

15     these materials were made available to the firewalled agent and

16     the firewalled AUSA pursuant to an agreement that is

17     enforceable and pursuant to this Court's orders.

18           For the government to say that the information, for

19     example, about authorizing visits by experts only pertained to

01:29 20     a timing issue is just completely wrong.  In any criminal case

21     there are experts who may meet with the defendant who are never

22     noticed and who were never called to trial.  The government

23     doesn't get to know about them.  The government doesn't get to

24     know about them before trial, during trial, after trial, on

25     appeal or on habeas.  That is work product.  That is the core

1    of work product.

2          Now the government wants to know what, if any, experts

3    visited Mr. Tsarnaev who weren't called to trial.  That's what

4    they're trying to find out.  And for them to say, Well, we're

5    responsible is sort of an ipse dixit argument.  They're simply

6    saying, We're responsible because we want to be responsible.

7    Why isn't the prosecutor who's responsible -- or the government

8    agent who's responsible, somebody in Colorado where

9    Mr. Tsarnaev is incarcerated?  Wouldn't that make more sense?

01:30 10   The government is setting up the condition precedent to make

11   the argument that this is necessary without ever justifying why

12   that's a condition precedent in this case.

13          THE COURT:  Okay.  I understand the --

14          MS. CONRAD:  Can I just say one more thing about --

15          THE COURT:  If it's new.

16          MS. CONRAD:  It is new.

17          Mr. Weinreb said, Well, we haven't shown that there's

18   anything privileged in that.  We don't know if there's anything

19   privileged in the file.  They don't know that because it's in a

01:31 20   firewalled file.  We don't tell the government what our

21   communications were with the firewalled agent.  That's the

22   whole nature of the firewalled communication.

23          And I don't really know where Mr. Weinreb 's coming up

24   with saying that Sister Helen Prejean was not cleared under the

25   SAMs.  She wouldn't have been allowed to set foot in Devens if

1    she hadn't been cleared under the SAMs.

2            THE COURT:  All right.  I'll reserve the matter.

3            Now let me turn to the issue of restitution.  There's

4    been a supplement to the PSR provided by the probation office

5    basically forwarding materials that came from both sides.  I

6    think it was addressed before but I understand that the defense

7    has made an *Apprendi*-based argument about it that I believe is

8    foreclosed by First Circuit law.  The issue is preserved, but

9    in accordance with existing precedent, I conclude that the

01:32 10    factfinding, to the extent it occurs and is properly

11    denominated as such, does not implicate the *Apprendi* rule.

12            I don't know whether Mr. Chakravarty is handling this.

13    You're the one that -- or Mr. Weinreb.  I don't care.  Either

14    one.  You wrote the letter.

15            MR. CHAKRAVARTY:  I wrote the letter.

16            THE COURT:  I'm not entirely clear what the

17    exhibits -- what the attachments are.  Maybe you can clarify

18    that.  Particularly B and C.  I understand A.

19            MR. CHAKRAVARTY:  Your Honor, we submitted three

01:32 20    categories of restitution figures.  One was the extensive

21    report and supporting materials for Dr. Thomas Barocci who did

22    essentially an extrapolation of costs to a small subset of the

23    victims, largely, the victims who were the families of

24    decedents and amputees.

25            The second category were those expenses which were

1    submitted to our office pursuant to our provisional canvassing

2    for victims to report eligible expenses under the restitution

3    statute on a form that we submitted to them and they could

4    submit it to -- any supporting materials or simply statements

5    about what they believed were their costs incurred, or

6    prospective costs incurred.  They would put it on the form and

7    give it to us.  We then tabulated -- instead of giving you --

8    we happened to give you each of the underlying forms that they

9    provided, I have them with me.  But instead, we tabulated those

01:33 10   on a spreadsheet which broke down per category of expense that

11   they had submitted to us.

12          And then the third component of our submission was

13   those expenses which were incurred or submitted to the

14   Massachusetts Victim Compensation Fund administered by the

15   State Attorney General's Office during the pendency of the

16   proceedings and had received payment from the Attorney

17   General's Office.  Those figures were also submitted for those

18   expenses which were determined to be eligible expenses under

19   the federal restitution statute.  So not including pain and

01:34 20   suffering, for example, which is not an eligible expense.  That

21   is the third category.

22          For that category, because of the privacy concerns, we

23   listed the victim by number as opposed to name, although it was

24   provided to counsel, and were the Court to order a restitution

25   judgment per individual, then we can further separate that list

1    out.  For everyone who submitted for eligible expenses to the

2    Attorney General's Office, we can spell that out so that we

3    have a comprehensive list of every victim that we submitted on

4    either three of these categories the amount that they have

5    submitted to us which, as far as we know, is not in dispute as

6    to what they are entitled to under the restitution statute.

7         THE COURT:  Well, that's what I can't figure out from

8    the exhibits.  What's the relationship of B to C?  Does C

9    include some of B or all of B or none of B?

