```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )



              BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE



                         LOBBY CONFERENCE


             John J. Moakley United States Courthouse
                        Courtroom No. 9
                        One Courthouse Way
                    Boston, Massachusetts  02210
                      Tuesday, April 21, 2015
                            9:16 a.m.



                   Marcia G. Patrisso, RMR, CRR
                      Official Court Reporter
                  John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 3510
                    Boston, Massachusetts  02210
                         (617) 737-8728

             Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Assistant U.S. Attorney
 3        John Joseph Moakley Federal Courthouse
          Suite 9200
 4        Boston, Massachusetts  02210
          - and -
 5        UNITED STATES DEPARTMENT OF JUSTICE
          By: Steven D. Mellin, Assistant U.S. Attorney
 6        Capital Case Section
          1331 F Street, N.W.
 7        Washington, D.C.  20530
          On Behalf of the Government
 8
          FEDERAL PUBLIC DEFENDER OFFICE
 9        By: Miriam Conrad and Timothy G. Watkins,
              Federal Public Defenders
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2     THE COURT:  So I understand there's some issues about

3  exhibits and other evidence.  I just wanted to be practical

4  about it so we can get going, what we'll get the first part of

5  the government case today, this morning, this afternoon maybe,

6  including the opening.

7     MR. WEINREB:  So I think probably the most efficient

8  way to start is for us to review which of these exhibits we're

9  not going to offer.  That's all new.

10     THE COURT:  Oh, I don't have the new list.  My list

11  goes through 1610, which was the end of last week.

12     LAW CLERK:  I can go get the binder.

13     THE COURT:  It's in the binder?

14     LAW CLERK:  Yes.

15     MS. CLARKE:  Would you mind if I grabbed my list?

16     THE COURT:  No.

17     So, yeah, why don't you go get it.

18     (Pause.)

19     MR. WEINREB:  So we already informed Mr. Bruck which

20  witnesses on our list we won't be calling.

21     THE COURT:  Okay.

22     MR. WEINREB:  Does the Court want to know as well?

23     THE COURT:  Sure.  I want to know as much as I can

24  know.

25     MR. WEINREB:  Then we need that list.  Actually,

```
 1   Mr. Bruck has the list.  He has his notes on it.

 2           MR. BRUCK:  Well, we've been told Karen McWatters

 3   won't be called, Lawrence, Williams, which are the emails;

 4   Danling Zhou.

 5           THE COURT:  Wait a minute.  So on the list that I have

 6   has FBI Special Agent Lawrence or Williams.  Neither?

 7           MR. WEINREB:  Neither.

 8           MR. BRUCK:  Lawrence or Williams.  Okay.

 9           And then moving down to Danling Zhou, we have crossed

10   out, and also Laura Woods.

11           THE COURT:  All right.  But Jinyan Zhao will?

12           MR. WEINREB:  Yes.

13           THE COURT:  She's a relative?

14           MR. MELLIN:  Right.

15           MR. WEINREB:  Yes.

16           THE COURT:  Okay.

17           MR. BRUCK:  And those are the only ones that are

18   definitely out.

19           MR. WEINREB:  That's correct.  And then with respect

20   to exhibits, if there are any discrepancies, we can discuss it.

