UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
v.                               )   Criminal Action
                                 )   No. 13-10200-GAO
                                 )
DZHOKHAR A. TSARNAEV, also       )
known as Jahar Tsarni,           )
                                 )
        Defendant.               )
                                 )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**<u>JURY TRIAL - DAY FORTY-SEVEN</u>**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, April 21, 2015
10:08 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
 3           Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
 4       Suite 9200
         Boston, Massachusetts  02210
 5       - and -
         UNITED STATES DEPARTMENT OF JUSTICE
 6       By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
 7       1331 F Street, N.W.
         Washington, D.C.  20530
 8       On Behalf of the Government

 9       FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10           Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  CELESTE CORCORAN

5      By Mr. Mellin             34

6  GILLIAN RENY

7      By Mr. Chakravarty        71

8  WILLIAM CAMPBELL III,

9      By Ms. Pellegrini         87

10 WILLIAM A. CAMPBELL, JR.

11     By Ms. Pellegrini         107

12 NICOLE GROSS

13     By Mr. Mellin             119

14                          E X H I B I T S

15

16 GOVERNMENT'S
     EXHIBIT       DESCRIPTION              FOR ID      RECEIVED
17
   1601,
18 1601-03,
   1601-04,
19 1601-15,
   1601-17,
20 1601-19,
   1601-21,
21 1601-24,
   1601-28       Photographs                          101
22
   1594          Photograph                            41
23
   1449          Photograph                            61
24
   1632          Photograph                            83
25

```
 1                    E X H I B I T S (cont'd)

 2
       GOVERNMENT'S
 3      EXHIBIT      DESCRIPTION                    FOR ID    RECEIVED

 4     1601-01,
       1601-02,
 5     1601-07,
       1601-08,
 6     1601-09,
       1601-12,
 7     1601-14       Photographs                               114

 8     1601-10       Replacing Exhibit No. 1601-14             119

 9     1619          Photograph                                123

10     1620          Photograph                                128

11     19            Photograph                                133

12

13
       OPENING INSTRUCTIONS BY THE COURT....................PAGE 5
14
       OPENING STATEMENT BY MS. PELLEGRINI..................PAGE 19
15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  All rise for the Court and the jury.

(The Court and jury enter the courtroom at 10:08 a.m.)

THE CLERK:  Be seated.

THE COURT:  Good morning, jurors.

THE JURORS:  Good morning.

THE COURT:  Welcome back.

THE JURORS:  Thank you.

THE COURT:  I must ask you:  Have you all been able to abide by my instructions to avoid any publicity about the case?

THE JURORS:  Yes, your Honor.

THE COURT:  Yes?  And any communications with anybody about the circumstances or the substance of the case?

THE JURORS:  Yes.

THE COURT:  Anybody have anything they want to mention to me privately at all that arose?  No?  Okay.

Well, jurors, as you know, you have unanimously found the defendant guilty of all the counts contained in the indictment.  Seventeen of those counts are capital counts, by which I mean that the death penalty is a possible punishment for those offenses.  Those counts are Counts 1 through 10 and Counts 12 through 18.

Substantively, those counts are, in summary, conspiracy to use a weapon of mass destruction resulting in death, use of a weapon of mass destruction resulting in death,

1    conspiracy to bomb a place of public use resulting in death,

2    bombing a place of public use resulting in death, malicious

3    destruction of property resulting in injury and death, and

4    possession and use of a firearm during and in relation to a

5    crime of violence resulting in death.

6          We're now about to begin the penalty phase of the

7    trial where you must consider separately with regard to each of

8    the capital counts whether imposition of a sentence of death is

9    the appropriate sentence for that conviction or whether the

00:09 10   defendant, Dzhokhar Tsarnaev, should be sentenced to life

11   imprisonment without the possibility of release.

12          As I have previously told you, the law leaves this

13   sentencing decision exclusively to you, the jury.  If you

14   determine that the defendant should be sentenced to death or

15   that he should be sentenced to life imprisonment without the

16   possibility of release, the Court is required to impose that

17   sentence.  You should understand that there is no parole in the

18   federal system.

19          The penalty phase is essentially a second trial, and

00:10 20   in many ways is like the trial you have just completed on the

21   issue of guilt, although now the sole issue for your

22   consideration is punishment.  You should understand that in

23   making all the determinations you're required to make in this

24   phase of the trial, you may consider any and all evidence that

25   was presented during the guilt phase of the trial as well as

1   the additional information that will be presented in this

2   penalty phase.

3          Just as in the first trial, during the course of the

4   penalty phase I'll anticipate that you will again see the

5   attorneys sometimes make objections to the introduction of

6   certain evidence, and I will rule on those objections as they

7   arise.  Please remember, as before, that when I sustain an

8   objection, meaning that I agree the evidence called for should

9   not be given, the witness won't answer the question.

00:11 10          If that's the case, then don't try to answer it

11   yourselves.  Don't try to guess what the answer might have been

12   if it were given.  Just take it that for whatever reason

13   there's no answer to that question, and the question itself is

14   now irrelevant.  Wait for the next question and the answer to

15   that because it's the witness's answers that supply the

16   evidence, not the lawyers' questions.  Unanswered questions

17   produce no evidence for your consideration no matter how much

18   they may suggest some.

19          Similarly, if I overrule the objection, the witness

00:11 20   will go ahead and answer the question.  That answer becomes

21   part of the evidence.  It is -- along with all the other

22   evidence that you'll have to evaluate, it doesn't have any

23   special meaning or significance because there was an answer

24   given after an objection had been made.

25          The structure will be similar to the form we followed.

1    We'll begin when I'm finished with these preliminary remarks

2    with the government's opening statement.  A defendant in a case

3    like this always has the opportunity to make an opening

4    statement but may elect whether to make it immediately

5    following the government's opening, or later on at the

6    commencement of the defense presentation of evidence, and in

7    this case the defendant has elected the second course, so that

8    the defendant's opening statement will actually be made just

9    prior to the beginning of the defendant's presentation of

00:12 10   evidence, which will be next week.  Next Monday is when we'll

11   begin that part.

12        So after the government makes its opening statement,

13   then the witnesses will again be called and examined and

14   cross-examined.  Exhibits will be shown and admitted.  And then

15   when it's all done, after the defendant's case has been

16   presented and you've been instructed again and had another

17   round of closing arguments, you'll begin to deliberate on the

18   issues presented in this phase of the case.

19        The final instructions I will give will be more

00:13 20   complete than these that I give you now, but I want to give you

21   some guidance as to how we'll proceed in the next several days

22   and weeks, perhaps.

23        Now, obviously it is impossible for me to overstate

24   the importance of the decision before you or the careful and

25   thorough consideration you should give to this matter.  I

1    remind you that at the time you were selected as jurors, each

2    of you assured me that if this case required a capital

3    punishment hearing, you would be open-minded as to the possible

4    punishment.  When you took your oath as jurors, you swore that

5    you would give a true verdict according to the law and the

6    evidence.  It is imperative that you keep that promise.

7            Congress has assigned to juries the decision whether a

8    defendant convicted of a capital crime should be sentenced to

9    death or to life imprisonment; however, before the death

00:14 10   penalty can be considered by you for any capital count of

11   conviction, you must first make three important findings

12   unanimously and beyond a reasonable doubt.

13           A sentence of death on a particular capital count may

14   be considered if, and only if, you made the following three

15   findings unanimously and beyond a reasonable doubt with respect

16   to that count:  First, you must find unanimously and beyond a

17   reasonable doubt that the defendant was 18 years of age or

18   older at the time of the offense charged in that count; second,

19   for each of the capital counts, you must find unanimously and

00:14 20   beyond a reasonable doubt that one or more of the following

21   four propositions has been proven.  I may sometimes refer to

22   these propositions as "gateway elements" or "factors."

23           The first is that the defendant intentionally killed

24   the victim or victims of the particular capital offense charged

25   in the respective count of the indictment under consideration;

1          Or, second, that the defendant intentionally inflicted
2    serious bodily injury that resulted in the death of the victim
3    or victims of the particular capital offense charged in the
4    respective count of the indictment;
5          Or that the defendant intentionally participated in an
6    act or acts contemplating that the life of a person or persons
7    would be taken, or intending that lethal force would be used in
8    connection with a person or persons other than one of the
9    participants in the offense, and that the victim or victims of
00:15 10   the particular capital offense charged in the particular count
11   of the indictment died as a result of the acts;
12         Or, fourth, that the defendant intentionally and
13   specifically engaged in an act or acts of violence knowing that
14   the acts created a grave risk of death to a person or persons
15   other than one of the participants in the offense such that
16   participation in the acts constituted a reckless disregard for
17   human life, and the victim or victims of the particular capital
18   offense charged in the respective count of the indictment died
19   as a result of those acts.
00:16 20         So the government must prove at least one of those
21   four propositions beyond a reasonable doubt.
22         Now, before I get to the third thing that must be
23   proved unanimously and beyond a reasonable doubt before the
24   death penalty can be considered, let me pause to define for you
25   two terms that you have heard and will hear throughout the

1    phase of the trial:  "aggravating factors" and "mitigating

2    factors."  You heard a little bit about these concepts during

3    the process of jury selection.

4         In general, these factors relate to the circumstances

5    of the crime or the personal traits, character or background of

6    the defendant.  The word "aggravate" means to make worse or

7    more offensive, or to intensify; the word "mitigate" means to

8    make less severe or to moderate.  An aggravating factor,

9    therefore, is a fact or circumstance that would tend to support

00:17 10    imposition of the death penalty.

11         As I will explain, aggravating factors may be either

12    statutory, meaning they are specified as aggravating factors in

13    the death penalty statute, or non-statutory, meaning they are

14    factors not specified in the statute but alleged by the

15    government to be aggravating factors in this case.

16         A mitigating factor is any aspect of the defendant's

17    character or background, any circumstances of the offenses, or

18    any other relevant fact or circumstance that would tend to

19    indicate that the defendant should not be sentenced to death.

00:18 20         Having said that, now, the third threshold, or gateway

21    finding, that you must make unanimously and beyond a reasonable

22    doubt before you may consider imposition of a death sentence is

23    that the government has proved the existence of at least one

24    statutory aggravating factor.  As I say, a statutory

25    aggravating factor is an aggravating factor that is

1    specifically set forth as such in the death penalty statute and

2    which has been identified in this case by the government for

3    your consideration.

4        The government alleges the following statutory

5    aggravating factors stated in summary form -- alleges that they

6    exist with regard to particular counts and in some cases all of

7    the capital counts.  So these are the statutory aggravating

8    factors that the government alleges:

9        First, the death of the person identified in a

00:19 10    particular count under consideration occurred during the

11    defendant's commission of a crime other than the crime charged

12    in that particular count; second, the defendant knowingly

13    created a grave risk of death to one or more persons in

14    addition to the deceased victim of the offense; third, the

15    defendant committed the offense in an especially heinous, cruel

16    and depraved manner; fourth, that the defendant committed the

17    offense after substantial planning and premeditation to cause

18    the death of a person or to commit an act of terrorism; fifth,

19    the defendant intentionally killed or attempted to kill more

00:19 20    than one person in a single criminal episode; sixth, the

21    defendant is responsible for the death of a victim who was

22    particularly vulnerable due to youth.

23        In summary, then, if after fair and impartial

24    consideration of all the evidence in this case you unanimously

25    find the government has proved beyond a reasonable doubt that

1    the defendant was at least 18 years of age and at least one of

2    the gateway factors about intent and at least one of the

3    statutory aggravating factors with regard to that particular

4    capital count, then you will proceed to the next stage of your

5    analysis.

6         If, however, you find with regard to a particular

7    capital count that the defendant was not at least 18 years old

8    or that no gateway factor had been proved beyond a reasonable

9    doubt or that no statutory aggravating factor had been proved

00:20 10   beyond a reasonable doubt, then your deliberations will be over

11   as to that count, and for that count the Court will impose a

12   sentence of life imprisonment without the possibility of

13   release.

14        If you proceed to the next stage of your analysis, you

15   will consider whether you unanimously find that the government

16   has proven beyond a reasonable doubt the existence of any

17   non-statutory aggravating factor.  Those are factors other than

18   those set out in the death penalty statute which have been

19   specifically alleged by the government for consideration in

00:21 20   this case.  The government alleges several non-statutory

21   aggravating factors.  And again, any finding that a

22   non-statutory aggravating factor exists must be unanimous and

23   beyond a reasonable doubt.

24        After your consideration of the non-statutory

25   aggravating factors, then you will consider and decide whether

1    the defendant has shown the existence of any mitigating

2    factors.  There are some important distinctions that I want to

3    highlight for you with respect to the proof of mitigating

4    factors.  The defendant has the burden of proving any

5    mitigating factors by the preponderance of the evidence.  The

6    defendant is not required to prove the existence of a

7    mitigating factor beyond a reasonable doubt, which is a burden

8    of proof the government has with respect to aggravating

9    factors.

00:22 10       The defendant need only establish the existence of a

11   mitigating factor by a preponderance of the evidence, that is,

12   by the greater weight of the evidence.  Put another way, you

13   need only be convinced that it is more likely true than not in

14   order to find that the mitigating factor exists.

15       Importantly, a unanimous finding is not required as to

16   the existence of any mitigating factor.  Any juror individually

17   or independently may find the existence of a mitigating factor

18   regardless of the number of other jurors who may agree.  A

19   juror who so finds may consider that factor in weighing the

00:22 20   evidence as a whole.  In other words, if any member of the jury

21   finds that a mitigating factor has been proved, that juror may

22   weigh that factor in making up his or her mind whether or not

23   to vote to impose the death sentence as opposed to life in

24   prison as to any of the capital counts.

25       After you've considered and decided what aggravating

factors and what mitigating factors have been proved, you will

then consider whether any proven aggravating factor or factors,

both statutory and non-statutory, outweigh any mitigating

factor or factors that you individually, or with other jurors,

have found to exist.

After weighing the aggravating and any mitigating

factors, the jury must consider whether all the aggravating

factor or factors found to exist sufficiently outweigh all the

mitigating factor or factors found to exist to justify a

sentence of death, or in the absence of a mitigating factor,

whether the aggravating factor or factors alone are sufficient

to justify a sentence of death.

In carrying out this weighing and balancing process,

jurors are called upon to make a unique, individualized

judgment about the appropriateness of sentencing another human

being to death.  This is not a mechanical process.  Neither is

the decision determined by the number of aggravating or

mitigating factors considered in the balance.

Jurors should consider such factors qualitatively,

assessing the weight and significance that should be given to

each factor.  For example, one aggravating factor, if

sufficiently serious, may outweigh several mitigating factors.

By the same token, a single mitigating factor may outweigh

several aggravating factors.  In short, what is called for in

weighing the various factors is not arithmetic but an

1    individual juror's careful, considered and reasoned judgment.

2         Again, whether or not the circumstances in the case

3    justify a sentence of death is a decision the law leaves

4    entirely to you, and you should not take that anything I may

5    say or do during this phase of the trial, or have said or done

6    in the prior phase, as indicating in any way what I think of

7    the evidence or what I think your verdict should be.

8         As I mentioned, you must deliberate and determine a

9    sentence for each of the capital counts separately.  You may

00:25 10   conclude the aggravating and mitigating factors should receive

11   different weights in conducting the separate weighing of

12   aggravating and mitigating factors applicable to each of the

13   capital counts.  In other words, a decision about one count

14   does not mean you have to make the same decision about any

15   other count.  You may or you may not as you determine as

16   appropriate and just.

17        There are several final points I want to make and

18   emphasize.  The first that I mentioned briefly is that you are

19   never required to return a verdict of death.  The law provides

00:26 20   you with guidance in making a decision, but as stated earlier,

21   your decision on whether this question of life or death is an

22   individual -- your decision on this question of life or death

23   is an individual judgment which the law in the final analysis

24   leaves up to each of you.  And as you've heard, in order to

25   impose a sentence of death, all 12 jurors must agree that death

1    is the appropriate sentence.

2          I also want to draw your attention to a unique aspect

3    of capital cases.  At the end of this case, along with the

4    other detailed instructions that you'll have that apply to the

5    sentencing decision, I will include an instruction along the

6    following lines:  In your consideration of whether to impose

7    the death sentence or life imprisonment without the possibility

8    of release, you must not consider the race, color, religious

9    beliefs, national origin or sex of either the defendant or the

00:27 10   victims.  You are not to return a sentence of death unless you

11   would return a sentence of death for the crime in question

12   without regard to the race, color, religious beliefs, national

13   origin or sex of either the defendant or any victim.

14         When they passed the Federal Death Penalty statute,

15   Congress considered this non-discrimination principle to be so

16   important that it created a special procedure for it.  When you

17   have completed your deliberations and have reached a verdict,

18   you will each be asked to sign a certificate swearing that you

19   have followed that instruction, that non-discrimination

00:27 20   instruction, in your sentencing determination.  You won't get

21   to the form, of course, until the end of the sentencing

22   process, but I wanted you to know about it so you can keep it

23   in mind throughout the hearing while you listen to the

24   evidence.

25         Let me highlight one last aspect of the case before we

