```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )



         BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
              UNITED STATES DISTRICT JUDGE



                    JURY TRIAL - DAY 48



          John J. Moakley United States Courthouse
                      Courtroom No. 9
                     One Courthouse Way
                 Boston, Massachusetts  02210
                  Wednesday, April 22, 2015
                        9:13 a.m.



               Marcia G. Patrisso, RMR, CRR
                   Official Court Reporter
               John J. Moakley U.S. Courthouse
               One Courthouse Way, Room 3510
                Boston, Massachusetts  02210
                      (617) 737-8728

         Mechanical Steno - Computer-Aided Transcript
```

1  APPEARANCES:

2       OFFICE OF THE UNITED STATES ATTORNEY
        By: William D. Weinreb, Aloke Chakravarty and
3            Nadine Pellegrini, Assistant U.S. Attorneys
        John Joseph Moakley Federal Courthouse
4       Suite 9200
        Boston, Massachusetts  02210
5       - and -
        UNITED STATES DEPARTMENT OF JUSTICE
6       By: Steven D. Mellin, Assistant U.S. Attorney
        Capital Case Section
7       1331 F Street, N.W.
        Washington, D.C.  20530
8       On Behalf of the Government

9       FEDERAL PUBLIC DEFENDER OFFICE
        By: Miriam Conrad, Federal Public Defender
10      51 Sleeper Street
        Fifth Floor
11      Boston, Massachusetts  02210
        - and -
12      CLARKE & RICE, APC
        By: Judy Clarke, Esq.
13      1010 Second Avenue
        Suite 1800
14      San Diego, California  92101
        - and -
15      LAW OFFICE OF DAVID I. BRUCK
        By: David I. Bruck, Esq.
16      220 Sydney Lewis Hall
        Lexington, Virginia  24450
17      On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                          I N D E X

2                    Direct   Cross   Redirect   Recross   Voir Dire
   WITNESSES FOR THE
3    GOVERNMENT:

4  ANDREW COLLIER

5       By Mr. Weinreb     5

6  JOSEPH ROGERS

7       By Mr. Weinreb     17

8  JOHN DIFAVA

9       By Mr. Weinreb     39

10 ERIC WHALLEY

11      By Mr. Chakravarty 51

12 ADRIANNA HASLET-DAVIS

13      By Ms. Pellegrini  75

14 GARY OLIVEIRA

15      By Ms. Conrad                                              94
        By Ms. Pellegrini  98
16      By Ms. Conrad              102

17 JINYAN ZHAO

18      By Mr. Chakravarty 121

19                       E X H I B I T S

20 GOVERNMENT'S
    EXHIBIT      DESCRIPTION                FOR ID      RECEIVED
21
   1602-8,
22 1602-10,
   1602-14,
23 1602-25
   1602-30      Photographs                             7
24

25

1                        E X H I B I T S  (cont'd)

2

GOVERNMENT'S
3   EXHIBIT          DESCRIPTION              FOR ID        RECEIVED

4
    1602-05,
5   1602-12,
    1602-16,
6   1602-17,
    1602-18,
7   1602-21,
    1602-26
8   1602-28,        Photographs                              24

9   1602-29         Photographs                              41

10  624             Photograph                               58

11  1598            Photograph                               62

12  1593            Photograph                               63

13  21-18           Photograph                               80

14  1607-002,
    1607-003,
15  1607-004,
    1607-005        Photographs                             138
16
    1600            Lu memorial                             146
17

18  DEFENDANT'S
    EXHIBIT
19
    1595            Still photograph from video             100
20
    4000            Video Clip No. 1                        106
21
    4001            Video Clip No. 2                        111
22
    4002            Video Clip No. 3                        115
23
    1606            Book cover                              131
24

25

1                        P R O C E E D I N G S

2              THE CLERK:  All rise for the Court and the jury.

3              (The Court and jury enter the courtroom at 9:13 a.m.)

4              THE CLERK:  Be seated.

5              THE COURT:  Good morning, jurors.

6              THE JURORS:  Good morning.

7              THE COURT:  Mr. Weinreb?

8              MR. WEINREB:  Good morning, your Honor.  The United

9    States calls Andrew Collier.

00:07  10                   ANDREW COLLIER, duly sworn

11             THE CLERK:  State your name, spell your last name for

12   the record, keep your voice up and speak into the mic so

13   everyone can hear you.

14             THE WITNESS:  Andrew Collier, C-O-L-L-I-E-R.

15                        DIRECT EXAMINATION

16   BY MR. WEINREB:

17   Q.   Good morning.

18   A.   Good morning.

19   Q.   How old are you?

00:08  20   A.   I am 27.

21   Q.   Are you Sean Collier's brother?

22   A.   I am.

23   Q.   Before I ask you any questions about your brother, I just

24   want to ask you a few questions about yourself.  Where do you

25   work?

1    A.    I work at Hendrick Motorsports.

2    Q.    What's that?

3    A.    It is a NASCAR race team in -- just outside Charlotte,

4    North Carolina.

5    Q.    What do you do there?

6    A.    I'm a machinist.

7    Q.    How long have you worked there?

8    A.    I've worked there for seven years.

9    Q.    Are you married?

00:08 10    A.    I am.

11    Q.    What's your wife's name?

12    A.    Tory.

13    Q.    Where were you born?

14    A.    I was born in Stoneham, Massachusetts.

15    Q.    And where did you grow up?

16    A.    Wilmington, Massachusetts.

17    Q.    Did you go to school there?

18    A.    I did.

19    Q.    Which ones?

00:08 20    A.    I went to Shawsheen Elementary, Wilmington Middle, and the

21    Shawsheen Valley Tech.

22    Q.    Who did you live with growing up?

23    A.    My brothers and sisters, all six of us, and my parents,

24    Kelly and Joe.

25    Q.    Mr. Collier, yesterday did you and I look at some

1   photographs together?

2   A.   We did.

3   Q.   Were they all fair and accurate photographs of what was

4   depicted in them?

5   A.   They were.

6        MR. WEINREB:  Your Honor, the government offers

7   Exhibits 1602-10 -- I'm sorry.  I should have started with

8   1602-8, -10, -14, -25 and -30.

9        THE COURT:  Is there any objection to any of those?

00:09 10     MS. CLARKE:  No, your Honor.

11       THE COURT:  All right.  Those may all be admitted.

12       (Government Exhibit Nos. 1602-8, 1602-10, 1602-14,

13   1602-25 and 1602-30 received into evidence.)

14       MR. WEINREB:  Mr. Bruemmer, can we have 1602-10,

15   please.

16   BY MR. WEINREB:

17   Q.   Mr. Collier, do you see the picture in front of you?

18   A.   I do.

19   Q.   Is that your family?

00:10 20    A.   It is.

21   Q.   Do you know roughly how long ago that picture was taken?

22   A.   It had to have been close to ten years ago, maybe more.

23   Q.   So if you could just start from the left-hand side of the

24   screen and go across to the right and tell us who the people

25   are who are pictured there, and go slowly so that we can

```
 1    follow, I'd appreciate that.  Thank you.
 2    A.    No problem.  Start on the left we have my sister Jen, the
 3    redhead.  Then we have Brendan, who is my brother-in-law.  He
 4    is married to my sister Nicole, who is the next one with her
 5    eyes slightly closed.  We have Sean next, right next to Nicole,
 6    behind her; and Jen, the second Jen, that is in front of Joe,
 7    my father; Kelly next to me; and I am finally the one in the
 8    Bruins hat.
 9    Q.    Okay.  So are you a blended family?
10    A.    Yes.
11    Q.    And how old were you when your stepfather and your mom got
12    together?
13    A.    I was about four years old.
14    Q.    And are you a -- who is the youngest in the family?
15    A.    I am.
16    Q.    And how old -- I'm sorry.  So you were, say it again, how
17    old?
18    A.    How old am I now?
19    Q.    No.  How old were you then?
20    A.    Then?  Probably -- actually, I was probably about 14 in
21    that picture.
22    Q.    Okay.  And who is the second youngest in the family?
23    A.    That would be Sean.
24    Q.    So the two youngest were the boys?
25    A.    Yup.
```

```
 1    Q.   And how close in age are Jen and Jennifer?
 2    A.   They're about two years apart, I believe.
 3    Q.   Did the siblings share bedrooms in any way?
 4    A.   Yup.  Sean and I shared a bedroom for quite a while; both
 5    Jens shared a bedroom; Nicole being the oldest usually got her
 6    own; and Rob had his own for most of the time.
 7    Q.   So growing up together, living in the same room, were you
 8    and Sean close?
 9    A.   Oh, yes, very.
10    Q.   Spend a lot of time together as kids?
11    A.   We did.  Almost all the time.
12    Q.   You said you work for Hendrick Motorsports?
13    A.   Yes.
14    Q.   And that's part of NASCAR?
15    A.   It is.
16    Q.   Did you and Sean ever do anything related to NASCAR
17    together?
18    A.   We both -- we started racing 124-scale slot cars up in New
19    Hampshire.
20    Q.   What are -- just for people who don't know, what are slot
21    cars?
22    A.   Basically it's, you know, a smaller car.  It -- you put it
23    on a track, it runs around, and you basically have a trigger.
24    It's a lot like a lot of kids use the smaller version of them,
25    you know, parents will buy them and they just follow the track
```

1    around.  It's a larger scale of that.

2    Q.   When you say you would race them, was this in your home or

3    competitive or --

4    A.   It was competitive.  We did a couple of weeks through New

5    England.

6    Q.   Did one thing lead to another?

7    A.   Yes.  So we -- through that we started getting into

8    NASCAR.  We eventually started racing go-carts together.

9    Q.   How did you afford a go-cart?

00:13 10    A.   Sean and I both worked.  First Sean got a job at the

11    soccer track, and then I did later on, and we just saved up.  I

12    helped fund his first one and I ended up buying my own.

13    Q.   How old were you?

14    A.   About 13, 14 years old.

15    Q.   So what do you do with the go-carts?

16    A.   So I -- you know, we'd both work on them and race them.  I

17    tended to be a lot better at working on them than driving them

18    and Sean tended to be a lot better driving them than working on

19    them.  So we teamed up a few times and had him work on it -- I

00:14 20    mean, have me work on it and have him race it.

21    Q.   And who would you race?

22    A.   You'd have a range.  There were guys all the way up into

23    their 60s racing against us at the track we'd run.

24    Q.   Where was the track?

25    A.   It was up in Weare, New Hampshire.

1    Q.   Was this a competitive thing?  Did they have tournaments?

2    A.   Oh, yeah, it was just like -- kind of like NASCAR.  You

3    had a point system, you'd race every week, get points, and at

4    the end of the year you could win championships or stuff like

5    that.

6    Q.   How did you and Sean do?

7    A.   As I said, I wasn't that great of a driver, but Sean did

8    great.  He always was winning races.  He made a lot of people

9    mad.

00:14 10         (Laughter.)

11   Q.   What was Sean like as a kid?

12   A.   Sean was someone that was, I guess, a moral compass, would

13   kind of be a good description.  He was always -- it was black

14   and white.  What's right and what's wrong.  And he was the one

15   always fighting for what's right.

16   Q.   How did that show itself?  Do you have any examples?

17   A.   I would do something wrong and get a morality speech on

18   it.  Or --

19         (Laughter.)

00:15 20   A.   -- he would always choose to just do the right thing, I

21   mean, down to you can't kill a bug.  You have to put it back

22   outside because you can't kill things.

23   Q.   Sean eventually became a police officer, of course?

24   A.   Yes.

25   Q.   Do you know when -- when did that ambition first surface?

1    A.    Before I was born, I believe.  I mean, as long as I can

2    remember, he wanted to be a police officer.  We all kind of

3    thought it was typical little boy wanting to be a police

4    officer, but he never grew out of it.

5    Q.    Did he -- how did he display that when he was younger?

6    A.    He would, you know, chase around us making siren noises,

7    telling us we're breaking the law.  He'd get very excited over

8    seeing a police car, especially one with lights going and all

9    that.

10   Q.    What was he like as an adult?

11   A.    He was really coming into just being a -- he was an

12   amazing person and he was just getting better by the day.  He

13   loved helping people, he -- we were talking about it last

14   night.  It's very rare to have someone that does so much great

15   things and won't talk about it.  He just does it and he doesn't

16   tell anyone.  And it was really after his death that we found

17   out how many great things he was doing for people in the

18   community and everything.

19   Q.    Is there something that sticks out in your mind in

20   particular?

21   A.    One of the -- I mean, he helped the MIT Outing Club.  I

22   remember one story of there was new parents, that the baby was

23   having trouble.  He was the first on the scene and he helped

24   them until the ambulance got there.  I mean, the parents

25   described it as he possibly saved the child's life.  And it was

1    down to he emailed and contacted the parents a week later to

2    make sure everything was all right.  I mean, that's something

3    most people don't get out of a police officer.

4    Q.   As you got older and became adults, did you and Sean stay

5    close?

6    A.   Yes.  We were kind of -- I think kind of typical boys

7    where we -- I mean, we didn't talk on the phone every day, but

8    when we did get together, it was like we were never apart.  And

9    that's one of the things -- I really felt like we were getting

00:17 10   closer and closer and hanging out more and more and building a

11   better relationship as time went on.

12   Q.   Did you ever ask each other for advice on things?

13   A.   Yeah.  I mean, he was obviously a police officer, but he

14   was also great with computers.  And, you know, I'd go to him

15   for stuff like, you know, my computer messed up and I couldn't

16   figure it out.  And I was a lot better with cars, he would come

17   to me.  But, I mean, even down to, you know, as I said, you

18   know, advice on everyday life, he was great at giving that.

19   Q.   Was the whole family close?

00:18 20   A.   Yes.  We're a very close family.  We go on annual trips

21   and everything every year.

22   Q.   Let me ask you about a couple of those trips.  We'll do it

23   through a couple of photographs, but let's start with 1602-30.

24   What's that a picture of?

25   A.   That's Sean and I.  Sean's on the left, I'm on the right.

1    We're both in our pajamas.  We both have our Teddy bears.  So I

2    stole -- he named his "Blue Baby," and then shortly thereafter

3    when I was born I stole the name, and we both had Blue Babies.

4           (Laughter.)

5    Q.   What did Sean think about that?

6    A.   Sean wasn't happy.  You know, typical younger brother

7    stealing stuff from the older brother.

8           (Laughter.)

9           MR. WEINREB:  Let's have 1602-8, please.

00:19 10   Q.   What's that a picture of?

11   A.   That's a school picture of Sean.

12          MR. WEINREB:  Let's try 1602-14.

13   Q.   What's that a picture of?

14          (Laughter.)

15   A.   So that was on one of our family trips.  It was a cruise,

16   and the stop was in Cozumel, Mexico.  My sister Jen, Sean and I

17   all went off on our own.  We bought cigars and walked around.

18   We went to a couple of bars like Señor Frog's.  And we walked

19   by and they had that little picture booth, basically, and we

00:20 20   thought it would be a good idea to sit down and take a picture.

21   Q.   Did it turn out to be a good idea?

22   A.   Yeah.  I mean, we had a good time that day.  We eventually

23   ran into a little trouble, but...

24          (Laughter.)

25   Q.   Well, at the risk of getting you into trouble all over

1    again, what happened?

2    A.    Excuse me?

3    Q.    I said at the risk of getting you into trouble all over

4    again, what happened?

5    A.    So that day -- the cruise ship stayed on Ft. Lauderdale

6    time, and of course I was using my cell phone which

7    automatically updates to go by time.  So we thought we were

8    being responsible.  We went out, you know, we had a good time

9    but we were going to head back early.  So we were all excited

00:21 10    that we're going to make the parents proud by heading back

11    early and getting on the boat and it turns out since the time

12    change we were getting there right as the boat was about to

13    leave.

14    Q.    Did you make it?

15    A.    We did, barely.  We were the last people onboard, and they

16    told us they were getting ready to say good-bye to us.

17    Q.    Did the two of you ever go hiking together?

18    A.    We did some hiking as kids up in New Hampshire.

19          MR. WEINREB:  Let's have 1602-25.

00:21 20    Q.    What's that a picture of?

21    A.    That was our last family cruise I went on with Sean.  We

22    went on a New Year's cruise.  That was one of the formal

23    nights.  We were taking a picture with our mom.

24    Q.    When was the last time you saw Sean?

25    A.    That was -- I briefly saw Sean over Easter.

```
 1   Q.   Right before he was killed?

 2   A.   Yeah, in 2013.

 3   Q.   So this was the last vacation you took together?

 4   A.   Yes.  So that was the last time I really took -- spent

 5   kind of quality time with Sean.

 6   Q.   Where were you when you heard that your brother had been

 7   killed?

 8   A.   I was at home in Concord, North Carolina, with my wife

 9   Tori.

10   Q.   How did you get the news?

11   A.   I woke up to a bunch of missed phone calls.  The last one

12   was from my sister Nicole.  I called her back and she informed

13   me.

14   Q.   What did you do?

15   A.   She -- I wasn't really thinking clearly.  She told me that

16   they were already working on a flight.  She asked if Tori was

17   coming up, which she was.  And we basically had to wait in

18   Charlotte for the next available flight.

19   Q.   What were your thoughts as you were waiting?

20   A.   My thoughts were very scattered.  It was very much

21   disbelief, that it couldn't be true.  Luckily, Tori was there

22   to keep my head on straight.

23   Q.   Have you thought about Sean a lot since then?

24   A.   Yeah, every day.

25   Q.   How does his loss affect you today?
```

```
 1   A.   It's still a huge loss.  It's something that will affect

 2   me and my family for the rest of our lives.

 3   Q.   Do you notice his absence when you're all together?

 4   A.   Yes.  I mean, there's always -- even when we're having

 5   fun, there's always a cloud over whatever event it is, whether

 6   it's a holiday or a vacation.

 7   Q.   What do you miss the most about your brother?

 8   A.   That would be -- that's a really hard question.  The only

 9   answer I can really come up with on what I miss most about Sean

10   is I miss Sean.  I miss everything about him.  There isn't one

11   thing that stands out that I can say:  That's it.  That's what

12   I miss the most.

13            MR. WEINREB:  Thank you.

14            MS. CLARKE:  Thank you very much.  No questions.

15            THE COURT:  All right, Mr. Collier.  Thank you.  You

16   may step down.

17            (The witness is excused.)

18            MR. WEINREB:  The United States calls Joe Rogers.

19                    JOSEPH ROGERS, duly sworn

20            THE CLERK:  State your name, spell your last name for

21   the record, keep your voice up and speak into the mic so

22   everyone can hear you.

23            THE WITNESS:  Joseph Rogers, R-O-G-E-R-S.

24                    DIRECT EXAMINATION

25   BY MR. WEINREB:
```

```
 1    Q.    Good morning.

 2    A.    Good morning.

 3    Q.    How old are you, sir?

 4    A.    I'll be 59 in July.

 5    Q.    Where do you work?

 6    A.    For the Massachusetts Office of Attorney General.

 7    Q.    What do you do there?

 8    A.    I'm an assistant attorney general.

 9    Q.    For how long?

 10   A.    For a little over 22 years.

 11   Q.    Are you married?

 12   A.    Yes.

 13   Q.    What's your wife's name?

 14   A.    Kelley.

 15   Q.    Are you Sean Collier's stepdad?

 16   A.    Yes.

 17   Q.    How long have you been married to Kelley?

 18   A.    Well, we -- I moved in in 1992, and we got married in

 19   1993.

 20   Q.    How old was Sean when you married his mom?

 21   A.    He was probably about six years old.

 22   Q.    When the two of you married and combined your families,

 23   how many kids were there?

 24   A.    Six.  Kelley has four children and I have two.  We all

 25   lived together.  It was sort of a Brady Bunch situation.
```

```
 1   Q.   And just so we can hear one more time, what are the names
 2   of the children from oldest to youngest?
 3   A.   The oldest is Nicole, then my son Robert, then the
 4   redheaded Jennifer, the brown-haired Jennifer, and Sean and
 5   Andy.
 6   Q.   What was your relationship with Sean like when he was
 7   growing up?
 8   A.   Well, he was sort of difficult at first and over the years
 9   he viewed me less as a bad guy, and at the end we were very
10   close.  He used to come to the football games with me.  I have
11   season tickets for the Patriots, and he used to love going to
12   the football games.  And that year was the first year -- he
13   actually had been working.  And I have four season tickets with
14   a friend of mine, and Sean wanted to buy more than a couple of
15   games.  He bought one of the seats.  And he also bought a
16   pickup truck because he wanted to be the person that drove to
17   the tailgate.  And he never had the opportunity to use those
18   tickets.
19   Q.   What was his personality like as a boy?
20   A.   He was very -- things were right or wrong.  When -- with
21   six children, things get broken, and nobody saw anything.
22             (Laughter.)
23   A.   But you could always look at Sean and he would sort of
24   spill the beans, so...  He would tell us when other children
25   were acting out.  I don't think he was, perhaps, their favorite
```

```
 1    at all times.  He used to tell us about how the brown-haired
 2    Jennifer used to leave to go to high school in one set of
 3    clothes and change in the bathroom to something we wouldn't
 4    like.
 5              (Laughter.)
 6    A.   So he was a cop at an early age.
 7    Q.   So what was family life like when the children were young?
 8    A.   Very noisy.  And I think -- you know, everybody got along
 9    sort of amazingly well.  And I think we were a very close
10    family until his death.
11    Q.   Did you do things together?
12    A.   Excuse me?
13    Q.   Did you do things together?
14    A.   Yes.  We -- I used to go on at least one cruise or some
15    type of large family vacation a year.  And you just saw the
16    picture of the kids, but my wife's family would also be there,
17    her parents and my mother and aunts and uncles.  So it was a
18    large group of people on those cruises.
19    Q.   And what about birthdays and holidays?  Were those a big
20    deal in your family?
21    A.   Yeah.  I mean, you almost have to rent a hall.  There are
22    quite a number of people.  My wife has three brothers and
23    sisters, and one of the sisters has five children, so it can
24    get a little crowded.  And the extended family was always there
25    as well.
```

1   Q.   How old was Sean when he knew he wanted to be a police

2   officer?

