UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Criminal Action |
| v. | ) No. 13-10200-GAO |
|  | ) |
| DZHOKHAR A. TSARNAEV, also | ) |
| known as Jahar Tsarni, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>SEALED LOBBY CONFERENCE</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, April 23, 2015
8:45 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, Federal Public Defender
10         51 Sleeper Street
           Fifth Floor
11         Boston, Massachusetts  02210
           - and -
12         CLARKE & RICE, APC
           By: Judy Clarke, Esq.
13         1010 Second Avenue
           Suite 1800
14         San Diego, California  92101
           - and -
15         LAW OFFICE OF DAVID I. BRUCK
           By: David I. Bruck, Esq.
16         220 Sydney Lewis Hall
           Lexington, Virginia  24450
17         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2      THE COURT:  Good morning.

3      MR. WEINREB:  Good morning.

4      MS. CLARKE:  Good morning.

5      THE COURT:  So I have been trying to look at the video

6  that you want to use.  Are we down to just the two clips of

7  Martin Richard?

8      MR. WEINREB:  So the clip of Martin Richard, it's just

9  the portion of him sort of walking along with the circle,

10  showing him enter and then at post-blast without any stills, so

11  no white -- so there's no -- basically, it's the clip of Martin

12  Richard, whatever you have, minus -- I believe there are two

13  still shots.

14      MR. MELLIN:  No, we gave the Court -- Paul and I tied

15  it down.  All it is is -- there's two post-blasts of Martin.

16  There's one that ends with Martin moving his arms, and then the

17  other one picks up with Denise over the top of Martin trying to

18  render aid or just support.  And that's all we would need.

19      MR. WEINREB:  Right.  And there are no stills of him.

20      THE COURT:  Okay.  And we'll come back to those in

21  just a minute.  Just so I know, everything else is off the

22  table?  The cell phone overlay?

23      MR. WEINREB:  No, that's the other thing.  The sound

24  overlay is the other clip that we want to play.

25      MR. MELLIN:  That we actually had decided -- well,

1    okay.

2              (Laughter.)

3              MR. WEINREB:  As of when I filed our opposition.

4              THE COURT:  I like him better.

5              MR. MELLIN:  I'm trying to trim it down, your Honor.

6              MR. WEINREB:  I think the sound overlay should come

7    in, so...

8              THE COURT:  So let's take them separately, then.

9              With respect to the Martin Richard clips.

10             MR. BRUCK:  Well, this is an enhanced video that we

11   received --

12             THE COURT:  I haven't seen the enhanced.  I guess I'd

13   like --

14             MR. BRUCK:  Well, it is enhanced at least in the sense

15   that it is magnified.

16             THE COURT:  I guess I should see that.

17             MR. WEINREB:  That's what you saw.

18             THE COURT:  That's what you saw.

19             MR. WEINREB:  It's not enhanced in any kind of highly

20   technical or forensic way.  Basically, using Adobe, Premier or

21   any video-editing software, it's possible to zoom in on part of

22   a video --

23             THE COURT:  All right.  So let me...

24             (Pause.)

25             THE COURT:  Can you just look at this and see if this

1    is what you mean by enhanced?

2         MR. WEINREB:  So just if I can finish what I was

3    saying.  So it's not enhanced in any forensically special way;

4    it's simply zoomed in the way that, you know, occasionally from

5    time to time throughout the trial the parties put up a

6    photograph and then drew a little box around it with the mouse

7    and then it expands to fill the screen.  That's what we did

8    here.  It's the exact same video that's already in evidence

9    essentially with a little box drawn around part of it to make

10   it bigger so it's easier to see.

11        MR. BRUCK:  As I say, we received this almost at the

12   eleventh hour, long after we thought we knew what the

13   government's exhibits were going to be.  It is extremely

14   inflammatory and it is cumulative to other evidence, including

15   the extremely graphic autopsy photos of Martin Richard to which

16   we objected but which were admitted.  On balance, we think the

17   Court should exclude it as more prejudicial than probative.

18        THE COURT:  I'll allow it.  With the limited -- I was

19   going to exclude the disk.  When I looked at the whole disk I

20   thought on balance the disk in its entirety was more

21   prejudicial than probative, but I did think there were some

22   probative segments.  And this actually was one of them when I

23   looked at it because I think the fact -- if it is a fact that

24   the jury can find from it, that it displayed consciousness on

25   the part of Martin.  That is a point the government's entitled

1    to make, I think.

