UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10200-GAO

UNITED STATES OF AMERICA,

v.

DZHOKHAR A. TSARNAEV,
Defendant.

OPINION AND ORDER
January 15, 2016

O'TOOLE, D.J.

Dzhokhar Tsarnaev was tried on a thirty-count indictment arising out of the bombings at

the Boston Marathon on April 15, 2013. Jury selection for his trial began January 5, 2015. On

April 8, 2015, the jury returned a verdict in the first phase of his capital trial finding him guilty

under all counts. The maximum penalty for seventeen of the crimes was death. On May 15, 2015,

the jury returned its verdict in the second phase of the trial, deciding that the death penalty should

be imposed on six of the seventeen capital counts, but not on the other eleven. On June 24, 2015,

the Court sentenced the defendant to death on those six counts in accordance with the jury's verdict

and to various terms of imprisonment on the remaining counts.

On July 6, 2015, the defendant moved for a new trial in the interests of justice pursuant to

Federal Rule of Criminal Procedure 33 and, in the alternative, for judgment of acquittal pursuant

to Federal Rule of Criminal Procedure 29. In his motion, he reiterates some grounds for such relief

that he had previously raised before or during trial. As to those grounds that are repeated from

prior written or oral motions, both aspects of the present motion are denied for the same reasons

the prior motions were denied. As to most of them, no further discussion is necessary; the issues are preserved for the defendant on appeal.

He repeats his objection to trial in this District, and the reasons for denying his renewed attack on venue are discussed below.

Lastly, he argues that all of his convictions under 18 U.S.C. § 924(c) for carrying a firearm during and in relation to a crime of violence must be vacated. His argument is based first on issues he claims arise from the Supreme Court's decision, issued days after he was formally sentenced, declaring a portion of the Armed Career Criminal Act unconstitutionally vague. See Johnson v. United States, 135 S. Ct. 2551 (2015). He also argues that his § 924(c) convictions must be set aside because it cannot properly be determined whether the various underlying crimes were "crime[s] of violence" in the necessary sense.

The Court permitted an extended briefing schedule and, after oral argument on a portion of the defendant's motion, allowed the parties to file supplemental memoranda. This Opinion and Order resolves the issues raised by the post-trial motion.

## I.      Venue

The issue of venue has been previously litigated in this case and extensively addressed in opinions of this Court and of the Court of Appeals. The defendant now again renews his venue argument, contending generally that local media coverage, local events, and information or postings on social networks during the course of the trial should raise a presumption of prejudice[1] and require a conclusion that the District of Massachusetts was an improper venue for his trial. The defendant's opening brief contains only limited references to legal authority, but he appears

---

[1] Notably, he does not argue that there was actual prejudice. (See Reply to Gov't's Opp'n to Mot. for J. Notwithstanding Verdict and for New Trial at 1-2 (dkt. no. 1589).)

to be raising the claim under both the Sixth Amendment to the Constitution and Federal Rule of Criminal Procedure 21(a), although he does not distinguish between them.

In Skilling v. United States, the Supreme Court identified four factors generally relevant to a determination whether a presumption of prejudice should be indulged: (1) the size and characteristics of the community in which the crime occurred; (2) the nature of the publicity surrounding the case; (3) the time between the crime and the trial; and (4) whether the jury's decision indicated bias. 561 U.S. 358, 382-84 (2010); see also United States v. Casellas-Toro, 807 F.3d 380, 386 (1st Cir. 2015); In re Tsarnaev, 780 F.3d 14, 20-21 (1st Cir. 2015) (per curiam).[2] The defendant does not expressly articulate a legal framework for analyzing his claim, but it appears he seeks to advance an argument related primarily to the second and third factors. For the sake of completeness, in this post-trial analysis I will address all four Skilling factors.

A.     Size and Characteristics of the Community

As has been previously described, see In re Tsarnaev, 780 F.3d at 21; United States v. Tsarnaev, Cr. No. 13-10200-GAO, 2014 WL 4823882, at *2 (D. Mass. Sept. 24, 2014), Boston is located in a large, diverse metropolitan area. The geographic region from which the jury was drawn, the Eastern Division of the District of Massachusetts, includes about five million people living not

---

[2] Some case law suggests that the number or percentage of jurors excused could be relevant to the inquiry. See, e.g., Casellas-Toro, 807 F.3d at 389 (citing cases regarding percentages of potential jurors excused for cause). The defendant does not make that argument here. Such a metric would not reliably assess the extent of any potential juror prejudice in this case. A very large number of jurors were excused because of the personal hardship they would endure if required to serve on the protracted trial. Another significant cohort of excused prospective jurors included those whose firmly held beliefs about the death penalty in general, and not about this case in particular, disqualified them under applicable law. Additionally, the Court was deferential to the parties' joint agreements about for-cause excusals of particular jurors, which appeared at least sometimes to be based on negotiations about those prospective jurors' general death penalty views. In light of these facts, the percentage of jurors excused would be an unreliable—indeed plainly inaccurate—proxy for the extent of any potential juror bias against the defendant.

just in Boston, but also in smaller cities and towns, encompassing urban, suburban, rural, and coastal communities.[3] Residents in the area obtain their daily news from a variety of sources. In re Tsarnaev, 780 F.3d at 21. In light of these facts, this factor weighs against a finding of presumed prejudice. Compare Skilling, 561 U.S. at 382 (stating that "large, diverse pool" of approximately 4.5 million eligible jurors in Houston area made the "suggestion that 12 impartial jurors could not be empaneled . . . hard to sustain"), and United States v. Yousef, No. S12 93 CR. 180 (KTD), 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997) (noting in pre-Skilling case that the district was one of the "largest and most diverse in the country" (quoting United States v. Salameh, No. S5 93 Cr. 0180 (KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993))), with Rideau v. Louisiana, 373 U.S. 723 (1963) (remarking that community where the crime occurred was a small parish of only 150,000 people), and Casellas-Toro, 807 F.3d at 386-87 (explaining district court acknowledgement that, although Puerto Rico has a population of 3 million people, a fact tending to mitigate the potential for prejudice, Puerto Rico is "a compact, insular community . . . highly susceptible to the impact of local media" (citation omitted)).

    **B.**    Nature of the Publicity

The main basis for the defendant's motion appears to be the extent and nature of the publicity concerning the case itself and the events at issue in it. In his post-trial motion, he focuses largely on media coverage concerning observances of the anniversary of the bombings, the 2015 Boston Marathon itself, and publicity about victims; coverage of foreign family witnesses; physical surroundings of the courthouse; and social media.[4]

---

[3] The residences of the empaneled jury reflect this geographic diversity.

[4] The defendant submitted two compact discs containing voluminous materials purportedly in support of his post-trial motion. In the Scheduling Order regarding post-trial motions, the parties were directed to include in their post-trial briefs "specific and detailed citations to the record and appropriate legal authority." (May 28, 2015 Scheduling Order at 2 (dkt. no. 1449).) To the extent

i.      *Marathon-related media coverage*

The defendant relies heavily on local marathon-related media coverage. It is certainly true that the local media gave substantial coverage to the anniversary of the bombings, its victims, and the 2015 marathon. What the defendant disregards, however, is the national—and international—interest in those same events and people. This was not a crime that was unknown outside of Boston. To the contrary, media coverage of the bombings when they occurred was broadcast live around the world over the Internet and on television. Contrast Casellas-Toro, 807 F.3d at 388 (noting that defendant "would be relatively unknown outside of Puerto Rico"). The defendant's own pretrial poll, for instance, show that even in his preferred venue, Washington, D.C., those polled overwhelmingly were familiar with the bombings.[5] (Reply to Gov't's Opp'n to Def.'s Mot. for Change of Venue and Submission of Supp. Material in Supp. Ex. 4F at 4 (dkt. no. 461-23)); see also In re Tsarnaev, 780 F.3d at 16 (96.5% of survey respondents).

Nor did the crime affect an event about which only Bostonians are concerned. Although the Boston Marathon is an important event in the city and region, it is also an iconic event known worldwide. According to testimony by the executive director of the Boston Athletic Association,

_____

there is material on the compact discs that is not expressly referred to by the defendant in his briefing, I decline to comb through uncited materials in order to locate what I might conclude the defendant would regard as relevant portions and then try to connect them to his legal arguments; that is a party's responsibility. (See, e.g., Mem. in Supp. of Mot. for J. Notwithstanding Verdict and for New Trial at 3 (dkt. no. 1506) ("A sample of . . . additional information is summarized . . . ."); id. ("Supporting materials—including those expressly mentioned in this [m]emorandum as well as many others—have been compiled . . . .").) Therefore, I generally limit discussion and consideration of the exhibits that were actually referenced by the defendant in his post-trial motion, as required by the Scheduling Order.

