UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,      )
                             )   Criminal Action
v.                        )   No. 13-10200-GAO
                             )
DZHOKHAR A. TSARNAEV, also  )
known as Jahar Tsarni,    )
                             )
        Defendant.      )
                             )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**<u>SEALED LOBBY CONFERENCE</u>**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, April 28, 2015
2:15 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
3             Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
7         1331 F Street, N.W.
          Washington, D.C.  20530
8         On Behalf of the Government

9         FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1          THE COURT:  So principally, I just wanted to deal with

2     the fact about the 302.

3          MR. WEINREB:  Okay.  Although there are still a few

4     remaining disputes on the Dolakov 302 as well.

5          THE COURT:  Oh, okay.  I thought -- okay.  So the

6     first page is not a problem.  I think you're on the same page.

7          MR. WEINREB:  Okay.

8          THE COURT:  And so two questions occurred to me.  I

9     guess this is -- there are two reasons for sculpting, if we can

10    call it that, the contents of this:  One is to limit it to what

11    each side would proffer.  That's kind of an affirmative way of

12    thinking about it; and then the other is to remove things that

13    either side thinks should be removed.  In other words, you

14    might not offer a paragraph but not object to the government's

15    offering it.

16         MS. CONRAD:  Uh-huh.

17         THE COURT:  But you might say, "No, that shouldn't go

18    in no matter who offers it."

19         MS. CONRAD:  Right.

20         THE COURT:  Okay?  So I'm trying to distinguish

21    between those because some of the things where there were

22    differences I thought might be in the category of you just

23    weren't interested in it, not that you didn't think it should

24    be there, and so we could go through it and I think maybe --

1          MS. CONRAD:  Well, I think really all of these are
2     things where the government doesn't think we should be putting
3     them in.  I don't think they're anywhere --
4          THE COURT:  Well, they think it because of the kind of
5     evidence they are.  I don't know if there's -- yeah, there's
6     probably a relevance objection as well.
7          MR. WEINREB:  In some cases, although I think in most
8     cases where there was a relevance objection we agreed to take
9     it out.  Maybe not.  But for the most part.  They're situations
10    where the government believes that it's -- particularly given
11    the fact that the person can't be cross-examined.
12         THE COURT:  Right.  And I have that in mind because
13    this is unusual in that we're, you know, dealing with evidence
14    that in the normal course of a regular guilt-phase trial,
15    non-death case trial, would not be admissible.  But because of
16    the broader latitude for evidence in this phase, it is.  But
17    that doesn't mean everything comes in either, of course.  So we
18    have to deal with those.
19         So let's just get down to the nuts and bolts.  On page
20    2, it says at the end of the paragraph in the middle of the
21    page, the government -- at the top of the page I think you're
22    in agreement.  The government would strike the last sentence of
23    the fourth full paragraph.
24         MS. CONRAD:  The one that says "Dolakov heard Tamerlan
25    Tsarnaev's parents" --

1          THE COURT:  Yeah.

2          I mean, I'm inclined to strike it just to put a little

3    bit of a stake in the ground against double hearsay.  Everybody

4    knows they went there.  You said it a million times.  I don't

5    think it's a fact that's in controversy but --

6          MS. CONRAD:  Okay.  I mean, not okay, but I

7    understand.

8          THE COURT:  So I would take that sentence out, okay?

9          In the defense version in the next paragraph you would

10   omit the sentences about the friends.  Again, I didn't know

11   whether you just weren't interested in putting that in or

12   whether you object to that being put before the jury.

13         MS. CONRAD:  I didn't think it was relevant from --

14         THE COURT:  We heard a little bit about it this

15   morning from Mr. Franca.

16         MS. CONRAD:  I don't have the unredacted version so I

17   don't remember what it says.

18         THE COURT:  "Vakhabov and Tamerlan's group of mutual

19   friends included Abu Bakar, Ibrahim LNU and Slava Go Lkov.  Abu

20   Bakar is Chechen and currently resides in Texas."

21         MR. WEINREB:  So, your Honor, there are no redactions

22   that the defense has made that we object to; in other words,

23   the mere fact that it's not --

24         THE COURT:  Okay.  So you don't care?

25         MS. CONRAD:  I was just trying to focus on --

1          MR. WEINREB:  We don't care.

2          THE COURT:  So that can stay out, then?

3          MR. WEINREB:  That can stay out.

4          THE COURT:  All right.  So that's one of the things I

5    wasn't clear about.

