```
                   UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )



              BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE



                          LOBBY CONFERENCE



              John J. Moakley United States Courthouse
                          Courtroom No. 9
                          One Courthouse Way
                     Boston, Massachusetts  02210
                      Wednesday, April 29, 2015
                             9:16 a.m.



                     Marcia G. Patrisso, RMR, CRR
                        Official Court Reporter
                     John J. Moakley U.S. Courthouse
                     One Courthouse Way, Room 3510
                      Boston, Massachusetts  02210
                           (617) 737-8728

              Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10             Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2      THE COURT:  So what's on the agenda?

3      MR. WEINREB:  So we received notice at various times

4 last night and early this morning of new exhibits that the

5 defense intends to introduce with witnesses, including ones

6 that may testify even before the first break, and so the

7 government has some motions.

8      So we received notice that Professor Reynolds will

9 be -- they intend to ask him about all sorts of computer

10 exhibits that were entered into evidence:  YouTube videos,

11 emails, Tamerlan's -- all of these are Tamerlan Tsarnaev's

12 computer -- his Odnoklassniki page, Kavkaz Center pages, some

13 Internet history, YouTubes relating to Syria and other things.

14 None of this was noticed in the disclosure of his expert

15 testimony.  The government has had no time to review these

16 exhibits, to prepare to cross-examine him on them.  We've been

17 given no summary of what he's going to say about them, no

18 statement of the bases and reasons for his opinions or anything

19 like that.

20      Mr. Reynolds was noticed back on -- by letter back on

21 October 2nd, 2014.  After giving his background, the defense

22 wrote, "Professor Reynolds will testify in response to the

23 government's three terrorism and geopolitics experts.  He will

24 provide context to the government experts' brief mention of the

25 conflicts in Chechnya and Dagestan, the defendant's references

1    to Chechnya in high school essays..." none of which ever came

2    into evidence "...and the presence of Russian-language violent

3    extremist materials emanating from or concerning the North

4    Caucasus on various electronic devices seized by the

5    government."  But then it said he will do so by briefly

6    describing the history of the Chechen people and that their

7    culture of self-reliance, independence, and so on, and then it

8    goes on to explain in some detail, five paragraphs of it, all

9    this history of the Chechen people and culture of

10   self-reliance, independence, familial and clandestine norms

11   that he intends to testify about.  So he was noticed purely as

12   somebody who would provide context to things by describing the

13   history of the Chechen people and their culture.

14         There was no notice given of these.  And frankly, your

15   Honor, I'm not an expert on Near East studies.  I cannot just

16   off the top of my head cross-examine him about these matters.

17   There's no -- we simply had no opportunity to consider -- I

18   need a statement of what it is that he's going to say about

19   them so that I can do some research on it, I can consult with

20   our expert on it, I can figure out whether there is a basis to

21   challenge him on it.  That's what notice of experts is for.  If

22   the rules mean anything, it means that we need to get some sort

23   of notice other than being told at 6:38 p.m. the night before

24   he testifies that all of these things are now going to be the

25   subject of his expert testimony.  So that's our first motion in

1    limine.

2          MR. BRUCK:  Well, there's less to this concern than

3    meets the eye.  Professor Reynolds will provide cultural and

4    historical background which really primarily goes to the issue,

5    in the end, of big brother-little brother in Chechen culture

6    and why historically the culture has evolved the way it has.

7    He will also explain the history that -- underlying the fact

8    that the Tsarnaev family, the father's generation, originated

9    in Central Asia, 2,000 miles away from Chechnya, which is

10   something I referred to in opening, simply by telling the story

11   of deportation, all of which was noticed.

12          He will then give, as we also noticed, the very brief

13   account, just a summary outline, of the last 20 years of

14   Chechen history, the two wars, and the critical point being

15   that the Chechen independence movement has been, in effect,

16   hijacked by radical Islam and the -- which was something that

17   was referred to by Dr. Levitt.  So he's going to expand on

18   that.

19          And the exhibits about which the government is so

20   concerned is simply he's going to note -- we've already put in

21   evidence this enormous amount of Internet traffic by Tamerlan

22   Tsarnaev, much of which focuses on radical Islamist websites

23   that originate from the Caucasus, Chechnya and Dagestan.  And

24   he's going to give about three or so or four examples of what

25   these things are like.  He's not going to give an expert

1    opinion about them.  We're just going to -- I mean, at that

2    level he's going to almost be like a reader witness.  We're

3    going to unpack a couple of these things, play three minutes or

4    so of a propaganda video about Syria that comes from

5    KavkazCenter.com, which is the leading jihadi website

6    originating from the Caucasus.

7         And the point of all of this is to illustrate that

8    young Chechens like Tamerlan Tsarnaev -- and the government

9    wants to argue Dzhokhar Tsarnaev -- in the Chechen diaspora,

10   outside of Chechnya who sort of go looking for their history

11   and for their roots online would find jihad, which is a sort of

12   phenomenon of the early 21st century which has a story behind

13   it, and he's going to tell that.  Now, that is all encompassed

14   by what we told the government he was going to do.

