```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )
```

                BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                      UNITED STATES DISTRICT JUDGE


                         **LOBBY CONFERENCE**


               John J. Moakley United States Courthouse
                            Courtroom No. 9
                          One Courthouse Way
                     Boston, Massachusetts  02210
                       Thursday, April 30, 2015
                              9:37 a.m.



                     Marcia G. Patrisso, RMR, CRR
                        Official Court Reporter
                     John J. Moakley U.S. Courthouse
                     One Courthouse Way, Room 3510
                      Boston, Massachusetts  02210
                            (617) 737-8728

              Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10             Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1
2     THE COURT:  We're not fully informed yet but one of
3 the jurors is ill.  He was in the bathroom throwing up and he's
4 seeing the nurse right now.  So that's what we're trying to
5 get.  I don't know whether he'll be able to continue today or
6 not.  But I just wanted to bring that up because that obviously
7 has implications.  We have to have the Russian witnesses today.
8     So I don't have any more to say than that except I
9 think we may be facing the necessity to excuse him if he can't
10 continue and we have to go forward, which would mean bringing
11 in the first alternate.
12     MR. WEINREB:  Is there the potential of delaying and
13 sitting tomorrow instead if the rest of the jurors are amenable
14 to that?
15     THE COURT:  We could do that, probably.
16     MR. WEINREB:  If it's just a one-day thing and it
17 seems like it would --
18     THE COURT:  Let's get a report from the nurse.  That's
19 an interesting idea.
20     MR. WEINREB:  It's different if he has the flu and
21 he'll be out for weeks.
22     THE COURT:  You don't have to comment.  I just wanted
23 to let you know we're in the process of dealing with the issue.
24 We'll let you know when we know more.
25     MR. WEINREB:  All right.

1              (The proceedings adjourned at 9:38 a.m.)

2              (The proceedings resumed at 9:52 a.m.  Attorneys

3     Chakravarty and Fick are not in attendance.)

4              THE COURT:  So I have talked to the nurse who has

5     consulted with him -- I was going to say "examined."  I'm not

6     sure if that's literally true or not.  But anyway, she feels he

7     is not able to continue today.  He is suffering from migraines.

8     He doesn't have his migraine medicine, which is causing the

9     problem, I guess.  And she said it's only going to get worse

10    during the day.  He's trying to talk her into saying he's fine

11    and he can do it, but she said there's a risk that he's just

12    going to get worse during the day.

13              I understood that to indicate that if he had his

14    migraine medicine he'd be better, so there's some possibility

15    that that would be the case.  So if everybody is willing to

16    take up the suggestion that we just punt until tomorrow, I

17    think that's probably the better course and would not require

18    any personnel change in the jury, which I think is desirable if

19    we could avoid it.  But that may be a possibility if he's in

20    the same condition tomorrow.  If he's not able to continue, we

21    can't keep doing that and we have to get these witnesses done.

22              MS. CONRAD:  Do we know if the rest of the jurors are

23    available tomorrow?

24              THE COURT:  We'll find that out.  If there's a problem

25    there, we'll obviously let you know.  So they -- I think --

 1   because it was obvious, I guess, they know that he's ill.  Now,

 2   timing wise that's going to work out?

 3          MR. WEINREB:  Yeah, I think the Russian witnesses

 4   aren't on a plane until seven o'clock.

 5          THE COURT:  Well, let's keep our fingers crossed and

 6   hope that will be the case.

 7          MS. PELLEGRINI:  Okay.

 8          THE COURT:  Okay?  So I don't know how to handle this

 9   publicly.  I mean, do you want me to come out and make the

10   announcement?

11          MR. WEINREB:  I think you should.

12          MS. CONRAD:  Otherwise, they'll just ambush us.

13          THE COURT:  Without the jury?

14          MR. WEINREB:  Yeah, without the jury.

15          THE COURT:  So Paul will deal with the jury.

16          THE CLERK:  Do you want to find out first about their

17   availability before you go out there and say definitely

18   tomorrow?

19          THE COURT:  Yeah, sure.  Actually, why don't you go

20   out and ask them now.  And as long as we have some time to

21   kill --

22          (Laughter.)

23          MS. CLARKE:  Now that you have us here.

24          THE COURT:  Right.

25          -- how about jury instructions?  We're coming to the

 1    point where that will be necessary.

 2              MR. MELLIN:  We have them ready to go.

 3              MR. WEINREB:  We've just been so consumed with other

 4    things.

 5              THE COURT:  I understand.  Well, now you'll have a day

 6    off.

