```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )



            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                  UNITED STATES DISTRICT JUDGE



                       LOBBY CONFERENCE


            John J. Moakley United States Courthouse
                        Courtroom No. 9
                       One Courthouse Way
                   Boston, Massachusetts  02210
                     Wednesday, May 6, 2015
                           1:54 p.m.



                  Marcia G. Patrisso, RMR, CRR
                     Official Court Reporter
                  John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 3510
                  Boston, Massachusetts  02210
                        (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad and William W. Fick
10              Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2      THE COURT:  So I wanted to do this so we could be more

3  efficient with the witness.  So tell me -- I don't know who

4  wants to go first -- the scope of the controversy here.

5      MR. BRUCK:  I'm sorry?

6      THE COURT:  I just want to get a sense of the scope of

7  the controversy first.

8      MR. BRUCK:  Right.  We are proposing to put in

9  evidence through our correctional expert, and possibly through

10  some government witnesses as well, about the SAMs which we view

11  as responsive to the aggravating factor that the defendant

12  incited others to commit additional acts of violence.  Now, I

13  realize they were talking about the boat, but it raises the

14  question will he do it again.

15      We think we're entitled to show that there is a

16  procedure in place to which the defendant's already subject,

17  the SAMs, which can be renewed indefinitely which would

18  essentially cut him off from the outside world with very, very

19  highly monitored exceptions.  The way that is done after

20  conviction is that he will be sent with virtual certainty,

21  which we will explore, to ADX in Colorado where there is a

22  special unit devoted to inmates who are under SAMs who are

23  serving life sentences.  And that is, you know, I'm going to

24  say with great confidence, where he'll be sent.  And then we

25  want to walk through the specific restrictions on

1   communication.  That's the issue.  So we think we're entitled

2   to show -- we've already shown the jury the prison, we've shown

3   it's an isolated location, which is what those pictures show.

4   We have been given photographs of the interior, of the cells,

5   of all the different visuals.  We're not going to use any of

6   that because it doesn't go to the issue of communication.

7         THE COURT:  When you say "communication," are you

8   talking only about communication with people outside the prison

9   or people within it or both?

10        MR. BRUCK:  He's restricted -- well, both.  I mean,

11  he's restricted from communication with other inmates by virtue

12  of being isolated in a particular unit.  We're going to

13  describe that.  We're not going to show it.  And then he's

14  single-celled and so forth.  And there will be an

15  acknowledgment that people talk through the pipe chase and

16  there is various opportunities for inmates subject to SAMs to

17  communicate with one another.

18        But the important thing is just that he is cut off --

19  his mail is very limited and closely scrutinized, his telephone

20  communication, there is an absolute prohibition on

21  communication with the news media and visitation, and then

22  also, contact with other inmates.  That is the restriction that

23  we want to show.  That's what the SAMs is.  It isn't a general,

24  you know, set of restrictions on his quality of life; it is a

25  restriction on communication.

1           So we think we're entitled to show that.  That does

2      not open the door to his quality of life across the board.

3      What the government sees this as an opportunity for is to

4      introduce details which are extremely inflammatory which, if

5      argued by a prosecutor, and we've given the cases, would be

6      misconduct.  You know, the victim is lying on the cold ground

7      and here he's watching *ESPN* and *ESPN2* and he doesn't have to

8      pay for it.  This is the sort of thing -- I mean, people --

9      which is so inflammatory and so prejudicial and has so little

10     relationship to the matter at issue.

11          Now, the government may say, Well, it's not fair

12     because it is very austere conditions and we're entitled to

13     show that he'll get to watch, you know, cable television.  But

14     that's not the issue, and the probative value on the matter

15     that is at issue is so minimal.  It's not a security breach

16     that he's allowed cable television within the discretion of the

17     prison.  We -- if need be, we can -- you know, there is a whole

18     program statement which we're ready to put into evidence.  We

19     don't need to.  We don't want to -- we don't see any reason to

20     go through every aspect of daily life.  We will if we have to.

21     Television is not listed.  It's something which is -- can be

22     withdrawn across the board in the unit or for an individual

23     inmate.  It is a tool of correctional control.  It is also a

24     way to stave off insanity.

