```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS



                                      )
UNITED STATES OF AMERICA,             )
                                      )
         Plaintiff,                   )
                                      )   Criminal Action
v.                                    )   No. 13-10200-GAO
                                      )
DZHOKHAR A. TSARNAEV, also            )
known as Jahar Tsarni,                )
                                      )
         Defendant.                   )
                                      )



          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
               UNITED STATES DISTRICT JUDGE



                     LOBBY CONFERENCE


        John J. Moakley United States Courthouse
                    Courtroom No. 9
                  One Courthouse Way
               Boston, Massachusetts  02210
                  Thursday, May 7, 2015
                       9:22 a.m.



             Marcia G. Patrisso, RMR, CRR
                Official Court Reporter
             John J. Moakley U.S. Courthouse
             One Courthouse Way, Room 3510
              Boston, Massachusetts  02210
                   (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10             Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2           THE COURT:  It was your suggestion, I think?
 3           MR. BRUCK:  Yes, it was.  Thank you for seeing us back
 4      here.
 5           The defense moves for a mistrial in light of a number
 6      of events that occurred during the cross-examination so far of
 7      Mark Bezy, and I would like to go through them one by one.
 8           Overall, we think that the government has created a
 9      false and extremely false and extremely prejudicial
10      misimpression about what will happen to the defendant after
11      conviction, and I'd like to -- in addition, the
12      cross-examination injected the impermissible topic of cost in
13      quite emphatic terms.  Mr. Mellin stated that it was incredibly
14      costly for the Department of Justice or BOP to have their
15      individuals, employees --
16           "Objection.
17           "THE COURT:  No, you may have it."
18           That's at page 42 of the transcript of Mr. Bezy
19      yesterday.  So that's the first.
20           MR. WEINREB:  Can we have the record reflect what the
21      answer was to the question?
22           MR. BRUCK:  The answer was, "I'll rephrase" --
23           "You may have it.
24           "I'll rephrase it."
25           And then it worked through into the purpose of the
```

1    stepdown.

2            "Objection.

3            "Sustained.  I think the point has been made."

4            So in context, the Court apparently felt that the

5    exchange had already made the point of the costliness of

6    this -- of keeping somebody at ADX, or keeping somebody in H

7    Unit under the SAMs.

8            MR. WEINREB:  I think, your Honor, the record will

9    speak for itself about what was said in the courtroom, but the

10   record should not reflect that the Court believed the point was

11   made.  The objection was sustained and there was no answer to

12   the question.

13           MR. MELLIN:  Your Honor, just so the record is clear,

14   that didn't have to do with the cost of the incarceration of

15   the defendant, it had to do with the reasons why there is a

16   stepdown process in place and why Mr. Bezy was involved in the

17   stepdown process.

18           MR. BRUCK:  The record will speak for itself.

19           Secondly, the cross-examination referred to -- and I

20   quote.  The question is, "the U.S. Attorney's Office may think

21   they want to have a SAMs in place, but the Department of

22   Justice overall may make a call and say no, correct?

23           "ANSWER:  It's possible.

24           "That's happened repeatedly, correct?

25           "It's very possible."

1          Based on that, last night we submitted a discovery

2    request to the government to ask for examples of such an event

3    where a SAMs had been requested in a terrorist case by the

4    investigating agency and the prosecuting agency and had been

5    overruled by the attorney general, either -- as to a renewal,

6    and have received no response.  We think this creates a

7    misleading impression that this is something which is plausible

8    and that is likely to happen in this case, or even reasonably

9    foreseeable to happen in this case.

10          This is a misleading impression.  If the government

11    has evidence to support that line of cross-examination, they

12    should produce it.  And if they don't, the Court should

13    instruct the jury -- well, we don't think the bell can be

14    unrung, that's why we're moving for a mistrial.  But in any

15    event, the damage, if it could be repaired, it should be.

16          The third, the defense -- the cross-examination moved

17    in a very unfair and misleading way, questioned Mr. Bezy about

18    the fact that the defense had moved to lift the SAMs.  The

19    context in which that occurred was completely different than

20    what we are litigating here.  That was a pretrial SAMs that was

21    applied on the basis of virtually no evidence of misconduct by

22    the defendant.  And the thrust of all of the litigation around

23    the SAMs pretrial had to do with limitations on the defense

24    effort, all of which is moot for someone under sentence.  But

25    the jury doesn't know any of that.

1          It is also the case that no court has ever ordered the

2     government to lift or fail to renew a SAMs.  There has been

3     litigation over particular people on a visiting list or details

4     of the communications restrictions, and so far as we're

5     aware -- and we've also asked the government to provide us with

6     citations and have received nothing.  So far as we're aware,

7     even on these minor requests -- judicial requests for judicial

8     modification, there has been no relief ever granted in any

9     case.  The closest that has ever come is that a court remanded

10    the matter to the FBI to reconsider a limitation on

11    communication involving particular correspondence.

12          So the misleading impression has been given that this

13    is a very porous system, that the government is not, in fact,

14    under control who is placed under SAMs, who goes to H Unit, who

15    stays there.  If this were true, then we would have to take our

16    lumps, but it is not true.  It's a false impression and it's

17    being done in multiple ways.

18          And the implied attack on the defense was particularly

19    prejudicial because it appeared to undermine our credibility

20    and forthrightness when, in fact, our challenges to the SAMs,

21    which were never actually ruled on, let alone denied -- we

22    never got to that.  The government voluntarily made some

23    modifications that had to do with the defense function, and

24    that was that.  But the impression the jury has been left with

25    is that this is a matter that we bring to the attention of the

```
 1    Court, and for all they know the Court may have done whatever

 2    and overruled the government.  It is just not fair and it's not

 3    fair because it's false.  And it's also false in a peculiarly

 4    prejudicial way because it is intended to make liars out of us,

 5    that we are pointing to this procedure postconviction and here

 6    we are moving to strike the SAMs, and it suggests as though --

 7    you know, it creates the impression that we're talking out of

 8    both sides of our mouth, and it's not true.  We're talking

 9    about apples and oranges in this litigation.

10         I don't know how this can be fixed.  It is a critical

11    issue.  You can tell by the way the government behaved

12    yesterday that they think it's a critical issue.  They may

13    think it's more critical than we do, and we think it's very,

14    very serious.

15         So we think this is an appropriate grounds for

16    mistrial overall.  We've given three specific examples, but

17    overall we think this cannot be limited to just these three

18    examples.  The government is working to create a false

19    impression about what will happen to this young man when he is

20    sent out here under a life sentence.  If he is, he's going to

21    ADX.  The government now concedes that.  And he will stay

22    there.  And to create this impression that there are a million

23    casual ways in which the government could forget about him,

24    that the attorney general will overrule the local U.S.

25    Attorney's Office, that the U.S. Attorney's Office won't
```

1    remember to get the SAMs renewed, that the defense can

2    challenge it in court, that it is too costly, all of this

3    is -- bears no relation to what's actually likely to happen in

4    this case, and it just isn't fair.

