```
                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )  Criminal Action
v.                                  )  No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
          Defendant.                )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**LOBBY CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, June 23, 2015
2:05 p.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3             Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: Miriam Conrad, Federal Public Defender
10         51 Sleeper Street
           Fifth Floor
11         Boston, Massachusetts  02210
           - and -
12         CLARKE & RICE, APC
           By: Judy Clarke, Esq.
13         1010 Second Avenue
           Suite 1800
14         San Diego, California  92101
           - and -
15         LAW OFFICE OF DAVID I. BRUCK
           By: David I. Bruck, Esq.
16         220 Sydney Lewis Hall
           Lexington, Virginia  24450
17         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2      THE COURT:  So I just wanted to convene before

3  tomorrow just to make sure we were all ready and knew what was

4  going to happen and so on and so forth.  Can you, the

5  government, bring me up to date on what victims intend to speak

6  or can you give us a list or something like that?

7      I know we have statements.  You've submitted written

8  statements.

9      MR. WEINREB:  And there are a few more statements

10  that --

11      THE COURT:  Just as a master of ceremonies I'm just

12  kind of interested.

13      MR. WEINREB:  -- might have trickled in.

14      We have a list.  It changes a little bit day by day

15  because people call in and add themselves or drop out.  But we

16  can --

17      MS. PELLEGRINI:  The latest one is pretty accurate.

18      THE COURT:  I don't need one before tomorrow morning,

19  but before the proceedings if I could have one.

20      MS. CLARKE:  If we could see it as well?

21      MR. WEINREB:  Yeah, of course we'll send it to you.

22      MS. CLARKE:  We were wondering if we could actually

23  know the names -- I understand the reason for redacting the

24  names for public filing, but if we could know the --

25      THE COURT:  I don't, actually.  Why should the names

1    be redacted?

2          MR. WEINREB:  Well, a lot of -- or many of the victims

3    indicated concern about having their names out there.  Some of

4    them, you know, revealing quite personal information, others

5    are just worried about the publicity that would attach to their

6    names.  And I think the First Circuit seemed to approve of a

7    procedure in which any -- although the statements are public,

8    the names need not be -- they can be appropriately redacted for

9    privacy reasons.

10          THE COURT:  We had some of the most seriously injured

11   victims on the stand.  Obviously they were exposing their

12   identity.  I mean, I don't see --

13          MR. WEINREB:  Other victims didn't testify precisely

14   because they didn't want to expose themselves.

15          MR. CHAKRAVARTY:  And there were some victims who

16   received, like, tweets and other kinds of social media backlash

17   for -- outside of court, so it wasn't their courtroom

18   testimony.  So that's one of the reasons --

19          THE COURT:  Is there any specific provision for

20   redaction or is this just general principles; that is, in the

21   victims' statute, for example?

22          MR. WEINREB:  No, not in the victim statute.  I mean,

23   I think the victim statute does talk about safeguarding the

24   privacy of victims.  I would have to take a look at -- I think

25   there's more general language, nothing that specific.

1          MS. PELLEGRINI:  The privacy maybe was indicated.

2          MR. WEINREB:  But I do think that the government takes

3     the position, for example, that that statute does affect what

4     can be redacted in discovery, for example.  I don't know that

5     that's ever been litigated or decided, but I do think that the

6     statute seems to embody principles of sensitivity to victims'

7     concerns for privacy.

8          THE COURT:  Does that include people who will speak in

9     public proceedings?

10          MR. WEINREB:  When you say that --

11          THE COURT:  Tomorrow.  Meaning redactions.

12          MR. WEINREB:  The redactions were done for all of the

13     statements --

14          THE COURT:  Will they identify themselves to me

15     tomorrow?

16          MR. WEINREB:  Yes, they will.

17          THE COURT:  So that will be in the public record?

18          MR. WEINREB:  That will be on the record, yes.  As

19     always, there's a difference between having it in writing and

20     having it just said.  But we will -- we're happy to share with

21     the defense all of the information with the understanding that

22     it's, you know, pursuant to a protective order.

