UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DZHOKHAR A. TSARNAEV, also known as Jahar Tsarni,<br><br>Defendant. | Criminal Action<br>No. 13-10200-GAO |

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**LOBBY CONFERENCE - SEALED**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Thursday, December 18, 2014
11:01 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By: William D. Weinreb, Aloke Chakravarty and
Nadine Pellegrini, Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts 02210
- and -
UNITED STATES DEPARTMENT OF JUSTICE
By: Steven D. Mellin, Assistant U.S. Attorney
Capital Case Section
1331 F Street, N.W.
Washington, D.C. 20530
On Behalf of the Government

FEDERAL PUBLIC DEFENDER OFFICE
By: Miriam Conrad, Federal Public Defender
51 Sleeper Street
Fifth Floor
Boston, Massachusetts 02210
- and -
CLARKE & RICE, APC
By: Judy Clarke, Esq.
1010 Second Avenue
Suite 1800
San Diego, California 92101
- and -
LAW OFFICE OF DAVID I. BRUCK
By: David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, Virginia 24450
On Behalf of the Defendant

P R O C E E D I N G S

* * *

THE COURT: Just a couple of very quick things about jury selection that I didn't want to say in public. One is that I would like to schedule a more serious session for the finalization of the procedures and the questionnaires and so on and so forth, and what we've been looking at is the 30th, Tuesday the 30th, in the morning.

Does that work for everybody?

MR. WEINREB: That's fine.

THE COURT: Okay. So we'll do that in camera, probably here.

MS. CLARKE: The holiday is sort of over for us already.

THE COURT: Before it began?

MS. CLARKE: Yes.

THE COURT: Well, you enjoyed Thanksgiving.

MS. CLARKE: Yes.

Did you set a time, Judge?

THE COURT: I didn't. I would think at 10:30, midmorning, just to let everybody attend to the first orders of business. We'll probably do it in this room. I didn't want to announce it publicly because I didn't want people dogging you as you came in or left.

I haven't finalized all of this in my own mind. My

inclination is to replicate the successful, and that would be the *Bulger* method that Judge Casper used which essentially kept media and most other observers out of the courtroom for the individual voir dire, so that it was one-on-one with broadcasting, or whatever you'd call it, to the other rooms, but no audience in the courtroom. And I think that inhibits candid discussion with the jurors, to have them stared at while they answer their questions.

My understanding is, on the defense request in the *Bulger* case, there were a minimal number of members of the public in the courtroom to overcome any objection that it was not a public proceeding. I'm not sure why physical presence as opposed to video and audio access makes a difference, but the law of the circuit is uncertain on this, and it seems to be developing, if we could call it that, and so I think that it may be prudent to do that. And maybe you could discuss how we do that without anybody making an objection to how we've done it. But I think it will -- so that's -- but that's so much a general idea at this point.

The only other thing was 18 U.S. Code 3432 which calls for the service on the defendant of the list of the witnesses and venire three days before the commencement of trial. I guess "trial" means the process of selecting the jury, so that would be the 5th, so I think three business days was your conclusion, so I think it pushes it to Monday, the 29th.

There are just a couple of issues. We would interpret -- it uses the term "veniremen." "A copy of the indictment and a list of the veniremen and of the witness list to be produced on the trial." The veniremen, I would think, would be the 1,200, not the original 3,000, but the net number of that. If there's no objection, we'll proceed on that assumption and we'll get that.

The other question is the statute requires the name and, quote, place of abode, which is undefined. There's been, apparently, varying practice about this. My preference would be to give town only and not street address for the venire. I don't know why a street address for prospective jurors is necessary. There is that issue. If you want to think about it, it's an issue.

I don't know that there's any -- I don't think there's any controlling guidance from what we've been able to determine. As I say, there may be different practices. A possible alternative is to use ZIP code. So, for example, it gives you a little more specificity for the City of Boston if you know the ZIP code rather than just the town. So that may be of some -- but I don't see any legitimate reason why you need to know exactly where the juror lives.

Witnesses could be a different thing. It raises the question of -- I know the government's witness list, the law enforcement people are identified by agency rather than home

address. That seems like a reasonable thing to do, but if there's anything you want to raise about that, we should confront that as well.

So basically, those are the questions I have under the statute which we need to answer. And, again, we can do that on the 30th when we -- no, we can't. We have to -- I'm sorry. I keep forgetting because the day before we have to give the list. So give it some thought and maybe you could report back that you have an agreement or disagreement and we could resolve that, okay?

