UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )  Criminal Action
v.    )  No. 13-10200-GAO
    )
DZHOKHAR A. TSARNAEV, also    )
known as Jahar Tsarni,    )
    )
    Defendant.    )
    )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**LOBBY CONFERENCE - SEALED**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, December 26, 2014
11:03 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: William D. Weinreb, Aloke Chakravarty and
 3           Nadine Pellegrini, Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
 4       Suite 9200
         Boston, Massachusetts  02210
 5       - and -
         UNITED STATES DEPARTMENT OF JUSTICE
 6       By: Steven D. Mellin, Assistant U.S. Attorney
         Capital Case Section
 7       1331 F Street, N.W.
         Washington, D.C.  20530
 8       On Behalf of the Government

 9       FEDERAL PUBLIC DEFENDER OFFICE
         By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10           Federal Public Defenders
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       - and -
         CLARKE & RICE, APC
13       By: Judy Clarke, Esq.
         1010 Second Avenue
14       Suite 1800
         San Diego, California  92101
15       - and -
         LAW OFFICE OF DAVID I. BRUCK
16       By: David I. Bruck, Esq.
         220 Sydney Lewis Hall
17       Lexington, Virginia  24450
         On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          THE COURT:  So we have scheduled on Tuesday a further

3     conference about juror questionnaires so I'm not going to get

4     into any of that.  This is really focused on the list issue for

5     now.  But except one -- there's always an exception, right?  On

6     the motion to continue, I've forgotten whether it's a motion or

7     you were seeking to file a reply to the government's --

8          MS. CLARKE:  Yes.

9          THE COURT:  Could we have that by the end of the day

10    on Monday so we could address it Tuesday?

11         MS. CLARKE:  Sure.

12         THE COURT:  Okay.

13         MS. CONRAD:  Is there a time for Tuesday?  I'm not

14    sure I'd seen that.

15         MS. CLARKE:  Yes, you said it when we were in there.

16         MR. WEINREB:  10:30.

17         THE COURT:  10:30.  And we'll probably do it here as

18    well.  It will not be on the calendar because it will be in

19    camera.

20         Okay.  So it appears that the controversy over the

21    lists has narrowed, if not evaporated?

22         MS. CLARKE:  It sounds like --

23         THE COURT:  That the law enforcement personnel can be

24    identified by their agency --

25         MS. CLARKE:  Yes.

1          THE COURT:  -- and not their home address?

2          That the other witnesses will be

3     addressed -- witnesses, non-law enforcement, will be identified

4     by home address --

5          MR. WEINREB:  Yes, your Honor.

6          THE COURT:  -- under the sensitive category of the

7     protective order, and that the veniremen will be identified

8     with home address.  And when we say "veniremen," I don't know

9     that this was ever a controversy.  We're talking about the

10    1,200, roughly, not the original 3,000, some of whom have

11    been disqualified and various things we're talking about.

12          MS. CLARKE:  That's the position we have taken, the

13    1,200 --

14          THE COURT:  Yeah, I think that's sensible as well.

15          MS. CLARKE:  There is one matter in controversy that

16    remains, and that is the government's instructions to its

17    witnesses with regard to the defendant requesting their

18    addresses as opposed to the statute requiring the production.

19    We took -- we feel like that's an incorrect interpretation of

20    the statute and causes some inflammatory -- potentially

21    inflammatory use by the witnesses towards us, and if it gets

22    out to the press, it will be played as "terror suspect seeks to

23    visit witnesses in their living room" or something like that.

24          THE COURT:  Yeah, all right.  I understand -- from the

25    papers I understand the controversy.

1          Tell me what -- why it's necessary to communicate with

2     the witnesses, to produce a list of the witnesses.

3          MR. WEINREB:  Well, your Honor, it's our position both

4     under the -- as we see the Victim Rights Act which requires us

5     to protect the witnesses' privacy, but even beyond that, simply

6     our role in assisting the witnesses to notify them that we're

7     providing their home addresses to the defense in the event that

8     they find out that the home addresses have been provided to the

9     defense which they could -- if defense investigators come

10    knocking on their door, they may ask us, "How did these people

11    have my home address?"  And it's very important to us that we

12    maintain their confidence because we both by statute and by

13    custom provide them with all sorts of assistance and guidance

14    with respect to the trial proceedings, and they need to be

15    confident that we're dealing straight up with them and --

16         THE COURT:  There may be two categories of witnesses,

17    though:  victims who will be witnesses and non-victims who are

18    not law enforcement.  So I understand the victims -- well, I

19    understand the possibility, anyway, that because of the victims

20    rights' statutes, witnesses who are also victims and meet the

21    definition might have to have some special consideration, but

22    that would not apply to non-victim witnesses.

