UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

v.

DZHOKHAR A. TSARNAEV, also known as Jahar Tsarni,

Defendant.

Criminal Action No. 13-10200-GAO

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**LOBBY CONFERENCE - SEALED**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Friday, January 9, 2015
2:28 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By: William D. Weinreb, Aloke Chakravarty and
Nadine Pellegrini, Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts 02210
- and -
UNITED STATES DEPARTMENT OF JUSTICE
By: Steven D. Mellin, Assistant U.S. Attorney
Capital Case Section
1331 F Street, N.W.
Washington, D.C. 20530
On Behalf of the Government

FEDERAL PUBLIC DEFENDER OFFICE
By: Miriam Conrad, Federal Public Defender
51 Sleeper Street
Fifth Floor
Boston, Massachusetts 02210
- and -
CLARKE & RICE, APC
By: Judy Clarke, Esq.
1010 Second Avenue
Suite 1800
San Diego, California 92101
- and -
LAW OFFICE OF DAVID I. BRUCK
By: David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, Virginia 24450
On Behalf of the Defendant

ALSO IN ATTENDANCE:

Michelle Rynne, Chief Deputy Clerk
James McAlear, Jury Administrator

P R O C E E D I N G S

THE COURT: Okay. So this is really in reference, as you may -- I hope you were told -- to the recent motion about the voir dire order and so on. And I thought the best thing would be to let Jim McAlear explain the process. Let me just give the preface and you can get into the details.

A number of jurors were selected from the 3432 list to be brought in for the first panel, A, Monday morning. It did not matter for any ordering purpose what sequence or time they showed up in. It was completely irrelevant to their placement on the due list. It's not a list like a sign-in, when you show up you sign in your name.

What happened was once everybody was in and ready for me to begin my remarks, at that point the body was frozen; that is, those people who were in the room to hear me were considered the people who had reported that morning. That fixed list was then re-randomized according to normal practice, regular practice -- I shouldn't say "normal," I guess. Regular practice. That's the normal -- and Jim can expound on that.

MR. McALEAR: Yeah. So when the first group of jurors, which we have called Session A for the CDs that you've received, they reported. They were told to report at 8 a.m. Some reported as early at 7:15 a.m. And that would go right until the time where we were ready to bring the judge out to greet the jurors.

Once the judge was on his way, we shut the doors, moved the tables up so that no other jurors could enter the jury assembly hall at that time for various and obvious reasons.

Once the judge was speaking to the group, Session A, Session A was then put onto the case entitled "*United States v. Tsarnaev*." When those jurors go onto the case in JMS, the Jury Management System, the only way to get them on the case is to tell the computer system -- type in the number of jurors that are here -- so, for example, if the first group, I think was, if I'm recollecting, 223 or 226, somewhere in that area, we entered 226 jurors were here. It then randomizes those jurors and puts them in order 1 -- or puts them in a random order 1 through 226.

So that's -- that Group A, Session A, you rinse and repeat for Session B, C, D, E and F. And each session gets put into the list that way. So that's that list that you now have, which is 1 through 1,373.

THE COURT: So it effectively -- when we have five -- I mean, six panels, it effectively created six new lists for each of the panels all drawn from the original list, but after selection in the order that they appeared on the original list, that is, 1 through 226 was the first group, then they're rearranged, so whoever was 1 might be 87 in the next round. But they're all the same people.

So I just wanted you to understand that. So I don't think the relief called for is appropriate.

MS. CLARKE: I think we understood it in our motion, because we had talked to Mr. McAlear before filing the motion, to sort of get the -- what happened. We got the 3432 list and then people got summoned in in that order.

THE COURT: Right.

MS. CLARKE: And then they didn't show up in that order.

THE COURT: The order in which they show up doesn't affect the process, as I understand it, except absentees and people at the margins.