01:35 10      MR. CHAKRAVARTY:  So it should not include any of -- B

11   should not include any of C.  But we -- in order to -- and the

12   B --

13        THE COURT:  And vice versa; that is, B isn't included

14   in C?

15        MR. CHAKRAVARTY:  Correct.  Now, that being said, it

16   was not done scientifically in terms of an audit.  We relied on

17   self-reporting of victims to say whether they had received

18   funds from the Victim Compensation --

19        THE COURT:  Let me ask you specific -- if you have it

01:35 20   there, would you look at B?  It's actually Line No. 3 but it's

21   the first name.  And then in the far right column it indicates

22   there was a payment from the Mass. Victims Fund.

23        MR. CHAKRAVARTY:  Correct.

24        THE COURT:  Now, is that also in C?  I can't tell

25   because there are no names in C.

1          MR. CHAKRAVARTY:  Right.  It should not be, your

2     Honor.  We subtracted from the total -- sorry.  Whatever the

3     figure is -- I can't -- I didn't match up to see whether the

4     figure, which is 25,000 here, whether exactly that figure is

5     also reflected.  This is what I meant by not having it audited

6     to determine if that is an accurate self-reporting of how much

7     they were compensated, but the fact that that person was

8     compensated is on C.

9          THE COURT:  So there is an entry on C that corresponds

01:36 10   to the person identified as the first person in B.  So what use

11     is to be made --

12          MR. CHAKRAVARTY:  So what I did, your Honor, is when

13     we got done with this, based on the self-reporting on Category

14     B -- I simply subtracted so that we would avoid this

15     duplication issue, subtracted from the B submission any

16     self-reported victim compensation for C so that we could

17     combine them all without having to --

18          THE COURT:  Well, how do we get to a final number?

19          MR. CHAKRAVARTY:  So the government's proposal is to

01:37 20   add each of the categories, from the first submission, second

21     submission, third submission.  As long as the self-reporting

22     was accurate on B, then there should be no double-counting with

23     Category C, and the same holds true for Category --

24          THE COURT:  Well, at the very least, even if you're

25     going to do that, if you're going to somehow -- I'm not

1     sure -- let me come at it from maybe a backwards point of view.

2     C represents payments that the people listed received, in fact,

3     from the Mass. fund?

4               MR. CHAKRAVARTY:  Correct.

5               THE COURT:  That's the state fund.  Are those

6     appropriated funds?

7               MR. CHAKRAVARTY:  They are appropriated.  There may

8     have been a special supplemental --

9               THE COURT:  But it's distinct from something like the

01:38 10    One Fund, which were charitable contributions by individuals?

11              MR. CHAKRAVARTY:  Correct.  Correct.

12              THE COURT:  Does the government -- does the

13    Commonwealth make a claim to those monies?

14              MR. CHAKRAVARTY:  They haven't asked for reimbursement

15    but they are --

16              THE COURT:  As I understand it, under (j)(1) of the

17    statute, they'd be entitled to it?

18              MR. CHAKRAVARTY:  Correct.

19              THE COURT:  And is that what you're asking?

01:38 20              MR. CHAKRAVARTY:  Correct.

21              THE COURT:  And those amounts similarly would not go

22    to the identified people because they've already received the

23    money.

24              MR. CHAKRAVARTY:  Correct.

25              THE COURT:  So in terms of a restitution order for the

 1   victims, apart from the Commonwealth, only A and B are

 2   pertinent?

 3          MR. CHAKRAVARTY:  That's correct.  And that's why we

 4   thought simply put the number -- identifying the victim by

 5   number on Category C, which was sufficient for this exercise,

 6   because all of those monies would go to the Attorney General's

 7   Office, unless the Court felt that she should be subrogated by

 8   first going to the victims, which is not the government's

 9   position.

01:39 10          THE COURT:  So the final tally could be -- this is a

 11  page from Dr. Barucci (ph) -- Barocci -- is the 17 persons

 12  injured, amputees, and then the four deceased.  To that list

 13  you would add the people identified in Attachment B?

 14          MR. CHAKRAVARTY:  Correct.

 15          THE COURT:  And at what sum?  This is the fifth column

 16  over?

 17          MR. CHAKRAVARTY:  It's the fifth column over, and it

 18  would be the sum total of that.

 19          THE COURT:  So that the total number of -- just let me

01:40 20  just do the math here.  There's 36 people listed there and

 21  there's 21 listed in the summary in A, so we're talking about

 22  57 recipients?

 23          MR. CHAKRAVARTY:  That sounds correct.  That's

 24  considering that there are many more in the Category C, but the

 25  sole recipient of any of those subordinated claims would be to

1    the Attorney General's Office.

2            THE COURT:  Does the defense have anything on the

3    computation issues?

4            MS. CLARKE:  No, your Honor.

5            THE COURT:  Well, what I would like the government to

6    do, then, is prepare a single summary, spreadsheet, chart that

7    can be attached to the amended judgment which adds the amount.