21   So we don't intend to offer Exhibit 10, which is the first one.

22   Exhibits 1603 and 1605 are noted as video survivors' montage.

23   They are the subject of a defense motion.  We're not going to

24   offer those in the way that -- in the form -- we're not going

25   to offer them at all, frankly.  What we're going to offer
```

1    instead, to focus -- hopefully address the defense objection,

2    is individual photos of each of the victims who actually

3    suffered amputations, but fully dressed photos of them, not

4    showing any scars or gore or anything like that, just them with

5    their prosthetic limbs attached.

6            THE CLERK:  Judge, here's a list.

7            THE COURT:  I looked at these over the weekend, and

8    1603, I didn't understand what it was.  Maybe you could tell me

9    what it is.

10           MR. WEINREB:  Those are -- all of the 260 victims who

11   suffered physical injury at the blast were asked to submit

12   photographs of themselves, not showing their injuries or

13   anything like that, just to -- so they could easily be

14   identified in court, but...

15           THE COURT:  So these are people who suffered some

16   physical injury as a result of the bomb blast?

17           MR. WEINREB:  Correct.

18           THE COURT:  Okay.  But you're not going to use, what,

19   1603 or 1605, in that form?

20           MR. WEINREB:  Correct.  Now, those exhibits included

21   photos of people who had lost limbs, and so we're just

22   narrowing it down to that number, which I believe is 17 or 18

23   people.

24           THE COURT:  I see.  Okay.  Is there an objection to

25   that?  Let's just pause on that.

1          MS. CLARKE:  Yes, same objection.

2          THE COURT:  The generalized objection to that it's

3    unnecessary on the grave risk.  Is that it?

4          MR. BRUCK:  Exactly.

5          MS. CLARKE:  It's not relevant to any aggravating

6    factor and the prejudice, probative value weighing.

7          MR. WEINREB:  Your Honor, we would argue that it's

8    relevant to several aggravating factors.  One is grave risk.

9    One is also substantial planning and premeditation to commit an

10   act of terrorism, and --

11         MR. MELLIN:  Cruel, heinous and depraved, the manner

12   in which the act occurred.

13         MR. WEINREB:  Evidence of how the act occurred.

14         MR. BRUCK:  As to that, we think that that focuses on

15   the murders, the homicides, not with reference to others.

16         MR. WEINREB:  We're not saying that it was heinous,

17   cruel and depraved as to these individuals but that these

18   individuals -- what happened to them is evidence that it was

19   heinous, cruel and depraved to the ones who died.

20         THE COURT:  I think it is relevant evidence and

21   admissible under the statute.

22         MR. WEINREB:  We won't be offering any of these emails

23   that are -- or translations that are 1611 to 1618.  And I

24   should just note for the record that to the extent that the

25   defense seeks to introduce defendant emails or emails from

1    family members in its case, we may seek to offer them at that

2    time to provide context, but not as --

3            THE COURT:  Sure.  I understand.  Or as rebuttal,

4    perhaps, afterwards.

5            MR. WEINREB:  Or as rebuttal, perhaps.

6            MS. CLARKE:  So, Bill, the 1600 series or the 1300

7    series?

8            MR. WEINREB:  I have them on this list at 1611 through

9    1618.

10            MS. CLARKE:  I've got a set of those and then a set

11    that is 1347, '48, '49, '50, '51, '53, '54, '55, '56 and '57.

12            MR. WEINREB:  Those are probably the same emails with

13    different numbers.

14            MS. CLARKE:  I don't believe so.

15            MR. BRUCK:  Here's the list if you care to look at it.

16            MR. WEINREB:  Sure.

17            (Pause.)

18            MR. WEINREB:  I think these are the same emails.  Have

19    you looked at them?

20            MS. CLARKE:  Yes.

21            MR. WEINREB:  And you know they're not the same?

22            MS. CLARKE:  They're different dates.  They may be the

23    same content on different dates.

24            MR. MELLIN:  We can check and get back to you.

25            MS. CLARKE:  If you're not planning on using emails --

1          MR. WEINREB:  We're not planning on using any of the

2     emails.

3          1621 to 1629, is that on the Court's list?

4          THE COURT:  Yes.  On this one, yes.

5          MR. WEINREB:  We don't intend to use any of these

6     photos of the grate; however, we do intend to use 1633, and

7     I'll explain what that is.  Government counsel moved down to

8     Boylston Street when the barriers had been put back up for this

9     year's marathon and stood at the grate where the bomb was

10    exploded last year.  And no photo that has been introduced into

11    evidence to date captures adequately how close that the bag

12    that was placed with the bomb in it was to the individuals

13    lined up on the grate.  You have to be there to perceive it.

14    You can literally take one step and would have been able to

15    touch those people on the head.

16         We considered asking the Court for a view because it's

17    quite relevant to whether there was substantial planning and

18    premeditation to commit an act of terrorism, to the cruel and

19    heinous nature of the event and to the grave risk of death to

20    people who were standing by the grate who did not, in fact,

21    die, but we considered the idea of a view on Boylston Street to

22    be impractical and so we looked for a way to bring the view

23    into the courtroom for the jurors.

24         So Michelle Gamble, the FBI photographer who testified

25    in the guilt phase, took photographs, overhead photographs of

1    the grate, and we have a precise one-on-one -- one-to-one scale

2    model of the grate, basically the grate just in photographic

3    form.  The photo's been put onto a piece of Tyvek so that it's

4    quite hard and you can step on it without doing any damage to