```
 1    begin:  During the course of the sentencing proceeding the
 2    government will be introducing what is known as victim-impact
 3    evidence.  Victim-impact evidence is evidence about the
 4    deceased person's personal characteristics and the impact of
 5    their deaths upon their families and on others.  The government
 6    has provided notice that it intends to present such evidence to
 7    show the injury, harm and loss caused by each of the victim's
 8    deaths.
 9            You must be careful not to permit this evidence to
10    cause you to sentence the defendant simply out of sympathy with
11    the victims or the family members.  Such sympathy may be
12    natural, even unavoidable, but it cannot be the basis for your
13    sentencing decision.  Your decision must be a reasoned moral
14    response to the evidence before you concerning all the
15    circumstances of the offenses and the defendant's own
16    background, character and record.  Your decision must not be
17    simply an emotional response to the victim-impact evidence or a
18    way to express sympathy with or support for the victim's
19    families.
20            I also caution you you should not be influenced by
21    speculation concerning what sentence you think anyone else,
22    including the victims's families, might wish to see imposed on
23    the defendant.  You have been selected to decide this case
24    because you committed to be fair and impartial in all respects,
25    and you have made your oath or affirmation to that effect.  It
```

1    is for you alone as fair-minded jurors, who have no friends to

2    reward and no enemies to punish, to decide the appropriate

3    sentence in this case.

4         I will repeat and elaborate on these points after you

5    have heard all the evidence and before you begin your

6    deliberations.  As in the prior proceedings, you'll have a

7    special verdict form to assist you and guide you in your

8    deliberations.  But because these procedures are unique to

9    capital cases and so fundamentally important to your

00:30 10   decision-making, I thought it advisable for you to have this

11   preliminary explanation.

12        So thank you for your attention.  We're now ready for

13   the government's opening statement.

14        Ms. Pellegrini.

15        MR. WEINREB:  Your Honor, we'd ask the jurors to lift

16   their screens.

17        THE COURT:  Okay.  I guess there will be use of the

18   screens.

19        MS. PELLEGRINI:  Good morning.

00:32 20   THE JURORS:  Good morning.

21        MS. PELLEGRINI:  Unbearable, indescribable,

22   inexcusable and senseless.  All of those words have been used

23   to describe the murders committed by Dzhokhar Tsarnaev.  Yes,

24   the deaths of Krystle Campbell, of Lingzi Lu, of Martin Richard

25   and of Officer Sean Collier have been all of those things for

1    their families and for their friends.

2            But don't let those descriptions make you think that

3    you'll never really understand what Dzhokhar Tsarnaev did to

4    those victims and don't think that you won't know the full

5    impact of his crimes, or that you won't be able to comprehend

6    what those murders did to their families, their friends and

7    their colleagues.  You will know the story of those four

8    families.

9            The deaths committed by Dzhokhar Tsarnaev were

00:33 10    deliberate, intentional and cruel.  You know how Krystle,

11    Lingzi, Martin and Sean died.  Now you need to know how they

12    lived.  You need to know and understand why their lives

13    mattered.  You will begin to know Krystle Campbell and

14    understand what it meant to lose the young woman that her

15    father, Bill Campbell, nicknamed "Princess."  You'll hear more

16    about Lingzi, and you will understand what it meant to lose the

17    young woman that her father, Jun Lu, remembered as a jolly

18    girl.

19            You'll see Martin Richard who so resembles his dad,

00:34 20    and see him in photos that will remind you of what an

21    eight-year-old boy's life is like.  Should be like.  And you

22    will know Sean Collier, the officer who inspired these words

23    spoken to those who mourned him:  "Live long, like he would.

24    Big hearts, big smiles, big service.  All love."

25            These young women, this young man and this little boy,

1   all of them were loved and they loved in return.  This is how

2   we should know them, because they weren't always just the

3   victims of Dzhokhar Tsarnaev.  Before he murdered them in some

4   of the cruellest ways imaginable, they were sons, they were

5   daughters, they were grandchildren, they were brothers and they

6   were sisters.  And all of them had rich and fulfilling lives

7   even at their young age.

8          But now these beautiful faces are memories and

9   memorials.  They're symbols, even, of loss, when all their

00:36 10   families would want is to have them back one more time to be

11   their son, their daughter, their best friend.  When all they

12   want is to have them come home one more time.  For Lingzi, that

13   would mean home to China, as she's pictured here, so that her

14   parents could tell her that they kept their promise, they kept

15   her beloved music collection safe when she left China to travel

16   halfway around the world to come to Boston to study.

17          One more time just to see them laugh and joke, like

18   Krystle here celebrating after a wedding that she had

19   successfully planned and pulled off on Spectacle Island.  Just

00:37 20   to watch them smile proudly, like Sean here at a family

21   wedding.  And just to see Martin decked out in green beads one

22   more time for one more St. Patrick's Day.

23          Their families had every right to expect they would

24   live out their lives and realize the potential of these young

25   lives, but Dzhokhar Tsarnaev took them all away, in the most

1   painful and brutal ways possible.  They were all beautiful, and

2   they're all now gone.

3          And there are others who, while they survived, found

4   their lives dramatically, irrevocably changed in an instant by

5   Dzhokhar Tsarnaev:  Jessica Kensky, Roseann Sdoia, Karen

6   McWatters, Jeff Bauman, Rebekah Gregory.  They're just a few of

7   the victim survivors.  Roseann, Karen and Rebekah each suffered

8   the amputation of one leg; Jessica and Jeff have now lost both

9   legs.  You heard and you saw what they went through, what they

00:38 10   suffered through and the terrible injuries inflicted by

11   Dzhokhar Tsarnaev.

12          And, yes, when they testified, they were brave, they

13   were resilient and they were open.  They faced you, as they

14   still face life, with great humor and good grace.  But now you

15   need to know the full story of all of them, of all of the

16   survivors.  You need to know how close they came to death as a

17   result of the actions of Dzhokhar Tsarnaev; how close they came

18   and others came, and how close others still might be.

19          The question of guilt has been answered, and the

00:39 20   question of sentence remains.  You have heard testimony and

21   you've seen photos and videos; you've heard the graphic

22   descriptions and the wrenching testimony of the victims and the

23   witnesses.  You needed to know all of that evidence because you

24   needed to know what happened on Boylston Street, in Cambridge

25   and in Watertown.

1          The verdicts don't supply you the answer to the next

2     question that you must answer, but the evidence will assist

3     you.  And you could consider everything that you have heard in

4     the guilt phase and everything that you are about to hear in

5     this phase; you'll just look at it in a slightly different way.

6     Because now all of the evidence and all of the information will

7     help to assist you in answering one more question.  And we

8     phrase the question as this:  Why?  Why?  After weighing all of

9     the aggravating factors and mitigating factors, why is the

00:40 10   death penalty the appropriate and just sentence for Dzhokhar

11    Tsarnaev?

12          The answer, we suggest, will be found in the entire

13    sum of Dzhokhar Tsarnaev's own character and his own actions.

14    Every gateway factor that the Court mentioned and every

15    aggravating factor will be proven to you beyond a reasonable

16    doubt.  Why is the death penalty the appropriate and just

17    sentence?  Because Dzhokhar Tsarnaev planned and he plotted to

18    kill.  Because when Dzhokhar Tsarnaev sauntered down Boylston

19    Street and took a pressure cooker bomb into the crowds, he

00:40 20   created a grave risk of death for every person within a radius

21    of that bomb.  And later he created that same risk for every

22    officer and every person in the radius of the bombs that he

23    threw down Laurel Street, and every officer in the range of the

24    car that he gunned down Laurel Street.

25          Why?  Because Dzhokhar Tsarnaev created grave risk of

1    death for every single one of the 17 victims who had to undergo

2    amputations, many undergoing multiple operations, some

3    undergoing multiple amputations, all of them being put at risk

4    and some still, I'd suggest.

5        Because in the course of four days he took the lives

6    of these four young, beautiful people.  Three died on the

7    streets of Boston, killed by pressure cooker bombs that

8    exploded with such lethal force that pieces of them were

9    embedded in the concrete buildings across the street.  Dzhokhar

00:41 10   Tsarnaev murdered each one of them in a way that they had time

11   to feel pain, they had time to be scared and frightened, but

12   they had no time to say good-bye.  And that is the very essence

13   of terror.

14       Why?  Because Dzhokhar Tsarnaev executed a police

15   officer targeted simply because he was an officer and Dzhokhar

16   Tsarnaev wanted his gun, an officer who sat in his cruiser on

17   that quiet Cambridge campus and died after he was shot between

18   the eyes.

19       The ultimate question requires you to make a

00:42 20   determination, but as the Court just instructed you, you cannot

21   make that final determination until you have made certain

22   gateway findings.  So let's look at what you already know and

23   what you will know.

24       Dzhokhar Tsarnaev was 19 and a half years old when he

25   walked down Boylston Street, just three months shy of his 20th

1    birthday.  He carried a backpack stuffed with a heavy took time

2    to build pressure cooker, itself lined with nails and BBs that

3    would become embedded in the bodies of his victims.  He carried

4    a weapon of mass destruction; not simply a random and quick

5    means, an opportunity to commit a crime.  It took time to build

6    the bombs.  It took time and planning to get Dzhokhar Tsarnaev

7    and the bombs into his hands.  It took planning and it took

8    coordination to get him and the bombs to Boylston Street.  And

9    quite obviously, his detonation of the bomb seconds after the

00:43 10   first blast was carefully coordinated and calculated.  You saw

11   the images of Dzhokhar Tsarnaev on his phone at the Forum site.

12   You saw the phone records.

13          As Dzhokhar Tsarnaev walked with his partner, his

14   coconspirator, his brother, he could see what the Boston

15   Marathon represented in those few blocks, and how could he not

16   see or know the vulnerability of each and every one of those

17   spectators?  There he is, a 26.2-mile road race that culminates

18   in the heart of Boston, surrounded -- the course surrounded by

19   well-wishers, celebrants, avid fans and casual observers.  The

00:44 20   finish line just ahead beckoning thousands of runners.  And

21   people stood cheering and ringing bells and clapping and

22   laughing.

23          And after Tamerlan Tsarnaev walked toward the finish

24   line, Dzhokhar Tsarnaev stood alone at the site of the Forum.

25   He stood alone, but he was in a crowd.  His lethal bomb at his

1   feet represented a grave risk of death and, of course, death

2   for those who died.  He stood, he looked, he called his brother

3   and he acted.

4          After both bombs exploded, three people lay dying, and

5   many people were so badly injured that their limbs were already

6   amputated or shortly would be.  And among the deceased was a

7   small eight-year-old boy.  Three days later Dzhokhar Tsarnaev

8   shot and killed a police officer.  After the carjacking that

9   followed that murder, he tried to murder police officers in

00:45 10   Watertown.  He threw bombs, and he was the one who drove the

11   car directly at those same officers.  Four deaths in four days.

12          In just that short retelling, you already have

13   evidence of age:  18 years or older; intentional killing of

14   four victims, because every death was intended.  There was no

15   mistake or accident about any one of these.  And you have and

16   will have evidence of the following factors:  the death of

17   individuals during the commission of other crimes; the grave

18   risk of death to people other than the victims; the heinous,

19   cruel and depraved method of committing these crimes;

00:46 20   substantial planning and premeditation; multiple killings and a

21   vulnerable victim.

22          You have that information, but there will be more.

23   Keep asking the question:  Why is the death penalty the

24   appropriate and just sentence for Dzhokhar Tsarnaev?  Because

25   the evidence has shown and will show that Dzhokhar Tsarnaev

1     deliberately selected a glorious and famous international

2     sporting event for its fame and for the vulnerability of its

3     spectators; because he twisted the marathon into something

4     cruel and ugly for his own purposes, and because he took the

5     marathon and turned it into a political statement to bring

6     attention to himself, to his own beliefs, and to others who

7     would share those beliefs.

8          But the horror and the death of the victims, that told

9     you what Dzhokhar Tsarnaev did and how he did it, but that

00:47 10   horror is now joined with the impact of the never-ending loss

11    upon the families of the victims.  Only when all of those facts

12    come together will you know the full effect of Dzhokhar

13    Tsarnaev's acts upon the families left behind, and only then

14    can you carefully weigh the factor of victim impact.

15         Your sentencing decision will be a consideration of

16    Dzhokhar Tsarnaev's character and his actions, and it is not an

17    exercise in comparison.  Each and every time you hear Tamerlan

18    Tsarnaev's name or any other person's name, you can ask

19    yourselves why.  Why are you hearing that?  Tamerlan Tsarnaev,

00:47 20   he's an easy target.  Easy target while he lived, certainly an

21    easy target when he's dead.  He's not a substitute for his

22    brother.

23         But it's much more than that.  Because ask yourselves

24    if there's anything about Tamerlan Tsarnaev or any other person

25    that will explain to you how Dzhokhar Tsarnaev could take a

1    bomb, leave it behind a row of children, walk away, down the

2    street, and detonate it.  Is there anything that will explain

3    how he could walk away from that happy and crowded scene, look

4    back over his shoulder, knowing that he just left death there

5    to go off, and he kept on going?

6         You may hear about family dynamics, family history,

7    family dysfunction.  But many people -- millions of people, one

8    would venture -- face troubles throughout their lives.  Who

9    among them murders a child with a bomb?

00:48 10         You may see photos of Dzhokhar Tsarnaev at family

11   gatherings, school events, dances, at camp, playing the drums.

12   That might tell you he had the advantages of a good education

13   at schools; that he led others, like those on his wrestling

14   team; that he was taken care of, and that he was educated.

15         But nothing will explain his cruelty and his

16   indifference.  Nothing will, other than his own character.  And

17   everything you know and will know about Dzhokhar Tsarnaev and

18   the crimes that he committed will reinforce he simply is

19   callous and indifferent to human life.  These personal

00:49 20   characteristics are what set him apart, and it's his character

21   that makes the death penalty appropriate and just.

22         It's not that hate and callous indifference to human

23   life are anything new.  Sadly, they're not.  But neither are

24   the notions of jihad or radicalization.  Those didn't start

25   with Dzhokhar Tsarnaev, and they certainly didn't start with

1    Tamerlan Tsarnaev, and it is tempting to look elsewhere when

2    one's beliefs and actions are so fundamentally different than

3    what you would expect from another human being.

4         So when Shakespeare wrote that "The fault, dear

5    Brutus, is not in our stars but in ourselves," he was reminding

6    us that we have to look inward.  We have to look towards the

7    person in whom the fault lies.  No alignment of the heavens

8    will explain or excuse Dzhokhar Tsarnaev.

9         The evidence presented and to be presented will show a

00:50 10   person whose cruel character can be found in the way that he

11   murdered and in his own reactions to those murders, his own

12   beliefs, and his own motivations.  It's the lines that he was

13   so willing to cross that make him fundamentally different.  And

14   it may have been hard to imagine that an individual would have

15   such feelings and then act upon them in such a way, but you no

16   longer have to imagine.  You've seen it.

17        If you want to understand Dzhokhar Tsarnaev and what

18   he did, you don't have to look to the heavens for an answer.

19   You can look for the man who walked alone down Boylston Street,

00:51 20   knowing that his brother had taken up his own place at another

21   location.  You can look for the man who stood alone behind the

22   Richard family for almost four minutes.  You can look for the

23   man who then walked off alone, leaving behind a bomb that would

24   kill Lingzi and Martin; who, without his brother, got back to

25   the UMass Dartmouth campus and three days later came back.

1              Look for the man who alone got the gun that killed

2      Sean Collier; who alone went into the bank and used the debit

3      card of a terrified carjacking victim to get money; and who

4      drove alone down Laurel Street trying to mow down Watertown

5      police officers; who escaped alone; and who then, alone with

6      his own thoughts, wrote in his own words -- wrote and carved

7      his manifesto into the inside of that boat on Franklin Street,

8      declaring his beliefs and righteousness of his own actions.

9              All of that evidence, and that which will follow, will

00:52 10      tell you that Dzhokhar Tsarnaev was and is unrepentant,

11      uncaring, and untouched by the havoc and the sorrow that he has

12      created.  Remember Dr. Levitt said a small number of people

13      cross the line into radicalization.  But in reality, Dzhokhar

14      Tsarnaev was willing to cross every line for personal glory and

15      for reward.  Kill innocents with a bomb:  Done.  Kill a police

16      officer:  Done.  Kill a child:  Done.  All of those lines were

17      crossed.  They were erased.  All those boundaries were

18      shattered.  It was done by Dzhokhar Tsarnaev.

19              You've seen the milk-buying video.  You've seen the

00:53 20      gym video.  You've seen the Shell gas station video where he

21      shops for snacks less than two hours after Officer Collier had

22      been executed.  And you know he was in Officer Collier's car.

23      And he shops while a terrified carjacking victim sits outside.

24              You've also seen the Bank of America video.  And while

25      it hasn't received the attention of the others, it may be just

1    as telling.  Dun Meng has been carjacked.  He's been forced to

2    give up his car and his PIN number.  You watch Dzhokhar

3    Tsarnaev as he enters that bank.  He calmly examines the card

4    in his hand.  During the course of the next three minutes, he

5    first punches in the number, and it's wrong.  Does he panic?

6    Does he run outside and seek the assistance of his brother?

7    No.  He calmly reenters that number.  He gets into the account,

8    and he steals money.  And then, as if he had all the time in

9    the world, he tries to get more money.

00:54 10           Dzhokhar Tsarnaev was as successful as only he and

11   *Inspire* magazine could have hoped.  "Successful means," *Inspire*

12   magazine wrote, "are through explosive devices and sacrificing

13   souls."  These -- these are the souls that he sacrificed.

14           You're considering Dzhokhar Tsarnaev's character.  And

15   you're free to ask, does it really matter who came first in the

16   long line of radicalization?  As I said, Dzhokhar Tsarnaev

17   wasn't the first to radicalize.  Neither was Tamerlan.  And

18   whether Dzhokhar Tsarnaev was radicalized by his brother, by

19   Anwar al-Awlaki, by some Internet lecture, by a song, or by a

00:55 20   terrorist-to-go magazine, the origin and the lineage of

21   terrorism don't matter.  What matters are his beliefs in

22   terrorism, his actions of terror, and the consequences of his

23   actions upon others.

24           He believed, because terrorism sang to him, and then

25   he acted.  He killed.  Nothing was forced upon him.  He simply

1    shared.  He shared his belief in terrorism, and he shared it

2    with his brother and others.

3         These people, they were the enemy to Dzhokhar

4    Tsarnaev.  He knew they were innocents.  He even called them

5    that.  But it didn't stop him from murdering them.  Two young

6    women and a young man that won't ever reach the age of 30.  And

7    a little boy who will never reach the third grade.  This will

8    be their story.  The impact that each of these young people had

9    in their lives and the impact of their death far exceeds the

00:56 10   scant number of years of life that they were given.

11        You know, some milestones in life are easy to spot,

12   easy to prepare yourself for:  birthdays and anniversaries,

13   graduations.  And then there are the little things:  teaching

14   your child how to ride a bike, drive a car, taking him to

15   dancing lessons or watching him go off to the prom, going to

16   ball games with him or watching them play baseball, going to

17   visit the grandparents or just hiking a trail.

18        But it's the very smallest of details woven together

19   that make up a life, and that's where grief resides.  It's

00:56 20   every minute of every day, grief and loss, and it is

21   inescapable.  It's the laugh that no one will ever hear again.

22   It's the talented fingers that won't ever touch the keyboard

23   again.  It's the selfies that won't be shared or laughed over.

24   It's the phone calls and texts that won't be sent or received.

25   It's even the little irritations of life.  Who drives you crazy

1    when they leave their sports equipment in the hallway?  Who

2    doesn't put away the laundry?  Who ate the last piece of cake?

3         Things that make you laugh and make you cry at the

4    same time.  And even in moments of happiness, sadness will

5    remain.  And the thoughts of the future will bring no peace.

6    Every time someone thinks, Oh, he really would have enjoyed

7    that game.  Or, Look at that, she would have looked great in

8    that dress.  Or, Remember that grandpa was so proud of him?  It

9    will come with a wrenching ache.

00:57 10      All of this loss is senseless, and it will remain so

11   because there's no sense to be made of it.  And these deaths

12   are inexplicable because there are no explanations.  And these

13   crimes are inexcusable because there should be no excuses.

14        The Boston-born poet and philosopher, Ralph Waldo

15   Emerson, wrote, "The only person you are destined to become is

16   the person you decide to be."  Destiny:  It's the sum of one's

17   decisions and actions and beliefs.  It's as personal and

18   individual as a fingerprint.  And for Dzhokhar Tsarnaev, his

19   decisions and his actions and his beliefs made up who he was

00:58 20   and who he is.  His destiny was determined by him, and he was

21   determined and destined to be America's worst nightmare.

22        You can keep your hearts and minds open, and you'll

23   find a man whose heart was full of rage and whose mind was dead

24   set on the path that he took.

25        On July 10th, 2013, almost three months after Dzhokhar

1    Tsarnaev had murdered Krystle Marie Campbell, Lingzi Lu, Martin

2    Richard, and Officer Sean Collier, he was here in this

3    courthouse.  He knew the United States had charged him for his

4    crimes.  In the room that he was in, there was a video camera.

5    Dzhokhar Tsarnaev was alone.  There was no brother with him.

6    And once more, just as he had done with the boat on Franklin

7    Street, he had one more message to send.

8                (Photograph displayed.)

9                MS. PELLEGRINI:  This should be on the screens.

00:59 10              This is Dzhokhar Tsarnaev, unconcerned, unrepentant,

11    and unchanged.  Without remorse, he remains untouched by the

12    grief and the loss that he caused.  And without assistance, he

13    remains the unrepentant killer that he is.  It is because of

14    who Dzhokhar Tsarnaev is that the United States will return and

15    ask you to find that the just and appropriate sentence for

16    Dzhokhar Tsarnaev is death.

17                Thank you.

18                THE COURT:  All right, Mr. Mellin.

19                MR. MELLIN:  Thank you, your Honor.

01:03 20              Your Honor, the United States calls Celeste

21    Corcoran.

22                      CELESTE CORCORAN, duly sworn

23                THE CLERK:  Have a seat.  State your name and spell

24    your last name for the record, if you would, please.

25                THE WITNESS:  My name is Celeste Corcoran,

```
 1    C-E-L-E-S-T-E, C-O-R-C-O-R-A-N.

 2                         DIRECT EXAMINATION

 3    BY MR. MELLIN:

 4    Q.   Good morning, Ms. Corcoran.  I think it's still morning.

 5    Can you pull the microphone maybe just a little bit closer to

 6    you?

 7    A.   (Witness complies.)

 8    Q.   Thank you.

 9    A.   Better?

10    Q.   That's much better.  Thanks a lot.

11         Miss Corcoran, where did you grow up?

12    A.   I grew up in Lowell, Massachusetts.

13    Q.   At some point did you graduate from high school?

14    A.   Yes, I did.

15    Q.   And where was that?

16    A.   It was a vocational high school.

17    Q.   Okay.  Did you meet Kevin Corcoran at some point?

18    A.   Yes, I did.

19    Q.   And who is Kevin Corcoran?

20    A.   Kevin is my husband.

21    Q.   When did you meet?

22    A.   We met as teenagers through a family friend.

23    Q.   At some point did you get married?

24    A.   Yes, we did.  In 1989.

25    Q.   And when was that --
```

```
 1    A.    I'm sorry?

 2    Q.    -- if you remember.

 3          Do you remember when you got married?

 4    A.    Yes.

 5              (Laughter.)

 6    A.    1989.

 7    Q.    Do you have any children?

 8    A.    I do.

 9    Q.    How many children?

10    A.    Two.

11    Q.    Who are they?

12    A.    Tyler; he's 22.  And Sydney will have her birthday in just

13    a couple of days, and she's going to be 20.

14    Q.    And Sydney previously testified in this courtroom.  Is

15    that right?