3   A.   Ever since I can remember.  You know, he was always

4   chasing Andy around.  Andy was always the bad guy and he was

5   always the police officer.  He used to make siren sounds, or

6   when he was -- we were driving down the interstate and he was

7   in the car, he saw somebody pulled over at the side of the

8   road, he would start singing the theme song to the TV series

9   *Cops*, so.  "Bad boys."

00:30 10   Q.   Did he also have a thing about flags?

11   A.   Yeah, he loved flags.  I remember him giving me a hard

12   time once on a -- I don't remember if it was Memorial Day or

13   Fourth of July -- because I didn't hang up the flag.  But he

14   was very into flags and he had them in his room.  And he liked

15   the flag.

16   Q.   Did Sean ever get into any trouble himself with the

17   police?

18   A.   Just once.  After -- the first time the Red Sox won the

19   World Series, they had the duck boat parade and somehow he

00:30 20   ended up at some party.  And he was down -- he was underage.

21   He was downstairs drinking a beer and there was a riot breaking

22   out upstairs, so the Boston police showed up and they told him

23   to get rid of the beer and stay there.  And he did exactly

24   that.  Most kids, including myself, as soon as the cop

25   disappeared to go upstairs, we would have disappeared too.  I

1    was reading the police report and I thought maybe I raised the

2    kid wrong.

3         (Laughter.)

4    A.   But he was charged with minor in possession of alcohol.

5    And he told his mother on the way home that God probably did

6    this so that he could understand what it was like to be

7    arrested.

8    Q.   So did he -- he did pursue his dream of being a police

9    officer?

00:31 10  A.   Yes.  He went to Salem State and graduated with a degree

11   in criminal justice.  He went to the part-time police academy,

12   and that was good enough to get you a summer job in Hull.  He

13   also was a volunteer for the Somerville Auxiliary Police.  He

14   obtained the rank of sergeant in the auxiliary police and was

15   the youngest sergeant they had ever had.

16        He -- after he graduated from college, since they knew him

17   at Somerville, they liked him, he was able to get a job as a

18   clerk at the police station.  And while he was working as a

19   clerk in the police station, they sponsored him to the MBTA

00:32 20  Transit Police Academy.  We had to pay his way through the

21   academy but they would -- they sponsored him so he could

22   attend.

23        In 2010, he graduated from the MBTA Police Academy.  And

24   at that time he had the highest grade point average of anybody

25   who had ever graduated from the police academy -- that police

1    academy.

2    Q.    Was he a popular kid?

3    A.    Yeah, he had a lot of friends.  And I've gotten to know

4    some of them a little better after he died.  I'm kind of proud

5    of the friends that he hung out with.

6    Q.    Do you know if he was popular with the students at MIT?

7    A.    Yeah.  When he was working, he would go through the

8    labs at night.  That was one of his jobs.  But he would

9    actually stop and talk to people and talk to the students about

00:33 10    what they were doing.  They worked kind of crazy hours.  So he

11    developed a relationship with these children -- young adults,

12    and he was very popular among them simply because nobody had

13    ever talked to them before.  And some of them come from places

14    where police officers are sort of an arm of the central

15    government, and he got them accustomed to, We don't necessarily

16    do things here like that.

17        And he had a lot of friends on their volunteer ambulance

18    that they have, he also was a part of the MIT Outing Club which

19    used to do hikes and climb Mt. Washington and things like that.

00:34 20    I mean, he was only a couple of years older than most of the

21    graduate students, which is who he tended to hang out with.

22    Q.    Did he do any volunteer work?

23    A.    Yeah.  He never really told us this.  He said he was

24    working, and his idea of work wasn't necessarily going and

25    punching a clock.  Somerville has a boxing club that's designed

1    for, I guess, at-risk kids, to teach them -- get them off the

2    streets and teach them boxing.  He used to volunteer there all

3    time.  And the auxiliary is a volunteer too.  He didn't get

4    paid for any of that.

5         But he would go around and sort of just help out people.

6    I remember there was a time, he must have been in college, he

7    was leaving and the little girl across the street who was

8    probably about ten or 12 at the time had fallen off her bicycle

9    and she was bleeding, and he carried her home and made sure her

00:35 10    parents took care of her, and then he went back and got the

11    bicycle.  He would do things like that for people.

12    Q.   Did he do anything with the homeless at MIT?

13    A.   Yeah.  I probably shouldn't tell you with the chief in the

14    room, but it bothered him that there were so many homeless in

15    Cambridge, and most of them are mentally ill or alcoholics.  So

16    that was part of the job that he didn't really like.  And one

17    night he found somebody -- it was in the winter -- they were

18    sleeping on a steam grate, so the steam was coming up and the

19    person was soaking wet.  And he knew if he moved him along he

00:36 20    would freeze to death.  So he pointed to a building and said,

21    "Go in there.  The door is open.  Go down in the basement.  You

22    better get out of here by nine o'clock in the morning."  So he

23    really wasn't supposed to do that, but that's the type of

24    things that he would do.

25    Q.   How about with his siblings?  Did he get along with them?

1    A.    Yeah.  They didn't really fight, just he used to torture

2    Andy until Andy became bigger than he was, and that ended,

3    so...

4    Q.    Did you and I look at some family photos yesterday?

5    A.    Sure.

6    Q.    And were they all fair and accurate photos of what's

7    depicted in them?

8    A.    Yes, they are.

9             MR. WEINREB:  Your Honor, at this time the government

00:37 10   offers Exhibit 1602-05, -12, -16, -17, -18, -21, -26 and -28.

11            MS. CONRAD:  No objection.

12            THE COURT:  No objection to any of those?  Okay.

13   Those are all admitted, then.

14            (Government Exhibit Nos. 1602-05, 1602-12, 1602-16,

15   1602-17, 1602-18, 1602-21, 1602-26 and 1602-28, received into

16   evidence.)

17            MR. WEINREB:  Mr. Bruemmer, 1602-5, please.

18   BY MR. WEINREB:

19   Q.    Is this a picture of your family?

00:37 20   A.    Yes.  That picture was taken back around '92-'93, when we

21   first moved in.

22   Q.    Can you just, let's say going left to right, starting in

23   the bottom row, can you tell us the names of the children?

24   A.    Yeah.  Starting on the bottom row to the left, that's

25   Jennifer, the brown-haired one; Andy; above him is Sean; and

1    then the other redheaded Jennifer; then above her, Robert; and

2    off to the far right is Nicole.

3    Q.    Let's skip ahead a little bit.  1602-12.  Where was that

4    taken?

5    A.    That was at Nicole's wedding in about 2005.  And Sean and

6    Andy are on the -- first Sean is next to Brendan, the groom,

7    and then Andy's on the end.

8    Q.    So Andy's on the far right, Sean's second to the right?

9    A.    Yes.

00:38 10          MR. WEINREB:  1602-16, please.

11    A.    That's a picture of Sean with the MIT Outing Club.

12    Q.    So what is the outing club?

13    A.    Just a bunch of kids that wanted to go camp and hike in

14    the woods.  And they were all very close.  And it just -- it

15    couldn't have been more than two weeks before he died, he had

16    gone up to Nova Scotia with them.

17          MR. WEINREB:  1602-17, please.

18    Q.    Where was that taken?

19    A.    That's in the Foxboro, the Patriots parking lot.

00:39 20    Q.    And who are we looking at, from left to right?

21    A.    Robert's on the left, then comes Sean, myself, and

22    brown-haired Jennifer's on the right.

23    Q.    Were you there for a game?

24    A.    Yes.

25    Q.    Did Sean have the pickup truck at that point or --

1    A.    No, that was earlier.  He never got to use the pickup

2    truck at a game.

3          MR. WEINREB:  1602-18.

4    A.    That's Sean with Jennifer, brown-haired Jennifer.

5    Q.    At a Patriots game?

6    A.    Yes.

7    Q.    How did he like going to the game with his sister?

8    A.    He told me that if he had to sit next to her one more

9    game, he wouldn't go because she wouldn't shut up the whole

00:40 10   game.

11          (Laughter.)

12          MR. WEINREB:  1602-21, please.

13   A.    This is a picture of red-haired Jennifer's wedding in

14   2010.  Sean had just graduated from the police academy at this

15   point.

16   Q.    So is that Sean just to her left?

17   A.    Yes.

18   Q.    And who else is in the picture?

19   A.    Starting from the left is brown-haired Jennifer, Sean,

00:40 20   red-haired Jennifer, Andy and Robert.

21          MR. WEINREB:  1602-26, please.

22   Q.    Where was that taken?

23   A.    This was the graduation from the MBTA Transit Police

24   Academy.  That's my wife pinning his badge on him.  It was held

25   at Faneuil Hall.

```
 1    Q.   He looks pretty happy.

 2    A.   That was probably the happiest day of his life.

 3              MR. WEINREB:   1602-28, please.

 4    Q.   What's that a picture of?

 5    A.   That's Sean in the MIT police car with this little boy who

 6    wanted to -- his mom asked Sean if he could sit in the car so

 7    she could take a picture.  So he was very excited.  And Sean

 8    put the hat on him so she could, you know, give him a thrill.

 9    Q.   Mr. Rogers, where were you when you found out Sean had

10    been shot?

11    A.   Well, we were at home.  We got a call around 11:30 at

12    night.  And my wife picked up the phone and she started

13    screaming and she gave me the phone.  And on the other end was

14    Chief DiFava.  And he told me that Sean had been shot and he

15    was at Mass. General and that they were sending a Wilmington

16    Police Officer to pick him up -- pick us up.  So they came, and

17    we went down to Mass. General Hospital and --

18    Q.   What happened when you got there?

19    A.   Well, we pulled down the street and there was cops all

20    over the place.  And they put us in this room and we -- my wife

21    had called the children, so one by one they all showed up

22    and -- except for Andy, who was in Charlotte.  And then the

23    doctor and Deputy Chief Perault came in to tell us that he was

24    dead.

25    Q.   What were your feelings at that moment?
```

|    |    |
|----|----|
| 1  | A.   It was rather devastating.  I mean, sometimes it still |
| 2  | feels like it's a dream.  And then they took us to see Sean. |
| 3  | And, you know, the jury saw the pictures of what he looks like. |
| 4  | He had a hole in the middle of his head and he was shot to |
| 5  | pieces.  And he's laying there.  They don't really clean you up |
| 6  | much; they just wipe off the blood.  And my wife is touching |
| 7  | him and his blood is coming up in her hands.  And so we got to |
| 8  | see him there.  And -- |
| 9  | Q.   Were you alone in the room or -- |
| 00:43 10 | A.   No; all the children were with us. |
| 11 | Q.   So they all had to see him that way too? |
| 12 | A.   Yes.  Yes. |
| 13 | Q.   Were there police officers around? |
| 14 | A.   There was -- no.  There were a couple stationed outside, |
| 15 | but they had a room where there were 20 or 30 police officers |
| 16 | that we went to visit after we saw Sean.  And it was people |
| 17 | from the academy, people from Somerville and MIT, and just cops |
| 18 | that he knew. |
| 19 | Q.   And what were they doing? |
| 00:44 20 | A.   They were crying and very upset.  I never saw a group of |
| 21 | people that upset. |
| 22 | Q.   What effect did it have on you and your family to see Sean |
| 23 | that way? |
| 24 | A.   Well, everybody's sort of been affected.  My wife is |
| 25 | probably the worse.  She's been diagnosed with having |

1    posttraumatic stress disorder.  She keeps remembering that

2    night and being told, what he looked like, and it runs over in

3    her mind.  She used to be the site administrator for Harvard

4    Vanguard Medical Associates, the Concord site, and she was

5    responsible for everybody except the doctors.

6    Q.    How many people?

7    A.    About 130 people plus the building.

8    Q.    She supervised all those people?

9    A.    Yes.

00:44 10    Q.    Was that --

11    A.    She hasn't really been able -- she tried to go back to

12    work a couple of times but she hasn't really been able to.

13    Each of the children have been impacted.  Some of them are

14    rather depressed.  And they've all had this -- I mean, it's

15    been a terrible two years.

16    Q.    Let me just -- let me focus your attention on them one by

17    one.  Let's just start with your wife Kelley.  After you came

18    back from the hospital that night, how was she?

19    A.    She was despondent.  It took her a couple of months just

00:45 20    to be able to get out of bed.  I mean, when a police officer

21    dies, especially like this, you lose sort of control.  The

22    state police have a contingent of officers who arrange for the

23    funeral, so they're in charge.  And, you know, given the

24    circumstances, it was better that they were in charge.  So you

25    lose something.  And it becomes much more public.

```
 1   Q.   And you say that Kelley wasn't able to get out of bed for
 2   a few months.  Did she eventually --
 3   A.   Yeah.  She's better than she was but, you know, the 18th,
 4   Saturday night, was the two-year anniversary, so she spent the
 5   weekend crying, so...
 6   Q.   What kind of a person was she like before Sean died?
 7   A.   She was very strong.  I mean, she only had an associate's
 8   degree in college and she was running this whole medical
 9   facility.
10   Q.   What was her personality like?
11   A.   She was a happy person.  She was a good mother and she
12   loved her children very much.
13   Q.   Have things changed since Sean's death?
14   A.   Excuse me?
15   Q.   I said, have things changed for her since Sean's death?
16   A.   Yes.  It's -- she's very scared of anything that may
17   happen to any of the other children.  This is not her first
18   child that died.  She had a baby that lived for about a day or
19   two, and then that baby died.  And she told me once that if
20   that baby had survived, she wouldn't have gotten pregnant so
21   soon.  And that next pregnancy was Sean, so Sean was a little
22   special in that he brought her out of the depression from
23   losing Crystal, the daughter.  They're buried together up in
24   Peabody.
25   Q.   What about J.R., Jennifer Rogers, brown-haired Jen?  How
```

00:46 (line 10)
00:47 (line 20)

1   has she been?

2   A.   Well, Jennifer's very depressed.  And she used to hang out

3   with Sean.  They're a year apart and they were both single.

4   And Jennifer liked his friends, and so she's lost that whole

5   part of her life.

6   Q.   What about Nicole?

7   A.   Nicole refuses to talk about it.  She's moved to Texas and

8   that way it's easier for her not to talk about it, but she

9   doesn't want to talk about it.

00:48 10   Q.   And Robert?

11   A.   Robert's a bit the same way.  He -- there's a memorial

12   being built at MIT that he did, and I think that helped him a

13   lot.  But he doesn't talk much either.

14   Q.   And Jennifer Collier, who you call red-haired Jen?

15   A.   Jennifer has had to deal with a lot of the press, the

16   unending press that we get, and that's been very difficult on

17   her and her marriage.  And, you know, it just wears you down

18   after a while.

19   Q.   How about you?

00:48 20   A.   Well, I just feel beat down after two years of this.

21   Q.   Do you all still get together for the holidays and --

22   A.   Yes, we still -- it's difficult now with Nicole in Texas,

23   but -- and she has three children.  But, yes, we try to get

24   together.  But, you know, there's somebody missing so, you

25   know, Thanksgiving, Christmas will never be the same.  And in

some respects it's sad because he's not there.  And he was

always a bit of a goof.  He'd show up late with a cup of

Dunkin' Donuts and make jokes, and that's all gone.  And Easter

is terrible because he was killed a week or so -- and that's

when most of us -- that's the last time most of us saw him.

MR. WEINREB:  Thank you, Mr. Rogers.

THE COURT:  No cross?

MS. CONRAD:  No.

THE COURT:  Thank you, sir.  You may step down.

(The witness is excused.)

MR. BRUCK:  Can we approach before the next witness?

THE COURT:  Okay.

(Discussion at sidebar and out of the hearing of the

jury:)

MR. BRUCK:  We have made a written objection to the

testimony at this stage of the trial of Chief DiFava, and we'd

like to renew it and make clear our grounds.

With respect to victim impact testimony, we believe

both under *Payne versus Tennessee* and the Federal Death Penalty

Act, victim impact evidence does not extend past family

members.  It does not go to employment or broader impact on the

job.  To the extent that the government wishes to -- I should

say, in addition, Chief DiFava has already provided testimony

of this nature at the guilt phase so that it's also cumulative

as victim impact testimony even if it were admissible.

1          With respect to the non-statutory aggravating factor

2     of Officer Collier having been killed as a police officer in

3     the line of duty, we think that is -- the testimony is clearly

4     cumulative and, in fact, can only be justified as victim

5     impact, which as the -- a problem that I've already raised,

6     there is -- it would be -- it would be cumulative and

7     prejudicial to give an extremely detailed account of this

8     officer's career and life and the impact on the force and the

9     other things that we would expect Chief DiFava to testify to

00:52 10    simply to establish the already well-established fact that

11    Officer Collier was killed in the line of duty and was a police

12    officer at the time, which is that statutory aggravating

13    factor -- non-statutory aggravating factor.

14          So for all of those reasons, we think the testimony as

15    a whole is inadmissible.

16          MR. WEINREB:  Your Honor, *Payne* did not

17    purport -- *Payne* held that victim impact testimony is

18    admissible as a non-statutory aggravating factor, did not

19    purport to put any limits on what victim impact testimony could

00:52 20    be.  Left that for another day.  The lower courts have

21    generally admitted testimony about impact on colleagues or

22    impact on the community as a whole.  For example, the *Ronell*

23    *Wilson* case, which was a murder of a police officer case which

24    was tried and then retried in the Eastern District of New York

25    recently, is yet another case.

1          The government is not going to ask Chief DiFava to

2    repeat what he said before.  This will be a side that was not

3    appropriate during the liability phase that is now in the

4    penalty phase.  So I don't believe that the cumulative

5    objection is well taken on that ground.

6          And as for establishing that he was a police officer

7    killed in the line of duty, although I do agree that there has

8    been testimony about that already, the government is not

9    limited to simply establishing a bare fact, but the jury has to

00:53 10   determine how much weight to give that aggravating factor.  And

11   knowing about Officer Collier, something about his

12   responsibilities, his duty, his career, that will help the jury

13   in determining how much weight to give that aggravating factor

14   and the way it processes.

15         THE COURT:  Okay.  I don't agree that the Supreme

16   Court or the statute has limited testimony to family relations

17   and may under some circumstances extend beyond that.  Probably

18   every case has to be judged on its own.  I would be concerned

19   about cumulativeness, but the representation is that they will

00:54 20   try to avoid that, so we'll just have to see how that goes.

21         MR. BRUCK:  Finally, we have consistently objected to

22   the display of the American flag in the course of the evidence

23   for reasons that the record already clearly reflects.  And the

24   graduation picture, I believe it is, is -- shows Officer

25   Collier with -- the entire frame is filled by the American flag

1   behind him, and we think that is not necessary and highlights

2   the sort of otherness and unAmericanness, if you will, of our

3   client's background and family in a way that is impermissibly

4   intentioned with the nondiscrimination provision of the Federal

5   Death Penalty Act about which the Court has already instructed

6   the jury.  We don't think it's necessary and we think it

7   creates a subconscious but powerful discriminatory impulse in

8   the very specific circumstances of this case.

9          MR. WEINREB:  Your Honor, there's nothing gratuitous

00:55 10   about the photo of the defendant [*sic*] standing in front of the

11   American flag.  It's his graduation photo --

12          MR. BRUCK:  Mr. Collier in front of the flag.

13          MR. WEINREB:  I keep saying that when I mean something

14   else, so I apologize.

15          There's nothing gratuitous about Officer Collier

16   standing in front of the American flag.  It's both his

17   graduation photo and therefore an appropriate and probative

18   exhibit.  There was also just testimony specific to him about

19   his feelings about the American flag.  And every single

00:56 20   reference in this case to the defendant's foreign birth, to his

21   so-called otherness, to his Chechen background and history has

22   been from the defense's mouth.  The government has never once

23   said a single word about it in opening, in closing, in the

24   testimony of any witness.  And it is our understanding that the

25   defense will be going into it in great, great detail in the

1    penalty phase.  So I do not believe that it fairly lies in the

2    mouth of the defense to say that the government is unfairly

3    uttering the defendant or calling attention to his foreign

4    birth in contrast to the American birth of someone like Sean

5    Collier.  And it is entirely their doing that that information

6    is in front of the jury.

7          MS. CONRAD:  May I just say that that's just not true

8    given the playing of the nasheed, with the showing of the

9    Shahadah which, by the way, we still haven't gotten a copy from

00:57 10   the government despite the Court's order.

11          THE COURT:  So let me just broaden this a little bit

12   because I guess the exhibits you propose -- I take that as an

13   objection to one of the photos.  Are there any others?  Any

14   other pictures?

15          MR. BRUCK:  No.

16          THE COURT:  Okay.  You have a -- one of the photos, I

17   think, that you intend to use is a photo with Officer Donohue?

18          MR. WEINREB:  Yes.  They were good friends.

19          THE COURT:  Is that the same occasion?

00:57 20         MR. WEINREB:  They were classmates.  I'm not 100

21   percent sure that was taken at the same occasion.

22          THE COURT:  I guess my thought is it's somewhat

23   duplicative.

24          MR. WEINREB:  Why don't I start with that one, and if

25   it turns out that they were at the same occasion --

1          THE COURT:  Then I think you don't need the second

2     one.