2          And as to the second part, the mother's reaction, I

3    think, now in this penalty phase, is something the government

4    is entitled to.  So the limited scope can be shown.

5          MR. BRUCK:  So the record is complete, we would note

6    that the -- it goes neither to the statutory aggravating factor

7    of vulnerable victim that he had a few seconds of consciousness

8    and -- nor does it go to the heinousness aggravating factor

9    which is based in this case entirely on the predicate of

10   aggravated battery, and that is shown by other evidence, but

11   whether he was conscious for 15 seconds or not does not

12   establish either of those factors.

13         THE COURT:  All right.  Let's move to the other issue,

14   the cell phone --

15         MR. WEINREB:  So the --

16         THE COURT:  -- overlay.

17         MR. WEINREB:  Yes.

18         So should I go first?  It's their motion but I'm happy

19   to go first.

20         THE COURT:  Explain what you want.

21         MR. WEINREB:  Okay.  So as we explained in the

22   opposition that we filed, the government alleges that this was

23   an act of terrorism, that there was substantial planning and

24   premeditation to commit an act of terrorism, is one of the

25   aggravating factors.  And the jury needs to know not just

1    whether it was an act of terrorism or not but what weight to

2    assign that factor when they're engaging in the weighing

3    process, of weighing aggravating and mitigating factors.

4        How terrifying the event actually was is a legitimate

5    consideration for them, and what makes an event terrifying is

6    not just how it looks but how it sounds, how it smells, how it

7    feels, even how it tastes if it's -- if there is an acrid smoke

8    in the air.  Witness testimony, as we all know, is not a

9    substitute for firsthand, or secondhand, in this case,

10   experiencing of it.  Just as a picture is worth a thousand

11   words, so is the sounds -- the actual sounds that were

12   occurring at the time.

13       Had the video actually had sound, then I don't know

14   we'd even have an issue here, it would simply come in the way

15   that the sound from Scene A came in.  This particular

16   surveillance video did not have sound but it's possible to

17   marry up to sound from this recording that was taken -- it

18   took -- you know, was made just feet away with the video so

19   that the jury can understand at Scene B as well as Scene A what

20   the nature of the event really was for the people who

21   experienced it.

22       THE COURT:  How would it come in?

23       MR. WEINREB:  Michelle Gamble, who testified earlier

24   and would testify again, would say that she was able to -- she

25   had the Forum video, she had the sound recording, and she was

1   able to synchronize them based on the sound of the first blast

2   and the heads all flipping around to see it, and then marrying

3   up the sound of the second blast with the image of the second

4   blast as it occurs on the video.

5          So that -- I don't think there's any question,

6   frankly, that it's a fair and accurate depiction of what it

7   sounded like at the scene.  The question -- the argument that's

8   been made by the defense to exclude it is just that it's

9   irrelevant and more prejudicial than probative.

10         MR. BRUCK:  Well, this, once again, is an

11   eleventh-hour addition to the evidence.  We were not provided

12   with this composite until, I guess, Friday.

13         MS. CONRAD:  Monday.

14         MR. BRUCK:  I'm sorry.  Monday.

15         MS. CONRAD:  Tuesday.  Excuse me.  Tuesday.

16         MR. BRUCK:  I've lost track of what day of the week it

17   is.

18         THE COURT:  Haven't we all.

19         MR. BRUCK:  And we think it's just too late to be

20   adding such powerful, and we think prejudicial evidence, not

21   only to the trial, evidence, but to our ability to prepare, to

22   conceptualize the evidence as a whole to defend our client.  So

23   we think it's unfair to provide this so late.

24         On top of that, we do think it is more prejudicial

25   than probative, and it doesn't establish any fact that it's

1  remotely in controversy.