[5] Similarly, 86.1% of Washington D.C. survey respondents in the defendant's pretrial poll indicated that "[b]ased on what [they had] read, seen or heard about the case," they "believe[d] Dzhokhar Tsarnaev was" either "definitely" or "probably" guilty. (Reply to Gov't's Opp'n to Def.'s Mot. for Change of Venue and Submission of Supplemental Material in Supp. Ex. 4F at 5) (dkt. no. 461-23).)

the organization which hosts the Boston Marathon, the race was originally known as "America's Marathon." (Mar. 4, 2015 Tr. of Jury Trial – Day Twenty-Seven at 69 (dkt. no. 1528).) Because "it is the only marathon outside of the Olympic Games and the world championships for which one needs to qualify in order to run, . . . it's an aspiration for a great many people." (Id. at 68.) It "attracts some of the finest competitors in the world." (Id. at 70.) The approximately 27,000 registered runners come from all 50 states and many countries. (Id. at 68, 75.) At least 40% of them are from "outside Massachusetts and New England." (Id. at 75.) Similarly, spectators include not only people from the Boston area but also many visitors from elsewhere, coming to watch friends and family members participating in the race. (Id. at 73.) Like the Olympic Games, the event receives worldwide media coverage. In recent years, approximately 1,000 media credentials have been issued to representatives of about 80 registered news organizations. (Id. at 80.) The marathon is broadcast live locally, nationally, and internationally to about 20 countries, and it is also live-streamed over the Internet. (Id. at 80-81.)

Not surprisingly, then, the pretrial and trial proceedings were covered not only locally but also nationally and internationally. National and international news outlets comprised approximately two-thirds of the media organizations that requested one of the thirty seats reserved for media in the trial courtroom and more than one-half of the media organizations that were ultimately assigned a seat or rotating seat there. Many others followed the proceedings from overflow rooms in the courthouse. Newspapers around the world closely followed the trial as it unfolded, both in their print editions and on the Internet, focusing not just on the more significant trial events like opening statements and closing arguments, but even on the more particular aspects

of the legal process.[6] There is no reason to think—and certainly no specific evidence—that this extensive coverage would have been any different in kind or degree if the trial had been conducted elsewhere.

Moreover, there is no reason to think that if the trial had been moved to another district, the local media in that district would not also have given it attentive coverage. What was first a national story would have become a local story in that venue. It surely is not plausible to believe that if the trial had been moved to the District of Columbia, as the defendant sought, the Washington Post, which covered the trial as a national story, would have ignored it as a local one, and residents of the vicinage from which jurors would have been drawn would have been exposed to that local, as well as national, reporting. In this case, that would likely have been inevitable wherever the trial was held.

I also disagree with the defendant's implicit assertion that the local coverage of the trial was prejudicial to him simply because there was coverage. Not only was the coverage generally factual in nature, rather than inflammatory, but with regard to the appropriate punishment for his crimes much of it skewed in the defendant's favor.[7] For example, as trial proceeded, media coverage regarding the appropriate punishment suggested a growing disapproval of the imposition of the death penalty by residents in the Boston area. One poll released by Boston's National Public

---

[6] For example, a graphics editor from the Washington Post, the most widely circulated newspaper published in the defendant's preferred venue, chronicled the end of the guilt phase and the entirety of the penalty phase of the trial in blogs and courtroom sketches. Richard Johnson, The Tsarnaev Trial: Drawing a Line, Washington Post, http://wapo.st/Tsarnaev (last updated May 15, 2015).

[7] Although it was not evident at the time the pretrial motions to change venue were briefed and decided, in the trial itself the potential for unfair prejudice from media coverage was as a practical matter confined to the question of punishment, not guilt. Any possibility of unfair prejudice with respect to whether the defendant was guilty of the crimes charged was effectively and dramatically overborne by his counsel's opening statement in the guilt phase, acknowledging, "It was him." See infra at 19.

Radio news station in March showed that the death penalty was not a popular choice in the community. Zeninjor Enwemeka, <u>WBUR Poll: Most in Boston Think Tsarnaev Should Get Life in Prison over Death Penalty</u>, WBUR News, Mar. 23, 2015, http://www.wbur.org/2015/03/23/wbur-poll-tsarnaev-death-penalty-life-in-prison (27% in Boston and 38% in Boston area favored execution as penalty). According to a later poll, the percentage of poll respondents in favor of a death sentence for the defendant decreased slightly as the case proceeded to the penalty phase. Asma Khalid, <u>Death Penalty for Tsarnaev Increasingly Unpopular, WBUR Poll Finds</u>, WBUR News, Apr. 16, 2015, http://www.wbur.org/2015/04/16/tsarnaev-death-penalty-poll-wbur (26% in Boston and 31% in Boston area favored execution). As the penalty phase continued, a poll conducted by the Boston Globe indicated that support for the imposition of the death penalty had declined further. Evan Allen, <u>Few Favor Death for Tsarnaev, Poll Finds</u>, Bos. Globe, Apr. 27, 2015, at A (15% in Boston and 19% in Massachusetts favored execution).

Both local and national media reported on statements of victims' family members, elected officials, religious leaders, and other organizations opposing the imposition of the death penalty for the defendant's crimes. For example, during the penalty phase of the trial, the parents of Martin Richard, the eight-year old boy killed by the bomb placed by the defendant, urged the prosecution not to pursue imposition of the death penalty in a letter published on the front page of the Boston Globe. Bill and Denise Richard, <u>To End the Anguish, Drop the Death Penalty</u>, Bos. Globe, Apr. 17, 2015, at A. The media also reported statements by two amputee victims and a social media post by the sister of Sean Collier, the police officer killed in the aftermath of the bombings, conveying their opposition to the imposition of the death penalty in this case. Eric Moskowitz, <u>2 More Oppose Death for Tsarnaev</u>, Bos. Globe, Apr. 20, 2015, at B; John R. Ellement, <u>Victim's</u>

Sister Still Against Death Penalty, Bos. Globe, Apr. 14, 2015, at B. There were published reports of similar statements by the Massachusetts Attorney General, both United States Senators, a local bar association, area Catholic leaders, veterans, and others. See, e.g., David Scharfenberg, Most Top Lawmakers Oppose Execution in Bombing Case, Bos. Globe, Apr. 10, 2015, at A; Associated Press, AG Healey: Marathon Bomber Should Spend Rest of Life in Jail, Bos. Herald, Apr. 8, 2015, http://www.bostonherald.com/news_opinion/local_coverage/2015/04/ag_healey_marathon_bom ber_should_spend_rest_of_life_in_jail; Bob Oakes, Why the Boston Bar Association Wants the Death Penalty Removed from Tsarnaev Trial, WBUR News, Feb. 25, 2015, http://www.wbur.org/2015/02/25/why-boston-bar-opposes-death-penalty-tsarnaev; Cardinal Seán P. O'Malley, Letter, Bishops Oppose Death Penalty, Taunton Daily Gazette, Apr. 10, 2015, at A4; Danny McDonald, Vets for Peace: Spare Tsarnaev, Metro – Bos., Apr. 21, 2015. Shortly before the jury began deliberations in the penalty phase, an anti-death penalty forum on the topic "Beyond the Death Penalty: A Public Conversation with Family Members of Murdered Victims," sponsored mostly by local organizations opposing capital punishment, was held in Boston. Juan Esteban Cajigas Jimenez, As Tsarnaev Trial Nears End, Death-Penalty Opponents Address Forum, Bos. Globe, May 12, 2015, at A. No doubt, these expressions were directed to the prosecution team in an effort to persuade the government to abandon its pursuit of the death penalty. The point to be made is that, even if the trial jurors saw and absorbed the extensive media coverage during the penalty phase, and I have no evidence whatsoever to believe that they did (and do have their repeated assurances to me that they did not), the coverage was not of a nature that would support a conclusion—or even a justifiable presumption—that the defendant was unfairly prejudiced by such exposure.