6          MS. CONRAD:  I think the next one is the last sentence

7    on that next paragraph.

8          THE COURT:  The last sentence on the next paragraph

9    and the next single-sentence paragraph.

10         MR. WEINREB:  Yes.

11         THE COURT:  And I would exclude both of those on this

12   principle:  I think that the admission of these kinds of

13   documents, the 302s, can be appropriate when the evidence to be

14   presented is essentially factual -- historical factual in

15   nature, but not opinion, because I think opinion testimony is

16   testimony that especially calls for cross-examination to get

17   the metrics of the opinion, the intensity of it and various

18   things, and I think just a flat statement of opinion that is

19   uncross-examinable --

20         MS. CONRAD:  Not subject to cross-examination.

21         THE COURT:  Right.

22         -- should be -- let's see how she writes that.

23         So I think that's a reason for excluding it.

24         MS. CONRAD:  May I just be heard as to these

25   particular ones?  I get the general principle, your Honor, and

1    I know there's another one coming up --

2              THE COURT:  There is.

3              MS. CONRAD:  -- where he says I don't think Jahar

4    would have done that but for.  That's an opinion.  But to say

5    their relationship grew apart as Tamerlan's views became more

6    radical is a statement of fact.  It's not an opinion that their

7    relationship grew apart.  He's explaining his own conduct and

8    what he did as a result of his observations.  And I think part

9    of --

10             THE COURT:  I'll give you half of that sentence.  The

11   word I have a problem with is "radical."  I don't know what

12   this witness regards as radical or not.

13             MS. CONRAD:  Well, I think he talks elsewhere about

14   jihadi videos and --

15             THE COURT:  I think it's too vague a term.  So if you

16   want the first half of the sentence, that their relationship

17   grew apart, that's fine.  I don't have any problem with that.

18             MR. WEINREB:  Nor do we.

19             MS. CONRAD:  Well, I think it doesn't make sense

20   without the other part.  I think it explains what he's saying.

21   I mean, these are both observations.  "He was becoming an

22   extremist radical Muslim."

23             THE COURT:  Okay.  That's my offer.

24             MR. BRUCK:  What if we took out "radical."  "As his

25   views became more..."

1          THE COURT:  Blank?

2          MR. BRUCK:  "More pronounced."

3          THE COURT:  No, no, we can't edit the document.

4          MS. CLARKE:  We can't make it "As a result of Tamerlan

5     Tsarnaev's views"?  I mean, that's what it means.

6          THE COURT:  No, I don't think we can edit by changing

7     wording.

8          MS. CONRAD:  Note my objection.

9          THE COURT:  So take the whole thing out or do you want

10    half the sentence?

11         MS. CONRAD:  No, I don't want half the sentence.  It

12    doesn't make sense otherwise.

13         THE COURT:  Okay.  So those will be out.

14         Similarly, at the end of the next full paragraph on

15    the -- full paragraph on the next page, "all of them were

16    radical" for the same reason.  And then you accept these that

17    are in the defense even though you didn't have it in yours?

18         MR. WEINREB:  Yes.  Yes.

19         MS. CONRAD:  And then -- right.  I think the next one

20    is page 4.

21         THE COURT:  Page 4, the third from the bottom is the

22    way it works out.  That's all you have on the page.

23         MS. CONRAD:  Yup.  Yup.

24         THE COURT:  And you're exact opposites on this

25    paragraph.

1          MS. CONRAD:  Oh, like I said, I don't have the rest of

2     it, but I understand him, that "Tsarnaev's influence could be

3     the only thing that pushed Jahar," that's an opinion and I

4     accept that, but "Jahar is like a little boy," I mean, those

5     are his observations.

6          MR. WEINREB:  Your Honor, I think under the

7     circumstances that's not an observation; that's an opinion.

8          MS. CONRAD:  Well --

9          MR. WEINREB:  I can imagine 20 questions I would want

10    to ask him about that, what exactly he actually meant by that.