15        And these are not -- these particular websites, I

16   mean, all the links are in evidence.  We got them from the

17   government.  They're on the -- on Tamerlan Tsarnaev's computer.

18   And they don't require, you know, expert response.  It's -- to

19   the extent that there's a story to tell, it is consistent with

20   a very brief part of Dr. Levitt's testimony.  And so this is

21   just illustrating evidence that's already here.

22        THE COURT:  As I understand it, sometime there was an

23   identification of slides that Professor Reynolds would use in

24   connection with this.  And that may be a separate -- somewhat

25   separate topic because I understand that's been revised and so

1   on, and I've seen a version.  It looks to me like it needs

2   further revision.

3            MR. BRUCK:  Yes, we've been on this.

4            THE COURT:  But it seems to me that that was a vehicle

5   or an occasion when the defense was notifying the government

6   what visuals were going to be used with his testimony.  And if

7   this material was excluded from that, I think the fair

8   conclusion from somebody receiving that would be "I don't have

9   to look at anything beyond this."  So, I mean, it seems to me

10   it would be a little misdirection.

11            MR. BRUCK:  Well, I mean, we've been -- the government

12   was pushing back about telling us they were going to object to

13   things, we were deciding what -- we wanted to use exhibits

14   which weren't actually in the discovery.  We decided we would

15   use exhibits that were in the discovery.  And so it's been a

16   dynamic situation.  We've been changing in response to

17   indications from the government about what it would and would

18   not object to.

19            But misdirection?  I mean, these are links that were

20   on the computer.  He's not analyzing them; he's simply using

21   them as illustrative.  There are hundreds and thousands of

22   links.  And to pick out two or three and say, This is the sort

23   of thing that Tsarnaev was watching and where it comes from and

24   why these sites exist is all we're going to do with it.

25            THE COURT:  I think it's too late, frankly, given the

 1    history.  I mean, I'm not sure in the abstract, in another

 2    timeline it would be, but I think it's beyond what was

 3    indicated would be the scope of his testimony.  The night

 4    before his morning testimony I think is just too late to do it.

 5         MR. BRUCK:  In the alternative, can we withdraw him

 6    until next week and let the government look at these?

 7         THE COURT:  Yes, if you think it's that important.

 8    I'm sure it is.  But I haven't seen them so I don't know what

 9    the connection is.

10         MR. BRUCK:  We could also re-call him, I guess.

11         THE COURT:  I would rather not have him re-called.  If

12    you want to postpone him, that's one thing.

13         MR. BRUCK:  We'll need a moment to think about that.

14         MS. CLARKE:  It will certainly affect our overbooking,

15    underbooking and scheduling.  We're doing the best we can.

16         THE COURT:  Call some of the relatives so they can get

17    out of here tomorrow.

18         MS. CLARKE:  We've got them on for tomorrow.

19         THE COURT:  Okay.

20         MR. MELLIN:  Your Honor, another concern is --

21         THE COURT:  What else.

22         MR. MELLIN:  As I understand it, the defense is going

23    to call two EMTs:  One that transported Tamerlan to the

24    hospital and one that transported the defendant to the

25    hospital.  The one who transported Tamerlan to the hospital,

1    I'm sure the point of that is to say he was still aggressive at

2    the time he was even in the ambulance on the way to the

3    hospital.  The defendant --

4            THE COURT:  Who are these people?

5            MR. MELLIN:  Laurel Lee and Michael Sullivan, I

6    believe.

7            THE COURT:  Okay.

8            MR. MELLIN:  Laurel Lee transported the defendant.

9            We don't see how any of that is relevant to this case.

10   The defense has already brought out through another photo that

11   has been introduced in the case that the defendant was shot and

12   that he had some injuries.  What they're trying to do now is

13   bring out the extent of those injuries through two very graphic

14   photos that we object to.  I think those were produced this

15   morning.  And there really is no point to -- for those photos

16   to be in this case.  It's irrelevant to what's going on in the

17   case and, in fact, one of the injuries that they want to focus

18   on is an injury to the face which the EMT will testify was a

19   fresh wound.  It was probably a wound that happened while he

20   was in the boat.  To the extent that the defense is trying to

21   say, Well, this might help explain what he was writing and what

22   he was saying as he was preparing his manifesto, this wound

23   occurs well after that.

24           Given that, it's irrelevant --

25           (Interruption in the proceedings.)

1          MR. MELLIN:  Given that, your Honor, they're only

2     being produced for sympathy and they are more prejudicial than

3     probative.  In fact, I don't know what the probative value of

4     them is.

5          THE COURT:  Is this the three of them?

6          MR. WEINREB:  Yes.  Two.

7          MR. MELLIN:  The first one I believe is already in

8     evidence.

9          MR. WATKINS:  It is not.  The government objected on

10    authentication grounds kind of.  This person will clearly

11    authenticate that.  So --

12         THE COURT:  These were at the hospital?

13         MR. WATKINS:  That's correct.

14         But Mr. Mellin's quite right that the EMT will say

15    that those are consistent with the wounds that she observed in

16    the ambulance.

17         MR. WEINREB:  We were given these at 8:15 this

18    morning.

19         MR. WATKINS:  These are all -- well, certainly 36D has

20    been an ongoing issue.  We are not trying to introduce the

21    whole set.

22         THE COURT:  The first one is from that group?

23         MR. WATKINS:  The first one is from that, and this is

24    the last one.  So that is all that will be in evidence.  But to