 7              MR. WEINREB:  So I know that the defense submitted a

 8    list -- submitted a draft verdict form, and we have a draft one

 9    too, but both of them now only have the aggravating factors in

10    them and I'm not sure what use that is.  We need the one with

11    the mitigating factors.

12              MR. BRUCK:  Well, the mitigating factors will

13    naturally have to be finalized to conform with the evidence,

14    plus there are -- there is an issue which the Court indicated

15    it was disposed to grant but we haven't completely resolved it.

16    It seemed like -- I understood you wishing the verdict form to

17    have everything.  It wasn't primarily focused on the mitigating

18    factors which are a separate issue.

19              THE COURT:  Well, can't we start with the ones you're

20    sure you'll have in there and then you can add if you think

21    that that's necessary after the rest?  I mean, there's at least

22    a core that I think is kind of undeniable.  The reason is that

23    it gives us a sense of how you want that -- how you want that

24    part of the verdict form organized, among other things.

25              MR. BRUCK:  Well, in terms of that, sure.  You know,

1    at the end of the evidence it's customary for the defense to

2    sort of reorganize the mitigating factors in the way that

3    really conforms to the way the evidence -- and it breaks them

4    up into two or -- so if we're not -- bound not to do that, we

5    can give you sort of an example of it based on what we've

6    already submitted that the Court can use to work from.

7            THE COURT:  Right, we can move it around.

8            MR. WEINREB:  Although, your Honor, it's the breaking

9    them up into two that is going to trigger the litigation in the

10   case.  So the earlier that we have a draft version -- I mean, I

11   think what would be preferable would be an overinclusive draft

12   session rather than -- the Court had said what you're sure of

13   and then others could be added later.  But if we could have all

14   of the proposed ones, that would make it possible to

15   expeditiously resolve any disputes that arise because it could

16   be a matter that needs to actually be briefed and argued and so

17   on.

18           MR. BRUCK:  Well, I mean, part of our problem is the

19   government has been very aggressive about challenging --

20   objecting to things we're trying to put in, and it's a little

21   problematic to have anything resembling a final list of

22   mitigators in the proper -- with the proper structure and

23   emphasis before we know what we manage to get in front of the

24   jury, so...

25           But we can certainly put in what we've got so far and

```
 1    do it that way.
 2            THE COURT:  Okay.  I guess it will be a working draft
 3    sort of thing.  And again, I presume that pretty much the
 4    instructions with some custom tailoring to this case,
 5    obviously, will follow Sand's model.  I assume everybody does
 6    that.
 7            MR. BRUCK:  We are following your lead-in.
 8            MS. CLARKE:  Judge, the Waltham reconsideration is
 9    pending.
10            THE COURT:  We're waiting for --
11            MS. CONRAD:  It's not a reconsideration; it's a
12    motion.
13            MS. CLARKE:  It's a motion for an order for a
14    subpoena.
15            THE COURT:  Right.  We were going to get a response on
16    that?
17            MR. WEINREB:  Yes.  So we contacted --
18            THE CLERK:  I explained to them the situation.  You
19    have nine jurors who can't do it tomorrow -- I did a head
20    count -- because they have work, they have plans.  Two were
21    like absolutely can't do it.  And so I said, you know, be
22    honest.  Just tell me.  If you can't do it, you can't do it.
23    And they all raised their hands, so...
24            (Pause.)
25            MR. WEINREB:  I hate to take somebody who has gone
```

1    this far and really wants to serve and has showed up and claims

2    that he is willing to do it.

3            THE COURT:  Well, the alternative is to keep the

4    witnesses here.

5            MR. WEINREB:  Till Monday.

6            THE COURT:  Till Monday.

7            MR. MELLIN:  Can we talk to the FBI about that, your

8    Honor?

9            THE COURT:  Yeah.  Why don't you talk about that.  It

10   seems like those are the only alternatives:  We go today

11   without him -- and the nurse is unequivocal that he can't sit

12   today and it would be an invitation to trouble, on the one

13   hand -- and adjourning until Monday with the witnesses here on

14   Monday.

15           MR. BRUCK:  I think we can predict right now the FBI

16   is not going to favor staying until Monday and so --

17           THE COURT:  Well, it's not necessarily preference,

18   it's can it be done logistically.  I'm going to assume the

19   answer is yes.

20           MR. WEINREB:  Obviously it could be done logistically,

21   the question is how weighty is their objection to it.  So we'll

22   consult with them and we'll come back.