25          We can explore all that if we have to but it's

1    not -- we shouldn't have to.  And if we do, I think we're

2    entitled to begin to show -- we provided an affidavit from an

3    inmate describing his psychological decline under SAMs at H

4    Unit.  And I think our witness would be entitled to read that.

5    This is a former warden who ran -- the predecessor at ADX,

6    Marion, and helped populate ADX when they moved the inmates

7    from Marion to ADX.

8           So we can go very far afield about all of the sort of

9    psychological terrors inherent in prolonged isolation at ADX

10   and the fact that allowing inmates to watch television is

11   something that in sound correctional management is something

12   that the prison wants to do.  But the inflammatory effect of it

13   is so great and the relevance to the actual issues -- we are

14   prepared to constrain our showing very tightly to the question

15   of -- goes to this location.  The jury's already seen the

16   location.  We're not going to show what the cell's like, we're

17   not going to show what the exercise yard looks like, we're not

18   going to show what the millions of the bars in the hallways

19   look like, we're not going to go into the isolation as such,

20   but we just think there has to be a limiting principle and it

21   should be one that doesn't impinge on this man's right to a

22   fair trial.  And if there is no limiting principle, I don't

23   know how we could be kept from going on and on to create the

24   full picture of what it's like, the psychological decline that

25   is described by this inmate, Mr. Eyad, was -- occurred when he

1    had television.  So what do you make of that?  It's just -- I

2    think we need to keep this focused.

3              THE COURT:  Who's -- Mr. Mellin?

4              MR. MELLIN:  Your Honor, there's really only one issue

5    at play now.  The jury has to decide between life imprisonment

6    or the death penalty.  Allowing us to explain to them what life

7    imprisonment will be like for Dzhokhar Tsarnaev, if he goes to

8    ADX, is very important.  The defense had opened saying -- and

9    this is Mr. Bruck saying, He will be facing a lifetime of

10   unrelenting punishment.  That is what Mr. Bruck said.  He went

11   on to say that he will be severely punished.  And then finally,

12   he comes back to say, "Years and years of punishment, day after

13   day, while he grows up to face the lonely struggle of dealing

14   with what he did."

15             Mr. Bruck has created an impression with this jury

16   that is a false impression, and we have a right to rebut that.

17   We're not looking to go far afield but we are planning on

18   talking about the amenities, the privileges, the things that

19   this individual would be getting if he is at ADX.  Mr. Bruck

20   knows better than anyone it's not even clear right now that

21   this defendant would necessarily be assigned to ADX.  It's

22   certainly highly likely, but it's not a determination that BOP

23   has even made yet.  But Mr. Bruck wants to go to the most

24   extreme example, as far as he can go, go as far to the H unit,

25   which is the most secure unit that BOP has, he wants to leave

1    the impression with the jury that the defendant will be

2    single-celled, have no contact, he said in his opening, with

3    the outside world at all, and that is just not true.  And we

4    have a right to show this jury exactly what Mr. Tsarnaev's life

5    will be like at ADX.  That's all we're trying to put forward.

6                THE COURT:  What is the process for classifying

7    someone who is convicted of the offenses this defendant has

8    been convicted of?

9                MR. MELLIN:  The process is the information is sent

10   down to Texas where they have a central processing area.  They

11   receive the information, they make a recommendation to

12   Washington, D.C.  The person in Washington, D.C., then makes an

13   ultimate call as to whether or not he will be designated to

14   ADX.

15               I think we all know that it's incredibly highly,

16   likely if not certain, that he will be at ADX, but BOP cannot

17   say that because they have standard procedures that they follow

18   when it comes to these designations.  So they will go through

19   their process.  The recommendation will go to D.C., someone in

20   Washington will then make the determination if he will be sent

21   to ADX.

22               MR. WEINREB:  May I add something briefly?  A couple

23   of things to keep in mind.  Mr. Bruck is saying that

24   the -- they are about to introduce evidence related entirely to

25   the SAMs and, therefore, rebuttal should be limited to the

 1    issue of communication with the outside world.  But we're

 2    entitled to rebut anything the defense has put in, not just

 3    what they happen to be putting in with these witnesses right

 4    here.  I think Mr. Bruck had a choice of trying to portray to

 5    the jury a certain image of what life would be like if the

 6    defendant were sentenced to life imprisonment or not.  He made

 7    that the centerpiece of his opening statement, no doubt because

 8    so many of the jurors during voir dire expressed the view that

 9    life imprisonment under the conditions that they assume it will

10    be would potentially be worse for him than a death even if it

11    took years for it to occur.  By putting that in play, by making

12    it an issue in the case, he's opened the door.  So the question

13    isn't is it responsive to the SAMs testimony, but is it

14    responsive to the defense case, the defense argument.