5            So we move for a mistrial on these grounds.

6            THE COURT:  Mr. Weinreb?

7            MR. WEINREB:  I'll start with the cost issue.  The

8    government does not dispute -- the government agrees that the

9    jury should not take into consideration the cost of

10   incarcerating the defendant as an alternative to the death

11   penalty, but that was not what the nature of the questioning

12   was about.

13           Mr. Bruck has decided to make an argument to the jury,

14   to offer evidence to the jury that if the defendant is put

15   in -- is sentenced to life imprisonment, he will be under

16   certain restrictive conditions.  He'll go to ADX Florence, he

17   will be put in H Unit and he will remain there for the rest of

18   his life.

19           The reality is that he will likely be stepped down at

20   some point over time.  And it was fair to ask their expert

21   whether the Department of -- the Bureau of Prisons tries their

22   best to step people down and to ask them why they try to do

23   that.

24           That was all that questioning was about.  So there was

25   no effort or intent to suggest to the jury that should be

1    making their decision based on the cost of incarcerating him;

2    only to suggest that the Bureau of Prisons would itself try to

3    step him down if it could because they have -- and to explain

4    why they try to do that.  They don't do it out of the kindness

5    of their heart, they do it because they have an incentive to do

6    it.

7          In addition, the questions really never got anywhere

8    because the defense made an objection.  Although the Court

9    overruled it, the witness by that point seemed to have

10   forgotten the question.  It was rephrased, asked another way.

11   There was an objection, it was sustained, so no answer was

12   given.  And the defense -- the jury has been repeatedly told by

13   the Court that the questions are not evidence, only the answers

14   are evidence.

15         So all in all, I can see why Mr. Bruck would want to

16   seize on this issue given that it's one of the clear-cut areas

17   where you're not supposed to argue about something to a jury,

18   but in this case it's a tempest in a teapot because it didn't

19   happen.

20         Also, we were handed a proposed requested penalty

21   phase instruction by the defense to instruct the jury not to

22   speculate about the cost of incarceration or to take that into

23   consideration.  Although we believe no error occurred in this

24   case and the instruction is not necessary, it is a fair

25   statement of the law.  We don't object to it.

1           When it comes to the jurors' potential

2    misunderstanding of the SAMs, first of all, we dispute many of

3    the factual assertions that the -- it's unclear whether they're

4    really factual assertions or legal assertions that Mr. Bruck

5    has made today in this lobby conference about how the SAMs

6    process works, and this is really an illustration of why this

7    is a problem of the defense's own making.

8           The manner in which SAMs are obtained, are imposed,

9    are reviewed, are modified, are abandoned is largely a matter

10   of law.  It's really not an appropriate matter for a witness to

11   be testifying about because it's not a factual matter.  And yet

12   the defense chose to call an expert to instruct the jury about

13   it and, unfortunately, they chose an expert who really doesn't

14   know what he's talking about.  This is not a person who has

15   ever been involved in SAMs, who really has any expertise about

16   them.  He basically just studied up on them to give his

17   testimony here, and he really doesn't know much what he's

18   talking about, whereas Mr. Mellin and the rest of us on this

19   team have a lot of experience with SAMs.  We know just how the

20   process works, and there was a good-faith basis for every

21   single question that Mr. Mellin asked of this witness.

22          The truth is that it was Mr. Bruck who created an

23   extremely misleading picture of how the SAMs process works by

24   suggesting to the jury that it is essentially just entirely up

25   to DOJ to decide whether a SAMs is in place and whether it's in

1     place year after year forever.  The truth is that there are

2     regulations that have the force of law that govern whether a

3     SAMs can be imposed or not.  The U.S. Attorney's Office has to

4     follow them, the FBI has to follow them, the attorney general

5     has to follow them.  And if he doesn't follow them, there's

6     judicial review, as there is any time the executive branch

7     violates something that has been -- that has the force of law.

8           When I say it has the force of law, I mean there are

9     regulations that were enacted by an administrative agency

10    that -- or in some case, pursuant to an authorizing statute.

11    They're just like any other regulation in the C.F.R.  They

12    can't simply be ignored at will.

13          The fact is that SAMs are very frequently not renewed

14    and are abandoned because the factual -- the basis -- the

15    requirements for keeping them in place no longer exist or the

16    government no longer believes that it can prove the existence

17    of it by the necessary standard to a court.  A good example,

18    although I don't know that any are needed, would be the Richard

19    Reid case.  I'm just familiar with it because it was prosecuted

20    by the U.S. Attorney's Office in Boston.

21          Richard Reid was in Florence at ADX in H Unit under

22    SAMs, but eventually those had to be -- for one thing, those

23    were overseen by Judge Young who ordered changes to them, and

24    eventually those SAMs had to be relieved.  And he's -- Richard

25    Reid, you know, a convicted terrorist, tried to murder many,

1   many people, has been stepped down and is in the general

2   population, as Ms. Conrad who was the attorney on that case,

3   knows well.

4          MS. CONRAD:  I'm not any longer the attorney in that

5   case and I'm not aware of that because Judge Young struck our

6   representation at the request of the U.S. Attorney.

7          MR. WEINREB:  She was the attorney in the case.

8          In any event, there is SAMs litigation ongoing in

9   Colorado right now.  It's absolutely a false impression to

10  suggest that the judicial branch exercises no oversight over

11  the SAMs process, that the government can do things at will.

12  And the reality of the SAMs process is that the U.S. Attorney's

13  Office and the FBI, when they submit their recommendations to

14  the Department of Justice or to the parts of the Department of

15  Justice that review them, sometimes get feedback saying, This

16  isn't not going to -- this isn't sufficient

17  under -- it's -- they are the guardians of the SAMs process.