23          THE COURT:  Yeah.

24          MR. WEINREB:  And as of now there are only a few

25     victims who plan to speak who have not submitted written

1    statements, and I believe at this point it is only the Richard

2    family, the Campbell family and Mark Fucarile's stepfather.

3           THE COURT:  I'd like you to remind the victims, if you

4    haven't already, that their address is to me, not to the

5    defendant.

6           MR. WEINREB:  Right.  So we have told all of them that

7    we would like to meet with them to advise them on these things,

8    and that's one of the things we'll tell them.

9           THE COURT:  They will be obviously standing in the

10   public courtroom where everyone can see them.  They will also

11   be subject to the broadcast to the other courtrooms, as I'm

12   sure you'll tell them.  And as I understand the technology,

13   there will be a general courtroom shot and there will be a

14   picture within the picture of the speaking person, whether it's

15   me on some occasion or the victim or whoever.

16          MR. WEINREB:  I should say, your Honor, we have and

17   will advise the victims to address their comments to the Court;

18   however, some of those comments may be addressed to the

19   defendant in the sense that people want to say to the

20   defendant, you know, "I want you to know that this did not" --

21   you know, "You did not succeed in destroying our lives.  We're

22   going to get past this," that sort of thing.  But it will be

23   said to you as opposed to him personally.

24          MS. CLARKE:  It literally should be said to the judge

25   that they want the Court to know that their lives are moving

1    on.

2         THE COURT:  Yes, I prefer that strongly.

3         MR. WEINREB:  Well, that can be hard for people who

4    are not accustomed to public speaking, to inform them --

5         THE COURT:  I know, but I think you have to emphasize

6    it to them, that's why I bring it up, that it's addressing the

7    Court, the theory, of course, being that it aids the Court's

8    decision, the extent the Court has judgment.  And that's the

9    purpose of the victim statements, that they enlighten the

10   judgment process, not that they're -- I understand they have

11   the collateral effect of catharsis, perhaps, but that's not

12   their primary purpose.

13        MR. MELLIN:  One other thing, Judge, is we'll instruct

14   them not to express their personal opinion about what they

15   think the punishment should be in this case.

16        THE COURT:  Okay.  Thank you.

17        Now, we kind of detoured, I think, Ms. Clarke, from

18   what you -- I interrupted you to get on to the redaction issue.

19   Did you cover --

20        MS. CLARKE:  I just was going to ask if we could be

21   given the names of the individuals because our copies were

22   redacted as well.

23        MR. MELLIN:  And, your Honor, we'll provide the names

24   as well as there is a victim identification number.

25        Do you have the victim identification number on some

1    of those statements?

2              MS. CLARKE:  Yes.

3              MR. MELLIN:  Say Stephanie Benz, we'll give you her

4    name and also the victim number.

5              MS. CLARKE:  On the list?  And then we can compare.

6              THE COURT:  And correlate it from there.

7              MS. CLARKE:  I do notice that many of them had no

8    objection to their names being public, even on their writings.

9              THE COURT:  Well, I'm satisfied for the time being if

10   the people who speak in public are identified.  The paper issue

11   is separate and I don't think we have to resolve that if all

12   the people who will be present in addressing me will tell me

13   who they are.

14             So we had set last Wednesday, I guess, the 17th for

15   any submissions from anybody and we didn't get any.

16             MR. WEINREB:  We don't plan to make a written

17   submission.

18             MS. CLARKE:  A submission about?

19             MR. WEINREB:  A sentencing memorandum.

20             THE COURT:  Anything.  A sentencing memo, brief.

21             MS. CLARKE:  That ship sort of sailed, I think.

22             THE COURT:  I think so too but I just want to confirm

23   it.  I just don't want to get something in at eight o'clock

24   tomorrow morning.