MS. CONRAD: Judge, can I ask you a question about what, if any, arrangements are being made for parking for the jurors.

THE COURT: The jurors -- okay. I can tell you that much. We will be entering a possible sequestration order, which is what they call it, which puts the jury in the custody of the marshals. They will meet at a remote location and be brought to the courthouse in a van, or two vans, I think, so they can come into the courthouse without having to go through the general front entrance. So they'll park wherever that is.

MR. BRUCK: This is the venire? Or is this for voir dire, the actual trial --

THE COURT: No, this is the trial jury.

MS. CONRAD: What about for the venire?

THE COURT: That's -- I guess that's their problem, as

it is for everybody now, you know? Any jury that we have, they're going to have a problem.

MS. CONRAD: Just in terms of the numbers, I was thinking.

THE COURT: Well, you know, I don't think it's -- the way we're going to do it, 200, 200, 200, 200, it's kind of like a normal Monday. It's a pain, but I guess you just have to hunt around.

MS. CLARKE: Judge, on the marshals and the remote location, my understanding is that many of the victims also meet at a remote location and are shuttled in.

THE COURT: Unrelated. We're not getting involved with the victims. That's all --

MS. CLARKE: But there's no connection? I mean, no --

THE COURT: I'll ask that question. I'm pretty sure it's not the same, but I will ask that question. I mean, part of our point is to keep those people separate.

MS. CLARKE: Right.

THE COURT: That's part of the reason not to have the jury -- the jurors will also have their lunch brought in here so they won't go to cafeteria and so on, and then they'll get whisked away at night for the same thing. But part of the point is to keep, from our point, the jurors away from witnesses, victims, everybody else.

MS. CLARKE: I understand. I just wanted to raise

that just in case --

THE COURT: I'll double-check that, but I'm pretty sure they are not the same at all.

MS. CLARKE: The other question, the 200, 200, 200, 200, that process, is that the order in which they will be called into the courtroom for voir dire? Say, the first 200 come and that's Numbers 1 through 200. Is that the same order --

THE COURT: Yeah, I think we'll proceed in sequence. They'll be assigned a number --

MS. CLARKE: At that point randomly assigned a number --

THE COURT: Yes. I don't know the details, again, we're going to replicate what *Bulger* did, but the first 200 will fill out their questionnaires, we'll take all the questionnaires, they -- I think the juror number in the *Bulger* case was handwritten on every page so that if they came apart, page 17 went with this juror.

MS. CLARKE: Sure.

THE COURT: And then I guess they're in -- they're probably in sequence -- I imagine they produce a list, just like in a regular simple trial where you come into the courtroom and they have the list of 1 through 45, who the jurors are. I assume they'll go 1 through 1,200 or whatever.

MS. CONRAD: Will that correlate -- when we get the

list of the venire next week, will the --

THE COURT: I would guess so. We can double-check that, but I would guess so.

MR. WEINREB: It would be useful to know if the Court's decided yet when we can expect to get the juror questionnaires, whether we'll be getting them every night or --

THE COURT: Oh, I see. That's something we'll work out on the 30th. Grossly, something like that.

MR. WEINREB: And then more --

THE COURT: You'll get them as they're produced.

MR. WEINREB: More to the point, how long we'll have to review them because --

THE COURT: That's something we have to work out.

MR. WEINREB: We may need to --

THE COURT: It won't be overnight. It will be more than overnight.

MR. WEINREB: I'm grateful to hear that, but how many people we need to make accommodations for to help us look at them may depend on how much time we have to look at them and what kind of --

THE COURT: I think our gross -- again, our sketch-out, was the Monday people we might be addressing on Thursday. So you'd have a couple of days for -- so that would be -- that would move through, I think. So the Tuesday people would be Friday and then the Wednesday people will be the

following Monday. So we wouldn't actually begin individual voir dire until early or mid second week.

MR. WEINREB: I see. Second week. Okay.

THE COURT: So for the third group, you have all weekend.

MR. MELLIN: Thank you, your Honor.

MR. WEINREB: Now I'm confused. When you say the second week, will we have --

THE COURT: So --

MR. WEINREB: So we'll be done by Wednesday with the questionnaires?

THE COURT: We'll have 200, 200, 200, 200. How many is that? That's 400 per day. Yes, 1,200.

MR. WEINREB: So the question is: The Thursday you're referring to, is that the very next Thursday or a week from Thursday.

THE COURT: No, that Thursday for Monday.

MS. CLARKE: Monday's your -- January 5th, 400 people we will be seeing again on Thursday.