23         MR. WEINREB:  That's correct.

24         THE COURT:  All right.  So is there any need to give

25    them an explanation, the non-victim civilian witnesses?  And I

1    guess the second part of the question is:  Why can't you just

2    blame me?

3           MR. WEINREB:  Well, your Honor, it's really -- it's a

4    little unclear to us really what relief the defense is seeking

5    here in the sense that what -- what an order might even say

6    because we have conversations with the witnesses -- the

7    victims in all kinds of ways.  They call us on the phone, they

8    send us emails, they talk to victim witness experts at the U.S.

9    Attorney's Office and the FBI.  And it's virtually impossible

10   to dictate word for word what each conversation is going to

11   sound like.

12          So, you know, if they say -- if a victim witness were

13   to ask -- even if we were to say, you know, "The judge has

14   ordered that all your addresses be given to the defense," we

15   might very well begin to get phone calls and letters saying,

16   "Why?  Why did he order that?"

17          THE COURT:  Because there's a statute.

18          MR. WEINREB:  There's a statute that says he must.

19   "And what's the defense going to do with that?"  "Why did they

20   want it?"  "Did you oppose it?"  "Did they have to ask" -- I

21   mean, we get all sorts of -- they're very curious.  We get all

22   sorts of questions about this and I think there's no -- unless

23   we were to say there's a gag order on it so we can't discuss

24   the matters at all, which that I think we'd really like not to

25   do because I think that would alarm them, I think it's not

1    practical to craft an order governing precisely what we have to

2    say about it.

3            MS. CLARKE:  Well, the truth of the matter is it's not

4    being given at the defendant's request.  The truth of the

5    matter is that the statute says "shall," and to take the

6    position that the defendant has to affirmatively waive is

7    pretty absurd, actually.  It's sort of like saying you have the

8    right to a jury trial but you could waive it and telling the

9    public that the defendant could waive his right to a jury

10   trial.  It's a little bit absurd.  The statute requires the

11   government to produce this information, period.  If the

12   government violated the statute and the defendant didn't

13   object, I think that's when the courts find a waiver, but the

14   statute requires it.

15           Now, if the government wanted to violate the statute

16   and then see if the defendant requests it, I guess that's a

17   different thing.  But the Court raised it on Friday -- or

18   Thursday after the status conference when we came in here in

19   camera.  The Court raised the question.  And the government

20   knows its obligation and it attaches because it's a capital

21   prosecution.

22           THE COURT:  Yeah.  I mean, I think in everyday

23   language speaking to non-lawyers whether something is mandatory

24   and waivable and waived and so on and so forth gets a little

25   bit, perhaps, more precise than practically speaking it should

1    be understood.  I mean, it is -- I mean, a defendant can insist

2    on a jury trial by refusing to waive it, you know, can insist

3    on the production of home information by refusing to waive it.

4    So it's not as simple as you say, but let's just -- I think

5    going forward you should explain to the witnesses that the

6    statute requires it and that under the circumstances I have

7    required that compliance.  If they -- we can't regulate every

8    conversation you have with them but I think it's fair to say

9    that it's statutory and it's being supervised by the Court or

10   whatever, okay?

11         Practically speaking, this is going to be able to be

12   done by the end of the day by Monday?

13         MR. WEINREB:  Providing the addresses?

14         THE COURT:  The names and addresses.

15         MR. WEINREB:  Yes, your Honor.

16         THE COURT:  Now, with respect to the law enforcement

17   people, the list is pretty general.  I assume you can confirm

18   whether this is true, that if the defense wanted to talk to a

19   particular FBI agent on the list, or at least tried to talk to

20   them, you could help them find where that person was?

21         MR. WEINREB:  Yes.

22         THE COURT:  The only thought I had further was if you

23   might identify the office where they work, Boston FBI,

24   Washington FBI, whatever.

25         MS. CLARKE:  I thought you were going to offer --

1          THE COURT:  But as a practical matter, if they want to

2    find --

3          MS. CLARKE:  I thought the government's position was

4    that it would be work addresses.

5          THE COURT:  Yeah.  But at least you know which

6    telephone number to call.

7          MS. CLARKE:  Right.

8          THE COURT:  So John Abruzzese, FBI, number one on the

9    list, you could say "Boston regional office."

10          MR. WEINREB:  Yes.  What we argued in our papers was

11    agency affiliation, not work address, per se, but we're willing

12    to add to that, which field office they're assigned to.