But can you give us some order of magnitude of the number of people that --

MR. McALEAR: A total out of the 1,373 jurors, 38 jurors are out of order for one reason or another. And what I mean by that, so the first day, Session A and Session B, there are 12 jurors that have a sequence order that is out of their first -- that first group of people who we would have brought in, various reasons such as they didn't show up on Monday because they forgot, they were on vacation, they had a doctor's appointment.

And in order to allow them to serve -- for example, a juror that wasn't here on Monday that we normally would have called in Monday -- and the reason, they were in Florida --

they came in on Tuesday at 8 a.m. so they could serve and do their -- do their service.

THE COURT: So they effectively transferred from the first body of 226 to the next body of 200 and whatever. And there are some crossovers like that. And it can go in both directions, as I understand it.

MR. McALEAR: Yes. And it's a total of 38 jurors.

THE COURT: Over the three days.

MR. McALEAR: Over the three days.

MS. CLARKE: Right.

Do you want me to make our point or do you want me to go ahead?

MR. BRUCK: Well, one concern which we expressed in the pleading is that while you could say that this is literal compliance with three days' advance notice of a jury list, it is effectively not because we have 1,400 -- close to 1,400 jurors. And the point of disclosing the list of veniremen and their places of abode is to allow the accused to do some research. And if we had thought that and -- and I think a fair reading of the intent of the statute is that we have the right to know who's at the front of the list and who's at the back three days ahead of time so that we can prioritize who we investigate or who we do research on, and that's what we did, only to find out that it's been scrambled after the time has elapsed and we no longer have our three days.

So that is part of the reason for the motion.

THE COURT: Right. Well, I don't know whether that's a purpose of the statute or not, particularly having the -- having in mind the ancient nature of the statute. But at any rate, I don't think it was serious -- it's a serious compromise of the information that the statute was meant to convey and that it requires any relief, so the motion is denied.

One other little thing I wanted to talk about was the redacted/reduced/edited video. It is my, I think, intention, unless you talk me out of it, to have it played when they come back for voir dire. I think it is a -- on reflection I thought that it was best if I were the only voice at the first session, but these will now be smaller groups of 20 each and I thought a nine-minute refresher course on the importance of jury service would be appropriate.

I did -- I don't know if we've talked about what I edited, but there were some things -- maybe you've compared them so you know what they are. It described a voir dire process that we don't follow, it had some -- one of the jurors displayed a little too much favorable impression of expert witnesses which I thought could be a problem and so we took those things out, but left, supposedly, at least what I regard as the inspiring parts.

And so I think a nine-minute refresher to get them in

the proper frame of mind, it's an appropriate thing.

MS. CLARKE: We've made our objection.

MR. BRUCK: Yes.

THE COURT: I guess noted.

MS. CLARKE: Duly noted.

MR. BRUCK: We think it gave the wrong impression in this case.

THE COURT: Okay. Enough said, I guess.

Is there any issue about the defendant's presence at voir dire?

MS. CLARKE: Not at this point.

THE COURT: Yeah.

MR. WEINREB: I mean --

THE COURT: That he will be, right?

MS. CLARKE: We're going to make it a day-by-day decision, but we're starting off with him present.

THE COURT: Well, if you'd -- since there may be some division of opinion on that, if you'd give us a heads-up so we can resolve anything on that score if that's the direction he wants to go in.

MS. CLARKE: I think that when we left the last time, your Honor, the government was asked to provide the Court with support for why he could not waive. I think the presumption is he can waive. And the government was to provide the Court with case law to the contrary.

THE COURT: I would still invite any case law from anybody on the subject. We've looked into it a little, and not myself rigorously, but my initial impression is it may be to the contrary.

MR. BRUCK: To the contrary?

THE COURT: To the contrary that I've seen cases that say there is no right to absence and that his attendance could be required. Some people, of course, illicitly absent themselves by taking off, and that's what a lot of the cases deal with, you know, when you make yourself absent by absconding. This is slightly different from that so it's not clear how things mesh with that. But apparently cases tend to consider it both as a matter of rule and as a matter of constitutional rights, so...