8    I can state now that I would -- there being no opposition to

9    the calculations -- combine the chart produced by Dr. Barocci

01:40 10   at page 12 of his report with the Exhibit B, and that would be

11   the order of restitution.  The order would be made -- and I

12   guess, again, if there's no objection, Exhibit C could be

13   included as -- since the subrogation chart for the

14   Massachusetts fund -- I'm not sure, actually, that's necessary

15   to be part of the judgment.  So I think we could do that

16   separate.  So if we simply incorporate the -- as the 58th

17   recipient the Commonwealth, then the total sum I think would be

18   sufficient for attachment to the judgment.

19           The Bureau of Prisons will be charged with the

01:41 20   assessment and collection of restitution in accordance with the

21   Inmate Financial Responsibility Program that is administered by

22   the Bureau of Prisons unless otherwise specifically ordered if

23   some issue should arise.

24           I will say that the -- it's my understanding that

25   under the program there is a minimum assessment of $25 per

           1    quarter, and that will be the default for at least the

           2    commencement of the collection.  That also is adjustable

           3    depending on the financial circumstances of the defendant.  If

           4    his income may rise or fall some adjustment under the program

           5    would be appropriate, but we will leave it to the bureau's

           6    program, as I say, subject to whatever necessary supervision

           7    might be -- might arise if there are issues.

           8            So I'd like -- I don't want to be unreasonable, but I

           9    would like it as soon as possible so we could finish the

01:43     10    amended judgment.

          11            Okay.  Anything else on restitution from anybody?

          12            MS. CLARKE:  No, your Honor.

          13            THE COURT:  Okay.  There's one final matter.  We

          14    have -- our capable clerk's office has been working on the

          15    unsealing of sealed entries, and you will be able to obtain

          16    today, each of you, a thumb drive with the documents that you

          17    respectively have submitted under seal.  We'd ask you to review

          18    those and indicate to us which may -- you agree now can be

          19    unsealed.  And there will be a lot of them that were protective

01:44     20    of the process in some way that the passage of time has now

          21    made unnecessary for them to remain under seal.

          22            There will be other things that probably will continue

          23    to -- particularly ex parte filings, I suspect, will likely

          24    remain under seal.  But anyway, review the list of your own

          25    documents and tell us which you think can be unsealed.  And

        1    confer with each other and agree on a joint list to be

        2    unsealed.

        3         To the extent there may be controversies, somebody

        4    thinks something should be unsealed and the other side thinks

        5    it shouldn't be, we would like a list of that as well and we

        6    can make some judgments about those.

        7         MS. CLARKE:  I think, your Honor, that there were ex

        8    parte filings I believe by both parties, so those are the only

        9    documents both of us won't get.  We'll get our ex parte and

01:44  10    they'll get their ex parte.

       11         THE COURT:  I think that's right.

       12         MS. CLARKE:  But we'll both get the documents that

       13    were served on each other.

       14         THE COURT:  I don't think so at the first cut.  I

       15    think this is a first cut.

       16         MS. CLARKE:  We're getting what we filed under seal

       17    and they're getting what they filed under seal?

       18         THE COURT:  Yes.  This is a convenience because you

       19    can't look at them online.  So -- I'd understood that one of

01:45  20    the problems was that people weren't exactly sure what sealed

       21    Item No. 788 was.

       22         MS. CLARKE:  That's correct.

       23         THE COURT:  And this will tell you that if it's your

       24    document, and you'll get to see it.  And then it will take the

       25    next step.  But you're right.  I think what we'll do is see

1    what's left after you've agreed to unseal your own sealed

2    filings.

3            MS. CLARKE:  So it will take us a little while to

4    figure out what we've both seen from these separate thumb

5    drives and what's ex parte?

6            THE COURT:  Well, what you'll be able to do is look at

7    your thumb drive and say, We no longer believe the following

8    items need to be sealed, and you would prepare a list.  And

9    then I guess we'll have to have a sharing of that.  We'll

01:46 10   figure that out.

11           MS. CLARKE:  I'm just suggesting --

12           THE COURT:  For the time being it's just your own

13   documents that are being --

14           MS. CLARKE:  It just may take us a little while trying

15   to come up with the list, that's all.

16           THE COURT:  Right.  We are anxious on behalf of a lot

17   of people to unseal as much as we can.

18           Okay.  I think that concludes the business.  We'll be

19   in recess.

01:46 20          THE CLERK:  All rise for the Court.

21           (The Court exits the courtroom at 11:32 a.m.)

22           THE CLERK:  Court will be in recess.

23           (The proceedings adjourned at 11:32 a.m.)

24

25

1                        C E R T I F I C A T E

2

3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4      the United States District Court, do hereby certify that the

5      foregoing transcript constitutes, to the best of my skill and

6      ability, a true and accurate transcription of my stenotype

7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

8      United States of America v. Dzhokhar A. Tsarnaev.

9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12

13     Date:  12/4/15

14

15

16

17

18

19

20

21

22

23

24

25