5    it.  And it accurately depicts the size of the grate, you can

6    see where the bomb went off because the pieces that were

7    shattered have been put back into place, and there will be a

8    photograph that will make it clear where the barrier was.  And

9    that way, with the aid of this exhibit, the jury will be able

10   to perceive precisely how close the bomb was to the people who

11   were along the curb who were injured.

12         MS. CONRAD:  Judge, first of all, we received this at

13   7 p.m. last night.  The photographs were taken, according to

14   the metadata, on Friday at approximately 1 p.m.  We received no

15   explanation from the government as to why we weren't provided

16   with these until 7 p.m. last night.  And despite repeated

17   emails asking for an explanation of what the relevance of these

18   were or how they were going to be used or even at least

19   initially through whom they were going to be offered, it was

20   like pulling teeth to get an answer.

21         As far -- I have not gone back -- because I just heard

22   this from Mr. Weinreb this morning as to what the purpose in

23   offering this is.  I have not gone back to the photographs from

24   the actual scene in 2013 to see where those barriers were, but

25   I don't think there's any showing that the barriers yesterday

1    were in the same place that they were in 2013.

2           MR. WEINREB:  Well, we're not offering the location of

3    where the barriers were yesterday.  That was just a background

4    as to what prompted the creation of this exhibit.

5           We intend to use a single photograph, Government's

6    Exhibit 1575, which is already in evidence.  It quite clearly

7    depicts where the barrier was on the date of the actual

8    marathon blast.

9           THE COURT:  When do you expect to get to this?

10          MR. WEINREB:  This afternoon.  By "this afternoon," I

11   mean after the break.

12          THE COURT:  Yeah.

13          MR. WEINREB:  So we have the exhibit --

14          THE COURT:  Assuming the foundation, it sounds

15   admissible to me.

16          MS. CONRAD:  And the late disclosure?

17          THE COURT:  Show me some prejudice, I guess.

18          MR. WEINREB:  The grate has been in evidence.  The

19   actual grate was in evidence -- or not in evidence, rather, but

20   was available in discovery.  It was a 1B item that the defense

21   had access to.  So all this is, is a photograph of that grate.

22          THE COURT:  Okay.  On the proffer it sounds like it

23   will be admitted.

24          MR. WEINREB:  So that's it for preliminaries.

25          MR. BRUCK:  We have a series of other objections that

1   have not been withdrawn.  The most pressing one is the

2   photograph of the defendant in his lockup.  And the reason

3   which the government has advised us they intended to use in

4   opening statement and have an enormous mockup, the

5   prejudice -- this is what it looks like.

6          THE COURT:  I've seen it.

7          MR. BRUCK:  The prejudice is really quite

8   extraordinary because what this is is a still from a video that

9   goes on for hours and the -- in context, it shows that the

10  defendant is sort of using this picture as a mirror and he's

11  kind of bouncing off the walls the way a 19-year-old kid with

12  nothing to do for a long period of time might do, and then he's

13  doing a little sort of dance and then he jumps up and he does a

14  V sign.  It's not clear whether he's addressing this as a

15  camera or as a mirror.

16          And then for a split second, you have to really squint

17  to see it, the V sign seems to turn into a -- or does turn into

18  a finger.  But if you cut a split second of this you create a

19  completely false image of what is happening.  I think the -- I

20  think the Court needs to see it in context.  And the immediate

21  problem is that this absolutely should not be shown in opening

22  statement out of context and let us not be able to answer it

23  for a week.

24          The prejudicial effect of that would be -- even

25  assuming that the Court admits it at all.

1          MS. CONRAD:  A couple of things further on that,

2     Judge.  First of all, we have the video clip to show you if you

3     would like to see it.  But second of all --

4          THE COURT:  How long is it?

5          MS. CONRAD:  I'm sorry?

6          THE COURT:  How long is it?

7          MR. WATKINS:  Very short.  Two minutes maybe, even.

8          MS. CONRAD:  Do you want to see it before --

9          THE COURT:  Go ahead.

10         MS. CONRAD:  The other issue is that the context of

11    this -- first of all, I think there's a discovery and a *Jencks*

12    issue here.  We wrote to the marshals after there was a report

13    about this video in the *Boston Globe*, and the U.S. Marshals

14    Service in Washington started an internal investigation that's

15    now in the office of the Inspector General.  And I have

16    correspondence I could share with the Court regarding that

17    investigation about how this video came to be disclosed to the

18    press.

19         And I inquired yesterday of the general counsel,

20    Gerald Auerbach, what the status of that is, and he told me

21    it's still under investigation.  Again, I have the

22    correspondence to show your Honor, and I'd like it to be made

23    part of the record.

24         But in addition, we have no *Jencks* for Deputy

25    Oliveira.  I assume Deputy Oliveira was questioned in

1    connection with this investigation.  I've asked General Counsel

2    Auerbach for any statements or reports written by or taken

3    regarding -- statements by Deputy Oliveira, and he said he

4    would inquire.  We've received nothing from the government.

5    And we would at least like an opportunity to determine whether

6    there are such reports.

7          In addition, we filed an ex parte motion regarding

8    further -- getting further information from the marshals,

9    including an opportunity to inspect the camera before this

10   evidence is presented.