16    A.    Yes, she did.

17    Q.    After you graduated from high school, did you begin work?

18    A.    I did.  I started working as a hairstylist immediately.

19    Q.    And did you continue to work as a hairstylist up until the

20    time of April of 2013?

21    A.    I did.

22    Q.    And around that time, where were you working?

23    A.    I'm sorry?

24    Q.    Where were you working?

25    A.    I was working at Emerge Spa & Salon on Newbury Street.
```

```
 1   Q.   Do you know where Newbury Street is in relation to
 2   Boylston Street?
 3   A.   It's parallel to it.
 4   Q.   Okay.  It's just one block over running parallel?
 5   A.   Yes.  Yes.
 6   Q.   Okay.  And how long had you worked on Newbury Street?
 7   A.   I believe it's been about 15 years, 14 years.
 8   Q.   On April the 15th of 2013, did you go to the Boston
 9   Marathon?
10   A.   I did.
11   Q.   Why did you attend?
12   A.   I went because my sister, Carmen, my only sister, was
13   running the marathon.
14   Q.   Had you ever run a marathon?
15   A.   God, no.
16        (Laughter.)
17   A.   No.  And this was her first marathon.  It was supposed to
18   be a one-and-done.  And I watched her train so hard, and there
19   was no way that my entire family was going to miss her running
20   that marathon.  I had never been to the Boston Marathon myself.
21   Q.   So on the morning of April 15, what did you do?
22   A.   We left Lowell very early.  One of my friends lives close
23   by, and she has a parking spot for us to stay -- to park in.
24   And I was very worried about parking and road closings and
25   everything, so we went early.  We left Lowell probably about
```

```
 1   8:30 in the morning, and so got to Boston fairly early.
 2       And I just remember that it was such a beautiful day.  And
 3   we had so much time, so we went on Commonwealth Ave, in that
 4   little grassy area, I think it's called the mall, and we had
 5   some Dunkin' Donuts, we talked.  It was my husband, my daughter
 6   and I.
 7   Q.   And when you say your daughter, Sydney?
 8   A.   Yes.
 9   Q.   Okay.
10   A.   And then when I work, I usually, you know, go to work and
11   then go home, and I don't explore the city that much.  So we
12   decided that we had enough time, I had said that I had never
13   walked over the Arthur Fiedler Footbridge, so we decided to
14   take a little stroll.  And we walked over that and we went over
15   to the Hatch Shell.  I had never been in that area before.  And
16   we walked out onto -- closer to the water, onto this little
17   pier, you know, where there were these chairs there.
18       And I just remember it being so beautiful.  We were
19   sitting in the sun.  And I remember sitting sideways in my
20   chair, and I just kind of put my feet up on the back of
21   the -- on the side of the chair and just kind of, you know,
22   raising my face to the sun and just thinking that it was such a
23   beautiful day.
24   Q.   When you talk about the water, that's the Charles River
25   right there?
```

```
 1   A.   Yes.

 2   Q.   After that, where did you go?

 3   A.   We made our way back to Newbury Street.  We met up with

 4   friends of ours, Ron and Karen Brassard, and their daughter

 5   Krystara.  We were tracking my sister through our cell phones

 6   and stuff, so we knew that we still had some time.  So the

 7   girls split off and we went into a couple of little shops, and

 8   the guys went to Joe's for a beer, and we agreed to meet maybe,

 9   like, an hour later.  We knew -- because we knew that it was

10   close to the time that my sister -- we wanted to be at the

11   finish line maybe -- you know, the tracking device wasn't

12   extremely accurate, so we wanted to be there in plenty of time

13   to absolutely not miss her.

14       So actually, then we -- when we did meet up, we ate at

15   Stephanie's restaurant on Newbury Street.

16   Q.   And do you know what cross-street that's at?  Is that at

17   Exeter?

18   A.   What?

19   Q.   Do you know what cross-street that is at?

20   A.   I believe it's --

21   Q.   Is it Exeter?

22   A.   Exeter.  I think it's Exeter.

23   Q.   All right.

24   A.   So when we were done eating lunch, we decided that it was

25   time to make our way up onto Boylston Street.  And we went up
```

1    Exeter and --

2    Q.   At that time who was all together as a group?

3    A.   So it was myself, my husband Kevin, Sydney, Ron and Karen

4    Brassard, their daughter Krystara, and Krystara had called her

5    roommate Victoria, I believe her last name was McGrath.

6    Q.   All right.

7    A.   And we all made our way to Boylston Street.  And at that

8    point my husband pointed out that we were -- we were going to

9    stay right there, and he was like, "Okay.  We're behind the

01:11 10   finish line.  You're not going to see her finish."  So he made

11   the call that we should all move towards the finish line.  So

12   we followed him and got to -- a couple of times along the way

13   we tried to get him to stop because we thought we were close

14   enough, but we ended up in front of Marathon Sports, and that's

15   where we stopped to watch.

16   Q.   Okay.

17        MR. MELLIN:  Your Honor, if I could have, just for the

18   witness right now, Exhibit 1594.

19   Q.   Mrs. Corcoran, do you see the exhibit in front of you now

01:12 20   on the screen?

21   A.   Yes.

22   Q.   And is that a photograph of where you were standing along

23   Boylston Street at the marathon?

24   A.   Yes, it is.

25   Q.   And as you look at it, in fact, do you see yourself in the

1    photograph?

2    A.    I'm right here (indicating).  Will that show?

3    Q.    It's actually -- if you could just answer "yes" or "no"

4    for right now.

5    A.    Oh, I'm sorry.

6    Q.    Do you see yourself in that photograph?

7    A.    Yes, I do.

8    Q.    And Sydney, and your husband Kevin as well?

9    A.    Yes, I do.

01:12 10    Q.    Okay.  And is that a fair and accurate picture of where

11    you were standing at that time?

12    A.    Yes, it is.

13            MR. MELLIN:  Your Honor, I would move into evidence

14    Exhibit 1594.

15            MS. CLARKE:  Subject to the previously noted

16    objection.

17            THE COURT:  All right.  It's admitted over the

18    objection.

19            MR. MELLIN:  And if it may be published, please?

01:13 20    Thank you.

21            (Government Exhibit No. 1594 received into evidence.)

22    BY MR. MELLIN:

23    Q.    Now, Mrs. Corcoran, you were about to touch the screen.

24    Can you please circle yourself in this photograph?

25    A.    (Witness complies.)

```
 1    Q.    Thank you.  And you drew a circle around the person who is
 2    actually identified as Celeste Corcoran, right?
 3    A.    Yes.
 4    Q.    Okay.  And there's also a line drawn to Sydney and a line
 5    drawn to your husband Kevin as well.  Is that right?
 6    A.    Yes.
 7    Q.    All right.
 8          MR. MELLIN:  We could take that down, Mr. Bruemmer.
 9    Thank you.
10    Q.    Mrs. Corcoran, shortly after you got to that location
11    there by the flags, what happened?
12    A.    We -- I remember being a little frustrated because we were
13    maybe six or seven people deep from the fence and my -- I was
14    determined that I was going to see my sister -- I needed to see
15    my sister cross the finish line.  So Sydney at the time was
16    taller than me, and I was kind of using her shoulder to kind of
17    lift myself up.  And I just remember my head being on a swivel,
18    looking back and forth, you know.  And we would yell back and
19    forth to each other, like, "Did you see it?  Did you see
20    anything?"  And we were just waiting and waiting.
21          And then Ron and Karen sort of -- I didn't know because I
22    was so attuned to watching the street, but Ron and Karen had
23    sort of -- we had sort of spread out a little bit, but Sydney
24    did stay next to me.  And at that point I think my husband
25    had -- was joking around with Ron and Karen and -- about the
```

1    signs.  Karen had made some signs to cheer my sister on.  And
2    then our whole world just exploded.
3    Q.   What do you remember about the explosion?
4    A.   I, unfortunately, remember every single detail.  I did not
5    pass out.  I remember being thrown up in the air, or having the
6    sensation of kind of flipping around.  I remember just, like,
7    landing hard, not being able to breathe.  I remember this
8    thick, thick, black, heavy smoke.  I was choking.  I was trying
9    to spit stuff out of my mouth.  I was completely confused.  I
01:16 10  didn't know what had happened.
11       There was this -- it's so hard to describe.  It was like
12   this deafening silence.  And when I opened my eyes and, you
13   know, could see the black smoke and everything, I could hear --
14   my eardrums got blown out.  So I just remember that being so
15   irritating, like, why can't I hear?  It was like my mind hadn't
16   caught up yet with what had happened.
17       And I remember hearing just blood-curdling screams.  I
18   remember just looking around, not really seeing -- just seeing
19   blood everywhere, sort of, like, debris falling from the sky.
01:17 20  It was such a surreal kind of out-of-body experience.  It's
21   very hard to explain but I want to try and get it right for you
22   all to understand.  And I just remember lying there, and I
23   think as my brain was kind of catching up, I just remember
24   thinking, like, what was that, you know?  And...
25   Q.   As you lay there, did you look around and could you see

1    what was around you?  You mentioned blood but --

2    A.    I saw blood.  I saw a lot of blood.  And when I had

3    flipped, I remember feeling someone.  I pushed off of someone

4    or something.  Our bodies collided or something.  And I don't

5    know who that was.

6         And I remember trying to sit up, and I couldn't sit up.

7    And I remember looking down, and I just saw -- as much as I

8    could sit up and look down, I just remember seeing so much

9    blood where my legs were and my -- one of my feet at a weird

01:18 10   angle.  And I just remember inside my head as it started to

11   kind of process, like the pain started -- I started to feel the

12   pain.  And I just remember thinking, No, no.  I want it to be

13   five minutes ago.  Like what just happened?  This can't be

14   happening.  This can't be reality.  And nothing went away, you

15   know?  Everything stayed the same, and the pain increased.

16   Q.    At that time, did you know where Sydney was?

17   A.    I did not.  I did not.  Right away my husband came down.

18   I saw him.  He was right in my face, and he was touching my

19   hair and he was telling me it was going to be okay.  He

01:19 20   literally said the words to me, "This was a terrorist bomb" or

21   attack.  I don't remember exactly which word he used, but he

22   said "terrorist."  He said, "This is a terrorist attack" or

23   bomb.  And I remember thinking, I don't care.  Like just

24   what -- I just remember thinking how awful this was and how

25   this had to stop.  This couldn't be real.  Couldn't be real.

1        And then he started to apply pressure on my legs.  And I
2   was just in such excruciating pain and there was so much
3   screaming and chaos that it was like I just had to kind of --
4   to kind of keep it together I just had to kind of go into
5   myself, and I just raised my arms to cover my eyes because I
6   didn't want to look at anything else.
7   Q.   At that time what were you thinking was going to happen to
8   you?
9   A.   I didn't know.  I just remember how much I hurt.  And I
01:20 10   think it was at that point that I asked my husband -- I said,
11   "Kevin, are my feet attached to my legs?" and he said yes.  And
12   they were.  And then I don't know how much longer after that,
13   because he kept applying pressure and I was just in so much
14   pain, but in my head -- because he was okay and he was tending
15   to me, I thought that Sydney was okay.  Like I knew that other
16   people obviously were hurt because of all the screaming and the
17   blood and everything that I saw, but I thought that she was
18   okay.
19        And I said to him, "How's Sydney?" thinking that she would
01:21 20   be devastated to see me because I knew how hurt -- or I
21   suspected how hurt I was.  And he didn't know.  Sydney got
22   blown back from us but he thought -- he said, "I think she's
23   okay.  I think she's with Ron and Karen."  So that, thankfully,
24   let me kind of calm down and try and just keep it together
25   until -- all I could think of was -- I just kept going over and

1    over in my head, No, no, no.  This doesn't happen here.  This

2    doesn't -- this couldn't have happened.  I'm dreaming.  I'm

3    going to wake up, something.

4    Q.    At some point did someone apply tourniquets to your legs?

5    A.    My husband did.

6    Q.    To both legs?

7    A.    He did.  He took his belt off and applied one to one of my

8    legs, and then he stopped someone walking past us and he got

9    his belt and he applied the other tourniquet.  And then he just

01:22 10   kept putting this excruciating pressure on my legs.  And he

11   kind of crouched down beside me, and he was trying to keep me

12   calm because he knew that I was on the verge of freaking out.

13        And he just kept -- I'll never forget.  He just kept

14   touching my head and taking my hair away from my face, and he

15   just kept telling me that he loved me and that I was going to

16   live and he wasn't going to leave my side and that it was going

17   to be okay.  "Hold on.  Hold on.  It's going to be okay."  And

18   he said, "I'm not going to leave."

19   Q.    At some point were you moved from that scene?

01:23 20   A.    Yes.  They -- I'm assuming the ambulance people came to

21   get me.  They put me on a board or gurney.  I have no idea

22   what.  I just know that when they moved me, I think that was

23   the first time that I had breath enough to scream in agony,

24   them moving me, because it hurt my legs so bad.  And then I

25   remember them taking me into the medical tent.

```
 1          And inside the medical tent there was like this like
 2     controlled chaos.  Like you could tell that everybody was sort
 3     of frantic but trying to hold it together.  People were
 4     yelling.  They were cutting my clothes off me.  I remember them
 5     cutting through my top and I remember them writing on my chest
 6     a number.  They said -- I said, "What are you doing?"  And they
 7     said, "We're writing a number on you."  I believe they said
 8     they were writing the number one.  I can't be positive about
 9     that but -- she said she was writing a number on my chest
10     because they had to get me out fast.  And I just remember them
11     saying, "She needs to leave.  She needs to leave now.  Get her
12     out of here."
13     Q.   At that point what are you feeling?
14     A.   Excruciating pain.  Inside there, I don't remember any of
15     their faces because, again, I had -- I guess that was my
16     defense, I had my arms up and I was just trying to just
17     breathe.  I had never felt pain like that before in my life and
18     I just was trying to hold it together.  And all I could think
19     was, Okay.  They're going to get me to the hospital, they're
20     going to fix my legs.  They're going to knock me out, I'm going
21     to go into surgery, they're going to fix my legs.  It's going
22     to be okay.  I just have to hang on until they get me to the
23     hospital.  They just have to get me to the hospital.
24     Q.   Did you look down to the see the extent of the injuries at
25     that time?
```

1    A.    I did not.

2    Q.    Why not?

3    A.    I think because I was just in too much pain.  I didn't

4    care.  It just hurt too much.  It wasn't relevant at that

5    point.  It was just I was in too much pain to move.  Any

6    movement was just horrific.  I remember thinking that I was

7    going to die, that I couldn't -- no one can go through that

8    much pain.  And I didn't know how bad it was.  I knew it was

9    very bad and I was just thinking, Is this it?  Is this -- am I

01:26 10   going to die?

11         And I remember thinking that I wanted to die.  I remember

12   thinking that the pain was too much and I just wanted to die.

13   And then on the heels of that, I remember almost

14   instantaneously it was like -- I don't know if it was the mom

15   in me or, you know, just -- I don't know where it came from but

16   I just remember thinking, I just want to die, just let me die,

17   and then immediately I was like, Hell no.  I don't want to die.

18   Please don't let me die, you know?

19         Then that was the mantra, sort of, that I was saying.  And

01:26 20   it was like, I can't die.  I have to be there for my kids.  I

21   have to be there for my husband.  I have too much living to do.

22   Don't let this be the end.  How can this be the end?

23   Q.    Do you remember what hospital you were taken to?

24   A.    I don't remember them telling me that, I don't think, but

25   I know I went to Boston Medical Center.