3          MR. BRUCK:  Officer Donohue, on reflection, and this

4     was Ms. Clarke's witness -- that highlights -- the whole

5     problem with victim impact testimony is -- and what makes it

6     problematic is the fact that the defendant doesn't know about

7     the facts and could not have foreseen the specific facts that

8     are being proven.  So it is intentioned with general focus of

9     the criminal law and the principles of punishment and the

00:58 10    defendant's intent -- his specific intent in what he knew.

11          Officer Donohue really compounds this because of the

12     fact that while the evidence is murky on this record, it is

13     quite well established that he was shot through friendly fire.

14     And to bring, you know, very graphic testimony about how he was

15     not merely dying but, quote, dead when he arrived at the

16     hospital, then to bring back Officer Donohue in connection with

17     this seems unnecessary and inflammatory.  And to have their

18     pictures together -- if it was -- it would be different if this

19     was somebody who the defendant himself had intentionally

00:59 20    targeted but that's -- those are not the facts.  It's just too

21     much.

22          MR. WEINREB:  Your Honor, this isn't about the

23     defendant, this is about the victim.  And the government is not

24     going to argue that there is any connection between the death

25     of Sean Collier and the shooting of Dic Donohue although, in

1    fact, Officer Donohue did respond to the crime scene at MIT.

2    But we won't be eliciting that.  It's simply to show that he

3    was a very well-liked officer who had close colleagues, and Dic

4    Donohue happened to be one of his closest -- one of his closest

5    friends.

6              MR. BRUCK:  Your Honor, I would add that there was

7    already in evidence, just been introduced a picture of the MBTA

8    police academy graduation, so this would be the second one

9    injecting Officer Collier.  So it's cumulative on top of

00:59 10   everything else.

11             THE COURT:  Yeah, I think the Donohue picture is not

12   necessary.  I think you can use the other one.

13             MR. BRUCK:  Very well.

14             (In open court:)

15             MR. WEINREB:  Your Honor, the United States recalls

16   John DiFava.

17                       JOHN DI FAVA, duly sworn

18             THE WITNESS:  My name is John DiFava.  First name

19   common spelling, J-O-H-N, last name D-I F-A-V-A.

01:01 20                      DIRECT EXAMINATION

21   BY MR. WEINREB:

22   Q.   Good morning, Chief.

23   A.   Good morning, sir.

24   Q.   Would you please remind the jury where you work.

25   A.   I am the chief of police at the Massachusetts Institute of

```
 1  Technology.
 2  Q.   As the chief of police at MIT, is one of your
 3  responsibilities to hire new officers?
 4  A.   It is.
 5  Q.   Did you hire Sean Collier?
 6  A.   I did.
 7  Q.   What are you looking for when you look to hire a new
 8  officer?
 9  A.   MIT is a very, very unique place.  It's -- the reputation
10  you hear about, it is very, very true.  We have probably the
11  smartest people in the world.  They're a very, very special
12  community.  It is also a very large community.  On any given
13  day, we have 21,000 people on campus, not to mention the people
14  that come and go on a regular basis.  But that community
15  requires special attention.  And they're so focused on their
16  research and on their scholarly activities, that sometimes they
17  forget to look out for themselves.
18       So we want to hire a police officer that understands
19  service, that understands that we're community policing.
20  That's an expression we've heard from the 1990s.  But it's not
21  an assignment; it's a philosophy.  So we look for officers who
22  embrace the community policing philosophy.  We look for an
23  individual who is respectful but also wants to engage our
24  community and be a part of that community.
25  Q.   How did Officer Collier fit that bill?
```

1   A.   Perfectly.

2   Q.   Can you say more?

3   A.   Yes, sir, I can.  I've been in police work for almost 42

4   years -- 28 years with the state police and now MIT -- and I've

5   seen a lot of police officers both within the two departments I

6   worked for as well as other departments, both on the local and

7   state and federal level.  And I got to tell you, Sean was one

8   of the very best.  He understood people.  And what made him a

9   police officer was not the uniform, it wasn't the badge; it was

01:03 10   the character that he possessed.  Whether he was in the suit or

11   not in the suit, he was the same.  He didn't rely on the

12   authority that that he was granted; he relied on the strength

13   of his character to be able to deal with the community.

14       But I'll tell you, I never saw anyone be able to go in

15   every nook and cranny of the institute the way he did.  He

16   engaged faculty, which is hard to do; he engaged staff, he

17   engaged students, he engaged visitors.  He knew everybody.

18       My leadership style has always been on the street.  I'm

19   there all the time.  I put in a lot of hours and I walk and I

01:03 20   see.  I guess it's management by walking around.  And

21   everywhere I went, I'd see Sean.  He was the real deal.

22           MR. WEINREB:  Your Honor, the government offers

23   Exhibit 1602-29, which is the photograph that's been discussed.

24           THE COURT:  Can I just see it?

25           MR. WEINREB:  Can I have it just for the witness?

1           THE COURT:  All right.  It will be admitted.

2           (Government Exhibit No. 1602-29 received into

3     evidence.)

4     BY MR. WEINREB:

5     Q.    Do you recognize that photo?

6     A.    I do.

7     Q.    Do you know when it was taken?

8     A.    I believe that was his photograph from the graduation of

9     the Transit Police Academy.

01:04 10    Q.    He looks quite serious in that photo.

11    A.    He does.

12    Q.    Is that what he was like?

13    A.    No, he wasn't stern like that.  By no means.  Sean was

14    extremely engaging, very friendly, and definitely someone that

15    could relate well to people.

16    Q.    Was he proud to be a police officer?

17    A.    Very.

18    Q.    What was your personal relationship with him like?

19    A.    The way I met Sean is I have a -- it's going to sound like

01:05 20    a little nepotism here but in the interest of full disclosure,

21    I have a cousin that's on the Somerville Police Department.

22    And he called me in the very early fall of 2007 and said,

23    "Look, I have a young guy that works for Somerville, civilian

24    employee."  He says, "You got to meet him."  He says, "You

25    absolutely got to meet him."  He says, "He's already

1    academy-trained, he's on the auxiliary.  But more than that,

2    he's exactly what you want in this profession."  So we have a

3    very rigorous recruiting process at MIT.  I don't have full

4    discretion to hire, but I certainly was willing to meet with

5    Sean, because if you can find someone good, you would like to

6    bring them onboard if you could.

7         So he came to my office and I met him and I understood

8    exactly what my cousin was talking about.  The first five

9    minutes of the conversation I knew that, you know, I was on to

01:05 10   somebody that could probably be very, very good at MIT.

11   Q.   Was he an ethical officer, in your view?

12   A.   Extremely so, sir.

13   Q.   Any examples of that?

14   A.   Well, you know, if I had to define Sean Collier in one

15   word, I would use the word "character."  And probably there's

16   100 people in this courtroom who we'd all have a different

17   definition of what "character" is.  But for me, "character" is

18   the ability to know what the right thing is and to do the right

19   thing, and he always did the right thing.

01:06 20        You know, we heard from his stepdad and from his brother

21   that Sean knew right and wrong, and I have to really support

22   that opinion.  He had a very well-defined idea of what was

23   right and what was wrong, and he followed that rule all the

24   time.  So, you know, you talk about ethics, I think that's the

25   foundation of the bedrock of ethics.

 1    Q.   How did he relate to his fellow officers?

 2    A.   Very well.  The one thing that I picked up on him right

 3    from the very beginning is he got along but he didn't get along

 4    to go -- he didn't go along to get along.  Peer pressure did

 5    not work with Sean.  You know, if he had an opinion, he stuck

 6    by that opinion.  And it wasn't one of those things where even

 7    if he was wrong he stuck to it, but if he felt he was on solid

 8    ground, he would push back.  And the police officers in the

 9    room understand how strong peer pressure can be in a police

01:07 10    organization.

 11    Q.   Has Sean's death had an impact on his colleagues?

 12    A.   Yes, it has.

 13    Q.   Can you describe it?

 14    A.   The atmosphere at the department changed greatly since

 15    April 18th of 2013.  There is an atmosphere of sadness, there's

 16    a sense of great loss.  They still perform admirably.  They did

 17    right from the day that Sean was killed.  But you can feel that

 18    they work at it a lot harder than they did before.

 19         I think that it will be there for as long as that

01:07 20    generation of officers remain and I think what will cause it to

 21    change back will be a new influx of officers.  But that's going

 22    to take a long time, and I believe that during that evolution,

 23    there still will be this sense of sadness, this sense of loss

 24    and this sense of grief.  It's remarkable, the support that we

 25    got from the community down there, but even with that support,

```
 1    the grief just has not gone away.
 2    Q.    Has Sean's death had an impact on you personally?
 3    A.    It has, sir.
 4    Q.    Can you say what that is?
 5    A.    You know, sometimes I wonder if I want to continue as a
 6    police administrator.  Policing is the only thing I've ever
 7    done in my life.  And it's -- and I've always tried very hard
 8    to be good at what I do and I always take a personal interest
 9    in my people.  And I lost one of my own.  And I have two
10    children at home, and I always thought I would be very, very
11    proud if they wore the uniform.  Now I'm not so sure I want
12    them to do that.
13              MR. WEINREB:  Thank you, Chief.
14              THE WITNESS:  You're welcome.
15              MR. BRUCK:  Thank you, Chief DiFava.  We have no
16    questions for you.
17              THE WITNESS:  Thank you, sir.
18              (The witness is excused.)
19              MR. CHAKRAVARTY:  The government calls Eric Whalley.
20              MS. CONRAD:  May we approach, please, your Honor?
21              THE COURT:  All right.
22              (Discussion at sidebar and out of the hearing of the
23    jury:)
24              MR. BRUCK:  We need to renew our continuing objection
25    to what amounts to victim impact testimony from non-homicide
```

 1    survivors.  We also have this -- I don't know if the Court has

 2    ruled on the exhibits, including the extremely graphic medical

 3    photographs of this survivor, including the open heel which we

 4    thought was --

 5            THE COURT:  I think I reserved it.  I wanted to hear

 6    how the testimony lay at the time it was being offered to see

 7    what value it had.

 8            MR. BRUCK:  Here's my understanding.  Mr. Whalley --

 9            THE COURT:  We've had similar kinds of evidence in the

01:10 10    other phase.

 11            MS. CONRAD:  This photo, your Honor --

 12            THE COURT:  No, I've seen it.  We've had some pretty

 13    gruesome pictures.  So I think its relevance and probative

 14    value, that's what I want to hear before --

 15            MR. BRUCK:  Okay.  We would point out for the most

 16    part, the most graphic evidence has been autopsy photos which

 17    concerns the homicides, and we're now in the sentencing phase

 18    for the homicides, not for Mr. Whalley's injuries or any other

 19    survivor victim's.  It's this persistent problem that we're

01:10 20    facing that the jury will find it impossible not to sentence

 21    this man in part for injuries and -- for which it has no

 22    sentencing authority; that is to say, they're non-capital

 23    offenses that are being depicted by -- I don't know how you

 24    draw the line when evidence this inflammatory is presented as

 25    something I cannot imagine.

1        We also have -- we've registered an objection to

2   testimony about -- unless it's -- I'm trying to remember if

3   your Honor has excluded the testimony about London in the

4   1970s.  But this witness, as we understand it, is going to say

5   he knew this was a terrorist attack because he'd been in one

6   before, 40 years before in London.

7        MR. CHAKRAVARTY:  We've directed him not to say that,

8   your Honor.  And just for the record, there are a host of other

9   factors which are relevant, like grave risk of death, like the

01:11 10   heinous nature of the crime, all of which the medical photos go

11   to.  The medical photos are going to be a guide to my witness

12   as to the injuries that I'm going to be asking about, that

13   he'll be talking about, all of which go to grave risk of death.

14        The only thing inflammatory about that photo is after

15   multiple surgeries, it was inflamed, and as part of the healing

16   process itself, he will use that to demonstrate to the jury all

17   of the complexities to actually put a leg back together and

18   that there are risks along the way, both from the complications

19   with the procedures themselves as well as the long-term risk to

01:12 20   both his leg -- because it still might be -- as has happened

21   with other victims, it may still have to be amputated, as well

22   as complications and issues that may jeopardize his life.

23        He's not going to talk about victim impact on his

24   life; we're simply going to talk about, as we did in the

25   liability phase, the procedures he went through, the risks

 1    attendant to those procedures, and what he's doing now in terms

 2    of where his medical status is now.

 3         MR. BRUCK:  Well, I know this Court will wait to rule,

 4    but even if we were wrong about the admissibility of this type

 5    of evidence in support of the grave risk of death factor or any

 6    other -- and I notice the government keeps citing the

 7    heinousness factor.  And that specifically refers in this case

 8    only on the basis of aggravated battery to the victim, which is

 9    the statutory factor.  So to be able to support that by showing

01:13 10   aggravating battery to other victims just goes beyond the

 11    statute.

 12         But all of that said, even if they establish a

 13    relevance, if the 403-type provision of the statute means

 14    anything, it has got to mean that photograph.

 15         THE COURT:  Can you tell me what the authority is for

 16    your argument that people who are not killed but were injured

 17    by the bomb were not victims of the capital offense?

 18         MR. BRUCK:  Well, there is no authority one way or the

 19    other on -- all of the grave risk of death -- you mean for --

01:14 20        THE COURT:  For victim impact.

 21         MS. CONRAD:  -- victim impact?

 22         THE COURT:  Yeah.

 23         MR. BRUCK:  The victim impact provision of the statute

 24    refers to the crime which in context I think there's a --

 25         THE COURT:  Right.  And so the crime -- let me just

```
 1   guide the question a little bit.  The crime here, to pick one,

 2   is bombing a place of public use, that's the capital offense,

 3   resulting in death.  I don't see why as a natural, ordinary

 4   matter, the law aside for a moment, it's not proper to regard

 5   somebody who is injured by the same bomb that killed somebody

 6   as a victim of the bombing.

 7             MR. BRUCK:  The way that -- and I'm not looking at the

 8   statute in front of me, but the way that language in the

 9   statute, referring to the victim impact testimony, is -- it

01:15 10   refers to a victim of the offense within the meaning of 3591, I

11   think it's (b) -- (a), (b), (c) -- or (2)(a), (b), (c) or (d)

12   and (e), which refers to the homicide.  That's the reason that

13   we say -- and I think that's something that Judge Wolf in

14   Sampson --

15             THE COURT:  I've read the Sampson case and I've read

16   the Gooch case, which you also cited to me.

17             MR. BRUCK:  That is our authority.

18             THE COURT:  And I think those are very different

19   circumstances.

01:15 20             MR. MELLIN:  Although, your Honor, I think it's very

21   unclear at this point what the law is in this case and how you

22   define "victim."  But the way we had tried to compartmentalize

23   this throughout is not to say that we're putting on victim

24   impact through these witnesses who have not died but, in fact,

25   put on evidence of the cruel, heinous and depraved nature of
```

1   the offense as well as the grave risk of death to these people.

2   THE COURT:  Are you aware of any cases besides *Gooch*

3   and *Sampson?*

4   MR. MELLIN:  There isn't a lot of case law, your

5   Honor.

6   THE COURT:  In both of those cases -- we'll take the

7   *Sampson* case.  Sampson was tried for the murder of McCloskey

8   and Rizzo.  And the government, I guess, offered evidence of

9   the victim Whitney who was killed in New Hampshire, which was

01:16 10   not one of the crimes of the offense.  And that makes perfect

11   sense to me.  I agree with that outcome, that that was not the

12   offense.

13   But we have an offense which not only killed people

14   but maimed people.  It seems natural that they fall within the

15   scope.  I recognize it's undecided, but that's why I was

16   looking to see -- well, I guess now I recognize it's undecided.

17   That's why I asked the question.

18   So I think -- the government may not like me saying

19   this, I think that's an additional reason why it's admissible,

01:16 20   but I will admit it to go to the grave risk issue.

21   MS. CONRAD:  May I ask --

22   THE COURT:  So the objection is preserved.

23   MS. CONRAD:  As for the photographs, your Honor, even

24   if the testimony -- assuming for the sake of argument testimony

25   is relevant, the photograph -- showing the photograph is far

```
 1   more prejudicial than it is probative in terms of what the
 2   photograph adds to the testimony.
 3           THE COURT:  Well, maybe.  That's what I'm reserving.
 4   Let me hear how it --
 5           MS. CONRAD:  It sounds like Mr. Chakravarty is
 6   planning on showing him the photograph and then asking him
 7   about it.  That's what I heard.  That's --
 8           THE COURT:  Let's see.  It is that balance that I'm
 9   trying to assess.  Okay.
10           (In open court:)
11                       ERIC WHALLEY, duly sworn
12           THE CLERK:  State your name and spell your last name
13   for the record.
14           THE WITNESS:  First name is Eric, surname is Whalley,
15   W-H-A-L-L-E-Y.
16                       DIRECT EXAMINATION
17   BY MR. CHAKRAVARTY:
18   Q.   Good morning, Mr. Whalley.
19   A.   Good morning.
20   Q.   Sir, just be mindful of the microphone.  Close but not too
21   close.
22        Mr. Whalley, where do you live?
23   A.   In Boston.
24   Q.   How long have you lived there?
25   A.   Sixteen years.
```

```
 1   Q.   And who do you live there with?

 2   A.   My wife.

 3   Q.   And how long have you been married?

 4   A.   Forty-five years.

 5   Q.   And is your wife's name Ann?

 6   A.   Ann, A-N-N.

 7   Q.   How old were you when you met?

 8   A.   Initially we met at school at 12 years old.

 9   Q.   Is there something that particularly drew you together?

10   A.   We shared common interests.  We were academically in the

11   same sort of class, and also we shared sporting activities,

12   many different types of sports, track and field in particular.

13   Q.   So how old are you now, then?

14   A.   I'm 67.

15   Q.   Do you have children?

16   A.   Two boys.

17   Q.   How old are they?

18   A.   Twenty-seven and 36.

19   Q.   And are you now retired?

20   A.   I'm retired yes.

21   Q.   And what did you do for work?

22   A.   I'm originally basically a pharmaceutically trained

23   individual.  And I worked in academia, on academic staff,

24   teaching in the university, and also in the biotechnology

25   industry, in drug discovery and development.
```

Q.   And how long did you have that career for?

A.   I was 14 years in academia.  And total, 22, 23 years, say,

in biotechnology, in Denver and then in Boston.

Q.   I gather from the accent that you didn't -- that you

came --

A.   I'm originally from England, in the U.K.

Q.   Sir, when did you come to the United States?

A.   In 1989.

Q.   Is that when you moved to Denver?

01:21 A.   Yes.

Q.   And then approximately when did you come to the Boston

area?

A.   1998.

Q.   Are you familiar with the Boston Marathon?

A.   Very familiar, yeah.  We've attended most of them since we

actually moved here.  We find it extremely interesting, the

athletic events, and the atmosphere it generates and being

involved with it.

Q.   So aside from the Boston Marathon, is sports and

01:21 athletics --

A.   Sports has been a significant part of my life and both my

wife.  We are active runners:  5K, 10K, half marathons.  I've

never done a marathon.  But we also have enjoyed mountain

biking and trail-running.

Q.   And so did you attend the 2013 Boston Marathon?

A.   Yes.

Q.   And this is -- it sounds like for most of the years that you've been in the Boston area, you've attended the Boston Marathon?

A.   Yeah.  We haven't attended them all since we came but --

Q.   But many of them?

A.   Yeah.

Q.   So what did you do the day of the 2013 Boston Marathon?

A.   We usually enjoy walking around Boston.  We used to live north of Boston.  Even though I worked in Cambridge, I commuted from the North Andover area.  And there's very little about -- Boston is a commute down, commute back, and then take the kids, you know, to their sporting events.

     That particular day we went for, you know, a six- to eight-mile walk, which we usually did about three times a week, walked, of course, around the Boston Common, we went down almost to the end of Newbury Street, and then we cut across to Boylston and were enjoying the atmosphere and the flavor and interaction, you know, between the crowd and spectators and the runners.  And --

Q.   So let me just stop you there.  Was there anyone running that you knew that you were there --

A.   We knew quite a few people but they weren't people we were supporting.  People I knew from work.

Q.   So you were there just for the tourism factor?

1    A.   Yeah, just the flavor of the event and the atmosphere.

2    Q.   All right.  So at some point while you were down on

3    Boylston Street, did you choose to go somewhere specifically?

4    A.   We specifically went into Crate & Barrel.  We had recently

5    moved down to Boston from North Andover and we were still

6    decorating and furnishing the house.  And we popped in there

7    for ten, 15 minutes.

8    Q.   That's the Crate & Barrel next to the Forum restaurant on

9    Boylston Street?

01:23 10    A.   Yeah, but I wasn't aware of that at the time.  I didn't

11    really know what the Forum was.

12    Q.   So when you left Crate & Barrel, where did you go?

13    A.   We decided to go down to the finish line, which was

14    getting very congested, and almost single file both ways, and

15    people letting each other, you know, through at intervals, one

16    way and then the next.

17    Q.   So that funneling process, was that by the crowd or were

18    there barriers or anything that --

19    A.   So there were barriers to the right and there was the

01:24 20    sports shop on the left with its railings.

21    Q.   Is that Marathon Sports?

22    A.   The Marathon Sports, right.

23    Q.   All right.  And so around that area, were you trying to

24    get through --

25    A.   We were trying to get through.  It was quite, as I say,

1    congested and quite difficult.  So actually, you know, I said

2    to my wife Ann, "I think we're going to have to force our way

3    through here," and I actually pushed her in front of me forward

4    and decided to walk through.

5    Q.    Okay.  So a very narrow passage.  You were actually

6    pushing your wife, and then what happened?

7    A.    Then there was just an all-mighty boom and just the smell

8    of a firework.