2          THE COURT:  You have the Scene A sound, right?

3          MR. WEINREB:  We do, your Honor.

4          THE COURT:  Isn't this cumulative of that?  Do you

5  need to show it for Scene B as well?

6          MR. WEINREB:  Well, your Honor, Scene B is the scene

7  that the defendant exploded the bomb at, and that's the one

8  that the jury is going to be weighing the most when they're

9  determining whether -- how much weight to give this factor.

10  And this is going to be a case where they're undoubtedly going

11  to be engaged in a genuine weighing process, and the

12  government's entitled to the moral weight of the evidence and

13  we're hoping that the jury will take that into account when

14  they're weighing the importance of this factor and the other

15  factors to which it relates, frankly.

16          You know, the more that the -- there's -- the more

17  that the five senses of the jury can be engaged in their

18  understanding of the evidence, the deeper an understanding they

19  have the more real it becomes for them and the better position

20  they're in to really evaluate just how weighty a factor that

21  is.

22          MR. CHAKRAVARTY:  One other point?  The audio was

23  captured at a location which was in proximity to where the

24  defendant was at the time, so these sounds would be the sounds

25  not just from Scene B generally to describe to the jury what

1   happened at Scene B, but also the sounds that the jury can

2   reasonably infer that the defendant was hearing similar sounds

3   to this as opposed to the Scene A sounds.

4           MS. CONRAD:  Where the defendant was when the bomb

5   exploded?

6           MR. CHAKRAVARTY:  You hear the first bomb explode and

7   then you hear the reaction of the crowd and then you hear the

8   second bomb explode.

9           MR. BRUCK:  Well, I mean, there's no testimony that

10  I'm aware of about any of that or where the defendant was when

11  the second bomb -- I mean, this is all, you know, something

12  that counsel is telling us.

13          THE COURT:  Right.

14          MR. WEINREB:  We're not --

15          THE COURT:  That wouldn't be evidence.

16          MR. WEINREB:  Yeah.

17          THE COURT:  But it does raise the question of the

18  foundation for it, I guess.  So Agent Gamble -- she's not an

19  agent; she's a photographer.

20          MR. WEINREB:  Correct.

21          THE COURT:  -- did this herself or supervised the

22  doing of it?

23          MR. WEINREB:  She did it herself.

24          THE COURT:  And she can explain the source of the cell

25  phone?

1          MR. WEINREB:  She can.

2          MR. BRUCK:  Through hearsay?  I mean, where was the

3     phone?

4          MR. WEINREB:  Well, she is the person who was

5     responsible, as she testified during the liability phase, for

6     collecting all the video and audio.  She oversaw -- she

7     was -- she's the photographer and was the person who oversaw

8     everything, so she is aware through her role in the case where

9     everything was collected from and how.  That was part of her

10    job.  And to the extent that she relied on records that were

11    compiled during it, that may be hearsay knowledge but that's

12    admissible during this phase of the trial.

13         MS. CONRAD:  Are there reports on where this was

14    collected from?  I mean, how do we know it's from Scene B and

15    not from Scene A?

16         MR. WEINREB:  Your Honor, I think the -- that's all

17    fodder for cross-examination if the defendant really --

18         THE COURT:  Well, in the first instance it's

19    foundation.  I mean --

20         MR. WEINREB:  That's true, your Honor.  But I think

21    the item itself on its face is what it purports to be.  In

22    other words, there's been ample testimony from which the Court

23    can conclude that there were two explosions.  One occurred at

24    Scene A and then it was followed by one at Scene B.  And if one

25    watches the video and listens to the audio, you can hear the

1    first explosion in the distance, and then you can hear the

2    second one immediately at hand.  And the audio and the video

3    sync perfectly in the exhibit itself.

4              THE COURT:  All right.

5              MR. WEINREB:  At that point it's for the jury to

6    decide whether it's accurate or --

7              THE COURT:  Okay.  Assuming that you can lay the

8    foundation, you can have it.

9              MS. CLARKE:  One more thing on the videos now that the

10   Court's ruled.  I mean, yesterday the Court stopped Ms. Conrad

11   from narrating -- or asking the witness to narrate what the

12   video was showing.  We make the same request of the government

13   in these videos.