In sum, the extensive coverage of the trial was not limited to this District. Contrast Casellas-Toro, 807 F.3d at 388. Consequently, moving the trial to another venue would not likely have eliminated or even substantially reduced the coverage. Furthermore, the media coverage of the trial as it unfolded was not demonstrably prejudicial to the defendant. And finally, the jurors gave repeated assurances that they were avoiding media reports about the case.[8]

####        ii.            *"Media Circus" over Foreign Witnesses*

The defendant complains about media coverage of the arrival and lodging of several witnesses who traveled from overseas to the United States with the government's assistance and pursuant in part to a court order. It is unclear how the circumstances of the travel and lodging of the foreign witnesses contribute to the defendant's venue arguments. The defendant describes a "media circus" surrounding the witnesses, but he does not suggest either that the jurors were at all aware of the so-called "circus"—there is no information suggesting that they were—or that it disrupted the court proceedings in any way.

As to court proceedings more broadly, it is an obvious fact but it bears emphasizing that throughout the trial, the atmosphere within the trial courtroom itself was quite solemn and essentially undisturbed by interruption throughout the trial proceedings. Prior to trial, I issued a Decorum Order governing trial conduct and prohibiting observers from any contact with jurors or depictions of them or reports of their names. (Decorum Order at 1-5 (dkt. no. 879).) The defendant does not contend that the Order was violated either by the media or general public.

---

[8] The defendant's present motion focuses on the media attention during trial. Of course, in denying the previous motions for a change of venue, I made the same conclusions about pretrial publicity that came after the flurry of initial news reports—that is, while extensive, it subsided somewhat in the time period between the crimes and trial, was largely sober and factual, and was not in any substantial degree inflammatory.

For those who were not present, a brief description of the courtroom may be helpful. About thirty seats in the gallery were reserved for media representatives, who were able to take notes but not photograph or record the proceedings. The remaining seats, numbering about eighty, were reserved for the defense and government teams, the defendant's family and supporters, victims and their advocates, law enforcement personnel, and members of the general public. There were no substantial disruptions of any kind; proper decorum was observed by all in attendance. There is no reason at all to believe the sitting jurors could have been affected in any way by the presence or deportment of the people in the gallery, except, perhaps, to be impressed by their good behavior.[9] Contrast Sheppard v. Maxwell, 384 U.S. 333, 353, 355, 358 (1966) (noting that "bedlam reigned at the courthouse during the trial and newsman took over practically the entire courtroom," thrusting jurors "into the role of celebrities" and creating a "carnival atmosphere"); Estes v. Texas, 381 U.S. 532, 536 (1965) (describing how reporters and television crews overran the courtroom with "considerable disruption" so as to deny the defendant the "judicial serenity and calm to which [he] was entitled").

Outside the courthouse, reporters and cameras were organized in an orderly way so that they could report on the comings and goings of various trial participants, including the foreign witnesses. On most days, a small number of people demonstrated against the death penalty and, on occasion, individuals demonstrated in general support of the defendant. Except that a relatively

---

[9] The Decorum Order also prohibited observers in the trial courtroom and overflow locations from "wear[ing] or carry[ing] any clothing, buttons, or other items that carry any message or symbol addressing the issues related to this case that may be or become visible to the jury," including law enforcement uniforms and badges. (Decorum Order at 2-3.)

large number of people were positioned outside the entrance to the courthouse, there was to my knowledge nothing approaching a "circus" atmosphere.[10]

In any event, the jurors did not enter the courthouse through the main entrance. Rather, they assembled at a remote location and travelled together by van directly into the garage of the building, bypassing the front and side doors to the courthouse. So even if there were some legitimate concern about the number of people at the front entrance, which I do not share, the jurors were not exposed to it in any significant way. Similarly, when they were not in the trial courtroom, jurors were in limited access space behind the courtroom where the media and other members of the general public are not permitted. (See Jury Management and Transportation Order at 1-3 (dkt. no. 1113) (under seal).) After they were seated and sworn, the jurors were never in the public spaces of the courthouse where they might have observed either media representatives or members of the public.

I am fully satisfied that the Decorum Order was effectively implemented and observed. Within and around the courthouse, the defendant was not deprived of the solemnity and sobriety to which he was entitled.

   *iii.*   *Physical Surroundings of Courthouse*

The defendant next argues that jurors could not have avoided exposure to various events and publicity about the marathon and related issues, including such things as "Boston Strong"

---

[10] The United States Marshals Service and other officers kept me informed about any issues possibly touching on security or public order. I am aware that over the whole length of the trial from January through mid-May, there were only a few occasions when a member of the general public present in the public spaces of the courthouse (not the courtroom itself) had to be reprimanded and warned by security personnel to observe proper decorum. To the best of my information, that is the full extent of anything that could remotely be called "disruption" in the courthouse. The jury was not exposed to any of those minor incidents.

signs and paraphernalia both in the vicinity of the courthouse and in other public places.[11] The defendant offers various photographs of things he claims the jurors might have been exposed to, but there really is no way to tell whether that happened during the trial or not, or if it happened, how much and to what extent.[12] We know, of course, that before they were jurors, they were people in the area who were aware of the events of the bombings and the aftermath. We know they had heard the term "Boston Strong" because we asked them about it in their written questionnaire and in their face-to-face *voir dire*. They were ultimately seated because I was satisfied that any prior exposure to such images or materials would not prevent their faithful performance of their duty to be impartial and fair-minded.

Between the verdict in the guilt phase and the commencement of the penalty phase, there was significant publicity about the 2015 running of the marathon, as well as various events commemorating the second anniversary of the bombings. By that time, the jurors had been advised recurrently to avoid all media accounts of the subject matter of the case, as well as publicity about events concerning the 2015 marathon. (See, e.g., Jan. 5, 2015 Tr. of Jury Trial – Day One – A.M. Session at 11-12 (dkt. no. 1512); Mar. 4, 2015 Tr. of Jury Trial – Day Twenty-Seven at 12-13, 189

---

[11] The Boston Strong theme is (or was) "about civic resilience and recovery. It is not about whether [the defendant] is guilty or not of the crimes charged" or about what kind of sentence he should receive if he were found guilty. In re Tsarnaev, 780 F.3d at 25 n.13. While the term, drawing from a history of similar slogans, appears to have arisen in the aftermath of the marathon bombings, that association weakened somewhat over time through overuse, particularly as people and companies coopted the term, often for profit. The defendant's materials showing Boston Strong merchandise sold at the airport alongside Red Sox hats, magazines, candy, and stuffed animals underscore this point. (See Mem. in Supp. of Mot. for J. Nothwithstanding Verdict and for New Trial Ex. A "Photos Collected By Defense Team" (dkt. no. 1509-1) (under seal).)

[12] For example, a banner hanging at a hotel across from the courthouse would not have been visible at the entrance used by the jurors or from their jury room, which faced only a large commercial building on the opposite side of the courthouse. Similarly, the cement truck referenced by the defendant in his brief was within a construction site bordered by a tall enclosure (See Fourth Mot. for Change of Venue Ex. A at 2 (dkt. no. 1108-1) (photograph taken from above on February 12, 2015, a day on which no empaneled juror attended court).)

(dkt. no. 1528); Apr. 6, 2015 Tr. of Lobby Conference at 3-21 (dkt. no. 1541) (under seal); Apr.

14, 2015 Tr. of Jury Trial – Day Forty-Six at 3-7 (dkt. no. 1287); Apr. 21, 2015 Tr. of Jury Trial –

Day Forty-Seven at 5, 137 (dkt. no. 1603); May 13, 2015 Tr. of Jury Trial – Day Fifty-Nine at 4,

183-84 (dkt. no. 1418).) Not only are jurors presumed to follow a court's instructions, but the

jurors in this case continually affirmed their adherence to my repeated instructions. Specifically,

before the guilt phase case was submitted to them, I interviewed each juror individually *in camera*

to inquire whether he or she had faithfully abided by my instructions to avoid media coverage and

private conversations concerning the case. They all assured me that they had. (Apr. 6, 2015 Tr. of

Lobby Conference at 3-21.) Between their verdict in the guilt phase and the commencement of the

penalty phase, on April 14, 2015, we had a short session in open court the main purpose of which

was to strongly instruct the jurors to avoid media coverage of the upcoming marathon and any

related events. (Apr. 14, 2015 Tr. of Jury Trial – Day Forty-Six at 3-7.) When they returned the

following week to begin the penalty phase, I asked them collectively, as I had generally done

throughout the trial, whether they had continued to abide by my instructions to avoid extraneous

influences. They affirmed their adherence. At the times of these inquiries, the defendant made no

objection nor request for any further follow-up inquiry.[13]

Moreover, in addition to sights and images which may have been sympathetic to victims

or associated with the marathon, there were also sights and images with messages friendly to the