11         MS. CONRAD:  Well, it's sort of like if he said

12    somebody was shot, you know?  Is that an opinion or is that an

13    observation?  I mean, you watch someone's behavior and --

14         THE COURT:  I think if we were applying the rules of

15    evidence it would be a lay opinion.

16         MS. CONRAD:  That someone was shot?

17         THE COURT:  Yeah.  Someone's drunk.  That's a classic

18    lay opinion.  So I think the paragraph should go out.  Since

19    you don't want the middle sentence, which is fine, and the

20    government doesn't agree with it, so I think that paragraph

21    should go out.  And I think that does it.

22         So somebody will make a copy that conforms to this for

23    the witness?

24         MS. CONRAD:  And can I just -- with respect to what

25    the Court said at sidebar.

1          MR. WEINREB:  Yeah, we have some disputes on the

2    Dolakov 302s.

3          THE COURT:  All right.  Let's do that.

4          MR. WEINREB:  So it might be useful for the record if

5    these have exhibit numbers, which I believe they do.

6          MS. CONRAD:  Yeah, it's 3270A.

7          MR. WEINREB:  Which is which date?

8          MS. CONRAD:  Which is the April 30th.  Date of entry

9    is made first.  It's an eight-page document.

10          MR. WEINREB:  Can I have the exhibit number again?

11          MS. CONRAD:  I'm sorry?

12          MR. WEINREB:  The exhibit number again?

13          MS. CONRAD:  3270A.

14          MR. WEINREB:  3207A?

15          MS. CONRAD:  No, 3270A.

16          MR. WEINREB:  3270A?  All right.

17          So this document that I have, this copy, is the --

18    what the defense proposes to offer with various parts

19    highlighted which are parts that the government believes should

20    be excluded.  On the first page it's the last full paragraph

21    which we object to on relevance grounds, and following on to

22    the following paragraph, and then the next one, the

23    one-sentence paragraph.

24          And essentially the government's objection is that

25    Dolakov's own experience with the FSB and Moscow has nothing to

1    do with this case but -- I mean, I don't think there's any

2    evidence that either Tsarnaev brothers were in Moscow and --

3            THE COURT:  Okay.  I'm inclined to leave it in.

4    General, general relations between Russia and Chechnya and the

5    people, I think, is part of the theme here.  So it's not, you

6    know, powerful evidence, I don't think, but I think it's

7    consistent with one of the themes.

8            MR. WEINREB:  Then on page 3 of 8, the third full

9    paragraph, the third sentence, "Tamerlan told Dolakov that the

10   FBI had come and spoken with him."

11           That we object to on the grounds that it is more

12   prejudicial than probative.  It's really -- given that there's

13   no context for it in this document whatsoever, it's not really

14   probative of anything, and it's prejudicial in the sense that

15   it could easily -- there's a risk that it will mislead the jury

16   and confuse the issues.

17           THE COURT:  Will the 2011 FBI 302s of Tamerlan and his

18   parents be in before the jury?

19           MS. CONRAD:  We're offering them and they're

20   objecting.

21           MR. WEINREB:  We have moved to exclude them.

22           THE COURT:  Maybe that's a prior decision.

23           MR. WEINREB:  So that's part of our larger motion in

24   limine.

25           THE COURT:  Because that would connect to this, right?

 1              MR. WEINREB:  That's true.

 2              THE COURT:  So maybe we should talk about that.

 3              MR. WEINREB:  Very well.

 4              MS. CLARKE:  Bill, that's 3236A, the FBI reports.

 5              MS. CONRAD:  3236A and B, or just A?

 6              MS. CLARKE:  No, there's two of them.  It must be A

 7    and B.  I just had an A down here.

 8              MS. CONRAD:  There's all sorts of references to it in

 9    the Homeland Security and Intelligence Community reports.

10              THE COURT:  And these are just the -- yeah, here they

11    are.

12              MR. WEINREB:  So, your Honor, for the record now, I

13    believe we were talking about --

14              THE COURT:  This is 3235A and 3236A.

15              MR. WEINREB:  That's all I was going to say at that

16    point.

17              So the government's objection, unless you want to read

18    them first.

19              THE COURT:  Well, I read them yesterday.

20              MR. WEINREB:  Okay.  So the entire --

21              MR. BRUCK:  I think we should clarify we're not going

22    to offer the actual 302s.