25    the extent the government was arguing authentication, they now

1    have a witness that they can cross-examine about.  That was the

2    complaint before.  So clearly there's not an issue with that.

3         As far as the general matter of whether this witness

4    can testify, I think it is fair -- there is going to be quite a

5    marked difference between Tamerlan Tsarnaev when he's

6    transported to the emergency room and Jahar Tsarnaev when he's

7    transported to the emergency room.  The government has talked

8    about equal partners and Mr. Tsarnaev being dedicated to the

9    cause in an equal way that his brother was.  This, I

10   think -- not "I think."  I know that this will cut against that

11   theory that the government has proposed all along.

12        As far as the pictures, there are many, many far more

13   graphic pictures.  I went out of my way to choose two pictures

14   which I think are the least controversial.  There are lots of

15   pictures during the surgery and the like that could have been

16   introduced.  This is the least graphic of all of them.

17        The government, as I understand it, has talked about

18   this smirk that Mr. Tsarnaev had on his face during the video

19   that was played out there.  Clearly those -- those injuries are

20   part of the evidence, and that's something that the jury should

21   be able to know.

22        In addition, to Mr. Mellin's argument that the wound

23   was fresh and therefore irrelevant to the boat writings,

24   absolutely.  Bring that out on cross-examination if he likes.

25   Try to prove that to the jury.  I would say that that's not

1    necessarily supported.  It's not a done deal at all.  So to the

2    extent -- I do think the jury can take that into account,

3    Mr. Tsarnaev's condition as he's writing those messages in the

4    boat.

5          So I think for all of those reasons, both the

6    testimony itself -- which is going to be extremely brief.

7    Perhaps ten minutes' log all together, perhaps 15 to get the

8    background of the ambulance drivers, but it's going to be

9    extremely brief.

10         And I know Ms. Conrad was trying to get my eye here.

11         MS. CONRAD:  Yeah.  So as far as the video, I saw a

12   little -- you know, the problem as far as the cell block photo,

13   the still the government showed, it looks like -- and I don't

14   know if they argued that or if they will argue that, but

15   certainly the jury could draw the conclusion that it's a sneer,

16   that it's a contemptuous expression.  And I asked Mr. Oliveira,

17   Deputy Marshal Oliveira, on cross whether he was aware that

18   Mr. Tsarnaev was shot in the face, and he sort of demurred and

19   said, "Well, you know, I'm not sure.  I know he was injured."

20   This shows that he was shot in the face.  And that is one of

21   the main purposes for showing it.  To explain also his

22   expression in the courtroom.  The left side of his face is

23   immobile, essentially.  And the jury has a right to know why

24   that is.

25         I also want to mention that his physical condition

1    when he was arrested undercuts the suggestion that he didn't

2    surrender immediately out of some kind of resistance or

3    defiance as opposed to the fact that he was simply physically

4    unable to get out of the boat and likely unconscious.

5            THE COURT:  Well, all right.  I'll think about it.

6            MR. WEINREB:  Okay.

7            THE COURT:  I understand the objection.

8            MR. WEINREB:  And I would just like to add one thing

9    in response to what Ms. Conrad just said which is that the

10   government has not and will not draw attention to the

11   defendant's demeanor in the courtroom in order not to burden

12   his Sixth Amendment right to be present, but if the defense

13   does, then we would deem that to be a waiver by opening the

14   door to fair response on that.

15           MS. CONRAD:  I'm not saying --

16           THE COURT:  All right.

17           MR. WEINREB:  There is one other thing.

18           MS. CONRAD:  The jury obviously is looking at him.

19           MR. WEINREB:  There's one other thing I would like to

20   put on the record.  The defense has notified us that certain

21   witnesses who were scheduled for today may be moved to

22   tomorrow, which is no problem.  However, I just want to again

23   make clear on the record that five witnesses have a scheduling

24   issue.  They're going back to Russia on Friday.  And it's often

25   the case that witnesses have scheduling issues and the parties

1    that seeks to call them either has to accommodate their

2    schedules or forgo their testimony.

3           If the defense leaves them to Thursday, and especially

4    leaves them to later on Thursday rather than first thing in the

5    morning, they're doing so at their own risk because these

6    witnesses are scheduled to leave on Friday and they're going to

7    leave.  So we will deem this to be a waiver of any rights that

8    they have.

9           THE COURT:  So there's five and they all have the same

10   exhibits for them.  It occurred to me that you're not going to

11   use all of them.  There's some backup here?  Is that --

12          MS. CLARKE:  No, our plan is to use them all.  We just

13   listed those exhibits because we didn't know who would put in

14   which one, and there may be some other family photos that the

15   government has.

16          THE COURT:  So you think all five are noncumulative?

17          MS. CLARKE:  Yes.

18          THE COURT:  Okay.  Well, I think that just underscores

19   the point.

20          MS. CLARKE:  And our point is -- and our plan is to

21   put them on -- all on tomorrow.  We really don't appreciate the

22   government's continuing threat that they're going to take them

23   away.

24          MR. WEINREB:  It's not a threat.  I'm just --

25          MS. CLARKE:  We absolutely plan to put them on

 1   tomorrow.  We needed as much time as we could get.  They were

 2   put under the glare of the media --

 3           THE COURT:  Why can't they come in this afternoon and

 4   get a head start on tomorrow?

 5           MS. CLARKE:  Judge, we're doing the best we can with

 6   them.  And I think the record should reflect the flurry of the