23           MR. FICK:  I would just note briefly the original --

24   the parole grant was for a period of up to two weeks with

25   departure within 48 hours of testimony.  And I understand that

1    there's a great logistical burden here; on the other hand, some

2    of the burden is of the executive branch's own making in the

3    sense there's sort of an overkill kind of control on these

4    people.  You know, they also are more than ready to get out of

5    here, I have to say, given the kind of house arrest conditions

6    they're living under, so, but, you know.

7            THE COURT:  Okay.  Why don't you make your

8    consultations.

9            MS. CLARKE:  We'll figure that out.  We're just going

10   to need an answer on Waltham.

11           THE COURT:  Yeah.

12           MR. WEINREB:  So we notified --

13           MR. MELLIN:  I'm going to step out and talk to them.

14           MS. PELLEGRINI:  I'll go with him.

15           MR. WEINREB:  We'll stay.  Al and I will stay.

16           So we notified Waltham that this motion has been

17   filed.

18           MS. CONRAD:  "Waltham" meaning the Waltham police?

19   There are three agencies.

20           MR. WEINREB:  I'm sorry.  We notified the Middlesex

21   District Attorney's Office that this had been filed.

22           MR. CHAKRAVARTY:  Yeah.  And so the upshot was from

23   the defense motion that there was a search warrant done -- a

24   federal search warrant done for certain samples that may

25   contain blood that -- for analysis, and the defense seized upon

1    the fact that they don't have the results of that analysis to

2    suggest there is something else out there.

3           We contacted Middlesex, Middlesex sent over the

4    analysis report of the blood analysis, and it revealed that

5    there was no DNA profile that could be matched.  So there was

6    no DNA profile at all in any of the samples that they took, and

7    so that there's no new information for purposes of matching to

8    anything that might corroborate the -- either Tamerlan or

9    Todashev's participation in the murder.

10          MS. CONRAD:  Was a sample -- I'm sorry.  Were you

11   done?

12          MR. CHAKRAVARTY:  In terms of the new information that

13   we have, that's the new information.

14          MS. CONRAD:  So there are two aspects to this:  One

15   was in the original motion and one was in the supplemental

16   memorandum that I filed.  The government has consistently taken

17   the position that its -- first of all, it's an ongoing

18   investigation.  So now Mr. Chakravarty says there's no new

19   information, which suggests that it's not an ongoing

20   investigation and, therefore, the invocation of the law

21   enforcement privilege way back when this issue was first raised

22   which Mr. Weinreb even said was tacking closer to the wind on

23   this issue is perhaps not validly invoked if there is no new

24   information.

25          To the extent that -- the government has also taken

1    the position that they do not -- are not in possession of the

2    information regarding the investigation, that the investigation

3    is being run solely by state officials, whether they be in the

4    DA's office, in the state police or in Waltham.  So that's why

5    we filed the motion for an order to those agencies to

6    provide -- for in camera review, if necessary, that

7    information.

8         And just to put it in context again, the reason, your

9    Honor, as I understood it ruled that we could not bring out

10   evidence of the Waltham murders and Tamerlan's involvement is

11   because we didn't have sufficient evidence to meet a threshold

12   to show that he was involved.  The government is taking the

13   position that whatever information exists is in the possession,

14   custody and control of state actors and they don't have access

15   to it, so the logical next step is for us to find out what

16   information exists within the hands of the state actors.

17        We used the example of the search warrant to indicate

18   that a federal search warrant was used to obtain these samples

19   and something like the results of that might be relevant.

20   There's also other indications that the FBI has been involved

21   in this investigation including the fact that in a 302

22   disclosed last week regarding Matanov, he was questioned at

23   length, and that was the supplemental memorandum, regarding the

24   Waltham murders and his knowledge of the Waltham murders and

25   his knowledge of Todashev who was apparently his roommate at

1   the time.

2          So there are two prongs to this:  The first is really

3   just simply we would like a court order to produce whatever

4   state agency information exists for in camera review and to

5   disclose under whatever protective order is necessary

6   information indicating that Tamerlan Tsarnaev was, in fact, a

7   participant in those murders.  Just as example, the Matanov 302

8   asks about money wired over to Russia in the aftermath of the

9   murders, quote, in the amount of the proceeds of the robbery.

10          Well, it's never been publicly reported, to my

11   knowledge, that there was a robbery.  This indicates that the

12   FBI was aware of the amount of money that was sent over.  I

13   think the clear implication is that the -- that Matanov got the

14   money from either Tamerlan or Todashev -- the implication is

15   Tamerlan because they talk about him not sending money over

16   when Tamerlan is in Russia.  So it seems like the government

17   has additional information.  So that's the second prong.

18          The first part is we would like a court order to the

19   state agencies.  The second part is -- if there's no

20   information, there is no information.  End of story.