15         The second thing:  The fact that the defendant may go

16    to ADX initially is almost certain to go to ADX initially, does

17    not mean he'll remain there his entire life.  ADX has a limited

18    number of beds, and they need to use that prison for prisoners

19    who cannot be in the general population:  Prisoners who have

20    killed other prisoners, prisoners who attack guards and for

21    other reasons.  So there is the chance, a -- potentially

22    not -- it is not unlikely that he will step down and can

23    continue to step down over time.  And as he continues to step

24    down, everything will change for him.

25         And these are all things that are fair rebuttal not

1    just to the opening statement but to this portion of the case.

2         Another thing that's fair to respond to in this

3    portion of the case is that SAMs are not forever.  The argument

4    that they can be renewed indefinitely at the discretion of the

5    attorney general is not true.  They're subject to judicial

6    review and they can be renewed.  So the defense is saying once

7    the government opens the door to a discussion of life in ADX,

8    then there's no limiting principle, but if the defense is

9    opening the door, and has already opened the door.

10        THE COURT:  Let me start at the last and move

11   backwards.  If the proposition is that the SAM is being in

12   place, the possibility to communicate and, therefore, incite or

13   whatever is controlled --

14        MR. BRUCK:  Yes.

15        THE COURT:  -- then the government should be able to

16   offer evidence that might lead the jury to conclude that it is

17   uncertain whether the SAMs will remain in place?

18        MR. BRUCK:  Well, sure.  But we're entitled to show

19   that essentially -- that it is the government's call.  It's the

20   FBI and the U.S. Attorney and the Attorney General; it's not

21   the prison system, it's not some faceless bureaucracy.  If they

22   decide he doesn't need it, great.

23        THE COURT:  The SAMs might -- the law and the

24   structures allow the SAMs to be relieved --

25        MR. BRUCK:  Or to put --

1        THE COURT:  -- possibly.

2        MR. BRUCK:  Or it expires every year and has to be

3   renewed.  So that's built in.  Sure.  We'll cover that.

4        THE COURT:  So I don't think that's a problem.

5        Whether the defense evidence -- putting aside the

6   opening for now, just the evidence -- permits a wider

7   discussion of BOP regulations generally, including the steps, I

8   think is a closer question, and it may depend on what we

9   actually hear in the defense direct testimony.  I can conceive

10  of circumstances where it might invite a clarification, if

11  that's what you think it is, by greater detail about the

12  opportunities that are afforded to step down when the SAMs are

13  removed.  So that I put in the middle ground.

14       I don't think you're entitled now to rebut the opening

15  where there is no evidence in support of the opening.  We tell

16  the jurors that that's not evidence.  You may have had an

17  opportunity to do it in your direct case when it was right

18  after the opening, but I think now that we're in the defense

19  case, I don't think it's proper rebuttal to the defense case to

20  address not evidence but opening statements.  Whether in your

21  rebuttal case you have that opportunity again, I don't know.  I

22  think probably not, but that may be an opening.

23       So the fact that we're talking about the prisons and

24  the comparison you're talking about, I think it seems to me to

25  be maybe an unsettled issue under the statute whether just

1    general evidence about how life in prison is for an inmate is

2    relevant under 3593(c).  I think there's a good argument that

3    it is, but I don't think the way this case has proceeded it

4    should be produced only in response to limited defense evidence

5    about the SAMs.

6              MR. MELLIN:  Your Honor, can I say in response --

7              THE COURT:  So -- but, again, you have to be careful

8    because --

9              MR. BRUCK:  I will.  And I'll need to confer with my

10   witness one more time.

11             MR. MELLIN:  Your Honor, the concern that we have is

12   that given the opening, we had to decide when we could rebut

13   that appropriately.  We did not allege future dangerousness.