18  It's their job to review whether the facts exist, just like the

19  OEO, the Office of Executive Operations in the Department of

20  Justice reviews Title III wiretap applications and will not

21  allow the government to submit them to a judge if it believes

22  that the probable cause plus standard has not been met.

23         It's the same thing with the -- part of the Department

24  of Justice that reviews FISA warrant applications.  They

25  exercise a very, very high standard of review and no warrant is

1    even given to the FISA court unless it is certain that it has

2    sufficient basis to be granted.  And that's true with the SAMs

3    also, and that's why SAMs don't get granted.

4         So it's creating a completely false impression to say

5    that if the U.S. Attorney's Office or the FBI wants it, they

6    get it, and that the proof of that is that they never get

7    turned down.  Well, we do get turned down, but it's done in an

8    internal process, in a way in which you don't have a judicial

9    record of it.  So, again, it is Mr. Bruck, I think, who has

10   been creating the misleading impression in front of the jury.

11        And one of the big problems is that he is trying to

12   put on evidence of a process that takes place outside of his

13   sight, outside of Mr. Bezy's sight, outside of a lot of

14   people's sight through an expert witness who knows nothing,

15   really, or very little about what he's talking about.

16        So it's not fair for the defense to put on a one-sided

17   self-serving presentation of the evidence and try to block the

18   government from challenging it.  If they put a witness up

19   there, we're entitled to cross-examine him.  If we ask him a

20   question and he says, "Possibly.  I don't know," that's the

21   witness he put up there.  That's the answer they get.  If they

22   wanted a different answer, they should have prepared him better

23   or have the facts be different, but they're not.

24        Excuse me one second.

25        (Counsel confer off the record.)

1          MR. WEINREB:  I think that it is perfectly fair for

2     the jury to hear that in this case the defense moved to modify

3     the SAMs pretrial.  They claim that -- because one of the

4     things that they argued in their motion was that SAMs are

5     subject to review pursuant to the constitution and pursuant to

6     the laws of the United States; in other words, it's not a

7     purely discretionary thing, again, with the Department of

8     Justice, that we just decide we want it and we get it, and the

9     only way it goes away is if we decide we don't want it.

10          This is a perfect example for the jury to see, that,

11     no, it is possible to go into a court, to tell a judge that the

12     U.S. Attorney's Office, the FBI, the Department of Justice in

13     seeking a particular restriction under a SAMs is violating the

14     Constitution, is violating the law in getting a judge to order

15     the office to do it differently.  And they're entitled to hear

16     what often happens in situations like that is you don't

17     necessarily get a ruling from the court, but you get a

18     compromise.  The parties work it out.  They modify things.

19     Because that happens all the time.

20          So again, you know, it's not fair for the defense to

21     come up here and say, you know, The mitigation phase allows us

22     to put all sorts of information in front of the jury.  Whatever

23     might seem to be mitigating.  But we get to put in a one-sided,

24     uncross-examined, unchallenged version of it.  We get to put in

25     the information.  You have to sit silent.  That's simply not

1    the law and that would not be appropriate.  The jury needs to

2    make a quality sentencing decision here.  They need to have all

3    the information in front of them.

4         MR. MELLIN:  Your Honor, can I make one additional

5    point, which is that the defense has changed course in the way

6    in which they wanted to present this evidence.  They submitted

7    a Touhy request, the government responded and identified three

8    witnesses that could talk about either ADX or SAMs or how they

9    are implemented, how someone is designated to ADX, what happens

10   if they are designated to ADX on SAMs.

11        We provided those witnesses.  The defense was given

12   multiple opportunities to talk to those witnesses.  That was

13   something we voluntarily allowed to happen.  There was a time

14   where Mr. Bruck was on a conference call with the three

15   witnesses; there's another time just recently on Tuesday that

16   Mr. -- the defense was given another chance to sit down with

17   these witnesses and talk to them.  It's at that point that Mr.

18   Bezy sat in on these interviews of Ms. Nicolet and -- as well

19   as Warden Oliver and David Schiavone.

20        Mr. Bezy then is now being called to regurgitate what

21   those witnesses said and put a certain spin on it even though

22   Mr. Bezy is not an expert in SAMs, and Mr. Bezy has had very

23   little, if any, involvement in the SAMs implementation during

24   his career with BOP.  So what the defense is trying to do is

25   trying to use their witness to put a spin on what the

1    government's witnesses would have said if the defense had

2    called them, and it's, frankly, not appropriate.

3         MR. BRUCK:  Well, to clarify the history of that, we

4    subpoenaed a witness from ADX of our choosing.  The government

5    did nothing for three months, or four, and finally responded

6    that we could not have that witness but that the government had

7    chosen three other witnesses who would be our witnesses.

8         We went through the process of conferring with them,

9    preparing -- trying to prepare their testimony, and came to the

10   conclusion that the fairest way of presenting our case, not the

11   government's case, would be to call our own witness and not to

12   call the witnesses that the government had directed us to call

13   instead of the BOP official that we wanted.  So I think the

14   record should reflect that it didn't exactly -- Mr. Mellin's

15   recounting is not the whole story.

16        THE COURT:  Okay.  Well, the motion for a mistrial is

17   denied.  As to the cost issue, I substantially agree with what

18   Mr. Weinreb said about it.  I understood it at the time to be

19   an explanation for the likelihood of step-down because it was a

20   motivation of the institution to do that, and that's, I suspect

21   without looking at the transcript myself -- that's the reason I

22   overruled the objection, was that it was -- it was not making

23   the point that was the forbidden one, that cost should be a

24   reason that you would opt against the death penalty; it was

25   making plausible why the prison custodians might lighten up on

1    prisoners, which is something that the jurors, as laypeople,

2    might think otherwise.

3         And as to the examination, I think most of what's

4    complained of is foreseeable consequence of opening up the area

5    which I think you were aware of.  I do think that there were

6    places -- and I think it's partly because the exchange between

7    Mr. Mellin and Mr. Bezy got a little excited at times.  I do

8    think there are some areas where misimpressions were left

9    plausibly with the jury.  One is the one you've identified

10   about whether SAMs have been relieved in the universe of cases

11   or in the relevant subset of cases that may be present here,

12   and the other -- there was another example that occurs to me

13   right on the spot.  There was a discussion about people in

14   general population coming out of their cells at 6 a.m. and

15   doing programs, and so on and so forth.  And I understood that

16   as referring to a USP and not to ADX, and that was not clear.