25             MS. CLARKE:  There was one issue that the presentence

1    report indicates at the end, I believe, that the government

2    will submit to the Court a date upon which it should consider

3    restitution?

4              THE COURT:  Well, okay.  Let's get to restitution.

5    What's your view on restitution?

6              MR. WEINREB:  So what we would ask the Court to do is

7    to enter an order of restitution at the time of sentencing with

8    the amount to be determined at a hearing within 90 days, which

9    I believe the statute permits.  So the restitution will be made

10   part of the sentence and pronounced as part of the sentence but

11   the amount will be calculated later.

12             THE COURT:  Okay.  What are your intentions?

13             MR. WEINREB:  With respect to restitution?  We are

14   already soliciting from the victims and others the information

15   that is normally presented to support an order for restitution.

16   It's mandatory.  Restitution is a mandatory part of the

17   sentence.

18             THE COURT:  Well, but the statute does permit it to be

19   omitted if the calculation is too burdensome.

20             MR. WEINREB:  That's correct.  But we don't believe it

21   is too burdensome.  We're going to collect the information.

22             MR. CHAKRAVARTY:  Your Honor, just to alert the Court

23   to an issue that might arise later, but one of the reasons why

24   restitution is important here, to the extent that in the future

25   the defendant seeks to profit from these activities, that

```
 1    restitution order is a key vehicle to be able to make the
 2    victims whole.
 3              MS. CLARKE:  I'm not sure that's correct because
 4    there's a profits statute that allows the government to seize
 5    profits, which is so beyond the pale at this point.  But if
 6    there were profits, the government can seize them under
 7    32- -- I don't have the statute in front of me, but there is
 8    a -- sort of a Son of Sam profits -- special forfeiture statute
 9    that allows you to do that without an order of restitution,
10    Judge.  We're going to have to --
11              THE COURT:  3681.
12              MS. CLARKE:  3681.  You remembered it and I just read.
13              MR. CHAKRAVARTY:  Which, I'd suggest, is not
14    necessarily coextensive with the restitution.
15              MS. CLARKE:  We're going to object to an order of
16    restitution on Apprendi grounds, but we also think that the
17    Court is correct that it's burdensome to calculate and should
18    be --
19              THE COURT:  I haven't actually said that.  I raised
20    the question.
21              MS. CLARKE:  Well, you know, it's an unrealistic thing
22    to ever get paid.  You know, if the Court's going to order it,
23    we're going to object -- not if the Court is going to order it.
24    We're going to object on Apprendi grounds and that's a
25    percolating point in the circuit.  Certainly the Supreme Court
```

1    just denied cert on that issue.  But it has not been resolved

2    nationwide the question of whether *Apprendi* applies.  I think

3    the rationale is pretty strong that is does so we will object

4    to the entry of an order of restitution.  We also think that

5    it's just a bit crazy to order.  It's a death sentence, it's a

6    life sentence after death.  It's just not going to get paid.

7         MR. WEINREB:  Your Honor, for all we know some, you

8    know, wealthy jihadi somewhere will decide that people who

9    martyr themselves for the cause deserve some kind of

10   compensation and will, you know, make some kind of gift to the

11   defendant.  And I just think we can't foresee all possibilities

12   of what might happen here.

13        Restitution at this -- you know, regardless of whether

14   there's an *Apprendi* issue, which remains to be seen, right now

15   the law is that it's *a* mandatory part of the sentence if it can

16   be calculated without undue burden.  We believe that it can be.

17   We're soliciting the information.  And if it proves otherwise,

18   that's an issue we can deal with down the road.  But at this

19   point there's no reason not to follow the ordinary course of

20   the law.

21        MS. CLARKE:  The other thing that we want the Court to

22   consider in regard to any financial -- which includes special

23   assessment, and there have been five or six death sentences, I

24   believe, in which the courts just waived all financial burdens,

25   including the assessment, restitution and fines.  But if the

1    Court is going to order the special assessments or, you know,

2    eventually restitution, we would ask that the Court order that

3    it come from earnings rather than the commissary account where

4    lawyers typically provide, you know, money each month so that

5    the client can buy shoes or soap or, you know, supplement the

6    food.  The diet in the prison is not all that good.  So that it

7    can come from, you know, what the government would be concerned

8    about rather than, you know, the legal teams and family members

9    providing money.