THE COURT: So the 6th, 7th, 8th. So on January the 8th you'll be considering -- we'll be considering --

MS. CLARKE: We'll all meet and say we agree to excuse the following?

THE COURT: Again, the details in *Bulger*, there was a deadline for the parties to submit their joint agreement on

excusals, and as I understand it, Judge Casper took the agreement, didn't reevaluate it. And I don't really see any reason to do otherwise if you both --

MS. CLARKE: So you're envisioning what Thursday's activity is is our submission of our joint agreement or --

THE COURT: And then to the extent have you disparate views on people, we can talk about them and reduce that. And then similarly the next day, Friday, we would do the Tuesday group and get them reduced. So you've got 400 on Monday, you reduce it to 75 as a result of the -- so on. And then -- and so by the end of the three-day process, Thursday, Friday, Monday, we'd know who the people who will be subject to individual voir dire will be and we can begin that process. Whether that begins the next day or we skip a day to build in --

MS. CLARKE: And will they maintain that same order that they're left standing in?

THE COURT: Yes. Yeah.

MR. CHAKRAVARTY: In *Bulger*, were they able to get through 200 a day?

THE COURT: They went faster than they thought. We're going to -- I don't know. That's something we're going to maybe refine. I think there was a disagreement on the papers whether we call them in by 25s or 50s. I don't -- you know, either one is a guess, in a sense. And it's adjustable. I

mean, if you brought in 25 and you sort of ran out of people at the end of the day, you could bring in more the next day.

So I think on this, it's probably -- we will probably get a jury by the third week sometime, before the end of the third week. Whether it's early in that week or not, I don't know. Maybe, if we're lucky, by the end of the second week, but that's sort of the range.

MR. WEINREB: So just if I could, your Honor, to return to something you said in the very beginning about having a minimal presence in there when we're doing the individual voir dire. So does that contemplate that there will be a portion of voir dire where there's a single potential juror --

THE COURT: Yes.

MR. WEINREB: -- being questioned?

THE COURT: Yes.

MR. WEINREB: But it will be in open court; it won't be under the husher or in the back?

THE COURT: So what I understand what Judge Casper did, she had a session in her courtroom, in the well of the courtroom. She sat at a table like this. And actually the individual juror sat here, Judge Casper was there, the reporter was there, counsel were further down, and the defendant, and the judge and the juror had a conversation.

It was videoed and audioed generally to the other rooms. If the juror had a particular sensitive issue that in

simpler times we would have done at sidebar, they shut the audio off. The cameras were positioned so that you could see the juror probably come in and sit down, but the camera was being shot over the juror's head, at Judge Casper. But there was a facility to kill the audio if the juror had something particularly --

MS. CONRAD: But if there was someone public in the courtroom?

THE COURT: I don't know what they did with that. That's a question we'll have to answer, whether they excuse them briefly or --

MR. WEINREB: I'm sorry to interrupt.

Were members of the press in the courtroom?

THE COURT: No. They were in the other rooms.

MR. WEINREB: Right.

MR. CHAKRAVARTY: Were the jurors told about the arrangements?

THE COURT: I don't know that detail.

Okay? So I guess to recap, if we could know by, say, Monday or so what your views are on the statute and what the meaning of the statutory terms are so we could prepare the list for service. It doesn't say who serves them. Is it the government who serves them or do we?

MR. WEINREB: Well, when the veniremen, I assume it's the Court. The witness list, it would be the government.

THE COURT: So this, interestingly, is another -- I don't know how old this statute is. It has archaic-sounding language.

MR. BRUCK: 1790. It was signed by George Washington. April 30th.

THE COURT: Because it says, "The witnesses to be produced on the trial for proving the indictment." It sounds like it's only the government witnesses, which I guess makes sense.

MR. BRUCK: Right.

THE COURT: But at any rate, the terms are a little obscure.

MR. BRUCK: It was the tail-end of the first crime bill that created federal crimes. And just as today, there were a couple of procedural things tacked onto the end.

MS. CLARKE: You could see that the code has grown since then.

THE COURT: Yes. Anyway, so if -- and, you know, kind of report back where we are on those issues on Monday and we can adjust it, okay?

MR. BRUCK: Okay. Thank you.

COUNSEL IN UNISON: Thank you, your Honor.

THE COURT: Thank you all.

(The proceedings adjourned at 11:17 a.m.)

C E R T I F I C A T E

I, Marcia G. Patrisso, RMR, CRR, Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.

/s/ Marcia G. Patrisso.
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

Date: 5/10/16