13          THE COURT:  Yeah, that was my point.

14          MR. WEINREB:  Sure.

15          MS. CLARKE:  Right.  I mean, I guess it would be a

16    question if we needed to issue a subpoena, we would know where

17    to do that.

18          THE COURT:  I'm sure they'll --

19          MR. WEINREB:  If the defense wants to subpoena any FBI

20    witness, they can just let us know and we'll make them

21    available.

22          THE COURT:  Without a subpoena?

23          MR. WEINREB:  Without a subpoena.  Yes, we will.

24          MS. CONRAD:  With respect to the emails that went out,

25    Judge, we had asked the government to give us a list of the

1    name of the witnesses who received the emails and the

2    government declined.  And I would press that request, the email

3    saying that it was the defendant's request that they were

4    required to provide their addresses.

5         THE COURT:  No, I think we'll leave it as it is.  I

6    don't want this to be a continual -- we have enough things to

7    fight about.

8         MR. WEINREB:  Your Honor, we have two entirely

9    unrelated things we just wanted to take this opportunity to

10   raise, if we could.  One is the question of the screen in the

11   courtroom.  I don't know if you personally have been involved

12   in these discussions --

13        THE COURT:  A little bit.

14        MR. WEINREB:  Okay.  So we --

15        THE COURT:  I haven't talked to the IT people; I've

16   talked to the clerk's office personnel who have talked to the

17   IT people.

18        MR. WEINREB:  I'll explain it to you from our

19   perspective, or our understanding of what the issues are which

20   might be slightly imperfect, which is we have quite a number of

21   exhibits that are visual and we have them in digital format,

22   and by far the best way to view them for the jury would be if

23   they were projected digitally; in other words, if the bus that

24   carried the signal from the computer to the screen maintained

25   the digital signal.  If you convert it to an analog signal, it

1    gets degraded, and then if you convert it even further to the

2    little screens that the jurors have in front of them as opposed

3    to a big screen, it can be impossible to see things that are on

4    there that would be useful for the jury to see, in our view.

5          So our main desire would be to be able to use a

6    digital projection screen in the courtroom.  We have one which

7    we've notified the court staff we have.  It's essentially a

8    white board.  And I think that the IT people had a concern that

9    because there would be a direct digital connection from the

10   computer to the screen, it would not be filtered through the

11   devices that the Court can use to shut things off, so we would

12   have to not turn on the screen unless the Court said it was

13   okay.

14         So we just wanted to -- if that wasn't your

15   understanding, we just wanted to let you know that was our

16   understanding of what the issue is.  But barring the

17   whiteboard, at the very least we would like to have one of the

18   large projection screens that are usually turned towards the

19   audience available for the jury to see, and our understanding

20   is there will be two in the courtroom.

21         THE COURT:  That might be more feasible.  I don't

22   know.  I'll have to explore that.

23         Have you been party to this at all?

24         MS. CLARKE:  No.

25         THE COURT:  So I don't know the technical aspects and

 1    I don't know what the degree of degradation is and so on and so

 2    forth.  Normally, you know, you work with government equipment,

 3    you get what the government provides.

 4            MS. CLARKE:  I think we're talking about the video,

 5    the Boylston Street video.  Is that the one?

 6            MS. PELLEGRINI:  There are a number of them.

 7            MR. WEINREB:  There are a number of photographs as

 8    well.

 9            THE COURT:  These are not things that come from the

10    defendant's computer?

11            MR. WEINREB:  No.

12            THE COURT:  Those would be different?

13            MR. WEINREB:  Those would be different.  These are

14    surveillance videos, photographs that were taken by people, by

15    law enforcement.

16            THE COURT:  In their original format they were

17    digital?

18            MR. WEINREB:  Yes.  Virtually all of them, they're all

19    digital.

20            THE COURT:  Because they're cell phones?

21            MR. WEINREB:  Cell phones, digital cameras.

22            MR. CHAKRAVARTY:  Some were emailed.

23            MR. WEINREB:  Digital cameras, recorders.

24            THE COURT:  I haven't gotten into it in detail with

25    the IT people.  We did arrange to have a second gallery screen

1    provided because people on that side of the courtroom can't see

2    the other one, so we just thought it was for the gallery,

3    basically.  I suppose it may be possible as necessary to just

4    flip that around.  It crosses that side of the courtroom, the

5    ability to see it.

6              MR. CHAKRAVARTY:  Or if it's possible to get a third,

7    they would be back to back.