So if anybody has any relevant -- we may have already assembled most of the relevant stuff, but if you have a perspective on it, I would like to hear it. But my tendency is to think that I could require him to be there. That's the "can" question; it's not the "should" question.

MS. CLARKE: Okay.

THE COURT: So. Okay. That's what I have.

MS. CLARKE: Judge, while we've got you --

MR. WEINREB: Who knew?

MR. MELLIN: This will be the last time you have these --

MR. WEINREB: Exactly.

THE COURT: In a space relation sense?

(Laughter.)

MS. CLARKE: You can run out of the room, and I'd like the record to reflect the judge ran when Judy spoke. Now we know who's A and B, C and D, E and F.

THE COURT: Yeah. Never mind. Go ahead. I'm just trying to remember what --

MS. CLARKE: You can go first.

THE COURT: No, go ahead.

MS. CLARKE: The Court's procedural order essentially is that we're supposed to agree on who should be excused and also submit follow-up questions for everybody at the same time. I'm wondering if we can -- can we give ourselves a little time to present to the Court who we think should be excused and then do the questions -- the follow-up questions by day. I mean, we're going to have 20 people in in the morning and in the afternoon.

THE COURT: I think we could probably tolerate that. I would like it in advance enough so that I can have studied those -- I'm going to -- so here's what I envision: Of the 400 A and B total, roughly, using round numbers, some fewer number will be left after you jointly agree that X number should be excused. So we'll have 400 minus X. Assuming that number is more than 40, we will then have the first 40 for the first day,

20 in the morning and 20 in the afternoon. The first 40 after the removal of the others. So that will give us a small body to look at and -- but we'll want to look at all of them. I will certainly, and you will too.

But I guess the point of it is if there are particular issues that are not necessarily readily apparent from the answer itself -- there may be some answers where it's perfectly obvious they should be followed up on. If there's some answers that it may not be so obvious that this should be a follow-up, I guess that's what we're looking for help on. So we'll --

MS. CLARKE: But if we could have an understanding of -- I mean, we might spend a lot of time doing the first 40 and 30 of them aren't going to come in, and so that seems like a crazy use of time.

THE COURT: Well, no, you'll know what the net is because you'll have agreed on it.

MS. CONRAD: But it's at the same time. I'm sorry. Go ahead, Judy.

MS. CLARKE: I'm sorry.

You have us submitting the objections and the questions at noon on Monday.

THE COURT: Maybe we could have a day's delay on that.

MS. CLARKE: That would be great. If we could submit the objections on Monday at noon and then the --

THE COURT: And then for A and B, follow up on the

next day? I think we can deal with that.

MS. CLARKE: Or even by Wednesday. I don't know how quickly the Court will be able to --

THE COURT: I'd rather have them Tuesday, but...

MR. BRUCK: If --

THE COURT: Or how about the end of the day Tuesday instead of noontime?

MS. CLARKE: The end of the day Tuesday --

THE COURT: For the Monday people, and then rolling on through.

MS. CLARKE: How quickly --

THE COURT: So that would give us all day Wednesday to be looking at those before we begin the examination on Thursday.

MS. CLARKE: Right. I'm just wondering how quickly we would know which ones were in the top 40.

THE COURT: You'll know as soon as you've done your joint cut.

MR. BRUCK: Okay. So you are not going to disqualify anybody that we don't agree on. Is that correct?

THE COURT: Correct.

MR. BRUCK: Okay. Okay.

THE COURT: Because I'm going to see everybody. If I weren't going to see everybody, we might go through that step.

MS. CLARKE: So we're not submitting --

THE COURT: But to the extent you have disparate views as to whether somebody should be excused or not --

MS. CLARKE: We should let you know.

THE COURT: Well, it might be that I could look at the paper and agree with one or the other of you.

MS. CLARKE: That's what we were thinking.