11         MR. WEINREB:  Your Honor, the claim that is made in

12   the papers and that's made again here is that the image needs

13   to be understood in context.  That is an argument about the

14   weight of the evidence, not its admissibility.  And the way the

15   defense counsel puts something in context is through

16   cross-examination or in their own case.

17         They're always free on cross-examination of the

18   witness to play the entire video, five minutes, ten minutes,

19   however much they think is needed to put it in context and

20   however much the Court will allow.

21         There's nothing prejudicial about showing an actual

22   photographic image of something that the defendant undeniably

23   did.  It's not likely to confuse the jury, to mislead them.  On

24   the contrary.  It's probative evidence of what his state of

25   mind was at the time that he did it.  And if the defense thinks

1    that it's not, that they should have another interpretation of

2    it, they're always free to suggest that through

3    cross-examination and argument.

4          Every other argument that was made today should have

5    been made 15 months ago when we first produced this video in

6    discovery.  The defense has had it for 15 months.  There's been

7    no claim that it should be suppressed on some ground, no claim

8    that there's anything wrong with it or that more information

9    should have been produced.

10         I think the *Jencks* claim is a red herring.  To the

11   extent that the witnesses were interviewed about how --

12   information about the video -- and by the way, I don't think

13   the video itself ever appeared in the press, or a photograph of

14   it.  I think there were just reports of it that appeared in the

15   press -- that's something for the marshals to deal with

16   internally and it has nothing to do with its admissibility in

17   this case and that would have nothing to do with the weight of

18   the evidence.  It would just be an effort to get into

19   collateral matters that normally are decided outside of the

20   jury's hearing, which is when there's an argument to suppress

21   evidence based on a claim of misrepresentation in a search

22   warrant.  It would have nothing to do with the admissibility --

23   once the admissibility of it is decided, that no longer has

24   anything to do with the weight of the evidence.

25         So the government -- it's obvious why the defense

1    doesn't like this photograph.  I don't need to articulate it.

2    But the fact is that their client did it.  It's nonverbal.

3    There's no constitutional problems here.  It's probative

4    evidence.  And certainly coming in, there's no reason why the

5    government should not be able to both admit it and use it as an

6    exhibit -- as a chalk in opening statements.

7            THE COURT:  What about statements by Oliveira?

8            MR. WEINREB:  If there is actual *Jencks* by Oliveira,

9    then we'll produce it.  But as far as we know, we're not aware

10   of any and we don't believe that any statements that he might

11   have made regarding how information about this may have

12   appeared in the press would be *Jencks* material for him because

13   it wouldn't relate to --

14           THE COURT:  No, I agree with that.

15           MS. CONRAD:  But it might be *Giglio*.  If he's the

16   subject of an investigation relating to this, it might be

17   *Giglio*.

18           THE COURT:  Remotely, perhaps.  But what I was getting

19   at is if he had something to say about -- did he learn of this

20   gesture because he was observing at the time?

21           MR. WEINREB:  I believe so, yes.  I believe that he

22   was --

23           THE COURT:  So if he had statements about his

24   observations, I think those would be *Jencks*.

25           MR. WEINREB:  Yes.  If there were written statements

1    about his observations.

2           THE COURT:  And the circumstances of his discovering

3    the tape or whatever it is.

4           MR. WEINREB:  Yeah.  I mean, if he wrote a report

5    saying, "On such and such a date I was observing this and this

6    is what I saw," then we would provide that as *Jencks*.  I'm not

7    aware of any such --

8           THE COURT:  We're not going to get to him for a while,

9    anyway, right?

10          MR. WEINREB:  No, but --

11          THE COURT:  But you want to use it in the opening.

12          MR. WEINREB:  -- we want to use it as a chalk in the

13   opening.

14          MS. CONRAD:  This is the correspondence that we

15   provided to the Court --

16          MR. WEINREB:  I think this is truly a red herring; in

17   fact, I would object to this going on the record.  Whether

18   somebody in the Marshal's Service did something, you know,

19   that --

20          THE COURT:  Right.  I agree with that.  I think that's

21   beside the point.  It does seem to me that if it's truly out of

22   context and indicates something other than what the government

23   suggests, then that can be shown to the government's

24   embarrassment.

25          MR. BRUCK:  The problem is the week interval.  It

1    seems so unfair that the government --

2            THE COURT:  Why can't you do it on

3    cross-examination -- I mean, Oliveira is going to testify in

4    the next day or so.  You can --

5            MS. CONRAD:  Can we show you the video?

6            THE COURT:  Sure, if it's just two minutes.

7            MR. WEINREB:  I'd also mention that to the extent

8    Mr. Bruck's argument is that he's not going to have a chance to

9    open for a week and say something about it, that's his choice,

10   so...

11           THE COURT:  All right.

12           (Video recording viewed.)

13           THE COURT:  Is it just video and not audio?

14           MR. WATKINS:  Exactly.

15           THE COURT:  This is the day of the arraignment?

16           MR. WEINREB:  Yes.

17           THE COURT:  Before the arraignment?

18           MR. WEINREB:  Approximately 11:30, and the arraignment

19   was approximately 3:30.