```
 1   Q.   And when you got to Boston Medical Center, what happened?
 2   A.   So they wheeled me in.  So I do know that when we left the
 3   tent, I know that Kevin was with me, and I know that they told
 4   him to ride in the front of the ambulance.  And there was a
 5   woman in the ambulance with me, I don't know who that was, but
 6   the attendant was trying to go between the two of us.
 7        And when we got to the hospital and they wheeled me in,
 8   again, it was that controlled chaos, like everybody moving so
 9   fast that you -- like I, again, shut my eyes.  Like they're
10   like running you down the hallway and people are yelling
11   instructions at each other and you just know -- you can hear in
12   their voice how serious this is so it scares the hell out of
13   you.  But at the same time they're trying to comfort you, you
14   know.
15        And they were cutting my clothes off, and one nurse was at
16   my head and she was asking me what my name was.  And at that
17   point I remember feeling -- I was so cold, and I remember -- I
18   remember my hands, they felt like they were like cramping up.
19   Like I remember trying to, like -- I don't know what I was
20   trying to do, if I was trying to move my hair or something, but
21   I remember my fingers feeling like they were cramping up and I
22   remember thinking I was like -- my face felt like it had all
23   pins and needles so it was hard for me to talk.  And her asking
24   me the questions.
25        I remember just thinking, like, Just knock me out.  Just
```

1    do something.  What are you doing?  And she was asking me if I

2    was allergic to medications, and then she asked me if I was

3    there with anybody, and I said my husband.  And she said, "No,

4    he's not here with you."  And I said, "Yes, he is."  And I

5    said, "He came with me in the ambulance."  And she said, "We

6    can't find him."

7          And I remember at that point, I think because I was in so

8    much pain, my patience had just run out, and I remember I

9    definitely snapped at her and I said, "He was in the ambulance

01:29 10   with me.  Go find him."  And then I remember a doctor on the

11   other side of me standing there...

12          (Pause.)

13   A.   ...just kind of stoically standing there without a lot of

14   emotion.  And he had a clipboard in his hand.  And in my mind

15   at that point they were going to fix me.  I didn't know what

16   was happening down there but they were going to fix me.  And he

17   had this clipboard, and he looked at me and he said, just, you

18   know, so matter-of-factly, he said, "Celeste, Celeste, we need

19   you to sign this because we need to amputate both your legs."

01:30 20   And I just remember looking at him and I went, "Both?"  And he

21   said, "Yes."

22          And all I could think of at that time was that, you know,

23   they wouldn't be telling me that if that didn't have to happen.

24   I just needed the pain to stop.  So I just scribbled my name,

25   and they must have knocked me out after that.

1    Q.   Do you know where Sydney was at that point in time when

2    you were going into surgery?

3    A.   No, I did not.

4    Q.   At some point later did you learn that she was there at

5    Boston Medical Center at the same time?

6    A.   Yes.  It was after I woke up.  I woke up and they told me

7    that she had been hurt, she had had surgery, and they were

8    going to put us in the same room together.  And that's what

9    they did.  They brought us in the same room together.  At that

01:31 10   point I didn't know the extent of her injuries at all, I just

11   knew that my daughter was there.  And I was just so glad -- I

12   mean, that my husband was there and my daughter was alive.

13        We just -- I just couldn't stop crying because it was the

14   second time I almost lost her, and I was so glad that she was

15   alive, that she wasn't taken from me.

16   Q.   How long were you and Sydney in the same hospital room?

17   A.   They put us in the same room for our entire stay.  I think

18   we were in the hospital -- my time gets blurred.  I think we

19   were there maybe three or four weeks.

01:32 20   Q.   And during that time, did you either hear or observe

21   problems she was having or complications she was having?

22   A.   Yes.  Yes.

23   Q.   What were those?

24   A.   So that was probably the most heartbreaking or

25   heart-wrenching thing as a mom.  I am such a mom.  I mother

1    everybody.  And to see your child in pain and not be able to

2    get up and go to them.  So our hospital beds were, you know, on

3    either side of the room, and Sydney had a reaction to I think a

4    pain medication that she had.  So she was violently ill.  And I

5    just remember just helplessly laying there in my bed watching

6    my daughter be violently ill.  And I couldn't get up, I

7    couldn't go to her, I couldn't hear because my eardrums got

8    blown out.  So when everyone was hovered around her and talking

9    and saying what they were going to do to her or what was going

01:33 10   on, I didn't know what was happening.  And that was probably

11   one of the hardest things as well as, you know, just being with

12   her through her recovery, that I've had to go through with her,

13   is seeing her in pain and not being able to go to her and

14   comfort her.

15   Q.   After you were at Boston Medical Center, were you moved to

16   Spaulding Rehab?

17   A.   Yes, we were.

18   Q.   The two of you were moved?

19   A.   We were moved together.  We were in adjoining rooms.  I

01:34 20   believe I stayed for -- it might have been just under two

21   weeks -- and Sydney stayed less than that.  I'm not sure if it

22   was four or five, six days.

23   Q.   What were the full extent of the injuries you sustained?

24   A.   I'm sorry?

25   Q.   What was the extent of the injuries you sustained?  You

1    mentioned your eardrums were blown out at the scene.

2    A.    Yes.

3    Q.    What else?

4    A.    My eardrums were blown out, I had shrapnel that hit my

5    body.  My legs -- as a result of the shrapnel that hit my body,

6    I am now a double amputee, one below the knee and one above the

7    knee.  And I wear prosthetic limbs.  And along my right side --

8    the blast came from my right side, so along my right side,

9    along my right thigh I have -- and on my face just a little

01:35 10   bit, it's almost like -- the doctors told me it's almost like a

11    tattoo.  It's like debris, maybe dirt, something that is

12    probably -- it's not big pieces of shrapnel but it's something

13    that will probably be forever embedded in my skin as a constant

14    reminder, as if my legs weren't enough.

15    Q.    How many surgeries did you undergo?

16    A.    So I had three surgeries, I believe, within that first

17    week on my legs, and then they were able to -- they do the

18    surgeries to remove all the shrapnel and know that they can

19    close it and it's going to be okay, so it required three

01:36 20   surgeries, and then they were at a point where they could close

21    it up.  And those were the only surgeries on my legs.

22          But then after those surgeries, when I started to

23    lessen -- when I started to need less medication, I realized

24    that a piece of shrapnel had hit my cheek.  It didn't penetrate

25    but it had broken my tooth, and a nerve -- my back molar, a

        1    nerve was completely exposed.  And I can't believe I'm saying

        2    this, but, you know, having your legs amputated, when you have

        3    a raw nerve that's just exposed, that was pretty painful also.

        4    And I couldn't eat.  And I was complaining about that.

        5         And they said that they couldn't fix it in the hospital

        6    because it wasn't, like, oral surgery.  I needed to see a

        7    regular dentist.  But I was in so much agony with that that --

        8    I believe he was a dental resident or something came to see me,

        9    and he just did a quick fix.  Like he saw what was going on and

01:37  10    he put some kind of compound -- he had to jam it in there.  And

       11    that wasn't fun.

       12    Q.   Was that ultimately fixed at some point?

       13    A.   Yes, after I was -- I believe it was after I came home

       14    from Spaulding.

       15    Q.   What happened with your eardrums?

       16    A.   So my left ear ended up healing itself.  After three

       17    months they checked me, and the left ear had healed itself, but

       18    my right ear, there wasn't enough of the eardrum to grow back.

       19    So I made the decision to get surgery on my ear to rebuild the

01:38  20    eardrum.  So I had that done.  And that was a lot more

       21    difficult than I thought it was going to be.  I thought, you

       22    know, It's my ear.  How bad can it be?  I lost my legs.  But

       23    that surgery was really tough and it kind of knocked me down

       24    again for a good couple of months.

       25         So the surgery was a success in that I now have a

1    functioning eardrum and I don't have a hole there any longer,

2    but my hearing -- they were hoping that my hearing would at

3    least come back to what the other side was, and it did not.  So

4    I have significant enough hearing loss in that ear to wear a

5    hearing aid.

6    Q.   As you sit here today, just for the record, you're wearing

7    two prosthetic legs, correct?

8    A.   I am.

9    Q.   One is above the knee and one below the knee?

01:39 10    A.   Yup.

11    Q.   Are there circulation problems that accompany having

12    double amputations?

13    A.   I don't know what you mean about circulation problems.  I

14    just know that I never forget that I'm a double amputee.  I

15    always have -- I wouldn't really call it pain, but it's always

16    a level of discomfort.  Right now when I'm wearing my

17    prosthetics I kind of feel -- it's weird, but I feel like I

18    have legs and feet.  Like I feel like I'm curling my toes right

19    now, which is a little comforting to me, but right now I'm not

01:40 20    comfortable.

21        The bottoms of my limbs are constantly -- there's this

22    constant -- it's like a numb, burning sensation.  And a lot of

23    times -- and that's with the prosthetics on.  And with the

24    prosthetics off, it comes and goes.  Sometimes it feels like --

25    the only way I can describe it is if -- you feel like you've

1    had the worst athlete's foot in your life.  It's like this

2    horrible burning.  There's times when I get shooting pains, and

3    it literally makes me catch my breath.  Like people notice when

4    that happens to me.  When I get those shooting pains, it's

5    strange because I feel it in my feet.  It's always my feet.  It

6    feels like somebody stabbed a toe or stabbed my heel or my calf

7    or something.  But it's usually my feet.

8         So can I get on with my life?  Absolutely.

9    Q.   Let me ask you:  Did you at some point after the bombings

01:41 10  get a service dog?

11   A.   I'm sorry?

12   Q.   Did you get a service dog?

13   A.   I did get a service dog.

14   Q.   What is the name of your service dog?

15   A.   Sebastian.

16   Q.   Sebastian's not in the courtroom today, correct?

17   A.   No, he's in the other room waiting for me.

18   Q.   All right.  And exactly what assistance does Sebastian

19   provide you?

01:41 20  A.   So he helps with my mobility.  I -- as a double amputee, I

21   have problems just walking.  You know, on a flat surface it's

22   easier, but walking -- I'm still not comfortable.  I still

23   haven't ventured out by myself walking on the sidewalk or -- an

24   uneven surface, you don't realize until you're a double amputee

25   how many dips and hills or whatever there are, inclines there

```
  1   are.
  2        Inclines are the worse [sic].  Going up is fine, but the
  3   inclines are very hard, and he helps me navigate those.  He has
  4   a harness, and I hold on to the harness and he braces me.  And
  5   if I've fallen, he's trained to -- I get up by myself but
  6   then -- well, partly get up, and then I can put my -- I can
  7   tell him to brace, and I can put my hand on his shoulder and he
  8   braces for me, to put a little bit more of my weight to get up.
  9   Q.   If I could have you look at a few photographs, please.
 10   Exhibit 9 which is already in evidence.
 11   A.   I should have brought my glasses.
 12   Q.   I believe Ms. Conrad has some that you can use.
 13   A.   May I?  Thank you.
 14   Q.   As you look at Exhibit 9, who do you recognize in that
 15   photograph?
 16   A.   I see my husband.
 17   Q.   And if you could, please, just draw a circle around
 18   Mr. Corcoran.
 19   A.   (Witness complies.)
 20   Q.   And you drew a circle around the man in a red coat in the
 21   middle of the photograph.  Is that right?
 22   A.   Yes.
 23   Q.   At that time he's over the top of you?
 24   A.   Yes.
 25   Q.   Okay.  Do you see your daughter Sydney?
```

1    A.    I do.

2    Q.    Would you please circle her?

3    A.    (Witness complies.)

4    Q.    And for the record, you drew a circle around the woman

5    who's down on the ground by the black fencing?

6    A.    Yes.

7    Q.    Thank you.

8              MR. MELLIN:  If I could have Exhibit 13, please.

9              THE COURT:  Also in evidence?

01:44 10             MR. MELLIN:  Yes, your Honor.

11   BY MR. MELLIN:

12   Q.    And for the record, who is shown in Exhibit 13?

13   A.    That's my daughter.

14   Q.    If I could have you look at Exhibit 12, please.

15             MR. MELLIN:  Also in evidence, your Honor.

16   Q.    Mrs. Corcoran, as you look at Exhibit 12, do you see

17   yourself?

18   A.    I do.

19   Q.    Could you please circle yourself?

01:44 20   A.    (Witness complies.)

21   Q.    For the record, you're the woman with the gray top on

22   that's being assisted by the man in the red coat?

23   A.    Yes.

24   Q.    And again, that's your husband, Kevin Corcoran?

25   A.    Yes, it is.

```
 1   Q.   All right.  Do you know Mary Daniel?

 2   A.   Mary?  Yes.

 3   Q.   And how do you know Mary?

 4   A.   Through Spaulding Rehab.

 5   Q.   And do you know if she had a leg that was amputated?

 6   A.   She did.

 7   Q.   Do you see her in this photograph?

 8   A.   I do.

 9   Q.   Could you circle her, please?

01:45 10   A.   (Witness complies.)

11   Q.   And for the record, you circled the woman who's

12   essentially in the middle of the photograph, I think wearing

13   white.  It's really hard to tell in that photo.  Is that right?

14   A.   Yes.

15   Q.   Okay.  And do you see the individual just below Ms. Daniel

16   in that photograph?

17   A.   I see Jeff Bauman.

18   Q.   Okay.  Thank you.

19   A.   With his legs sticking out.  His raw legs sticking out.

01:45 20   Q.   And finally, if I could have you look at Exhibit 20 --

21        MR. MELLIN:  Which is in evidence, your Honor.

22   Q.   Mrs. Corcoran, as you look at Exhibit 20, do you see

23   yourself in that photograph?

24   A.   Yes, I do.

25   Q.   And could you circle where you are in Exhibit 20?
```

1     A.    (Witness complies.)

2     Q.    For the record, you've circled the woman at the top right

3     corner of the photograph?

4     A.    Yes.

5     Q.    And do you see someone with their hand on your leg wearing

6     a red coat?

7     A.    Right here?

8     Q.    Yes.

9     A.    Yup.

01:46 10    Q.    What is going on there?

11    A.    I believe my husband is applying pressure to my legs.

12    Q.    Thank you.

13          MR. MELLIN:  Thank you, your Honor.

14          If I may just have one moment.

15          (Counsel confer off the record.)

16    BY MR. MELLIN:

17    Q.    May I have you look at Exhibit 1449, which I'm not sure is

18    in evidence.

19          MR. MELLIN:  Just for the witness, please.

01:47 20    Q.    Do you recognize Exhibit 1449?

21    A.    That's my daughter Sydney.  That's her legs.

22    Q.    Is that a fair and accurate photograph of the scars on her

23    legs?

24    A.    It's not all of them, but, yes, it is.

25          MR. MELLIN:  Your Honor, we would move into evidence

```
 1    Exhibit 1449 and ask to publish.
 2              MS. CLARKE:  Subject to the earlier objection.
 3              THE COURT:  All right.  Overruled and admitted.
 4              (Government Exhibit No. 1449 received into evidence.)
 5    BY MR. MELLIN:
 6    Q.   Mrs. Corcoran, as we look at Exhibit 1449, you said that's
 7    some of the scars but not all of them.  Can you describe the
 8    scar that's on the left inner thigh of your daughter Sydney?
 9    A.   The scar on the left is where they took a vein or artery
 10   from her leg to put it on the right-hand side where her femoral
 11   artery was severed, to reattach her femoral artery.
 12   Q.   Okay.  And the reattachment, was that the scarring that we
 13   see at the top of her thigh on 1449?
 14   A.   Which side?  It's -- I'm sorry.
 15   Q.   Can you describe the two scars that you see on the right
 16   leg of your daughter?
 17   A.   Okay.  So on my daughter's right leg -- can I circle?
 18   Q.   Yes.
 19   A.   So on my daughter's right leg, right here is where a piece
 20   of the pressure cooker went into her leg.
 21   Q.   And just for the record, as you look at 1449, that's the
 22   scar on the farthest left of the photograph?
 23   A.   It went into her femoral artery.  And you don't see, but
 24   up here, the piece of the bomb, it was the size of a cell
 25   phone, and it was in her leg here and sticking out here.  So it
```

1    severed her femoral artery, so they took a vein from here and

2    attached it here where she was damaged, where she almost bled

3    out from (indicating).

4    Q.   All right.  So you started with the scar on the farthest

5    left on this photograph, is that right, as you're looking at

6    it?

7    A.   The scar on her left is --

8    Q.   No, no, no.  In the photo.  I'm totally confusing you.

9    A.   I'm sorry.

01:49 10    Q.   As you look at this photograph, the scar on the left is

11    the entry wound of a piece of the pressure cooker?

12    A.   Yes, it is.

13    Q.   And then you indicated that it went through and was

14    embedded in the --

15    A.   Right here.  Up.

16    Q.   -- area between her thighs?

17    A.   Yes.

18    Q.   Is that fair to say?

19    A.   Yes.  She was very close to losing her leg.

01:49 20    Q.   And so then the surgeons took an artery out of her left

21    leg and put it in the right leg, and that's attached to the

22    scar that is kind of running down the middle of her thigh?

23    A.   Yes.  And both those scars -- may I say this?  Both those

24    scars go all the way up here (indicating).

25    Q.   And for the record now, you just indicated that the scars

1    go from what is shown in 1449, they go up to almost her -- the

2    base of her abdomen?

3    A.   Yup.

4    Q.   You also mentioned there is other scarring as well.  What

5    other scarring did she have or does she have?

6    A.   She had a hole blown through her foot, she had -- so she

7    has no feeling.  Do you want me to elaborate on that?

8    Q.   A little bit, yes.  Go ahead.

9    A.   She had a hole blown through her foot.  So her -- if this

01:50 10   is her foot, the hole was blown through right here, and she's

11   missing this bone in her foot so her pinky toe is like -- it

12   has no feeling whatsoever; it's just attached by tendons.

13        She has numerous other shrapnel wounds, but what you don't

14   see on her legs in those pictures, because they're of her

15   thighs, is on her right leg, where the graft was done, she has

16   on her calf -- I'm sorry -- on her calf she has two incisions

17   that go the entire length of her calf that basically look like

18   two zippers.  And I'm not a doctor, but I believe it was called

19   compartmental syndrome, because when they reattached the veins

01:51 20   and arteries, there's a danger of, like, too much blood flow

21   going down there, so they need to make those incisions so that

22   basically her leg would just kind of blow up.  So she has those

23   scars also.  I'm trying to think.  Just other, you know,

24   scarring on her whole leg from different pieces of shrapnel.

25   Q.   Thank you.

```
 1                MR. MELLIN:  Thank you, your Honor.

 2                MS. CLARKE:  Thank you very much.  No questions.

 3                THE COURT:  No questions?

 4           All right, Ms. Corcoran.  Thank you.  You may step

 5      down.  You're excused.

 6                (The witness is excused.)

 7                THE COURT:  We'll take a short recess.

 8           Jurors, again, you know what I'm going to say.  No

 9      discussion of the evidence in the case.  There will be a time

01:52 10     for that, but it is certainly not now.

11           We'll take a 15-minute recess.

12                THE CLERK:  All rise for the Court and the jury.  The

13      Court will be in recess.

14                (The Court and jury exit the courtroom and there is a

15      recess in the proceedings at 11:54 a.m.)

16                THE CLERK:  All rise for the Court.

17                (The Court enters the courtroom at 12:16 p.m.)

18                THE COURT:  I understand counsel would like to be

19      seen.

02:15 20                (Discussion at sidebar and out of the hearing of the

21      public:)

22                MR. BRUCK:  We move for a mistrial based on the

23      testimony of the last witness, Celeste Corcoran.  We think it

24      was -- you know, partly restating the objections that we

25      raised -- have raised consistently and previously concerning
```

1    what we described as victim impact relating to the survivors,

2    we think that the -- any arguable relevance to any statutory

3    aggravating factor was exceeded by the excessively detailed,

4    excessively graphic and excessively prolonged-in-time

5    testimony.  In other words, the testimony went beyond

6    describing her injuries or the risk of death from her injuries

7    and became victim-impact testimony of which we received no

8    statutory notice which is not relevant to any statutory

9    aggravating factor.

02:16 10          The underlying harm that comes from this and where the

11    line was far transgressed by this testimony is that it

12    pressures the jury and induces the jury to sentence the

13    defendant for the murders, for the crimes against these

14    surviving victims.  They do not sit as sentences for the

15    injuries to Ms. Corcoran or to any of the amputees or to any of

16    the many people that were injured that did not die; they are

17    sentences only with respect to capital counts which involve

18    homicides.  And that is where the line must be drawn and where

19    it was transgressed here.

02:16 20          We think it invites not only a violation of the

21    statutory scheme under the Federal Death Penalty Act but also

22    invites arbitrary decision-making in violation of the Eighth

23    Amendment.  There was no possible way that we could have jumped

24    up repeatedly during Ms. Corcoran's testimony without drawing

25    the wrath of the jury, not only upon the lawyer making the

1    objection, but also vicariously on the defendant.

2         We had made our objections prior to the testimony.  I

3    point out that in addition to all of this, the witness was

4    permitted to give a narrative that went on and on without being

5    interspersed by -- with questions, and across the board this

6    was way over the top.  And it is prejudicial and we think

7    requires a mistrial.

8         If the mistrial should be denied, we are asking that

9    the government be instructed to keep their testimony from this

02:17 10   category of witness with far stricter bounds than was true of

11   this last witness if there is any hope of maintaining the focus

12   on the actual capital counts that the law requires.

13        MR. MELLIN:  Your Honor, we disagree.  Her testimony

14   was tied to the injuries for herself and her daughter.  And

15   explaining all of that, that's important for us to prove the

16   cruel, heinous and depraved manner in which the victims died,

17   in addition to also just proving the grave risk of death to

18   each of these individuals.

19        I disagree with Mr. Bruck saying that the only thing

02:18 20   these jurors are to consider is -- are the decedents.  There is

21   a specific aggravating factor tied to the 17 amputees which

22   talks about grave risk of death.

23        MR. WEINREB:  Your Honor, if I may just add one thing.

24   The government does not accept that the defense need not make a

25   real time objection.  And if they believe, for example, that a

1    particular question or -- has pushed -- gone over a line that

2    the Court has drawn, or a motion to strike testimony if they

3    believe it's gone over the line, or, for example, if a witness

4    is giving narrative testimony and they believe that that's

5    improper and more questions should be asked, these are

6    precisely the kinds of objections that need to be made in real

7    time; cannot be made ahead of time.  And they are waived if not

8    made.

9         And the defense's concern that the jury be -- resent

02:19 10   them for bringing objections to be dealt with by the Court's

11   instruction to the jury that they should not hold objections

12   against the attorneys.  There is nothing different about this

13   case than every other case.  No party ever wants to object and

14   be seen as objecting in front of the jury and yet that's part

15   of how trials work in an adversarial system.  They're not

16   excepted from it just because they have a special sensitivity

17   to it.

18         THE COURT:  Okay.  First, I agree with that general

19   observation.  It would be prejudicial to repeatedly stand up

02:19 20   and object.  I don't think that means you're excused from doing

21   it at least once, because it calls the issue to the Court's

22   attention while it can still be addressed and perhaps remedied.

23   And as a matter of fact, I believe the Supreme Court in *Payne*

24   actually acknowledged the dilemma, was the word used, but

25   brushed by it, frankly, saying that's a decision you have to

1    make.

2         MR. BRUCK:  They're referring there to victim-impact

3    testimony.  That's not what --

4         THE COURT:  And I think it was with respect to how you

5    object.

6         As to the substance, I agree, essentially, that it is

7    relevant to statutory factors as well as grave risk.

8         MS. CLARKE:  So in other words, it would have done no

9    good to object?

02:20 10        MR. BRUCK:  And a great deal of harm.

11        THE COURT:  Well, I don't see how that helps.

12        MS. CLARKE:  Well, that's what I'm hearing.  Because I

13   don't want to have to do it to this next witness when the exact

14   same kind of --

15        THE COURT:  If it's the same ground, yeah.  But it

16   won't be a basis for a mistrial motion after the testimony

17   either.  If you think it sometimes -- with each witness it gets

18   worse and, therefore, may support more radical action, then I

19   think you do have to call it out and it can be headed off.

02:21 20        MS. CLARKE:  Can the government be instructed not to

21   allow the witness to go on with a narration as opposed to

22   answering the question?

23        THE COURT:  Well, that's a whole different area.  And

24   I noticed that myself, actually, that she was going on a little

25   bit.

1          MS. CLARKE:  That's Mr. Mellin's specialty.

2          MR. MELLIN:  Narration is my specialty?

3          THE COURT:  Watch it.  I do agree with that objection.

4          MR. MELLIN:  Excuse me.

5          MS. CLARKE:  The confrontation clause.

6          MR. BRUCK:  We also want to renew the point that the

7    confrontation clause is violated to the extent the testimony is

8    relevant to an eligibility factor and invokes hearsay or

9    testimony absent witness cross-examination.  We want a

02:21 10   continuing objection to anything --

11          THE COURT:  Well, I don't think you can have a

12   continuing objection on that basis.  It will have to be made

13   when hearsay is offered.

14          MS. CONRAD:  Your Honor, could we have a continuing

15   objection to the government eliciting testimony about the

16   impact on the surviving victims of their injuries?  Because

17   what I hear your Honor saying --

18          THE COURT:  Well, it has multiple purposes, this

19   evidence.  You're seeing it as the bad purpose that you think

02:22 20   is objectionable, they're seeing it as legitimate purposes

21   under the statute, including supporting some alleged statutory

22   aggravating factors.  That --

23          MS. CONRAD:  I didn't hear anything about grave risk

24   of death.  I only raise this when she talked about her hearing

25   loss.  I didn't hear about grave risk of death when she talked

        1    about the scars that her daughter has on her.  I didn't hear
        2    about grave risk of death when she talked about how upset she
        3    was that she couldn't go to help her daughter when she was
        4    violently ill in the hospital.  So I don't see how that's grave
        5    anything other than victim impact.
        6            But I'm just saying they're offering something that
        7    doesn't address grave risk of death or heinous or depraved,
        8    that -- as to that, we have a continuing objection.
        9            MR. WEINREB:  And, your Honor, I would just like to
02:23  10    add not every word out of a defendant's mouth has to be
       11    directly --
       12            THE COURT:  Out of a witness's mouth.
       13            MR. WEINREB:  I'm sorry.  Out of a witness's mouth has
       14    to be directly relevant to a factor.  They're allowed to give
       15    some narration and context to what they're saying so the jury
       16    can understand the situation when the issue arises.  That's why
       17    real time objections are needed.
       18            THE COURT:  I agree.  Right.  Okay.
       19            (In open court:)
02:24  20            THE CLERK:  All rise for the jury.
       21            (The jury enters the courtroom at 12:27 p.m.)
       22            THE CLERK:  Be seated.
       23            THE COURT:  Mr. Chakravarty.
       24            MR. CHAKRAVARTY:  Thank you, your Honor.  The
       25    government calls Gillian Reny.