9    Q.    What happened to you?

01:25 10    A.    I don't remember too much, to be perfectly honest.  The

11    last thing that I do remember -- I clearly remember the boom

12    and also the firework, having had a previous experience with

13    something like that.  But I fell to the ground, I guess, and

14    the last thing I remember was basically just scratching off my

15    pants, which were burning.  So I remember scraping off my

16    burning pants and looking at it.  And after that --

17            MS. CONRAD:  Objection.  Objection.

18            THE WITNESS:  -- I don't remember anything.

19            THE COURT:  I'm sorry?

01:25 20            MS. CONRAD:  Objection.

21            THE COURT:  I'm not clear.

22            MS. CONRAD:  I said "objection."

23            THE COURT:  Yes, I understand.  But the basis?

24            MS. CONRAD:  403, your Honor.

25            THE COURT:  No; overruled.

1          Go ahead.

2    BY MR. CHAKRAVARTY:

3    Q.    Let me ask you a smaller question.  Where did you land

4    relative to where you were walking between --

5    A.    Probably about, we reckoned, five to six -- we were blown

6    backwards.  And as I've been told, my wife was blown behind me

7    about five to six feet from where I ended up.  And I lost

8    consciousness.

9    Q.    Okay.

01:26  10         MR. CHAKRAVARTY:  So if I may, I believe this is

11   already in evidence, Exhibit 8, your Honor.

12   Q.    Mr. Whalley, I'm showing you Exhibit 8.  Do you see

13   yourself in this photo?

14   A.    Yes, I do.

15   Q.    So the screen in front of you is interactive.  You can

16   touch it and it will leave a mark.  Can you, with the pad of

17   your finger, just circle where you are in this picture?

18   A.    This is me.  Not the guy with the yellow thing but the guy

19   on the ground.

01:27  20   Q.    And do you see your wife, Ann?

21   A.    Yeah, she's here with the blue quilted...

22   Q.    And so before the bomb exploded, she was actually in front

23   of you?

24   A.    She was in front of me.  And I was basically pushing her

25   on her back/shoulders, trying to force our way through the

1    crowds.

2    Q.   All right.  And was she injured as well?

3    A.   She was injured.  She had a severe injury to her right leg

4    and foot.  The heel was blown off with soft tissue damage.  And

5    she had significant chunks of shrapnel in her leg and thigh,

6    which it almost appears the long bone, the femur.  And she had

7    large chunks of shrapnel in both wrists.  And she had quite

8    marked burns to her chest, neck and face and hair, and her

9    mouth was damaged with shrapnel and required reconstructive

01:28 10   surgery.

11    Q.   And so you were describing when you got blown back that

12    you noticed your pants were burning?

13    A.   Yup.

14    Q.   Is there -- did I show you a photograph that depicts you

15    on the sidewalk next to that Marathon Sports grate?  Do you

16    remember that?

17    A.   Yes.

18          MR. CHAKRAVARTY:  Your Honor, I would move into

19    evidence Exhibit 624.

01:28 20         THE COURT:  I'm sorry.  6 --

21          MR. CHAKRAVARTY:  624.

22          THE COURT:  Is there any objection to this photo?

23    Ms. Conrad, any objection to 624?

24          MS. CONRAD:  As previously noted, your Honor.

25          THE COURT:  Can I see it?

1          MR. CHAKRAVARTY:  Yeah, just for --

2          MS. CONRAD:  As previously noted.

3          THE COURT:  Okay.  All right.  Admitted.

4          (Government Exhibit No. 624 received into evidence.)

5    BY MR. CHAKRAVARTY:

6    Q.   Mr. Whalley, is that you depicted in this photograph?

7    A.   Yes.

8    Q.   And the -- your right eye, does that appear to be bulging

9    out of your eye socket?

01:29 10   A.   Yeah.  It was penetrated by a ball-bearing, and the blood

11   vessels and other tissue behind the eye had ruptured and was

12   leaking fluid.  Unfortunately, my eye was almost pushed out of

13   the eye socket.

14   Q.   So in addition to injuries to your eyes, do you see

15   injuries about your head and your legs as well?

16   A.   So I had a brain injury.  I have a ball-bearing that went

17   to the back of my eye and almost forced it out of its socket,

18   went into the eye orbit and traversed from the right front

19   temporal lobe across the median brain into the left temporal

01:30 20   lobe.

21   Q.   And in addition to your head injury, was there other

22   injuries that you had to your legs?

23   A.   So I had, again, severe injury to the right leg.  I had

24   lost significant amounts of soft tissue and part of the heel

25   bone.  The fibula was broken.  I had shrapnel injuries in both

1    legs and burns on both legs.

2    Q.   And so you said earlier that after you remember the

3    burning pants, that you didn't remember very much after that.

4    Is that right?

5    A.   I didn't remember anything until Thursday morning --

6    Q.   Okay.

7    A.   -- following --

8    Q.   All right.  So let's get to that.  Shortly after this

9    incident, was Ann taken to the hospital?

01:31 10   A.   So one of the issues was they didn't know who we were

11   because we lost our identities, you know, cards in our

12   backpacks and what have you.  So I learned later that my wife,

13   Ann, had been taken to Faulkner Hospital, and I'd been taken to

14   Brigham and Women's.  And it was both my sons who actually, you

15   know, found us, where we were.  And Ann was in Faulkner and I

16   was in Brigham and Women's.  And they used the Internet -- they

17   became aware that we were involved in it just through pictures

18   that appeared on the Internet that day.

19   Q.   So your sons were visiting you separately during the --

01:31 20   A.   Yeah, they sort of shared visiting between the two

21   hospitals until -- for that first week.

22   Q.   All right.  And sometime later, I think you were alluding

23   to it -- on that Thursday, did Ann actually come to join you at

24   the Brigham?

25        (Pause.)

1    A.    Yup.  She thought I was dead and I thought she was dead

2    because we didn't know.  Ann had been sedated heavily due to

3    her injuries as well, and they decided to bring her into the

4    same hospital room that I was in.  And she was wheeled in, side

5    by side.  We were both prone.  You know, we weren't able to get

6    off the bed.  And I just grabbed her arm and just wouldn't let

7    go.  So that was when I think we both realized that we were

8    both in this but we were alive and well.

9    Q.    Well, you were alive but you had a number of injuries,

01:33  10   correct?

11   A.    Uh-huh.

12   Q.    And both of you continued to get medical treatment for

13   several weeks after that?

14   A.    Yeah.  I think I had a total of 44 days in hospital and my

15   wife was 32 days.  And we had, I don't know, between 20 and 25

16   surgeries, I had, and my wife had about 15 to 20.  Some

17   actually happened after we'd left hospital --

18   Q.    Okay.

19   A.    -- as follow-up operations.

01:33  20   Q.    Let me slow you down there.  There's a lot of information.

21         How long were you in the hospital?

22   A.    A total of 44 days.

23   Q.    And how about your wife?

24   A.    A total of 32 days.

25   Q.    And approximately how many surgical procedures did you

1    undergo in that time, or actually have you undergone up to

2    today?

3    A.    Between 20 and 25.

4    Q.    Okay.  And how about your wife, Ann?

5    A.    Between 15 and 20.

6    Q.    So you started talking about your injuries from the scene?

7    A.    Uh-huh.

8    Q.    Over the course of your hospitalization and treatment, was

9    there evolution of the status of those injuries?

01:34 10   A.    So one of the issues was I had the brain injury and I had

11   the eye injury.  And to be perfectly honest, I was so pleased I

12   was in the Boston area because one of the first things they did

13   in the emergency room, which was about 20 minutes after getting

14   there, was a surgical procedure just to release the pressure,

15   you know, behind the eye.  And that -- it's a common procedure

16   but -- or surgery.  And that saved my eye, actually, from

17   popping out.  If I had been anywhere else or it had been a

18   longer time period, I don't think I would have kept the eye,

19   despite the fact that I ultimately lost the sight in it.

01:35 20   Q.    Sir, did you actually send me a photograph of your retina

21   at some time later after that procedure?

22   A.    Yes.  Some of the -- I was a case study in two, three --

23   actually, four publications of the different injuries that I

24   had.  And some of them turned out to be, I don't know, pretty

25   unique, particularly the one with the eye, which is not seen

1   very often.  And I can't describe in detail, clinical

2   terminology, you know, the exact situation, but it was quite

3   rare.

4           MR. CHAKRAVARTY:  Your Honor, at this point I move

5   into evidence Exhibit 1598.

6           MS. CONRAD:  Objection as previously noted.

7           THE COURT:  May I see it?

8           (Pause.)

9           THE COURT:  All right.  Admitted.

01:35 10           (Government Exhibit No. 1598 received into evidence.)

11   BY MR. CHAKRAVARTY:

12   Q.   And, Mr. Whalley, what does this show?

13   A.   This basically just shows, you know, pictures of the eye

14   in section.  A and B are essentially two days and seven days

15   post trauma.  And where the arrows are is just showing the back

16   of the eye coming away from the globe.  And although you can't

17   see it on these pictures, there was significant bleeding into

18   the eye, in the gap between the retina and the back of the eye.

19   And that was a cause for real concern.

01:36 20           Most of the retina in that area was irreversibly damaged,

21   but it was important to actually get it back.  The C is three

22   weeks after the first surgery that I had to try and stabilize

23   the eye, stabilize the bleeding and re-connect it to the back

24   of the eye.  Unfortunately, three months later, it all came

25   undone again, so the surgeons had to go back in and I had

1   another four-hour operation reattaching and clearing the eye.

2   That's how it's shown in D.  Unfortunately, we don't have a

3   normal picture here to compare it to because that's pretty

4   drastic.

5        And in the second surgery, they also decided to take out

6   the lens and the cap shield because they realized there's no

7   sight.  The ball-bearing also irreversibly damaged my optic

8   nerve, so even if I retained retinal function there, it

9   wouldn't have changed anything because the optic nerve was too

01:37 10   severely damaged.

11   Q.   So you've lost sight in the eye?

12   A.   I've lost sight in my eye.

13   Q.   But they were able to physically keep the eyeball still in

14   the --

15   A.   Yup, which -- yup.

16   Q.   In addition, did you send me a photograph of your brain

17   injury?

18   A.   Yes.

19            MR. CHAKRAVARTY:  I'd move into evidence Exhibit 1593.

01:37 20            MS. CONRAD:  As previously noted, your Honor.

21            THE COURT:  Okay.  Admitted.

22            (Government Exhibit No. 1593 received into evidence.)

23   BY MR. CHAKRAVARTY:

24   Q.   What does this show?

25   A.   So this is my brain.  There's two different sections.  And

           1   it's essentially flipped.  So right is left and left is right.

           2   It's just the way it's oriented and the way it's depicted here.

           3        So on the right-hand side we can see my eyeball.  And the

           4   ball-bearing came through the back of my eye.  Can I make a

           5   mark?

           6   Q.   Yeah, can you touch the screen?

           7   A.   Sure can.  So it came through there and fractured the

           8   orbit, went through the orbit and to the right prefrontal

           9   cortex and then across the midline into the left frontal

01:38     10   cortex.  The arrows here show subarachnoid hemorrhage, bleeding

          11   into the brain, which is quite significant.

          12        While I'm on this one, actually, not -- it's difficult but

          13   simply I'll tell you, a second ball-bearing actually broke my

          14   nose and the cleft, and I ended up actually swallowing that

          15   ball-bearing.  And you can't see it on there obviously.  But

          16   the ball-bearing ended up lodged in the left prefrontal cortex,

          17   and that's shown on the left-hand side here, this white thing

          18   there.  And the arrows show significant subarachnoid

          19   hemorrhage, brain bleeding.

01:39     20        And one of the issues was with this particular thing, I'm

          21   on blood thinners -- I was on blood thinners.  I had atrial

          22   fibrillation.  So that did not help with the recovery and the

          23   bleeding.  I think it might have exacerbated it a little bit.

          24        It was deemed too risky to remove that surgically so it's

          25   still in there and, you know, causes me mental issues, thinking

1    about various things.

2    Q.    So that BB that we see on the screen is still on top of

3    your brain?

4    A.    Yup.

5    Q.    You described that you had leg injuries?

6    A.    Yup.

7    Q.    What type of leg injury?  What did the doctors do with

8    regard to your leg injury?

9    A.    So I actually met with a large group of surgeons and

01:40 10   residents, maybe 15 in total at one particular -- before they

11   actually did the major surgery on my leg.  And there were

12   several issues that needed to be decided, and decided quickly,

13   and one was whether to amputate or whether to do limb salvage

14   on my leg because of the type of damage that had been incurred.

15   The second issue --

16   Q.    You used the term "limb salvage"?

17   A.    Yeah.

18   Q.    Can you explain what that means?

19   A.    So limb salvage is an alternative -- a good alternative to

01:41 20   amputation, but it's very dependent on how much residual tissue

21   you have in place and what the availability of any other tissue

22   that's required, either from other limbs -- so for example,

23   skin flaps to be used in my case, blood vessels from my left

24   leg were transplanted to the right leg along with nerves

25   because they had been blown off with the injury, plus the heel.

1          So basically, it was just a reconstruction of the bones,

2     fix them in place with an external fixator; try to cover the

3     wound, which they could not do, by the way; and replace blood

4     vessels and nerves.  The blood vessels, in part, obviously to

5     improve and maintain diffusion.  If they couldn't have done

6     that, it was going to be off.  And that was one of the biggest

7     concerns along with, as always with any surgery, infection.

8          So I was faced with this group and what to do and when to

9     do it, and I was dealing with the brain thing.  I'd also had my

01:42 10     ear drum totally blasted out and that had gotten infected.  I

11     was dealing with that, dealing with the eye.  And I just

12     thought they talked about limb salvage, and I thought I don't

13     want my leg to be amputated.  I'm not sure I could handle it.

14     So I insisted on trying to salvage it.  And they said they

15     would have a go, but they said, "You probably will be back

16     shortly," you know, sort of because of the issues they thought

17     was going to occur by salvaging the leg.

18     Q.   It's not always a clear-cut decision as to whether to try

19     to salvage a leg that --

01:43 20     A.   Right.  Right.  My reasoning was that I wanted to have a

21     go for salvaging it at all costs, and if that failed, there was

22     a backup plan, so to speak.

23     Q.   Did you send me a photograph of your leg during the

24     rehabilitation?

25     A.   Yes, I did.  Yeah.

```
 1              MR. CHAKRAVARTY:  And for the witness and the Court,
 2    1599, please.
 3    Q.   And what does the photograph show?
 4    A.   So this is my right foot and heel.
 5    Q.   Sorry --
 6              MS. CONRAD:  Your Honor, I object.
 7              THE COURT:  This is just for the witness.
 8              MR. CHAKRAVARTY:  This is just for the witness.
 9              MS. CONRAD:  Oh, the description also.
10              THE COURT:  Let's have a question.
11    BY MR. CHAKRAVARTY:
12    Q.   So can you describe the circumstances of this photograph?
13    A.   So this is ten weeks after the injury.
14    Q.   And what does it show?
15              MS. CONRAD:  Objection.
16              THE COURT:  Overruled.
17              THE WITNESS:  So this is my right foot, and it's
18    encased in an external fixator with half a dozen pins going
19    into the long bone and various bones in my foot to keep them in
20    place.  That was there for three months.  It also shows this
21    piece here -- straight arrows -- but anyway, this flap there,
22    that was taken from my left thigh, and then skin was taken from
23    another area on my thigh and covering this open wound area
24    here.  And that was a concern that they had, that they couldn't
25    close the wound.  It was weeping fluid, blood daily, and they
```

        1    didn't really hold out any good hope that this would work.  And
        2    it was tremendously swollen.  And I had had antibacterial
        3    surrounding beads put in there to replace some of the bone that
        4    had been shot off.
        5         And so I was unable to weight bear at all or stand
        6    properly without, you know, aid for like -- I think the first
        7    time I truly weight-beared was at 14 months after the surgery.
        8    They did warn me that this would be a long process.  Age was
        9    against us, both my wife and I, because of our age and that,
01:45  10    you know, the bone repair in particular and some of the healing
       11    is significantly reduced.
       12                 MS. CONRAD:  Your Honor --
       13                 THE COURT:  I think it's gone beyond...
       14                 MR. CHAKRAVARTY:  Ok.  I'll ask another question.
       15                 THE WITNESS:  Okay.
       16    BY MR. CHAKRAVARTY:
       17    Q.   So staying on the photograph for a moment, does the
       18    photograph depict your heel exposed?  Open and exposed?
       19    A.   Yes.
01:46  20    Q.   And does it depict your heel as being several times larger
       21    than the normal human foot?
       22    A.   Yes.
       23    Q.   And this is ten weeks after your --
       24    A.   This ten weeks after.
       25    Q.   How long was it after the swelling had decreased enough to

1    even close your foot?

2    A.   Even though I got to weightbearing, the wound healing took

3    probably 18 months in total.  And one of the issues was when I

4    was weightbearing, the wound would reopen and bleed and leak

5    fluid.  So that was an issue.

6    Q.   So what were the other complications and risks associated

7    with this limb salvage procedure?

8    A.   I guess the biggest issue was potential infection, like

9    any surgical procedure, particularly in recovery.  And I did

01:46 10   have mild infections in two or three places, but it was

11   adequately treated.

12   Q.   And did you also have a clot filter placed in?

13   A.   Yeah.  Both my wife and I had what they call inferior vena

14   cava, sort of blood filters.  And one of the problems I had, I

15   developed a deep vein thrombosis.  I had one in each leg:  One

16   behind the knee and one behind the thigh.  So I had an

17   intravenous filter placed because of the possibility of the

18   floating thrombosis getting to my heart.

19   Q.   And so did your wife also have a deep --

01:47 20   A.   Yes, they did.

21   Q.   Were they able to get her filter out?

22   A.   So we went in for surgery about five weeks ago.  And I had

23   mine removed.  Mine came out quite easily.  It's a quick

24   procedure.  But despite many attempts, my wife's wouldn't come

25   out.  It was too embedded into the blood vessel, and so they

  1  left it in place.

  2  Q.   You've mentioned that it had been 14 months before you can

  3  place weight on your --

  4  A.   Be fully weightbearing, it was almost exactly 14 months.

  5  Q.   So how long was it before you could actually walk again?

  6  A.   I believe -- I would -- 16, 17 months.

  7  Q.   And are you still dealing with issues related to your leg?

  8       MS. CONRAD:   Objection, your Honor, as previously

  9  noted.

01:48 10       THE COURT:   Overruled.

 11       You may answer it.

 12  BY MR. CHAKRAVARTY:

 13  Q.   Are you still dealing with issues related to your leg?

 14  A.   Yeah.  It's sort of like a diabetic foot where you have

 15  reduced sort of sensation and feeling and you have to be

 16  careful what you tread on, like a nail or some sharp object

 17  because you wouldn't feel it.  I have a significantly reduced

 18  range of motion and an ability to walk long distances, so, and

 19  the foot swells up significantly.

01:49 20       So, you know, ambulating is like an incremental process.

 21  So you do a little bit and then you stop and then you do some

 22  more.  It can be painful in the ankle area and it has stopped

 23  me sort of walking at times.  We have good days and bad days.

 24  And that's the same for my wife.

 25  Q.   And so as you mentioned with regard to your -- the brain

```
 1    injury, is there still an ongoing risk related to your leg?

 2    A.    So because of the functions of the prefrontal cortex that

 3    is actually involved -- I won't go into all the details -- I am

 4    a little bit concerned about, you know, potential stroke risk,

 5    seizure risk.  I was on anti-seizure medication for quite a

 6    while, six months or so, I think it was, before I was weaned

 7    off, and the memory processing.  That area is involved in, you

 8    know, memory processing.  So, you know, a little bit concerned

 9    about, you know, premature decline in cognitive function, to be

01:50 10   perfectly honest.

11    Q.    That's related to the head injuries?

12    A.    That's the head injuries, yeah.

13    Q.    And you've mentioned your ears were also --

14    A.    The ear -- so I had an ear transplant.  They took fascia

15    tissue, the connective tissue from my bicep muscle and remade

16    an eardrum and surgically implanted it.  And it was heavily

17    infected, as I said.  There was damage to the inner ear.  And I

18    have permanent tinnitus, which actually drives me crazy, and I

19    have balance and vertigo issues, and they have not resolved.  I

01:50 20   have a significant hearing loss but that actually has gotten a

21    little bit better.  A little bit better.

22    Q.    Were you burned as well?

23    A.    Yeah, I had -- 7 percent of my legs were affected.

24    Q.    I'm sorry.  How much percentage?

25    A.    Actually, it was 10 percent.  10 percent of the area of
```

1    the legs were burned.

2    Q.   I'd asked you a bit earlier, it may not have been clear,

3    are there ongoing risks attendant to your limb, the leg that

4    was salvaged?

5    A.   So the leg was salvaged.  It still may have to be

6    amputated for a variety of reasons, and it could relate to

7    perfusion issues, the pain issues, and just pure

8    intolerability.

9    Q.   You mentioned it was 14 months before you were able to put

01:51 10   weight on the leg?

11   A.   Yeah, full weight.

12   Q.   How long was it before your wife Ann was able to walk?

13        MS. CONRAD:  Objection.  Objection.

14        THE COURT:  Overruled.

15        Go ahead.

16        THE WITNESS:  Probably about six to seven months.

17   BY MR. CHAKRAVARTY:

18   Q.   In addition to the BB in your brain, do you still have

19   other shrapnel in your body?

01:52 20   A.   Yes, I have quite a lot of shrapnel in the lower limbs,

21   both legs.

22   Q.   And how is that going to come out, or is it going to come

23   out?

24   A.   They gradually work out to the surface.  And I am

25   considering having three in particular removed, which are sort

1   of protruding a little bit.  So I'm going to evaluate that with

2   the surgeon.