14             MR. WEINREB:  Well, there's not going to be any

15   narration of them once they're actually playing.  There will be

16   testimony about how they were -- what they are.

17             MS. CLARKE:  The government throughout has said, "And

18   what you're seeing now," "And what you're seeing now," and the

19   Court stopped Ms. Conrad --

20             THE COURT:  So in other words, as I understand it,

21   will the witness -- do you intend to have the witness say, "You

22   will see that Martin moves his arms momentarily"?

23             MR. WEINREB:  No.  No.  But I will add --

24             (There is an interruption in the proceedings.)

25             MR. WEINREB:  So we will be pausing the video and

1   asking, "Who is that?"  "Who is that?"  That's about the extent

2   of it.

3           THE COURT:  But the jurors will form their own

4   impression as to whether Martin is moving his arms or not?

5           MR. WEINREB:  Yes.  Yes.  No, obviously, I will

6   not ask her simply --

7           MS. CLARKE:  We object to that.  That's exactly what

8   Ms. Conrad was trying to do yesterday and wasn't permitted to

9   do.

10          MS. PELLEGRINI:  No, what Ms. Conrad was trying to do

11  yesterday was trying to have inferences drawn about the

12  defendant's --

13          THE COURT:  Well, no, the question was what the

14  witness thought was going on.  And what I'm hearing is you're

15  not going to have a witness say what the witness thinks is

16  going on.

17          MR. WEINREB:  No, no.  We're simply -- but she does

18  know who the individuals are.  She can recognize them.

19          THE COURT:  Oh, you mean to identify it as Martin?

20          MR. WEINREB:  Yeah.  Simply, "That's Martin Richard,

21  that's Denise Richard," that's whoever it is.  Yeah, she's met

22  all these people.

23          THE COURT:  I mean -- okay.

24          Any other admissibility issues?

25          MS. CLARKE:  Yes.

 1              Do you want to do the list?

 2              MR. BRUCK:  Well, we've made the objection to

 3    the -- the most recent iteration of these survivors'

 4    photographs.  We objected to a depiction of a couple hundred --

 5    or a very large number of injured people in relatively

 6    innocuous settings and fully clothed, and the government has

 7    now substituted photos of all 17 amputees displaying their

 8    prostheses or amputated limbs.  We think that for all of the

 9    reasons that we've consistently argued throughout, these are

10    irrelevant to any statutory aggravating factor, they are

11    inflammatory, they are cumulative.  Enough is enough.

12              The jury is going to sentence -- impose a capital

13    sentence to punish for these crimes.  As the evidence just gets

14    higher and higher and higher concerning victims that did not

15    die and are not the subject of capital counts.  And we just

16    think that we've long since passed the point and certainly

17    would pass it by any reckoning if these -- all of these

18    photographs of 17 amputees are introduced.

19              In addition, they -- we just learned that the

20    government proposes to offer them through the testimony of one

21    of the amputees talking about these people.  She knows them

22    all.  They're her friends.  And she has suffered with them and

23    endured great trauma with them.  It's victim impact testimony.

24    And so it's a way of enhancing the empathy and the emotion from

25    injuries which are not, in the final analysis, the subject of

1    this sentencing hearing.  So we think it's far more prejudicial

2    than probative.  It's really just time to focus on the subject

3    of this hearing.

4         MR. WEINREB:  So, your Honor, I'm somewhat mystified

5    as to why we keep being told that the subject of this hearing

6    is the sentencing of the four decedents.  Obviously it is, but

7    the government has alleged that the defendant's sentence should

8    be a death sentence because of various aggravating factors, and

9    the aggravating factors don't all necessarily relate just to

10   the four decedents.  On the contrary.  Many of them

11   specifically relate to people other than the decedents.

12        In the opposition that we filed last night, we noted

13   five separate aggravating factors to which these photographs

14   are relevant and probative:  three statutory aggravating

15   factors and two non-statutory aggravating factors.  To the

16   extent that Mr. Bruck's argument is that there's already been

17   evidence of them, that's not a dispositive objection.  The

18   question is not simply whether the aggravating factors exist or

19   not, but what weight they should be given in a weighing process

20   that the jury is about to begin.