---

[13] It is also significant that by the time of the anniversary of the bombings, the jurors had been immersed in the trial evidence for weeks, and had heard testimony from almost 100 witnesses and seen over 1,000 exhibits. The jurors themselves were so "saturated" with the actual evidence at trial by that point that passing glimpses of media reports or other physical images would have been inconsequential. As one alternate juror observed when asked about his compliance with the Court's instructions to avoid media: "[I]f there's anything on, I just walk away. There's nothing—I didn't see any point. There's nothing that I could absolutely hear about this. I mean, what's the point? . . . I'm an eyewitness." (Apr. 6, 2015 Tr. of Lobby Conference at 19.)

defendant's interests, including the presence and signs of death penalty opponents who peacefully protested every day of trial near the front entrance to the courthouse and occasionally distributed leaflets. Their signs included messages such as, "Death penalty is murder," "Capital punishment dehumanizes us all," "Blessed are the merciful," "Mercy, not sacrifice," and "Why do we kill people to show that killing people is wrong?" See, e.g., Shira Schoenberg, Anti-Death Penalty Advocates Maintain Presence Outside Dzhokhar Tsarnaev Trial, Masslive.com, Apr. 30, 2015, http://www.masslive.com/news/boston/index.ssf/2015/04/anti-death_penalty_advocates_maintain_presence_dzhokhar_tsarnaev_trial.html;   Philip   Marcelo, Death   Penalty   Protest   Resumes,   N.H.   Gazette,   Apr.   21,   2015, http://www.gazettenet.com/home/16604387-95/death-penalty-protest-resumes. Again, of course, because the jurors did not pass through the front entrance, any exposure to the signs would have been minimal at most, if it occurred at all.

    *iv.*       *Social Media*

The defendant also argues that the jurors should be presumed to have been prejudiced because of social media activity, primarily by uninvolved third-parties.[14] As an initial matter, I consider the argument largely waived. Most of the evidence cited by the defendant was available to him during the course of the trial and he had ample opportunity to raise any such issue while the proceedings were ongoing. (See, e.g., Apr. 6, 2015 Tr. of Lobby Conference at 3-22 (questioning each juror individually prior to the close of the guilt phase regarding their adherence

---

[14] In support of his claim of presumptive prejudice, the defendant also cites some limited social media activity by the jurors, but he does not contend that the jurors were actually prejudiced, nor that they engaged in any misconduct. (See Reply to Gov't's Opp'n to Mot. for J. Notwithstanding Verdict and for New Trial at 2).) The defendant utilizes the jury's social networks as his sample, but he appears to dismiss as irrelevant whether any jurors actually saw any of the cited material. (See id. at 5-7.)

to the Court's instructions without any objections or requests for follow-up from counsel); May 13, 2015 Tr. of Lobby Conference at 11-12 (dkt. no. 1510) (under seal) (raising explicitly with counsel, prior to close of penalty phase, whether there was any issue regarding jurors' use of social media).) In light of the evident effort the defendant expended on social network research during jury selection and the nature of his venue objection, it strains credulity to suggest that no one on the defense team could follow—or actually was following—the jury's social media activity during the course of the proceedings.[15]

In any event, the defendant's claims regarding social media "saturation" are overblown. The defendant describes social media activity during the trial to argue that the jurors' accounts were "saturated" by social media activity he labels "inflammatory." But much of the activity is not "inflammatory" in any sense of the word, and the defendant provides no context by which to measure the "saturation." The government's analysis, which assumes that the jury's "friends"[16] each generated one "story"[17] per day, suggests that the cited activity was merely a small fraction of all stories that may have appeared in any particular "news feed" on any particular day. Although the government's calculation may both overvalue and undervalue the total number of "stories" generated by the activity of any particular user, it does reflect what we already know from this

---

[15] Indeed, the data in the file "Name" and "Date Modified" fields for many of the submitted files suggest that files were created during the trial. The same is true for Facebook's timestamps of some of the posts included as exhibits.

[16] The parties uses the term "friend" to describe a connection on Facebook. Of course, the term does not actually suggest a real-world relationship. Over a billion people use Facebook and connect with other users as "friends." Some may be friends in the traditional sense, but others are no more than acquaintances or contacts or in some cases may even be complete strangers.

[17] A "story" might include a post with a status update or other textual remark, photo, video, or hyperlink; app activity; "likes" from other people and groups with whom a user may be connected; and other social networking activity. When a Facebook user takes one of these actions, Facebook generates a "story" which then *may* appear on the constantly-updating "news feeds" of their "friends." (See Opp'n to Def.'s Mot. for J. Notwithstanding the Verdict and for New Trial at 8-11 (dkt. no. 1542); see id. Ex. A at 1-22 (dkt. no. 1542-1).)

case's history: the selective citation of data does not always accurately represent the whole. See, e.g., In re Tsarnaev, 780 F.3d at 21 (describing defendant's selective quotations from jury questionnaires as "misleading").

C.      Time Between Crime and Trial

Nearly two years passed in between the marathon bombings and the presentation of evidence in the trial. The trial did not swiftly follow the crimes or contemporaneous reports about them, permitting the overall level of any community passions to diminish. See In re Tsarnaev, 780 F.3d at 22. This case is therefore dramatically unlike Rideau, 373 U.S. at 724-26, where the defendant's lengthy confession was videotaped and broadcasted three times throughout a small town only two months before trial, and Irvin v. Dowd, 366 U.S. 717, 719-20, 725-26 (1961), where jury selection began less than twelve months after the crime and eight months after a widely-reported confession in a small community of 30,000 where 95% of the households received local newspapers which detailed the confession, and Casellas-Toro, 807 F.3d at 383, 387-88, where jury selection began only two months after defendant's televised sentencing in an "intertwined" criminal case that had been covered "every minute of every day" by the media. In this case, local and national media attention naturally increased as the trial neared and then began, but that would be expected no matter where the trial occurred and, as noted *supra*, the coverage was composed of largely factual, and not emotional, accounts describing the proceedings. See Tsarnaev, 780 F.3d at 22.

D.      Jury Verdict

Prior to trial, the Court noted that recent experience with high profile trials in this District reflected local jurors' capacity to carefully evaluate trial evidence despite widespread media coverage. United States v. Tsarnaev, Cr. No. 13-10200-GAO, 2015 WL 45879, at *5 (D. Mass.

Jan. 2, 2015) (citing Jury Verdict, <u>United States v. Phillipos</u>, Cr. No. 13–10238–DPW (Oct. 28, 2014) (ECF No. 510)); <u>Tsarnaev</u>, 2014 WL 4823882, at *3 (citing Jury Verdict, <u>United States v. O'Brien</u>, Cr. No. 12–40026–WGY (July 24, 2014) (ECF No. 579); Jury Verdict, <u>United States v. Tazhayakov</u>, Cr. No. 13–10238–DPW (July 21, 2014) (ECF No. 334); Jury Verdict, <u>United States v. Bulger</u>, Cr. No. 99–10371–DJC (Aug. 12, 2013) (ECF No. 1304); Jury Verdict, <u>United States v. DiMasi</u>, Cr. No. 09–10166–MLW (June 15, 2011) (ECF No. 597)).

It is now possible to evaluate the jury's verdicts in this case in hindsight for possible signs of improper prejudice, on the one hand, or expected impartiality, on the other. In the guilt phase of the trial, the jury found the defendant guilty on all counts in the indictment. In some cases, such an outcome might possibly be a sign of abdication of duty and simple submission to the government's theory and authority. That concern is absent in this case. Here, the guilty findings were hardly surprising in light of the defendant's strategy and the overwhelming evidence against him. After all, in her opening remarks, defense counsel essentially conceded that the defendant was guilty of the crimes with which he was charged:

The government and the defense will agree about many things that happened during the week of April 15th, 2013. On Marathon Monday, . . . Jahar Tsarnaev walked down Boylston Street with a backpack on his back carrying a pressure cooker bomb and placed it next to a tree in front of the Forum restaurant. . . .

After their pictures were on television and on the Internet, Tamerlan and Jahar went on a path of devastation the night of April the 18th, leaving dead in their path a young MIT police officer and a community in fear and sheltering in place. Tamerlan held an unsuspecting driver, Dun Meng, at gunpoint, demanded his money and compelled him, commanded him, to drive while Jahar followed behind.

The evening ended in a shootout. You've heard about it. Tamerlan walked straight into a barrage of gunfire, shooting at the police, throwing his gun, determined not to be taken alive. Jahar fled, abandoned a car, and was found hiding in a boat.