23              MS. CONRAD:  We want to --

24              MR. BRUCK:  We want to simply show the fact of the

25    interview.

1           MS. CLARKE:   And the connection.

2           MS. CONRAD:   So there are references to the interviews

3    in a number of other exhibits including the Homeland Security

4    committee report and the Intelligence Community report.   And

5    really what we want to get in is the fact that, first of all --

6    and this is also disputed evidence -- the fact that there was

7    information received from the Russian government regarding

8    Tamerlan and Zubeidat's radicalization, and second of all, that

9    this prompted the FBI to open an investigation into them which

10   they went and interviewed them.

11          We're not really interested in the contents of the

12   302s as far as what Zubeidat said and what Tamerlan said and

13   what Anzor said, what we want is the fact that this information

14   was there because it corroborates the evidence that Tamerlan

15   was becoming radicalized and that Zubeidat was part of that

16   process.   And those are two important parts of our narrative.

17          Now, you know, I think the government's objection is

18   they don't want there to be speculation about, you know, could

19   the FBI have prevented this and why did the FBI do this and why

20   did the FBI do that, and I've been very careful in redacting

21   the Homeland Security and Intelligence Community reports to

22   take out the discussion of, you know, possible

23   miscommunications, failures of follow-up or whatever you will.

24          We're not trying to say, you know, Gee, what if the

25   government had done this?   What if the FBI had done that?   But

1    we think the fact that there was information received and the

2    contents of that information, which is the SMS text that we

3    want to offer, is relevant because it shows what was happening.

4    I mean, so much of the testimony now that people are offering

5    saying, Yes, I offered a change -- I noticed a change in time

6    in Tamerlan and Zubeidat, you know, the government could argue

7    at the end of the day, Well, gee, that's what people say now

8    but it's colored by hindsight when, in fact, what we have is

9    contemporaneous reports of the process in real time.  And that

10   is powerful corroboration.

11          Sorry.  I didn't mean to take that away from you,

12   David.

13          MR. BRUCK:  No.  And this goes back to the January

14   text from Zubeidat to her former son-in-law in which she

15   makes -- you cannot read this without seeing her as having

16   radicalized, as having a sort of jihadist mindset on her own,

17   of being sympathetic with -- fearful and yet sympathetic with

18   what she said Tamerlan is doing.  This is at a time when the

19   defendant was 17 years old and still in high school.  So it is

20   tremendously powerful evidence.

21          The government says, Well, we don't know what that is.

22   We just got that from the Russian government and it could be

23   completely bogus.  It is characteristic of her.  It even has

24   her odd, quirky punctuation in it.  But these things are all of

25   the peeps.  They get this -- the Russian government,

1    apparently -- it's not -- we can't prove it beyond a reasonable

2    doubt, but it is certainly more likely than not that this is an

3    authentic text, was probably handed over by a nervous family

4    member for all we know, to the Russian government, and then the

5    U.S. government was not given the text originally but they were

6    notified -- as we understand all the investigative reports that

7    have followed since, they were notified to check these people

8    out.  They did.  And the fact that they did corroborates the

9    fact that there was some level of credibility or -- to this

10   initial text.

11       So all of these things link together, and if you cut

12   them all out it leaves us with the -- it creates the false

13   impression that, as Ms. Conrad said, that it's all just

14   hindsight, and at the time nobody actually saw

15   anything -- there was no evidence of anything.  It's not true

16   and this shows it.

17       And, you know, of course there's a danger in any piece

18   of evidence maybe the jury will take it wrong, but this goes to

19   the core of our story and it just seems so -- and given the

20   defendant's age at the time and the power of the mother and the

21   older brother and all of that put together, the mere fact that

22   the FBI followed up, got this tip, later on we get the actual

23   text that started the process in motion.  The government can

24   say, Well, we don't really know what that is.  It's not

25   corroborated.  That's grist for the mill, but that's not

 1    relevance; that's the weight.

 2          MS. CONRAD:  May I just add one thing to that?  If

 3    there really is an issue about the circumstances under which

 4    this text was required and so forth, all we have is the

 5    government's representation that this was acquired afterwards.

 6    It seems to me that the Court should have a hearing, and

 7    outside of the hearing of the jury, to determine any

 8    preliminary issues of reliability and the circumstances.  But

 9    we have no independent knowledge of that.