 7   leak that caused them to be chased by the media to a hotel,

 8   removed from that hotel to another hotel.  They've had to be --

 9   you know, they've got two FBI agents per witness, they have

10   them in ankle bracelet.  These are people who are coming from

11   villages in a -- from the moon.  They've landed on the moon

12   here.  And we've done our best to sort of let them acclimate to

13   being in the United States, in Boston, calm their fears.  I

14   think the FBI has even switched its view of what's going on to

15   protect them rather than protect America from them.

16           It's not a good situation and we're dealing with it

17   the best we can.  They're scheduled for tomorrow.  I'm

18   confident we can get them all on and off tomorrow unless the

19   government, you know, spends the morning objecting to what

20   we're about to do.

21           THE COURT:  Okay.

22           MR. WEINREB:  Folding in time for objections, for

23   cross-examination, that's all part of scheduling one's

24   witnesses.  There's absolutely no threat here.  These witnesses

25   are here at enormous expense and difficulty for the government.

 1   They were -- every effort was made to get them their parole

 2   expeditiously and to get them here as quickly as possible.  By

 3   tomorrow they will have been here for a week.  And the defense

 4   has had four full days in which to put them on the witness

 5   stand.

 6          It's not reasonable or fair to ask that they be kept

 7   here over Friday, Saturday, Sunday, all again until Monday

 8   simply because the defense chooses not to call them until the

 9   last minute.  So they're going back.

10          THE COURT:  Well, I don't think the government's

11   position is unreasonable in the travel arrangements, and since

12   this has been vetted, I don't think you can expect to look to

13   me for any relief if you don't have them finished.

14          MS. CLARKE:  If for some odd reason they're not done,

15   then we'll be asking the Court to let us go on Friday morning

16   to finish them up.  They don't leave until Friday night.  But

17   our intention is not to keep them over the weekend.  These

18   folks don't want to be here any more than the government wants

19   them to be here.

20          It does raise a related issue, Judge.  They have ankle

21   bracelets on that we've now been advised could possibly be

22   audiotaping what's being said.  Now, Mr. Chakravarty was going

23   to check on that.  That comes as a complete stunning surprise

24   to us.  And if that is happening, we would ask that it be cut

25   off, and if it is happening, that those audiotapes be sealed

 1    and destroyed and not listened to by any prosecuting authority

 2    or anybody closely related to the prosecution.

 3              THE COURT:  You'll find out about that.

 4              MR. CHAKRAVARTY:  I've inquired.  Regardless, for the

 5    record, the prosecution team has no awareness of any

 6    communications that the attorneys are having with those

 7    witnesses.  If there is some other reason why that is

 8    happening -- and we have no reason to believe it is, but if

 9    there were some other reason, they would be filtered and

10    shielded from the prosecution.

11              For purposes of their testimony, it's also our

12    intention to have those bracelets removed for purposes of

13    testimony.  We don't know if that's going to be possible, but

14    we think it probably will be.

15              THE COURT:  All right.  So the order of witnesses,

16    Mr. Lipson is going to finish up?

17              MS. CONRAD:  Yes.  I only have a couple of questions.

18              THE COURT:  And Ms. Petri is going to go back on the

19    stand and read things?

20              MS. CONRAD:  Correct.

21              THE COURT:  Do we have issues with what she's reading?

22              MR. WEINREB:  Yes, your Honor.  We filed motions to

23    exclude virtually all of them.  There was a motion in limine

24    filed a week ago.  And I can review what the objections are.

25              THE COURT:  I think we should resolve them now because

1    she's going to be on very soon, I would assume.

2         So I don't know that I have all the copies.  I have

3    copies of some of them.  3200 and 3200A.

4         MS. CONRAD:  Yes, those are the text message, SMS

5    messages.

6         (Attorneys Clarke, Mellin and Watkins exited the

7    proceedings.)

8         MR. WEINREB:  We filed a supplemental memorandum last

9    night.

10        THE COURT:  Okay.

11        MR. WEINREB:  So on top of our other objections which

12   we made at length yesterday, and I won't repeat about the

13   dubious nature of this material and the jurors' inability to

14   weigh it, is the fact that it is a written statement by a

15   witness who's available to the defense and has been all along.

16   She's an American citizen.  She needs no visa, no parole to

17   enter the country.  And the defense has a statutory -- has the

18   power to subpoena her.  There's a statute that specifically

19   provides that an American citizen in a foreign country can be

20   subpoenaed and that subpoena can be enforced.

21        The defense doesn't want to call her to the witness

22   stand and ask her about whether she was radicalized or she did

23   anything to radicalize Tamerlan because she'll deny it.

24   Instead, they want to put in a written statement that can't be

25   cross-examined or put into context or can't even be

1  authenticated.  That's just entirely unfair.  It will be read

2  to the jury and the government will have nothing to say about

3  it and no way to say anything about it.  That's the whole

4  reason we require witnesses to be on the witness stand, so that

5  they could be questioned about it.  If they deny it, they can

6  be impeached with it.  They have a chance to explain what was

7  in it.  Maybe they'll say, "I didn't mean what I said."  Maybe

8  they'll say, "You're misinterpreting it."  Maybe they'll say,

9  "I never wrote that.  The government made it up."  And that's

10  all something that the jury ought to be able to hear and

11  they're not going to hear it if she doesn't take the witness

12  stand.

13          MS. CONRAD:  Well, so, this is -- first of all, this