21          The second part is we would like the government to

22   produce for in camera review any information it now has, as

23   opposed to the information it had a year and some months ago,

24   regarding Tamerlan's involvement for in camera review because

25   to say we haven't met a burden without us having access to the

1    information that would permit us to meet that burden it seems

2    to me would be fundamentally unfair.

3         MR. WEINREB:  So to the extent that the federal

4    government has any information relating to Tamerlan Tsarnaev's

5    potential involvement in the Waltham triple homicide, we have

6    reviewed it and have produced to the defense everything that in

7    our judgment is either favorable material evidence or material

8    to the preparation of the defense.  There would be nothing for

9    us to give the Court for in camera review that I know of.

10   Everything that we have, which is basically nothing, has been

11   turned over to the defense or has already been turned over to

12   the Court for in camera review.

13        It does, in fact, however, remain the case that the

14   Middlesex District Attorney's Office is conducting its own

15   investigation into the triple homicide, as it has been ever

16   since the homicide occurred, and that they have steadfastly

17   maintained that that needs to be kept confidential and they

18   have not shared their file with us despite requests.

19        I think they have been concerned, not without reason,

20   that anything that is revealed to us in the course of this case

21   could easily wind up in the hands of defense attorneys who may

22   have, you know, involvement with people who they believe may be

23   implicated in the case or without the defense's knowledge,

24   maybe even without the Middlesex District Attorney's knowledge

25   and they simply have deemed it inconsistent with the goals of

1    their investigation to share it with us and, therefore, have

2    declined to do so.

3            So that much we agree with the defense, that what's in

4    their files, we don't know, but what's in our files, we do

5    know, and we believe we have handled it appropriately.

6            THE COURT:  So you're not going to file a written

7    response to the motions, then?  I mean, that's --

8            MR. WEINREB:  No, I think we should.  I think we

9    should and we'll do that over this -- if there's a break here,

10   we'll do it over the break.

11           THE COURT:  Okay.  I guess --

12           MR. WEINREB:  So we'll see what the FBI says --

13           THE COURT:  See what the answer is.

14           MR. WEINREB:  -- and come back.

15           MS. CLARKE:  One other issue --

16           THE COURT:  Let me put my thumb on the scale.  I think

17   that's the preferred solution.

18           MR. WEINREB:  Is to wait until Monday?

19           THE COURT:  Yeah, rather than disrupt the jury.  And

20   my concern is the integrity of the case.

21           MR. WEINREB:  No, I understand.

22           THE COURT:  And I think that is the better choice.

23           MS. CLARKE:  Judge, I found out yesterday that the

24   Court had denied the Elmirza motion.  And I haven't been able

25   to put my hands on that order so that we could raise

1  whatever --

2          THE COURT:  We'll -- if you haven't been sent -- it's

3  under seal, so the clerk will send you a paper copy or an image

4  or whatever.  We'll make sure that happens.

5          MR. CHAKRAVARTY:  This is the motion to compel parole?

6          MS. CLARKE:  That was our motion.  So I don't know

7  whether the Court offered other alternatives.

8          THE COURT:  Well, the alternative is, I think -- I

9  don't know whether the order did it, we talked about it -- is a

10 video hookup.  We set that up once before.  I'm sure we can set

11 it up again.  He's in Almaty.

12         MS. CLARKE:  Right.  We were just sort of counting the

13 minutes down because it's not like it can be set up like that,

14 so...

15         MR. CHAKRAVARTY:  So if the government's involvement

16 is going to be necessary for that; for example, if it's going

17 to be done in a U.S. government facility, then we would need to

18 talk about it.

19         MS. CLARKE:  We would have to contact you.  I would

20 like to see the order.

21         MR. CHAKRAVARTY:  Tomorrow is a holiday, apparently,

22 in Kazakhstan.  So it could be done next week.

23         MR. BRUCK:  May 1st.  That's right.  Hence, the suit.

24 It's May Day.

25         THE COURT:  All right.  Okay.  So I'll be out in a

1    little while.  We'll find out, I guess, the answer.  And if we

2    have to confer further, we will.

3            (The proceedings adjourned at 10:10 a.m.)

1                       C E R T I F I C A T E

2

3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4      the United States District Court, do hereby certify that the

5      foregoing transcript constitutes, to the best of my skill and

6      ability, a true and accurate transcription of my stenotype

7      notes taken in the matter of Criminal Action No. 13-10200-GAO,

8      United States of America v. Dzhokhar A. Tsarnaev.

9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  2/1/16
13

14

15

16

17

18

19

20

21

22

23

24

25