14   And so we have to make the right determination, which is we

15   could not in our case-in-chief put forth this information

16   because we didn't allege future dangerousness.  It's only the

17   statements of Mr. --

18             THE COURT:  Well, I guess -- I'm not sure you couldn't

19   have, but that's -- you'd have to strategize --

20             MR. MELLIN:  It's fraught with danger.

21             MR. WEINREB:  Frankly, we also dispute that the

22   government alleged anything that makes any of this information

23   relevant.  And so what's happening here --

24             THE COURT:  Well, it's a mitigating factor, though,

25   that they've suggested.  They've affirmatively proposed that

1    they should rest easy he can't be --

2            MR. WEINREB:  Yes, but I think the cases that talk

3    about what is and is not proper mitigating evidence allow the

4    defense to allege lack of future dangerousness as a mitigation

5    factor only insofar as it relates to the defendant's character

6    that he's a peaceful person, he's not the kind of person who is

7    violent; not the ability of the prison system to secure

8    prisoners, because that applies to everybody equally.  And the

9    whole point of the Federal Death Penalty Act and the whole

10   system that the Supreme Court has mandated is to figure out

11   ways to distinguish murderers who deserve the death penalty

12   from those who don't.  All of them are going to encounter the

13   same level of security, so it can only be their characters that

14   distinguish them one from the other.

15           MR. MELLIN:  And the cases that --

16           MR. WEINREB:  I'm sorry.  I'm not finished.  One more

17   thing I want to add, which is the combination of the opening

18   statement and now, where we were told that this would be a

19   bleak existence with nothing to do but sit around and stare at

20   four walls and think about your crimes for the rest of your

21   days, which is precisely what many of the jurors during voir

22   dire said that they would rather see him do than get the death

23   penalty, is what Mr. Bruck is going to try to convince the

24   jurors through this testimony is going to happen, because he's

25   going to say he's going to be cut off with all communication

 1   from the outside world.  He will lead a lonely existence where

 2   he does nothing but sit around and stare at the wall.

 3          And that is so misleading and so -- it will

 4   simply -- I mean, it could literally lead jurors to make a

 5   different decision in this case than they would make if they

 6   knew the truth, and it's not the truth.

 7          THE COURT:  Well, that's all premised on the

 8   immutability of the SAMs, though, which you could counter.

 9          MR. WEINREB:  No, but he's not staring at the four

10   walls; he's staring at a color television all his days.  That's

11   what they're trying to do.  That's the misleading picture

12   they're trying to --

13          MR. MELLIN:  Mr. Bruck says there's a place so secure

14   that he won't even be able to glimpse the outside world; all

15   you could see from the narrow cell -- from the small, one-man

16   exercise cage is a patch of sky.  That's not a true impression

17   of what ADX is like.

18          And so we have the right to rebut these claims that

19   create false impressions.  That's all we're trying to do, your

20   Honor, is respond to his opening statement.  And we understand

21   the cases that Mr. Bruck is talking about where there is a link

22   drawn between the defendant's day in the life versus Martin

23   Richard.  No one is going to argue that.  No one is getting

24   close to that.  The point is to clarify for the jury exactly

25   what is the determination they're making.  They're making a

1    determination between life in prison or the death penalty, and

2    when they're deciding that, they have the right -- and

3    especially given his opening, they have a right to know what

4    really life imprisonment is for each of these individuals.

5         MR. WEINREB:  They shouldn't have a misimpression,

6    they shouldn't be making the decision based on a lie.

7         MR. BRUCK:  I have a response to every point that has

8    made, but I generally follow the practice of not arguing when

9    the Court has ruled provisionally in our favor.  So if the

10   Court wants to hear further argument, I've got it, but I'm

11   inclined not to prolong this unduly.

12        The opening statement was factual.  It was -- what was

13   being talked about was the fact of that a life sentence.  He

14   would have his lifetime --

15        THE COURT:  Well, no.  I think it was pretty emphatic.

16   I mean, I agree generally with the characterization of it --

17        MR. BRUCK:  It is also not evidence, and we are not

18   putting in evidence that does anything more than what we've

19   described, which is the limitations on communications.  They

20   are not absolute limitations; they are restrictions.  There is

21   family phones, family visiting.  All of that is going to be

22   discussed.

23        MR. WEINREB:  The opening statement is the roadmap of

24   the evidence they're going to see.  Here comes the evidence,

25   and they will take that as proof of what was argued in the

1    opening statement unless we have a chance to rebut it.  That's

2    the problem.  What the opening statement was not:  He won't be

3    a danger to people in the outside world.  If it were limited to

4    that, that would be a different story, but it wasn't about that

5    at all.  It was about the thing that Mr. Bruck knew the jurors

6    cared about and it was intended to create a misimpression, and

7    that's what it will do if this evidence goes in unrebutted.