17        MR. BRUCK:  Yes.

18        THE COURT:  So there are some -- that, I think, is

19   correctible by -- actually, I think both of them are

20   correctible by redirect, but I am concerned because of the

21   nature of the examination that those errors could recur.

22   That's why I mention them.

23        MR. WEINREB:  Could I just --

24        THE COURT:  There was an oppositional tone I think

25   that wasn't constructive.

1          MR. WEINREB:  Can I ask for clarification?  When the

2    Court says there was an misimpression about SAMs being relieved

3    in the relevant universe of cases.  What exactly is meant by

4    "relieved"?

5          THE COURT:  Whatever -- again, I don't have the

6    transcript, but "repeatedly," I think was the word; that they

7    expire or are --

8          MR. WEINREB:  "Relieved" could mean that they expire

9    and are not renewed --

10          THE COURT:  Right.

11          MR. WEINREB:  -- which does happen.

12          THE COURT:  Again, I don't know what the words were in

13    the question, but there was an impression it's not an uncommon

14    event for SAMs initially imposed, later not to be continued.

15          MR. WEINREB:  No, that's a very common event.

16          THE COURT:  I know in the universe.  But is it for --

17          MR. MELLIN:  For terrorism.

18          THE COURT:  Of these offenses?

19          MR. MELLIN:  We had --

20          THE COURT:  Okay.  All right.  Well, then maybe it's

21    not a misimpression.

22          MR. MELLIN:  I would be happy to ask that question

23    again, your Honor, but I don't know that Mr. Bezy knows the

24    answer.  He has been called as an expert on this, but when I

25    try to get the answer from him it's obvious he doesn't know the

1    answer to, that there are instances where a terrorism -- an

2    inmate convicted of a terrorism charge who had a SAMs,

3    ultimately the SAMs was not renewed.

4         THE COURT:  All right.  Well, that should be

5    clarified.

6         MR. WEINREB:  Richard Reid is a perfect example.

7         MR. MELLIN:  And John Walker Lindh.

8         MR. BRUCK:  He has the date on that --

9         THE COURT:  Well, that should be clarified.

10        MR. BRUCK:  -- and we'll bring it out on redirect.

11        THE COURT:  So there's no misimpression on it.

12        The other matter about the difference -- what general

13   population means in ADX is different from what it means in the

14   USP, I think the jury does not understand that.

15        All of that having been said, this is a touchy area,

16   obviously.  The government has made some points, rather

17   forcefully, I think.  I don't know how much more needs to be

18   done.

19        MR. WEINREB:  Well, your Honor, before we leave the

20   topic entirely, the one area that I think is fair for the

21   government to get into, because Mr. Bruck has made such a point

22   of showing to the jury this image of ADX in a freezing cold,

23   snowy environment that looks like Siberia or the moon, that

24   prisoners inside the prison are kept comfortably warm, that

25   they have a bed with a blanket on it, that they're not freezing

1    in the cold like you might think looking at the outside of it,

2    and furthermore, that if people want to visit, it's not like

3    they have to travel to Siberia or the moon; that the prison is

4    located conveniently to an airport, that it's possible to get

5    there without too much trouble.  I mean, those are things that

6    are -- that Mr. Bruck is clearly trying to suggest through that

7    particular picture.  There are plenty of pictures of ADX that

8    don't show it in that kind of environment.  Even the Court said

9    it looked like it was on the moon.

10          We know that we're being at least during this phase,

11   as opposed to rebuttal, limited to some degree in discussing

12   what the conditions of the prison are like inside, but at a

13   minimum, we should be able to respond to those that the defense

14   has fairly invited response to by putting in, again, a

15   one-sided self-serving portrait of what it is and trying to

16   require us to leave the jury with that instead of providing

17   them with relevant information that will enable them to make a

18   decision about whether they think this is an accurate picture

19   of it or not.

20          THE COURT:  Well --

21          MR. BRUCK:  This gets us back to TV?

22          MR. WEINREB:  No, I didn't say anything about

23   television; I'm talking specifically about these issues that

24   are raised by that photo, the isolation --

25          THE COURT:  I think isolation is a fair point.  I'm

1    not sure physical description of the inside is raised by

2    the question.

3            MR. WEINREB:  The only thing we're asking for is to

4    the extent that it looks like it is a freezing cold place

5    which -- you know, I mean, I think that a picture, you know,

6    tells -- is better than a thousand words.  It creates an

7    impression, and that picture creates an impression that the

8    people there are like in Siberia, like in the movies you see

9    where the guards are walking around in, you know, huge coats

10   trying to keep themselves warm.  It's nothing like that.  This

11   is a very modern facility.  It is well heated.  There are --

12   you know, prisoners are kept comfortably warm.

13           THE COURT:  You can do that and you can have the

14   airport testimony, but that's it.  Okay.  So can we --

15           MR. WEINREB:  Sister Helen?

16           THE COURT:  Can we move to the next issue?

17           MR. MELLIN:  Your Honor, if I could just go over the

18   areas that I was planning on going over with Mr. Bezy?

19           THE COURT:  Okay.

20           MR. MELLIN:  I plan on discussing with him, number

21   one, the fact that he has a business where he goes around

22   testifying in all of these cases and the amount of income he

23   makes in these cases, the fact that he's always testified for

24   the defense, those types of questions.  Going back to the fact

25   that he doesn't really have any personal knowledge of the SAMs

1  program, and what SAMs he ever worked on; how he became aware

2  of the information in this case; the fact that there were these

3  meetings, he sat in on those meetings; up to that point he

4  didn't even know that information, how he became aware of that

5  information; and how it was he turned around yesterday to

6  regurgitate it.  And then to go into the communication, he left

7  the impression the defendant is only allowed one phone call --

8  only one 15-minute phone call under the SAMs, that's completely

9  incorrect.  He has to be allowed one phone call, but he may be

10 permitted more phone calls.

11         MS. CONRAD:  He said that.

12         MR. MELLIN:  So I want to go into the communications,

13 I want to go into the social visits.  He indicated and said

14 that it was just the immediate family.  That isn't even true

15 for the SAMs in this case, and that can be modified, so I was

16 planning on going into that.  The written communications, legal

17 visits, legal communications are unlimited, go into that a

18 little bit.  Those are the areas I intend to go into.

19         MR. BRUCK:  Now, as far as -- do you intend to

20 identify the visitors that have been allowed in this case in

21 pretrial status?