10          THE COURT:  Doesn't the Inmate Financial

11   Responsibility Act or whatever it's called deal with that, you

12   can take some of the commissary money but not all?

13          MS. CLARKE:  If the Court direct it come from

14   earnings, the Bureau of Prisons will comply with that.

15          THE COURT:  Right.  But in other words, they don't

16   scoop out the account.

17          MS. CLARKE:  Well, they might.  They scoop out

18   whatever they decide to scoop out.  My last experience with the

19   prison was -- and this young man got just -- money from his

20   parents every month.  And they figured out how much he needed

21   and would send it, and then the prison started taking 25 bucks

22   a month.  So they had to adjust how much that they would send.

23   But the more they would send, the more they would take.  So

24   it's a -- you end up having family and lawyers paying

25   restitution a nickel at a time which is really not, I don't

1    think, what it was aimed at.  It's typically, you know, if a

2    guy gets a job in prison, they take it out of that.  But when

3    these lifers or people facing death go, they don't get all

4    these jobs, so they don't have any source of income to pay it

5    other than, you know, family, lawyers.

6         MR. WEINREB:  So the flip side of that consideration

7    is the one that we have raised, which is the possibility of

8    gifts being made to the defendant or money being sent to him by

9    essentially fellow travelers or sympathizers that could far

10   exceed what his parents or lawyers might send to him, and that

11   justly should go to paying a special assessment or restitution.

12   And so limiting it to earnings --

13         THE COURT:  Let me just -- this disagreement should be

14   on the record tomorrow, I think, properly.  I mean, I don't

15   want to be pre-deciding sentencing.

16         MS. CLARKE:  But just to get in the Court's head.

17         THE COURT:  But I'm glad you're flagging it.  I

18   appreciate that.  But I don't know that we have to resolve it.

19   But, I mean, I think you should make the argument in public

20   tomorrow.

21         MS. CLARKE:  But the other flag I want to give to the

22   Court is that in one case what we did agree with the government

23   to do was create an amount below which the prison could not

24   take any funds, so that there was a cap on how much money the

25   individual could have, and then they could take restitution

1   beyond -- or special assessments beyond that.  So perhaps

2   that's something --

3           MR. WEINREB:  I mean, Ms. Clarke and I had spoken

4   earlier about possibly negotiating something but --

5           MS. CLARKE:  Maybe we could do that afterwards.

6           MR. WEINREB:  Okay.

7           THE COURT:  Okay.  Well, this gives me a partial

8   answer to one of my broader questions, which is neither of you

9   submitted a sentencing memoranda.  There are apparently some

10  issues on which you each wish to be heard.  Again, this is my

11  master of ceremonies --

12          MS. CLARKE:  Well, restitution didn't seem to us to be

13  an issue because the presentence report said that the

14  government would be asking for a date -- the Court to set a

15  date to have a restitution hearing.

16          THE COURT:  Anyway, we'll touch on that and perhaps

17  this other question of other financial issues.  Are there other

18  matters of that sort that you think there will be some exchange

19  of views and argument on?

20          MR. WEINREB:  Well, the other thing that we'll be

21  asking for tomorrow is for the Court to enter the order --

22  proposed order of forfeiture which we submitted.  And I believe

23  that there are three steps, if anybody remembers what they are.

24  I can't exactly recall.

25          MS. PELLEGRINI:  The Court has to pronounce it, and

1   the judgment --

2           MR. WEINREB:  So there's a written order which we

3   submitted which we would ask be signed, and then the Court also

4   has to pronounce it orally as part of a sentence.  I believe

5   that may be it.