8              THE COURT:  We can look into that.  My impression was

9    the space was pretty limited, and that may be --

10             MS. PELLEGRINI:  It is limited, your Honor; however,

11   I've been in there when they've played it, and just trying to

12   see and going around from screen to screen.  So the irony is

13   that the gallery gets a great view because those monitors --

14   the monitor that's in there now is very much like this, nice

15   and sharp.  And then sitting in the jury box, the screens are

16   kind of dark, people do have to share, so you have to tilt your

17   head a little bit sometimes.

18             So we were thinking, I think there is room for the

19   smart board monitor to back up to the gallery monitor.  It's

20   tight, but it's doable.

21             THE COURT:  The other issue is being outside the

22   control system, so one of the features of the system is that I

23   control who sees what.  It's not just that I control it, but

24   that I have different options.  So that in doing --

25             MS. CLARKE:  As to who sees it.

1          THE COURT:  That's right.  And if you do it -- if you

2     have to lay a foundation for an exhibit, for example, you can

3     show it only to the witness and that, of course, excludes the

4     jury.  You can show it only to me so that the witness doesn't

5     see it.  And so there are all those possibilities which will

6     probably be lost.  It will be binary then; everybody sees it or

7     nobody sees it.

8          MR. WEINREB:  No.  No.

9          THE COURT:  Would it still work through the system?

10          MR. WEINREB:  No, this would just act as an additional

11     monitor, so basically it would just mean that the Court

12     couldn't control this monitor, everything else --

13          THE COURT:  That's what I mean.  I couldn't show it.

14          MR. WEINREB:  So the monitor would, by default, be

15     off.

16          THE COURT:  Right.

17          MR. WEINREB:  And it would be turned on when the Court

18     permitted the jury to see an exhibit.

19          THE COURT:  Right.  I understand that.

20          MR. CHAKRAVARTY:  So you could daisy-chain.

21          THE COURT:  So in other words, I want to --

22          MR. WEINREB:  It's not either/or.  It's not either the

23     whiteboard or the Court system.  Both can be active

24     simultaneously.

25          MS. CLARKE:  The whiteboard comes on after the Court

1    says, Yes, the exhibit is admitted.

2            MR. WEINREB:  And even then the Court system stays on.

3    So the whiteboard is just a monitor.  The only thing is,

4    instead of getting its signal from the output of the Court

5    system --

6            THE COURT:  So it would be going through both sources

7    at the same time?

8            MR. WEINREB:  So the computer that has the source

9    material on it would have an output to the court system and an

10   output to this monitor.

11           THE COURT:  It would be a supplement; not a

12   substitute?

13           MR. WEINREB:  Yes.

14           MS. CLARKE:  Can you just give the control to the

15   judge and he could turn that monitor on?

16           MR. WEINREB:  Unless it has a remote control, which it

17   might have.

18           MS. PELLEGRINI:  It would have a mouse.  A mouse

19   that's wireless.  I don't know about -- that's for using it

20   when you start making things come up and down on the monitor.

21   But for actually turning it on, I don't know, actually, where

22   that control is.  I think it might be over where the other Phil

23   in the clerk's office sits with the other materials.

24           MR. CHAKRAVARTY:  The other -- just in order to give

25   the IT people some options, the other potential is to

1    daisy-chain it to the other monitor so nothing would go on that

2    screen.

3           MR. WEINREB:  Then it wouldn't be digital.  Once it

4    goes through the court system, it is converted to analog.  So

5    it would be a supplementary system.  There's an on/off switch

6    on it, and barring any sophisticated way of using it, which is

7    once an item is admitted into evidence the button could be

8    pushed, and before that it would be off.

9           THE COURT:  Now, it's not the immediate problem, but

10   the admitted exhibit would then be part of the JERS system, and

11   it would be analog then or digital?  I think it's digital.

12          MR. CHAKRAVARTY:  I think it's digital.

13          MS. CONRAD:  Everything that -- I mean, I'm

14   not -- this is irrelevant, but I'm not understanding how it's

15   analog.  I mean, if I've got a video in a digital format on my

16   computer and I plug in the cable that connects it to the court

17   system and play it, it's digital.  It's playing in a digital

18   format.

19          MR. WEINREB:  It's getting converted to an

20   analog -- whether the signal is digital or analog depends on

21   the wire that is connected to the nest.  The wire that connects

22   your computer to the court system is capable of carrying a

23   digital signal.

24          MR. CHAKRAVARTY:  So if it was an HD regular VGA cable

25   with the photo plugs, then it's downgrading --

1              MR. WEINREB:  The red, white and yellow plugs, you

2      know, so...