THE COURT: I'm not sure how productive that would be. And in light of the fact that we're going to -- whatever -- so I guess the current thinking is whatever the remainder is after the joint agreement of excuse, we're going to start and work through --

MS. CLARKE: But it seems --

THE COURT: -- 20 at a time until we get to our required number. How much that would be aided by further weeding out things that -- I mean, I assume there are going to be people that we'll have voir dire on where there will be different views as to who they are.

MS. CLARKE: Yes.

THE COURT: So we're going to deal with the different views in that context anyway, I guess we just didn't think there needed to be an intermediate step on the paper.

MR. WEINREB: We would prefer the situation the Court originally proposed which is everybody who is an agreed-upon strike is excluded and everybody else is brought in and voir dired. I think, frankly. We're going to be excusing by

agreement a lot of people so that I don't think that there's -- it's really going to affect the numbers who are brought inasmuch as, you know, one might suspect.

THE COURT: Yeah, okay.

MS. CLARKE: I guess we can play it by ear and see how this first round goes but it -- I think we -- both sides may be doing a different approach to get rid of the first -- you know, get rid of questionnaire-based people, the cause -- I think the government may be looking at one set of questions when we're looking at a combination of another set of questions, and who knows how it's going to play out. But you may want to know that from us if we can't agree so that the Court could make its own decision.

For example, if there's a set of people who presume guilt and are unable to set aside their opinion, should we be having them in? And I think the government may be saying yes and we may be saying no, make the cut to get rid of the presumption of guilt who say they are unable to set aside their opinion. That's just --

THE COURT: That sort of pushes in the other direction. That suggests that the agreed strikes won't be that many.

MR. WEINREB: Well, that may be.

MS. CLARKE: That's what we're worried about. Now, the hardships may be --

MR. WEINREB: I mean, our assumption -- a lot of this is speculative. Our assumption is that the defense is likely to have many more proposed strikes than the government, so we are assuming that everybody who we propose to be struck, virtually that the defense will agree should be struck. And so -- and I think that the category that Ms. Clarke has identified is the category where there's going to be the greatest amount of disagreement, which is there is a particular question that says: Have you formed an opinion about the defendant's guilt or the appropriate punishment and could you set that aside? And it's the government's view that that, in retrospect, was a question that would have been better asked in person because I'm not sure the jurors understand that setting it aside doesn't mean that they --

THE COURT: Disagreeing with it.

MR. WEINREB: Disagreeing with it; it simply means -- it has a legal meaning different from the common sense meaning. So I do think there are going to be a lot of disagreements over that particular issue; but nevertheless, I do think that we're going to reach more agreement than one might imagine given the lack of agreement, so...

MS. CLARKE: Well, we'll try.

THE COURT: Okay. So to the other point, though, if there are particular things -- non-obvious issues that you have noticed that you want to call attention to, perhaps by the end

of the day Tuesday for the Thursday panels, for the first 80.

MS. CLARKE: Oh, for the Thursday -- for 80 people by the close --

THE COURT: For the voir dire -- 40. Forty people. I'm sorry.

MS. CLARKE: By the close of business Tuesday?

THE COURT: Right. For the first 40 the end of day Tuesday so we could have it Wednesday to look at it.

The other thing that was occurring to me was Attachment B. I think from Jim, nobody's looked at them yet. My thought was to have somebody from the jury staff perhaps volunteer to look through them. I suspect there will be very few people circled, and that would be an easy way to dispose of that. I mean, if there's nobody circled on Attachment B on any of them, we'll just save Attachment B, obviously, but that's -- there's no issue there anymore.

MS. CLARKE: That sounds right.

THE COURT: Does that sound okay?

MS. CLARKE: That sounds right.

MR. BRUCK: Yes.

THE COURT: All right. Thank you.

COUNSEL IN UNISON: Thank you.

(The proceedings adjourned at 2:55 p.m.)

C E R T I F I C A T E

I, Marcia G. Patrisso, RMR, CRR, Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

Date: 5/10/16