20           THE COURT:  And what determines the scope of this

21   clip?  Who decided when to start and when to stop?

22           MS. CLARKE:  It's just the minute or two around

23   that --

24           THE COURT:  It's actually a lot less than that.

25           MS. CLARKE:  Around the camera incident.

1          THE COURT:  Is there a timer?  There is at the top.

2          (Video recording viewed.)

3          MR. BRUCK:  Do you see the problem?

4          THE COURT:  So it's about 36 seconds, it looks like,

5     by the counter.  Okay.

6          MS. CONRAD:  May I just note, your Honor, that this

7     still was not provided in discovery.  The still was not

8     provided until last week.  What was provided in discovery were

9     the entire tapes from that day, not the isolated still.  And in

10    addition, if there is going to -- this is going to be

11    presented, in addition to making a request for Mr. Oliveira's

12    reports or statements, I would ask for any logs the marshals

13    kept that day of Mr. Tsarnaev's conduct, any other observations

14    that were made of him that day to put this in context.  They

15    had him under observation for an entire day, for about six

16    hours.

17         MR. WEINREB:  Your Honor, this was provided 15 months

18    ago, at the time the discovery request --

19         THE COURT:  I agree that that's discovery.  But in

20    terms of *Jencks*, if Oliveira has anything to say about it or I

21    guess maybe anybody else who viewed it that might impeach his

22    testimony about what he saw.

23         MR. WEINREB:  I believe he's being offered just to

24    authenticate this.  And the photo speaks for itself.  It's

25    really just, This was a fair and accurate photo.

 1           THE COURT:  So I think it can be used.

 2           MS. CLARKE:  To be clear, I thought Mr. Weinreb

 3    suggested that our only objection was it was out of context.

 4    We have a more prejudicial and probative objection under the

 5    Death Penalty Act as well and --

 6           THE COURT:  Okay.

 7           MS. CLARKE:  And nobody knows what that bird or peace

 8    or whatever shot was to, to himself, to a camera, nobody knows,

 9    and it really takes a leap that the government, I think is

10    trying to take unfair advantage of and it will confuse and

11    prejudice the jury.  We're already in a place in this case

12    where there's a lot of loss, grief, pain, blood, damage.  And

13    to further inflame I think would be inappropriate.

14           THE COURT:  Okay.  I think it's admissible.  And the

15    video can be shown to contextualize it --

16           MR. BRUCK:  If it's admissible, we want to emphasize

17    this enormous blowup still should not be used in opening.

18           MR. MELLIN:  Your Honor, it's no different than

19    photographs.

20           THE COURT:  I don't see why not.  I understand why you

21    don't like it, but I think it's admissible.

22           MS. CONRAD:  I'll take that back if it's not being

23    made part of the record.

24           MS. CLARKE:  Your Honor, it has to be offered for an

25    aggravating purpose in the death penalty, so I gather it's

1    being offered for lack of remorse?

2              THE COURT:  That's what I infer.

3              MS. CLARKE:  Thank you.

4              THE COURT:  Anything else with respect to the exhibits

5    that are proposed to be used that you want to use?

6              MS. CLARKE:  I'm told that Ms. Pellegrini will use

7    some photographs of the victims in her opening.  There are some

8    photographs of the victims in evidence already and she was not

9    sure that they were the same ones, offered us an opportunity to

10   look.  But it seems like the Court ought to rule on the

11   admissibility of those photographs if they're not ones that are

12   already in evidence.

13             MR. WEINREB:  Your Honor, they're just innocuous

14   family photographs that don't show anything inflammatory.  Just

15   pictures of victims and life.

16             THE COURT:  Yeah.  Some number of pictures.  I mean, I

17   think it can be overdone.  And actually, an issue I had with

18   the montages was that it was just too much.  I think photos in

19   the montages can be used, but I think the compiling of the

20   montages was an emotional impact that is separate from the

21   informational value.  So I would -- I think there's an

22   objection to that, and I think the montages themselves are a

23   little too emotional, but individual pictures from them can be

24   selected and the witnesses can talk about them.

25             MR. WEINREB:  Right.  So we -- one thing we could do

1  is essentially use the montages like a PowerPoint, and

2  basically one photo at a time in still, not rolling through it.

3      THE COURT:  Yeah.  But even then, however many are in

4  any given montage may be too many, is what I'm saying.  In

5  other words, take the shortest one, which is Martin Richard.

6  There's some information value pictures in there.  I guess one

7  people have seen is with his siblings.  That shows something

8  about their closeness and that's an informational value that

9  the jury should understand, this is a close family and they'll

10 miss him and so on and so forth.  Every charming photo of him

11 doesn't necessarily convey the same information value, I guess

12 is what I'm saying.  And that's true of the others as well.

13 It's true of -- I think I'm thinking of Krystle Campbell.  A

14 lot of nice photographs, nice memories and so on, but it's a

15 little too much.

16      At some point I think that the emotional tug outweighs

17 the informational value, is all I'm saying.  Giving another

18 example, there's a picture of her with her extended family.

19 That's informational value.  All of these people are affected

20 by this crime.  Her, you know, dancing or saluting somebody

21 with a drink, less so.

22      MR. WEINREB:  Although I think you'll find, your

23 Honor, that those photos were selected because they are the

24 anchor for testimony.

25      THE COURT:  Fine.  If they illustrate a point that the