```
 1                    GILLIAN RENY, duly sworn
 2              THE CLERK:  Have a seat.  State your name, spell your
 3       last name for the record, keep your voice up and speak into the
 4       mic so everyone can hear you, okay?
 5              THE WITNESS:  Gillian Reny, R-E-N-Y.
 6                         DIRECT EXAMINATION
 7       BY MR. CHAKRAVARTY:
 8       Q.    Good afternoon.  How old are you?
 9       A.    I'm 20 years old.
10       Q.    And where do you live?
11       A.    I live in Boston, Massachusetts.
12       Q.    And are you in college?
13       A.    Yeah, I'm a sophomore at the University of Pennsylvania.
14       Q.    And are you just back for the weekend, essentially?
15       A.    Yeah.  I'm back for the weekend.  My family ran the
16       marathon yesterday.
17       Q.    Is that a family tradition?
18       A.    Yes.  My family has been running the marathon for years.
19       Each of my parents have run five now, and my sister has run
20       three.
21       Q.    Your sister Danielle?
22       A.    Yeah, my sister Danielle.
23       Q.    Do you live with -- or before you went to college, did you
24       live with all of them in Boston?
25       A.    Yes, we all lived in Boston together.
```

1    Q.   So how long -- for how long has the Boston Marathon been a

2    tradition in your family?

3    A.   I mean, ever since I can remember.  We live in downtown

4    Boston so it's hard to not feel the excitement of the city on

5    that day.  Like I said, each of my parents have run it multiple

6    times, and so we always would go -- I'd follow them along the

7    course and ultimately end at the finish line, and then kind of

8    meander back over to our house.

9    Q.   About how many times do you think you've been to the

02:28 10   marathon?

11   A.   I'd say at least ten.

12   Q.   And for the 2013 Boston Marathon, did you attend that day?

13   A.   Yes, I did.

14   Q.   Who was running that day?

15   A.   My older sister, Danielle, was running.  It was her first

16   marathon.

17   Q.   Were your parents running?

18   A.   No, my parents were not running.  We were all following

19   her along the course.  We started in Natick, and then we went

02:28 20   to my friend's house in Newton, and then we ended up at the

21   finish line.

22   Q.   Was this the first time that you had actually attended

23   with both of your parents?

24   A.   Yeah, it was the first time I'd been with both of my

25   parents.

Q.   And who else from your family, aside from your parents,
was attending?

A.   My sister was running with a friend of hers from Harvard,
so we were with her mother who had flown in from California; we
were with -- my uncle was running as well.  So we were with my
grandmother and my sister's boyfriend, Kyle, as well as my
cousins.  However, in Newton we split up into two different
cars.  My aunt's family lives in the South End, so they went to
the other side of Boylston, and we live in Beacon Hill, so we

02:29  went to the opposite side.  So I was standing with my mother,
my father, my sister's boyfriend, my grandmother and my
sister's friend's mother.

Q.   And who was on the side of Boylston Street?

A.   Right across from us, we were actually kind of looking at
each other, was my grandfather, my aunt, and her two young
daughters.

Q.   And about what time did you arrive at the finish line
area?

A.   We arrived around 2:15, and we first saw my uncle cross,

02:30  and then we were waiting for my sister.

Q.   And you said that you're 20 now?

A.   Yup.

Q.   How old were you on April 15, 2013?

A.   I was 18.  I was just finishing my senior year of high
school.

```
 1    Q.   Around what time did your Uncle Bill cross the finish
 2    line?
 3    A.   I think he finished around, maybe, 2:30, a little before
 4    then, maybe.
 5    Q.   And how close were you to the finish line itself?
 6    A.   We were -- I remember because my mom had sent a text to my
 7    father and my sister's boyfriend who were parking the car, we
 8    were standing right out between Marathon Sports and
 9    LensCrafters.
02:31 10    Q.   And what was the atmosphere like?
11    A.   I mean, it was so exciting.  It was -- everyone was
12    celebrating everyone crossing the finish line.  We'd just seen
13    my uncle.  It was definitely really exciting to be there.
14    Q.   Around that time when your uncle crossed, how far away did
15    you understand that your sister was from coming?
16    A.   So she was close behind.  I think she was around ten
17    minutes.  I remember we got a text from a friend who was
18    further up Boylston shortly before the bombs went off saying
19    that she had just passed them.
02:31 20         MR. CHAKRAVARTY:  I'm going to call up Exhibit 1594,
21    your Honor, which has just been admitted into evidence.
22    Q.   Ms. Reny, do you recognize these people over here?
23    A.   Yup.  That's my mother, and my father standing behind her.
24    Q.   Okay.  Can you just circle them by touching the screen?
25    A.   (Witness complies.)
```

```
 1   Q.   And "Audrey" is your mother's name?

 2   A.   Yeah, "Audrey."

 3   Q.   And do you now know who these people are?

 4   A.   Yup.  And the woman standing in front of them is Amanda

 5   North, who is my sister's friend's mother.

 6   Q.   Okay.  So Amanda was with you that morning?

 7   A.   Yes.

 8   Q.   And who are the people behind her?

 9   A.   That's Krystle Campbell and her friend Karen.

10   Q.   And is this where -- where were you in this picture, or

11   are you in this picture?

12   A.   I believe I was standing right behind my dad, but I'm a

13   bit shorter than him so you can't see me.

14        MR. CHAKRAVARTY:  Can we go to Exhibit 18, please.

15        Also in evidence, your Honor.

16   Q.   Now, this is a different angle.  And again, do you see

17   Krystle Campbell and Karen Rand/Karen McWatters?

18   A.   Yes.

19   Q.   Can you see any part of yourself in this picture?

20   A.   Yeah, that's my hair right behind the man with the

21   sunglasses, who is my sister's boyfriend.

22   Q.   I'm sorry.  Go ahead and circle it.

23   A.   Oh, sorry.

24   Q.   And the man behind you, that's --

25   A.   Kyle, my sister's boyfriend.
```

1    Q.   And so is that where you were standing right before the

2    bombs went off?

3    A.   Yeah.

4         MR. CHAKRAVARTY:  Thank you, Mr. Bruemmer.

5    Q.   What do you remember when the bombs went off?

6    A.   Well, like I said, my -- we had just received a text that

7    my sister was on Boylston and she was about to cross, so my dad

8    actually just had turned on his video camera to get prepared at

9    this point.  We'd been standing there, like I said, since

02:34 10   around 2:15, so we were towards the front, towards the fence.

11        And I just remember, like, silence, like.  I mean, I had

12   no idea what was going on.  It felt like I was in a movie, it

13   was a joke.  I had no idea what was going on.  And there was

14   like just a complete, utter, like, chilling silence and then

15   just chaos.  Chaos like I have never seen and would hope to

16   never see ever again.

17        I fell onto the ground.  Luckily, I had been pushed by the

18   force into my mom.  And I looked down at my legs, and there was

19   so much blood.  My tibia had been completely snapped in half

02:35 20   and was sticking out of my legs.  Muscle was everywhere.  It

21   was the most horrifying image I could ever imagine.  And to see

22   that on my own body was terrifying.  Luckily, I was with my

23   mom, and shortly after my dad found us.  He held on to my --

24   Q.   Let me stop you there before we get to that.  And there's

25   some water in front of you, and also tissues if you want.

```
 1    A.    Thank you.

 2    Q.    After you were moved by the force of the blast, did

 3    you -- you said you couldn't hear anything.  Could you smell

 4    anything?

 5    A.    Yeah.  It was very smokey, like just a burning smell

 6    everywhere.  Intoxicating.  It smelled awful.  And the smoke

 7    had settled around.  You -- it was very foggy, just very

 8    chaotic.

 9    Q.    You were just describing that you had looked down.  Before

02:36 10   you looked down, did you look around to see what happened?

11    A.    Well, my leg was completely torn apart, so I remember

12    almost for that little, like, silence, I just was sort of like

13    in shock.  And then I had nothing to stand on so I kind

14    of -- my body crumbled to the ground but I -- I remember

15    looking around and that there just seemed like bodies

16    everywhere, blood everywhere.  People who were coming over to

17    help, screaming and crying, and just so -- distress amongst

18    everyone.

19    Q.    Did you feel anything coming from the pavement?

02:37 20   A.    It was really hot.  It was -- I was wearing a fleece, and

21    I remember at one point being so hot I sort of took it off, but

22    I don't -- I didn't even realize how hurt I was until I felt

23    the ground and looked down at my legs, or what was left of

24    them.

25    Q.    What did you see when you looked at your legs?
```

1    A.   My tibia was completely snapped in half.  I had lost a

2    large amount of bone and muscle.  My lower leg on my right side

3    was completely torn apart, and my left leg was also severely

4    damaged.  Just so much blood.  It was horrifying to look down

5    and see that that was your own body.

6    Q.   Was there blood where you were?

7    A.   Yeah, blood was pooling around where I was laying.

8    Q.   Could you tell whether it was your blood or somebody

9    else's?

02:39 10    A.   There was too much blood to know.

11    Q.   Was it one leg or both legs?

12    A.   It was both my legs, but my right was significantly worse

13    off than my left.

14    Q.   Where was the injury on your leg?

15    A.   It was in my lower -- beneath my knees, my right tibia.

16    So lower -- like my shin area.

17    Q.   And on the other leg, on the left leg?

18    A.   The same.

19    Q.   Could you see your left leg -- the muscle of your left

02:39 20    leg?  Excuse me.

21    A.   Yes.  The muscle of my left leg was like flapping over

22    the -- my shredded jeans.

23    Q.   Were you bleeding?

24    A.   Yes, enormously.  Looking down at the blood, I was shocked

25    that that much blood could come out of someone.  I felt so,

1     like, weak, and I was terrified that I was going to die.  I did

2     not know that you could be that injured and survive.  And I

3     also was 100 percent certain that my right leg was gone

4     entirely.  It felt completely disconnected from my body.  And

5     the pain that I was experiencing was something that I wouldn't

6     wish on anyone in a million years.  It's difficult to explain

7     because it's not like anything I've ever felt before.

8     Q.   Did people come to help you?

9     A.   Yeah.  Like I mentioned before, my grandfather was across

02:40 10    the street, and when he saw -- I mean, we were looking at each

11    other.  And when he saw it go off, he sent my aunt and my

12    cousins away and he ran across the street and he -- he held

13    onto my left leg, and my father, who ended up finding us, held

14    onto my right leg.  And then after a little, a man came over

15    and helped us as well.  He was previously in the Army, so he

16    took control.  And he had my dad give -- take off his belt to

17    tie and make a tourniquet, and he took off his belt as well to

18    make a tourniquet on my other leg.

19    Q.   So you had tourniquets on both legs?

02:41 20    A.   Yes.

21    Q.   Were your parents injured as well?

22    A.   They were injured, but at the time I had no idea.  And I'm

23    so glad that I had no idea because I would have been worrying

24    about them as well.

25    Q.   Did you lose consciousness while you were on Boylston

```
 1   Street?
 2   A.    No, unfortunately.
 3   Q.    And the pain you felt, did that continue for as long as it
 4   took for you to get to the hospital?
 5   A.    Yeah.  I expected to pass out.  I guess movies are not
 6   accurate in that sense.  But I was then transported onto some
 7   sort of lifting board.
 8   Q.    A board to put you on -- before we get to that, I wanted
 9   to show you some more images from the scene and ask you if you
10   recognize it.
11   A.    (Nonverbal response.)
12         MR. CHAKRAVARTY:  I would ask to publish Exhibit 12,
13   which is in evidence, your Honor.
14   Q.    Do you see yourself in this picture?
15   A.    Yeah.
16   Q.    Would you please just circle yourself?
17   A.    (Witness complies.)
18   Q.    And who is that leaning over you?
19   A.    That's my grandmother.
20   Q.    And do you see your mother in this picture as well?
21   A.    Yeah.
22   Q.    Can you just circle her?
23   A.    (Witness complies.)
24   Q.    And were you standing right next to Krystle Campbell?  You
25   can see her as well?
```

```
 1   A.   (No verbal response.)
 2        MR. CHAKRAVARTY:  Go to Exhibit 16, please.
 3   Q.   And again, can you see your mother here?
 4   A.   Yeah.
 5   Q.   And this is -- appears to be a short time later.  And are
 6   you apparently behind the woman with the green jacket on in the
 7   foreground?
 8   A.   Yeah.
 9   Q.   So when you fell, you said you crumbled.  Did you try to
10   move?
11   A.   No, it hurt much too badly to move.  I remember my father,
12   when he came over to help, he took off his jacket, I think it
13   was his jacket, and kind of was trying to preserve what was
14   left of my leg off the sidewalk.  And he moved it, obviously
15   up, to try to get the jacket underneath, and it was
16   excruciating pain, even worse than what I was feeling when I
17   was just laying there.  So after that, they were trying as best
18   they could to keep me, like, as still as possible.
19   Q.   When you were in that pain, did you scream?
20   A.   Yes.
21   Q.   Did you hear screaming around you?
22   A.   Yes.
23   Q.   Did I show you a video from that day?  Does that fairly
24   and accurately portray both the audio as well as the video of
25   what was happening around you?
```

1    A.    Yes.

2            MR. CHAKRAVARTY:  At this point I would request to

3    publish Exhibit 11B, which was previously admitted.

4            MS. CLARKE:  Subject to our previous objection.

5            THE COURT:  Your objection is preserved.

6            (Video recording with audio played.)

7    BY MR. CHAKRAVARTY:

8    Q.    Is that you, Ms. Reny?

9    A.    (Nonverbal response.)

02:47 10          MR. CHAKRAVARTY:  Your Honor, I have two photos just

11   to show the witness.

12            1631, please.

13   Q.    What's that?

14   A.    That's me, and my mom holding me.

15   Q.    1632?

16   A.    That's me and my mom as well.

17            MR. CHAKRAVARTY:  I'd move 1631 and 1632 into

18   evidence.

19            MS. CLARKE:  Same objection, your Honor.

02:47 20          THE COURT:  Can I see 1631 again?  Do you need both of

21   them?

22            MR. CHAKRAVARTY:  No, your Honor.

23            THE COURT:  1632.

24            MR. CHAKRAVARTY:  Thank you.

25            THE COURT:  1631 will be excluded.

```
 1              (Government Exhibit No. 1632 received into evidence.)
 2              MR. CHAKRAVARTY:  Request to publish, your Honor.
 3       BY MR. CHAKRAVARTY:
 4       Q.   Ms. Reny, we saw on the photos that your mother was on one
 5       side of you.  Is now she leaning right over on top of you?
 6       A.   (Nonverbal response.)
 7       Q.   How quickly were you transported from the scene?
 8       A.   I've been told that I was one of the first.
 9              MS. CLARKE:  Objection.
02:48 10              THE COURT:  Why don't you start again.
11              MR. CHAKRAVARTY:  I'll revisit.
12       BY MR. CHAKRAVARTY:
13       Q.   Were you transported from the scene?
14       A.   Yes.
15       Q.   Was it shortly after what the photos depict?
16       A.   Yes; I was towards the front.
17       Q.   Were you closest to the fence line?
18       A.   Yes, I was almost in the front.
19       Q.   You were starting to say before I interrupted with the
02:49 20       pictures that you were placed on a board.  Can you explain what
21       happened?
22       A.   Shortly after, I was placed on a board to transport me
23       into the ambulance.  And so once they had put me on the board,
24       they put me in an ambulance with another person who had been
25       seriously injured, and my parents came in as well.
```

1   Q.   And you went to the hospital?

2   A.   Yeah, I was transported to Brigham and Women's.

3   Q.   Were you -- did you have the same concerns that you had

4   when you were out on Boylston Street once you made it to the

5   hospital?

6            MS. CLARKE:  Objection.

7            THE COURT:  Overruled.

8            You may answer.

9            THE WITNESS:  As I was being transported to the

02:50 10  hospital, I was still extremely nervous about my outcome.  I

11  was feeling more hopeful that I was going to make it, but I had

12  lost pretty much all about my leg being salvaged.  But getting

13  to the hospital was definitely -- I did feel some more

14  security.

15  BY MR. CHAKRAVARTY:

16  Q.   Did you undergo several surgeries in the hospital?

17  A.   Yeah, I was in the emergency room and then immediately

18  transported to an initial surgery, and then I was placed under

19  a medical-induced coma for a few days while they figured out a

02:50 20  treatment plan.  And then a few days later I went -- I

21  underwent a surgery that -- they had first planned on doing a

22  series of surgeries over the next few weeks, but because I was

23  young and the risk of infection --

24            MS. CLARKE:  Objection.

25            THE COURT:  Overruled.

1          THE WITNESS:  -- was so high, they were able to do one

2    extremely long surgery and accomplish pretty much most of what

3    they wanted to do.

4    BY MR. CHAKRAVARTY:

5    Q.   In addition to the risk of infection, was there another

6    concern that the doctors had about the complications?

7          MS. CLARKE:  Objection.

8          THE COURT:  Overruled.

9          THE WITNESS:  They were able to salvage my leg but

02:51 10   they were unclear as to its function and whether it would be

11   successful for weeks, and actually months after.

12   BY MR. CHAKRAVARTY:

13   Q.   And just in lay terms, what is limb salvage?

14   A.   Basically, instead of amputating, they -- I had one vein

15   that was a major connecting vein between my foot and the rest

16   of my leg that was miraculously intact, so because of that they

17   went and tried to go down the road of saving my whole leg,

18   which is sort of, like, limb salvage.

19   Q.   How much flesh was connecting the lower part of your leg

02:52 20   to the top part of your leg?

21   A.   Hardly any.  My bone was entirely exposed, and I had lost

22   a lot of bone as well.  So in order to repair, they had to take

23   sections of my abdomen to use to cover my leg and use as a

24   makeshift -- non-functioning but makeshift muscle.

25   Q.   Did they put a blood filter in you as well?

1    A.   Yeah, they put a in filter because the risk of blood

2    clotting was extremely high.

3    Q.   Did they harvest tissue from various parts of your body

4    for those procedures?

5    A.   Yeah.  Like I said, my abdomen, as well as skin, because I

6    had lost enormous amounts of skin on both my left and right

7    legs.

8    Q.   From your observations over the -- both your time on

9    Boylston Street as well as in the hospital, did you understand

02:53 10    what happened, the mechanism of your injury, how you got hurt?

11    A.   Yes.  If you look at my legs, a piece of the bomb went

12    straight through.  So while it mostly hit my right leg, which

13    is what broke it, it did hit the left as well.  So it just kind

14    of went straight through.  And that's what I was told.

15    Q.   How long were you in the hospital?

16    A.   Six weeks.

17    Q.   Do you still have chunks of your leg that are missing?

18    A.   Yes.

19         MR. CHAKRAVARTY:  Thank you.

02:54 20         THE COURT:  Okay?

21         MS. CLARKE:  Thank you very much.  No questions.

22         THE COURT:  All right, Ms. Reny.  Thank you.  You may

23    step down.

24         We'll take the lunch recess at this stage.

25         THE CLERK:  All rise for the Court and the jury.  The

1    Court will take the luncheon recess.

2           (The Court and jury exit the courtroom and there is a

3    recess in the proceedings at 12:56 p.m.)

4           THE CLERK:  All rise for the Court and the jury.

5           (The Court and jury enter the courtroom at 2:08 p.m.)

6           THE CLERK:  Be seated.

7           THE COURT:  Ms. Pellegrini.

8           MS. PELLEGRINI:  Thank you, your Honor.  The United

9    States calls William Campbell III.

04:07 10                    WILLIAM CAMPBELL III, duly sworn

11          THE CLERK:  State your name, spell your last name for

12   the record, keep your voice up and speak into the mic so

13   everyone can hear you.

14          THE WITNESS:  William Campbell III, C-A-M-P-B-E-L-L.

15                       DIRECT EXAMINATION

16   BY MS. PELLEGRINI:

17   Q.   And, Mr. Campbell, will you tell the jury what town you

18   live in.

19   A.   Medford, Massachusetts.

04:08 20   Q.   And who resides with you?

21   A.   My parents.

22   Q.   And who are your parents?

23   A.   William Campbell, Jr., and Patricia Campbell.

24   Q.   And anybody else?

25   A.   No, just -- no, just them.

1    Q.   All right.  And, Mr. Campbell, your sister was Krystle

2    Campbell, correct?

3    A.   Correct.

4    Q.   And tell us about, first of all, the age difference

5    between you two.

6    A.   Two years age difference between us.

7    Q.   And you're older?

8    A.   Yes.

9    Q.   All right.  And even though you're older, what was it like

04:08 10   growing up with Krystle?

11   A.   It was great.  She was my sister.  I mean, I don't know.

12   We had a lot of fun together.  We liked to hang out.  And we

13   were friends more than brother and sister for most parts.  She

14   was always there for me and I was there for her.  It was just

15   how we worked.

16   Q.   All right.  Now, sometimes brothers and sisters don't get

17   along, so what made your relationship work?

18   A.   I think it was, like, right around when we became

19   teenagers and stuff and we just had more things in common.

04:09 20   And, you know, when I had my low day, she would be there for me

21   and we would tease each other or just, you know, if I was

22   having a bad day, Okay.  Let's go out and do something.  Let's

23   get out of the situation.  Let's make the day better, you know.

24   So we did.

25   Q.   And what are the things that you had in common?