3   Q.   And that's for the shrapnel that --

4   A.   That's just the shrapnel.

5   Q.   The shrapnel that rises to the surface?

6   A.   Yeah.

7   Q.   You don't know where all the shrapnel is in your body?

8   A.   No.

9          MR. CHAKRAVARTY:  That's all I have, your Honor.

01:52 10          THE COURT:  That's all you have?  All right.  Any

11   cross-examination?

12          MS. CONRAD:  No questions.

13          THE COURT:  All right, Mr. Whalley.  Thank you.  You

14   may step down.

15          (The witness is excused.)

16          THE COURT:  We'll take the morning recess.

17          THE CLERK:  All rise for the Court and the jury.  The

18   Court will take the morning recess.

19          (The Court and jury exit the courtroom and there is a

02:15 20   recess in the proceedings at 11:00 a.m.)

21          THE CLERK:  All rise for the Court and the jury.

22          (The Court and jury enter the courtroom at 11:43 a.m.)

23          THE CLERK:  Be seated.

24          THE COURT:  Ms. Pellegrini?

25          MS. PELLEGRINI:  The government calls Adrianna

1    Haslet-Davis.

2                ADRIANNA HASLET-DAVIS, duly sworn

3          THE CLERK:  State your name, spell your last name for

4    the record, keep your voice up and speak into the mic so

5    everyone can hear you.

6          THE WITNESS:  My name is Adrianna Haslet-Davis.  Last

7    name Haslet, H-A-S-L-E-T, hyphen, Davis, D-A-V-I-S.

8                       DIRECT EXAMINATION

9    BY MS. PELLEGRINI:

02:38 10   Q.   Good morning, Ms. Haslet-Davis.

11   A.   Good morning.

12   Q.   Can you tell the jury where you currently reside, the city

13   or town?

14   A.   Yes.  My husband and I live in Marblehead, Massachusetts.

15   Q.   And your husband is who?

16   A.   Adam Davis.

17   Q.   And how long have you and Adam been married?

18   A.   We have been married just -- we just celebrated our

19   six-year wedding anniversary.

02:38 20   Q.   And can I ask you how old you are?

21   A.   I am 34.

22   Q.   And, Ms. Haslet-Davis, I would like to direct your

23   attention to Marathon Monday of 2013.  With Adam did you happen

24   to attend the Boston Marathon?

25   A.   Yes, I did.

         1    Q.    Now, I know it's going to sound like an odd question.   Do

         2    you remember what shoes you were wearing that day?

         3    A.    I do.

         4    Q.    And why do you remember what shoes you were wearing?

         5    A.    I was trying to look cute for my husband so I was wearing

         6    platform shoes.

         7    Q.    And did they have a very high heel?

         8    A.    They did.  I would guess it would be about four and a half

         9    inches.

02:39   10    Q.    So later on in the afternoon, around 2:30, 2:45, did

        11    wearing those heels cause you to consider what plans you were

        12    going to be making, where you were going to go with respect to

        13    the marathon?

        14    A.    That is correct.

        15    Q.    And so what did you decide to do?

        16    A.    We decided to take one more walk around the block to watch

        17    the runners.

        18    Q.    And what block was that?

        19    A.    We were going to walk down Boylston Street to watch the

02:39   20    runners and then go home because my feet were sore.

        21    Q.    And as you were walking down Boylston Street, do you

        22    recall approaching the Forum restaurant?

        23    A.    I did not know it was the Forum at the time, but I do now

        24    know it was the Forum.  We were so in love and just happy

        25    together that we -- I didn't realize even where we were.  But,

1    yes, I do know now that it was the Forum.

2    Q.   And as you were walking down the street -- this is later

3    on in the afternoon, about 2:45 or so, 2:49 -- what do you

4    recall happening?

5    A.   I remember hearing a very loud bomb go off behind us, and

6    I remember grabbing ahold of my husband and saying, "The next

7    one's going to go, the next one's going to go."

8    Q.   Now, when you say looking behind you, so were you walking

9    away from the finish line?

02:40 10   A.   We were walking away from the finish line.

11   Q.   And when you said you heard something, what did you hear

12   exactly?

13   A.   I heard an extremely loud explosion and I did not think

14   that it was a firework or anything else.  I knew right off the

15   bat that it was a terrorist attack, and I don't have any answer

16   to why I knew that.  I just was bracing for impact.

17   Q.   And what did you do when that happened?

18   A.   I wrapped my arms around my husband and said, "The next

19   one's going to hit.  The next one's going to hit," and I

02:41 20   believe I was just curling myself into him.

21        MS. PELLEGRINI:  May I have Exhibit 21-03 already in

22   evidence, your Honor.

23        THE COURT:  Already in evidence?

24        MS. PELLEGRINI:  Yes, your Honor.

25   BY MS. PELLEGRINI:

1    Q.    Ms. Haslet-Davis, do you see the photograph on the screen

2    in front of you?

3    A.    I do.

4    Q.    All right.  And I'll enlarge this part right here.  Do you

5    see yourself and your husband Adam in this photo?

6    A.    I do.

7    Q.    Your screen is interactive.  You can draw a circle around

8    it with the pad of your finger.

9          Could you tell the jury where you and Adam are in this

02:41  10    photograph?

11    A.    Yes.  Would you like me to circle it?

12    Q.    Yes, please.

13    A.    (Witness complies.)

14    Q.    So you're both sort of -- you circled a young woman with

15    blonde hair, a young man with blonde hair behind you.  You both

16    seem to be wearing white jackets, is that correct, or something

17    along those lines?

18    A.    Yes, that's correct.

19    Q.    All right.  And you're looking now down towards the finish

02:42  20    line, correct?

21    A.    That is correct.

22    Q.    And what are you doing with your hands?

23    A.    I believe I was covering my mouth out of disbelief, shock,

24    unknown.

25    Q.    Could you see anything as you were looking in that

1    direction?

2    A.   Yes; I saw a lot of smoke and I heard screams.

3    Q.   And you said you talked to your husband.  What's the next

4    thing that you recall happening?

5    A.   I remember him saying, "No, no, babe, no," and all of a

6    sudden I opened my eyes and I was on the ground.

7    Q.   Do you know what happened?

8    A.   Another bomb went off.

9    Q.   Now, when you opened your eyes and you were on the ground,

02:42 10   what did you see?

11   A.   I was, for lack of a better term, little spooned to my

12   husband, and his back was turned toward me.  I saw the back of

13   his head and I opened my eyes and I screamed, "Adam," and I

14   couldn't hear myself scream.  I...

15        (Pause.)

16   Q.   Adrianna, there's some tissues and some water to your

17   side.

18   A.   I thought that because I couldn't hear myself scream that

19   I was dead, and I screamed it again and I saw his head turn,

02:43 20   and I thought that maybe he was alive.  And the next thing I

21   remember, he had turned his body toward me and he sat up onto

22   his -- he sat up onto his rear end, and I couldn't move more

23   than my shoulders.

24   Q.   But did you try to move?

25   A.   I did.

1    Q.   All right.  And how did you try to move?

2    A.   I tried to sit up.

3    Q.   Could you do so?

4    A.   No.

5    Q.   Did you look at your body to see why you couldn't move,

6    why you couldn't sit up?

7    A.   I looked down, but because I could only move my shoulders

8    I couldn't see much more than my waist down at that moment

9    before my husband lifted up my leg.

02:44 10    Q.   What did you feel?

11    A.   I had a few seconds or minutes, the time is difficult to

12    tell, where I felt nothing, and then I heard my husband scream

13    a scream that was earth-shattering and I'd never heard before,

14    and I looked down and I could see blood everywhere.  And I

15    somehow got my hands behind me and leaning toward onto his

16    body, and I could see, with him lifting it in the air, that it

17    was completely covered in blood.

18    Q.   When you say "it," what --

19    A.   My left leg.  My left foot.

02:45 20    Q.   And what did you do after you saw that?

21    A.   He didn't stop screaming.  And my first thought was he's

22    in shock and I have to save myself, and so I turned and somehow

23    got my body over onto my stomach and crawled with my arms, my

24    forearms, and -- along the broken glass, and shredding open my

25    forearms, as I drug myself.

1    Q.   Now, in addition to the broken glass, did you have any

2    other sensation?  What could you feel from the sidewalk, from

3    that area as you crawled along?

4    A.   I could feel the broken glass and I could feel the parts

5    of my -- top of my foot and the bottom of my foot changing and

6    hitting and dragging across the sidewalk.

7            MS. PELLEGRINI:  May I have 21-18 for the witness and

8    counsel only, your Honor.

9    Q.   Ms. Haslet-Davis, on the screen before you is an image.

02:46 10   Do you recognize this?

11   A.   Yes, I remember -- I remember that moment.

12   Q.   And, in fact, is this you and Adam and does this fairly

13   and accurately represent the scene as you recall in the minutes

14   after the blast?

15   A.   Yes.

16           MS. PELLEGRINI:  Your Honor, the government would

17   offer 21-18 and ask that it be published.

18           MR. BRUCK:  As previously noted.

19           THE COURT:  All right.  Okay.  The objection is

02:46 20   overruled.  It may be admitted and it is displayed.

21           (Government Exhibit No. 21-18 received into evidence.)

22   BY MS. PELLEGRINI:

23   Q.   Ms. Haslet-Davis, let me enlarge this portion here.  Can

24   you tell the jury what we're looking at here?

25   A.   This is my husband in the white hooded sweatshirt that is

1 bent over my leg, what's left of it, and my body laying down on

2 the sidewalk.

3 Q. And in this position, is this how you crawled into the

4 Forum?

5 A. Yes, a little -- a little -- I think I was a little bit

6 more this way right after the foot.  I was taken more on my

7 stomach, but yes.

8 Q. And did you, in fact, make it into the Forum restaurant?

9 A. I did.

02:47 10 Q. All right.  And what happened there?

11 A. As soon as I made it toward the entrance of the Forum, I

12 was grabbed by my vest by someone and dragged to the bottom of

13 the stairs.

14 Q. Ms. Davis, I'd like to ask you to go back just a minute to

15 before you got into the Forum restaurant.  I asked you before

16 when the first explosion happened if you turned and you saw

17 anything, and after the second explosion happened, did you have

18 an opportunity to look around you and see anything else other

19 than you and Adam?

02:48 20 A. I saw a lot of people.  I saw just a ton of people just in

21 shock.

22 Q. And could you smell anything?

23 A. I could smell lots of smoke.  I could smell lots of smoke

24 and I could smell the kind of smoke that I've never smelled

25 before.  And that was another contributing factor that I knew

1    something was very wrong.

2    Q.   Now, as you crawled along and got into the Forum, what was

3    happening with your leg and your foot?  Could you ever stand?

4    A.   No.

5    Q.   And did you get -- you actually got into the Forum?

6    A.   I did.

7    Q.   All right.  And what happened in there?

8    A.   When I was laid down at the bottom of the stairs in the

9    Forum from my vest, I laid there and a bunch of people came

02:49 10    toward me and were trying to hold my hands and trying to help

11    me.

12    Q.   Now, did Adam stay as close to you as he is in this photo,

13    21-18, when you got into the Forum or did you separate at that

14    point?

15    A.   At that point we separated.  And he came walking in and --

16    after me, and then collapsed on the stairs right next to me.

17    Q.   And what happened while you were in there?

18    A.   We cried.  And I was in a lot of pain.  And I thought that

19    that was it.  And I thought that there were more bombs going

02:49 20    off and I didn't -- I didn't think anybody would come to save

21    us because I thought there were too many more people injured.

22    Q.   When you say you thought that was it, what do you mean?

23    A.   I thought I was going to die.

24    Q.   Did someone come to your aid?

25    A.   Yes.

1   Q.   Do you today, as you sit here, know who that person was?

2   A.   Yes.

3   Q.   And who was that?

4   A.   I now know him to be Dr. James.

5   Q.   And what did he do?

6   A.   Well, Adam had applied the first tourniquet, and then the

7   doctor came later on and said that he was a doctor and at that

8   point had checked out my tourniquets and made sure that they

9   were tight.

02:50 10   Q.   Were you able to observe your own leg at this time and

11   your foot?

12   A.   I was.

13   Q.   What did you see?

14   A.   I saw all five of my toes but I saw a lot of blood and I

15   didn't see any ankle.

16   Q.   What about your shoes?

17   A.   I only had one shoe on, as you can see in this photo.

18   Q.   Do you know how long you stayed at the Forum before you

19   left the Forum?

02:51 20   A.   I don't know the exact time but it felt like a year.

21   Q.   And what was it like for you while you waited?

22   A.   I begged for whiskey because I just wanted the pain to go

23   away.

24   Q.   And were you eventually removed from the Forum and taken

25   to a hospital?

1    A.    Yes.  I only begged for the whiskey when I thought I was

2    going to die.

3    Q.    What did you think about Adam?  What were your thoughts

4    about Adam at that time?

5    A.    He just kept saying how sorry he was.  He -- that was all

6    that he could say.  And that he loved me.  He was so sorry.

7    And that -- I remember people telling him that he needed

8    tourniquets also and that he should not have walked.  And I

9    looked down and someone took off his shoe and his artery was

02:52 10   spurting out blood as he was laying there, and his face kept

11   getting whiter and whiter and his speech got slower and slower.

12   Q.    Did you make any other observations of his face?

13   A.    I did.

14   Q.    What were they?

15   A.    His eyes started rolling back into the back of his head.

16   Q.    What did you think was happening to Adam at that time?

17   A.    I thought he was dying.

18   Q.    Adrianna, did there come a time when you and Adam left the

19   Forum?

02:52 20   A.    There did.

21   Q.    Were you able to leave together?

22   A.    No.

23   Q.    Who went first?

24   A.    I did.

25   Q.    Do you know where you went?

```
 1    A.    I went out into the street.  I was onto a board.  I was

 2    put onto a board by either all firemen or policemen.  And I was

 3    put onto a board and laid down on the street before being put

 4    into an ambulance.

 5    Q.    And Adam didn't go with you in that ambulance.  Is that

 6    correct?

 7    A.    No.  I thought he was dead in the Forum.

 8    Q.    What hospital did you go to?

 9    A.    I went to Boston Medical Center.

02:53 10   Q.    What happened when you got there?

11    A.    I just kept screaming that I was a ballroom dancer.  And

12    they kept giving me pain medication.  And I had felt a buzz

13    going off on my upper right-hand shoulder.  And I still had my

14    vest on, and they started cutting my clothes off to see my

15    injuries, and I reached over and I grabbed the buzz on my

16    shoulder and I realized it was my cell phone.

17    Q.    Who was calling?

18    A.    I don't remember who was calling but I knew exactly who I

19    wanted to call.

02:54 20   Q.    Who was that?

21    A.    My parents.

22    Q.    Did you call your parents?

23    A.    (Nonverbal response.)

24    Q.    What did you tell them about yourself?

25    A.    They live in Seattle, and I just kept thinking how awful
```

1    it would have been to get that call.  And I told them that I

2    was in a terrorist attack, because that's what I thought at the

3    time, and I told them that I needed to talk to them.  My father

4    answered, and I said, "I've been in a terrorist attack and I

5    don't think I have a left foot anymore.  And I'm in really bad

6    shape and I really need to talk to you because this might be

7    it.  Where are you?"  And they said, "We were driving down the

8    freeway."  And I said, "You need to pull over."  And my dad

9    said, "It's illegal to pull over on the freeway."

02:55 10          (Laughter.)

11   A.   And I said.  "I don't care if it's illegal.  This may be

12   our last words.  I need to talk to my mother."  And he said,

13   "She's driving."  So they pulled over.

14   Q.   Did you tell him about Adam?

15   A.   I did.

16   Q.   At that time what did you tell them about Adam?

17   A.   I said, "I've been in a terrorist attack at the Boston

18   Marathon" and Adam was dead and this might be it for me; that I

19   need you to call his parents because I can't tell them the

02:55 20   news.

21   Q.   Adrianna, later on you did, in fact, lose your left foot.

22   Is that correct?

23   A.   That's correct.

24   Q.   And when you walked in today, you're wearing pants?

25   A.   I am.

```
 1   Q.   So the jury cannot see that you are using a prosthetic
 2   device.  Is that correct?
 3   A.   That is correct.
 4   Q.   And what -- what is the nature of the injury to the left
 5   leg and the foot?
 6   A.   I lost my left leg below the knee.
 7   Q.   And Adam's injuries, do you now know what injuries he
 8   suffered?
 9   A.   I do know what injuries he suffered.
10   Q.   And what were those?
11   A.   He has suffered tendinitis [sic], which resulted in
12   constant ringing in his ears on -- or in one ear -- excuse
13   me -- 24 hours a day, seven days a week; he has a blown artery
14   in his left foot; he has ice cream scoops out of most -- what
15   look like ice cream scoops out of most of his calves and -- out
16   of both calves; and he also has -- the artery that was blown in
17   his left foot he got a skin graft on, and we're on his second
18   surgery to repair the donor nerve that we received the first
19   time.  And we're on a waiting period to see if that will be
20   saved.
21   Q.   Now, Adam's not here with you today, correct?
22   A.   That's correct.
23   Q.   Why is that?
24   A.   He has bravely admitted himself into a mental facility at
25   the VA Hospital.
```

1          MS. PELLEGRINI:  I have no further questions for

2     Miss Haslet-Davis.

3          MR. BRUCK:  Thank you, Miss Haslet-Davis.  We have no

4     questions.

5          THE COURT:  You may step down.  Thank you.

6          (The witness is excused.)

7          MR. WEINREB:  Your Honor, may we approach before the

8     next witness?

9          THE COURT:  All right.

02:57 10          (Discussion at sidebar and out of the hearing of the

11     jury:)

12          MR. WEINREB:  Your Honor, the next witness is Deputy

13     Oliveira.  He's the one who witnessed the incident where the

14     defendant gave the finger to the camera.  He's being called

15     essentially just to authenticate that video.  He will testify

16     briefly about his background, that he was on duty that day,

17     that he was monitoring the cameras, that he saw the event in

18     real time, and that the video's a fair and accurate video.

19          It's our understanding, and we know because we were

02:58 20     notified, that there was a -- there was a newspaper report

21     about this picture.  I don't think the picture has ever made it

22     into the press but there was a report about it.  And the

23     defense sent a letter to the Marshals Service asking them to

24     investigate how the press found out about it.

25          I'm not aware of the particulars of what they've done

1   to investigate it, but we do know, because he's been asked,

2   that Mr. Oliveira knows nothing about the investigation.  He

3   wasn't questioned during it and he didn't even know -- doesn't

4   even know that it exists; therefore, there will be no

5   foundation to question him about it and any such questions will

6   simply serve to confuse and mislead the jury by suggesting that

7   there's some relevance to it when, under the circumstances,

8   particularly given the limited nature of his testimony, there

9   can't be any relevance to it.  So we're moving in limine to

02:59  10   exclude those questions.

11          MS. CONRAD:  Well, obviously I was not planning on

12   asking him about the investigation.

13          THE COURT:  You were not?

14          MS. CONRAD:  I was not planning on asking about the

15   investigation.  I was planning on asking -- as I have asked the

16   general counsel for the U.S. Marshals Service who said he would

17   inquire as to whether Mr. Oliveira has made any statements or

18   provided any statements in the course of that investigation.

19   And I think I'm entitled to those as *Jencks*.  And as I did

03:00  20   yesterday, Mr. Weinreb said he's not aware of what they've

21   done.

22          As I did yesterday, I would like to have made part of

23   the record my correspondence with the Marshals Service which

24   includes the most recent response by General Counsel Auerbach

25   saying that the investigation has been referred to the Office

1    of the Inspector General for the U.S. Department of Justice and

2    is considered open and ongoing.

3            THE COURT:  And why is it germane?

4            MS. CONRAD:  Well, first of all, because I think there

5    might be *Jencks*.

6            MS. PELLEGRINI:  He didn't rule on it.

7            MS. CONRAD:  Well, that's what he says, but I don't

8    know if there's *Jencks*.  So it's being represented to me he

9    doesn't know about it.  I'm just asking -- and I asked

03:00 10    Mr. Auerbach, and he said he would inquire, whether

11    Mr. Oliveira made any statements in the course of that

12    investigation.  I have not received a response to that.  The

13    government, I know, has communicated with Mr. Auerbach several

14    times in the last day or two about related issues.

15            THE COURT:  Well, but any *Jencks* material would have

16    to relate to the testimony.

17            MS. CONRAD:  Well, I don't know what -- it would

18    probably very well have been, This is what happened, This is

19    what I did.  And I don't know what the -- whether the

03:01 20    statements are relevant without knowing whether there are

21    statements that exist.  It doesn't sound like the government

22    has inquired from the inspector general -- excuse me -- from

23    the general counsel or from the inspector general whether such

24    statements exist.  It's their duty.  It is the Department of

25    Justice that is conducting this investigation.  It is their

```
 1    duty to seek out and provide Jencks, witness statements that

 2    are in their possession, custody or control.  They are on

 3    notice, they've been on notice, Mr. Auerbach is on notice that

 4    I've requested these statements.

 5             THE COURT:  Okay.

 6             MR. WEINREB:  So there were two reports written by

 7    Mr. Oliveira documenting what he saw.  Those were provided and

 8    have been provided, you know --

 9             MS. CONRAD:  Yesterday.  Yesterday they were provided.

03:02 10            MR. WEINREB:  They were provided as soon as we got

11    them.  So we made an inquiry, we got the reports, and we handed

12    them over; however, we don't think there's anything there.  But

13    if the Court is inclined to investigate this further, we would

14    propose at a minimum that it be done out of the jury's

15    presence, kind of voir dire.  The defense can ask him whether

16    he made any other statements other than the ones in the report,

17    and if he says no, then they have their answer.

18             MS. CONRAD:  Well, I still think that there should be

19    an inquiry made to the inspector general -- to the general

03:02 20   counsel because that's the one that told me that they would

21    have the reports.

22             THE COURT:  Well, no.  I think -- if you want, we'll

23    let you ask the witness about any reports he made and take it

24    from there.

25             MS. CONRAD:  Can I raise another issue while we're up
```

1   here?  I -- I guess I'll leave it at that.  But I would like to

2   do that.