21        One of the important aggravating factors in this case

22   was that the defendant terrorized an entire population by

23   committing the crimes in a particular manner, a manner

24   calculated to gratuitously disfigure the decedents' bodies.

25   And the evidence of what happened to people who did not die is

1    evidence of what he intended to do to the people who did die.

2          One of the things that made it terrifying was the

3    number of people who were affected by it who were seriously

4    damaged by it.  One of the things that made it a particularly

5    heinous crime was the grave risk of death to which he exposed

6    many people who did not actually die.

7          He picked the marathon as -- one of the aggravating

8    factors we've alleged was that he picked the marathon to commit

9    the crime because it was particularly susceptible to the active

10   effects of terrorism.  And all of these photos -- these photos

11   all go to that -- those aggravating factors.

12          It's true that of these 17 people, 12 of them have

13   testified, but five of them haven't.  And the 12 who testified,

14   I don't believe it is the case, as Mr. Bruck argued in his

15   motion, that the jury had ample opportunity to actually see

16   with their own eyes that these individuals now are fated to

17   live their lives with prosthetic limbs.  The jury's view of

18   them was blocked first by the people in the audience, then by

19   counsel and the tables that obscured -- or clips their view of

20   them, and then by the walls of the jury box itself.  The

21   purpose here -- and furthermore, they saw them interspersed

22   with other witnesses over the course of a seven-week

23   presentation of evidence.  The goal here is to emphasize a

24   particular point which is that this was an offense that

25   occurred that involved all of these people.

1          These pictures are -- were selected precisely to

2     minimize any prejudicial impact that they might have.  They are

3     pictures mostly of people smiling, showing their resilience, in

4     spots that are conducive to a belief among the jurors that they

5     still are capable of finding happiness in their lives.  It

6     basically just emphasizes to them the magnitude of the crime

7     without inflaming them, without being particularly emotional,

8     without seeking to arouse their passions.  And therefore, we

9     think that the probative value really does outweigh any danger

10    of unfair prejudice.

11          THE COURT:  Yeah.  No, I think they, among other

12    things, summarize points the government is entitled to make.

13    They are not themselves inflammatory except for the fact that

14    they show people with prosthetic limbs.  But I've looked at all

15    of them before this.

16          There is one minor issue.  I believe it's Kensky

17    appears twice.

18          MR. MELLIN:  Correct.  She's only going to appear

19    once, your Honor.  We've removed the other one.

20          THE COURT:  So she's only going to be in the one with

21    her husband?

22          MR. MELLIN:  She's going to be in the one with her

23    husband, correct.

24          MR. BRUCK:  There are a couple more things.  Does the

25    government still intend to put photographs of Martin Richard

1    in?  And the latest we were noticed of doing that through a

2    victim witness person who is -- does not appear on the

3    government's statutory witness list.

4            MR. WEINREB:  Right.  No, so we do intend to put in

5    several pictures of Martin Richard.  Just three of them.  They

6    were actually gotten by Michelle Gamble from the family.  So

7    she'll put them in.

8            THE COURT:  And what are they?

9            MR. WEINREB:  They are -- I actually have them

10   outside.  I don't know if I brought them with me.  But they're

11   just three.

12           MS. CLARKE:  I have the stack.  I don't know which

13   ones...

14           MR. WEINREB:  Okay.  This photo, this photo and this

15   photo.

16           THE COURT:  So 1605, '06 and '09?

17           MR. WEINREB:  That is correct.

18           MR. BRUCK:  This raises an issue of foundation, how

19   the FBI is in a position to put in family photos.

20           THE COURT:  Well, is Mrs. Richard not going to

21   testify?

22           MR. WEINREB:  She is not.  And the FBI asked the

23   Richard family for family photos and --

24           THE COURT:  I think the foundation will be adequate.

25   And three is not overdoing it.

1          MS. CONRAD:  May I see them?

2          THE COURT:  Is that the quality of them?

3          MR. WEINREB:  No, they're better.

4          MR. BRUCK:  Two more matters briefly.  The Court has

5     partially granted and partially denied our motion respecting

6     Dr. King, but we still don't have any real picture of what

7     Dr. King is going to testify to except in the most general

8     sense.