There's little that occurred the week of April the 15th—the bombings, the murder of Officer Collier, the carjacking, the shootout in Watertown—that we dispute. If the only question was whether or not that was Jahar Tsarnaev in the video that you will see walking down Boylston Street, or if that was Jahar Tsarnaev who dropped the backpack on the ground, or if that was Jahar Tsarnaev . . . captured in the boat, it would be very easy for you: It was him.

(Mar. 4, 2015 Tr. Excerpt: Jury Trial – Day Twenty-Seven at 3-5 (dkt. no. 1117); see id. at 5-6

("We do not and will not at any point in this case sidestep—attempt to sidestep or sidestep Jahar's

responsibilities for his actions . . . .").) So too in her closing in the guilt phase, counsel said:

Jahar Tsarnaev followed his brother down Boylston Street carrying a backpack with a pressure cooker bomb in it and put it down in front of the Forum restaurant, knowing that within minutes it would explode. Three days later, Tamerlan Tsarnaev murdered Officer Collier, and Jahar was right there with him.

Within a half an hour or so, . . . Tamerlan Tsarnaev held a gun to Dun Meng's head, demanded him to drive, and Jahar followed in the Honda. He took the ATM card, he took the code, and he stole $800 from Dun Meng's ATM account. Jahar was part of a shootout in Watertown. We know that his brother had the Ruger P95 because he was shooting at the police. We know that Jahar had a BB gun.

Still, he hurled explosives at the police, and when he saw his brother walk into a hail of gunfire shooting, clearly determined to go out in a blaze of glory, he ran to the Mercedes and escaped as police riddled the Mercedes with bullets. And he ran over his older brother, the brother that he loved, and the brother that he followed.

When I talked with you almost—just over a month ago, I said to you the evidence would bear out all of the events that I just talked about and that they just talked about. And it has. I said to you that we would not disagree with this evidence or dispute it, challenge it, and we haven't. I said to you that it was inexcusable, and it is. And Jahar Tsarnaev stands ready, by your verdict, to be held responsible for his actions.

. . .

And now when you go back to the jury room, we are not asking you to go easy on Jahar. We are not asking you to not hold him accountable and responsible for what he did. The horrific acts that we've heard about, the death, destruction and devastation that we've heard about deserve to be condemned, and the time is now. I know, and we know, that by your verdict, you will do what is right and what is just, and your verdict will speak the truth.

(Apr. 6, 2015 Tr. Excerpt: Jury Trial – Day Forty-Three at 4-5, 27 (dkt. no. 1244).) Consistent with these concessions, during the guilt phase the defendant often chose to not cross-examine witnesses or to challenge the prosecution's version of "who, what, where and when."[18] (Id. at 5.)

---

[18] Indeed, it was the defendant who introduced photographs documenting his capture from the boat in Watertown and who successfully moved for a jury view of the boat and the message the defendant wrote in it prior to his capture. (Ex. Def-3060G ("Boat photos_DT arrest on ground"); Mot. to Bar Spoliation of So-Called "Boat Writings" and to Make Boat Available for View by Jury at Trial (dkt. no. 923) (under seal).)

Yet, despite the defendant's strategy and defense counsel's wholesale concessions, it appears that the jury nevertheless thoughtfully deliberated the defendant's guilt of the crimes charged. At the end of their second day of deliberations, the jury asked two questions. The questions indicated that, notwithstanding counsel's concessions, the jury was measuring the evidence against the applicable legal principles as to the various charges in the indictment. For example, the jury asked, "Can a conspiracy pertain to a sequence of events over multiple days or a distinct event?" (Apr. 8, 2015 Tr. Excerpt: Jury Trial – Day Forty-Five at 3 (dkt. no. 1250).) The jury later asked, "What is the difference between aiding and abetting? Is there a differentiation between the two? If there is phrasing of aiding and abetting, it doesn't seem like there is evidence of both aiding and abetting, but rather only aiding or abetting. How can it be said that aiding and abetting took place?" (Id. at 6.) These questions suggest that the jury did not take an "all or nothing" view of the case, or mindlessly accede to the government's arguments, but rather carefully considered some of the more complicated—and arguably at times weaker—parts of the government's case, such as what events appropriately should be considered within the scope and duration of the charged conspiracies and to what extent co-conspirator Tamerlan Tsarnaev's conduct should be imputed to the defendant. The questions suggest patient and careful deliberation. They do not suggest a jury inflamed by prejudice, eager to return a verdict adverse to the defendant, *even when the defendant had effectively conceded the point.*

Similarly, in the penalty phase of the trial, the jury did not simply blindly accept the government's case. Again, during their deliberations, the jury asked several questions. (See, e.g., May 14, 2015 10:20 a.m. Note from the Jury (requesting additional copies of the verdict form and jury charge because it "would be helpful" for some jurors to have a "visual to use") (dkt. no. 1433); May 14, 2015 11:08 a.m. Note from the Jury (posing multiple questions related to the consideration

of aiding and abetting and conspiracy in determining whether the government had proved the gateway intent factors); May 14, 2015 12:43 p.m. Note from the Jury (asking additional question on whether to consider aiding and abetting when determining gateway intent factor).) The questions reflect serious thought and consideration of the issues they were required to resolve.

Second, their ultimate verdict in the penalty phase appears to be the product of careful, nuanced decision-making. For example, despite the government's focus on the defendant's boat writings and social media posts, the jury entirely rejected the government's alleged aggravating factor regarding whether the defendant made statements suggesting that others would be justified in committing additional acts of violence and terrorism against the United States. They also declined to find some of the government's proposed statutory aggravating factors, such as whether the defendant knowingly creating a grave risk of death to the victim in the commission of a crime or his subsequent flight and whether the defendant committed the offense in an especially heinous, cruel, and depraved manner. The jury also appeared to carefully consider, as individuals, mitigating factors about the defendant, answering the mitigation questions with varying degrees of approval. And perhaps most notably, the jury ultimately distinguished the defendant from his brother, and overt conduct from conspiracy, determining that death was the appropriate sentence only for the harms caused directly by the defendant and his bomb: the deaths of Lingzi Lu and Martin Richard. The discriminating nature of the verdict itself is convincing evidence that this was not a jury impelled by gross prejudice or even reductive simplicity, but rather a group of intelligent, conscientious citizens doing their solemn duty, however reluctantly.

"The jury's ability to discern a failure of proof" in the government's case and to carefully evaluate as individuals mitigating factors about the defendant "indicates a fair minded consideration of the issues and reinforces [the Court's] belief and conclusion that the media

coverage did not lead to the deprivation of [the] right to an impartial trial." See Skilling, 561 U.S. at 384 (quoting United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989)) (second alteration in original). As I have previously noted, the jury's penalty verdict was not the only possible outcome, but it was a reasoned moral judgment on the evidence before them.

For all the foregoing reasons, I find and conclude that the defendant has failed to demonstrate that this is one of the rare and extreme cases where prejudice must be presumed so as to override the constitutional norms requiring criminal trials to be held in the State where the crimes were committed. See U.S. Const. art. III, § 2, cl. 3 ("Trial shall be held in the State where the said Crimes shall have been committed . . . ."); id. amend. VI ("[T]he accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); see also Fed. R. Crim. P. 18 ("[T]he government must prosecute an offense in a district where the offense was committed."). The defendant's renewed attack on venue is again rejected.

## II. Convictions under 18 U.S.C. § 924(c)

### A. The "Residual" Clause – Section 924(c)(3)(B)

In Johnson v. United States (Samuel Johnson), 135 S. Ct. at 2557,[19] the Supreme Court held that a portion of a statutory definition of the term "violent felony" set forth in 18 U.S.C. § 924(e)(2)(B) was unconstitutionally vague. The defendant argues that the decision requires a

_____

[19] In this Opinion and Order, the short-form citation includes the petitioner's first name because there is a second case relied on by the defendant in which the petitioner was a Curtis Johnson. That case, Johnson v. United States, 559 U.S. 133 (2010), will be referred to in short form as Curtis Johnson. Referring to the cases as "Johnson I" and "Johnson II", as the parties and other writers have done, can be misunderstood as suggesting a lineal or historical relationship between the cases that does not exist.

conclusion here that the statutory definition of a different term applicable in a different context is also unconstitutionally vague.