10          MR. WEINREB:  Your Honor, the government objects to

11    any evidence of the Russian communication in 2011 notifying

12    the -- or asking -- really requesting that the American

13    government investigate Tamerlan Tsarnaev for two reasons:

14    First, it's unreliable.  The government also received an

15    official communication from the Russian government no different

16    from this one that several members of the defense team had

17    traveled to Russia, had misrepresented their purpose for being

18    there, had informed people who they were interviewing that they

19    were FBI agents, and based on all of that, they were expelled

20    from Russia.

21          There was no difference in the quantum of reliability

22    between this one thing that was received in 2011 and what the

23    defense adamantly claims is utterly inaccurate, unreliable and

24    untrustworthy evidence.  There's simply no foundation for this,

25    where this came from.

1          As the defense attorneys have themselves repeatedly

2    claimed in connection with this case, and both intrajudicially

3    and extrajudicially, the Russians are suspicious of the

4    Chechens.  They view all Chechens as terrorists and so on.

5    There is -- are indicia of unreliability attached to this and

6    no way to test its reliability.

7          But even more important, this communication --

8    basically what would come into evidence is there was a content

9    list communication from the Russian government saying, We

10   suspect that these people are radicals and might be terrorists.

11   Please go investigate them.  It is left to the jury entirely to

12   speculate what well of evidence might have prompted the Russian

13   government to send such an official communication to the United

14   States government.

15         The jury knows absolutely nothing about how

16   intelligence agencies function, about what threshold of

17   suspicion must be crossed or communication like that to come

18   our way, whether it represents knowledge on somebody's part,

19   whether it's, you know, pure speculation on their part.  It is

20   really a quintessential example of the kind of evidence that

21   has the potential to confuse and mislead the jury and waste a

22   lot of their time in trying to figure out what could possibly

23   have prompted this.

24         Its probative value, on the other hand, is low

25   primarily because it's cumulative of a great deal of other

1   evidence that the defense is going to put in that Tamerlan

2   Tsarnaev radicalized at a certain time and in a certain way.

3   These Dolakov 302s, the Vakhabov 302s, they are at least more

4   reliable in the sense that there are actual identified people

5   and we have their actual words here as opposed to just guessing

6   at what the information was.

7          It is indeed the case that after the marathon bombing,

8   in response to a follow-up request from the American

9   government, the Russian government provided these two things:

10  What purports to be an email between Zubeidat Tsarnaev and one

11  of her son-in-laws -- her former son-in-laws -- and what

12  purports to be this conversation between Mr. Kartashov and

13  Zubeidat Tsarnaev.  But again, we have absolutely no idea what

14  the provenance of these are, whether they're accurate, whether

15  they're reliable, whether they were invented in order to

16  justify the warning that had previously been given, whether

17  they're all the evidence, whether they're a fraction of the

18  evidence, whether they're really evidence at all.

19         It's not the kind of information on which a jury that

20  is being asked to decide whether Dzhokhar Tsarnaev is

21  sufficiently more culpable than other murderers and should be

22  put to death, this kind of thing which is so remote from the

23  considerations that really need to weigh significantly in their

24  minds should not be brought in.  It's simply too much -- it's

25  too much off to the side, it's too unreliable, it's too

1    distracting for the jury, it opens up too many cans of worms

2    and it's unnecessary.

3            MR. BRUCK:  One thing that has to be corrected is that

4    there may be a fair amount of evidence that Tamerlan Tsarnaev

5    radicalized, but there is very little hard evidence that we can

6    point to, or documentary evidence, that the mother radicalized.

7    And that is a very important part of the story.  This text from

8    her really is extremely revealing and it's not cumulative to

9    anything else.  So if we don't have that, we're really -- we're

10   really in a hole.

11           The government is free to point out that its

12   provenance is uncertain.  It has indicia of being -- it is

13   stylistically this sort of over-the-top crazy style that she

14   writes here.  The content is unusual because she's much more

15   revealing than in most of her emails -- than any of her other

16   emails or texts.

17           This business about it's just like the report

18   of -- the text from her is the most critical thing --

19           THE COURT:  I understand all of that.  I want to come

20   back now to the Dolakov documents.  So this all emanates from

21   that single sentence?