14  is not a statement that's being offered for the truth; this is

15  a statement that she made.  It's made -- but I mean --

16          THE COURT:  It's a statement the Russians say she

17  made, right?

18          MS. CONRAD:  Yes.

19          THE COURT:  Is there any way of testing its

20  authenticity?

21          MS. CONRAD:  I mean, you know, the frustrating thing

22  here, Judge, is that the information regarding how this

23  information, when this information was transmitted to the

24  United States government is entirely within the possession,

25  custody and control of the executive branch.  And the

1   government has not provided us with any information about this.

2   What we do know is that the American government acted on this

3   information, first of all, by sending FBI agents to interview

4   Zubeidat Tsarneva and Tamerlan Tsarnaev, and secondly, by

5   placing Tamerlan Tsarnaev on the terrorist watch list.  It is

6   basically her state of mind.

7          As far as verifying that she wrote it?  I don't think

8   there's any reason to think that she didn't write it.  She's

9   writing to her former son-in-law, it's someone that she knows.

10         (Attorneys Clarke and Mellin rejoin the proceedings.)

11         MS. CONRAD:  It is typical of her style of

12  communication, which we all kind of know from personal

13  experience.  And I think the government, if it has some issue

14  as far as its reliability, should come forward with something

15  more than just, you know, well, gee, we don't know.

16         I mean, the government acted on this information.  It

17  is -- it is basically her expression of her state of mind.

18  It's not being offered for historical fact.  You know, to bring

19  her to this country, the media circus that we just saw last

20  week would be magnified tenfold exponentially if she were to

21  come to this country, not to mention the fact that she has an

22  outstanding warrant in Rhode Island, and I have no doubt that

23  as soon as she --

24         MS. PELLEGRINI:  Framingham.

25         MS. CONRAD:  Sorry.  Framingham.

1          And I have no doubt that the minute she set foot in

2     this country she would be arrested.

3          So for us to make the defendant's mother come under

4     those circumstances is just not possible.

5          THE COURT:  Now, just to vet everything, assume that

6     objection is not sustained and the document is perhaps usable.

7     Are there things about the document, the use of the document

8     itself, that are problematic or is that the main --

9          MR. WEINREB:  Well, there are several problems with

10    the document.  First of all, it's just not true to say it's not

11    being offered for the truth of the matter asserted.  She

12    asserts in it that "Tamerlan said this to me.  I said this to

13    Tamerlan."  Her state of mind is irrelevant to this case.  What

14    does it matter what her state of mind is after she leaves the

15    country and goes to Dagestan or -- I'm sorry -- not when she

16    goes but during the time that this is purportedly sent.

17          Her state of mind is so remote to the issues in this

18    case that that would not be a basis for admitting it in the

19    first place, especially given the prejudicial nature of it, the

20    risk that the jury will treat it as being offered for the truth

21    of the matter asserted and the dubious provenance of it.

22          The other thing I want to correct for the record is

23    that we have disclosed everything we know about this document.

24    It was given to -- from the Russian government to the United

25    States government after April 15th, 2013.  That is all we know

1   about it.  That is all we have ever been able to find out about

2   it from the Russian government.  We have been given no

3   information about where they got it, how they got it or

4   anything like that.  So --

5              THE COURT:  Okay.

6              MR. WEINREB:  -- that objection is not well taken.

7              And to the extent that the Court is inclined to admit

8   it, then we would propose to, at least at a minimum, redact

9   every assertion of fact in it so that the jury does not take it

10  for the truth of the matter asserted.

11             MR. CHAKRAVARTY:  There's one other point.  This is

12  not a circumstance where we're also explaining the

13  circumstances, the nature of the bilateral relationship,

14  whether they -- the Russians give reliable or unreliable

15  information in the past.  It's not something that we can offer

16  up a witness to be able to explain.

17             THE COURT:  Yeah, okay.  Fine.  I understand that.

18  I'll --

19             MR. WEINREB:  Okay.  The Kartashov redacted 302 -- or

20  not 302.

21             THE COURT:  Yeah, it is 302.

22             MR. WEINREB:  302?

23             MS. CLARKE:  We're not using the Skype conversation.

24             MR. WEINREB:  Didn't this already --

25             MS. CONRAD:  No, Kartashov did not come in.  Vakhabov

1   and Dolakov.  So this is 3202A.

2        MR. WEINREB:  Right.  So unlike with respect to

3   Vakhabov and Dolakov, we don't waive our objection to this 302

4   because this is one where we do have -- first of all, we regard

5   it as cumulative in light of the others that have come in; and

6   secondly, there were grave doubts about Kartashov's reliability

7   as a witness.  He's in prison, he's got other

8   impeachable -- maybe I should defer to Mr. Chakravarty who's

9   more familiar with this.

10        MR. CHAKRAVARTY:  Well --

11        MS. CONRAD:  The government -- I'm sorry -- but the

12   government, well, only objected to portions, not to the

13   admission of the entire thing.  I'm looking at the motion in

14   limine that was filed.  It says portions should be excluded

15   because they are irrelevant or more prejudicial than probative.

16   So this is the first time I'm hearing that the government is

17   objecting to the entire thing.

18        MR. CHAKRAVARTY:  So, your Honor, the touchstone has

19   been with the reliability of the witness and the circumstances

20   in which these statements were made.  These statements were

21   made for -- Mr. Kartashov was associated with the Union of the