8         MR. MELLIN:  And, your Honor, I don't think there's a

9    case out there that says that we're not entitled to bring out

10   this information about what privileges that someone would have

11   or anything along those lines.  You can't bring it out to make

12   that link.  We're not going to make any link.

13        THE COURT:  Well, I mean, part of this is just normal

14   trial sequencing, and I think that probably would have been

15   appropriate, probably.  I don't have to rule because we're past

16   that point in your presentation to --

17        MR. WEINREB:  Well, we could do it in our rebuttal

18   case.

19        THE COURT:  I'll reserve that possibility.

20        MR. WEINREB:  Yeah.  I mean, we're willing to do that.

21        THE COURT:  I don't know.  Let's see what this is

22   like.  But today, with the defense witness, you can show that

23   the SAMs are not immutable, that the premise on which the

24   reassurance depends, is questionable; and, therefore, they

25   should be careful of drawing the conclusion.  I mean, you could

1    do all of that with respect to the SAMs without getting into

2    general classification conditions and so on and so forth.  I'll

3    think further about whether that's an appropriate rebuttal

4    matter.

5            MR. MELLIN:  The concern I have there, your Honor, is

6    that this defendant, even if he goes to ADX, will be able to

7    step down even in ADX.  So there will be more communications he

8    could have, things along those lines.  So I just want to make

9    sure that I understand where the Court is coming out on that.

10           THE COURT:  Well, I think -- if the premise -- I think

11   it's fair for the jury to understand the significance of the

12   lifting of the SAMs.  As I understand it, one of the

13   significances of the lifting of the SAMs is it opens the

14   possibility of an administrative adjustment farther -- or wider

15   than it would if the SAMs remained in place.

16           MR. MELLIN:  Correct.

17           THE COURT:  And so I think that's legitimate.

18           MR. MELLIN:  Which will increase his communications

19   abilities and all --

20           THE COURT:  I think that's legitimate.

21           MR. BRUCK:  Of course, we'll bring out that would be a

22   problem of the government's own making because they have the

23   ability to keep the SAMs in place.  And the business of the

24   court -- there has never been a court that has limited the

25   SAMs.  There has been one court order requiring the FBI to

1   reconsider a limitation on communication, on mail, or

2   visitation, which the FBI was not required to do and didn't do,

3   and that's the extent of the judicial review in the entire

4   history of the program.

5          So this idea that courts can -- we asked for discovery

6   from the government, and I've received no response on any court

7   order that has lifted the SAMs from an inmate.

8          MR. WEINREB:  The problem is that just like when it

9   comes to, let's say, wiretap warrants, we don't seek them if we

10  don't see there's probable cause to seek them.  The government

11  doesn't seek to renew SAMs when it believes that it can no

12  longer justify the need for their existence.  That's how they

13  get lifted for the most part.

14         We have one other issue, which the defense made a

15  request for several BOP witnesses.  We have supplied them.  One

16  of them, we informed them, had personal issues, family issues.

17  She needed to testify yesterday and then leave.  We kept her

18  around for another day because of the delays that occurred with

19  the Russian witnesses.  If she does not testify today, she

20  needs to leave.

21         THE COURT:  Who is she?

22         MR. MELLIN:  Michelle Nicolet.

23         MR. BRUCK:  We'll know after Mr. Bezy if we need her.

24         MR. MELLIN:  The list we got last night had Michelle

25  Nicolet listed before Mr. Bezy.

1          THE COURT:  What's her contribution?

2          MR. MELLIN:  She is the chief for the FBI overseeing

3     the SAMs determination.  So she would be able to explain the

4     SAMs program and how it --

5          THE COURT:  Let's get going.

6          MS. CLARKE:  I think we'd better get going.  We could

7     take it up at sidebar?

8          THE COURT:  What?

9          MS. CLARKE:  I just had other things to do.

10          THE COURT:  No, let's do this thing.

11          (The proceedings adjourned at 2:18 p.m.)

1                        C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12

13   Date:   2/1/16

14

15

16

17

18

19

20

21

22

23

24

25