22         MR. MELLIN:  I do not, as long as he does not push

23 back on there are people other than immediate family members.

24 Part of the problem, Mr. Bruck, is when I ask a question, he

25 doesn't give the appropriate response, and I think it's

1   probably because he doesn't know a lot about the SAMs and he

2   doesn't know a lot about the SAMs program, but that was a

3   decision you made in calling him.

4        MR. BRUCK:  We would like to object to any reference

5   to the notion that the people he met with were our witnesses

6   because that is a misimpression.  They are witnesses that were

7   designated by the government to be defense witnesses, not

8   witnesses that we chose.  I think that is an area to be left

9   alone.  If he met with BOP officials that you say has superior

10  knowledge, great, but not that they were defense witnesses that

11  we decided not to call.

12       THE COURT:  Yes, I agree with that.

13       Okay.  Can we move to the Sister Prejean question?

14  Can I have a proffer of what she would say?

15       MS. CONRAD:  Sure.  Well, there are interrelated

16  issues here between Sister Prejean and the statement of

17  remorse, but let me focus on Sister Prejean first of all

18  because with respect to the statement of remorse, I mean, if we

19  were permitted to elicit that, we would elicit that from her,

20  or certainly her opinion about whether he is remorseful.  But

21  we also are prepared to narrow that if the Court rules against

22  us on this to essentially a character witness.

23       She has met with him, her impressions of him.  The

24  fact, I think, just alone that a Catholic nun has established

25  what she will describe as an instant rapport with someone who

1  the government has painted as an extremist Muslim terrorist I

2  think is very telling, and I think the jury should be allowed

3  to hear that.

4         THE COURT:  So tell me the details.

5         MS. CONRAD:  So the details are that she was contacted

6  by -- she knows someone on the defense team.  She was asked to

7  meet with him simply because --

8         THE COURT:  When?

9         MS. CONRAD:  In -- she first met with him in March.

10 Early March.

11        MR. WEINREB:  Of this year?

12        MS. PELLEGRINI:  Of this year?

13        MS. CONRAD:  Of this year.

14        She is someone who works with prisoners, individuals

15 not just on death row but also people serving life in prison

16 who, as she puts it, accompanies them and essentially befriends

17 them, works with them, helps them come to terms with what they

18 have done.  But not just that, but she works with them

19 sometimes for ten years, sometimes is present at the execution.

20 She essentially functions as a spiritual advisor --

21        THE COURT:  With respect to this defendant, that's

22 what I'm interested in.  How many times has she met with him?

23        MS. CONRAD:  She's met with him five times.

24        THE COURT:  And what's the nature of the testimony?

25        MS. CONRAD:  To talk with him.

1              THE COURT:  No, her testimony.  What would she say?

2              MS. CONRAD:  Her testimony is that I've met with him

3     five times, I have formed an impression of him that he is

4     someone who recognizes the sorrow and pain that he has caused,

5     that he deeply regrets it.  Again, this is something that

6     depends on the scope of the Court's ruling.  That he was open

7     to meeting with me.  We discussed scripture.  We discussed many

8     things.  We discussed what his life would be like going

9     forward.  We -- and that he is someone who she believes she can

10    work with in the future.

11             So if she's not allowed to testify about either her

12    opinion or about what he has said about remorse, then -- but I

13    certainly have an argument about why she should be allowed to,

14    then she could testify, essentially, as clergy, as a character

15    witness, who has gotten to know the defendant over the last few

16    months and sees in him human -- human qualities of dignity,

17    introspection and a possibility -- although she wouldn't use

18    that word and I wouldn't elicit it -- of redemption.

19             MR. WEINREB:  That's not character testimony, your

20    Honor, as the Court knows.  We object to this because every

21    single thing that she will say is based on things that the

22    defendant has said to her which she -- the jury will

23    necessarily be led to believe that he said things to her, words

24    of remorse, words of regret, words of reflection, words of

25    sorrow, and that she found them credible, that she personally

1    believes him.  And so instead of him expressing those words to

2    the jury and allowing them to assess whether they believe them,

3    whether this is something just being said for -- to obtain a

4    benefit, whether it's sincere or insincere, how far it goes,

5    whether he still harbors jihadi beliefs, any number of things

6    that they would find out if they could see him testify under

7    oath subject to cross-examination, they will instead again hear

8    a one-sided self-serving presentation of what he had to say

9    filtered through this person who can't be cross-examined about

10   precisely what he said without getting into, you know, all

11   sorts of out-of-court statements.

12          And she will -- essentially by being a Catholic nun

13   will get up there and say, You know, I'm somebody who, if I

14   swear an oath to tell the truth, you know, clearly I would

15   never violate it.  I'm a Catholic nun and you can believe what

16   I say.  The imprimatur of her robes, or her habit, and her

17   celebrity, which inevitably will be brought up because it will

18   be necessary to bring it out to impeach her, will be a stamp of

19   sincerity or believability on everything that she says the

20   defendant said to her.  It's just incredibly unreliable

21   information.

22          Of all the people to pick to give this character

23   testimony, you know, an internationally known anti-death

24   penalty woman of the cloth, and it's just -- again, it's

25   a -- it's an attempt by the defense to block the jury from

1    getting the full picture and to carefully filter exactly what

2    it is that they hear through the mouth of somebody who will

3    shield the defendant from having to really display who he is,

4    what he feels like, what his potential for redemption is.

5         She has absolutely no expertise to testify as an

6    expert.  She's not qualified as an expert in anything.  There's

7    no science of anything that she can testify about.  She has no

8    better claim than anyone else to be able to detect things that

9    are as ineffable as remorse or the capacity for redemption.

10   She would essentially be -- there's no way that this could

11   avoid issues of the morality of the death penalty, of morality

12   in general, whether the Catholic church approves of the death

13   penalty or not.

14        Putting her on the witness stand necessarily injects

15   into the case all sorts of unreliable, inadmissible kinds of

16   evidence, things the jury should not be focused on.  It's hard

17   enough for them to understand their task in this case, that

18   there are aggravating factors that have to be proved by a

19   certain quantum of evidence, mitigating factors, that they get

20   weighed.  To, at the end of the whole process, inject this

21   wrath of irrelevant and distracting and misleading and

22   confusing issues, putting it all before them is not something

23   that the defense should be able to do, especially spring it on

24   us at this incredible late date.