6           MS. CLARKE:  That was a motion that was filed.

7           THE COURT:  Right.

8           MR. WEINREB:  Right.  It's a motion for forfeiture.

9   So the motion would have to be granted, the order entered and

10  the judgment pronounced.

11          MS. CLARKE:  I think we kind of looked at that as a

12  two-week response time.

13          THE COURT:  It's fairly common.  I don't know about

14  the timing, but it's a fairly common procedure in criminal

15  cases here, anyway, that such motions are filed.  They are

16  typically granted at the sentencing and -- or not, and the

17  preliminary order entered at the time, and it's part of the

18  proceedings and reflected in the judgment.

19          MS. CLARKE:  Well, given that, we have to look at

20  forfeiture in the light of the *Apprendi* issue as well, and we

21  may just need to flag that for the Court.  But that looked like

22  a two-week -- all of this looked like it was going to be put

23  off, that's why you didn't get anything from us.

24          THE COURT:  Okay.  So we have those sort of low end of

25  the judgment form issues, I guess is the way I would put it.

1    Will there be any major argument about the sentences over which

2    the Court potentially has some range of judgment?

3              MS. CLARKE:  No.

4              THE COURT:  I say "potential" because I don't think I

5    really do, the way it's been calculated.  The statutes pretty

6    much control.

7              MR. WEINREB:  Except there are only two counts I think

8    on which the Court has discretion.

9              THE COURT:  Well, it could be four depending on how

10   you read it.

11             MR. WEINREB:  Right, it could be.  I think there was a

12   suggestion --

13             THE COURT:  Again, I'm just trying to get -- this is

14   really courtroom management more than substance.  I'm just --

15   when we've heard all the victims, typically the next step I

16   would turn to the government for argument, I would turn to the

17   defense for argument.

18             Does the defendant intend to say anything?

19             MS. CLARKE:  We're still in conversation about that.

20             THE COURT:  Could you let us know when you know?

21             MS. CLARKE:  That would be last anyway, right.

22             THE COURT:  Yes, last before me.

23             MR. WEINREB:  So just to be clear, so the victims will

24   go first and then we'll resolve any disputes over issues, then

25   government argument, defense argument, and then the defendant

1    if he wishes to speak?

2              THE COURT:  Right.  Right.

3              MS. CLARKE:  It looks like the victim speakers will be

4    standing behind government counsel tables, essentially?

5              THE COURT:  Yes.  I think we'll put -- one of the mics

6    will reach to there.

7              MR. WEINREB:  There was some concern among some of the

8    victims that they be able to leave the courtroom after they

9    give their statements.  Is the Court opposed to that?

10             THE COURT:  Not if they can do it quietly.

11             MR. WEINREB:  Okay.  That's fine.

12             THE COURT:  As I always do in criminal cases after a

13   verdict when there will be a sentencing, I invite jurors to

14   return if they wanted to.  A number of them will.  Because

15   there are a number of them, we were thinking of where to put

16   them because the courtroom is so filled.  I'm actually going to

17   put them in the jury box.  It's just a matter of courtesy.

18   They of course are not a jury.  But as I say, it is my custom

19   to invite people, and once in a while they take me up on it,

20   but this jury did.

21             MS. CLARKE:  You just want to give us all whiplash.

22             THE COURT:  Anyway, I just wanted you to not be

23   surprised.

24             So the arrangement will be those people will be in the

25   box.  The sketch artists will be where we put the alternates

 1  when they are outside the box.  That will give them a view of

 2  the whole courtroom including the speaking victims.

 3       MR. WEINREB:  When the press sees the jury in the

 4  courtroom, they will undoubtedly ask us for guidance on whether

 5  they're enjoined from talking to them.

 6       THE COURT:  No, I don't think we've ever enjoined

 7  them.  I mean, the same rules apply.  My advice to the jury is

 8  be careful in their decision-making.

 9       MS. CONRAD:  I'm sorry.  Enjoined from speaking to the

10  press?