3              THE COURT:  All right.  Well, we'll look into it.

4              MR. WEINREB:  I think, you know, as our final plug, it

5      would really enhance the ability of the jury to see the

6      evidence, if we have that option.

7              THE COURT:  Okay.

8              MR. WEINREB:  And the other issue we could wait till

9      Tuesday.  I just wanted to flag it in case it required any more

10     discussion than that.  The parties have agreed on an approach

11     to doing social media checks of potential jurors, which

12     coincides with the recent opinion of the -- I think it was

13     the --

14             MR. CHAKRAVARTY:  The bar counsel.

15             MR. WEINREB:  -- bar counsel, which is that

16     it's -- they decreed it was not unethical for parties to

17     do -- look up information about potential jurors on social

18     media as long as there was no contact made.  So no friend

19     requests, no -- no forms of access that leave behind --

20             THE COURT:  Footprints.

21             MR. WEINREB:  -- footprints.  Precisely.

22             THE COURT:  And you're agreed on that?

23             MS. CONRAD:  Yes.

24             MS. CLARKE:  We agreed on that.  And the understanding

25     is the government has access to other information about jurors

1    that they'll provide to us.  Whatever they search and find

2    based on --

3              THE COURT:  Criminal record checks, you mean?

4              MS. CLARKE:  Yes.

5              MR. WEINREB:  It would just be a criminal record

6    check.

7              THE COURT:  You're going to do that for everybody?

8              MR. WEINREB:  We are.

9              THE COURT:  And you'll share it?

10             MR. WEINREB:  We will.

11             THE COURT:  Just on that, you may know the answer to

12   this, I don't know off the top of my head, is there an

13   affirmative indication that civil rights have been restored for

14   someone convicted in a crime?  Do you know, anybody?  I don't

15   know if you tell simply by the passage of time.  I think it's

16   seven years under the Massachusetts statute.  I don't know

17   whether it's automatic.

18             MS. PELLEGRINI:  I thought it was still an open

19   question.

20             THE COURT:  Maybe it is.

21             MR. WEINREB:  I don't believe it shows up in NCIC.

22             THE COURT:  You can't rely on the jurors to tell you

23   reliably.  They won't know the answer, frankly.  Most of them

24   won't.

25             MS. CONRAD:  I thought for felonies it was seven years

1    after release from prison, which makes it more complicated.  I

2    think the open question has to do with felon-in-possession

3    cases, whether their right to carry a firearm has been

4    restored.  I think that was resolved by statute in 1998 in

5    Massachusetts, that misdemeanor -- it's a long story.  But

6    misdemeanor -- defendants who committed Massachusetts

7    misdemeanors never lost their civil rights, and then there was

8    a question about -- I think it was Judge Saris' case,

9    *Indelicato*, about whether by virtue of never having lost those

10   rights they were said to be restored for purposes of a felon in

11   possession statute.

12          That being said, I don't think that affects

13   eligibility to serve on a jury.  I think that's what you're

14   thinking of.

15          THE COURT:  All right.  Well, we may all have to look

16   into that.

17          MS. CONRAD:  It's the felon in possession line of

18   cases.

19          MS. PELLEGRINI:  Could be.

20          THE COURT:  It's not uncommon for a juror to have a

21   ten- or 15-year-old felony conviction, and they don't know, and

22   they could not tell us.  Maybe the rare one would say, "I

23   subsequently went down and, you know, got a firearms permit

24   from the police chief," indicating restored rights, but other

25   than that, they wouldn't know, really.

```
 1            MS. CLARKE:  Right.

 2            THE COURT:  Anyway -- so anyway, that exchange of

 3    information is fine.  Of course, the two conditions are

 4    important:  No contact, and that goes for the list too.  No

 5    contact, obviously, with the jurors, just because the list is

 6    available with their home addresses.  And no footprints, which

 7    I gather is technically feasible.

 8            MR. WEINREB:  Yes.

 9            THE COURT:  Okay.

10            MS. CLARKE:  Happy new year.  Oh, I'll see you before

11    that.  Merry Christmas.

12            THE COURT:  We'll see you on Tuesday.

13            MS. CLARKE:  Thank you, Judge.

14            THE COURT:  Okay.  Thank you, all.

15            (The proceedings adjourned at 11:28 a.m.)

16

17

18

19

20

21

22

23

24

25
```

1                        C E R T I F I C A T E

2

3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Criminal Action No. 13-10200-GAO,

8     United States of America v. Dzhokhar A. Tsarnaev.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12

13    Date:  5/10/16

14

15

16

17

18

19

20

21

22

23

24

25