```
 1    witness will make, then that's something else.

 2              MR. WEINREB:  Yes.

 3              THE COURT:  But just playing them straight through.

 4              MR. WEINREB:  This was a selection from among hundreds

 5    of options because they zero in on particular facets of the

 6    person's character, the loss of which is felt by --

 7              THE COURT:  Fine.  The last thing is the Lingzi Lu's

 8    father's eulogy I've looked at again, and I think that can be

 9    played as-is.  To the extent there's an objection to that, it's

10    overruled.

11              So her montage -- so the Collier, Lu, Campbell and

12    Richard montages should be disassembled, I guess.  Individual

13    pieces can be used.

14              MS. CLARKE:  Judge, I guess there's -- I'm not sure

15    whether there's a reason for the Court to rule now on the

16    objections to the Marc Fucarile and Eric Whalley X-rays and

17    medical pictures.

18              THE COURT:  Yeah, tell me how those will be used.

19              MR. WEINREB:  Those will be used to talk about grave

20    risk of death.

21              THE COURT:  Who will use them?

22              MR. WEINREB:  The witnesses themselves will be on the

23    witness stand.  This is shrapnel that is in their bodies

24    currently.  With Marc Fucarile, for example, they were able to

25    remove some of those pieces of shrapnel but he still has a
```

1   piece of shrapnel in his heart that can't be removed.

2   Mr. Whalley had a BB, actually, pierce his skull and travel

3   through his brain.

4           THE COURT:  Yeah.  So normally this would be through a

5   witness with medical competency.

6           MR. WEINREB:  This is the phase of the trial when the

7   rules of evidence are not strictly applied.  So these are

8   witnesses who have been told by their physicians what the

9   medical significance of this is.  They're not going to be

10  offering expert medical testimony about it.

11          THE COURT:  Right.  I just want to isolate off that

12  objection to what I think is the objection.  In other words,

13  the objection is not that it's the wrong witness; you object to

14  the evidence itself for its --

15          MR. BRUCK:  I have to say there is a threshold.  It's

16  true that the rules of evidence don't apply, but the

17  confrontation clause applies to eligibility because under *Ring*

18  *v. Arizona*, eligibility factors are constitutionally the

19  equivalent of elements of a greater offense of capital murder,

20  and there is a fair amount of case law that -- in the circuit

21  courts that say that the Sixth Amendment right of confrontation

22  does apply to the extent that the government is proving

23  eligibility for the death penalty.  We understand that this --

24          THE COURT:  Are you talking about the gateway?

25          MS. CLARKE:  Both.

1          MR. BRUCK:  Yes, both gateway factors.  Gateway and

2     the statutory aggravating factors.  Non-statutory aggravating

3     factors, the law is weaker on that, and that's not the primary

4     point we're making.  But to the extent that the eligibility

5     factor of grave risk of death is being proven by hearsay, we

6     think that is a confrontation clause violation.

7          MR. MELLIN:  Your Honor, it's not being proven by

8     hearsay.  These witnesses are getting on the stand and saying,

9     "Yes, that is a photograph of me and that is a photograph of my

10    injuries."  I don't understand what the hearsay is necessarily.

11    From Mr. Whalley -- Mr. Whalley has an MRI of his skull and

12    there's a BB in his skull which he knows is inside his skull,

13    so, from the damage from the -- entered in his temple and

14    embedded in the side of his head.

15         THE COURT:  It may depend on the particular image

16    whether a layperson -- you know, you could go in and have an

17    X-ray of your wrist done and then you could later see the

18    product of that process and you could say, "That's my wrist

19    because I was there and I can see the break."  So it's possible

20    for a witness to do that.

21         To the extent the witness only knows something because

22    a doctor said that's what this is, I think there might be a

23    problem.  It's interesting whether that's hearsay or just

24    foundation.

25         MR. WEINREB:  And if the defense would prefer we put

1    in medical testimony how gravely these people were injured and

2    how close they came to death, we could probably arrange a

3    doctor to examine the films and the medical reports and give

4    testimony about how close they came to death.

5            MR. BRUCK:  It's a little late for that now.

6            MR. WEINREB:  I don't think so.

7            THE COURT:  Let's see how it goes.

8            MS. CLARKE:  Well, Judge, is that a situation where we

9    just have to object?

10           THE COURT:  Yeah, I think so.  We'll see what they