```
        1    A.   We liked to go out, we liked dancing.  We just had fun.  I
        2    mean, we liked being around people.  And it was good.  We just
        3    knew how to enjoy whatever we were doing at the time.
        4    Q.   What was your earliest memory of Krystle?
        5    A.   Probably when we were real little, I mean, either getting
        6    in trouble with my parents or just fighting over the remote to
        7    the TV.  I mean, simple things.  Playing video games.
        8    Q.   Now, did you attend the same schools?
        9    A.   We did for the most part, yes.
04:10  10    Q.   All right.  And how was that, having, you know, a sibling
       11    in the same school?
       12    A.   It had its ups and downs.  I mean, sometimes, you know,
       13    it's like "Why are you hanging out with my friends?" and stuff
       14    like that when we were younger.  It was good.  When we were
       15    older, I mean, we went to different schools and stuff like that
       16    around high school time and it was a little bit different.  It
       17    was good.  It was fun.  We had mutual friends, so...
       18    Q.   And were you able to observe Krystle's relationship with
       19    your folks?
04:10  20    A.   Yeah.
       21    Q.   What was that like?
       22    A.   It was good.  She always was -- spoke up if there was
       23    something -- you know, we'd get in trouble for something, and
       24    she was always explaining why she did this or that before even
       25    I would.  I would just be, like, "Okay.  I know I messed up.
```

1    I'm just going to go over here," and she would argue the fact.

2    Q.   All right.  And, Mr. Campbell, tell us about Krystle's

3    work and work experience and her work ethic.

4    A.   She was a hard worker, much more than I ever was.  She

5    pushed herself to do everything she did.  She wouldn't let

6    people hold her down or tell her that she couldn't do

7    something, whether it was schoolwork, whether it was -- you

8    know, making a career for herself.  She just really knew how to

9    not listen to people who were trying to hold her back and just

04:11 10   push forward to be who she was and just to accomplish what she

11   set her goals to.

12   Q.   And how about her education?  What did she do to further

13   her own education?

14   A.   She went to college.  She, you know, did the college

15   thing.  I never did myself, so I don't -- but she just studied

16   hard, you know?  A lot of the schooling didn't come as easy but

17   she pushed through and she got the help she needed, and that's

18   what she did.

19   Q.   Do you know how she got through college; that is, who paid

04:12 20   for it?

21   A.   Herself.

22   Q.   How did she do that?

23   A.   Applying for financial aid, just working a lot, and

24   just -- I mean, she's been working since she's been 14.  She's

25   never stopped.  On top of school and everything.  She just

1    pulled her own weight.  She didn't have handouts or anything.

2    She just pushed her way through.

3    Q.   And you said she'd been working since she was 14.  What

4    kinds of jobs did she hold?

5    A.   Mostly food service, restaurant industry.  Whether it was

6    waitressing, you know, bussing, whatever.  I mean, I don't know

7    what the ground level stuff is.  She started working before I

8    did.

9    Q.   All right.  And did she continue in that field?

04:12 10  A.   She did.

11   Q.   All right.  And tell us what you know about the jobs that

12   she held.

13   A.   Mostly it was waitressing, and then as she got more

14   through college it became more into the management field, and

15   to progress forward in that type of food industry and

16   management.

17   Q.   And what kind of things did she do as manager for the food

18   service?

19   A.   You name it, I mean, she's done it.  Whether it was

04:13 20  running events, whether it was setting up things for, you know,

21   anywhere from weddings to a birthday party, she took care of

22   that.  She handled it.  She was the go-to person.

23   Q.   Mr. Campbell, one of things you said you liked to do was

24   go to dances together and things like that.  Did you share a

25   common interest in music?

1    A.   Yeah, for the most -- I mean, we liked all types.  I mean,

2    it really didn't take much to have us go and join, you know,

3    wherever we were with each other.  We'd just have a few laughs

4    and then we'd end up dancing.  It's just how it was.  I don't

5    know.

6    Q.   How about other sports?

7    A.   I mean, we went to sporting events and stuff like that,

8    but she played baseball and -- when she was younger and things.

9    She was really big into sports teams and...

04:14 10   Q.   And how about things like skiing and swimming?

11   A.   Yeah.  She was more of a skier.  I liked to snow-board.

12   We'd gone on many trips and had good times.

13   Q.   Were those family trips?

14   A.   Some were.  I mean, we went up to my uncle's house a few

15   times.  He has a place over in Mansfield, and when we could use

16   it, we did.

17   Q.   Mr. Campbell, how would you describe the relationship --

18   Krystle's relationship with other family members, other than

19   you and your mom and your dad?

04:14 20   A.   She was just the centerpiece.  I mean, she could talk to

21   anybody.  She stayed close to every relative:  aunt, uncle, my

22   grandparents.  She just really took good care of her family and

23   always made sure that -- regardless of how busy she was with

24   work and schooling -- everybody around her was all right.

25   Q.   How did she keep in touch with folks?

```
 1   A.   Whether it was a phone call or whether it was a random
 2   visit, whether it was just, "I wonder how this person is doing
 3   today."  She just wanted to see how people were and make sure
 4   they were okay and...
 5   Q.   Now, Mr. Campbell, you have a son?
 6   A.   I do.
 7   Q.   And how old is he now?
 8   A.   He's six years old.
 9   Q.   And tell us about Krystle's relationship with your son.
10   A.   She loved my son.  I mean, she would have done anything
11   for him.  She was just a great aunt.  And, you know, even with
12   her work schedule and being as hectic as it was, she always
13   made time for him whenever she could see him.
14   Q.   And your son, tell us about him and how he felt about
15   Krystle.
16   A.   My son -- my son loved his aunt.  He would go over and
17   give her a hug and play little games.  He's like, you know,
18   it's...
19   Q.   Did he do that with everybody?
20   A.   No, my son doesn't necessarily come off -- you've got
21   to -- you've got to work your way into my son sometimes because
22   he's a little standoffish at first, but once he knows you and
23   he cares, it's pretty simple for him to show his affection.
24   Q.   And, Mr. Campbell, what's your favorite memory of Krystle?
25   A.   My favorite memory?  Just her always -- I mean, I don't
```

```
 1   know if it would be a favorite, it's just a feeling that I
 2   always had when I was with my sister.  It was more that I just
 3   always knew that I had somebody there for me regardless of the
 4   circumstances.  And those memories are the most fond of mine,
 5   knowing that if I was having a bad day or whatever, I just was
 6   a phone call away before, you know, I could just have somebody
 7   to talk to.
 8   Q.   And when's the last time you saw Krystle?
 9   A.   I seen her the Saturday before the marathon.
10   Q.   What did you guys do?
11   A.   We went to the Square One Mall and we just did some
12   shopping.  I had my son with me.  I bought him a new toy.  And
13   it was simply that, you know.
14   Q.   And on Marathon Monday of 2013, first of all, did you know
15   where Krystle was that day?
16   A.   I wasn't 100 percent sure where she was but I had an idea
17   where she was.
18   Q.   What was your idea?
19   A.   I didn't know if she was at the Red Sox game or if she was
20   watching the marathon.  I knew it was one or the other, though.
21   Q.   And did there come a time when you heard about the
22   bombings on Boylston Street?
23   A.   There was.  I heard it over the radio.
24   Q.   And what did you do?
25   A.   I had a mini panic attack.  I mean, I just was worried.
```

1    So, you know, I'm not supposed to use my phone on the floor but
2    I ran out and called her anyway, and there was no answer.
3    Nobody picked up.  And I kept calling and --
4    Q.    What happened?
5    A.    Eventually I got a phone call back from her number and I
6    was relieved and I thought everything was fine.  And I found
7    out that it was just a nurse saying that my sister was among
8    one of the victims.  And I just left work.  I told my boss,
9    "I'm leaving," and then I grabbed my mother because she works
04:17 10   in -- close to my job as well, and we just went to the hospital
11   where we thought she was.
12   Q.    What happened when you got there?
13   A.    We had to wait.  And at first they told me everything was
14   fine, that she was going to survive and, you know, she would
15   have problems with her leg for probably the rest of her life
16   but she was alive.  And I was relieved.  I was calling family
17   members, telling them she's going to be okay and it's going to
18   be all right.  She's going to have a tough road ahead of her
19   but she's going to be fine.
04:18 20        And then it was just more waiting for her to get out of
21   surgery.  We thought that was her in surgery.  And it wasn't
22   until about four-thirty in the morning, four o'clock when we
23   found out that it wasn't my sister; it was a mistaken identity.
24   Q.    Did you know who the person was who actually was in
25   surgery?

1    A.    I was not allowed in the room at that time, but I had an

2    idea that it was her friend Karen Rand.

3    Q.    And what did you finally find out about Krystle?

4    A.    We all kind of left because obviously it wasn't my sister,

5    and then slowly a homicide detective came up.  And I just kind

6    of told my parents, you know, this is not -- kind of expect the

7    worse, because normally a homicide detective doesn't show up

8    unless it's -- I didn't know what it was.  And then we just

9    were told.  We were shown the photo.  And we were just in shock

04:19 10   and disbelief after the day we'd had.

11   Q.    And, Billy, what was it like for you to learn that Krystle

12   was gone?

13   A.    It wasn't real at first.  It was just something's wrong.

14   This can't be true.  This isn't real.  Like you just were

15   stunned.  You didn't sleep.  You were just trying to

16   rationalize everything in your own mind, trying to make any

17   type of reason.  Maybe there was another mistaken identity,

18   maybe there was -- just anything you could tell yourself to

19   calm yourself down at that point.

04:19 20   Q.    And as time went on, how did you deal with it?

21   A.    I had a hard time dealing with it.  I went to bad places.

22   I didn't do probably the right things.  But I just eventually

23   had to deal with it.  I had to deal with it for my family, I

24   had to deal with it for my son.  I just eventually had to

25   accept the facts.

1   Q.   And how did your family react?

2   A.   They were horrified.  I mean, there was crying.  It was

3   emotional.  You don't know what to say, you don't know what to

4   do.  There's this heightened state of panic and you don't know

5   what to say.  You don't know what's comforting.  You're trying

6   to comfort somebody else while you, yourself, need comforting.

7   You're just lost.

8   Q.   And since that time two years ago, what's it been like --

9   or what's it like now for your family without Krystle?

04:20 10  A.   It's tough.  It's still tough.  Every day, you know, we

11  still think about her.  She's -- not a day goes by when she

12  doesn't pop into your head at least in some aspect.  I think

13  the hardest time I had was trying not to pick up my phone every

14  time I wanted to call her if I'd run into some friends or

15  something.  I think that was the hardest thing to get over,

16  just not being able to make that phone call anymore.

17  Q.   And for your mom and dad?

18  A.   They still struggle with it daily.  You know, they have

19  their okay days and then they have their bad days.  I mean...

04:21 20  Q.   Now, Mr. Campbell, before you came into the courtroom

21  today, did you review some photographs with me?

22  A.   Yes, I did.

23  Q.   And these photographs, did you, in fact -- were these

24  photographs provided to the United States Attorney's Office and

25  the FBI by your family?

```
 1    A.    Yes, I believe most of them are, yeah.

 2    Q.    And you've looked at these and you're in some of them?

 3    A.    Yes.

 4    Q.    And you recognize the others that you're not in?

 5    A.    Yes.

 6    Q.    And you recognize those as being of your sister Krystle?

 7    A.    Yes.

 8    Q.    And these are -- fairly and accurately depict the

 9    situation going on when the photograph was taken?

10    A.    Yes.

11    Q.    All right.

12            MS. PELLEGRINI:  Your Honor, the government would

13    offer and ask to enter Exhibits 1601, -03, -04, -15, -17, -19,

14    -21, -23, -24 and -28.

15            THE COURT:  Is there any --

16            MS. CLARKE:  Your Honor, as the Court knows, we saw

17    them in a different format, so I have no idea.

18            THE COURT:  Have you shown this group to counsel?

19            MS. PELLEGRINI:  This is from the same group, your

20    Honor.

21            THE COURT:  I understand, but do they know which ones?

22            MS. PELLEGRINI:  Yes.  This is the group, actually.

23            (Pause.)

24            MS. CLARKE:  May we approach?

25            THE COURT:  I'll see you.
```

```
 1              (Discussion at sidebar and out of the hearing of the

 2       jury:)

 3              THE COURT:  Is this this witness's son?

 4              MS. PELLEGRINI:  Yes.

 5              MS. CLARKE:  Well, you know, I don't know that photos

 6       No. 1 and 2 meet the Court's prescription.  I can understand

 7       family photos, that he would describe an event, and his child.

 8       It's hard to tell what the photo on the beach and the -- I take

 9       it that's him.  And then I don't have a clue what the photo

04:24 10 with her in the dress with a drink.

11              THE COURT:  Probably better for the record to refer to

12       it by the number.

13              MS. CLARKE:  Other than this photo and that photo?

14              THE COURT:  Yeah.

15              MS. CLARKE:  So 1601, -03 and -04, I don't know

16       whether that's him or whether he has memories of those to talk

17       about.  The ones that don't seem to connect to what the Court

18       ruled in chambers are 1601, -21, -23 and -28.  The ones the

19       Court has --

04:24 20        THE COURT:  So --

21              MS. PELLEGRINI:  May I?

22              THE COURT:  Go ahead.

23              MS. PELLEGRINI:  So this is Mr. Campbell in both 1601,

24       -03 and -04.  He would testify when they were little they had

25       their pictures taken together.  This is him, this is his
```

1    sister.  He recalls this event.  He was -- I don't know if you

2    call it an usher at that age, a ring bearer, maybe at a

3    wedding.  She was with him.  He does recall that one.

4         1601-21 just relates to Krystle's work, working at the

5    food service, he would testify what she did at work.  This

6    relates to he knows she was a bridesmaid -- 1601-23 that she

7    was a bridesmaid many times, and he knows what wedding that is

8    that she attended.

9         THE COURT:  Was he there?

04:25 10        MS. PELLEGRINI:  I didn't ask him if he was there.  I

11   cannot recall.  I just asked him if he knows what this event

12   was and he recalled the wedding of a particular person.

13        1601-08, he calls this is a picture taken on Spectacle

14   Island for an event that Krystle did the wedding planning for.

15   This is Jasper White's nephew's -- it's the White wedding.  And

16   she was also a bridesmaid.

17        THE COURT:  Okay.  I think this one is unnecessary.

18        MS. CONRAD:  1601-23?

19        THE COURT:  Yes, thank you.  I think all the others

04:26 20   would meet my criteria of having some information beyond just

21   the emotion.  So take out 23.

22        (In open court:)

23        MS. PELLEGRINI:  Mr. Bruemmer, if I may start first

24   with 1601-03.

25        THE COURT:  So these are admitted as a group pursuant

1    to the discussion, so they'll be displayed.

2            (Government Exhibit Nos. 1601, 1601-03, 1601-04,

3    1601-15, 1601-17, 1601-19, 1601-21, 1601-24 and 1601-28,

4    received into evidence.)

5    BY MS. PELLEGRINI:

6    Q.   Mr. Campbell, do you see on the screen before you a

7    photograph?  Do you recognize who's in the photo?

8            THE COURT:  Do you have it?

9            THE JURORS:  No.

04:27 10            THE COURT:  Hang on.  The jury didn't get it.  Yes?

11    Okay.

12            THE WITNESS:  Yes, I do.

13    BY MS. PELLEGRINI:

14    Q.   And who's in that photo?

15    A.   Me and my sister.

16    Q.   And do you recall the circumstances under which this was

17    taken, and why this was taken?

18    A.   Probably like a family photo or something like that, just

19    from when we were little.

04:27 20    Q.   Did you often have family photos of you and your sister

21    together?

22    A.   Especially when we were younger, yeah.

23            MS. PELLEGRINI:  May I have 1601-04, please.

24    Q.   Do you recognize this photo, Mr. Campbell?

25    A.   I do.

```
 1    Q.   And what is this?

 2    A.   I believe I was in a wedding with my sister or something

 3    like that.  I mean, obviously I'm not -- do you know what I

 4    mean?  We're at a wedding.

 5    Q.   All right.  And so you're the little boy in the --

 6    A.   That has his finger in his mouth, it looks like, yeah.

 7             (Laughter.)

 8    Q.   Yeah, the finger in your mouth.  And that's Krystle next

 9    to you?

10    A.   It is.

11             MS. PELLEGRINI:  1601-15, please.

12    Q.   Do you recall the occasion where this photo was taken?

13    A.   Yes.  It was my parents' 25th wedding anniversary.

14    Q.   And what do you recall about that particular occasion?

15    A.   It was a surprise party that my sister threw for them.

16    Q.   How did she do that?

17    A.   She just knew how to do things.  She called friends and

18    family from all around.  My biggest job was just not to tell

19    them.

20             (Laughter.)

21    Q.   And so just for the record, you're in the picture to my

22    right, and mom and dad in the middle, and Krystle on the end?

23    A.   Yes.

24             MS. PELLEGRINI:  1601-17, please.

25    Q.   Mr. Campbell, do you remember when this was taken?
```

```
 1    A.    Yes.

 2    Q.    When was this?

 3    A.    This was the last Thanksgiving with my grandfather.

 4    Q.    And your grandfather is the gentleman in the middle

 5    wearing the red shirt?

 6    A.    Yes.

 7    Q.    Actually, do you know what?  The screen is interactive.

 8    If you touch it, you can draw a circle on it.

 9    A.    Around my grandfather?

10    Q.    Uh-huh.

11    A.    Okay.  Gotcha.

12    Q.    And you said this was the last Thanksgiving?

13    A.    Yeah.

14    Q.    All right.  And so Krystle is behind your grandfather.  Is

15    that correct?

16    A.    Yes.

17    Q.    And your mom and dad are where?

18    A.    My mom's right behind me over on the right.

19    Q.    Okay.  So this is you right here.  Actually, you have to

20    do it for me.