3          THE COURT:  Okay.  So we'll excuse the jury now and

4   then we won't have to interrupt his testimony, we'll just do it

5   all at once.  We'll come to a point and then excuse them.

6          MS. CLARKE:  My understanding is the exhibit is a

7   photograph of the video.  Is the government intending to put in

8   the video or the photograph?

9          MS. PELLEGRINI:  Just the photograph.

03:03 10        MS. CLARKE:  I'd been confused by Mr. Weinreb's --

11         THE COURT:  Do you intend to play the video?

12         MS. CONRAD:  I do.  I plan to play several portions of

13   the video.

14         THE COURT:  Several portions?  It's only -- what did

15   we say yesterday, 30 seconds?

16         MS. CONRAD:  There are several relevant portions to

17   the video.

18         THE COURT:  All right.  Okay.

19         (In open court:)

03:03 20        THE COURT:  Jurors, we have to do something without

21   you for a minute.  We're going to excuse you and have you back

22   as soon as we can have you back.

23         THE CLERK:  All rise for the jury.

24         (The jury exits the courtroom at 12:11 p.m.)

25         THE COURT:  All right.  Could we have the witness?

```
 1                    GARY OLIVEIRA, duly sworn
 2            THE CLERK:  Have a seat.  State your name and spell
 3     your last name for the record, if you would, please.
 4            THE WITNESS:  Gary Oliveira, O-L-I-V-E-I-R-A.
 5            THE COURT:  I don't know if the witness knows the
 6     arrangement, but this is a brief voir dire before we have your
 7     testimony at the request of the defense.
 8            THE WITNESS:  Yes, your Honor.
 9                    VOIR DIRE EXAMINATION
10     BY MS. CONRAD:
11     Q.   Good morning, Mr. Oliveira.
12     A.   Good morning.
13     Q.   I just have a few questions for you about any reports or
14     statements you might have given that I just want to clear up
15     before the jury's brought back in.
16     A.   Yes, ma'am.
17     Q.   You know that you're here to testify about something that
18     occurred in the cell block on July 10th of 2013, correct?
19     A.   Yes, ma'am.
20     Q.   And what, if any, reports did you write about that?
21     A.   I wrote one report about the incident I saw.
22     Q.   And that report was dated July 12th?
23     A.   I believe.  It was either the same day or the day after.
24            MS. CONRAD:  If I can just show the witness.
25     Q.   Can I just show you this document?  Do you recognize that?
```

```
 1   A.   Yes, ma'am.

 2   Q.   Is that the report you wrote?

 3   A.   Yes, ma'am.

 4   Q.   And just focusing in on the date on that, is that July

 5   12th, 2013?  Down at the bottom.

 6   A.   Oh, yes, ma'am.  That's the day it was submitted.

 7   Q.   But the incident occurred on July 10th, right?

 8   A.   Correct.

 9   Q.   And is that your usual practice, to write an incident

10   report?

11               MS. PELLEGRINI:  Objection.

12               THE COURT:  You may answer that.

13               THE WITNESS:  Pertaining to -- I've written many

14   incident reports but --

15   BY MS. CONRAD:

16   Q.   But about an incident of this nature?

17               MS. PELLEGRINI:  Objection.

18               THE COURT:  Overruled.

19               You may answer it.

20               THE WITNESS:  Yes.  I mean, if something happens in

21   the cell block worth notice, yes, I write a report.

22   BY MS. CONRAD:

23   Q.   Somebody flipping a bird, you write a report?

24   A.   Well, yeah.

25   Q.   You've done that for other defendants as well as
```

1    Mr. Tsarnaev?

2              MS. PELLEGRINI:  Objection.

3              THE COURT:  I think we've gone beyond the scope of the

4    purpose of the voir dire.

5              MS. CONRAD:  Okay.

6    BY MS. CONRAD:

7    Q.   And would you usually write the report the same day?

8    A.   Yeah.

9    Q.   And do you know you didn't write this report -- well, can

03:07 10   you tell us why you didn't write this report until two days

11   later?

12   A.   I was notified to do it.

13   Q.   By whom?

14   A.   Upper management.  Or somebody above me told me we should

15   write a report.

16   Q.   So at the time you didn't think it was important enough to

17   write a report about --

18              MS. PELLEGRINI:  Objection.

19              THE COURT:  Sustained.

03:07 20   BY MS. CONRAD:

21   Q.   Did you write any other reports?

22   A.   No, ma'am.

23   Q.   Is there a log that is kept in the marshal's office of

24   incidents that occur during the course of a day in a cell

25   block?

```
 1    A.    I don't understand your question.

 2    Q.    I'm just wondering if there's some kind of logbook

 3    where -- you know, presumably you're watching the cameras,

 4    right?

 5    A.    No.

 6    Q.    So why don't you explain it to me.

 7    A.    There's no logbook.

 8    Q.    Okay.  But you are watching the cameras, right?

 9    A.    Yes, ma'am.

03:08 10    Q.    And are you aware that there was an investigation within

11    the Marshals Service and later referred to the Office of the

12    Inspector General about a release of information about this

13    particular video?

14    A.    I wasn't aware of it till yesterday, somebody mentioned it

15    to me.

16    Q.    So you were never asked to provide a statement to either

17    internal affairs or the Office of the Inspector General?

18    A.    No, ma'am.

19    Q.    Were you aware that this incident was described in a

03:08 20    newspaper article in December of 2013?

21            MS. PELLEGRINI:  Objection.

22            THE COURT:  Sustained.  I think we've covered the

23    ground we intended to cover.

24            MS. CONRAD:  Okay.  Thank you.

25            THE COURT:  All right.  We'll call the jury back in.
```

1          (Pause.)

2          THE CLERK:  All rise for the jury.

3          (The jury enters the courtroom at 12:18 p.m.)

4          THE CLERK:  Be seated.

5          THE COURT:  Jurors, the witness on the stand has been

6     sworn prior to your return to the room.  He's under oath.

7                        DIRECT EXAMINATION

8     BY MS. PELLEGRINI:

9     Q.   For the record again, in the presence of the jury, would

03:11 10     you give your name, please?

11    A.   Gary Oliveira.

12    Q.   And, Mr. Oliveira, will you tell the jury by whom you're

13    employed?

14    A.   The United States Marshals Service.

15    Q.   And in what capacity?

16    A.   Deputy U.S. marshal.

17    Q.   And how long have you held that position?

18    A.   Fourteen years.

19    Q.   And briefly, can you describe the duties of a deputy

03:11 20    United States marshal?

21    A.   All aspects of the court security, the federal building

22    security, prisoner transport, fugitive apprehensions.

23    Q.   And I'd like to direct your attention specifically to the

24    date of the defendant's arraignment on July the 10th of 2013.

25    Were you working in this courthouse on that day?

1    A.    Yes, ma'am.

2    Q.    And what were your duties on that day?

3    A.    I was the deputy in charge of the court operations unit.

4    Q.    And what does that mean?

5    A.    Basically I would sit -- there's an operations desk that

6    overlooks our squad room, monitor cameras that are there in

7    front of you, daily deal with the clerks -- daily court

8    operations itself, really, anything to do with the courts for

9    the day.

03:12 10   Q.    And what's the ops desk?

11   A.    Operations desk is where normally the deputy in charge

12   will sit where it's just -- it's the center point where all the

13   phone calls come in.  Anything that goes through will go

14   through the operations desk.  It's one main desk in the squad

15   room.

16   Q.    And with respect to being seated in that area, do you also

17   have access to cameras to other areas in the courthouse?

18   A.    Yes, ma'am.

19   Q.    So specifically with respect to people who are detained or

03:12 20   in your custody, what is the setup with the cameras?

21   A.    There's -- right in your direct line there's three

22   cameras -- three monitors -- excuse me -- three screens that

23   have multiple views of different angles of cells, the corridors

24   and the cell block area, and then there's one standalone, and

25   that could be -- you could put any camera -- the three are set

1    cameras that are always on.  The standalone one is -- you can
2    change it to whatever you like, whatever particular camera.
3    Q.   And with respect to the defendant, were you able to view
4    the defendant in a cell block room on July the 10th of 2013?
5    A.   Yes, I did.
6    Q.   And do you recall as you sit here now without anything in
7    front of you what cell that was?
8    A.   Cell 4.
9    Q.   And at approximately 11:20 or '23 in the morning on July
03:13 10   the 10th, were you still in that position and able to view the
11   camera into that cell block?
12   A.   Yes, ma'am.
13   Q.   All right.
14        MS. PELLEGRINI:  I'd like for the witness, your Honor,
15   and counsel only, Exhibit, marked for identification, 1595.
16   Q.   Deputy Oliveira, with respect to the image on the screen
17   in front of you, do you recognize that image?
18   A.   Yes, ma'am.
19   Q.   And how is it that you recognize this particular image?
03:14 20   A.   I physically saw it happen that day monitoring the
21   cameras.
22   Q.   Now, this image is, in fact, an image from a longer video.
23   Is that correct?
24   A.   Correct.
25   Q.   And this is being captured by a video camera within the

1    cell?

2    A.   Correct.

3    Q.   But when this incident occurred at 11:23:19, you were

4    actually watching the monitor?

5    A.   Yes, ma'am.

6    Q.   And does this fairly and accurately represent what you saw

7    on July the 10th of 2013 in Dzhokhar Tsarnaev's cell?

8    A.   Yes, ma'am.

9         MS. PELLEGRINI:  Your Honor, the government would

03:14 10  offer Exhibit 1595.

11        MS. CONRAD:  Objection for the reasons previously

12   stated, and in addition, we would ask that the video, and not

13   the still, be shown.

14        THE COURT:  Well, either the government or you can

15   show it, but I'll admit the photograph.

16        (Government Exhibit No. 1595 received into evidence.)

17        MS. PELLEGRINI:  May it be published, your Honor.

18   BY MS. PELLEGRINI:

19   Q.   Detective Oliveira, with respect to the photograph 1595

03:15 20  now in evidence, there is a notation on the top of the

21   photograph toward the right-hand side, correct?

22   A.   Yes, ma'am.

23   Q.   And what is that?

24   A.   The date and timestamp.

25   Q.   All right.  And have you had occasion to determine whether

 1     or not the date and the timestamp are accurate on the video

 2     cameras that are located in the cells?

 3     A.    Yes.

 4     Q.    And, in fact, they record in real time, correct?

 5     A.    Correct.

 6     Q.    And with respect to the notation on the bottom left of the

 7     image, what is that?

 8     A.    The 061 gives you the camera number, "cell" stands for the

 9     cell, and 4 is for the cell he's actually in.

03:15 10          MS. PELLEGRINI:  May I have just a moment, your Honor.

11                (Counsel confer off the record.)

12     BY MS. PELLEGRINI:

13     Q.    Detective Oliveira, are you aware of whether or not this

14     was the first day that Dzhokhar Tsarnaev was in the Moakley

15     courthouse?

16     A.    Yes, it was.

17          MS. PELLEGRINI:  Thank you.  I have no further

18     questions.

19                          CROSS-EXAMINATION

03:16 20   BY MS. CONRAD:

21     Q.    Good afternoon, Deputy Oliveira.

22     A.    Good afternoon.

23     Q.    Do you remember what time Mr. Tsarnaev arrived that day?

24     A.    No, I don't.

25     Q.    Is there anything that would refresh your recollection?

1    A.    I would have no -- there's a cell block log --

2    Q.    Yes.

3    A.    -- that would tell you what time the prisoners arrived

4    into the cell block.

5    Q.    Yes.

6    A.    Not something that I would have done but something that is

7    done.

8    Q.    Okay.  I'm just asking.  If I can just have a moment and

9    show it to you, and let's see if that refreshes your

03:17 10  recollection.  My binder is not cooperating.

11              MS. CONRAD:  And this is just for the witness, please,

12   your Honor.

13   Q.    Just asking you to take a look at the last line on that

14   document, does that refresh your recollection as to what time

15   he arrived?

16   A.    Yes, ma'am.

17   Q.    Yes?

18   A.    Yes.

19   Q.    And what time was that?

03:17 20  A.    11:10.

21   Q.    Thank you.  And when he was placed into a cell at that

22   time, did you observe that?

23   A.    I don't recall.  I wasn't in the cell block.

24   Q.    But that would be captured also on the video camera?

25   A.    The camera's constantly monitoring, yes.

1          MS. CONRAD:  Okay.  So at this time I would like to

2     play the 11:10 clip, please, Ms. Sarr.

3          THE COURT:  Is it on the cart or Table 3?

4          MS. CONRAD:  It's the cart.  The first one.

5          MS. PELLEGRINI:  I don't believe this is in evidence.

6          THE COURT:  It isn't in evidence.

7          MS. CONRAD:  I'm sorry?  I'm about to offer it.  But

8     is there an objection?  I can have it just for the witness.

9          MS. PELLEGRINI:  My objection is it's not in evidence.

03:18 10          MS. CONRAD:  Okay.  Well, I'll show it, then, just to

11     the witness and then I'll offer it.

12          THE COURT:  This is displayed only to the witness.

13     BY MS. CONRAD:

14     Q.   So do you recognize what that depicts?

15     A.   Yes, ma'am.

16     Q.   And is that the cell block -- Cell 4 on July 10th at 11:08

17     a.m.?

18     A.   According to this timestamp, yes.

19          MS. CONRAD:  I would offer this.

03:19 20          MS. PELLEGRINI:  Relevance?  Objection, your Honor.

21          THE COURT:  How long does it run?

22          MS. CONRAD:  Two minutes.

23          THE COURT:  I'm sorry?

24          MS. CONRAD:  Two minutes.

25          THE COURT:  Let me see you.  Let me see you at the

```
 1   side.
 2            (Discussion at sidebar and out of the hearing of the
 3   jury:)
 4            THE COURT:  I'm not sure what this is relevant to.
 5            MS. CONRAD:  I'll tell you two things it's relevant
 6   to.  One thing, it shows Mr. Tsarnaev standing completely
 7   passively and compliantly while the chains are removed from him
 8   and then it shows him looking into the camera and using it as a
 9   reflection as he fixes his hair.
10            MS. PELLEGRINI:  So?
11            MS. CONRAD:  Excuse me?
12            It shows that he is, first of all, viewing this not as
13   a camera, but as a mirror, a reflection.
14            THE COURT:  And you have others of similar --
15            MS. CONRAD:  Then I'm going to show the clip of
16   the -- that the still is.
17            THE COURT:  That I saw the other day?
18            MS. CONRAD:  Yes.
19            THE COURT:  And then?
20            MS. CONRAD:  And then there's another clip that it
21   appears that marshals come and speak to him about what just
22   transpired because he walks over to the screen.  And I'm going
23   to ask if someone spoke to him.  And then he walks back and
24   sits down, completely compliantly.
25            The government has just made this the centerpiece for
```

03:19 (line 10)
03:20 (line 20)

```
 1    the argument that this is a message.
 2            THE COURT:  All right.  You can use it.  It provides
 3    the context.
 4            MS. CONRAD:  Thank you.
 5            (In open court:)
 6            MS. CONRAD:  So I'm not sure what our next exhibit
 7    number is.  I apologize.  Can we say 3700 just to start
 8    someplace?  I don't think that's used yet.
 9            THE COURT:  That's fine.  If you're confident that's
03:21 10    well above where...
11            MS. CONRAD:  One moment.
12            (Counsel confer off the record.)
13            THE COURT:  You know, we're in a separate phase so it
14    doesn't necessarily have to pick up.  So if you're
15    confident -- if you want to pick a number that you're confident
16    is well above the numbering, 4000, for example.
17            MS. CONRAD:  4000.  Thank you.  So we'd now offer
18    this, your Honor, as exhibit whatever the number we just agreed
19    on was, 4000.
03:22 20            THE COURT:  I will admit it, and I think to
21    distinguish -- you're going to offer --
22            MS. CONRAD:  Three clips.
23            THE COURT:  -- more than one?
24            MS. CONRAD:  Yes.
25            THE COURT:  Let's identify it by its start time just
```

```
 1   for the record.  So it's started at 11:08:17.
 2              MS. CONRAD:  Yes, thank you.
 3              THE COURT:  That's admitted --
 4              (Defense Exhibit No. 4000 received into evidence.)
 5              MS. CONRAD:  As Exhibit 4000?
 6              THE COURT:  -- as Exhibit 4000.  And that will be
 7   displayed to the jury.
 8              MS. CONRAD:  Thank you.
 9              (Video recording played.)
```

03:22 10   BY MS. CONRAD:

```
11   Q.   So, Deputy Oliveira, I don't know if the jury can see this
12   yet, what are we viewing here?
13   A.   That's an empty cell, Cell 4.
14   Q.   And that's the cell where Mr. Tsarnaev was held?
15   A.   Correct.
16   Q.   And if you would just bear with me for a second here.
17   What's that over to the right, the screen we see on the bottom
18   right corner?  Right here in the bottom of the screen.
19   A.   Oh, that's the partition wall.
```

03:23 20   Q.   Okay.  And what did we just see happen right there?

```
21   A.   The cell door either was opened or somebody opened it and
22   he walked in.
23   Q.   And that's Mr. Tsarnaev in the orange?
24   A.   I'm assuming.  I can't see his face from here.
25   Q.   Okay.  Can we resume playing the tape?
```

```
 1                  (Video recording played.)
 2     Q.   And what's happening now?
 3     A.   He's being unrestrained.
 4     Q.   And he is, as you can see in this video, compliant?
 5               MS. PELLEGRINI:  Objection.
 6               THE COURT:  Sustained.
 7     BY MS. CONRAD:
 8     Q.   Did you observe this happening?
 9     A.   I don't recall.
03:23 10    Q.   As far as you know, he did not resist in any way?
11               MS. PELLEGRINI:  Objection.
12               THE COURT:  Well, the film speaks for itself.
13               MS. CONRAD:  Now, if you can just pause again, please,
14     Ms. Sarr.  Wait.  Let's go back.  I think we skipped something.
15     That's good.  Probably right about there.
16                  (Video recording played.)
17     BY MS. CONRAD:
18     Q.   So there was a chain around his waist that's being
19     removed?
03:24 20    A.   I'm assuming that's typical trans- -- how we transport
21     prisoners.  I actually never see the chain move, so.  Yes,
22     there it is.
23     Q.   Right?  And that was about 11:09?
24          And when you see Mr. Tsarnaev walk -- step away, I just
25     want to ask you to look at his left hand.  Do you see what's on
```

1    his left hand?

2    A.    Yes, ma'am.

3    Q.    What was it?

4    A.    Some form of brace.

5    Q.    And do you know that, in fact, he had been injured?

6    A.    Yes.

7    Q.    And so what's in that cell besides the bench that he's

8    sitting on?

9    A.    He's headed right towards -- there's a toilet and a sink,

03:25 10    it's all one unit, right where he's at right now.

11    Q.    And there's really nothing else in that cell, right?

12    A.    No, ma'am.  Air vents.  You have air vents that's...

13    Q.    And do you know what time his arraignment was scheduled

14    for that day?

15    A.    I don't recall.  I want to say 3:30.

16        MS. CONRAD:  Okay.  Stop right there.

17    Q.    Now, it seems like he's looking up into the camera at that

18    point.  Did you see that?

19    A.    Right now he's not, no.

03:25 20    Q.    Okay.

21        MS. CONRAD:  Well, just keep going.

22        (Video recording played.)

23    Q.    Right now he's looking up in the camera?

24    A.    Correct.

25    Q.    And does that camera have a reflective surface?

1   A.   It's not an actual -- the camera's inside a case, so there

2   is glass of some form across it.  To be honest with you, I

3   don't remember if it's tinted or clear or not, so I'm not sure.

4   Q.   But it appears that he is using that reflection as a

5   mirror?

6            MS. PELLEGRINI:  Objection.

7            THE COURT:  It speaks for itself.

8            THE WITNESS:  I'm sorry.  I didn't hear you.

9            THE COURT:  The objection is sustained.  The film

03:26 10   speaks for itself.

11   BY MS. CONRAD:

12   Q.   But there is a reflective surface over the camera surface,

13   correct?

14   A.   Yes.

15   Q.   So someone in that cell who looks up at the camera would

16   see a reflection of themself?

17   A.   I would assume.  I've never really done it myself.

18   Q.   But have you seen people engage in similar behavior in the

19   cellblock using the camera surface or the box encasing the

03:26 20   surface as a reflection?

21            MS. PELLEGRINI:  Objection.

22            THE COURT:  Overruled.

23            You may answer that.

24            THE WITNESS:  I've seen people looking into the

25   camera, yes.

1    BY MS. CONRAD:

2    Q.    Looking into it as if they're looking at their own

3    reflection?

4    A.    I can't say that I've seen that.  A lot of times people do

5    that to get our attention.

6    Q.    Well, what did that look like to you when you observed it

7    on that day?

8              MS. PELLEGRINI:  Objection.

9              THE COURT:  Sustained.

03:27 10   BY MS. CONRAD:

11   Q.    Now, you said he had an injury to his hand, right?

12   A.    I don't know if it was his hand or his wrist.  I know he

13   had a brace on it.