9          THE COURT:  Yeah, I'd like to hear it too.

10          MS. PELLEGRINI:  So Dr. King is going to testify in

11     the usual course of his background, his education.  He's a

12     trauma surgeon at MGH.  He's also a lieutenant colonel in the

13     Army.  And in that capacity he has been deployed overseas as a

14     combat surgeon.  And there, in Iraq and Afghanistan, he has

15     treated many victims who have been injured by IEDs.  And he's

16     going to talk about the general nature of those injuries and

17     what problems they cause with respect to the body, the pain

18     that is endured initially, and then what follows during a

19     recovery, if a person's, in fact, able to survive that.

20          Specifically, he will talk about the fact that on the

21     day of the marathon he was at Mass. General and he treated

22     several of our victims.  And specifically, Marc Fucarile and

23     Roseann Sdoia are two people that he will talk about, and about

24     the nature of the injuries, the grave risk of death, how close

25     they came to death, and the continuing problems that one has

1  with various things that have already been spoken to by

2  survivors but not actually explained, such as the deep vein

3  thrombosis, the blood clot filters, the compartment syndrome

4  that occurs, the risk of infection, and so on and so forth,

5  things that continue with respect to -- also to limb salvage

6  and what that means and when one harvested veins.

7       Secondly -- that relates to the grave -- I'm sorry --

8  the cruel, heinous and depraved nature.  He will talk about the

9  level of pain and what is required to relieve that.  How people

10 process that pain and the fact that -- with respect to the

11 three victims, to Martin Richard and to Lingzi Lu and to

12 Krystle Campbell, that they would not have died instantaneously

13 and they would have had time to feel pain.  And he'll speak

14 specifically to nature of the injuries.  He reviewed all the

15 autopsy reports.  There will not be any autopsy photos shown.

16 But he will talk to the nature of the injuries and how the body

17 would process the pain that would be felt by those injuries.

18      And the third general category is the fact that Martin

19 Richard was a vulnerable victim due to his youth and the

20 attendant small stature and the blood volume and that,

21 therefore, that caused the very nature of the injuries where,

22 in fact, his injuries were across the abdomen and the arm,

23 whereas others would be the leg, and how that made him more

24 vulnerable with respect to the more rapid blood loss that

25 caused death.

1          THE COURT:  There was a reference earlier to viewing

2     his clothing.

3          MS. PELLEGRINI:  I don't intend to do that.

4          THE COURT:  Good.

5          MS. PELLEGRINI:  I intend to use two photographs that

6     are already in evidence.

7          MR. BRUCK:  With respect to the military, there is

8     just no showing of a necessity to start describing wounds or

9     observations in Iraq and Afghanistan in order to explain his

10    testimony, so we just don't think that a discussion of the

11    details of IED wounds that he's learned overseas by observing

12    injuries to American troops is -- comes anywhere close to

13    satisfying the more relevant probative and prejudicial test of

14    the Federal Death Penalty Act.

15         THE COURT:  I gather you would not object to a general

16    assertion by him that he is familiar with the wounds caused by

17    IEDs, if that was it?

18         MR. BRUCK:  We object across the board, but if that

19    was it, that obviously would be far less prejudicial than what

20    Ms. Pellegrini has just described.

21         MS. PELLEGRINI:  Your Honor, I don't know how he could

22    explain how he's familiar with IEDs.  They don't often happen

23    here in the United States.

24         THE COURT:  Well, no, this should be very, very

25    limited testimony, it seems to me.  There's no flag waving.

1   So, yes, I mean, he could say he has experience as a surgeon in

2   those theaters and is, therefore, familiar with IEDs, but two

3   sentences will do it, it seems to me.  No description of

4   particular incidents, for example, or particular injuries he's

5   observed.  If it's unchallenged, his other professional

6   qualifications, it seems to me, are enough to vouch for his

7   subsequent opinions.