Section 924(c) of Title 18 of the United States Code punishes a person who carries a "firearm," a defined term, "during and in relation to" a "crime of violence." The defendant was charged with and convicted of fifteen separate § 924(c) offenses, each related to an underlying "crime of violence" that was specifically identified in the indictment, including use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a, bombing a place of public use in violation of 18 U.S.C. § 2332f, malicious destruction of property by fire or explosive in violation of 18 U.S.C. § 844(i), carjacking in violation of 18 U.S.C. § 2119, robbery affecting interstate commerce ("Hobbs Act robbery") in violation of 18 U.S.C. § 1951, as well as conspiracies to commit some of those crimes. The punishment imposed on § 924(c) "carrying" charges, which have statutory mandatory minimum terms of imprisonment, is additional to any punishment imposed on the underlying crime of violence; any sentence for a "carrying" conviction must run consecutively to any sentence imposed on the underlying offense. 18 U.S.C. § 924(c)(1)(A).

As used in § 924(c), a "crime of violence" that can serve as a predicate offense for the enhanced "carrying" conviction and punishment is defined as a felony that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Id. § 924(c)(3).

Samuel Johnson examined a different term in another part of the statute, § 924(e), which provides for enhanced punishment for certain recidivist criminals who unlawfully possess a firearm. 135 S. Ct. at 2555-56. A prior felon convicted of unlawful possession of a firearm under 18 U.S.C. § 922(g) is subject to enhanced punishment if he has had at least three prior convictions

for a "violent felony" or a "serious drug offense." What constitutes a "violent felony" for these purposes is defined in § 924(e). While the provisions are similar, the definition of "violent felony" in § 924(e) differs somewhat in its formulation from the definition of "crime of violence" in § 924(c). As relevant here, § 924(e) defines "violent felony" as any felony that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another
> . . . .

Id. § 924(e)(2)(B).

As can be seen from a comparison of the two definitions, the first clauses in both provisions are quite similar, but the second clauses are organized differently and use different terms. In shorthand, the first clause in each definition has come to be known as the "force" clause, and the second in each as the "residual" clause.[20]

In Samuel Johnson, the Supreme Court held that the residual "or otherwise involves conduct" clause of § 924(e) is too vague to give fair notice of what conduct can be punished by enhanced criminal sentences and thus violates the Due Process Clause of the Fifth Amendment to the Constitution. 135 S. Ct. at 2556-57, 2563. Because the § 924(e) residual clause played no role in the defendant's sentence in this case, the Court's invalidation of that residual clause has no direct applicability here.

The defendant's argument rather is that the Court's opinion in Samuel Johnson should be understood as condemning not only the residual clause in § 924(e) but also any provision that calls

---

[20] Strictly speaking, the residual clause in § 924(e) is the last part of clause (ii), beginning "or otherwise involves conduct." The first part of clause (ii) identifies specific criminal offenses and was not held to be unconstitutionally vague. See Samuel Johnson, 135 S. Ct. at 2563. "Residual" aptly describes the clause in § 924(e) beginning "or otherwise." Section 924(c)(3)(B) lacks that formulation, and it seems less apt to describe that portion of the definition as "residual," though it is apparently the universal practice to do so.

for the categorical assessment of "risk," and that since § 924(c)(3)(B) requires assessing whether a particular offense "by its nature, involves a substantial risk that physical force against the person or property of another may be used," it must, given the Court's reasoning in Samuel Johnson, also be held to be too vague to be valid. (See Def.'s Mem. in Supp. of Mot. for J. Notwithstanding Verdict and for New Trial at 31-32 (dkt. no. 1506).)

That is a very—and I think unduly—expansive reading of the Court's opinion. In fact, the Court itself cautioned against that very expansion of its ruling:

> The Government and the dissent next point out that dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk," suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt. Not at all. . . . As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree."

Samuel Johnson, 135 S. Ct. at 2561 (second alteration in original) (citations omitted).

There will not always and necessarily be difficulty or ambiguity in making a categorical assessment whether a particular offense "by its nature" involves a "substantial risk that physical force against the person or property of another may be used in the course of committing the offense." For example, it is simply common sense to conclude that using the mails to execute a scheme to defraud does not as a categorical matter involve a substantial risk that physical force will be used against the person or property of another, 18 U.S.C. § 1341, but that using the mails in furtherance of the use of a weapon of mass destruction, id. § 2332a(a)(2)(A), does. There may be debatable cases, but that possibility only counsels for making case-specific judgments. Although the Court in Samuel Johnson held that § 924(e)'s residual clause was facially void, rejecting an "as applied" approach, the reasons seem to be the Court's overarching conclusion that the clause's "or otherwise involves conduct" standard had been demonstrated in practice to be hopelessly inconducive to

coherent and consistent application on a case-by-case basis. <u>See</u> 135 S. Ct. at 2560; <u>see also</u> <u>Chambers v. United States</u>, 555 U.S. 122, 133 (2009) (Alito, J., concurring) ("After almost two decades with [the] 'categorical approach,' only one thing is clear: [the Armed Career Criminal Act's] residual clause is nearly impossible to apply consistently."). That is not true of § 924(c).[21]

The Court in <u>Samuel Johnson</u> also thought that an attempt to understand the risk involved in the "ordinary case" of a crime that might fall within the residual clause of § 924(e), as required under its prior precedents, compounded the problem. 135 S. Ct. at 2257-58; <u>see also</u> <u>James v. United States</u>, 550 U.S. 192, 208 (2007) ("The proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another."), <u>overruled by</u> <u>Samuel Johnson</u>, 135 S. Ct. 2551; <u>Taylor v. United States</u>, 495 U.S. 575, 602 (1990) (stating that in determining whether crime falls within § 924(e)(2)(B)(ii) courts should look to the elements of "generic" offense. The § 924(e) residual clause followed the enumeration of four specified offenses that Congress had apparently concluded involved conduct presenting a

---

[21] There is a structural reason why this is so. Whereas § 924(e) mandates a sentencing enhancement in the event of a particular prior criminal history, § 924(c) defines a separate crime from the underlying "crime of violence." <u>See</u> <u>United States v. Felton</u>, 417 F.3d 97, 104 & n.3 (1st Cir. 2005); <u>see also</u> <u>United States v. Hansen</u>, 434 F.3d 92, 104 (1st Cir. 2006). Section 924(c) operates necessarily in an "as-applied" context. A defendant is charged under § 924(c) with having carried a firearm during and in relation to a crime of violence that is, typically, as here, specifically alleged in the same indictment. Accordingly, consulting the specific allegations of the indictment is unavoidable. Even if the underlying crime is not specifically alleged as a separate offense, to convict under § 924(c) the jury would necessarily have to conclude that the elements of that crime were proven in order to convict on the "carrying" charge. In other words, what is referred to as the "modified categorical approach"—consultation of so-called <u>Shepard</u>-approved documents—is necessarily imposed by the circumstances. <u>See</u> <u>Shepard v. United States</u>, 544 U.S. 13, 26 (2005). Consequently, adjudicating the § 924(c) count "require[s] gauging the riskiness of conduct in which an individual defendant [is alleged to have engaged] *on a particular occasion*." <u>Samuel Johnson</u>, 135 S. Ct. at 2561 (emphasis in original). As the Court further noted, "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." <u>Id.</u> Rather than imagining an "idealized ordinary case," which the Court found necessary under the residual clause in § 924(e)(2)(B)(ii), <u>id.</u>, the focus under § 924(c)(3)(B) must necessarily be on the specific "case" alleged in the indictment.

serious potential risk of physical injury: burglary, arson, extortion, and the use of explosives. The Court thought that it was unclear how those examples constructively guided the categorical inquiry under the residual clause. See Samuel Johnson, 135 S. Ct. at 2558 ("These offenses are 'far from clear in respect to the degree of risk each poses.'" (quoting Begay v. United States, 553 U.S. 137, 143 (2008))). That is a problem occasioned by the unique text of § 924(e); there is no similar confusing enumeration of offenses followed by an invitation to extrapolate contained in § 924(c). See id. at 2561 ("Almost none of the cited laws links a phrase such as 'substantial risk' to a confusing list of examples. 'The phrase "shades of red," standing alone, does not generate confusion or unpredictability; but the phrase "fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red" assuredly does so.'" (quoting James, 550 U.S. at 230 n.7 (Scalia, J., dissenting) (emphasis in original))).

It should also be noted that the reasons that the Court identified in Taylor as warranting a categorical approach are absent in the § 924(c) context. The statutory language indicates that it is the fact of a prior conviction, not the historical facts concerning what the offender had done, that serves the basis for sentence enhancement under § 924(e)(1). For identified crimes such as burglary, what matters are the elements of the crime in the generic case, which the categorical approach is suited to identify. Taylor, 495 U.S. at 600. That reading of the statute is also supported by the legislative history. Id. at 601. Further, the categorical approach to identifying qualifying prior convictions avoids the practical problems attendant upon seeking to understand what had transpired in the historical prosecution that led to any particular conviction. Id. Because in the § 924(c) context there is no "prior conviction," but rather an actually or effectively simultaneous one, those considerations are all inapposite.