22           MR. BRUCK:  Yes, it does.

23           THE COURT:  Okay.  Is there anything else on

24   that -- in the rest of this document?

25           MR. WEINREB:  Yes.

1          THE COURT:  I just want to identify what the scope of

2     the controversy is.

3          MR. WEINREB:  So on page 4 of 8, the next page,

4     the -- it's a little hard for me to tell because of the

5     blackout.

6          MS. CONRAD:  It's Dolakov thought that Tamerlan was

7     being followed by the FBI because of his views which

8     explains why --

9          MR. WEINREB:  Yeah, if I could just identify where on

10    the document.

11         MS. CONRAD:  Oh, sorry.

12         MR. WEINREB:  There's a paragraph that begins, "In

13    January 2013."  It's the last sentence of that paragraph.

14         (Pause.)

15         THE COURT:  Okay.  Anything else?

16         MR. WEINREB:  Nothing else in that document.  There is

17    another Dolakov document.

18         MR. BRUCK:  I think we have one thing to add given the

19    ground rules that have been laid out about opinion, which is at

20    the bottom of page 5 Dolakov offers the opinion that he had

21    always thought it odd how close they were and says that in

22    their culture older and younger brothers are not that close and

23    do not hang around together.  You know, if we're going to be

24    cutting out opinion, let's cut that.

25         THE COURT:  Yeah, I think so.

1          MR. WEINREB:  Then I think we should also cut the next

2     one, the next full paragraph on 36.

3          THE COURT:  Yeah, fine.  Well --

4          MR. WEINREB:  Leave "Tamerlan" --

5          THE COURT:  -- at least the first sentence.

6          MS. CONRAD:  We can take the whole paragraph out.  It

7     doesn't really --

8          MR. WEINREB:  Either one.

9          THE COURT:  Right.  Right.

10         MR. WEINREB:  And then there's another Dolakov 302

11    which is dated May 21st, 2013, if you'd be so kind to give me

12    the exhibit number.

13         MS. CONRAD:  Which one?

14         THE COURT:  3271A.

15         MR. WEINREB:  3271A.

16         MS. CONRAD:  Yes.

17         MR. WEINREB:  Okay.  So the record is clear.

18         Again, this is being offered for entirely one

19    paragraph, and we object to one line in the paragraph which is

20    the second from the bottom, "Dolakov advised that Jahar did not

21    really speak when he was with his brother Tamerlan."  And we

22    object to that because it's stated generally, as a general

23    proposition about the two of them when they're together, but

24    Dolakov had absolutely no foundation for making that.  He had

25    only met Jahar once.

1          MS. CONRAD:  But he says that.

2          MR. WEINREB:  I admit he does say it, but I believe

3    the way the sentence is phrased, that is precisely the kind of

4    thing where the government would absolutely on

5    cross-examination make sure that the witness clarified that he

6    had no basis for saying something like that other than what

7    happened in the gym, and then we would try to establish just

8    what a short time they were together in the gym and whether

9    they were occupied doing other things and whether he was paying

10   attention to what Dzhokhar was doing all the time.  It's just

11   not fair.

12         MS. CONRAD:  They have all that in the document.  The

13   document talks about what they did while they were at the gym.

14         MR. BRUCK:  And they also have on video parts of it.

15         MS. CONRAD:  Right.  But he said --

16         THE COURT:  All right.  I think that one can stay in,

17   in the context where it says he only saw him that one time.

18         MR. BRUCK:  You said it can stay in?

19         THE COURT:  Can.

20         MS. CONRAD:  Yes.  I don't think you had any

21   objections on 3269, according to my notes, which is the June

22   11th.

23         MR. WEINREB:  That's right.  We had no objection to

24   that one.

25         THE COURT:  Okay.

1          MR. WEINREB:  Just -- I don't want to belabor the

2     earlier argument, I just want to add one thing to the record in

3     response to Mr. Bruck's statement about Zubeidat's

4     radicalization -- purported radicalization.  She's an available

5     witness to the defense, as far as we know, and until -- unless

6     it's shown otherwise, I don't think that anything she had

7     written ought to be admitted into evidence.