22   Just which is this organization that the Russian government is

23   not particularly fond of, and when placed in custody in

24   circumstances post bombing where they're looking for the help,

25   he had all the incentive in the world to explain, to exculpate

1    his own involvement and to implicate Tamerlan as being

2    unstoppable or in some other way pursuing jihad despite his

3    admonitions.

4         That self-serving nature of those statements leads to

5    the additional lack of credibility when you -- on top of that,

6    you put him in jail.  He's arrested at a wedding in which

7    essentially he was accused of being essentially anti-Russian

8    and fomenting hatred.  So he had every incentive in the world

9    to suggest just the opposite, and that's what those statements

10   reflected, that he was counseling Tamerlan to avoid going into

11   the forest, statements which I should add the audio files which

12   Mr. Fick introduced yesterday substantially, if not even --

13   better evidence of that was introduced yesterday by having

14   Tamerlan's own conversation with others related to that very

15   same issue.  So this will be entirely cumulative and, in fact,

16   it will be the opinions of Mr. Kartashov as opposed to facts as

17   to what his interaction was with Tamerlan.

18        MR. WEINREB:  And the agreement not to -- the

19   statement in the motion that we would only object to portions

20   of it was made at a time that we had outstanding objections to

21   the Vakhabov 302 and others that have now been admitted and we

22   believe now render this cumulative and more prejudicial than

23   probative.  Its probative value is diminished with -- over time

24   because of the other testimony that's come in.  This is

25   arguably more reliable.

1          MR. FICK:  First of all, on the issue of

2     cumulativeness, it's really a uniquely different piece of

3     evidence that does corroborate some of the other evidence in

4     the case.  But this is the man in Russia who interacted the

5     most with Tamerlan and had direct observations of Tamerlan's

6     state of mind, the things he said, the things he did, the

7     things he was interested in.

8          The Court will recall that we sought to obtain a

9     deposition of this witness.  The Court denied that in part at

10    the time, as I understood it, because the Court indicated,

11    well, there was this 302.  Hearsay can come in during the

12    penalty phase and that would likely happen.

13         The issue about reliability I think is also not well

14    taken.  In a sense, what Mr. Kartashov has said to the FBI is a

15    statement against interest.  The FBI interviewed other members

16    of the Union of the Just in Russia, and those folks all sort of

17    demurred or minimized Tamerlan's own radicalization because

18    that is -- if someone wanted to hide and suggest there was no

19    culpability the way they would do it would be to say, "No, no,

20    we didn't notice anything about him."

21         In contrast, Kartashov was very forthright.  He talked

22    explicitly and expressly and in detail about Tamerlan's state

23    of mind and about his efforts to talk to Tamerlan, and sort of

24    concluded that, you know, "when Tamerlan left, I thought he had

25    sort of calmed down."  But the overall account is actually much

1   more consistent with the other evidence we've seen both here

2   and on some of those audiotapes.  But it's really unique

3   because it's the one human being in the world who interacted

4   the most with him and told the FBI about that experience.  So

5   it's really a uniquely --

6              THE COURT:  All right.  I want to move along.  We have

7   a jury sitting here.  I'm not going to bar it entirely.  So the

8   question comes down to redaction.  And I have a redacted

9   version here.  I don't know whether it's been gone over or

10  whether there's --

11             MS. CONRAD:  I have not compared my redactions to what

12  the government wanted.

13             THE COURT:  I will admit it with the same caution to

14  the jury about judgment of its reliability and weight and so on

15  and so forth.  And also, because I had signaled that I would

16  admit it as a solution to the deposition problem.  So I think

17  it's fair to admit it.  And I do think it adds things that the

18  other affidavits or 302s did not add.

19             So the battleground becomes particular redactions and

20  I don't know where you are on that.  As I say, I have a

21  redacted version here.

22             MR. WEINREB:  Do you have my redacted version?

23             MS. CONRAD:  I just have the one that you attached to

24  your opposition.  I have not compared it to what I did.  So we

25  can take a few minutes maybe we can try to work things out.

1          MR. WEINREB:  So the government's offered proposed

2     redactions and the defense needs a chance to review it.

3          THE COURT:  That may be what this is.  I don't know

4     where I printed from at this stage.

5          MS. CONRAD:  The government's proposed redactions were

6     highlighted in yellow, so the ones that actually show portions

7     blacked out, those are my redactions.

8          THE COURT:  Okay.  Well, see what the differences are,

9     if any.

10          MR. WEINREB:  Moving on.

11          THE COURT:  I think that brings us to the two reports.

12          MR. WEINREB:  Yes.

13          THE COURT:  Again, just to expedite things, I have

14     looked at those as well and I have some proposed redactions.

15          MS. CONRAD:  Okay.

16          THE COURT:  I think there is some narrative of what I

17     think are probably not disputed facts and then there are parts

18     that are, I think, speculative and not well supported.

19          MS. CONRAD:  So that would be 30, just for the record

20     3023A.

21          THE COURT:  3023A.

22          MS. CONRAD:  That's the Intelligence Community report.

23          MS. PELLEGRINI:  We don't have --

24          THE COURT:  No, 3A is the --

25          MS. CLARKE:  Homeland Security.

1          THE COURT:  House Committee.

2          MS. CONRAD:  I'm looking at the wrong one.  I

3   apologize.

4          THE COURT:  I'm looking at page 11 of 37, which is the

5   first one after the title.