25        I mean, if she testified -- the time for noticing

1    experts is eight months ago.

2            MS. CONRAD:  She's not an expert; she's a lay witness.

3            MR. WEINREB:  We were told she's going to give an

4    opinion about whether he was remorseful.

5            MS. CONRAD:  A lay opinion.

6            MR. WEINREB:  The time for noticing witnesses of any

7    kind was four months ago, especially celebrity witnesses.  This

8    was the woman who wrote the book *Dead Man Walking* and then was

9    featured in it by a famous actor.  This was a popular movie

10   that got nominated for four Academy Awards and won two of them.

11   Many of the jurors probably saw it and have an impression of

12   this woman based not on what they're going to see in the

13   courtroom but of their memories of Susan Sarandon who played

14   her in the movie.

15           And that movie was a fiction, and yet because she

16   wrote the book and then the movie was made about it, any juror

17   who sees, Oh, my God, this is the woman I saw in that movie,

18   that woman who I thought was so wonderful, was so believable,

19   was such a great woman who could see something that nobody else

20   could see, that this guy on death row who for years and years

21   and years denied that he had committed this murder and finally

22   came around under her tutelage to admit what he had done, to

23   accept it moments before his execution, that -- it is hard to

24   imagine anything more prejudicial than that.

25           If they wanted to call her, the time to notice it was

1    four-plus months ago and we could have asked the jurors if they

2    saw the movie, if they knew who she was, if they had memories

3    of the movie.  It's just too late.  She's the wrong person.  It

4    shouldn't come in.

5           And to the extent that she testifies, gives character

6    testimony -- character testimony can be limited to -- based on

7    whether -- it is normally limited not to examples, not to have

8    spoken to him and I've seen his sorrow and pain.  He deeply

9    regrets it.  We discussed scripture.  That's not character

10   testimony; that is just somebody talking about their

11   conversations with somebody and essentially channeling what he

12   said to her to the jury, shielding it from all forms of

13   scrutiny.

14          MS. CONRAD:  May I respond?  First of all, I don't

15   know if the government's objection -- it sounds like they're

16   saying no clergy can ever testify because their testimony would

17   carry too much weight.  That can't possibly be true in the

18   penalty phase of a death penalty case -- of a capital case or

19   because she's famous.

20          Now, the jury has been exposed to all kinds of

21   information about this case and they have said that they

22   understand that they are to decide this case solely on what is

23   presented in court.

24          With respect to the late -- so-called late disclosure,

25   we provided notice of April 22nd, the day after the

1    government's opening statement in the penalty phase when we

2    first realized what the government was doing and where the

3    government was going with lack of remorse, when they displayed

4    over our objection the still from the cell block video.

5         Now, this leads to -- and I think this is important,

6    Judge -- to the larger question of how we rebut lack of

7    remorse.  The government chose to identify lack of remorse as

8    an aggravating factor in this case.  The government chose --

9    and this is what really prompted us to notice her as a witness.

10   We initially were not planning to call her as a witness.  She

11   met with him and she will testify to this as part of her

12   ministry, to minister to people who have committed horrible

13   crimes and to help them on their journey.

14        But Ms. Pellegrini in her opening said the defendant

15   is unchanged.  And that, your Honor, put us on the spot to try

16   to show that he has changed.  When the government filed the

17   notice of lack of remorse as an aggravating factor, they had in

18   their hands the statement that we seek to introduce, 3249, the

19   handwritten statement of remorse.  The government's position is

20   that we cannot -- the only --

21        MR. WEINREB:  I prefer we move on to the statement.  I

22   would just like to briefly respond to the points.

23        MS. CONRAD:  I'm not moving on because I'm talking

24   about why this is --

25        THE COURT:  So your analog is lay opinion, I gather?

1           MS. CONRAD:  Correct.

2           THE COURT:  Do you have any case law about this kind

3    of circumstance?

4           MS. CONRAD:  Well, it's character.  I mean,

5    character --

6           THE COURT:  No, that's different from lay opinion.

7           MS. CONRAD:  Character evidence is lay opinion.  Do

8    you have an opinion of his character?  That's lay opinion.

9           THE COURT:  Well, in very limited circumstances.  I

10   have to look at the rule.  Usually it's reputational.

11          MS. CONRAD:  No, in a guilt phase reputation for

12   honesty, but not in a penalty phase.  In a penalty phase, what

13   could possibly be more relevant than the defendant's character?

14          THE COURT:  Cases?

15          MS. CONRAD:  I don't have them.  Mr. Bruck may know

16   them but I can't imagine --

17          THE COURT:  I'm just looking for some guidance, is

18   all.  I mean, if someone who has considered this position

19   before, I would like to see it.

20          MS. CONRAD:  I can actually give you one example which

21   comes from the government's motion in limine in which they

22   cited -- I believe it was *United States versus Lighty*, and

23   their citation of it was kind of misleading.  First of all, it

24   was plain error review.  In that case the defendant --

25          THE COURT:  I've looked at that case.

1          MS. CONRAD:  There they said it wasn't remorse because

2     it wasn't truly remorseful, it was character evidence and it

3     was cumulative of other character evidence.  And I would note

4     that many of the cases the government cites on statements about

5     lack of -- about remorse are cases in which there were

6     precisely the type of unsworn statements that they object to in

7     this case and, therefore, an unsworn allocution to the jury

8     would be cumulative.

9          So the government to say that the only way a defendant

10    can ever confront an allegation of lack of remorse is by taking

11    the stand, first of all, would severely burden, obviously, the

12    Fifth Amendment privilege; and, second of all, is not supported

13    by the cases that they cite.  And I can go into more of that as

14    far as the statement itself.  But on the character, I think,

15    you know, *Lighty* talks about it, there certainly are many cases

16    in which clergy testify.

17         But we also have another challenge in this case, which

18    is the SAMs.  So in order to show who -- what the defendant's

19    character is now, what the defendant's remorse is now, the

20    universe of people with whom he has had contact since this

21    crime is extremely limited.

22         THE COURT:  Okay.

23         MS. CONRAD:  Obviously we can't testify.

24         THE COURT:  So let me ask you about the argument

25    concerning notice to the jury pool and, therefore, the

1    opportunity to voir dire about this rather notorious movie and

2    person.