11       MR. WEINREB:  Explain to the jurors -- well, the

12  jurors were never enjoined from anything, but there was an

13  order that the Court issued --

14       THE COURT:  The decorum order?

15       MR. WEINREB:  No, not just that, but there was this

16  order that for administrative purposes the jury was still a

17  jury for 90 days, and the press, I think, many of them, were

18  concerned that that meant they couldn't talk to them for that

19  reason.

20       THE COURT:  They should talk to their lawyers.

21       (Laughter.)

22       MS. CLARKE:  There's a motion pending --

23       THE COURT:  There is a motion.  And so that's -- so

24  just to finish up on that, that is not the purpose of that

25  order.  That order was to give them the benefit of the Employee

1    Assistance Program, so that they could -- the bureaucracy would

2    be satisfied they could extend that benefit to those people.

3    That's the only reason.  The decorum order, I guess, expired.

4    Has it expired?

5             MS. CLARKE:  You no longer have to have good behavior

6    in the courtroom?

7             (Laughter.)

8             THE COURT:  We will bring the jurors up to their

9    position in the box through the back of the house -- the former

10   jurors -- just to prevent them from being assaulted by the

11   press.  They'll have to leave on their own.  They're going to

12   arrive on their own.  They're not being bussed the way they

13   were.  So they'll have to make their way safely home themselves

14   but --

15            MR. CHAKRAVARTY:  Your Honor, their identity, both

16   their names as well as their likenesses, I think, also has not

17   been publicized, but the press will be concerned about that.

18            THE COURT:  Well, there's no photography in the

19   courtroom.  I guess the only implication is for the sketch

20   artists, and their sketches are such that...

21            MS. CLARKE:  You can't tell.

22            THE COURT:  You could have fooled me the past few

23   months.

24            MR. WEINREB:  I'm not sure this should be public.

25            THE COURT:  There were some that I didn't think looked

1    like me and I thought that's fine.

2            MR. WEINREB:  Your sketches may suffer.

3            THE COURT:  That's okay.  I'm not invested in them.

4    So I don't think there are any formal restrictions with respect

5    to that, again.

6            MR. WEINREB:  With respect to victims addressing the

7    Court, is it all right for family members to stand together?

8            THE COURT:  Yes.

9            MS. CLARKE:  Judge, I've just never heard this before

10   but admittedly I've not been in these shoes.  Mr. Mellin

11   indicated that they would be advising victims not to express an

12   opinion to you as to what they felt what the appropriate

13   penalty was.  I'm not sure what that comes from.

14           MR. MELLIN:  Their personal opinions are irrelevant.

15   I mean, when they're talking about victim impact, it's the

16   impact on their lives.

17           THE COURT:  I guess I took the earlier comment to be

18   relevant only to the death counts; that is, because the jurors

19   were final on that and I'm not making any judgment about that.

20   So I think as to those, it's inappropriate.  As to the others,

21   I suppose, they could say, "Don't give him 25 years on the

22   carjacking."  I suppose that's possible.  I was focused on the

23   death counts.  There's nothing to be said about that.  I can't

24   do anything about it.

25           MS. CLARKE:  Right.  But I'm not sure that they can

1   have their opinions restricted.  And not that, you know, it

2   weighs one way for either party or another, I just didn't know

3   that victims could be restricted in their opinions in a

4   sentencing hearing post-jury.

5          THE COURT:  Well, as I said, strictly speaking, the

6   benefit to the system is to be that they can influence the

7   judgment that the Court might make that's within its range to

8   make.  The death/life sentence issue as to those counts is not

9   mine to make so there's no range of judgment.

10          MS. CONRAD:  That sort of calls into question -- I

11   mean, obviously, they have the right to speak and they should

12   be given the opportunity to speak, but to the extent you're

13   saying but it shouldn't influence -- they shouldn't express an

14   opinion about the sentence because then nothing they say would

15   be relevant to the sentence because the sentence has been

16   predetermined.