11   found -- what the government offers before --

12           MR. BRUCK:  There are some particular -- there's a

13   picture of Mr. Whalley's heel which you cannot -- it's a

14   grievous, hideous injury, and the picture -- I don't know if

15   the Court has seen it.

16           THE COURT:  I have.

17           MR. BRUCK:  You know what I'm talking about.  It goes

18   to grievous injury which is not an aggravating factor.  It does

19   not tend to show grave risk of death.  Whether it did or not,

20   the probative effect of that -- I don't think that's the one

21   you're offering but it's one where the heel is sewed up.

22           MS. CLARKE:  That's 1599.

23           MR. BRUCK:  Is it?

24           MS. CONRAD:  Yeah.

25           MR. BRUCK:  I mean, the prejudicial effect of that so

1    far outweighs its probative value that I don't think it's a

2    close call under the Federal Death Penalty Act.  It wouldn't be

3    a close call under 403.

4         MR. MELLIN:  Your Honor, to the contrary, I think this

5    shows the grave risk of death these people are facing.

6         MR. BRUCK:  Even if it did, that should not come in.

7         MR. WEINREB:  Your Honor, we have a limited number of

8    photos to choose from.  Virtually all of them show some kind

9    of -- some body part in some state that could -- is not what

10   jurors are accustomed to seeing.  So we have tried to avoid the

11   bloodiest, the goriest, you know, the most shocking and picked

12   ones that are relatively antiseptic.  And for Marc Fucarile,

13   for example, the X-ray photos are, by far, the least graphic of

14   the many, many photos of his injuries that are utterly

15   extraordinary in their -- we think the probative impact they

16   would have on the jury but potentially an emotional one.

17        THE COURT:  Well, I think -- I'll assess it as he

18   testifies.  We'll just see what the photo will add, if

19   anything, at the time it's offered.

20        MR. BRUCK:  May I ask you, with respect to this same

21   witness, we have been told that he knew this was a terrorist

22   attack because he had been present at a terrorist bombing in

23   the past.  We have no further information about that.

24        MS. CLARKE:  In London in the 1970s.

25        MR. BRUCK:  Well, we think that serves no probative

1    value whatsoever and is merely an inflammatory detail that

2    should be excluded.

3            MR. WEINREB:  One of our aggravating factors is that

4    this was an act of -- there was substantial planning and

5    premeditation to commit an act of terrorism.  That's something

6    the jury needs to hear evidence on.  This is somebody who

7    has --

8            THE COURT:  I'm not sure --

9            MR. WEINREB:  -- basically a lay expert, his firsthand

10   experience of it from his own experience.

11           THE COURT:  Again, we'll see how it is when he

12   testifies.

13           MR. WEINREB:  The defense is proposing to put on an

14   expert to compare the defendant to other terrorists and say

15   that evidently he wasn't as bad as them, so I think the

16   comparison of this event to other events is something that

17   they're planning on doing.

18           MS. CONRAD:  I don't see how -- I guess we'll just

19   have to object.

20           THE COURT:  Okay.  So how far do you think you'll get

21   this morning, that is, up till one o'clock?

22           MR. WEINREB:  Yes.  Just up until one o'clock?  I

23   think --

24           MR. MELLIN:  It's ten o'clock now.

25           MR. WEINREB:  I think through the Campbells.

 1            THE COURT:  Through the Campbells?

 2            MR. WEINREB:  I would think so.

 3            THE COURT:  This is probably going to move along

 4   fairly quickly.

 5            MR. WEINREB:  Yes.

 6            THE COURT:  You may even be done tomorrow.

 7            MR. WEINREB:  We have several witnesses, four

 8   witnesses, in fact, who can only testify on Thursday.

 9            THE COURT:  On Thursday?

10            MR. WEINREB:  Yes.  That are flying in from various

11   places.

12            THE COURT:  Okay.

13            MR. WEINREB:  Marc Fucarile --

14            THE COURT:  So we might have a pause in the middle.

15            MR. WEINREB:  Well, Wednesday I think we may finish at

16   the lunch break.  We've tried to time it so that the jury won't

17   waste their time here.  So the way that we anticipate it is

18   that today we'll go nearly to the normal time, perhaps,

19   tomorrow likely just through lunch, and then Thursday at least

20   to the break.

21            THE COURT:  I'm thinking this is Monday.  Sorry.  I

22   dropped a day.  I got it.

23            MR. WEINREB:  Right.  So they'll hear -- their time

24   won't be wasted on any day.

25            THE COURT:  Okay.

1          MS. CLARKE:  Two other very quick matters, Judge.

2   Michelle Gamble on the witness list is shown with the Martin

3   Richard montage as an exhibit.  I'm not aware that she is a