21    A.    Oh, okay.  So that's me, my mom.

22    Q.    All right.  And dad?

23    A.    Dad is right here.

24    Q.    Who are the other folks in the picture?

25    A.    That's my uncle right there, and my other uncle, my cousin
```

| | |
|---|---|
| 1 | Lillian, my Nana, Aunt Cheryl, Aunt Betty, my cousin Linda. |
| 2 | Q.   You have to keep your voice up, Mr. Campbell. |
| 3 | A.   And my cousin Linda.  I'm sorry.  My Aunt Cheryl, my Aunt |
| 4 | Betty.  I don't know if you caught that. |
| 5 | Q.   Okay.  We'll clear that one. |
| 6 |         MS. PELLEGRINI:  And 1601-19. |
| 7 | Q.   Who's this in this picture? |
| 8 | A.   That's my sister and my son. |
| 9 | Q.   All right.  And how old is your son in here? |
| 04:30 10 | A.   I believe he -- I think he was four.  It might actually be |
| 11 | on his fourth birthday, if I'm not mistaken. |
| 12 | Q.   Do you know where this photo was taken? |
| 13 | A.   I want to say probably 2012. |
| 14 | Q.   And do you know where it was taken? |
| 15 | A.   My parents' backyard. |
| 16 |         MS. PELLEGRINI:  1601-24. |
| 17 | Q.   Who's this? |
| 18 | A.   Me and my sister. |
| 19 | Q.   Okay.  I have to say, you have kind of a look on your |
| 04:30 20 | face. |
| 21 | A.   Yeah. |
| 22 | Q.   What was that for? |
| 23 | A.   I may have been drinking. |
| 24 |         (Laughter.) |
| 25 |         MS. PELLEGRINI:  1601-21. |

```
 1    Q.   Do you know where this is?

 2    A.   I'm not exactly sure the location but I believe it's a

 3    promotion for the Summer Shack, a restaurant she worked at,

 4    which she was showing the type of food they serve in their

 5    restaurants.

 6              MS. PELLEGRINI:  And 1601-28.

 7    Q.   Do you know the occasion that this photo was taken?

 8    A.   It was a wedding.

 9    Q.   And do you know where that wedding was held?

10    A.   I believe it was Spectacle Island.

11    Q.   And whose wedding was it?

12    A.   My sister's boss's nephew's wedding on Spectacle Island.

13    Q.   Okay.  And what role did Krystle have in the wedding?

14    A.   She was the best man/bridesmaid.  I don't know how that

15    works.  But she was the best man, but she was the best man but

16    she's a girl, so it's a brides -- I don't know.  I'm trying to

17    explain it.  But, yeah, that's the role she played.

18              (Laughter.)

19    Q.   And did she participate in the wedding taking place and

20    putting the wedding together, if you know?

21    A.   I'm not 100 percent sure but I think so, yeah.

22    Q.   Mr. Campbell, what do you miss about Krystle the most?

23    A.   Just being able to talk to her.  I mean, it's that simple.

24    Just the simple phone call just to see how she was.  You have

25    to get used to a whole new lifestyle.  This is somebody you
```

```
       1   talked to every day.  And regardless, it was like, "Hey, what
       2   are you doing?"  "Absolutely nothing," but just, "What's up?"
       3   you know, and that's how it was.  Just like hanging out.  Like,
       4   "What are you doing?"  You got a day off, "You want to grab a
       5   drink?"  "You want to go somewhere?"  Like, you just realize
       6   you can't make that phone call anymore, you can't make plans to
       7   see each other.  You know, you grow up with somebody your
       8   entire life and you just always expect them to be there and now
       9   they're gone.
04:32 10   Q.   It's been two years.  Has it gotten any easier?
      11   A.   I mean, it's gotten -- not really.  I guess.  I don't
      12   know.  It's different.  It's -- maybe you just kind of accept
      13   it a little bit more, but it's still the same.  There are still
      14   times you just want to talk.  And that's somebody that
      15   understood you, you know.  I mean, how you grew up, every
      16   aspect about you.  You didn't have to overly explain how you
      17   were feeling; you could just say a couple of words and she
      18   already got what you were going through without having to
      19   overexplain.  It was just easier.
04:33 20           MS. PELLEGRINI:  Thank you.  I have no further
      21   questions.
      22           MS. CLARKE:  Thank you very much.  No questions.
      23           THE WITNESS:  I'm all set?
      24           THE COURT:  All right, sir.  Thank you.  You may step
      25   down.
```

```
 1              (The witness is excused.)

 2         MS. PELLEGRINI:  William Campbell, Sr.  [Sic]

 3              WILLIAM A. CAMPBELL, JR., duly sworn

 4         THE CLERK:  State your name and spell your last name

 5    for the record, keep your voice up and speak into the mic so

 6    everyone can hear you.

 7         THE WITNESS:  My name is William A. Campbell, Jr.,

 8    C-A-M-P-B-E-L-L.

 9                        DIRECT EXAMINATION
```

04:34 10    BY MS. PELLEGRINI:

```
11    Q.   Good afternoon, Mr. Campbell.

12    A.   Good afternoon.

13    Q.   Mr. Campbell, can you tell us what town you live in?

14    A.   Medford, Massachusetts.

15    Q.   And who do you live with?

16    A.   I live with my wife, my son.

17    Q.   And what's your wife's name?

18    A.   Patricia.

19    Q.   And I got into trouble the last time I asked this, but how
```

04:35 20    long have you been married?

```
21    A.   Thirty-six years.

22    Q.   And tell us about your family.

23    A.   We're very close.  We've always been close.  We've been

24    like that since me and Patty got married.  We decided to have a

25    family two, three years, after being married, and we did so.
```

1    We're pretty close.  We do a lot of things together.

2    Q.    And you were the father of Krystle Campbell, correct?

3    A.    Yes, I am.

4    Q.    All right.  Tell us what Krystle was like.

5    A.    Krystle was the light of my life, Billy's life.  She was

6    extremely smart, hard-working, beautiful.  Every father's

7    dream.

8    Q.    Did you have a nickname for her?

9    A.    I miss her a lot.

04:36 10   Q.    I'm sorry.  Did you have a nickname for her?

11   A.    Yeah.

12   Q.    What was that?

13   A.    Her name was "Princess."  I never called her "Krystle"

14   unless she did something wrong or something like that, then I'd

15   call her "Krystle Marie," and then she knew I was angry or

16   something.  I always called her "Princess."

17          (Laughter.)

18   Q.    Why?

19   A.    That's what she was the day she was born.

04:36 20   Q.    What was it like being her dad?

21   A.    She was really something.  She was always willing to do

22   anything for anybody.  I mean, she wouldn't hesitate.  She just

23   had that way of her.  I mean, if you needed a shirt, she'd give

24   you hers.  She was just always out there.  She was just a

25   perfect young lady.  I was very lucky.

1    Q.   Now, when she was growing up, what did she like to do?

2    A.   Oh, God.  Well, she wasn't really a girly girl, okay?  I

3    wouldn't ever call her that.  But she loved to white-water, she

4    used to love to camp, she liked to play baseball, and she had a

5    good arm on her.  She had a good bat.  I was very proud of her.

6    Q.   And how about family activities?  Anything you guys would

7    do together?

8    A.   Oh, all kinds, yeah.  Yeah.  Anything.  That's what I

9    meant before.  Because I wouldn't know what she was going to

04:37 10   come over with the next day because she had a day off, it was

11   like, "Mom, come on.  Let's go.  We've got to do this.  Come

12   on, just give it a shot."  I mean, she even jumped out of an

13   airplane.  But I just asked her not to tell her mom until she

14   did it and came home, you know?

15        But we did all kinds of things together.  We were lucky

16   enough to have a pool that I built in the backyard.  All of us

17   built it together, actually.  Put it together.  And we had some

18   great times together.

19   Q.   Mr. Campbell, what about your relationship, you and

04:38 20   Krystle, just the two of you?

21   A.   I just loved her to death.  She -- she -- I just loved her

22   to death because she always made me happy.  You know, I had

23   troubles with my back and stuff and she would get me out of

24   bed, get me moving, you know.  And I thought that was a pretty

25   cool talent because I was just about ready to give up.  And

1    she'd come over 7:30 in the morning, "Come on dad.  Get up.  Do

2    your exercise.  Let's go."  And I ended up all right, so...

3    Q.    Now, when she got older, how often did you two talk?

4    A.    Oh, God.  Every day she'd call me.

5    Q.    Why would she call you every day?

6    A.    Every day.  Every single day because -- well, we had

7    Rocky.  She'd drop him off at four o'clock, five o'clock, six

8    o'clock in the morning, and she would have to come back and

9    pick up Rocky later in the night, because she loved dogs.

04:39 10   Q.    I was just going to ask you who Rocky was.

11   A.    Yeah, Rocky is her dog.  And we'd baby-sit for Rocky.  So,

12   you know, we got to see her every single day, twice a day.  And

13   we were a really, really close family.  Very close family.

14   Q.    How about with other members of your family, grandparents,

15   aunts and uncles?

16   A.    Yeah, well, when my mom got sick, really sick, Krystle was

17   just about ready to move out on another adventure.  And when

18   she found out that Nana was sick, she moved right in with Nana.

19   Never hesitated, nothing.  She just moved right in to take care

04:39 20   of my mother.

21   Q.    And was she still working at the time?

22   A.    Yeah.

23   Q.    So how did she do both?

24   A.    She did it.  She had breakfast with her at six o'clock,

25   she'd call her in the afternoon, she'd come home and spend the

1    nights with her.  I don't know how she did it.  I really don't.

2    Q.   How about Krystle's relationship with your wife, Patricia?

3    A.   Oh, that was special.  It wasn't like every mother and

4    daughter type.  They were like good buddies.  I mean, when

5    she'd tell me, you know, Krystle asked her to go out with her

6    girlfriend or something like that, I would just say, "Yeah,

7    yeah, you know, go ahead," because I knew when Patty would come

8    home, she'd be all happy and excited.  And, you know, that's

9    what Krystle did for her mother, you know?  They were like best

04:40 10   of friends.  They laughed, they joked.  It was amazing to see,

11   you know?

12   Q.   How about her work?  What did she do for work and how did

13   she do it?

14   A.   Her work ethics was unbelievable.  She wouldn't think

15   anything of working 10, 12 hours a day or more.  I mean, she

16   just never ran out of gas.  And yet like I said, she

17   would -- she would work a 12-hour day and then if somebody

18   needed something or wanted something or whatever, she would

19   just be right there.  She would just be right there for them.

04:41 20   Q.   Did you ever get to see her interacting with her coworkers

21   or people that she managed?

22   A.   Oh, yeah.

23   Q.   Yeah?

24   A.   Oh, yeah.

25   Q.   What was that like?

1    A.   Well, it was funny because I kept telling her that, you

2    know, she couldn't be a boss and be friends too, like you had

3    to be one or the other.  But she proved me wrong on that

4    because, you know, somebody needed help and they were at the

5    lower end of the train, she would go in there and help them and

6    then go right on with what she'd have to do.  Her coworkers

7    loved her.

8    Q.   How about Krystle with other children?

9    A.   She had a knack with kids.  She had a knack with kids.

04:42 10    Q.   Did she have that all her life?

11    A.   Yeah, she -- she -- I don't know.  That and animals.

12    Young kids and animals.  She had a natural knack.

13    Q.   Do you remember anything in particular about her

14    relationship with kids who might have troubles in their lives?

15    A.   Well, she had a great relationship with my grandson, and

16    that was every Saturday.  And he looked forward to that.  He

17    knew Aunty was coming on Saturday morning.  And if it was past

18    nine o'clock he actually asked, "Where's Aunty?  Where's

19    Aunty?"  And he was only four.  So the bond that he had with

04:42 20    Aunty was very special.

21    Q.   How about keeping in touch with the wider family group?

22    Who did that?

23    A.   She would.  Krystle did that.

24    Q.   How did she do it?

25    A.   She made phone calls, she asked everybody when they're

1    coming down.  Aunt Betty lived in New Hampshire, Aunt Lillian

2    lived in Philadelphia.  When's the next time we were going to

3    meet, and then she would plan something.  And she was -- she

4    drived [*sic*] by that.  She'd get everybody together and pull it

5    off.

6    Q.    Have you been able to keep that up?

7    A.    No.  No.  Nobody could fill that boot now.  My sister's

8    moved down to Philadelphia.  And it hasn't been the same, no.

9    Q.    Mr. Campbell, I'm going to ask you about Marathon Monday

04:43 10    of 2013 and ask you when you found out what had happened to

11    Krystle.

12    A.    That was a real bad day.  I was home watching the marathon

13    and I saw what had happened, the explosion, and I didn't feel

14    right.  And my son called me because we really didn't know

15    where she was, whether she was there or at the Red Sox game

16    yet.  We didn't know yet.  So we waited ten to 12 hours and

17    were talking to the doctors and they were saying they may have

18    to cut off her leg and do things like that, and we said, "Go

19    ahead.  You do what you got to do.  Just save my baby," you

04:44 20    know?

21        And then the doctor asked me to take a walk with him and

22    take a look and see her.  I walked through the door, and it

23    wasn't Krystle.  And I passed out on the floor.  I couldn't

24    remember anything after that till I woke up about five minutes

25    later and I realized that Krystle was gone and they had made a

```
 1   mistake.
 2   Q.   What's it been like since Krystle is gone?
 3   A.   Horrible.  It's one of the toughest things I think any
 4   parent goes through, but I would never wish it on any parent or
 5   any person.  It's very hard.  She was the light of my life.
 6   I'm proud of her.  She was strong, beautiful, smart, giving.  I
 7   miss her.
 8   Q.   Mr. Campbell, before coming into court today, did you and
 9   I look over some photographs that your family had supplied?
10   A.   Yeah.
11   Q.   And do you recognize as you looked at these photographs
12   the people who are in them, family members and Krystle?
13   A.   Yeah.
14        MS. PELLEGRINI:  Your Honor, the government would
15   offer 1601-01, -02, -07, -08, -09, -14 -- I'm sorry -- -12 and
16   -14.
17        MS. CLARKE:  No objection.
18        THE COURT:  No objection?  Okay.  Then those several
19   exhibits are admitted.
20        (Government Exhibit Nos. 1601-01, 1601-02, 1601-07,
21   1601-08, 1601-09, 1601-12, 1601-14, received into evidence.)
22        MS. PELLEGRINI:  Thank you.
23   BY MS. PELLEGRINI:
24   Q.   Mr. Campbell, we're going to put up on the screen in front
25   of you --
```

```
 1              MS. PELLEGRINI:  Can we start, Mr. Bruemmer, first,
 2      with 1601-01.
 3      Q.   Mr. Campbell, do you remember this?
 4      A.   Yeah, that was her first birthday.  She was a Cabbage
 5      Patch.  It was when we lived in a small place in Somerville.
 6      But she even had a big smile at that age.
 7              MS. PELLEGRINI:  And go to 1601-02, please.
 8      Q.   Who's this?
 9      A.   That's mom and Krystle.
04:46 10      Q.   And this is Patricia and Krystle?
11      A.   Yeah, both of them had their pajammies on together.
12           (Laughter.)
13              MS. PELLEGRINI:  1601-07, please.
14      Q.   Do you remember this day?
15      A.   Yeah, that's her First Holy Communion.
16      Q.   And where did this take place?  Where is St. Joseph's?
17      A.   St. Joe's in Medford.
18      Q.   And so who else is in the photo?  Who else is in the
19      photo?
04:47 20      A.   Oh, my God.  We've got her nephew, me, Pat, and I
21      think -- I don't know who that other little guy is.
22           (Laughter.)
23      A.   Christopher.  Billy, yeah.
24      Q.   How about 1601-08?  Now, you said she wasn't a girly girl.
25           (Laughter.)
```

```
 1    A.    Yeah.

 2    Q.    So what's happening here?

 3    A.    Well, that's when she -- that's when she was a girly girl.

 4          (Laughter.)

 5    A.    But she loved it.  She liked to tap.  She -- but she gave

 6    it up for a baseball bat.

 7    Q.    All right.

 8          MS. PELLEGRINI:  Let's go to 1601-14.  -14?  Or it

 9    might be -19.  We'll stay with that one for a second.

04:48 10   Q.    How about this photo, Mr. Campbell?  Do you remember this

11    one?

12    A.    Yeah, it was her prom.

13    Q.    Her prom?

14    A.    Yeah.

15    Q.    Did she go to many?

16    A.    Actually, she -- yeah, she went to a couple.  She was very

17    lucky, yeah.

18    Q.    Yeah?

19    A.    Yeah.

04:49 20   Q.    And as a matter of fact, how about her circle of friends?

21    A.    She -- like I said, she just -- she was a very lucky young

22    lady.  She had girlfriends, boyfriends.  I mean, not in the

23    idea of a boy, but as friends.  I mean, she had a lot of

24    friends because she would always -- she liked to do things.  I

25    mean, she wouldn't sit around.  And, you know, she was always
```

1    outgoing and would have a plan, and that's why people really

2    liked her.

3    Q.   Mr. Campbell, we talked to your son about a wedding that

4    Krystle put together on Spectacle Island for Jasper White's

5    nephew.  Do you remember that?

6    A.   Yes.

7    Q.   And do you remember what Krystle had to do for the next

8    day?

9    A.   Yeah.  It was -- well, she got kind of angry because she

04:50 10   wasn't just a maid of honor for that either; she was running

11   the wedding.  She was maid of honor, but yet the boss had put

12   up another event for five o'clock that following day and he let

13   her know, like, at ten or eleven o'clock that night.  So she

14   ended up sleeping at the ranger station, but she still did it.

15   And that's just the way she was.  I mean, sleeping at a

16   ranger's station so that she didn't miss it.  A lobster event?

17   I don't know.  But that was Krystle.

18        MS. PELLEGRINI:  1601-10.

19   Q.   All right.  So we went from the girly girl?

04:50 20   A.   Yeah.  That's when she played baseball.  That's before she

21   switched to softball.  She played hardball, and that was -- she

22   had a good talent, exceptional talent.

23        MS. PELLEGRINI:  And 1601-09.

24   Q.   Now, you mentioned you had a pool?

25   A.   Yeah.

```
 1    Q.    Is that your pool in the backyard?

 2    A.    That's the one we built, yeah.

 3    Q.    Yeah?  And is that Krystle in the middle of the picture?

 4    A.    Yeah.  Well, there's no room in the cooler, so Krystle

 5    figured keep the watermelon cool by throwing it in the pool, so

 6    that's what we did.  It was a good idea.

 7          (Laughter.)

 8    Q.    Mr. Campbell, what do you miss the most about Krystle?

 9    A.    I miss my hug every day.  She never left the house without

10    giving me a hug.  I miss that the most.  I miss her being here.

11    But I miss the hug.

12          MS. PELLEGRINI:  Thank you, Mr. Campbell.  I have no

13    further questions.

14          MS. CLARKE:  Thank you very much.

15          THE WITNESS:  Thank you.

16          THE COURT:  Thank you, sir.  You may step down.  Thank

17    you.

18          (The witness is excused.)

19          MS. PELLEGRINI:  Your Honor, before I leave, I think I

20    had misspoken about one of the numbers.  I thought it was -14,

21    but it was that one 1601-10, and I would ask that that be

22    entered appropriately.

23          THE COURT:  Strike -14 and put in -10?

24          MS. PELLEGRINI:  -10.  Yes, sir.

25          THE COURT:  Okay.
```

1           (Government Exhibit No. 1601-10, replacing Exhibit No.

2     1601-14, received into evidence.)

3           MS. PELLEGRINI:  Thank you.

4           MR. MELLIN:  The United States calls Nicole Gross.

5                 NICOLE GROSS, duly sworn

6           THE CLERK:  State your name and spell your last name

7     for the record, keep your voice up and speak into the mic so

8     everyone can hear you.

9           THE WITNESS:  Nicole Gross, G-R-O-S-S.

04:53 10                 DIRECT EXAMINATION

11    BY MR. MELLIN:

12    Q.   Good afternoon, Ms. Gross.  Where did you grow up?

13    A.   Bowie, Maryland.

14    Q.   When you were growing up, did you play any particular

15    sports?

16    A.   I started swimming competitively at the age of eight.

17    Q.   And at some point based on your swimming ability did you

18    go to the University of Tennessee?

19    A.   I did.

04:53 20    Q.   And did you swim at Tennessee?

21    A.   I did.

22    Q.   And while you were at Tennessee, did you meet somebody

23    named Michael Gross?

24    A.   I did.

25    Q.   And if you could just move a little closer to the

1    microphone, maybe, or pull it closer to you.  And who is

2    Michael Gross?

3    A.   He was at the time a swimmer on the men's swimming and

4    diving team at the University of Tennessee, became my

5    boyfriend, fiancé, and now husband.

6    Q.   When were you all married?

7    A.   2006.

8    Q.   Who was a better swimmer?

9    A.   He was, but he didn't have to work as hard as I did.

04:54 10    Q.   At some point did the two of you move to Charlotte, North

11    Carolina?

12    A.   Yes, we moved shortly after graduating.

13    Q.   And were you a personal trainer as well as a kind of

14    triathlete coach?

15    A.   Yes, and also running.

16    Q.   Taking you to April of 2013, did you attend the Boston

17    Marathon?

18    A.   I did.

19    Q.   And how was it that you came to Boston, or why did you

04:54 20    come to Boston that year?

21    A.   It was the very first time that I'd ever come to Boston.

22    I've had a few athletes compete and qualify but I didn't get

23    the chance to go until 2012 when it was a Christmas gift from

24    my mom's husband.  And I was my mom's coach to help her qualify

25    for the Boston Marathon.