14   Q.    And did you know that he also had an injury to his face?

15   A.    Yes.

16   Q.    And did you know, in fact, he had been shot in the face?

17   A.    I don't know if he had been -- that he was shot in the

18   face, no.  I know that he had injuries to the face.

19   Q.    And do you know that those injuries affected the left side

03:27 20   of his face?

21             MS. PELLEGRINI:  Objection.

22             THE COURT:  Sustained.

23   BY MS. CONRAD:

24   Q.    Well, you observed him that day, correct?

25   A.    No closer than I am here with the camera -- with the

1    monitor.  I was not in the cell block.

2    Q.   But you also were aware that when he was first arrested,

3    when he was first in the marshals' custody, he was not in a

4    detention facility; he was in a hospital?

5              MS. PELLEGRINI:  Objection.

6              THE COURT:  Sustained.  Let's stay to the point of the

7    direct.

8              MS. CONRAD:  Well, your Honor, may we be heard at

9    sidebar?

03:28 10             THE COURT:  No, I think that was a fairly clear

11   ruling.

12             MS. CONRAD:  Well, as far as the reason why I would

13   like to elicit that and why it's relevant to the --

14             THE COURT:  No.  Continue, please.

15             MS. CONRAD:  Can we play the second clip.

16             THE COURT:  For the record, it's 11:23:09?

17             MS. CONRAD:  Yes.

18             THE COURT:  I've indicated that all three can be

19   admitted.  So this is a new number?

03:28 20             MS. CONRAD:  This would be 4001.

21             THE COURT:  4001 at 11:23 --

22             (Defense Exhibit No. 4001 received into evidence.)

23   BY MS. CONRAD:

24   Q.   Now, just drawing your attention to the time at the top,

25   this is 11:23:09?

```
 1   A.   I see it.

 2   Q.   And so that's shortly before the still photograph that

 3   Ms. Pellegrini showed you?

 4   A.   Correct.

 5   Q.   And by the way, when the -- the photo that she showed you,

 6   the still that she showed you, that's not how you saw this at

 7   the time that it occurred, right?  You didn't see it as a

 8   still?

 9   A.   No, ma'am.

10   Q.   You saw it the way we're seeing it now, as a video?

11   A.   Correct.  Live.

12        MS. CONRAD:  Okay.  Can we just continue to play that,

13   please?

14        (Video recording played.)

15   Q.   So that was the exact sequence of what you saw, right?

16   A.   Correct.

17   Q.   And that was Mr. Tsarnaev getting up on the bench, right?

18   A.   Correct.

19   Q.   Peering toward the camera, right?

20   A.   Correct.

21   Q.   Arranging his hair?

22        MS. PELLEGRINI:  Objection, your Honor.  The video,

23   again, speaks for itself.

24        THE COURT:  It speaks for itself.

25   BY MS. CONRAD:
```

```
 1    Q.   And before the still that you -- before the image that

 2    Ms. Pellegrini introduced as Exhibit 1595, you saw Mr. Tsarnaev

 3    make a two-finger gesture, correct?

 4    A.   Correct.

 5    Q.   A V sign?

 6              MS. PELLEGRINI:  Objection again.

 7              THE COURT:  Speaks for itself.

 8    BY MS. CONRAD:

 9    Q.   Well, do you know when he did that what he was -- strike

10    that.

11         Had anything occurred right before this that he was

12    reacting to?

13              MS. PELLEGRINI:  Objection.  That was --

14              THE COURT:  You may answer whether anything that was

15    not shown on the video had occurred before the video clip.

16              THE WITNESS:  Not that I know of.

17    BY MS. CONRAD:

18    Q.   Well, during the time that you were observing the video

19    monitors from the time of his arrival to the time that you made

20    that observation at 11:23, did anything occur to which he

21    seemed to be responding?

22              MS. PELLEGRINI:  Objection.

23              THE COURT:  If you recall you may answer it.

24              THE WITNESS:  I don't recall.

25    BY MS. CONRAD:
```

```
 1    Q.   He was in that cell alone during that entire time, right?

 2    A.   The cell but not the -- there could have been people on

 3    other sides.  It's not the only cell -- right there is not the

 4    only cell in that corridor.

 5    Q.   Are you aware of anything that occurred --

 6    A.   No.

 7    Q.   -- that he was responding to?

 8    A.   No.

 9    Q.   Are you aware of why he made a V sign?

03:31 10   A.   No.

11    Q.   Are you aware of why he raised his middle finger?

12    A.   No.

13    Q.   And, in fact, after that occurred, what did you do?

14    A.   I immediately reported it to my upper supervisors.

15    Q.   And did someone go speak with him?

16         MS. PELLEGRINI:  Objection.

17         THE COURT:  You may answer that.

18         THE WITNESS:  I believe so.  I don't recall who.

19         MS. CONRAD:  Okay.  So if we could now just for the

03:31 20   witness show the clip that begins at 11:25 or 11:26.

21         (Video recording played.)

22         MS. CONRAD:  Okay.  Can we scroll that back for a

23    second?  Okay.  Stop that right there.

24    BY MS. CONRAD:

25    Q.   So do you recognize that?
```

```
 1    A.    It's the same cell.

 2    Q.    On the same day?

 3    A.    Correct.

 4    Q.    About two minutes later, right?

 5    A.    Correct.

 6              MS. CONRAD:  I would offer this, your Honor, as 4002.

 7              THE COURT:  All right.  I already indicated it would

 8    be admitted.

 9              MS. CONRAD:  Thank you.

10              (Defense Exhibit No. 4002 received into evidence.)

11              MS. CONRAD:  Okay.  Can we go back to the beginning,

12    please, Ms. Sarr.

13    BY MS. CONRAD:

14    Q.   All right.  Here you see Mr. Tsarnaev, and he seems to

15    walk more purposefully over to the grate?

16              MS. PELLEGRINI:  Your Honor, I'm going to object.

17              THE COURT:  Yes, stop characterizing it.  The jury can

18    see it and they can make their own conclusions.

19    BY MS. CONRAD:

20    Q.   And does it appear -- do you know whether at that time

21    someone went to speak to him?

22    A.   I don't know.

23    Q.   Does it appear that he's speaking to someone?

24              MS. PELLEGRINI:  Objection.

25              THE COURT:  Same thing.
```

BY MS. CONRAD:

Q.   If someone were speaking to him, where would they be situated in that image?

        MS. PELLEGRINI:  Objection.

        THE COURT:  You may answer that.

        THE WITNESS:  Someone could be speaking to him from the other side of the cell or on either side.  There's cells on either side of that.

BY MS. CONRAD:

Q.   But right here is where -- I'm sorry.  Somebody from the marshals' --

        MS. CONRAD:  Could you pause that, please?

Q.   Somebody from the marshals' service, where would they go to speak to him?

A.   Where you have that arrow, in that general vicinity.

Q.   The lower right-hand?

A.   Well, to be honest with you, probably more in the middle where the door is.

Q.   But near where he was standing just a moment ago?

A.   Correct.

Q.   And --

        MS. CONRAD:  Okay.  Could you play the rest of that clip, please, Ms. Sarr?

        (Video recording played.)

        MS. CONRAD:  You can stop it now.

```
  1   BY MS. CONRAD:

  2   Q.   And so after that, nothing else occurred, did it, that

  3   day?

  4   A.   As far as what?

  5   Q.   Mr. Tsarnaev didn't do anything to draw your attention the

  6   rest of that day?

  7           MS. PELLEGRINI:  Objection.

  8           THE COURT:  No, you may answer that.

  9           THE WITNESS:  No.

 10   BY MS. CONRAD:

 11   Q.   And, in fact, for most of the time that you were watching

 12   those cameras, he sat alone on a bench in that cell?

 13           MS. PELLEGRINI:  Objection.

 14           THE COURT:  Sustained.

 15           MS. CONRAD:  Well, can I play another clip, then?

 16           THE COURT:  I think we've had enough, actually.

 17   BY MS. CONRAD:

 18   Q.   Do you know how long he stayed in that cell that day?

 19   A.   No.

 20   Q.   Well, going back again to the log --

 21           MS. CONRAD:  If I could have this just for the

 22   witness.

 23   Q.   -- does that refresh your recollection as to what time he

 24   left the building?

 25   A.   That would tell me what time he left but now how long he
```

1    was physically in that cell.

2    BY MS. CONRAD:

3    Q.   Well, he arrived at 11:10, right?

4    A.   Correct.

5    Q.   And he left at what time?

6    A.   15:55.

7    Q.   That's 3:55?

8    A.   Correct.

9    Q.   And does this also tell you what time he was scheduled to

03:35 10   appear in court?

11   A.   Yes.

12   Q.   And what time was he scheduled to appear in court?

13   A.   1530.

14   Q.   So that would be 3:30 p.m.?

15   A.   Correct.

16   Q.   Now, in that image, his mouth seems to be at sort of an

17   odd shape?

18        MS. PELLEGRINI:   Same objection.

19        THE COURT:   Sustained.

03:35 20   BY MS. CONRAD:

21   Q.   You didn't write a report about this incident until two

22   days later.  Is that right?

23   A.   Whatever the date was.  I don't remember.  I know it was

24   either that day or --

25   Q.   Well, normally if there's an incident you would write a

1    report the same day, correct?

2    A.    Correct.

3    Q.    But in this instance you didn't write a report till two

4    days later, correct?

5    A.    Correct.

6          MS. CONRAD:  Now, just for the witness again.  Oh,

7    strike that.

8    Q.    And did someone direct you to write that report?

9    A.    Someone did.

03:36 10   Q.    And was that a supervisor?

11   A.    Yes, it was.

12   Q.    And --

13         MS. CONRAD:  May I just have one moment, please.

14   Q.    How old was Mr. Tsarnaev at that time?

15   A.    I don't know.

16   Q.    You don't know he was 19 years old?

17         MS. PELLEGRINI:  Objection.

18         THE COURT:  Sustained.  Sustained.

19         MS. CONRAD:  May I just have one moment?

03:36 20        (Counsel confer off the record.)

21         MS. CONRAD:  Nothing further.

22         THE COURT:  Any further exam?

23         MS. PELLEGRINI:  No, your Honor.

24         THE COURT:  All right, Deputy.  You may step down.

25   Thank you.

1            We'll take the lunch recess.

2            (The witness is excused.)

3            THE COURT:  You have another witness?

4            MS. PELLEGRINI:  Today, yes.

5            MR. WEINREB:  Yes.  And actually, taking the lunch

6      recess now will be perfect.

7            THE COURT:  Right.  We'll take the lunch recess.

8      We'll resume at two o'clock.

9            THE CLERK:  All rise for the Court and the jury.  The

03:37 10      Court will take the lunch recess.

11            (The Court and jury exit the courtroom and there is a

12      recess at 12:44 p.m.)

13            THE CLERK:  All rise for the Court and the jury.

14            (The Court and jury enter the courtroom at 2:11 p.m.)

15            THE CLERK:  Be seated.

16            THE COURT:  Mr. Chakravarty.

17            MR. CHAKRAVARTY:  Thank you.  The government calls

18      Jinyan Zhao.

19                         JINYAN ZHAO, duly sworn

05:05 20            THE CLERK:  State your name, spell your last name for

21      the record, keep your voice up and speak into the mic.

22            THE WITNESS:  My name is Jinyan Zhao, my last name

23      Zhao spelled Z-H-A-O.

24                         DIRECT EXAMINATION

25      BY MR. CHAKRAVARTY:

```
  1    Q.   And, Jinyan, so stay close enough, but don't feel the need
  2    to lean into the microphone as long as it's close enough to
  3    you.
  4         Do you also go by the Anglicized name of "Helen"?
  5    A.   Yes, call me Helen.
  6    Q.   And where do you live?
  7    A.   I live in Cranston, Rhode Island.
  8    Q.   How long have you lived there?
  9    A.   About 20 years.
05:06 10    Q.   How long have you been in the United States?
 11    A.   About 20 years.
 12    Q.   Did you come from China?
 13    A.   Yes.
 14    Q.   All right.  Who do you live in Rhode Island with?
 15    A.   My husband and two kids.
 16    Q.   How are you related to Lingzi Lu?
 17    A.   Lingzi call me "aunt" because my sister married to
 18    Lingzi's mother's brother.  So basically, you know, Lingzi call
 19    my sister "aunt," so she call me "aunt."
05:06 20    Q.   And in Chinese culture, she treated you as an aunt and you
 21    treated her as a niece?
 22    A.   Yes, as a niece.
 23    Q.   Do you know her parents?
 24    A.   Yes.
 25    Q.   Were her parents able to travel from China to be with us
```

           1   here today?

           2   A.   No.

           3   Q.   Why not?

           4   A.   I don't think they're capable because the devastation that

           5   had -- even mention about, you know, the whole case, stuff.

           6   One time they told me, the husband -- things the father told

           7   me, the mom could not get out of bed for two days just to hear,

           8   you know, something from this side.  So they absolutely cannot

           9   make it here.

05:07     10   Q.   What kind of upbringing did Lingzi have in China?

          11   A.   Lingzi grow up very ordinary, middle-class family.  And

          12   she live with her parents and her mother's side parents.  So

          13   three generations lived together.

          14   Q.   Is that customary in Chinese culture as well?

          15   A.   Some, but I think their case actually very special.  I

          16   think they get along very well and they're very close, so they

          17   lived together for, like, at least 15 years.  I think when the

          18   parents first got married, were not together, then they moved

          19   together.  So since -- I think since she was born, they live

05:08     20   together.

          21   Q.   And have you visited their family home?

          22   A.   Yeah, a couple of times.

          23   Q.   Where do they live?

          24   A.   Shenyang, China.

          25   Q.   Can you just spell that for the court reporter, please?

1   A.   S-H-E-N-Y-A-N-G.

2   Q.   When did Lingzi come to the United States?

3   A.   August 2012.

4   Q.   And were you instrumental in introducing her to the United

5   States?

6   A.   Yes.  Yeah, when she start looking for apartment when she

7   still in China, we start to emailing.  And she show me, you

8   know, the apartments she found with her roommate.  And I help

9   her, you know, get apartment ready.

05:08 10   Q.   And did she tell you that her roommate -- she had found a

11   roommate?

12   A.   Yes, they met online actually, but in China.  So they knew

13   they both going to go to BU, so they form a friendship and they

14   decide to live together.  They find an apartment.

15   Q.   Was that Li Jing?

16   A.   Yeah.

17   Q.   And how did she decide to come to the United States?

18   A.   I think she always do.  Since she's small, I think she

19   just want to go out, you know, to, you know, make something for

05:09 20   herself.  I think America was her first choice, just the

21   education, the schools, just every -- you know, kids want to

22   come here to study.

23   Q.   Is it easy for a Chinese student to come to the United

24   States to study?

25   A.   No, not for her because she's -- their family very

1    average, middle-class.  And I know their relatives help them

2    out, you know, they pitched in together, you know, to try to

3    send her here.

4    Q.   They pitched together, pitched money together?

5    A.   Yeah.  Yeah.

6    Q.   In addition to money, are there other difficulties in

7    getting into schools here?

8    A.   Yeah.  Because I think she's an only child, so I'm sure,

9    you know, everybody can relate to this is an only child, only

05:10 10    daughter, to allow her to come all the way here, it's going to

11    be hard.  I think it's going to be very hard for the parents.

12    But I think they want her to be happy, to do what she wants, so

13    they let her out.

14    Q.   Did you get closer to Lingzi when she came to the United

15    States?

16    A.   Yes.  We -- my husband and I pick her up at Logan Airport

17    in the morning.  It remind me like 20 years ago, you know, when

18    I first landed in this country.  It's just kind of, you know,

19    you're nervous.  Actually, she came with her cousin, which is

05:10 20    my sister's son.  They both came, one for graduate school and

21    one for high school.

22    Q.   So you had another family member --

23    A.   Yeah.  Yeah.

24    Q.   Her nephew?

25    A.   Yeah.  My nephew.

1    Q.    Your nephew.  Her cousin?

2    A.    Yeah, her cousin.

3    Q.    So when was this?

4    A.    August 200- -- August 2012.

5    Q.    2012?

6    A.    Yes.  And actually, we -- they arrived really early that

7    morning so it got -- I think we going to treat them in

8    Chinatown.  And actually they're not -- you know, too early, so

9    the restaurants aren't open.  So we end up at this greasy

05:11 10   basement -- this only place open.  And actually --

11          (Laughter.)

12   A.    -- she order like I think ham-egg sandwich, big one.  So I

13   was impressed, gosh, after 15 hours flying you still have the

14   appetite to eat it, yeah?  So this good memory.  It's the

15   first -- it's really memorable.

16   Q.    Was she excited to be here?

17   A.    Yes.  I can see exciting and also nervous.  Yeah, just

18   everything's new, you know, just start her new life here.

19   Q.    After you dropped her off at BU, did she continue to stay

05:12 20   in touch with you?

21   A.    Yes.  Yeah, we -- actually, before she came, we know she

22   rent an apartment.  Then actually, so we save some furniture

23   for her.  So we rent a truck and we drove -- you know, set her

24   up.  And because actually, the apartment, the doorway to the

25   stairs is so narrow so we basically have to take the bed apart

1    and actually assemble right in her room.  And it was summer.

2    It was a hot day.  I remember clearly.  My husband bring the

3    tools and assemble the bed there for her.  It's very exciting

4    for us too.  This make me feel like -- taste a little bit of

5    sending your kids to college, because my kids still young.  But

6    it just very exciting for me to see how she going to start her

7    life.

8    Q.   Did she keep in touch with you while she --

9    A.   Yes.  Yes.  At the beginning we kind of, you know, went to

05:13 10   pick them up because this is new.  So eventually, you know,

11   they took train on weekends, come over, and Thanksgiving break

12   and Christmas break.

13   Q.   So when she would spend the holidays with you, describe

14   how Lingzi acted and interacted with you.

15   A.   Yeah, Lingzi, you know, she love food, you know, she have

16   a sweet tooth, you know, deserts.  And she's very excited about

17   small things.  Everything you do -- she's type of kid, the

18   parents want to cook for her, because everything you cook, she

19   say, "It's so good.  It's awesome.  Thank Auntie and Uncle."

05:14 20   So every time she comes down, you know, we tried to cook

21   something good for her, I know she's going to enjoy it, if

22   nobody else, yeah.  And she loved the turkey.

23   Q.   Turkey?

24   A.   And she loved the pumpkin pie.  Actually, at the end of

25   day they would have half left, I remember she sitting there by

1    herself at the dining room table reading the iPad, something,

2    she just one spoon, one spoon, and okay, I tell myself, "Is she

3    going to finish the whole pie?"  And actually, she did.

4              (Laughter.)

5    A.   At the end, "Oh, Auntie, Auntie," you know, "I finished

6    the whole pie."  She's, you know, kind of like bubbly and just

7    innocent girl.

8    Q.   What would you do with her when she was at your home,

9    aside from eating, of course?

05:14 10   A.   You know, we talk.  You know, she share her stuff, you

11   know, school, friends.  And the world, what she wants to do and

12   later.  And we talked about boys too.

13   Q.   So start with school.  What was she studying at BU?

14   A.   Statistics.

15   Q.   And that was the graduate school program?

16   A.   Yes.

17   Q.   Was Lingzi a good student?

18   A.   Yes, she -- at the memorial service her professor talk

19   about her, she's a very diligent -- very, very good student,

05:15 20   and smart and hard working.

21   Q.   And in your conversations with her, did you also sense

22   that intelligence?

23   A.   Yes.  Actually, one time I saw her notebook.  And she

24   wrote a lot of notes.  And it's so neat, it almost look like

25   it's a part of a textbook.  She write a note on the textbook.

1    It's just that impressive.  And she wrote a lot, and every

2    letter so neat.  Yeah, just she is.  And when she -- Christmas

3    break, you know, she brought school stuff there, you know, and

4    she gets up every morning at same time, even on break, and

5    just, you know, either read or something.  She's very

6    disciplined, you know.

7    Q.   And speaking of discipline, did she play music?

8    A.   Yes.  She played since she was very little.  That from her

9    parents.  You know, I wasn't with her.  But even -- she

05:16  10   continue even in BU, she took piano lessons with somebody.

11   Q.   You mentioned some of how she was doing in school, meaning

12   the academic side.  Did she also integrate with her friends at

13   the BU, the campus?

14   A.   Yeah, they have fun.  Yeah, she had a lot of friends over

15   there.  And they go out, you know.  I know she visit New York,

16   you know, some of her friends there, so they went to see

17   Broadway.  I think it was the *Phantom of the Opera*.  She loved

18   music.  She told me she was very excited, finally she got to

19   see it.

05:17  20   Q.   What was she interested in aside from what you have

21   mentioned?  What were her interests?  What were her passions?

22   A.   I think she basically laugh.  Everything just good in

23   life.  I think, like, she love animals.  She has pet.  She

24   called herself "sister" to the pet.  And she loved good food,

25   appreciate good food.  And she told me, you know, how much she

likes Boston.

   She told me once, she said, "Oh, Auntie, like every corner
I saw -- I turn" -- it's a picture to her.  At Boston, you
know, she like the brownstone building.  And actually, that
spring she was very excited to see spring finally come.
Because she came August, so she didn't get to enjoy the spring.
And she told me, "Oh, I can't wait to see how pretty Boston
going to be in the spring."

Q.   Did she leave Boston to take a trip with her friends that
spring?

A.   Yes, she went to Florida that March break.

Q.   March break.  March of 2013?

A.   Yeah.

Q.   Do you know where they went in Florida?

A.   I think they went to Disney.  I know that area.

Q.   What were Lingzi's ambitions?  What did she want to do
with her life?

A.   I think -- she told me actually that summer, she had
wanted to work in internship somewhere, Wall Street.  But
ultimately, she want to have a job in New York, Wall Street.
And that's, you know, her ambitions.  She want to work some --
you know, I don't know, the pension planning, that part of
business.