8           MR. BRUCK:  Now, this is the first time that we've

9   heard that he intends to testify about pain suffered by all

10  three of the deceased in the bombing.  In the expert witness

11  disclosure, it was -- only reference was made to Martin

12  Richard.  So this is not a matter that we were able to -- that

13  we've had any opportunity to explore with the defense forensic

14  pathologist that we have been consulting with about this very

15  issue.

16          In addition, as Ms. Pellegrini acknowledges, he did

17  not perform the autopsies, he did not see the bodies, he did

18  not treat any of these victims.  This is extrapolating,

19  theorizing in an area where I think any layperson realizes

20  there is wide variability.  Jeff Bauman said he felt no pain.

21  You know, maybe, maybe not, but simply to allow this trauma

22  surgeon to say, when we're dealing with victims who all bled to

23  death within seconds or a minute, it appears, that he thinks

24  that they must have suffered pain and this is why they suffered

25  pain and this is how the mechanism -- it is so speculative.  We

1   have no medical records from the two people he did treat, and

2   none of that was provided in discovery.  And, in fact, we found

3   out in the last two minutes who the actual victims that he

4   testified -- that he treated were.

5            Just to dump this all on us in the last minute given

6   the truly marginal relevance and the highly inflammatory and

7   prejudicial nature of this, this is just not fair.

8            THE COURT:  Well, as to the extrapolation, I think

9   that's a matter for weight rather than admissibility.  The jury

10  can assess whether -- I think that a person with his stated

11  qualifications would be able to extrapolate from autopsy

12  reports and so on, I think.  And how much the jury could credit

13  that would be up to them.  But what -- I'm interested in the

14  point about the disclosure of the other two victims as opposed

15  to Martin Richard being mentioned in the expert disclosures.

16           MS. PELLEGRINI:  I have to go look at our disclosure.

17           MR. WEINREB:  We don't have the medical records.

18  They're not in our possession, custody or control.

19           MS. PELLEGRINI:  This is more a general if you get

20  your leg blown off you don't die instantly and you feel pain.

21           THE COURT:  Is this generally rather than about

22  Krystle Marie Campbell particularly?

23           MS. PELLEGRINI:  I mean, he knows what happened to her

24  because he's also reviewed her autopsy report.

25           THE COURT:  Well, it's not a question of whether he

1   has a professional basis, it's a question of whether it's a

2   surprise that he would be offering an opinion about those two

3   as well as Richard, which was identified in the report.  That's

4   the --

5        MR. BRUCK:  I can assure the Court, I've read this

6   many, many times, it's not in the expert disclosure.

7        THE COURT:  If that's the case, then I don't think he

8   should include those.  Now, if there's general testimony about

9   injuries, that's a different matter.  That's within his scope.

10  But he can't tie it to them particularly.

11       MS. PELLEGRINI:  It would be because it still goes

12  under the grave risk of death as relating to what -- people who

13  have their limbs blown off.

14       THE COURT:  All right.

15       MR. WEINREB:  Your Honor, I have a brief motion in

16  limine in particular given counsel's question about the ability

17  of Michelle Gamble to authenticate these pictures from the

18  Richard family.  As the Court probably knows from reading the

19  news, that the Richard family has publicly stated their

20  opposition to a penalty phase in the case where the death

21  penalty would not be carried out swiftly and surely, the

22  government's motion is that the defense not seek through

23  Ms. Gamble to try to offer any testimony about the Richard

24  family's views or willingness to participate in this phase of

25  the case which is not a relevant matter for the jury to

1    consider.

2           THE COURT:  Is there any intention to do that?

3           MS. CONRAD:  No.

4           MR. BRUCK:  No.

5           MS. CLARKE:  We do have a concern about victim impact

6    being put in through an FBI official.  She may not be an agent

7    but she works for the FBI, and that seems inappropriate.  If

8    the Richard family, in fact, did not want to participate in the

9    penalty phase, an FBI official shouldn't be permitted to put in

10   victim impact that they themselves did not want introduced.

11          THE COURT:  I don't think that's a principle I would

12   endorse, that they couldn't do it in this phase where the rules

13   of evidence are relaxed.  If the photos can warrantably be

14   found to be what they say they are, then I think they're

15   admissible.