The Court in <u>Taylor</u> also concluded that use of a categorical approach to classifying an offender's prior history of criminal convictions avoided anomalies that might arise from variations in state law definitions of similarly named crimes, raising the prospect that persons could face enhancement of the federal sentence, or not, depending on which State's law controlled the prior conviction. <u>Id.</u> at 590-91. The solution was to look only to the fact of conviction of the generic crime, an approach supported directly by the statutory language. <u>Id.</u> at 600. The effect of variations in state law is not a potential problem in the case of a "carrying" charge under § 924(c); the underlying predicates will always be federal crimes. <u>See</u> 18 U.S.C. § 924(c)(1) ("[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States . . . .").

For these reasons, I conclude that the Supreme Court's opinion in <u>Samuel Johnson</u> neither requires nor counsels the conclusion that § 924(c)'s residual clause is unconstitutionally vague. I understand that some courts have taken a different view. It is sufficient here to say that, for the foregoing reasons, I respectfully disagree with their reasoning.

B.      The "Force" Clause – Section 924(c)(3)(A)

Under § 924(c)(3)(A), the "force" clause, an offense is a "crime of violence" if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Citing <u>Johnson v. United States</u> (<u>Curtis Johnson</u>), 559 U.S. 133 (2010), the defendant argues that the "physical force" required to meet the statutory definition must be "violent force" as discussed in that case, <u>id.</u> at 140, and that because the predicate offenses charged against him were capable of being committed without the necessary violence, as a categorical matter

(borrowing from <u>Taylor</u>, 495 U.S. at 600, and successor cases addressing § 924(e)) it cannot be reliably concluded that they involve the use of violent force.[22]

To begin with, the defendant overreads what was decided in <u>Curtis Johnson</u>. The question presented in that case was "whether the Florida felony offense of battery by '[a]ctually and intentionally touch[ing]' another person 'has as an element the use . . . of physical force against the person of another,' and thus constitutes a 'violent felony' under the Armed Career Criminal

---

[22] As the defendant notes, (<u>see</u> Mem. in Supp. of Mot. for J. Notwithstanding Verdict and for New Trial at 28 n.2), whether a crime qualifies as a "crime of violence" under § 924(c) is a matter of law for the court to decide. <u>United States v. Weston</u>, 960 F.2d 212, 217 (1st Cir. 1992), <u>abrogated on other grounds by</u> <u>Stinson v. United States</u>, 508 U.S. 36 (1993); <u>see also</u> <u>United States v. Morgan</u>, 748 F.3d 1024, 1034 (10th Cir. 2014); <u>United States v. Credit</u>, 95 F.3d 362, 364 (5th Cir. 1996) (collecting cases); <u>cf.</u> <u>United States v. Bishop</u>, 453 F.3d 30, 32 (1st Cir. 2006) (citing cases). In this case, the government requested a jury instruction that each of the underlying offenses charged was a crime of violence within the definition of § 924(c). The defendant made no objection either to the government's request or to my draft instructions that were given to the parties, and after I instructed the jury to that effect, made no objection to the actual instruction. The defendant did object to other parts of the government's requests and of my actual instructions. Under these circumstances, the omission to object could reasonably be considered a waiver by tacit acquiescence of any claim that it was error to instruct the jury that the underlying offenses were crimes of violence under § 924(c). Certainly, if there had been an affirmative expression of "no objection" by defense counsel, one would be warranted in finding a waiver. Especially in light of the diligence and vigor with which defense counsel did object to various matters, including proposed and actual jury instructions, it would not be unfair to infer from the absence of a voiced objection that there was in fact no objection. Because the principal cases upon which the present argument about the "force" clause is now pressed had been decided before the indictment in this case, there can be no contention that the legal basis of the present arguments regarding the "force" clause was unavailable to him, in contrast to the arguments based on <u>Samuel Johnson</u> directed at the "residual" clause. If the arguments directed to the "force" clause were waived, the waiver is a sufficient basis in itself for denying the relief requested.

Alternately, the omission to object to the instruction that the predicate offenses each qualified as a "crime of violence" could be considered to have been a forfeiture, rather than a waiver. In the latter circumstance, the Court of Appeals could review the point for plain error. <u>See</u> <u>United States v. Olano</u>, 507 U.S. 725, 732-33 (1993); <u>see also</u> Fed. R. Crim. P. 52(b). In order for an error to be "plain," it first must be determined to be an "error." <u>Olano</u>, 507 U.S. at 732; <u>United States v. Antonakopoulos</u>, 399 F.3d 68, 77 (1st Cir. 2005). I explain in this Opinion and Order why I think there was no error.

Act." [23] 559 U.S. at 135 (alterations in original) (citations omitted). Under the Florida statute at issue, a person commits the offense of battery if he "[a]ctually and intentionally touches or strikes another person against the will of the other," or if he "[i]ntentionally causes bodily harm to another person." Id. at 136 (alteration in original) (quoting Fla. Stat. § 784.03(1)(a)). In sum, the Court held that for a battery under Florida law to qualify as a "violent felony" under the Armed Career Criminal Act (the "ACCA"), the "force" involved could not be merely an intentional and unconsented to touching under the first statutory alternative but rather had to be "violent force" sufficient to "cause[] bodily harm" under the second. See id. at 140 (emphasis omitted). In other words, because under the state statute a person could be convicted of battery if he "[a]ctually and intentionally touche[d] . . . another person against the will" of that person, without necessarily causing any bodily harm, it was possible to be guilty of a non-violent battery. The Court sensibly concluded that for a prior conviction to count as a "violent felony" under the ACCA it could not be a conviction for a non-violent battery.

The defendant argues that while the § 924(c) underlying offenses in this case certainly can be committed in a violent way and thus under Curtis Johnson could be considered "crime[s] of violence," it is also possible to imagine non-violent methods of commission of the offenses, so using only a categorical analysis, it cannot be determined that they qualify as "crime[s] of violence." The argument is a mix of ingenuity and sophistry. For example, the defendant argues that the definition of a "weapon of mass destruction" in 18 U.S.C. § 2332a(c)(2) includes not only "destructive device[s]" such as explosive bombs (which concededly involve violence), but also poisons, toxins, and radiation. (Def.'s Mem. in Supp. of Mot. for J. Notwithstanding Verdict and

---

[23] The Court was interpreting § 924(e), but the relevant language of § 924(c)—"has as an element the use . . . of physical force against the person . . . of another"—is the same.

for New Trial at 33-34.) These latter agents, he says, can be deployed passively—as by non-explosive release—so they do not necessarily involve the use of "violent force," as he says <u>Curtis Johnson</u> requires. This argument rests heavily on an understanding of "violent force" that is strictly limited to the specific factual context of that case, which involved an ambiguous battery conviction under the Florida law described above, and it also requires swallowing the proposition that killing a person by poison or radiation does not necessarily have as an element the use of violent physical force against that person. Under the defendant's proposed theory, the destruction of internal organs by poison (or toxins or radiation) should not be considered "violent physical force" but may be deemed non-violent. There is no support in <u>Curtis Johnson</u> for such an artificial and cramped construction.[24]

The defendant's argument that the crimes of use of a weapon of mass destruction, bombing of a place of public use, and malicious destruction of property by fire or explosive are not by their nature "violent" enough to be considered "crime[s] of violence" is refuted by its mere statement.[25] The defendant's argument has a bit more traction with respect to the carjacking and Hobbs Act robbery counts, because, he argues, those crimes can be committed by "intimidation" in the case of carjacking, 18 U.S.C. § 2119, or by "extortion" in the case of Hobbs Act robbery, <u>id.</u> § 1951, as

---

[24] <u>Cf.</u> <u>United States v. Castleman</u>, 134 S. Ct. 1405, 1415 (2014) (The petitioner "errs in arguing that although '[p]oison may have "forceful physical properties" as a matter of organic chemistry, . . . no one would say that a poisoner "employs" force or "carries out a purpose by means of force" when he or she sprinkles poison in a victim's drink.' The 'use of force' in Castleman's example is not the act of 'sprinkl[ing]' the poison; it is the act of employing poison knowingly as a device to cause physical harm. That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter. Under Castleman's logic, after all, one could say that pulling the trigger on a gun is not a 'use of force' because it is the bullet, not the trigger, that actually strikes the victim.") (alterations in original) (citation omitted).