8          MS. CONRAD:  She has an outstanding warrant.  It's not

9     clear she would be allowed into the country.

10         MR. WEINREB:  She would be allowed into the country to

11    testify.

12         MR. BRUCK:  I'm sure.

13         MR. WEINREB:  She's a U.S. citizen.  She doesn't need

14    permission to come into the country.

15         MS. CONRAD:  I just do also want to add with respect

16    to this whole thing about the Russian information, I mean, you

17    know, looking at the Intelligence Community record and so

18    forth, Tamerlan was placed on the terrorist watch list.

19         THE COURT:  Yeah, okay.  I want to solve these

20    documents because we have a jury sitting there and they're

21    going to get read to for a while.  I want to get to it, okay?

22         MS. CONRAD:  Okay.  Right.  I get it.

23         THE COURT:  And so we, I think, indicated at the

24    bottom of page 5 and the top of page 6 those two short

25    paragraphs will come out.  I think just to move things along,

1    we should take out the sentence the government objects to about

2    the FBI.  That doesn't defeat the rest of your argument.  We'll

3    deal with that in other respects and move on so we could get

4    this read to the jury.  It's the -- I guess it's the second

5    sentence of the third paragraph on page 3.

6              MS. CONRAD:  Okay.

7              THE COURT:  I'm sorry.  The third sentence.

8              MS. CONRAD:  Yeah, I got it.

9              THE COURT:  That's just to move us off the dime here.

10             MS. CONRAD:  And also on the following page, on page

11   4, Dolakov thought that Tamerlan was being followed by the FBI?

12             THE COURT:  Let me look at that again.  Yes, yes.  The

13   last line, yes.  I think then you can get the Dolakov stuff in.

14             MS. CONRAD:  Judge, your Honor has said at sidebar

15   that you were going to tell the jury that, you know, because

16   that these are witnesses or these people are not subject to

17   cross-examination, they should give it less weight or whatever

18   you were going to say.  I think if you're going to say anything

19   like that, it shouldn't come now; it should come in the final

20   instructions just as it would, for example, if someone were

21   testifying pursuant to a plea agreement or had gotten some kind

22   of consideration.  That instruction is not generally given at

23   the time the person testifies; it is given at the end of the

24   case.

25             THE COURT:  Sometimes it's given both.  I'm going to

1   do it now.

2           MS. CONRAD:  Well --

3           THE COURT:  I'll do it again, actually.

4           MS. CONRAD:  -- I emailed some cases on the Fifth

5   Amendment point.  I mean, by analogy one of them was *Bartelho*

6   and the other one was *Gary*, both First Circuit.  *United States*

7   *versus Gary* and *United States versus Bartelho*.  The fact that a

8   witness takes the fifth as to a collateral matter does not make

9   their testimony inadmissible.  I think it's by analogy here.

10          THE COURT:  Yeah, I don't think the cases are on

11  point.  This is a unique circumstance again, by nature of this

12  proceeding.  It would be justifiable to refuse to accept the

13  document at all.  I'm proposing to relax it so you could have

14  the benefit of the document, but attaching to that the

15  condition that the jury understand that the reason the witness

16  isn't saying this on the stand subject to cross-examination is

17  because he refuses to.  I won't say it that bluntly.  But I

18  think if they have otherwise inadmissible evidence, they should

19  understand a little bit about the context, that's all.  I just

20  think it's a balancing ruling.

21          MS. CLARKE:  And so the Court remembers that Dolakov

22  isn't refusing.  We just can't find him.

23          THE COURT:  Right.  No, this is Vakhabov.  This is

24  Vakhabov.

25          MS. CONRAD:  I might need a couple of minutes just to

1   make the additional redactions.

2          THE COURT:  Okay.

3          MS. CONRAD:  I know.  I just don't want to

4   accidentally have it flash up on the screen and see something

5   we don't want to see.

6          (The proceedings adjourned at 2:47 p.m.)

1                          C E R T I F I C A T E

2

3              I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4      the United States District Court, do hereby certify that the

5      foregoing transcript constitutes, to the best of my skill and

6      ability, a true and accurate transcription of my stenotype

7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

8      United States of America v. Dzhokhar A. Tsarnaev.

9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12

13     Date:  1/22/16

14

15

16

17

18

19

20

21

22

23

24

25