6          MS. CONRAD:  So, I'm sorry.  After the title, you

7   said?

8          THE COURT:  The first page after the cover page is 11

9   of 37.

10         MS. CONRAD:  Yes.

11         THE COURT:  And it has a heading "2011 Assessment of

12   Tamerlan Tsarnaev."

13         MS. CONRAD:  Yes.

14         THE COURT:  I think those two paragraphs that go over

15   to the top of the next page are admissible as narrative of

16   facts that are not really in dispute.

17         MR. WEINREB:  It may be that they're not in dispute

18   but they're utterly irrelevant.

19         THE COURT:  Well, they may be.  But -- then just to go

20   through, I think beginning with the next paragraph over to the

21   end of the first paragraph on page 13 is -- should be redacted.

22         MS. CONRAD:  So where it says "The FBI case agent,"

23   that paragraph starting there?

24         THE COURT:  Correct.

25         MS. CONRAD:  On page 12?

1            THE COURT:  Through over to the end of the first

2    paragraph on the run-over paragraph on page 13.

3            MS. CONRAD:  Well, I think I redacted that out so --

4            THE COURT:  Okay.

5            MS. CONRAD:  -- it's that paragraph after --

6            THE COURT:  Let me just give you mine.

7            MS. CONRAD:  Sure.  I want to make sure I'm following.

8            THE COURT:  I'm not looking at your -- I'm looking at

9    a prior version.

10            MS. CONRAD:  I got it.

11            THE COURT:  So there may be some overlap and there may

12    not be.  Then the paragraph after "The FBI's assessment" can

13    stay in.

14            MR. WEINREB:  So the paragraph after it or that

15    paragraph itself?

16            THE COURT:  The paragraph that --

17            MS. CLARKE:  I think you guys are looking at different

18    pages.  Yes.

19            THE COURT:  Yes, that paragraph can stay in.

20            MR. WEINREB:  That can stay in?  Okay.

21            THE COURT:  And the rest of the document should be

22    redacted.

23            MS. CONRAD:  Including "travel to Russia"?

24            THE COURT:  You can have that one sentence but I think

25    that's cumulative.  So, no, I think it's neater just to end at

1    the end of the paragraph.  The rest is much more speculative,

2    it seems to me.

3            MS. CONRAD:  Okay.

4            MR. WEINREB:  So, your Honor, although we object on

5    relevance grounds, if this were to come into evidence, then we

6    would at least ask that it simply be read to the jury as a

7    stipulation, not that the majority staff of the committee on

8    Homeland Security be a witness in the case.

9            MS. CONRAD:  Well, Judge, I think it's admissible

10   under whatever the new version of 803(8)(c) is, which is a

11   report pursuant to legal obligation admissible against the

12   government --

13           THE COURT:  I'm not sure it fits that but I think it

14   can be identified for what it is.

15           MS. CONRAD:  And admitted?

16           THE COURT:  Read.

17           MS. CONRAD:  Not -- but we're seeking admission under

18   that rule, your Honor.  It's an official government document.

19   It is a compilation of information conducted as part of an

20   investigation pursuant to --

21           THE COURT:  Yes.  Yes.  I think the easiest way to do

22   it is to put it in with the cover page.

23           On the Intelligence Committee, again, it's

24   duplicative, I think.  But I have four pages which are numbered

25   1, 2, 7 and 8.  There are some redactions already on the page

 1    that I have.  The only additional redaction I would make is to

 2    the second full paragraph on page 2.

 3              MS. CONRAD:  Okay.

 4              THE COURT:  Otherwise, that's okay.  Oh, no.  There

 5    are two minor ones.  On page 8 there's a squabble about whether

 6    the FBI is responsible for transliterating improperly, and I

 7    think that's not necessary.  So that's the last sentence on the

 8    first run-over paragraph with the footnote.  It goes out.  And

 9    it happens again at the bottom of the -- actually, it's the

10    last sentence of the page, "Based on information, database..."

11              MS. CONRAD:  Last -- got it.

12              THE COURT:  Okay?  So that's just a squabble about

13    spelling.

14              MS. CONRAD:  And the first one, just to make sure I'm

15    on the same page, literally, "importantly"?  Begins with the

16    sentence, "Importantly, the memorandum including" --

17              THE COURT:  Correct.  Correct.

18              MS. CONRAD:  Sure.  I might need a moment or two to

19    make those redactions.

20              THE COURT:  Okay.

21              Next?

22              MR. FICK:  Just as a matter of concern about some

23    ongoing, I guess, leaks, quote/unquote, you might say, somehow

24    a transcript including sort of sidebar and chambers matters of

25    I think it was either Monday's proceeding wound up on the

1    Internet which became, among other things, a *Boston Globe* story

2    today, again sort of beating the drum about the amount of

3    resources being spent on the Russian witnesses who are here and

4    just feeding that frenzy.  So I'm not sure what, if anything,

5    can be done to establish how that happened, but I guess we

6    would just ask that especially the sidebar and chambers

7    conference portions of any proceedings be sealed and not, you

8    know --

9            THE COURT:  It was a misunderstanding by one of the

10   reporters, that's all.  One of the court reporters.

11           MS. CONRAD:  I think we still have more exhibits to

12   discuss.

13           THE COURT:  This looks like 3063A and 3064A?

14           MS. CONRAD:  So those are documents that are in

15   evidence that were seized from the Norfolk Street apartment.

16   Both 3063 and 3064 are in evidence, and these are just

17   translations.

18           MR. CHAKRAVARTY:  Well, they were in evidence for

19   limited purposes, to show that there was something found in the

20   liability phase from --

21           THE COURT:  From a notebook.

22           MR. CHAKRAVARTY:  Correct.

23           MS. CONRAD:  And Tamerlan's fingerprints were on these

24   items.

25           MS. CLARKE:  There was one --

```
 1          THE COURT:  Well, I think they can be shown to be what
 2   the thing is.  I mean, it's not offered for the truth that
 3   they're things.
 4          MS. CONRAD:  No, it's what he wrote.
 5          MR. CHAKRAVARTY:  It's what someone wrote.
 6          MS. CONRAD:  Well, one can infer from his fingerprints
 7   that he wrote it.  So I'm sorry, those are --
 8          THE COURT:  Yes.
 9          MS. CONRAD:  Including the translations?  They're in
10   Russian.
11          MR. FICK:  The government has had those for weeks.
12   Again, we would ask for any objections.
13          THE COURT:  Fine.  We've been over the admission by
14   party opponent.  That's not coming in.
15          MS. CONRAD:  May I just be informed of the basis for
16   that?  Previously I think it was first the government said --
17          THE COURT:  It's not an admission by a party opponent.
18          MS. CONRAD:  Well, under *Kattar* it is.
19          THE COURT:  No, it's not.
20          MS. CONRAD:  But if the rules of evidence don't apply.
21          THE COURT:  What's the next issue?  I have 3235A,
22   parents of 3236 --
23          MS. CONRAD:  Yeah, I don't think I'm going to offer
24   the fact that -- the substance of those reports.
25          THE COURT:  Those are the 302s.
```

1          MS. CONRAD:  Right.  Just the fact that they were

2     interviewed, which if I have a moment to check may be

3     actually --

4          THE COURT:  It's printed in the narrative, I think you

5     have.

6          MS. CONRAD:  Right.  I think it's in there.  So if we

7     get it in that way, then we won't be putting it in this way.

8          MR. WEINREB:  Then I think one additional thing was

9     just added, which is a Matanov 302.

10          MS. CONRAD:  There are two Matanov 302s.

11          MR. WEINREB:  Two Matanov 302s.

12          MS. CONRAD:  I think the earlier Matanov 302 the

13     government had and addressed.  I just -- we thought we might do

14     those later, but I think we might do them now.

15          THE COURT:  Yeah.  Is he available?

16          MR. FICK:  So his counsel had previously told us that

17     he would invoke the Fifth Amendment.  I actually called him

18     this morning to inquire again and I'm waiting to hear back just

19     to confirm that that is still his state of mind.

20          THE COURT:  I have to hear the answer to that.

21          MS. CONRAD:  Well, he is being, as the Court probably

22     knows -- being prosecuted in this court.

23          THE COURT:  I know.

24          MS. CONRAD:  The circumstances -- his current

25     circumstances are a little unclear because these 302s say

1   pursuant to a plea agreement he was debriefed.  As I've checked

2   the docket, I'm unaware of any plea agreement that he has.

3          THE COURT:  Well --

4          MS. CONRAD:  So, you know --

5          THE COURT:  At any rate, we have to solve whether he's

6   unavailable or not.  Sometimes people with plea agreements do

7   testify at the behest of the government.

8          MS. CONRAD:  Not for the defense, generally.

9          THE COURT:  Well, it would be an interesting question

10  whether they can pick and choose, so...

11         MS. CONRAD:  Well, it would be helpful if the

12  government could shed some light on what the circumstances are

13  and whether, in fact, there is a plea agreement.

14         THE COURT:  Now, if he is unavailable, are there two

15  302s?

16         MS. CONRAD:  Yes.

17         THE COURT:  There's a brief one that I saw just this

18  morning.

19         MS. CONRAD:  I sent one this morning.  There was one

20  that was previously marked and identified --

21         THE COURT:  Was it the day before?

22         MS. CONRAD:  No, it's in March, I believe.  I have

23  that.

24         MR. WEINREB:  Your Honor, if he's unavailable how can

25  the jury possibly be -- I mean, it will be an incredibly

1  lengthy sideshow to try to convince the jury not to believe a

2  word he says because of his prior convictions.  He's given

3  seven, maybe, statements over time.  He never says the same

4  thing twice.  Are we really going to read every single one of

5  those?

6          THE COURT:  Well, I want to take it one step at a

7  time.  Let's find out whether he's available or not.  If he's

8  available, there's no need to consider them at all.  If he's

9  unavailable, we'll consider whether they should be -- so they

10 can't be done now anyway.

11         MS. CONRAD:  But can I mention one thing?  If he were

12 a live witness and he made seven different statements, the

13 government would be perfectly within its rights to introduce

14 those other statements and wouldn't say he can't testify --

15         THE COURT:  And cross-examine.

16         But anyway, so that will have to be deferred.

17         MS. CLARKE:  Two, just sort of housekeeping matters,

18 Judge, I think none of us really were aware that the Court had

19 granted the discovery portion of the CT scan issue.

20         THE COURT:  Right.  Right.

21         MS. CLARKE:  So when we found that out, we brought the

22 CT scans that we have and provided them this morning so the

23 Court doesn't need to go forward with work.

24         THE COURT:  All right.

25         MS. CLARKE:  I hadn't been aware of it and I don't

1    think the government --

2            THE COURT:  Because I think it was, well --

3            MR. WEINREB:  We'll check with --

4            THE COURT:  -- an artifact of the sealing process, I

5    think.

6            MR. WEINREB:  Judge, we appreciate the defense doing

7    that.  We'll check with Beth Israel and make sure we've got it

8    all.  If it's true, then there is no need for --

9            MS. CLARKE:  If you have something different than what

10   we have, you might let us know.

11           MR. WEINREB:  We will.  We'll share it with you.

12           MS. CLARKE:  The other thing is the bracelets on the

13   witnesses, your Honor.  Mr. Chakravarty told the Court a little

14   earlier they're going to try to get them off.  If they can't,

15   we're going to have to ask the Court to assist us in getting

16   them off for purposes of the testimony, just to let you know.

17           THE COURT:  Okay.  All right.

18           MS. CONRAD:  Just in terms of immediate timing, I've

19   got Mr. Lipson -- finishing out Mr. Lipson on direct.  I do

20   need a few minutes to make the redactions before Ms. Petri goes

21   on and also to confer with Mr. Weinreb.  So I know we don't

22   want to keep the jury waiting but I need a few minutes.

23           THE COURT:  I understand.

24           MS. CLARKE:  But she can read before we admit the

25   document, right?

```
 1            MS. CONRAD:  So in other words -- the question is:

 2    What is she reading?

 3            MS. CLARKE:  Sure.  Judge, and one final housekeeping.

 4    If Professor Reynolds pulls from today, we're going to have

 5    some witness issues, just to let you know.

 6            THE COURT:  Okay.

 7            (The proceedings adjourned at 10:03 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4   the United States District Court, do hereby certify that the

 5   foregoing transcript constitutes, to the best of my skill and

 6   ability, a true and accurate transcription of my stenotype

 7   notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8   United States of America v. Dzhokhar A. Tsarnaev.

 9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date: 2/1/16
13

14

15

16

17

18

19

20

21

22

23

24

25
```