3            MS. CONRAD:  First of all, I don't plan to bring out

4    any reference to *Dead Man Walking*.  I don't plan to bring out

5    any reference to the books that she's written.  I don't plan to

6    focus on her fame or celebrity.  The fact of the matter is she

7    is who she is.  The government added people to the witness list

8    for the penalty phase such as Gary Oliveira who I don't believe

9    were ever on the witness --

10           MS. PELLEGRINI:  He is.  He was on the master list.

11           MS. CONRAD:  Before voir dire?

12           MS. PELLEGRINI:  Yes.

13           MR. WEINREB:  We couldn't add anybody after voir dire

14   because of the statute.

15           MS. CONRAD:  Well, there were a number of people added

16   and there were statutory objections that we raised that

17   we made --

18           MS. PELLEGRINI:  With respect to Gary Oliveira, he was

19   there.  He was on the list.

20           THE COURT:  Okay.

21           MR. WEINREB:  Your Honor, lack of remorse was

22   identified as a non-statutory aggravating factor I believe in

23   January of 2014.  All Ms. Pellegrini said in her opening

24   statement was to -- all she did was to put up the photo of the

25   defendant giving the camera the finger and saying that as of

1    July of 2013, the defendant was unremorseful and unchanged.

2    She did not say that today he was unremorseful and unchanged,

3    that we were planning on putting on in our case-in-chief and so

4    it wasn't said.  That was the evidence that we had of lack of

5    remorse, that's what we put in.  That did not open the door to

6    all of this.

7            If the Court is looking for case law guidance, we

8    think the most appropriate cases to look at are the three

9    circuit court opinions stating that it's improper to allow

10   unsworn allocution, because the kind of so-called character

11   evidence -- that's just, you know, putting the wolf in sheep's

12   clothing.  This is an attempt to put before the jury what the

13   defendant has said to Sister Prejean.

14           The only way she has any impression of him, the only

15   way she has any impression of his character, of any of the

16   things she's going to talk about are by talking to him and

17   believing the truth of what he is saying to her.  So it is

18   essentially statements of remorse, statements of reflection,

19   statements of contrition being made to her.  She is judging

20   them to be true and then she is presenting them to the jury in

21   the disguise of a character opinion.  That is just a way of

22   putting in unsworn allocution and it should be barred for all

23   the reasons that those courts on whose cases we rely on

24   have -- and there are state court cases as well which we didn't

25   bother citing which held that unsworn allocations should be

1    barred.

2         MS. CONRAD:  That's not what they say.  They

3    say that --

4         MR. WEINREB:  I'm not done.

5         As for Ms. Conrad's argument that these jurors said

6    that they wouldn't be affected by prior publicity about the

7    case, there were plenty of jurors who didn't say that and they

8    weren't allowed on the jury.  These jurors were not asked a

9    different question, which was whether a very powerful and

10   moving film depiction of somebody is something that they could

11   put aside in hearing her testimony on the witness stand.

12        They also were not asked, and we would surely have

13   requested that they be asked it, especially the ones who are

14   Catholic on the jury, is whether they would treat the testimony

15   of a nun differently from the testimony of another witness

16   simply because she's a nun.  I'm not saying that no one from

17   the clergy can ever testify, but we're entitled to jurors who

18   can judge all witnesses fair and impartially.

19        If they have a police uniform on, they're not entitled

20   to more credibility simply because of that.  And if they wear a

21   nun's habit, they're not entitled to more credibility.  They

22   weren't asked that, and I guarantee you that there would be

23   Catholics on that jury who potentially would not feel like it

24   was appropriate to disbelieve what a nun said even if, frankly,

25   they may believe that they could not.  That is a very, very

1  powerful association for some people.

2          THE COURT:  Okay.

3          MR. WEINREB:  And then there's one other thing I would

4  like to point out which is that the fact that Ms. Conrad says

5  she's not going to elicit that this is a nun who wrote *Dead Man*

6  *Walking* and all of that, that's a specious kind of argument to

7  make because the government has to elicit that to show her

8  bias.  We have no choice.  How else are we going to get the

9  jury to doubt that this nun has any reason to say anything

10  other than the truth or that she has any reason to not filter

11  what she's hearing?  She is a committed death penalty

12  abolitionist.  She's made it her life work.  She's given

13  hundreds, if not thousands, of speeches against it.  The jury

14  needs to know that.

15          MS. CLARKE:  Judge, I hate to weigh too much into this

16  but I have a little bit of history how she came to be involved

17  in our case.  You know, this trial started in January and this

18  young man sat and watched the voir dire and he sat and realized

19  that he was -- you know, ultimately this trial was going

20  forward.  And in my experience, and in this case, it's very

21  difficult for the accused, particularly someone that young, to

22  understand what they're going through.

23          So we had a connection to Helen Prejean and asked her

24  to come, you know, work with him and see if he could see a path

25  forward.  I mean, you know, it's a very challenging time.  And

1    I'm sure the Court's looked at him and watched him and, you

2    know, you see a kid struggling with connecting to what's going

3    on around him.  So Helen Prejean did not come into this case to

4    be a witness; she came into this case to help us help him.

5         And when she connected so quickly with him -- she

6    would be the first to say that she doesn't always connect, that

7    there's not always remorse, that there's not always an

8    understanding of the depth of the harm someone has caused.

9    When she said that, you know, we thought, Oh, my goodness,

10   we've got the potential for remorse here.  And then the

11   government came out swinging in opening in the penalty phase

12   that he was unchanged, unrepentant and uncaring.  And that's

13   not the truth.  And that's just not where we're at.

14        THE COURT:  Let me move to a different question, and

15   that is the two exhibits.  How would you propose -- or under

16   what authority would you propose those would be admissible?

17        MS. CONRAD:  Well, your Honor, you know, again, the

18   government talks about this unsworn allocution.  *Hall*, which is

19   sort of the major case on this, in *Hall* there actually -- it

20   was an unsworn allocution.  And the cases talk about that there

21   is no right to an unsworn allocution, no First Circuit case on

22   point, an unsworn allocution to the jury by the defendant.  In

23   *Hall* there was testimony, I believe by the sisters of the

24   defendant, about his remorse.  There was no discussion in that

25   case about whether that's an unsworn allocution.

1          In *Lawrence* there was evidence introduced, a journal

2     entry.  It's the same as the journal entry.  In *Bolden* the

3     statement was excluded but there was other testimony regarding

4     remorse.  The government's position is we can't offer any

5     evidence of remorse.

6          MR. WEINREB:  That's not true.

7          MS. CONRAD:  Other than live testimony from the

8     defendant on the witness the stand.

9          MR. WEINREB:  Not true.

10          MS. CONRAD:  Well, I don't know what other option the

11     government proposes if we're not allowed to offer a handwritten

12     statement by the defendant which the government has had in its

13     possession for a year and a half.

14          And so the only reason I provided the email was

15     because I thought the government wanted to -- us to put out --

16     or for the jury to know that this was in the context of a plea

17     discussion, and also essentially to authenticate that this was

18     provided to the government, that they received it, it was

19     accepted as a statement of the defendant.

20          It's in his handwriting, it's on his signature.  There

21     are other examples of his handwriting in evidence.  And the

22     government can certainly argue -- you have the statement,

23     he -- we -- it's not under oath, we don't have the opportunity

24     to cross-examine.

25          THE COURT:  Well, that was the question I was going to

 1  ask.  Can the government call him?

 2          MS. CONRAD:  I'm sorry?

 3          THE COURT:  Could the government call him?

 4          MS. CONRAD:  No.

 5          THE COURT:  Why?

 6          MS. CONRAD:  Because he has a Fifth Amendment right

 7  not to testify.

 8          THE COURT:  Once he's offered the testimony through

 9  the exhibit.

10          MS. CONRAD:  It's not testimony, it's a statement.

11  There is absolutely no case law that would say --

12          THE COURT:  It's offered to the jury as a statement by

13  the defendant.

14          MS. CONRAD:  And the government can --

15          THE COURT:  And that doesn't open up the question?

16          MS. CONRAD:  No, absolutely not.

17          MR. WEINREB:  What if we went back into court and he

18  sat down and wrote the same note today and handed it up to

19  somebody to read on the witness stand?

20          MS. CONRAD:  Well, then you could elicit that it was

21  just written today and, you know, and maybe there's even an

22  instruction -- and some of the cases suggest that with respect

23  to unsworn allocution -- I do want to point out there are

24  several courts that have allowed unsworn allocutions to the

25  jury, although I stand by the argument that that's not what

```
 1    this is.  One is United States versus Chong, which is District

 2    Court of Hawaii, one is United States versus Gabrion, which is

 3    the Western District of Michigan.  I have the cases.  Another

 4    is United States versus Whitten.  Now, Whitten, which is

 5    Eastern District of New York, was reversed by the Second

 6    Circuit because after the unsworn allocution the government in

 7    the view of the Second Circuit improperly argued that the

 8    defendant did not take the stand.  I think the line was

 9    something, well, like the path to the witness stand was never

10    blocked.  So it seems to me that Whitten, which is

11    W-H-I-T-T-E-N -- I can provide the citation -- Whitten clearly

12    stands for the proposition that, A, it's permissible for a

13    district court to allow an unsworn allocution to the jury,

14    which is not what we're asking for; and second of all, that if

15    that happens, the government cannot say, But he chose not to

16    testify.

17            Now, you know, the case law on that is a little

18    unclear going forward in other circuits, perhaps.  There's a

19    Supreme Court case that talks about an instruction, but if the

20    Court and the government were correct in the theory that if he

21    submits a statement -- in that case a live statement to the

22    jury, the government can then call him to the stand and

23    cross-examine him?  I don't think Whitten would have

24    affirmed -- excuse me -- reversed for prosecutorial misconduct

25    in calling attention to his failure to testify.
```

1          You know, it's not just the unchanged, whatever, you

2     know, comment that Ms. Pellegrini said in her statement, it's

3     also the government cross-examining one of the relatives and

4     saying, Oh, but he is indifferent.  He is indifferent to the

5     suffering of the victims in this case.  The government wants

6     the jury to look at him as someone who is indifferent, who is

7     unremorseful to this day, and they want them to impose the

8     death penalty on that basis.

9          The cases the government cites are not cases in which

10    the government alleged lack of remorse.  The government chose

11    to cite that as an aggravating factor.  The government argued

12    it in their opening, the government opened the door.  We have a

13    rebut -- right to rebut it, and I do not think that the

14    defendant can be required to testify in order to rebut it.

15         MS. PELLEGRINI:  Then how could the government say to

16    the jury that we have no ability to cross-examine?  It forces

17    us to make a choice of either skating so close to the line that

18    we're going into irreversible error -- I'm commenting on the

19    fact that he's not testifying -- or we get to say to the jury

20    that we weren't able to cross-examine him.  It makes no sense.

21         MS. CONRAD:  It's just like the 302s.  The Court told

22    the jury that the 302s were statements that were not made under

23    oath and that the witness was not subject to cross-examination.

24         MS. PELLEGRINI:  Those witnesses don't have the same

25    right.

```
 1          THE COURT:  All right.  With respect to the two
 2   documents, they're not admissible.  I won't admit the two
 3   documents.  I want to reflect on the argument about the
 4   witness.
 5          If the witness were to testify, how long would it be?
 6          MS. CONRAD:  Not very long.  Half-hour, maybe?  Can I
 7   just --
 8          THE COURT:  And if -- I just want to explore what's
 9   happening here.
10          MS. CONRAD:  Yeah.
11          THE COURT:  If the witness is not permitted to
12   testify, is Bezy the last witness, then?
13          MR. BRUCK:  Yes.
14          THE COURT:  Okay.  I'm partly thinking just of
15   logistics with the jury.
16          MS. CONRAD:  May I just respond to one --
17          MS. CLARKE:  We have some technical stuff to take care
18   of --
19          THE COURT:  Yeah.  No, there's a lot of stuff to take
20   care of.
21          MS. CONRAD:  May I just respond to one point
22   Mr. Weinreb said that I don't understand because they don't
23   have any choice but to bring out the books she wrote and the
24   movie that she was in?  I mean, they can certainly bring out
25   her anti-death penalty views for bias without going into movies
```

1    and books.

2              THE COURT:   I understand his point.

3         So I think -- to be productive, I think we should go

4    and do Bezy, finish that, and then we'll probably take a break

5    and I'll look at a few things before I rule on the other

6    motion.  So I don't know how much time it will be but at least

7    we'll get the jury doing something and then suspend again for

8    some necessary period of time.

9              (The proceedings adjourned at 10:20 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

8    United States of America v. Dzhokhar A. Tsarnaev.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12

13   Date:  2/4/16

14

15

16

17

18

19

20

21

22

23

24

25