17          THE COURT:  No, they can say things relevant to the

18   sentences about which I have to make the judgment.

19          MS. CLARKE:  I don't think that their right is --

20          THE COURT:  For example, one thing I get to decide is

21   concurrence or consecutiveness, some of which I get to decide,

22   some statutory.  They could say something about that.  But, you

23   know, saying, "We're glad the jury did what they did or we're

24   not glad the jury did what they did," I don't know that that --

25          MR. WEINREB:  Anyway, nobody's instructing them not to

1    speak publicly their minds about any issue, it's simply what's

2    appropriate in the context of a sentencing hearing.  And there

3    are many things that, you know, they might like to say,

4    especially to the defendant, which they won't be permitted to

5    say which also would have nothing to do with the sentence.  I

6    think it's best we give them some principles that make sense

7    about what they should say and shouldn't say.

8            THE COURT:  Let me just come back to one thing on the

9    restitution question.  As I understand it, the marshals are

10   prepared to remove him from the district, and I've told them to

11   go ahead and do that.  There's no contingency about

12   restitution.  We're not going to have him hanging around while

13   that is debated.  If it's necessary to bring him back for a

14   hearing we'll, I'm sure, be able to make the arrangements.  It

15   may be that we could make long-distance arrangements as well if

16   there is a hearing.  So I just wanted to tie that off, he'll be

17   leaving tomorrow.

18           MS. CLARKE:  Does the Court have any indication where

19   he's going?

20           THE COURT:  I don't.

21           MS. CONRAD:  Does the government?

22           MR. WEINREB:  No.

23           MS. CLARKE:  And how quickly he's going?

24           THE COURT:  He's going quickly.

25           MS. CLARKE:  I mean, if we could know because we're

1    scheduling visits out with the prison here and --

2            THE COURT:  It's -- I don't think anybody's ever told

3    me anything specific but I am surmising that it's probably late

4    tomorrow.  But that's surmise.

5            MS. CLARKE:  Okay.

6            THE COURT:  I base that basically on the general tenor

7    of the concern that the marshals expressed about having to hold

8    on to him if a restitution hearing was being set.  It sounds

9    like they were ready to go.

10           MR. MELLIN:  I actually --

11           MR. WEINREB:  I assume he's going to Terra Haute.

12           MR. MELLIN:  I actually figured you would want to know

13   the answer to this question.

14           MS. CLARKE:  You were supposed to tell me, yes.

15           MR. MELLIN:  I've tried to look into this, and the

16   answer is they don't know yet, unfortunately.  So it's either

17   going to be Terra Haute or ADX, but no one knows right now

18   where he's going.

19           MS. CLARKE:  Well, if they're thinking about tomorrow

20   afternoon, I would think they might need to know where to

21   direct the plane --

22           MR. MELLIN:  I've asked for some clarification how

23   that was going to occur but there was no more information on

24   that.

25           THE COURT:  I know the probation officer got an

 1   inquiry from BOP if they could see the PSR in advance of the

 2   sentencing.

 3          MS. CLARKE:  They have him in their custody so...

 4          THE COURT:  Right.  But I think that suggests that

 5   they were working on something.

 6          MS. CLARKE:  Thank you.

 7          THE COURT:  I take it there are no issues to be

 8   resolved with the PSR?

 9          MS. CLARKE:  No.

10          THE COURT:  There was a hypothetical one from the

11   government on obstruction of justice, but it has absolutely no

12   effect on anything.

13          MS. CONRAD:  And I just raise some issues about -- you

14   know, I think this really affects just the judgment in terms of

15   the statutory maxes; for example, I just had this experience.

16   Probation says this is a guideline sentence and then there's a

17   tendency to create a judgment that says concurrent on these

18   counts; whereas, Counts 19 and 21 do have term of years max.

19   So it shouldn't be life on those.

20          THE COURT:  Correct.

21          MS. CONRAD:  And then there's -- I think there's a

22   question about whether you can impose supervised release after

23   a term of life imprisonment.  It seems kind of fallacious --

24          THE COURT:  I guess.

25          MS. CONRAD:  -- because it suggests that he's ever

1  going to be released in order to be on supervised release.  You

2  certainly can impose it, I suppose, after --

3          THE COURT:  I can impose it.

4          MS. CONRAD:  -- on 19 and 21 in case those sentences

5  are vacated.  But it seems, you know -- if you can't impose the

6  supervised release after a death sentence, you certainly can't

7  impose one after a life sentence and vice versa.

8          MS. CLARKE:  But, no, other than financial issues, I

9  don't think there's much --

10         MS. CONRAD:  I don't know if there is an issue, and I

11 assume no one's asking for a fine?

12         MR. WEINREB:  We're not asking for a fine.

13         THE COURT:  I actually didn't focus on that in the

14 PSR.  I don't think she did.  She didn't recommend it to me

15 anyway.  She just sets out the ranges.

16         So we found this regulation, 28 C.F.R. Section 26.2.

17 Well, 26.1 and 2.  26.1 says the regulations of this part apply

18 whenever a sentencing hearing is conducted by a United States

19 District Court -- conducted in a United States District Court

20 has resulted in a recommendation or determination that a

21 criminal defendant be sentenced to death for the commission of

22 an offense described in any federal statute; and then the

23 second part is, Whenever this part becomes applicable, the

24 attorney for the government shall promptly file with the

25 sentencing court a proposed judgment and order.  And it shall

1    state in addition to other matters required by law that the

2    sentence will be executed by a U.S. marshal designated by the

3    director of the marshal service; that it shall be executed by

4    intravenous injection of a lethal substance; that it should be

5    executed on a date and place designated by the director of the

6    Bureau of Prisons; and that the prisoner be committed to the

7    custody of the attorney general for detention pending execution

8    of the sentence.

9         MR. MELLIN:  Your Honor, it's been my experience that

10   courts just -- the judge just reads that as an order from the

11   Court, but we could certainly --

12        THE COURT:  There seems to be some range of options

13   there, I guess.  Or maybe not.  Well, maybe -- maybe that's the

14   answer, you just incorporate those conditions in the judgment,

15   leaving it to the attorney general or his designee -- her

16   designee to fill in the blanks, I guess.  Okay.  Well, that

17   covers the judgment issue.

18        We made reference to the motion from the press for

19   juror identification.  We've held off on that.  I don't know if

20   anybody wants to weigh in on that.

21        MS. CLARKE:  We don't intend to.

22        THE COURT:  I don't know whether the government does.

23   But if you do, I think that two weeks from maybe this Friday or

24   next -- yeah.  So if you have anything to say -- I'm thinking

25   seriously about -- I think these cases are not routine and

1    every case has to be considered on its own, so I don't know

2    what the answer is.  But if you have any input, I would be

3    interested in it.  If you don't, that's fine too.

4              I guess that's all I have.

5              MS. CLARKE:  Okay.  9:30.

6              THE COURT:  I'll see you tomorrow at 9:30.

7              Oh, yeah.  Jane just reminds me.  I think to avoid

8    pressure on the returning former jurors, I'd appreciate it if

9    there was no comment to the media about it before tomorrow.

10             MS. CLARKE:  We've been just yakking away with the

11   media all along.

12             THE COURT:  Just make it easier for them.

13             (The proceedings adjourned at 2:38 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2

 3         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4    the United States District Court, do hereby certify that the

 5    foregoing transcript constitutes, to the best of my skill and

 6    ability, a true and accurate transcription of my stenotype

 7    notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8    United States of America v. Dzhokhar A. Tsarnaev.

 9

10    /s/ Marcia G. Patrisso.
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12
      Date:  2/5/16
13

14

15

16

17

18

19

20

21

22

23

24

25
```