4   victim impact witness and wouldn't be able to put those

5   pictures in.  We would object to that, to the use of an FBI

6   official to introduce victim impact testimony which is not

7   victim impact testimony.

8          MR. WEINREB:  She would only be called to authenticate

9   that the photos are, in fact, photos of the person depicted in

10  them.  We would be offering no testimony about them at all,

11  it's really just to spare the surviving family members.

12         THE COURT:  We're going to do that a different way

13  anyway now.

14         MR. WEINREB:  We weren't going to actually publish

15  them to the jury through her.  So she's just authenticating the

16  photos.  Frankly --

17         THE COURT:  Well, you said 1603 and 1605 you're going

18  to do a different way.  Those are the other -- the injured

19  people --

20         MR. WEINREB:  Right.  Right.

21         THE COURT:  -- right?

22         And as to 1604, you were going to not use the montage

23  as such but use pictures, so I'm not sure there's much for her

24  to authenticate.

25         MR. WEINREB:  Well, the pictures themselves to the

1   extent they need authentication.

2           THE COURT:  Well, isn't Mrs. Richard going to testify?

3           MR. WEINREB:  Well, the people, the family members

4   themselves could authenticate them, but we're hoping to spare

5   them the pain of having to do that.

6           THE COURT:  I see.  All right.  She could probably do

7   that.

8           MS. CLARKE:  Well, I don't know how an FBI official

9   gets to introduce or authenticate photographs that are to be

10  victim impact testimony, and we'd object.

11          THE COURT:  We'll have to hear what she says, about

12  how she can authenticate them.

13          MS. CLARKE:  The other thing, Judge, and I

14  don't -- maybe this isn't an issue, is the government has

15  listed 11B.  That was the -- remember the video that was taken

16  by this guy Kilgore and it kind of was --

17          THE COURT:  We shut down the sound.

18          MS. CLARKE:  We shut down the sound.  And I assume the

19  government will continue to shut down the sound.

20          MR. WEINREB:  No.  At this point, your Honor, our

21  argument is that to whatever degree the probative value of that

22  evidence might have been outweighed by its prejudicial

23  potential for undue fair prejudice, now that we're in the

24  penalty phase that the balance has shifted in the other

25  direction, now it is -- the jury is being asked to focus on the

 1    circumstances of the offense and what effect they have on

 2    people in terms of it being an act of terrorism, creating

 3    substantial danger, injury through just the panic and the

 4    response to the event as well as the event itself.

 5            THE COURT:  How long is it?

 6            MR. WEINREB:  Short.

 7            MR. MELLIN:  Maybe two minutes.

 8            MR. WEINREB:  Two minutes at the most, I think.

 9            MS. CLARKE:  Well, it doesn't go to an aggravating

10    factor.  It's clearly more prejudicial than probative.  The

11    Court already kept out the sound, and we would object.

12            THE COURT:  I think it's probably admissible so I

13    think it's a different calculus on this -- on this phase.  It

14    shows the horror of the event.

15            MS. CLARKE:  That's not an aggravating factor.

16            THE COURT:  Heinous.

17            MS. CLARKE:  That's to the homicide victims, Judge.

18            MR. MELLIN:  No, your Honor, it puts into context the

19    homicide victims' pain.

20            MS. CLARKE:  One last thing, Judge.  On the grave risk

21    of death argument as we have made it to the statutory

22    aggravating factor, we have made the argument that that occurs

23    when the act occurs and not the result of the act.  And I take

24    it the Court is ruling against us on that?

25            THE COURT:  Yes.  I think the attending consequences

1    are part of understanding the act.

2            MS. CLARKE:  Including the medical complications

3    suffered by someone as a result of the act?

4            MR. WEINREB:  Yes, your Honor.  Just as if somebody's

5    injured and has a bullet in their body and 20 years later they

6    die from it, they can be charged with murder.  It's the

7    understanding under the law of medical sequale that results

8    from the act itself.

9            THE COURT:  Okay.  All right.  So take a couple of

10   minutes to get set up.  We'll be out and we'll bring the jury

11   out and I'll have the preliminary instructions and then I guess

12   the opening.

13           MR. WEINREB:  Okay.  How long do you expect the

14   instructions to be?

15           THE COURT:  Not that long.  About 20 minutes?  15

16   minutes.

17           (The proceedings adjourned at 9:57 a.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  12/14/15
13

14

15

16

17

18

19

20

21

22

23

24

25