```
 1    Q.    Who in addition to you came up to Boston in April of 2013?

 2    A.    I flew up from Charlotte with my husband Michael, and my

 3    sister Erica, and my mom came down from Baltimore.

 4    Q.    Taking you to the April 15th of 2013, at some point did

 5    your group go to the marathon?

 6    A.    Yes, we had to -- my mom had booked us a hotel in

 7    Framingham, so -- she also rented a car.  So Michael drove us

 8    to the airport because my mom had booked us a five o'clock

 9    flight that day.  So logistically, we were trying to make sure

10    that it was going to be easy for her to finish the race and get

11    to the airport in time.

12          So that day, after dropping the car off, we took the T to

13    Newbury Street.  And since the three of us had never been, we

14    just used the day to sort of travel around, took some pictures

15    by the water and had lunch on Newbury Street and eventually

16    just waited for some of our athletes that we knew from where we

17    worked and that I coached to see if we could catch them running

18    up towards Hereford and onto Boylston Street.

19    Q.    When you say the three of you, who are you talking about?

20    A.    Michael, Erica and myself.

21    Q.    And then at some point did you get down towards the finish

22    line?

23    A.    Yes; we stopped at the 26-mile mark.  I wanted to stop and

24    honor the Newtown memorial that they had placed there.  So I

25    sat there and took a couple of pictures, and my sister and I
```

1    were able to get up close to the guardrails and we were able to

2    just watch all the runners run by with a very clear picture.

3    And we stood there for about 45 minutes and --

4    Q.   If I can just stop you there.

5          MR. MELLIN:   If I could have Exhibit 1594 brought up.

6    Q.   And, Ms. Gross, do you see Exhibit 1594?

7    A.   I do.

8    Q.   As you look at it, do you see yourself in that photograph?

9    A.   Yes.

04:56 10   Q.   If you could do us a favor and just circle yourself.

11   A.   (Witness complies.)

12   Q.   And for the record, you're the woman whose face is below

13   the red and blue flag in the middle?

14   A.   Yes.

15   Q.   In this photo can you see your husband?

16   A.   No, I can't.  He had stepped back a few feet to start

17   taking some pictures at a better angle for my mom as she was

18   preparing to cross the finish line, so I'm looking back at him.

19   Q.   And at that point where's your sister, Erica?

04:57 20   A.   She's hidden behind the flag right next to me.

21   Q.   So as you look at this photo, she would be on your right?

22   A.   Correct.

23   Q.   The photo on the left, but -- I'm sorry -- on your right?

24   A.   Correct.

25   Q.   And if I could just have you look --

1          MR. MELLIN:  And just the witness, please, Exhibit

2     1619.

3     Q.   And as you look at that photograph, Ms. Gross, do you

4     recognize who's in the photograph?

5     A.   I do.

6     Q.   Who do you see in the photo?

7     A.   My husband Michael.

8     Q.   Okay.  Do you see your sister?

9     A.   I see her jacket.

04:58 10    Q.   Is this a fair and accurate photo of the finish line

11    on Boston -- in Boston on April the 15th, 2013?

12    A.   Correct.

13          MR. MELLIN:  Your Honor, we would move that into

14    evidence, Exhibit 1619, and ask to publish.

15          MS. CLARKE:  Subject to the earlier objection.

16          THE COURT:  All right.  Admitted.

17          (Government Exhibit No. 1619 received into evidence.)

18    BY MR. MELLIN:

19    Q.   And, Mrs. Gross, you said that you see your husband

04:58 20    Michael.  Can you circle where he is in this photo?

21    A.   (Witness complies.)

22    Q.   For the record, it's the man with the black knit cap to

23    the right of the center of the photo?

24    A.   Correct.

25    Q.   All right.  And if I could just zoom in on that portion.

```
 1    I just zoomed in on that portion.  The part that is now zoomed
 2    in, do you see your sister?
 3    A.   I see her jacket.
 4    Q.   Okay.  And where is her jacket in this zoomed-in portion?
 5    A.   Do you want me to draw?
 6    Q.   Yes, if you don't mind.  Thanks.
 7    A.   (Witness complies.)
 8    Q.   And for the record, you circled the light blue with a
 9    little bit of a darker blue sleeve on the jacket.  Is that
10    correct?
11    A.   Correct.
12    Q.   Do you see yourself in this photo at all?
13    A.   I do.
14    Q.   Okay.  Where are you?
15    A.   (Indicating.)
16    Q.   And, again, for the record, you're the woman with blonde
17    hair.  Not the woman in the front but right behind her.  Is
18    that right?
19    A.   Correct.
20    Q.   And let me ask you, did you recognize anyone wearing this
21    black cap right here?
22    A.   Unfortunately, no.
23    Q.   Okay.  Do you recall ever seeing that person that day?
24    A.   Unfortunately, no.
25    Q.   Thank you.
```

1          MR. MELLIN:  Thank you, Mr. Bruemmer.

2     Q.   At some point did you and Erica move from this area that

3     was shown in that photo where you're kind of towards the back

4     towards more to the front?

5     A.   We moved just a few steps closer.  My husband had moved a

6     few feet behind us, and it was as if we were at a concert

7     trying to push our way through towards the closer parts to the

8     front.  And as two people moved away, I had seen an opening to

9     kind of move us forward.

05:00 10     Q.   Who moved forward?

11     A.   My sister was standing right in front of me, and I had my

12     hands on her back.

13     Q.   Shortly after that, what happened?

14     A.   I pushed her forward as I was saying "1, 2, 3, ready, go,"

15     and as I said "go," the bomb exploded.  And I remember falling

16     back in slow motion, seeing the flags waving, and completely

17     confused as to why a sound like that would be going off at a

18     finish line as I've been to many.  And I fell back.  And as I

19     woke up, I was actually -- instead of facing the flags, I was

05:00 20     looking down the street and saw nothing.  I saw nobody near me.

21     I knew something was wrong as I looked down at my legs, that I

22     knew were once ready to run away from danger, and my right quad

23     was blown open.  I could feel my shoes just dangling by what

24     felt like threads.

25          And I didn't see anybody around me and I thought that for

1    sure there was a second bomb that would go off to destroy

2    everybody that was still alive that may have survived that

3    first explosion.  And being so terrified in knowing that I

4    couldn't run for help and I didn't see anybody near me, I just

5    screamed for somebody to save me or hear me.  And when I did, I

6    was rescued by first responders who turned my position down so

7    that I could lay down on my back.  But right before I did, I

8    looked in the eyes of somebody taking a picture of me, and I

9    remember being so scared and helpless and then angry that

05:02 10   someone would be taking a picture at such a destructive time.

11         And I laid down on my back with my legs propped up because

12   I didn't want to put them down because I didn't know what was

13   left of them.  And I kept feeling like I was going in and out.

14   So my first visions was seeing nobody to seeing a camera,

15   laying on my back, a slight turn to my right, and I see my

16   husband standing there.

17         THE COURT:  Could we have --

18   Q.   Did you call out to your husband or speak to him?

19   A.   I tried to but I couldn't speak, but it was registering

05:02 20   that he was right there.  So I was reassured that he was alive

21   because I saw him standing.

22   Q.   At that time what did you think about yourself?

23   A.   I knew I was receiving help so I was trying to pay

24   attention to what they were telling me, asking me my name,

25   where I was.  So I was trying to stay very calm but I'm sort of

1   in this other world of paying attention to seeing my husband

2   and calling out that "My husband's right there.  My husband's

3   right there."  And then I look over further to my right and the

4   only person I see left that was a clear vision was my sister

5   laying down, and her eyes were closed.

6   Q.   Did you see her injuries at that point?

7   A.   No, but I saw that she was being taken care of.

8        So I was not sure what was going to happen to me but I was

9   comforted by the fact that I knew my husband was alive and that

05:03 10   I had a glimpse of my sister and that someone was taking care

11   of her.  And I knew that if I didn't pay attention to what the

12   first responders were trying to tell me -- I was going in and

13   out.

14   Q.   Did anyone attach a tourniquet to your legs or anything

15   like that?

16   A.   They did.

17   Q.   What happened?

18   A.   I don't remember anything, I just know what was told to me

19   afterwards, that there was a first responder as a fireman and

05:04 20   as a runner who wrapped tourniquets around my legs.  And my

21   left leg had been broken and was split off to the left, and he

22   put it back in place to be lined up with the rest of my leg.

23   And I just remember being picked up and rushed into an

24   ambulance.

25   Q.   If I could --

1          MR. MELLIN:  Just for the witness, please.

2    Q.   -- have you look at Exhibit 1620.

3          Ms. Gross, do you recognize Exhibit 1620?

4    A.   I do.

5    Q.   Who is that that is on the stretcher in that photo?

6    A.   That's me.

7    Q.   Okay.  And is that April 15th of 2013?

8    A.   Yes.

9          MR. MELLIN:  Your Honor, we would move into evidence

05:05 10   Exhibit 1620 and ask to publish it.

11          THE COURT:  Subject to the prior objection, which was

12   overruled, it's admitted.

13          (Government Exhibit No. 1620 received into evidence.)

14   BY MR. MELLIN:

15   Q.   Ms. Gross, as we look at this, again, for the record, that

16   is you on this stretcher.  Is that right?

17   A.   Correct.

18   Q.   And there's a wrap around your left leg.  Is that right?

19   A.   Correct.

05:05 20   Q.   Is there also one around your right leg?

21   A.   I believe so.  I don't know.

22   Q.   You mentioned earlier that you had a problem with a

23   quadricep that was blow open.  Which quadricep was blown open?

24   A.   My right.

25   Q.   After being put on the stretcher, were you taken to the

1    hospital?

2    A.    Yes.

3    Q.    And when you arrived at the hospital, what happened?

4    A.    I was completely by myself.  My family -- my mom had been

5    running and stopped.  The cell phone lines were down but I'd

6    remembered my husband and my mom's cell phone number and I kept

7    asking them to call.  I was just worried about everybody else.

8    And was rolled into an extra room because there were more

9    critical people that needed to be rushed immediately into

05:06 10   surgery.

11         So I just laid there asking them to keep calling.  And

12   they gave me pain meds and they wrapped me up because I was

13   freezing.  And I just remember laying there completely alone.

14   I was alone in the ambulance, and kept feeling helpless and

15   alone.

16   Q.    You went into surgery that day.  Is that right?

17   A.    Correct.

18   Q.    And how many surgeries have you had?

19   A.    Between ten and 11.

05:06 20   Q.    What was the extent of your injuries?

21   A.    My right eardrum was blown open; I broke both the tibula

22   and -- tibia and fibula in my left leg that required a rod to

23   be placed along my tibia; my right ankle was blown open with

24   soft-tissue damage; my right Achilles was three-quarters

25   severed; and I had complications from a blood-clotting filter

1    that was inserted through my groin that had punctured my vena

2    cava and lower bowel that required 20 staples along my abdomen.

3    Q.   And what happened with your right quad?

4    A.   It was blown open close to the femoral artery, but

5    thankfully it was not affected.

6    Q.   At some point did you learn the extent of your sister's

7    injuries?

8    A.   I did.

9    Q.   And what were those?

05:07 10         MS. CLARKE:  Objection.

11               THE COURT:  Overruled.

12               You may answer.  You can answer the question.

13               THE WITNESS:  Okay.

14    A.   I learned that she lost her leg below the knee.

15    BY MR. MELLIN:

16    Q.   And approximately how many surgeries has she had?

17    A.   Over 20.

18               MR. MELLIN:  If we could have the witness, please,

19    look at Exhibit 9.

05:08 20         THE COURT:  Is this in evidence?

21               MR. MELLIN:  Yes, it is, your Honor.  All of these are

22    in evidence.

23    BY MR. MELLIN:

24    Q.   Mrs. Gross, as you look at Exhibit 9, do you recognize

25    that scene?

1    A.   Yes, I do.

2    Q.   And as you look at that photograph, can you see both

3    yourself and your husband Michael?

4    A.   I can see myself right now.  I can't see Michael.

5    Q.   All right.  If I enlarge it, can you see yourself?

6    A.   Yes, I do.

7    Q.   Can you please draw a circle around you in this

8    photograph?

9    A.   (Witness complies.)

05:09 10   Q.   And for the record, you're the woman who's on the ground.

11   You can see your right thigh, is that fair to say, in this

12   photograph?

13   A.   Correct.

14   Q.   Okay.  And your husband is where in this photograph?

15   A.   (Witness indicating.)

16   Q.   And again for the record, it's a gentleman wearing kind of

17   a black sweat top with his head turned back?

18   A.   Correct.

19   Q.   Okay.  As you look at this photograph, there's blood on

05:09 20   your leg.  Is that right?

21   A.   Yes.

22   Q.   And were you able to see if you were bleeding from that

23   quad injury?

24   A.   At that point, no.  My skin had turned a weird gray color,

25   and I just saw just a blown-open quad.

1              MR. MELLIN:  If I could please have the witness look

2      at Exhibit 12.

3      Q.   As you look at Exhibit 12, do you see yourself in that

4      photograph?

5      A.   Yes.

6      Q.   Okay.  Where are you?

7      A.   (Witness indicates.)

8      Q.   And you just circled the woman in the red jacket,

9      essentially in the center of the photograph?

05:10 10   A.   Correct.

11     Q.   Do you see your sister in this photograph?

12     A.   Yes.

13     Q.   Could you please circle her?

14     A.   (Witness complies.)

15     Q.   And you just circled the woman who's laying on the ground

16     in the light blue jacket.  Is that right?

17     A.   Yes.

18              MR. MELLIN:  And then if I could please have Exhibit

19     19 brought up?

05:10 20        I'm not sure that Exhibit 191 is actually in evidence,

21     your Honor.

22              THE COURT:  All right.

23              MR. MELLIN:  Just for the witness.

24     BY MR. MELLIN:

25     Q.   Mrs. Gross, as you look at Exhibit 19, do you recognize

```
 1   anyone in that photograph?

 2   A.   Yes.

 3   Q.   Who do you see in that?

 4   A.   My sister, and I see my leg.

 5   Q.   All right.

 6            MR. MELLIN:  Your Honor, I would move into evidence

 7   Exhibit 19 and ask to publish it.

 8            MS. CLARKE:  Same objection.

 9            THE COURT:  All right.  Admitted.

05:11 10         (Government Exhibit No. 19 received into evidence.)

11   BY MR. MELLIN:

12   Q.   Mrs. Gross, as you look at Exhibit 19, could you please

13   circle your sister.

14   A.   (Witness complies.)

15   Q.   For the record, you circled the woman in the middle of the

16   photograph in a light blue jacket.  Is that right?

17   A.   Yes.

18   Q.   And you mentioned that in this photo you can also see your

19   leg.  Is that right?

05:11 20   A.   Yes.

21   Q.   And can you circle where you see your leg?

22   A.   (Witness complies.)

23   Q.   And you circled the leg next to the man in blue.  Is that

24   right?

25   A.   Yes.
```

 1    Q.   All right.  I'm going to try to zoom in on that.  Now, do

 2    you see your leg there?

 3    A.   Yes.

 4    Q.   All right.  And then finally, if I could have you look at

 5    Exhibit 20.

 6              MR. MELLIN:  Which is in evidence, your Honor.

 7    Q.   Mrs. Gross, do you see your sister in that photograph?

 8    A.   Yes.

 9    Q.   Could you please circle her?

05:12 10    A.   (Witness complies.)

11    Q.   And for the record, you circled the woman in the light

12    blue that's just to the left of the woman in the red.  Is that

13    right?

14    A.   Yes.

15    Q.   Okay.

16              MR. MELLIN:  With the Court's indulgence.

17              (Pause.)

18              MR. MELLIN:  Thank you, your Honor.

19              MS. CLARKE:  Thank you.  No questions.

05:12 20              THE COURT:  All right, Mrs. Gross.  Thank you.  You

21    may step down.

22              (The witness is excused.)

23              THE COURT:  Let me see counsel at the side.

24              (Discussion at sidebar and out of the hearing of the

25    jury:)

```
 1          THE COURT:  So I was told earlier that that probably
 2   is it for the afternoon?
 3          MR. WEINREB:  Yes.
 4          THE COURT:  Can you tell us who will be up tomorrow?
 5          MR. WEINREB:  Yes.  I think we'll probably begin with
 6   the Colliers, Andrew Collier.
 7          THE COURT:  I don't know if I'm working from the most
 8   current list.  This is from last week.
 9          MR. WEINREB:  Okay.  This may not be -- we were having
10   to adjust the order for various things, but we'd probably begin
11   with Andrew Collier.  And Joe Rogers is Sean Collier's
12   stepfather.  And then at that point it's a little flexible.
13   Oh, Chief DiFava will also testify about Sean Collier.  And
14   then at that point we're flexible, but among the witnesses we
15   intend to call tomorrow were Michelle Gamble, the -- a witness
16   from the United States Marshal's Service who will authenticate
17   the screen shot from the video.
18          We may, in lieu of having Ms. Gamble ID -- or
19   authenticate pictures of various victims, streamline it or
20   simplify it by having one of the victim witness advocates
21   identify all of the photos, but it's just a very quick witness,
22   identifying the photos.  And then Eric Whalley.  Mr. Whalley
23   and Adrianne Haslet-Davis for tomorrow.
24          I think all the others have scheduling issues and they
25   need to testify on Thursday.
```

1          THE COURT:  And -- okay.

2          MS. CONRAD:  We would like to be heard maybe after the

3     jury is excused about some issues with respect to the marshals.

4     In particular, we, over the lunch break, asked to inspect the

5     camera and inspect the cell block and we were told that -- and

6     also to take a photograph of it because we believe it's

7     reflective.  And we were told that according to general counsel

8     for the marshals that permission would have to come from the

9     U.S. Attorney's office.  I trust that the Court's order will

05:15 10    suffice to allow us to inspect that.

11          THE COURT:  Okay.  So why don't we do this.  I don't

12     know if you've had any negotiations or conversations about

13     this.  Why don't we let you see what you can accomplish

14     together, and we can take it up early tomorrow morning if we

15     have to.

16          MS. CONRAD:  Well, I'm going to need a chance for

17     someone to take a photograph before the witness testifies, so I

18     really need to --

19          THE COURT:  Yeah, before.

05:16 20          MS. CONRAD:  But if we take it up tomorrow morning, I

21     don't know when I'm going to have someone take a photograph and

22     when I can inspect it before we actually start because I'm

23     going to be in court.

24          THE COURT:  All right.  Well, let's -- maybe you can

25     talk about it and we can have a four o'clock session or

1    something.

2           MS. CLARKE:  Your Honor, there's also the question of

3    the revised photos of the survivors.  We've seen --

4           THE COURT:  Yeah, I was going to get to that.  That's

5    why I wanted to know who's coming, because I want the

6    government to match the exhibits with those people as the

7    sorting has now happened, but so we won't go through it in open

8    court.

9           MS. CLARKE:  Right.  Thank you.

05:16 10        THE COURT:  I agree with that.  Okay.

11          So we'll let them go until tomorrow morning and we'll

12   plan to get together at four o'clock?  Does that work?

13          (In open court:)

14          THE COURT:  Jurors, for your purposes, that's it for

15   today.  Witness scheduling issues mostly.  We'll continue

16   tomorrow on the usual schedule at nine o'clock and proceed with

17   the evidence.

18          And again, please, no conversation about the case

19   among yourselves or with anyone else, and avoid any media

05:17 20   reports.

21          Have a pleasant evening, and we'll see you tomorrow

22   morning at nine o'clock.

23          THE CLERK:  All rise for the Court and the jury.  The

24   Court will be in recess.

25          (The Court and jury exit the courtroom and the

1    proceedings adjourned at 3:19 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  12/14/15
13

14

15

16

17

18

19

20

21

22

23

24

25