Q.   Pension planning?

A.   Yeah.

Q.   Are you familiar with the one-family-one-child policy in

China?

A.   Yes.  Yes.

Q.   Can you just briefly explain what that is?

A.   That thing, it started 19- -- I think 1970.  I was the

last one, last generation.  My parents, you know, able to have

two.  I have a sister.  But since I think 1978 or '77 it

started, you know, to control the population.  So it's a

one-child policy.

Q.   And was Lingzi the only child?

A.   Yes.

Q.   What was her role within the family?

A.   Because my brother-in-law was -- he live in different

city.  So in that city, just Lingzi's parents and grandparents

and her.  So I can imagine she is the, you know, center of that

family.  And her grandparents basically, particularly her

grandfather, I think it's her first teacher, he, you know,

bring her -- introduce her to books and taught her Chinese

calligraphy.  And her grandmother in the morning braid her

hair, you know, bring her to classes, you know, that kind of

stuff.  And they're very close.  And I think there's only one

granddaughter there, so I guess she got all the attention,

yeah.

Q.   Are her grandparents still alive?

A.   Yes.  And her grandfather last year finally wrote a book

1    for her, you know, to memory of her.

2            MR. CHAKRAVARTY:  Your Honor, I would move into

3    evidence Exhibit 1606 and ask to publish.

4            MR. BRUCK:  All of these exhibits subject to the

5    previous motion.

6            THE COURT:  Okay.  All right.  It may be admitted.

7            (Government Exhibit No. 1606 received into evidence.)

8    BY MR. CHAKRAVARTY:

9    Q.   Ms. Zhao, is this the cover of the book that Lingzi's

05:21 10   grandfather wrote?

11   A.   Uh-huh.

12   Q.   Now, Lingzi was close to this grandfather.  Is that right?

13   A.   Yes, very much.

14   Q.   And does this book -- why don't you describe what it

15   recounts.

16   A.   This book basically is from her -- so first it talk about

17   the bomb, you know, the whole thing that few days' incident,

18   then start from how she growing up a small -- you know, the

19   family stuff.  So then eventually they also have her diaries

05:21 20   since she kept diaries since she was small.  I think she

21   thought her grandfather taught her it's good way to keep, you

22   know, writing down things and practice writing -- and, yeah, it

23   was about her life.  And also a lot of her friends wrote about

24   her in the book too.

25   Q.   Now, in Chinese culture, is there a sense of obligation to

1    take care of elders?

2    A.    Yes.   That's why I guess the Chinese parents, they

3    sacrifice for their kids.   It's just the culture, you know, the

4    parents do the best for their kids, and in return, when they

5    get older, the children, you know, take care of the elderly.

6    If you don't, there's a strong culture stigma, you know, if you

7    don't, you know, take care of your elderly.   So that just for

8    the parents, it's just extremely sad.   It's sad, you know,

9    she's gone.

05:23 10    Q.    And it's true of the grandparents as well?

11    A.    Yes.

12    Q.    Let's talk a little bit more about Lingzi's life in China.

13    Where did she go to college?

14    A.    She went to a college called Beijing University of

15    Technology.   There I think she study international finance.

16    And she went to -- actually, she went to California for a

17    couple of months around that time to study.   And also I think

18    at that time she also want to get experience, explore the

19    option to come here to study.

05:23 20    Q.    And when she was in China, did she cook for herself?

21    A.    Yes, she loved -- she loved food in general.   So, yes, so

22    she cook and she enjoy other people's cooking, yeah.

23    Q.    So when she came to the U.S. and she had to cook for

24    herself --

25    A.    Yes.   She's very conscious -- she conscious about, you

1    know, healthy eating, and she will cook herself something good,

2    but also she had weakness for the sweets, you know?  She can't

3    help.  And one time we told her we're going to swing by her

4    apartment.  And she purposely, actually, leave a cupcake,

5    actually, she told me she bought from the cupcake place in

6    Newbury Street, like very famous she discovered, so she have to

7    save one for my daughter.  Yeah, she's a sweet kid.

8    Q.   Did she occasionally confide in you, what she was thinking

9    and feeling?

05:24 10   A.   Yes, she does.  You know, I ask, "Do you have boyfriend?"

11   You know, typical self.  She doesn't have so I ask her a lot.

12   Yes, she had -- actually, one time she had a boy ask her out,

13   and she likes him too.  But then later I ask her how did it go,

14   the date, and she said, "Auntie, I don't know why he did not

15   talk."  I said, "Why?"

16   Q.   I'm sorry.  What did he not talk?

17   A.   Yeah, "Why he didn't ask me" -- "He didn't talk?"  I said,

18   so "Why didn't you ask him question?"  And then she said, "He's

19   the one ask me out.  Why he's not talking to me?"

05:25 20           (Laughter.)

21   A.   She said -- I said then -- so -- you know, think about

22   something to talk.  And she said, "Auntie, no."  She admitted

23   herself, that's what she said, she's lacking intelligence in

24   romance.  She does not know how to talk to boys.  So I think

25   about these two just sitting there being all curt.

1    Q.   How would you describe her personality?

2    A.   She's interesting person, actually.  Very, like, physical

3    and bubbly.  But also, of course, she's very smart, determined,

4    very focused, very studious kid.  And -- but she's very

5    interesting.  She has this comfort personality, you know, that

6    struck me as -- like when we're going to see -- she's very

7    conscious about her look.  She want to look good too, pretty,

8    but also, she had no problem go on stage.  If people ask her to

9    say something or sing, she would do it.  She just don't have

05:26 10   that -- what's the word -- like feel embarrassed.  Very brief,

11   actually.

12        And I feel she's kind of a beautiful nerd.  One was just

13   this beautiful, you know, then she's nerdy too.  It's the one

14   time she told me -- a test in China, one big test, she -- she

15   was really tired, you know, she study overnight.  She actually

16   decided to take a half-hour nap once she'd taken the test.  And

17   she said she woke up and she continued the test and she did

18   very well.  So I said, "Okay, I can't believe you did that.

19   That's really weird."

05:27 20        But, yes, she's very interesting kid.  And she discovered

21   the whipped cream actually one time.  And I make pancake and I

22   say, "Pancake goes with whipped cream, right?"  And she tried

23   the whipped cream, then she's just sitting there kind of eating

24   the whipped cream without the pancake, then she kept scraping

25   the whipped cream -- she make my daughter laughing too.  It's

1    kind of like silly girl too, yeah.

2    Q.   Did she make people happy around her?

3    A.   Yes.  She just get excited from things that -- very

4    upbeat, very vibrant kid.

5    Q.   How would she keep in touch with her parents?

6    A.   Most by that WeChat, and also at time Scape -- not Scape.

7    What's that word?  Skype.

8    Q.   Skype?

9    A.   Yeah.

05:28 10   Q.   And WeChat is a Chinese communication?

11   A.   Yeah, a Chinese communication.

12   Q.   Did she inquire about how her pets were doing back then?

13   A.   Yes, every time I think she need to call the pet, "Come

14   over to the screen, let sister look at you.  Let big sister

15   look at you."  She was really talking to the pet like her

16   sister.

17   Q.   When's the last time you spoke with Lingzi?

18   A.   That Friday before the bomb, the 15th.  I just asked

19   her -- typically every weekend I would ask her if she's going

05:29 20   to come down and that -- no, she just told me she's busy, she

21   had a lot of exam, so she said she need to study.  And besides,

22   she only just have one day off because that day is the high

23   school break.  So, yeah, she just say no, she's going to stay

24   there.  I did not think she's going to go to watch marathon; I

25   thought she going to study.

1  Q.   So the Monday -- Marathon Monday, Patriots' Day was a

2  holiday?

3  A.   Yeah, only over here.  Rhode Island is not.

4  Q.   In fact, you just played for me a voicemail message she

5  left for you.  Is that right?

6  A.   Hmm.  Hmm.  Yeah, saying, you know, she's not coming down

7  because she had too much to do.

8  Q.   Describe the tone of her voice in that voicemail.

9  A.   Just a very calm, very confident, like articulate, you

05:29 10  know, when she speaks.  And kind of not rushed; take her time

11  to speak, yeah.

12  Q.   And you've kept that?

13  A.   Yeah.

14  Q.   Are there other messages from her you've kept?

15  A.   Yeah, I kept her -- so I never delete her voicemails, so

16  she's always there.

17  Q.   How did the rest of the family view Lingzi?

18  A.   You mean her parents?

19  Q.   Her parents and the collective family, like your cousins

05:30 20  and her aunts and uncles.

21  A.   How they doing now?

22  Q.   No, how they viewed her.

23  A.   Oh, okay.  Yeah, I mean, I -- because I'm in this country

24  so I didn't go back that often, so but over the years I just,

25  you know, hear from my sister, my brother-in-law, just, you

1   know, they talk about -- a lot about her, you know, just how

2   proud the parents, you know, about her, you know, how this girl

3   was just so, you know, determined at school, you know, very

4   pleasant to be around.  They're very, very proud of her.

5   Q.   How was she as a daughter?

6   A.   As a daughter?  I think she's kind of sweet.  And I think

7   at first she -- I learned when she's here, I can tell she's

8   really appreciative of what her parents did for her.  You know,

9   she really want to get good job and graduate and she can give

05:31 10   her parents back, you know, have them have a better life, live

11   more, and even enjoy some more.  And even went to the mall,

12   Providence Mall, you know, the first thing she'll try to look

13   through some things for her grandmother and her mother.  So

14   she's just all-around good girl.

15   Q.   Did her younger cousins look up to her?

16   A.   Yes, very much.  Because, I mean, boy, I mean, she's

17   extremely good, she -- I mean, she took good notes.  And, you

18   know, on the textbook, my nephew's average.  So my

19   brother-in-law, you know, just always use her as an example,

05:32 20   "Why don't you just, you know, learn something from Lingzi,

21   like take better notes so you get better grades like Lingzi."

22        Yes, she help him a lot, you know, in school stuff, and

23   she -- also, anytime he, you know, needs help, she was like a

24   big sister to him.

25   Q.   And that's her cousin?

1    A.    Her cousin.

2    Q.    Did her cousin go back to China?

3    A.    Yes, he did.  I drop him off in June 2013.  That day when

4    I dropped him off, it's the same spot pretty much I picked both

5    them up.  When that -- when I see -- give him a hug, I do felt,

6    you know, how his grandparents going to felt when they send two

7    here and only one back.  That was a very hard day for me.

8    Q.    Let me show you some photos now.

9    A.    Um.

05:33 10          MR. CHAKRAVARTY:  I'd move into evidence 1607-002

11    through -005, and I would ask to publish -002.

12          MR. BRUCK:  No objection.

13          THE COURT:  Okay.

14          (Government Exhibit Nos. 1607-002, 1607-003, 1607-004

15    and 1607-005 received into evidence.)

16    BY MR. CHAKRAVARTY:

17    Q.    Ms. Zhao, what is this a photo of?

18    A.    I think this in California.  I think when she went to -- I

19    think it was Riverside, California.  She was there for two

05:33 20    months.

21    Q.    Is this when she came -- before she had came --

22    A.    Yeah, I think it's her third year in college.

23    Q.    And so do you know about what year this was, 200- --

24    A.    Let me think.  2011.

25    Q.    2011?

```
 1    A.    Yeah, 2010, somewhere around there.  Yeah.

 2    Q.    Was she 23 years old when she died?

 3    A.    Yes.

 4          MR. CHAKRAVARTY:  -03, please.

 5    Q.    What is this a photo of?

 6    A.    Yeah, that's one Shenyang, her hometown.  I think it's her

 7    birthday, you know, in the apartment room, they have just

 8    family get-together.

 9    Q.    A family get-together in her hometown?

10    A.    Yeah.

11    Q.    And is that a cake that she's showing us?

12    A.    What's that?

13    Q.    Is that a cake?

14    A.    Yes, it's a cake.  Yes.

15          MR. CHAKRAVARTY:  -04.

16    Q.    Did Lingzi like the outdoors?

17    A.    Yes, she did.  Yeah.  Actually, we went -- when she was

18    with me, we took her to Narragansett.  Yeah, I mean, we took

19    her to little crabbing, little spot, you know, she enjoy very

20    much.

21          MR. CHAKRAVARTY:  -05, please.

22    Q.    What is this?

23    A.    I think this one probably is in Disney somewhere.

24    Q.    She has Minnie Mouse ears?

25    A.    Yes.  Silly picture.
```

```
 1              MR. CHAKRAVARTY:  Go to 1499 already in evidence.
 2    A.   I think this one, I think, is in her college.
 3    Q.   In Beijing?
 4    A.   Yeah.
 5              MR. CHAKRAVARTY:  1501, please.
 6    Q.   This is also in her college in China?
 7    A.   Uh-huh.
 8    Q.   After Lingzi was killed did -- were you the first
 9    contacted in the family?
10    A.   Yes.  Yeah, the Boston police, the next morning, they
11    called me, told me they're going to come down.  So at that time
12    we don't know where she is, so -- anything.  So we thought,
13    "Okay.  They're coming."  We kind of think something not good,
14    but he didn't say anything.  So they came down -- two of them
15    came to my house, you know, basically said, "I'm sorry.  That's
16    your niece?"
17         At that time in China, they already start -- they heard
18    about -- you know, they have Lingzi friends in Boston try to
19    look for her.  So then I talk to my sister first, so, and my
20    brother-in-law, say, "You guys going to figure out how to say
21    to them."
22    Q.   And what was the reaction?
23    A.   It's just shock.  My sister, like really just shock.
24    Because nobody ever going to think, you know -- I have think so
25    many different scenarios, she probably got kidnapped or
```

1    something, you know, but never crossed my -- even that morning,

2    it still never crossed my mind she could be dead.

3    Q.    Did her parents come over afterward?

4    A.    Yes, they came over on the 19th.

5    Q.    Did you help make arrangements for the funeral?

6    A.    Yes, I booked the flights for them and -- yeah.  And BU

7    helped a lot too.

8    Q.    And both to bring the family over as well as to decide

9    where to either bury Lingzi or send her home?

05:38 10   A.    We didn't talk that when they're flying this, you know,

11   here.  But after, yeah, then, you know, we decided -- they

12   decided -- we have to decide how we going to do it, you know?

13   Then --

14   Q.    So what did --

15   A.    They decided to leave her here.

16   Q.    Yeah.  What did they decide and how did they decide that?

17   A.    I think they decide -- I think after they arrived, it's

18   kind of -- it's kind of chaos to me because everything happen.

19   And at a quiet time, then they start talking about, "Okay.  The

05:39 20   body is in funeral home.  Okay, what we do?"  Then some

21   relatives suggest, you know, move back and they suggest here.

22   But ultimately her mom want her to be here because I think she

23   just felt, you know, this is too short for her, you know, she

24   only here for seven month.  She really had planned to stay here

25   longer.  And, you know, it -- just make a life, you know, here.

1       And also, how she died and why she died, I think it just
2   felt like she's part of Boston, part of city.  So, you know,
3   the thing is, she should be here.
4   Q.   Did her mother choose a dress to bury her in?
5   A.   Yeah.  Yeah, because they didn't bring anything from
6   Shenyang -- you know, I can imagine what they do just in a
7   couple of days.  And so we need to find dress for her.  So her
8   mom had this image, I think, in her head, something, she want
9   something flowy, long.
05:40 10      So actually, me, my sister and her mom and her aunt, four
11   of us, we went to the mall, Boston area, just like typical
12   shopping women.  We go to different store try to find the
13   dress.  Somehow we went to a few stores.  It just somehow, it
14   did not -- we don't have the one.  They couldn't find the one
15   she wanted.
16       So eventually some aunt -- somebody brought -- "Why don't
17   try a bridal shop?"  Actually, we did end up, you know, in a
18   bridal shop in the outskirt of Boston.  And, yeah, she find a
19   pink princess dress.  Actually, it's a bridal gown, but she
05:41 20   wanted pink first.  And then she liked the dress, the flowy
21   thingy.  And so that's where we got her dress.
22       And that bridal shop very nice.  They -- because the low
23   cut most of the dress, so they actually used the fabric on the
24   bottom to sew on top to cover everything and make a nice
25   collar, like a Victorian style -- that's what she -- because

```
  1    her mom has -- I would think she want her to wear, you know,
  2    that kind of style dress.  I think maybe for her bridal dress,
  3    I think that's what her mom had imagined, her daughter going to
  4    wear that.
  5    Q.    So it was a bridal dress?
  6    A.    Bridal pink dress.
  7    Q.    With her --
  8    A.    And she bought her tiara.
  9    Q.    Did she think of her as a princess as well?
05:42 10    A.    Yes, I think she had this two image mixed.  That's how I
 11    felt.  I said, "Okay.  You're going to put tiara on the bridal
 12    dress," but I guess that's what she wanted.
 13    Q.    Did she have an open casket funeral?
 14    A.    Yes, she did.
 15    Q.    Is that traditional in Chinese culture?
 16    A.    No, in China, you know, most people is cremated.  So it's
 17    not normal.  It's not common at all.
 18    Q.    And did her parents place anything with her?
 19    A.    Yeah, when she buried, she -- they put a music box and
05:42 20    some, like, books she likes very much.  And her mom gave her a
 21    bracelet to put on her and then her mom also wear herself one.
 22    Q.    Was that a good luck bracelet?
 23    A.    Yeah.
 24    Q.    Did they choose to bury here in Boston?
 25    A.    Yes.  Yeah.  I just also in the open casket, when they
```

        1    went to see her, is so not real.  Like even you look at her,

        2    it's her there, but you just couldn't comprehend.  It's still

        3    like it's hard.  But her mom touch her hand, it's her hand.

        4    Later her mom told me because Lingzi has this beautiful hands,

        5    they really beautiful, like porcelain, like long piano hands,

        6    and she loved the turquoise color nail polish.  And she -- her

        7    mom touched her hand and took her hand and she told me, "No

        8    matter what, I don't want to believe it's her hand; it's her."

        9    Q.   A few days after that was there a memorial service at

05:44  10    Boston University?

       11    A.   Yeah.

       12    Q.   Did you attend?

       13    A.   Yes.

       14    Q.   And did her father give a speech?

       15    A.   Yes.

       16    Q.   Now, did you speak with him before he gave the speech?

       17    A.   Yes.  It was -- yeah, everything kind of -- you know, a

       18    lot of people attend.  It's a -- I know it very hard for her

       19    and for him.  I mean, he basically, he all dressed up, you

05:44  20    know, waiting for the hotel room, for the room.  And he told

       21    me, he said, "Helen, I got this feeling I'm going to give a

       22    toast in my daughter's wedding."

       23         He is totally adrenaline, you know, kind of mode, you

       24    know.  He can -- I don't think he has slept a couple of hours

       25    every night.  I mean, the parents are very -- they're very

```
      1   private, strong person -- people, and they don't show a lot of,

      2   you know, emotions in front of even us.  But I'm sure in the

      3   private, in, you know, closed door, both alone, I'm sure, you

      4   know, they will be, you know, devastated.

      5        And her mom actually one time told me during that week,

      6   she told me basically -- each day, you know, she just afraid of

      7   darkness.  She said she afraid of dark, I think dark, because

      8   she thought she's going to have nightmares, and just she -- it

      9   was terrifying experience.

05:45 10   Q.   Did her father spend some time choosing what he was going

     11   to say about her?

     12   A.   Yes.  Yes.  I think they wrote maybe on the way here, you

     13   know.  And we have -- yeah, and BU have somebody translate in

     14   English.

     15   Q.   Did you see a video of that speech?

     16   A.   Yes.

     17   Q.   And he gave the speech in Chinese, correct?

     18   A.   Right.

     19   Q.   And then right after he gave it, somebody had given the

05:46 20   English translation, correct?

     21   A.   Yes.

     22   Q.   And did you see the video I showed you that has the

     23   English translation superimposed -- dubbed onto the image of

     24   Mr. Lu giving that memorial?

     25   A.   Yes.
```

1    Q.   And is it a fair and accurate recitation of that speech?

2    A.   Yes.  Yes.

3            MR. CHAKRAVARTY:  At this point, your Honor, I would

4    move into evidence Exhibit 1600 and ask to publish.

5            THE COURT:  Okay.  It's admitted.

6            MR. BRUCK:  (Nonverbal gesture.)

7            (Government Exhibit No. 1600 received into evidence.)

8            THE COURT:  I'm not getting it.

9            MR. CHAKRAVARTY:  There's nothing on the screens, your

05:47 10   Honor.

11           THE COURT:  No, I'm not getting the feed.  There we

12   are.

13           (Audio and video recording played.)

14           MR. CHAKRAVARTY:  Thank you, Ms. Zhao.

15           MR. BRUCK:  No questions, Ms. Zhao.  Thank you very

16   much.

17           (The witness is excused.)

18           THE COURT:  I believe that's the witnesses for today.

19   We'll finish a little early again today and we're going to

05:55 20   continue tomorrow.

21           I had said earlier that you should expect to sit on

22   Friday this week because we had a Monday holiday.  It may be

23   that the government actually finishes its principal case

24   tomorrow and Friday may not be necessary.  So I just give you

25   that heads up.  It's not a promise yet, but it's a possibility

1    and I wanted you to know about that in advance, all right?

2           Again, remember my cautions.  No peeking at the news,

3    no discussion.  We'll see you tomorrow and continue with the

4    matter.

5           THE CLERK:  All rise for the Court and the jury.  The

6    Court will be in recess.

7           (The Court and jury exit the courtroom and the

8    proceedings adjourned at 3:03 p.m.)

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  12/28/15
13

14

15

16

17

18

19

20

21

22

23

24

25