16          MR. BRUCK:  One last point of record-keeping very

17   briefly.  We wanted to put on the record that during

18   Ms. Pellegrini's opening statement, she displayed the cell

19   block photograph in what appeared to be a 4-by-3 foot blowup

20   between equally large blowup photograph displays of all four of

21   the homicide victims of this case on easels directly in front

22   of the jury, so it's our view that the prejudicial effect of

23   what we think was an out of context and, therefore, quite

24   distorted still from the cell block was greatly enhanced and

25   its inflammatory effect was greatly enhanced by its

1    juxtaposition between these very attractive and touching

2    photographs of the victims in life.  And I wanted the record

3    simply to reflect that that was, in fact, the way that all

4    three -- the cell block video and the victim photographs were

5    displayed at the end of the closing -- of the opening

6    statement.

7         MS. CLARKE:  Your Honor, one last thing on Dr. King:

8    There was some mention of having treated two victims, and I

9    think we got that kind of blurred up with testimony about the

10   three deceased victims, but we have received no reports by

11   Dr. King or medical records of those two people; in fact, as

12   Mr. Bruck said, we just learned that he was going to testify

13   about them minutes ago.

14        MR. WEINREB:  So that's the two to whom I was

15   referring when I said those records are not in our possession,

16   custody or control.  So he treated them in the course of his

17   ordinary work at the hospital on that day, not as an expert for

18   us who was providing records.

19        THE COURT:  Is he going to describe the treatment of

20   them in particular?

21        MS. PELLEGRINI:  Not specifically the treatment but as

22   it relates to -- of course Marc hasn't testified yet, but as it

23   relates to, for example, with Roseann's injuries that she has

24   already testified about and which there is photographic

25   evidence of, how that relates to grave risk of death, what

1    really occurs with the body when something like this happens

2    and all of the attendant physical problems that can arise from

3    that relating to the continuing risk that occurs from such an

4    injury.

5         So that's -- there are various things he's going to

6    testify to that victims have already mentioned.  So we're going

7    to cover, for example, the deep vein thrombosis I mentioned and

8    things like that so there's a complete understanding for the

9    jury what that actually means.

10        MS. CONRAD:  Was there notice on that?

11        MR. BRUCK:  No.

12        MS. CLARKE:  No.

13        MS. PELLEGRINI:  Well, there is notice on the grave

14   risk of death.

15        MS. CONRAD:  No, of Dr. King.

16        MR. BRUCK:  Dr. King being an expert testifying on the

17   basis of his treatment of these particular defendants.  Again,

18   this is a victim -- again, this is the first we've heard of it.

19        MS. PELLEGRINI:  It's his basis of treatment.

20        THE COURT:  I'll have to look at the disclosure.  Do

21   you have it handy?

22        MS. PELLEGRINI:  I do have it out in the courtroom.

23        THE COURT:  All right.  I'll have to look at it.

24        Okay.  So yesterday's list is still accurate?

25   Fucarile, Abbott, King, Wolfenden, Gamble?

```
 1              MR. MELLIN:  Yes, with a change in the order, though,
 2      your Honor.  It's going to be Fucarile, Abbott, Gamble, King
 3      and then Wolfenden.
 4              MS. CONRAD:  Can you say that again?  Fucarile,
 5      Abbott, King, Gamble?
 6              MR. MELLIN:  No, Gamble before King.  Gamble, King,
 7      Wolfenden.
 8              MS. PELLEGRINI:  No, I'm sorry.  That can't be right.
 9      We have to put Michelle on after the break.
10              MR. WEINREB:  So it will be Fucarile, Abbott, King,
11      Gamble, Wolfenden.
12              MR. CHAKRAVARTY:  And a brief break before Gamble,
13      which may be the natural break.
14              THE COURT:  Time estimate, just general, just so I --
15              MR. WEINREB:  At this point, I think we'll probably
16      make it to the lunch break.
17              THE COURT:  But not beyond that?
18              MR. WEINREB:  I doubt it.
19              THE COURT:  Okay.  All right.  Thank you.
20              (The proceedings adjourned at 9:43 a.m.)
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  1/7/16
13

14

15

16

17

18

19

20

21

22

23

24

25