[25] Under existing First Circuit precedent, conspiracy to commit a crime of violence is also a crime of violence for purposes of § 924(c). <u>United States v. Turner</u>, 501 F.3d 59, 67 (1st Cir. 2007).

well as by the use or threat of physical force, and intimidation and extortion might conceivably be accomplished without the use or a threat of physical harm. The argument is not persuasive.

In the first place, Hobbs Act robbery is regarded as a crime of violence under § 924(c)(2)(A) under First Circuit precedent. United States v. Morales-Machuca, 546 F.3d 13, 21 (1st Cir. 2008). It is not up to me to decide otherwise. The instruction to the jury that the Hobbs Act robbery was a crime of violence was thus consistent with governing law.

The First Circuit has not explicitly held carjacking to be a crime of violence, although several other circuits have done so.[26] See United States v. Brown, 200 F.3d 700, 706 (10th Cir. 1999); United States v. Moore, 43 F.3d 568, 572-73 (11th Cir. 1994); United States v. Jones, 34 F.3d 596, 601-02 (8th Cir. 1994); United States v. Mohammed, 27 F.3d 815, 819 (2d Cir. 1994); United States v. Singleton, 16 F.3d 1419, 1423 (5th Cir. 1994). The language of the statute strongly supports the conclusion that the act of taking the car from a person by "intimidation" connotes intimidation by threat of physical harm, rather than, say, economic deprivation. One of the elements of the offense is a present "intent to cause death or serious bodily harm" on the part of the defendant. 18 U.S.C. § 2119; see also Holloway v. United States, 526 U.S. 1, 12 (1999). The statute also requires that the vehicle be taken "from the person or presence of another." 18 U.S.C. § 2119. Thus, the statute describes a face-to-face encounter in which the carjacker is possessed of an "intent to cause death or serious bodily harm." Further, the taking must be accomplished "by force and violence or by intimidation." Id. In context, then, the use of the word "intimidation" strongly connotes that "intimidation" means intimidation by threat of the use of physical force.

---

[26] In United States v. Quinones, 26 F.3d 213, 217 (1st Cir. 1994), the court assumed, without deciding because it was not in issue, that "carjacking by its nature is a violent felony." See also United States v. Gonzalez-Melendez, 594 F.3d 28, 31 (1st Cir. 2010) (noting that grand jury indicted appellant "on one count of aiding and abetting a carjacking" and "one count of using a firearm during and in relation to a carjacking (*which is a crime of violence*). . . ." (emphasis added)).

Even if either question were an open one, the defendant's argument, relying on Descamps v. United States, 133 S. Ct. 2276 (2013), and prior cases addressing what is or is not a "violent felony" under the ACCA, that neither carjacking or Hobbs Act robbery can be said to be categorically a "crime of violence" because either could conceivably be performed without the use or threat of physical force (by non-violent intimidation or non-violent extortion), is based on a misreading of the relevant precedents.

In Descamps, the issue was whether the so-called "modified categorical approach" could be used to determine whether the defendant's prior conviction for burglary under California law was for "generic" burglary, and thus a "violent felony" under § 924(e). Id. at 2281-82. The state statute at issue punished "a person who enters" certain locations "with intent to commit grand or petit larceny or any felony" as "burglary." Id. at 2282 (quoting Cal. Penal Code § 459 (West)). To prove the crime, it was not necessary to prove that the "entry" was unlawful, id., as would be required under the "generic" crime of burglary as established in Taylor, see 495 U.S. at 599. Consequently, a person could be convicted under the statute of either generic burglary, if the entry was proved to have been unlawful, or non-generic burglary, if not. The Court held that when a statute contained a "single, 'indivisible' set of elements sweeping more broadly than the corresponding generic offense," the modified categorical approach—consulting certain limited case documents—could not be employed to identify whether the conviction was on the basis of facts that fit the generic definition of burglary or not. Descamps, 133 S. Ct. at 2283.

The Court, however, continued to sanction the use of the modified categorical approach in the case of a so-called "divisible" statute, one that "sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building *or* an automobile." Id. at 2281 (emphasis in original). "[W]hen a statute lists multiple, alternative elements, and so

effectively creates 'several different . . . crimes,'" the modified categorical approach permits comparing the elements of the generic crime to the elements, not the facts, of the crime of the defendant's prior conviction. Id. at 2285 (quoting Nijhawan v. Holder, 557 U.S. 29, 41 (2009)).

The defendant's argument regarding the carjacking and Hobbs Act robbery counts is a case of trying to have one's cake and eat it too. On the one hand, he maintains that the statutes should be regarded as "indivisible" under the Descamps taxonomy, so that as a categorical matter it cannot be determined whether those crimes were committed by the use or threat of force or by some kind of non-forceful "intimidation," in the case of carjacking, or "extortion," in the case of Hobbs Act robbery. On the other hand, in positing that those crimes can be committed by non-violent intimidation or extortion rather than by violent threats or actions, he necessarily emphasizes that the statutes by their texts authorize alternate proofs, else there is no conundrum, which seems to put them squarely in the "divisible" category under Descamps. Id. at 2284 (noting that a statute is "divisible" if it "comprises multiple, alternative versions of the crime"). His way out of the dilemma is to argue that "intimidation" and "extortion" do not establish alternate *elements* of the offenses but only refer to different *means* of committing them. Fortunately, we are saved from the search for a reliable method of distinguishing the elements of a crime from the means of committing it, see Richardson v. United States, 526 U.S. 813, 817-18 (1999), because the Court said in Descamps that for present purposes the distinction does not matter:

> Whatever a statute lists (whether elements or means), the documents we approved in Taylor and Shepard—i.e., indictment, jury instructions, plea colloquy, and plea agreement—would reflect the crime's elements. . . . When a . . . law is drafted in the alternative, the court merely resorts to the approved documents and compares the elements revealed there to those of the generic offense.

133 S. Ct. at 2285 n.2.

It should be observed that it is far from clear that Congress' inclusion of "intimidation" in the carjacking statute or "extortion" in the robbery statute actually was intended to create an

alternative of any kind, or was simply the kind of synonymous repetition not uncommon in legislative drafting. I have explained above why it is quite plausible that in context "intimidation" as used in § 2119 means intimidation by use or threat of physical force. The same is true for "extortion" as used in § 1951. The term is defined there as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."[27] 18 U.S.C. § 1951(b)(2). There are alternatives in this formulation, but they are the obtaining of property (a) "by wrongful use of actual or threatened force, violence, or fear," and (b) "under color of official right." Id. There is no contention that the vehicle that was carjacked in this case was obtained "under color of official right," and if there were, the modified categorical approach applied to this divisible provision would plainly establish that the former and not the latter alternative was the basis for the defendant's conviction. There is no suggestion in the statute that the alternative of extortion "by wrongful use of actual or threatened force, violence, or fear" is further divisible and includes an alternative that does not have "as an element the use, attempted use, or threatened use of physical force against the person or property or another." Id. § 924(c)(3)(A).

In sum, either the carjacking and Hobbs Act robbery statutes each define an indivisible offense that has as an element the actual, threatened, or attempted use of physical force against the person or property of another, or each defines divisible alternatives, whether of elements or means, and the Shepard-approved documents, notably the indictment and jury instructions, establish that in each case the defendant was necessarily convicted of the alternative that had such an element. The defendant's argument addressed to the "force" clause is without merit.

---

[27] Congress expressly classified extortion as a "violent felony" in § 924(e)(2)(B)(ii).

### III.    Death Penalty

The defendant also renews his previously rejected challenge to the constitutionality of the federal death penalty. He relies on a dissenting opinion in <u>Glossip v. Gross</u>, 135 S. Ct. 2726, 2755-80 (2015), where Justice Breyer, joined by Justice Ginsberg, considered perceived problems with the death penalty, including "lack of reliability, the arbitrary application of serious and irreversible punishment, individual suffering caused by long delays, and lack of penological purpose," and concluded that "the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t].'" <u>Id.</u> at 2756, 2776 (Breyer, J., dissenting) (alteration in original) (quoting U.S. Const. amend. VIII). Whatever the merit of the concerns articulated in the dissent, binding precedent—as reflected in the majority opinion of the same case—compels this Court to reach the contrary conclusion.

### IV.    Conclusion

For the foregoing reasons, the defendant's Motion for New Trial Pursuant to Fed. R. Crim. P. 33 and for Judgment Notwithstanding Verdict Pursuant to Fed. R. Crim. P. 29 (dkt. no. 1490) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge