UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | Criminal Action |
| v.  ) | No. 13-10200-GAO |
| ) | |
| DZHOKHAR A. TSARNAEV, also  ) | |
| known as Jahar Tsarni,  ) | |
| ) | |
| Defendant.  ) | |



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**<u>JURY TRIAL - DAY FIFTY-EIGHT</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, May 11, 2015
9:51 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
10            Federal Public Defenders
          51 Sleeper Street
11        Fifth Floor
          Boston, Massachusetts  02210
12        - and -
          CLARKE & RICE, APC
13        By: Judy Clarke, Esq.
          1010 Second Avenue
14        Suite 1800
          San Diego, California  92101
15        - and -
          LAW OFFICE OF DAVID I. BRUCK
16        By: David I. Bruck, Esq.
          220 Sydney Lewis Hall
17        Lexington, Virginia  24450
          On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                    Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    GOVERNMENT:

4  MICHELLE NICOLET

5      By Mr. Mellin            20                   34
       By Mr. Watkins                    26
6
   JOHN OLIVER
7
       By Mr. Mellin            38                   73
8      By Mr. Watkins                    49

9  WITNESSES FOR THE
     DEFENSE:
10
   SISTER HELEN PREJEAN
11
       By Ms. Conrad         4                    17
12     By Mr. Weinreb                 14

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  All rise for the Court and the jury.

3          (The Court and jury enter the courtroom at 9:51 a.m.)

4          THE CLERK:  Be seated.

5          THE COURT:  Good morning, jurors.

6          THE JURORS:  Good morning.

7          THE COURT:  Thank you for your patience.  Let me ask

8   you again:  Have you all had success in avoiding any news

9   reports about the case?

00:16 10         THE JURORS:  Yes.

11         THE COURT:  And avoided any discussion of the case

12  with yourselves or others?

13         THE JURORS:  Yes.

14         THE COURT:  Yes?  All right.  Thank you.

15         All right.  Ms. Conrad, we're ready to proceed.

16         MS. CONRAD:  Thank you, your Honor.  The defense calls

17  Sister Helen Prejean.

18                 SISTER HELEN PREJEAN, duly sworn

19         THE CLERK:  Have a seat.  State your name and spell

00:18 20  your first and last name for the record, keep your voice up and

21  speak into the mic so everyone can hear you.

22         THE WITNESS:  Sister Helen Prejean, H-E-L-E-N,

23  P-R-E-J-E-A-N.

24                      DIRECT EXAMINATION

25  BY MS. CONRAD:

```
 1   Q.   Good morning, Sister.  I'm over here.

 2   A.   Thank you.

 3   Q.   Are you a Catholic nun?

 4   A.   Yes, I am.

 5   Q.   When did you become a nun?

 6   A.   1957.

 7   Q.   And to what order do you belong?

 8   A.   Sisters of St. Joseph.

 9   Q.   Where is that located?

10   A.   Well, we're in different places in the United States.  I'm

11   based in New Orleans, but we have other places too.

12   Q.   And are you a native of Louisiana?

13   A.   I am.

14   Q.   What kind of work does the order do generally?

15   A.   Well, nuns do things from -- anything having to do with

16   poor people.  Teaching:  We have academies, teach young women;

17   hospitals:  nursing, healthcare; Working with the elderly.

18   Q.   What kind of work have you done since joining the order in

19   1957?

20   A.   Well, I began as a teacher of English.

21   Q.   What grades?

22   A.   Seventh and eighth, and then also high school.

23   Q.   Please continue.  I'm sorry.

24   A.   And then also taught adults in the Catholic church at the

25   Vatican II.  We had adult education that began to educate the
```

1    people.  So I've worked as the director of religious ed in a

2    parish, doing religious education as well.

3    Q.    Have you also done prison -- excuse me.  Have you also

4    established a prison ministry?

5    A.    Yes.

6    Q.    And can you just tell us very generally what that means?

7    A.    Well, in general, sisters -- some of them, anyway, visit

8    prisoners.  Ours is focused on death row prisoners and -- but

9    also in connection with that, with victims' families.  We

00:20 10    started a group called "Survive" for murder victims' families

11    as well.

12    Q.    At some point earlier this year -- strike that.

13          Have you met Jahar Tsarnaev?

14    A.    I have.

15    Q.    And how did that come about?

16    A.    Well, some of the members of the defense team that I

17    know -- that I've known for a long time, asked me if I would

18    come and visit with Jahar.

19    Q.    And by the way, do you see Jahar in the courtroom?

00:20 20    A.    I do.  He's right there.

21    Q.    When was the first time that you met with Jahar?

22    A.    I think like early March.

23    Q.    So do you know when that was in terms of when the first

24    phase of the trial started?

25    A.    So it was before the trial started.

1    Q.   And why did you agree to meet with him?

2    A.   For the same reason that I visit with other people who

3    have, you know, done really terrible crimes, and just to be

4    able to accompany them and be with him.  Same reason.

5    Q.   When you say "accompany," what do you mean?

6    A.   Well, the expression kind of came out of Latin America.

7    It means not just to go to somebody to direct them or to elicit

8    from them or to convert them, but simply to be by their side

9    and let them know that they have a dignity, and accompany -- in

00:21 10   the case of some of the prisoners that I've worked with who

11   have done terrible crimes, a part of that means to help them to

12   come to grips --

13             MR. WEINREB:  Objection, your Honor.

14             THE WITNESS:  -- and take responsibility for --

15             MR. WEINREB:  This goes beyond what we discussed.

16             THE COURT:  All right.  That's far enough, I think.

17   BY MS. CONRAD:

18   Q.   I think we'd better stop there.

19   A.   All right.

00:21 20   Q.   By the way, you have worked with prisoners -- not just

21   prisoners on death row but other prisoners?

22   A.   Right.  Lifers.

23   Q.   And before you met with Jahar, did you know that he was

24   Muslim?

25   A.   Yes.

1    Q.   So how did you prepare to meet with him?

2    A.   Well, I began -- I had begun doing this anyway, to look

3    into the Qur'an and Islam so I could try to understand, you

4    know, what we have in common, what the deep spiritual core is

5    of both.  And so I had begun to read and to study a little bit

6    about that.

7    Q.   And you said you first met with him I think in early

8    March?

9    A.   Yes.

00:22 10   Q.   And how many times altogether did you meet with him?

11   A.   I think it's been five.

12   Q.   And over what period of time?

13   A.   March until very recently, just a couple of days ago.

14   Q.   So throughout the -- both the first and second phases of

15   the trial?

16   A.   Yes.

17   Q.   When you first met with him, how did he react to meeting a

18   nun?

19   A.   Well, I'm not sure he had ever met a nun before, but he

00:23 20   was very open and receptive.  He was -- it was pleasant.  He

21   was good.

22   Q.   What do you remember about that meeting?  Without telling

23   us anything that he said, but what do you remember about that

24   first meeting with him?

25   A.   It's just, I walked in the room and I looked at his face

1    and I remember, "Oh, my God, he's so young," which he is.  And

2    it just had that kind of spontaneity to it that you have with

3    young people, because young people are open and more, you know,

4    responsive.  I sensed he was very respectful and that we

5    easily -- I felt it was pretty easy to establish a rapport.

6    Q.   What kinds of things -- without telling us again what was

7    said, but what kinds of topics did you discuss, not just in

8    that first meeting, but through the course of all five

9    meetings?

00:24 10    A.   Well, we talked about far-ranging.  I told him a little

11    bit about being a nun, that I was dedicating my life to God.

12    And one of the things I did know about Islam is to try to do

13    the will of God is the goal of your life.  I talked about being

14    a Catholic, serving the people, the kind of stuff I've done,

15    growing up in Louisiana.  A little bit about what it means to

16    be a Cajun.

17        And then we did get into the whole thing of the death

18    penalty in the United States, told him what my work was and

19    what I --

00:24 20    Q.   I'm going to stop you right there.  Did you talk about

21    some of the differences and similarities between Catholicism

22    and Islam?

23    A.   Yeah.  They kind of naturally emerged.  Like I talked

24    about how in the Catholic church we have become more and more

25    opposed to the death penalty --

```
 1              MR. WEINREB:  Your Honor, I would object.
 2    BY MS. CONRAD:
 3    Q.   All right.  I'm going to stop you right there.
 4         Did you also talk about scripture?
 5    A.   Yes.
 6    Q.   And did you talk with him -- and again, not telling us
 7    what was said, but did you talk with him about his crimes?
 8    A.   Yes.
 9    Q.   And did he -- by the way, when you were talking about
10    Islam and Catholicism, did he just automatically agree with
11    everything that you said?
12    A.   No.  No, we had definite disagreements.
13    Q.   And -- but how would you characterize those disagreements?
14    A.   Well, I think some of it revolved around the God of love.
15              MR. WEINREB:  Objection, your Honor.
16    BY MS. CONRAD:
17    Q.   Okay.  Just as far as whether they were respectful or
18    whether they were --
19    A.   Yeah.  No, it was always very respectful.  And I actually
20    had asked him, because I didn't know a lot about --
21              MR. WEINREB:  Objection.
22              THE COURT:  Wait for the next question, Sister.
23              THE WITNESS:  Okay.  Thank you.
24    BY MS. CONRAD:
25    Q.   At some point did he express to you his feelings about
```

00:25 (line 10)
00:26 (line 20)

1    what happened to the victims in this case?

2    A.    After we had established trust with each other, at one

3    point I said to him --

4    Q.    Okay.  I'm not going to -- not what you said to him, but

5    just what did he say to you about the victims?

6    A.    He said it emphatically.  He said, "No one deserves to

7    suffer like they did."

8    Q.    And when he said that, how did you perceive his sincerity?

9    A.    As absolutely sincere.

00:27 10    Q.    And what do you base that opinion on?

11    A.    Well, I have long experience --

12              MR. WEINREB:  Objection, your Honor.

13              THE COURT:  Sustained.

14    BY MS. CONRAD:

15    Q.    Just what you observed about him and also what you had

16    observed about him during the previous times that you had met

17    with him.

18    A.    That his response was so spontaneous, and it's not like he

19    was hedging or it's not like he was trying to -- he just simply

00:27 20    said, "Nobody deserves to suffer like that."  And I had every

21    reason to believe that it was sincere.

22    Q.    How would you describe his expression when he said that?

23    A.    Well, he -- his face registered it, and he kind of lowered

24    his eyes.  And it was the -- it was his voice when

25    he -- because I had said to him, "Look at the" --

```
 1              MR. WEINREB:  Objection.

 2              THE COURT:  Sustained.

 3    BY MS. CONRAD:

 4    Q.   Okay.  Not what you said.

 5    A.   Okay.  Okay.

 6    Q.   If you can, you said he lowered his eyes?

 7    A.   And he just said --

 8              MR. WEINREB:  Objection, your Honor.  This has now

 9    been asked and answered several times.

10              MS. CONRAD:  I'm asking now how he said it, and I

11    think we were interrupted.

12              THE COURT:  Yes, which doesn't call for what was said,

13    again.  So why don't you redirect it so it's not content.

14    BY MS. CONRAD:

15    Q.   What, if any, observations did you make about his voice

16    when he said that?

17    A.   It was -- it had pain in it, actually, when he said what

18    he did about nobody deserves that, and --

19    Q.   I'm sorry.

20    A.   And I just had every reason to think that he was taking it

21    in and that he was genuinely sorry for what he did.

22    Q.   Now, what about the time that you had spent with him

23    leading up to that conversation affected or influenced your

24    evaluation of his sincerity?

25    A.   It's -- to establish a relationship, that's the
```

1    accompaniment thing, that it's sincere.  He knows he can trust

2    me.  I feel like I can trust him.  And that gave the

3    groundwork, so that when I blatantly just said to him, "But

4    look at this" --

5              MR. WEINREB:  Objection, your Honor.

6    BY MS. CONRAD:

7    Q.   Again, you can't --

8    A.   I'm sorry.  I'm a Catholic nun that teaches and I keep

9    thinking of what I said.  I'm sorry.

00:29 10   Q.   Okay.  But just -- so you said that you established, you

11   felt --

12   A.   Yeah.  So the trust and the groundwork was there, so when

13   he said what he did, I knew -- I felt it.  It's the way you

14   know when somebody's sincere.  And I don't know, can I talk

15   about the experiences I've had with other prisoners?

16             MR. WEINREB:  Objection.

17   BY MS. CONRAD:

18   Q.   No.

19   A.   I didn't think so.  Just checking it out.  Okay.

00:29 20            (Laughter.)

21   BY MS. CONRAD:

22   Q.   Is there anything else about your meetings with him or

23   what you observed about Jahar that influenced your opinion

24   about his sincerity?

25             MR. WEINREB:  Objection.

```
 1              THE COURT:  I think you have to direct the inquiry a
 2   little more specifically.
 3              MS. CONRAD:  Okay.
 4   BY MS. CONRAD:
 5   Q.   Do you believe that Jahar is unrepentant?
 6              MR. WEINREB:  Objection.  This has now been asked and
 7   answered quite a number of times.  Belaboring.
 8              THE COURT:  Yeah, sustained to the -- well...
 9              MS. CONRAD:  May I have one moment, please?
10              (Counsel confer off the record.)
11   BY MS. CONRAD:
12   Q.   Do you believe based on your interactions with Jahar that
13   he is untouched?
14              MR. WEINREB:  Objection, your Honor.  We had a
15   discussion before.  I think we've covered the ground that was
16   to be discussed.
17              THE COURT:  Yeah, I think Mr. Weinreb is correct.
18              MS. CONRAD:  I don't have anything further at this
19   time.
20                        CROSS-EXAMINATION
21   BY MR. WEINREB:
22   Q.   Good morning, Sister Helen.
23   A.   Good morning.
24   Q.   My name is Bill Weinreb.
25   A.   I'm glad to meet you.
```

```
 1   Q.   You too.
 2        Sister, you're not based in Massachusetts, are you?
 3   A.   Correct.
 4   Q.   You don't live here?
 5   A.   No.
 6   Q.   And your order is not located here?
 7   A.   Some -- sisters are related in different branches, so some
 8   of our cousin sisters of St. Joseph are here.
 9   Q.   But not you?
10   A.   But not me.
11   Q.   In fact, you live and work in Louisiana?
12   A.   I'm based in Louisiana, but I travel a lot.
13   Q.   Okay.  But the defense asked you to accompany the
14   defendant.  Is that correct?
15   A.   To visit with him, yes.
16   Q.   Even though you come from different faiths?
17   A.   Yeah.
18   Q.   Now, you're known as one of the leading death penalty
19   opponents in the United States.  Would that be fair to say?
20   A.   Yes.
21   Q.   You believe capital punishment is never an appropriate
22   punishment no matter what the crime?
23   A.   Correct.
24   Q.   You're the public face of an organization that's called
25   the "Ministry Against the Death Penalty"?
```

```
 1    A.    Correct.

 2    Q.    The organization is mainly funded by your speaking fees

 3    and your book sales?

 4             MS. CONRAD:  Objection.

 5             THE COURT:  No, overruled.

 6             You may have that.

 7             THE WITNESS:  Yeah, that's correct.

 8    BY MR. WEINREB:

 9    Q.    You've served on the board of the National Coalition to

10    Abolish the Death Penalty?

11    A.    Correct.

12    Q.    You lecture against the death penalty?

13    A.    Yes.

14    Q.    You organize against it?

15    A.    Yes.

16    Q.    You write articles against it?

17    A.    I do.

18    Q.    You make speeches against it?

19    A.    I do.

20    Q.    Your own website calls you one of the best-known voices

21    for the abolition of the death penalty in the United States,

22    correct?

23    A.    Correct.

24             MR. WEINREB:  Thank you.  I have no further questions.

25             MS. CONRAD:  If I may have one moment, please.
```

```
 1              (Counsel confer off the record.)

 2                      REDIRECT EXAMINATION

 3   BY MS. CONRAD:

 4   Q.   Sister Helen, why are you opposed to the death penalty?

 5           MR. WEINREB:  Objection.

 6           THE COURT:  Sustained.

 7   BY MS. CONRAD:

 8   Q.   When you told us that you believed that Jahar was

 9   sincerely remorseful for what he had done and the suffering he

10   had caused --

11           MR. WEINREB:  Your Honor, she can't vouch for her own

12   credibility.  I would object.

13           MS. CONRAD:  I'm getting to my question.  I would like

14   to finish the question.

15           THE COURT:  Let her finish the question.  I have to

16   hear the question.

17   BY MS. CONRAD:

18   Q.   -- was that opinion influenced by your opposition to the

19   death penalty?

20           MR. WEINREB:  Objection.  That's not a proper question

21   for --

22           THE COURT:  No, you may answer it, Sister.  Go ahead.

23   Overruled.  You may answer it.

24           THE WITNESS:  I can answer it?

25   BY MS. CONRAD:
```

```
 1   Q.   Yes.
 2   A.   Of course.  That's like the groundwork, because it's based
 3   on the dignity of each person.
 4          MR. WEINREB:  Objection, your Honor.
 5          THE COURT:  All right.  The answer may stand.
 6   BY MS. CONRAD:
 7   Q.   Would you tell this jury that he was sincerely remorseful
 8   if you didn't truly believe it?
 9          MR. WEINREB:  Objection.  She can't vouch for her own
10   credibility.
11          THE COURT:  Overruled.  She may answer it.
12          THE WITNESS:  Can I answer?
13   BY MS. CONRAD:
14   Q.   Yes.
15   A.   Absolutely.
16   Q.   I'm sorry.  Would you tell the jury that he was sincerely
17   remorseful if you did not believe that?
18   A.   No, I would not.
19   Q.   And so are you here testifying today in order to advance
20   your anti-death penalty cause or in order to tell this jury
21   what you have seen in Jahar Tsarnaev?
22          MR. WEINREB:  Objection.
23          THE COURT:  Sustained to that.  It's argumentative.
24   BY MS. CONRAD:
25   Q.   By the way, is the defense paying you for your appearance
```

1    here?

2              MR. WEINREB:  Objection.  That's beyond the scope.

3              THE COURT:  No, you may answer that.

4              THE WITNESS:  Not a dime.

5    BY MS. CONRAD:

6    Q.   Is the defense paying anything or donating any money to

7    your order or to your ministry?

8    A.   No.

9              MS. CONRAD:  I have nothing further.

00:34 10              THE COURT:  Anything else?

11              MR. WEINREB:  No, your Honor.

12              THE COURT:  All right, Sister.  Thank you.  You may

13    step down.

14              THE WITNESS:  Thank you.

15              (The witness is excused.)

16              THE COURT:  Ms. Clarke?

17              MS. CLARKE:  Your Honor, we rest.  There are some

18    motions we should make at sidebar.

19              THE COURT:  Yes, let me see you at the side, please.

00:35 20              (Discussion at sidebar and out of the hearing of the

21    jury:)

22              MS. CLARKE:  Just for purposes of the record, your

23    Honor, we renew our Rule 29 motion.

24              THE COURT:  Okay.  I think to this point I've reserved

25    it.  I continue to reserve until the completion of all of the

```
 1    evidence.

 2              You will proceed now with Nicolet?

 3              MR. WEINREB:  We will.

 4              THE COURT:  How long do you think that will be?

 5              MR. MELLIN:  Twenty minutes or so.

 6              (In open court:)

 7              THE COURT:  All right, jurors.  The defense has rested

 8    its case in this phase of the trial.  The government has an

 9    opportunity for some short rebuttal witnesses.

00:36 10              Mr. Mellin?

11              MR. MELLIN:  Thank you, your Honor.  The United States

12    calls Michelle Nicolet.

13                     MICHELLE NICOLET, duly sworn

14              THE CLERK:  State your name, spell your last name for

15    the record, keep your voice up and speak into the mic.

16              THE WITNESS:  Michelle Nicolet, M-I-C-H-E-L-L-E

17    N-I-C-O-L-E-T.

18                          DIRECT EXAMINATION

19    BY MR. MELLIN:

00:37 20    Q.   Good morning.

21    A.   Good morning.

22    Q.   Where are you employed?

23    A.   At the Federal Bureau of Investigation.

24    Q.   And how long have you been with the FBI?

25    A.   For approximately ten years.
```

1    Q.   If you could do me a favor and maybe sit just a little

2    closer to that?

3    A.   Sure.

4    Q.   Thank you very much.

5         If we could quickly go through your background.  Did you

6    go to college?

7    A.   I did.

8    Q.   Where did you go to college?

9    A.   Harding University.

00:37 10  Q.   Did you play sports there?

11   A.   I did.

12   Q.   What did you play?

13   A.   Basketball.

14   Q.   All right.  If you can try to keep your voice up a little

15   bit?

16        THE COURT:  The microphone is also adjustable.  It

17   moves up and down as you need to adjust it.

18        THE WITNESS:  Thank you.

19   BY MR. MELLIN:

00:37 20  Q.   Agent, after you graduated from college, did you go to law

21   school?

22   A.   I did.

23   Q.   Where did you go to law school?

24   A.   University of Virginia School of Law.

25   Q.   And after going to the University of Virginia, what did

1    you do?

2    A.    I worked as an attorney in Manhattan for two years.

3    Q.    Following that, did you join the FBI?

4    A.    I did.

5    Q.    In what year was that?

6    A.    2005.

7    Q.    After joining the FBI and going through Quantico, where

8    did you go?

9    A.    I did about a two-month TDY in Washington, D.C., and then

00:38 10    I went to the New York field office.

11    Q.    And in New York, what types of cases did you work on?

12    A.    I worked counterterrorism investigations.

13    Q.    At some point did you end up in Washington, D.C.?

14    A.    I did.

15    Q.    When did you end up in D.C.?

16    A.    April 2012.

17    Q.    And what were you doing in Washington?

18    A.    Initially I was working at our Military Commissions

19    prosecution unit as a supervisory special agent.

00:38 20    Q.    And what is a supervisory special agent?

21    A.    It's essentially a supervisor-level special agent

22    overseeing other FBI employees.

23    Q.    And at some point did you get involved in the SAMs

24    program?

25    A.    I did.

```
 1  Q.   When did you get involved in that?
 2  A.   April 2014.
 3  Q.   And exactly what is your position and how is it related to
 4  the SAMs program?
 5  A.   I am the unit chief of the National Joint Terrorism Task
 6  Force.  That's a unit that falls within the counterterrorism
 7  division of the FBI.  And we oversee a number of
 8  counterterrorism-related initiatives and programs, including
 9  the FBI's involvement in the renewal and monitoring of SAMs
10  terrorism inmates.
11  Q.   And when you say you're the unit chief, what is a unit
12  chief?
13  A.   I oversee approximately 50 FBI and interagency personnel
14  from approximately 40 different agencies.
15  Q.   Just to be clear, did you meet with Mark Bezy last week?
16  A.   I did.
17  Q.   Okay.  Were there others in that meeting as well?
18  A.   There were.
19  Q.   Okay.  The SAMs program that we've been talking about,
20  does that require a yearly review?
21  A.   It does.
22  Q.   And can you just briefly describe how that review process
23  works?
24  A.   Sure.  So initially within the NJ -- we call it NJTTF.
25  That's the acronym for the unit I work in.  So we will solicit
```

1    recommendations from the appropriate FBI field offices.  We

2    will then compile those and make our own recommendation on

3    behalf of the FBI to the appropriate U.S. Attorney's office,

4    which in this case would be Boston.  And once we provide our

5    recommendation to the U.S. Attorney's office, they will in turn

6    provide their recommendation to DOJ's Office of Enforcement

7    Operations.  And then once they receive that, then they will

8    make a formal decision and provide a memorandum to the director

9    of the Bureau of Prisons for either the -- for the renewal of

00:40 10    the SAMs if appropriate.

11    Q.   And the process we're talking about, is that -- does that

12    involve a number of telephone conversations or meetings?

13    A.   It does.  There are informal discussions throughout the

14    renewal period prior to the actual formal paperwork.

15    Q.   If a SAMs is not renewed, what happens to it?

16    A.   It will lapse on the date of the -- at the annual

17    expiration.

18    Q.   Okay.  And if the federal regulations that are involved

19    are not satisfied, what happens to the SAMs?

00:41 20    A.   We take a fresh look at it every year, and if it does not

21    rise to the level of warranting continuance, then we will allow

22    it to lapse at the appropriate time.

23    Q.   Are you aware that prisoners have filed litigation

24    regarding modifying SAMs?

25    A.   I am.

```
 1    Q.    Has that litigation resulted in modifications to SAMs?

 2            MR. WATKINS:  Objection.

 3            THE WITNESS:  Yes, in instances --

 4            THE COURT:  No, the objection is overruled.  The

 5    answer may stand.

 6            THE WITNESS:  Yes, it has in certain instances.

 7    BY MR. MELLIN:

 8    Q.    And are you aware whether the SAMs in this case has been

 9    modified?

10    A.    It has.

11            MR. WATKINS:  Objection.

12            THE COURT:  Sustained to that.

13            The answer is stricken.  The jury will disregard it.

14    BY MR. MELLIN:

15    Q.    As you sit here in 2015, is there any way to predict how

16    long a SAMs will be on a particular inmate?

17    A.    No, not at all.

18    Q.    And in spite of the existence of these special

19    administrative measures, at times have there been violations of

20    those measures?

21            MR. WATKINS:  Objection.

22            THE COURT:  You may answer that question.

23            THE WITNESS:  There have been.

24    BY MR. MELLIN:

25    Q.    Do you have an approximate number of violations that the
```

           1    FBI's aware of?

           2            MR. WATKINS:  Objection.

           3            THE COURT:  Sustained.

           4    BY MR. MELLIN:

           5    Q.   Do inmates come off of SAMs every year?

           6    A.   There's no guarantee, but generally, yes.

           7    Q.   And since March of 2014 have inmates at ADX convicted of

           8    terrorism charges come off of SAMs?

           9    A.   Yes, they have.

00:42     10            MR. WATKINS:  Objection.

          11            THE COURT:  The answer may stand.  The objection is

          12    overruled.

          13            MR. MELLIN:  Thank you.

          14            Thank you, your Honor.  That's all.

          15            THE COURT:  That's all?

          16            MR. MELLIN:  That's all.

          17            THE COURT:  Mr. Watkins?

          18                         CROSS-EXAMINATION

          19    BY MR. WATKINS:

00:42     20    Q.   Good morning, Ms. Nicolet.

          21    A.   Good morning.

          22    Q.   You talked about the annual renewal period that you begin

          23    to look at whether SAMs will be renewed.  In addition to that

          24    renewal period, you keep constant watch on people that are

          25    under SAMs.  Is that correct?

1    A.   What do you mean by "constant watch"?

2    Q.   Well, you would talk about -- if any issues came up, if

3    the name came up in some way, you would monitor that.  You

4    don't just wait till the end of the year?

5    A.   We're in regular coordination with BOP throughout the

6    year, yes.

7    Q.   So Bureau of Prisons gives you input, also the U.S.

8    Attorney here in Boston gives you input, the local FBI office

9    gives you input throughout the year.  They're not limited to

00:43 10   those three months before the renewal.  Is that correct?

11   A.   That's correct.

12   Q.   And one of the things that you always consider with SAMs

13   inmates is ongoing relevance?

14   A.   Yes, that's one of the many things we consider.

15   Q.   Ongoing relevance can include, for example, broad

16   publicity, the nature of the case?

17   A.   It can, yes.

18   Q.   And the actual offense that was committed.  That's ongoing

19   relevance, right?

00:43 20   A.   Yes.

21   Q.   And how that offense is perceived around the world or

22   around the country, you would take that into account in whether

23   you're going to renew the SAMs, right?

24   A.   We would, yes.

25   Q.   The Bureau of Prisons, do they have a seat at the table

1    when you decide whether to renew the SAMs?

2    A.    Well, there's not an actual table, but we -- they are not

3    officially involved in the renewal process, but we will have

4    discussions with them.

5    Q.    You will have discussions -- well, you'll learn of their

6    input through the local FBI agent in Colorado in the case of

7    ADX, right?

8    A.    That's correct, yes.

9    Q.    So BOP does not contact you directly and say, Hey, why

00:44 10   don't you give us these SAMs?

11   A.    I've been involved directly in conversations with BOP

12   about various SAMs, but generally it does come through our

13   local field office.

14   Q.    And SAMs -- there are some SAMs that have been in effect

15   since 2002, which was when the regulation was passed, right?

16   A.    The regulation I believe was passed in the mid '90s, but

17   there have been individuals who have been on SAMs since 2002,

18   yes, yes.

19   Q.    And that is when the SAMs -- well, 2002, and have been on

00:45 20   SAMs constantly.  Every year they've been renewed?

21   A.    Correct.

22   Q.    And even in the case of someone where you -- DOJ elected

23   to let the SAMs lapse, they can be reimposed if something

24   happens again, correct?

25   A.    Correct.

1    Q.   You talked about modifications that have been made to SAMs

2    over the years.  One aspect of a SAMs is whether an inmate can

3    have physical contact with another inmate?

4    A.   Yes.

5    Q.   And that is in effect for Mr. Tsarnaev in this case.  He

6    cannot have physical access to another inmate.  Is that

7    correct?

8    A.   I believe that is correct.  I would have to see his actual

9    SAMs to know for sure.

00:46 10   Q.   And that's one of the modifications that the Department of

11   Justice can make.  They can keep a SAMs in place but remove

12   that physical contact aspect?

13   A.   We can make modifications, but for many of the

14   modifications, it's ultimately up to the Bureau of Prisons as

15   to whether or not they implement those.

16   Q.   Whether they implement them.  But some modifications you

17   have to make before the Bureau of Prisons can phase somebody

18   down or step somebody down.  Is that correct?

19   A.   Certain situations require modifications, yes.

00:46 20   Q.   So if the Bureau of Prisons in some cases wants to move

21   someone to a different unit or a different program, they have

22   to get your okay, right?

23   A.   Yes; that's correct.

24   Q.   We talked about litigation and modifications made.  Isn't

25   it true that no court has ever ordered the SAMs to be vacated?

```
 1              MR. MELLIN:  Objection.

 2              THE COURT:  You may answer that.

 3              THE WITNESS:  I am not aware of any situation where

 4    that has happened.

 5    BY MR. WATKINS:

 6    Q.   And because that is your business and you're the unit

 7    chief, you would be aware if that had happened?

 8              MR. MELLIN:  Objection.

 9              THE COURT:  You may have it in a different form.

10    BY MR. WATKINS:

11    Q.   You are responsible at the FBI for 50 agents and the SAMs,

12    correct?

13    A.   Yes.

14    Q.   You keep track of developments in SAMs, not just what your

15    agents are doing but litigation also, correct?

16    A.   I do.

17    Q.   So if you had an adverse ruling by a court, you would

18    learn about it?

19    A.   Within the last 14 months that I've been there, yes.

20    Q.   But you didn't come there out of a vacuum; you learned

21    about the SAMs as you went -- even before you got your current

22    position, right?

23    A.   I became aware of the SAMs program when I got to my

24    current position.

25    Q.   And it's true, then, that you know of no case where a
```

1    court has ordered the SAMs to be vacated?

2            MR. MELLIN:  Objection.

3    BY MR. WATKINS:

4    Q.   Or even modified?

5            THE COURT:  Overruled.

6            You may answer that.

7            THE WITNESS:  I'm aware of a case where -- an instance

8    where the court has ordered that a SAMs be modified, yes.

9    BY MR. WATKINS:

00:48 10   Q.   No.  Well, where the court ordered the FBI to consider

11   whether it should be modified.  Is that correct?

12   A.   My understanding is that the court has ordered a

13   modification.

14   Q.   And what case is that?

15   A.   It is this one.

16           MR. WATKINS:  Your Honor, may we be seen at sidebar?

17           THE COURT:  All right.

18           (Discussion at sidebar and out of the hearing of the

19   jury:)

00:49 20           MR. WATKINS:  I would like the Court to instruct the

21   jury that that's not true.

22           MR. MELLIN:  Your Honor, he went into this area and he

23   went into it very hard, and he's stuck with the answers and

24   what this agent knows about this process.

25           MR. WATKINS:  It's not accurate.

1        MR. WEINREB:  He was specifically told not to go into

2    this area; not to discuss specific cases.

3        THE COURT:  Right.  I presume the answer was

4    unexpected.

5        MR. WEINREB:  Then don't ask the question if you don't

6    know the answer.

7        THE COURT:  But there was a reference to this case

8    which may have --

9        MR. WATKINS:  There has been no court.  We asked the

00:49 10  government for that answer.  I'm entitled to the answer that --

11       THE COURT:  Well, to some extent a problem is what

12   lawyers would understand an order to be and what non-lawyers --

13   I know that she's a lawyer.

14       MR. WATKINS:  Judge, the government proffered her as

15   somebody who knew about litigation in this case, if the Court

16   specifically asked about that.  And that's why I understood

17   that.  The answer she gave me the other day was "none."  I'm

18   entitled to that today.

19       MR. WEINREB:  He can impeach her with a prior

00:50 20  inconsistent statement, but I think that, frankly, the Court

21   did effectively order the government to modify the SAMs in this

22   case.  And the proper objection might have been that -- the one

23   that was made at side, which is that pretrial is different from

24   post-trial.  But this is not a well-taken objection because we

25   were told to modify the SAMs or face the possibility of a

1    court-ordered modification, and we chose to settle.

2            MR. MELLIN:  And counsel is aware of that, your Honor,

3    and he is the one who went into this.

4            MR. WATKINS:  The question was very narrow.

5            THE COURT:  The problem is the issue, I think,

6    requires me to revisit the transcripts of the hearings and

7    status conferences in which these matters were discussed.  I'm

8    not sure it rises to an implicit order as suggested, but it

9    certainly -- I think we had some discussions which encouraged

00:51 10   the parties to adjust, in particular the government to

11   reevaluate things, and that --

12           MR. WATKINS:  The question was whether a court had

13   ordered it.

14           THE COURT:  Well, I think we should continue with the

15   examination of the witness, and if there's something to be

16   done, we can do it.

17           MR. WATKINS:  My examination is done.  That is the

18   last question on it.  The answer, a truthful answer, is --

19           THE COURT:  Well --

00:51 20           MR. WATKINS:  -- no court has done it.  This Court

21   knows that it has not done it.

22           THE COURT:  That's still correctable, but I just want

23   to reflect on it a little bit, perhaps by looking at the status

24   conference transcripts.

25           MR. WATKINS:  I will ask one follow-up question, I

1    think.

2              (In open court:)

3    BY MR. WATKINS:

4    Q.   Ms. Nicolet, regarding SAMs on prisoners that have been

5    sentenced, has there ever been a court order where a court has

6    vacated the SAMs or ordered them modified?

7    A.   Not that I'm aware of.

8              MR. WATKINS:  I have nothing further.

9              MR. MELLIN:  Very briefly.

00:52 10              THE COURT:  Mr. Mellin?

11                        REDIRECT EXAMINATION

12   BY MR. MELLIN:

13   Q.   Agent, you were asked by Mr. Watkins about what impact

14   ongoing relevance has to a determination about a SAMs.  What

15   other issues are issues that are considered before SAMs are

16   renewed?

17   A.   We consider a number of issues including current

18   relevancy, but also if they are a leader of a terrorist group

19   or any violations that have occurred historically, we consider

00:53 20   those as well, potential disciplinary -- other disciplinary

21   infractions within the Bureau of Prisons.  We consider many

22   things.

23   Q.   Counsel asked you about if there had been SAMs that had

24   been in effect since 2002.  Do you remember those questions?

25   A.   I do.

```
 1    Q.   And just so we're all clear, SAMs went into effect before

 2    2002.  Is that right?

 3    A.   Correct.

 4    Q.   In 1995?  '94, '95?

 5    A.   Approximately, yes.

 6    Q.   And 2002 is when the H unit, or the special security unit,

 7    kicked in.  Is that correct?

 8    A.   That is my understanding, yes.

 9    Q.   Have there been individuals who are on SAMs since 2002

10    where the SAMs now have been removed?

11              MR. WATKINS:  Objection.

12              THE COURT:  Overruled.  You may answer that question.

13              THE WITNESS:  Yes, there are.

14              MR. MELLIN:  Thank you.  Nothing further.

15              THE COURT:  Anything else?

16              MR. WATKINS:  No, your Honor.

17              All right, Agent.  You may step down.

18              (The witness is excused.)

19              THE COURT:  Let me see counsel.

20              (Discussion at sidebar and out of the hearing of the

21    jury:)

22              THE COURT:  I gather we're going to --

23              MR. WEINREB:  The warden.

24              THE COURT:  -- Oliver at this point.

25              So with respect to what we had discussed, I think that
```

00:53 (line 10)
00:54 (line 20)

1    a -- again, raising the level of generality, I think it will be

2    permissible to ask if some prison programming is available to

3    people in their cells as a result -- under the conditions

4    of -- all right?  But just that.

5             MR. BRUCK:  Not television?

6             THE COURT:  Not television.

7             MR. MELLIN:  Not television?

8             THE COURT:  No, just some level of programming.

9             MR. WEINREB:  Can I ask that --

00:54 10          THE COURT:  In other words, I think it's legitimate

11   for the government to counter a suggestion that he sits in

12   chains on a cement bed, okay?  I think it's fair -- that's

13   something that you can fairly document, but I think it should

14   be done at a level of generality.  If he can participate in

15   programming or something --

16             MR. MELLIN:  But he can also watch television 24 hours

17   a day.

18             MR. WEINREB:  If he can participate in programming in

19   his cell?

00:55 20          THE COURT:  Without getting into how he does it.

21             MR. WATKINS:  Your Honor, I reiterate now that the

22   examination is open, I think it's incumbent upon the defense

23   to --

24             THE COURT:  As I say, I want to look at what was said.

25   There might be something that was said.

1             MS. PELLEGRINI:  Your Honor, I have, in preparation

2    for our stipulation that we had provided which the Court has

3    now ruled it's not going to use, reviewed some of the

4    transcripts and also some of the pleadings.  And the defense

5    had quoted the Court -- this is how I remember this -- with

6    respect to the Court's ruling that the legal visits needed to

7    be changed, and that the Court did, in fact, then rule that

8    there was such a procedure as a mixed social and legal visit,

9    and as a result of that we modified the SAMs.

00:56 10             THE COURT:  Okay.  I'm going to look at all of them.

11    If you can give me the reference --

12             MS. PELLEGRINI:  I have to go back up and get that.

13             MR. MELLIN:  Your Honor, just so I don't trip over any

14    wires, can I ask does he have available programming in his

15    cell?

16             THE COURT:  Prison programming.

17             MR. MELLIN:  Okay.

18             THE COURT:  Prison programming.  The prior witness

19    referred to that generally.  But not the medium.

00:56 20             (In open court:)

21             MR. MELLIN:  Your Honor, can I have just a moment?

22             THE COURT:  Yes.

23             (Pause.)

24             MR. MELLIN:  The United States calls Warden John

25    Oliver.

```
 1                        JOHN OLIVER, duly sworn

 2              THE CLERK:  State your name, spell your first and last

 3    name for the record, keep your voice up and speak into the mic.

 4              THE WITNESS:  Yes, sir.  My name is John Oliver,

 5    J-O-H-N, O-L-I-V-E-R.

 6                        DIRECT EXAMINATION

 7    BY MR. MELLIN:

 8    Q.    Sir, where are you currently employed?

 9    A.    I'm currently the complex warden at FCC Florence in

10    Florence, Colorado.

11    Q.    And, Warden Oliver, when did you join the Bureau of

12    Prisons?

13    A.    I joined the Bureau of Prisons in 1992.

14    Q.    Where did you grow up?

15    A.    I grew up in Florence, Colorado.

16    Q.    How long did you live in Florence before you moved out?

17    A.    I moved out when I went to college.  So I lived there for

18    about 20 years prior to leaving.

19    Q.    Is Florence, Colorado, in Siberia?

20    A.    No, sir, it's not.

21    Q.    Where is Florence located?

22    A.    Florence is located approximately 45 miles south of

23    Colorado Springs, which is also 30 miles west of Pueblo,

24    Colorado, in an area that's in the Arkansas Valley.

25    Q.    And have you seen the photograph that was shown in court,
```

1   this aerial photo of ADX?

2   A.   Yes, sir, I have.

3   Q.   And did you see that last week here in court?

4   A.   Yes, sir, I did.

5   Q.   Okay.   In that photo there's snow on the ground.   Is that

6   right?

7   A.   Yes, sir, there is.

8   Q.   How often does it snow in Florence, Colorado?

9   A.   Not very often.

00:59 10   Q.   How many days out of the year would you actually have snow

11   on the ground?

12   A.   I would expect less than ten or 15 days out of the year in

13   Florence itself.

14   Q.   Do employees who work at ADX live in Colorado Springs?

15   A.   Yes, sir, they do.

16   Q.   I want to talk to you very briefly about your background.

17   When you joined the Bureau of Prisons, where did you go?

18   A.   I first started with the Bureau of Prisons in 1992 as one

19   of the first ten correctional officers hired in the complex.   I

01:00 20   started at FCI Florence, Colorado, which is a medium-security

21   institution on the complex.

22   Q.   Can you briefly describe what are the complexes that are

23   in Florence?

24   A.   We have the Federal Bureau of Prisons complex in Florence,

25   but also in Fremont County we have approximately another six

1    other, at least, state prisons within that same county.

2    Q.    You mentioned there's an FCI in Florence?

3    A.    Yes, sir.

4    Q.    Okay.  And again, what does that stand for?

5    A.    The "FCI" stands for federal correctional institution.

6    Q.    And what level is that?

7    A.    That's a medium-security.

8    Q.    Is there a high-security facility as well?

9    A.    Yes, sir, there is.

01:00 10    Q.    What's the name of that?

11    A.    That's the United States penitentiary right next to the

12    ADX.

13    Q.    Okay.  And then in addition to that, there's ADX?

14    A.    Yes, sir.  The ADX is a maximum-security prison on the

15    complex.

16    Q.    Okay.  So you started at the FCI.  Where did you go from

17    there?

18    A.    After I left the FCI in 1994, I was a correctional officer

19    that activated the ADX.  The ADX is the administrative maximum

01:01 20    penitentiary.

21    Q.    And when you say you activated, what do you mean by that?

22    A.    I helped escort all of the inmates in from Marion,

23    Illinois, as well as I developed policies and procedures for

24    the institution.

25    Q.    After that what did you do?

```
 1   A.   I left the ADX and went to the United States penitentiary
 2   in Lompoc, California, as an entry-level supervisor, which is
 3   called a lieutenant.
 4   Q.   After you went to Lompoc, where did you go?
 5   A.   I went back to the complex again, to the United States
 6   penitentiary, as a lieutenant.
 7   Q.   When you say you went back in, again, you're in Florence,
 8   Colorado?
 9   A.   Yes, sir.  In Florence, Colorado.
10   Q.   How long were you there?
11   A.   I was there about two years.
12   Q.   Where did you go after that?
13   A.   Back to the ADX again as a lieutenant.
14   Q.   Okay.  At some point did you go to Terre Haute?
15   A.   Yes, sir, I did.
16   Q.   What did you do at Terre Haute?
17   A.   In 2007 I went to Terre Haute as an associate warden.
18   Q.   You saw Mr. Bezy in there last week.  Is that right?
19   A.   Yes, sir, I did.
20   Q.   And did you know Mr. Bezy was the warden at Terre Haute
21   from 2004 to 2006?
22   A.   Yes, sir, I'm aware of that.
23   Q.   After you were at Terre Haute, where did you go?
24   A.   After I left Terre Haute as an associate warden, I went to
25   the federal correctional complex in Coleman, Florida, as an
```

```
 1   associate warden.

 2   Q.   At then at some point you end up at ADX, right?

 3   A.   Yes, sir.  After I left Coleman, I went back to Terre

 4   Haute as the warden at FCI Terre Haute, and then I was selected

 5   as a warden at the United States penitentiary in Florence, and

 6   then ultimately, I'm now the warden at ADX Florence.

 7   Q.   If there is a new inmate that comes into ADX on SAMs, how

 8   many social visits is he permitted per month?

 9   A.   An inmate at the ADX is permitted five social visits a
```
01:03 10   month regardless of the SAMs or not.
```
11   Q.   And the social visits, are they individual or can there be

12   more than one person coming for that visit?

13   A.   Most of the visits are individual.  One adult.

14   Q.   Can there be additional people that come as well?

15   A.   Yes, there can be.

16   Q.   And the five visits are per month.  Is that right?

17   A.   Yes, sir, they are.

18   Q.   How many legal visits can an inmate have per month?

19   A.   Unlimited.
```
01:03 20   Q.   All right.  Are inmates allowed to use the telephone?
```
21   A.   Yes, they are.

22   Q.   When they first come in on a SAMs, how many phone calls

23   are they permitted?

24   A.   In the H unit, or the special security unit, an inmate on

25   Phase 1 will get two social phone calls a month of 15 minutes'
```

1    duration each.

2    Q.    So 30 minutes of phone calls that month?

3    A.    Yes, sir.

4    Q.    At some point during the phases, are they permitted to

5    make more phone calls?

6    A.    Yes, sir.  In Phase 2 they're allowed to make three phone

7    calls, three 15-minute phone calls a month.

8    Q.    And then what about Phase 3?

9    A.    Phase 3 they're allowed to make four 15-minute phone calls

01:04 10   a month.

11   Q.    Can an inmate write letters?

12   A.    Yes, sir, they can.

13   Q.    Is there any limit on the number of letters an inmate can

14   send out?

15   A.    No, sir, there's not.

16   Q.    Is there a limit on the number of letters an inmate may

17   receive?

18   A.    No, sir, there's not.

19   Q.    And in addition to that, can an inmate send out legal

01:04 20   mail?

21   A.    Yes, sir, they can.

22   Q.    Is there any limit on the number of legal mailings they

23   can make?

24   A.    No, sir, there's not.

25   Q.    Can an inmate write a book?

```
 1   A.   Yes, sir, they can.
 2   Q.   And can an inmate write or send that book to someone on
 3   his contact list?
 4   A.   Yes, sir, he can.
 5   Q.   Very briefly I want to talk about the H unit cells.  Have
 6   you seen the H unit cells?
 7   A.   Yes, sir, I have.
 8   Q.   As the warden, I'm assuming you see them quite often?
 9   A.   Yes, sir, I do.
10   Q.   Is there a bed in the cells?
11   A.   Yes, sir, there is.
12   Q.   Is there a desk in the cells?
13   A.   Yes, sir, there is.
14   Q.   Can inmates watch prison programming in their cells?
15   A.   Yes, sir, they can.
16   Q.   And what type of prison programming is permitted in the
17   cells?
18            MR. WATKINS:  Objection.
19            THE COURT:  No, we'll leave it at that.  The objection
20   is sustained.
21   BY MR. MELLIN:
22   Q.   Can inmates exercise in their cell?
23   A.   Yes, sir, they can.
24   Q.   Can inmates hold jobs?
25   A.   Yes, sir, they can.
```

1    Q.    Can an inmate in the H unit hold a job?

2    A.    Yes, sir, they can.

3    Q.    In addition to rec time that occurs outside of the cell,

4    are there other reasons why an inmate would be outside of their

5    cell?

6    A.    Yes, sir, there is.

7    Q.    And generally what would that be?

8              MR. WATKINS:  Objection.

9              THE COURT:  Overruled.

01:06 10              You may answer that.

11              THE WITNESS:  Some of the other reasons that an inmate

12    would be out of his cell in Phase 1, for example, would be if

13    an inmate is pulled out of his cell for medical reasons; for

14    visits; for a shower; to work, as we indicated earlier as an

15    orderly; for education purposes; legal visits; social visits;

16    you get team reviews with his unit team; to speak to a

17    lieutenant, various reasons to come out of the cell.

18    BY MR. MELLIN:

19    Q.    Can an inmate earn a college degree?

01:06 20    A.    Yes, sir, they can.

21    Q.    It's my understanding that everyone that is in the H unit

22    is on some type of SAMs restriction.  Is that right?

23    A.    Yes, sir, that is correct.

24    Q.    If a SAMs comes down on a particular inmate, can he remain

25    in the H unit?

1    A.    I'm sorry.  If the SAMs is removed?

2    Q.    Is removed, correct.

3    A.    If the SAMs is removed, then the inmate is removed from

4    the H unit.

5    Q.    Where does the inmate go?

6    A.    We will either move the inmate into our general population

7    housing units or we'll place him into our step-down program.

8    Q.    How do you make a determination where he's going to go?

9    A.    We look at the inmate as -- how he's been acting in the

01:07 10   institution.  We use those 13 steps to take a look and see

11   where we're going to put these inmates inside the institution.

12   Q.    And can you generally describe the 13 criteria you're

13   talking about?

14   A.    Yes, sir.  First of all, we look at the inmate's conduct

15   while he's in ADX.  We look at his ability to program.  Has he

16   been programming based off of what his unit team's

17   recommendations were?  His behavior towards inmates and other

18   staff:  Is it positive?  Institutional conduct or institutional

19   adjustment:  Is the inmate keeping up with his hygiene?  Cell

01:08 20   sanitation?  The reason he was placed in ADX.  Why he was

21   designated there.  We also look at his criminal history.  His

22   criminal involvement since he's been there.  We look at his

23   adjustment since his incarceration.  We look at the safety of

24   staff, the safety of the inmate, the safety of other inmates,

25   the safety of the public.  And then the last one is all --

```
 1    pretty much all-encompassing.  The 13th is any other relevant
 2    factors that we need to consider.
 3    Q.   And one of those factors, does that include the notoriety
 4    of a case?
 5    A.   You know, we wrap that up in the inmate's safety or the
 6    safety of other inmates.
 7    Q.   Okay.  And is that the overriding concern or is that just
 8    one of the things that you consider?
 9    A.   No, sir, it's just one of the things we consider.
10    Q.   So if an inmate has some notoriety, does that dictate by
11    itself where someone is going to go?
12    A.   No, sir, it does not.
13    Q.   Can inmates who originally were on SAMs who are no longer
14    on SAMs be actually sent out of ADX?
15    A.   Yes, sir, they can.
16    Q.   And again, what criteria do you look at to make that
17    determination?
18          MR. WATKINS:  Objection, your Honor.
19          THE COURT:  No, generally.  You may answer it
20    generally.
21          THE WITNESS:  I look at the same criteria that we just
22    discussed.
23    BY MR. MELLIN:
24    Q.   Okay.  And that can even apply to an inmate who had a
25    terrorism conviction who is no longer on SAMs?
```

```
 1              MR. WATKINS:  Objection.

 2              THE COURT:  Overruled.

 3              You may answer.

 4              THE WITNESS:  Yes, sir, it does.

 5    BY MR. MELLIN:

 6    Q.   If an inmate does go to another facility, another U.S.

 7    penitentiary, a terrorism inmate, what are those conditions

 8    generally like?

 9              MR. WATKINS:  Objection.

10              THE COURT:  Sustained to that.

11    BY MR. MELLIN:

12    Q.   If an inmate has the SAMs removed, may that inmate

13    communicate with the media?

14              MR. WATKINS:  Objection.

15              THE COURT:  You may answer that.

16              THE WITNESS:  Yes, an inmate may communicate with the

17    media.

18    BY MR. MELLIN:

19    Q.   Inmates get rec time.  Is that right?

20    A.   Yes, sir, they do.

21    Q.   How much rec time do inmates get in the H unit?

22    A.   H unit in Phase 1 and Phase 2 get a minimum of ten hours a

23    week.

24    Q.   That's a minimum?

25    A.   Yes, sir, it is.
```

1    Q.   So they may get more time?

2    A.   Yes, sir, they may.

3    Q.   Is that always indoors or outdoors, or how is that split

4    up?

5    A.   We have both indoor recreation areas and we also have

6    outdoor recreation areas that we use in the H unit.

7    Q.   And if an inmate goes outside, to the outdoor recreation,

8    is he able to communicate with the other inmates who are out at

9    the time?

01:11 10   A.   Yes, sir.  There are six recreation enclosures outside,

11   and at times we'll have up to six inmates that are separated by

12   a fabric mesh between the rec enclosures which they can

13   communicate with each other.

14   Q.   Thank you.

15        MR. MELLIN:  Thank you, your Honor.

16        THE COURT:  Mr. Watkins?

17                     CROSS-EXAMINATION

18   BY MR. WATKINS:

19   Q.   Good morning, Warden.

01:11 20   A.   Good morning, sir.

21   Q.   You were here in Boston last week?

22   A.   Yes, sir, I was.

23   Q.   And you went back to Colorado over the weekend?

24   A.   Yes, sir, I did.

25   Q.   Was it snowing?

A.   It was snowing in Denver, but it did not snow in Florence.

Q.   Is the Bureau of Prisons governed by regulations?

A.   Yes, sir, they are.

Q.   Those regulations are put into effect by Bureau of Prisons program statements?

A.   Yes, sir, they are.

Q.   Those program statements operate systemwide to give guidance on how prisons operate and procedures in every facet, Bureau of Prisons operations?

A.   Yes, sir, we do.

Q.   In addition to program statements, the institutions have institutional supplements that guides -- that gives specific guidance as to the institution itself?

A.   Yes, sir, we do.

Q.   And both within the program statements that are systemwide and within the institution, those are updated regularly?

A.   Yes, sir, they are.

Q.   At Florence ADMAX, you have several institutional supplements, correct?

A.   Yes, sir, we do.

Q.   And one of them applies specifically to H unit?

A.   Yes, sir, it does.

Q.   And that one was updated in 2013?

A.   I would have to look at the date on it, but we typically try to update them every year.

```
 1    Q.   But that's an institutional supplement that you consult --
 2    you and your staff consult as you operate the Florence ADMAX?
 3    A.   Yes, sir.
 4    Q.   And H unit specifically?
 5    A.   Yes, sir.
 6    Q.   When did you begin to be -- when did you start as warden?
 7    A.   October of 2014 at the -- are you talking about the ADX?
 8    Q.   Yes.
 9    A.   Yes, sir.  At the ADX 2014.
01:13 10    Q.   That's eight months ago?
11    A.   Yes, sir.
12    Q.   And before that it was Warden Berkebile?
13    A.   Yes, sir, it was.
14    Q.   And that institutional supplement then, that provides a
15    template.  It shows what is supposed to happen in particular
16    programs and how the Bureau of Prisons -- and how you operate H
17    unit?
18    A.   Yes, sir, it does.
19    Q.   And some of those reasons, the 13 -- well, not some of
01:13 20    them, all of them.  The 13 reasons that you mentioned to
21    Mr. Mellin, those are all in that institutional supplement
22    also, right?
23    A.   Yes, sir, they are.
24    Q.   And one of those considerations -- well, let me put it
25    this way:  That institutional supplement, one of the things you
```

1    mentioned was the reason the inmate was designated to ADX.

2    That's one of the considerations you take regarding moves,

3    right?

4    A.   Yes, sir, it is.

5    Q.   And that consideration follows the inmate all during his

6    time at ADX, and indeed all during his time at the Bureau of

7    Prisons, right?

8    A.   I don't know about the Bureau of Prisons, but I know those

9    are considerations we use within ADX.

01:14 10   Q.   But if an inmate were to go -- well, that is what you use

11   at ADX, and that's one of the considerations you use as far as

12   whether somebody can be moved, whether the conditions could be

13   improved, right?

14   A.   Yes, sir, it is.

15   Q.   Another one is the safety and security needs of the

16   inmate.  That is one of those considerations also?

17   A.   Yes, sir, it is.

18   Q.   Are there some inmates because of the kind of crime they

19   commit always going to be a safety issue?  Is that fair to say?

01:14 20   A.   No, that is not fair to say.

21   Q.   There are no inmates because of their time -- of the crime

22   that they committed are going to be a safety issue?

23   A.   They may be a safety issue at that point, but it doesn't

24   mean it's always going to be a safety issue.

25   Q.   Within the Bureau of Prisons there are self-described

```
 1    patriots as inmates there, right?
 2              MR. MELLIN:  Objection, your Honor.
 3              THE COURT:  Overruled.
 4              You may answer it.
 5              THE WITNESS:  Could you define a patriot for me?
 6    BY MR. WATKINS:
 7    Q.   Well, isn't it true that there are inmates that would see
 8    it as a sign of honor to be able to do harm to somebody of the
 9    Muslim faith?
10              MR. MELLIN:  Your Honor, objection.
11              THE COURT:  Overruled.
12              Go ahead.
13              THE WITNESS:  I don't know that -- you know, an
14    individual inmate that's trying to go after a Muslim inmate, I
15    don't know that for a fact.
16    BY MR. WATKINS:
17    Q.   Are there inmates who would also see it as a sign of honor
18    to go after somebody who had committed a murder against a
19    child?
20    A.   As in a lot of prison systems, I think that's something
21    that's true.
22    Q.   So where that is present, that is always going to be, as
23    far as that factor, something you consider, the safety and
24    security needs of the inmate as far as where he is sent and
25    what you can do for his security?
```

1    A.    Yes, sir, that's one of the factors we use.

2    Q.    I want to talk specifically about the special security

3    unit.  We've mentioned three phases within that special

4    security unit?

5    A.    Yes, sir.

6    Q.    You've already mentioned this special security unit was

7    designed for people with SAMs, right?

8    A.    Yes, sir, it is.

9    Q.    That was its mission.  That's -- its mission is to

01:16 10    accommodate the regulations that come with the SAMs, right?

11    A.    Yes, sir, it is.

12    Q.    And it's a three-phase program, right?

13    A.    Yes, sir, it is.

14    Q.    So everybody -- an inmate coming in would start at Phase

15    1, right?

16    A.    Yes, sir, it is.

17    Q.    And he would start with that lesser set of privileges:

18    the two phone calls a month rather than the four that he might

19    get to eventually, right?

01:17 20    A.    Yes, sir.

21    Q.    And in that Phase 1, you spend at least 12 months within

22    that Phase 1, according to the institutional supplement and the

23    program that you run there, right?

24    A.    Yeah, it's ordinarily 12 months.

25    Q.    It can be longer than that, right?

```
 1    A.   Yes, sir.  And it can also be shorter than that.
 2    Q.   It could be shorter, but it's rare for it to be shorter.
 3    You want to see somebody demonstrate clear conduct, right?
 4    A.   Yes, sir.
 5    Q.   So somebody coming in, you want to make sure that they're
 6    not a problem on H unit, right?
 7    A.   Yes, sir, that's correct.
 8    Q.   So after 12 months they can be considered -- it's not a
 9    guarantee to go to Phase 2, but they can be considered for
10    Phase 2, right?
11    A.   Yes, sir, that's correct.
12    Q.   And then there's a special screening committee for --
13    within the Bureau of Prisons to determine whether somebody
14    should go to Phase 2 once they become eligible, right?
15    A.   Yes, sir, that's correct.
16    Q.   So -- the inmate's not part of that committee, of course,
17    right?
18    A.   No, he's not.
19    Q.   No inmates are part of that committee, right?
20    A.   No, they're not.
21    Q.   You're part of that committee?
22    A.   Yes, sir, I am.
23    Q.   As -- along with other staff at the H unit that have
24    specific knowledge of the person, right?
25    A.   Yes, sir, that's correct.
```

1    Q.   And at the end of that, to go from Phase 1 to Phase 2, you

2    make the decision ultimately, as the warden, whether that is

3    appropriate?

4    A.   Yes, sir, that is correct.

5    Q.   Now, going from Phase 2 to Phase 3, again, you're looking

6    at those 13 criteria that you talked about and that are in the

7    institutional supplement, right?

8    A.   Yes, sir.

9    Q.   And you consider all of those factors -- well, Phase 2,

01:18 10   also, that's 12 months minimum that you would spend on Phase 2

11   before being considered for Phase 3?

12   A.   Ordinarily, yes, sir.

13   Q.   Could be shorter, but many, many, many times it's longer.

14   Is that fair to say?

15   A.   There's times that it's longer.  Yes, sir.

16   Q.   And so Phase 2, it's starting to think about whether to

17   give this additional -- to go over to Phase 3 of the special

18   security unit, right?

19   A.   Yes, sir.  Our intent is to try to place inmates on a less

01:19 20   restrictive environment.

21   Q.   Right.  And you consider those 13 factors and you decide

22   that they should go to Phase 3 if they've shown appropriate

23   institutional adjustment, they had clear conduct, all of those

24   things that you talked about there, and you would think they

25   would be appropriate for Phase 3.  Can you on your own put them

1    into Phase 3 where there's a SAMs present?

2    A.   No, sir, I cannot.

3    Q.   Why can't you -- well, you can't put them into Phase 3

4    because what Phase 3 has is a few hours a day of

5    inmate-to-inmate contact, right?

6    A.   Yes, sir.  The SAMs has to be modified for inmate contact.

7    Q.   And you can't modify that SAMs sitting there as the

8    warden, right?

9    A.   No, sir, I cannot.

01:19 10   Q.   Even if you and your screening committee think that this

11   is a perfectly appropriate person to go to Phase 3, you can't

12   do it without that being modified, right?

13   A.   That is correct.

14   Q.   The only way to go to Phase 3 is if the Department of

15   Justice, the National Joint Terrorism Task Force, the operation

16   of enforcement -- Office of Enforcement Operations, the U.S.

17   Attorney's Office and the FBI decide that that modification

18   should be made, right?

19   A.   Yes, sir, that is correct.

01:20 20   Q.   You can send information to them:  We think this is a guy

21   good to go to Phase 3.  They don't have to listen to you,

22   correct?

23            MR. MELLIN:  Objection.

24            THE COURT:  Overruled.

25            You may answer it.

1           THE WITNESS:  No, sir, they don't.  We have a

2   partnership where we work closely together.  And understanding

3   that, we provide them information.  There may be things going

4   on that I don't know about.  But we do provide them information

5   as far as what's going on with the inmate in the institution.

6   BY MR. WATKINS:

7   Q.   So all of those things you mentioned, active participation

8   and completion of all programs recommended, positive behavior,

9   respectful conduct towards staff and other inmates, overall

01:21  10   institution adjustment, personal hygiene, self-sanitation, all

11   of those things could be great, but someone cannot go into

12   Phase 3 without the Department of Justice's say-so, right?

13   A.   That is correct.

14   Q.   You talked in response to Mr. Mellin's question about

15   ability to work on the unit.  How many jobs do you have on H

16   unit?

17   A.   We have two jobs for orderlies in the unit.

18   Q.   And what does an orderly do on the unit?

19   A.   The orderly comes out of his cell and cleans the showers,

01:21  20   clean the common areas of the cell -- or excuse me, of the cell

21   house of H unit.

22   Q.   So that's what it is, is cleaning functions, right?

23   A.   Yes, sir, it is.  It's a very popular job.

24   Q.   And how many inmates do you have at H unit vying for those

25   two orderly jobs?

1    A.    The majority of the inmates would like to be an orderly.

2    Q.    How many inmates do you have on the special security unit

3    right now?

4    A.    I have a total of 29 inmates in the housing unit.

5    Q.    And of the 29, all of them want those two jobs, right?

6    A.    Yes, sir.  A lot of them want those jobs.

7    Q.    And someone might spend years on H unit before they're

8    allowed to get that orderly job?

9    A.    Yes, sir, that is correct.

01:22 10   Q.    Once they have them, they don't like to give them up.  Is

11   that true?

12   A.    That is correct.

13   Q.    That is a time that they can get out of their cell in

14   addition to those other times that you mentioned?

15   A.    Yes, sir, it is.

16   Q.    If -- once the Department of Justice does modify the SAMs

17   in order to allow someone to go to Phase 3, the time they spend

18   in Phase 3 -- well, you talked about the 12 months in Phase 1

19   and the 12 months in Phase 2.  What is the time listed in the

01:22 20   institutional supplement for the amount of time someone will

21   spend in Phase 3?

22   A.    The amount of time somebody will spend in Phase 3?

23   There's no time.

24   Q.    It's indefinite?  That's what it says in the institutional

25   supplement?

1   A.   Yes, it is.

2   Q.   It's indefinite because that is again something you have

3   no control over, right?  To move out of Phase 3, again, it's a

4   Department of Justice decision whether somebody can move out of

5   Phase 3, right?

6   A.   Yes, sir.  But you don't have to be Phase 3 to move out of

7   the unit, though.

8   Q.   Sure.  But still, the Department of Justice is the one

9   that makes the decision whether someone can move off the

01:23 10   special security unit, right?

11   A.   Yes, sir, it is.

12   Q.   So someone could be in Phase 3 for years and years and

13   years and not move beyond there and be released from H unit,

14   right?

15   A.   That is not correct.

16   Q.   Well, people are there for years.  That is true, right?

17   A.   Yes, sir.  But the part I was talking about is we can move

18   an inmate in the Bureau of Prisons with a SAMs to any

19   institution that we want to.

01:24 20   Q.   Where someone has a specific SAMs -- well, yes.  One

21   can -- ADX is the most secure facility in the country, right?

22   A.   Yes, sir, it is.

23   Q.   It has three missions, one of which is the special

24   security unit, right?

25   A.   Yes, sir, it is.

1   Q.   The special security unit is designed for SAMs inmates,

2   right?

3   A.   Yes, sir, it is.

4   Q.   And it is the only prison in the United States that is

5   designed for SAMs inmates.  Is that correct?

6   A.   It wasn't designed for it.  It was modified.  But we also

7   have other institutions that we house SAMs inmates in that are

8   sentenced for, like, medical conditions and those types of

9   things.

01:24 10   Q.   Right.  I want to talk first about ADX, though.  Modified

11   specifically to comply with the SAMs and to be able to

12   implement the SAMs, that's what ADX does, right?

13   A.   Yes, sir, it does.

14   Q.   Now, someone might have a medical problem and need to go

15   to the federal medical center and BOP deals with that, but the

16   SAMs unit is a special security unit in ADX, Florence,

17   Colorado.  Is that right?

18   A.   Is your question is that unit in the ADX?  Yes, it is.

19   Q.   To be relieved of -- to get out of the special security

01:25 20   unit, putting aside medical issues, and be moved to some other

21   form of security requires the Department of Justice concurrence

22   by removing the SAMs, right?

23   A.   No.  From what I understand you're saying, there's only

24   one way to get out outside of medical.  But we do have people

25   who go out to court, medical transports.  There's other reasons

1    inmates go out of that unit.

2    Q.   Sure.   There are reasons why inmates go out of that unit

3    on a short-term basis, right?

4    A.   Yes, sir.

5    Q.   In order to move to a different security level, to be

6    housed at a different security level, the Department of Justice

7    has to concur?

8    A.   No, sir, it does not.

9    Q.   It has to concur by eliminating the SAMs to get out of

01:26 10   H unit?

11   A.   No, it does not.

12   Q.   Aside from the medical issues, the short-term -- well, let

13   me put it this way:   There are inmates in Phase 3 that have

14   been there for many years?

15            MR. MELLIN:   Objection.

16            THE COURT:   No, you may have the question.

17            THE WITNESS:   Yes, sir, there are.

18   BY MR. WATKINS:

19   Q.   And with those inmates that have been there for many

01:26 20   years, if the SAMs were removed by the Department of Justice,

21   you could move them to a different housing system, right?

22   A.   Yes, sir, I could.

23   Q.   Even if the SAMs are removed, you still have to consider

24   those 13 factors that you told Mr. Mellin about and that are in

25   the institutional supplement?

A.   Yes, sir, I do.

Q.   In addition, the Central Inmate Monitoring System that you heard Mr. Bezy talk about, you also are familiar with that?

A.   Yes, sir.

Q.   That has specific criteria, things that are special about an inmate that are going to affect the security classification. Is that true?

A.   Potentially it is, yes.

Q.   For example, broad notoriety, broad publicity is a factor that would affect the security designation of a person, right?

A.   It may have an impact on it.  We've had people with that security housing in a camp, a federal camp.

Q.   It will affect the decision that you make as warden.  It has to affect.  You can't just ignore that broad publicity of Central Inmate Monitoring classification, right?

A.   No, sir.  It is a consideration.

Q.   It is there by regulation.  There's a federal regulation that requires it, and there's a program statement that implements that, right?

A.   Yes, sir, it is.

Q.   You talked about a person moving to the general population of ADX.  Is the general population of -- the general population of ADX is completely different from the general population of an ordinary United States prison.  Is that true?

A.   Yes, sir, it is.

1    Q.   It is different in a number of ways, the main one being

2    that all of the inmates are in single cells?

3    A.   In the general population at ADX?

4    Q.   In the general population of ADX.

5    A.   Yes, sir, they are.

6    Q.   And their movements are sharply limited, right?

7    A.   Yes, they are.

8    Q.   They're shackled whenever they make movements, right?

9    A.   Yes, sir.  We do use restraints on them.

01:28 10    Q.   And they, like the inmates in H unit, get ten hours of

11    recreation a week -- a minimum of ten hours of recreation a

12    week, right?

13    A.   Yes, sir, that is correct.

14    Q.   And that's outside and inside recreation?

15    A.   Yes, sir, it is.

16    Q.   There are inmates that are in the general population of

17    ADX for many years, right?

18    A.   Yes, sir, there can be.

19    Q.   And they never go into the step-down program in

01:29 20    preparation to go to some other United States prison, right?

21    A.   Yes, sir.  And many factors such as conduct, that type of

22    thing, limits them as far as their ability to progress out of

23    the institution.

24    Q.   Sure.  It's those 13 factors you told us that include

25    safety and security of the inmate and the nature of the crime

1    that they committed, right?

2    A.   Yes, sir.  Those are part of them, yes.

3    Q.   If -- and constantly your consideration is whether a

4    person for all of those 13 reasons is appropriate for housing

5    at a different security level, right?

6    A.   We are -- can you repeat your question, please?

7    Q.   Whenever you're making a decision to move a person, you

8    consider those 13 factors.  It's not just whether they go to

9    Phase 2 or Phase 3, but whether they go to general population

01:30 10   or the step-down program, right?

11   A.   Yes, sir, that's correct.

12   Q.   So, for example, the broad notoriety, the broad publicity,

13   that's something that can never be changed by an inmate.

14   There's nothing that good conduct will do for that, right?

15              MR. MELLIN:  Objection.

16              THE COURT:  Overruled.

17              You may answer it.

18              THE WITNESS:  No, sir, there's not.

19   BY MR. WATKINS:

01:30 20   Q.   The same thing for the nature of the offense.  That stays

21   with a person for the rest of their lives.  There's nothing

22   they can do to overcome that for the Bureau of Prisons, right?

23   A.   Yes, sir, that is correct.

24   Q.   I want to talk a little bit about the communications on

25   the inside of the special security unit.  In answer to

       1   Mr. Mellin's question, you talked about the outside recreation,
       2   and that is a chance where inmates can talk to each other?
       3   A.   Yes, sir, it is.
       4   Q.   That outside recreation, that's in, I think you described,
       5   cages.  It's covered above, covered on the side, right?
       6   A.   Yes, sir.
       7   Q.   There are high walls encircling that entire recreation
       8   area?
       9   A.   Yes, sir.  That was a modified area which was an open rec
01:32 10   area.  We placed recreation enclosures in there at a later
      11   date.
      12   Q.   And that was because of SAMs and the nature and the
      13   mission of the special security unit, correct?
      14   A.   Yes, sir, that's right.
      15   Q.   Outside of that minimum of one and a half hours a day that
      16   an inmate is there, they would talk to another inmate by
      17   talking across cells, right?
      18   A.   Yes, sir.
      19   Q.   And that is through a steel door?
01:32 20   A.   Yes, sir.  Inmates communicate through the steel door.  We
      21   have a speaker box on the outside of the door for staff to
      22   communicate.  Inmates will use that.  They'll talk through the
      23   toilet, the vent, through the door.  It's easy to communicate
      24   between the cells.
      25   Q.   And you have a capability to record any of that that's

         1    going on there, right?

         2    A.    We have capabilities.

         3    Q.    And that's the same for the outside rec.  You have the

         4    capability to audiotape and videotape any interactions between

         5    inmates there, right?

         6    A.    We have the capability.

         7    Q.    Let's talk about, now, communications with the outside

         8    world.  To get to Boston, do you fly out of Denver?

         9    A.    Yes, sir, I do.

01:33   10    Q.    To your knowledge, is that the way most people -- the

        11    airport most people fly into to get down to ADX?

        12    A.    No, we have Colorado Springs Airport which is about 55

        13    minutes from Florence.

        14    Q.    But you used Denver to come here, right, to Massachusetts?

        15    A.    Yes, sir.  The government requires me to get the cheapest

        16    ticket.

        17          (Laughter.)

        18    Q.    Because it's very expensive to go into Colorado Springs,

        19    isn't it?

01:33   20    A.    Yes, sir.

        21    Q.    Even though you also have to rent a car in order to

        22    get -- well, you have your own car there.

        23          So a family also wanting to get the cheapest flight to go

        24    visit a loved one there would have to go into Denver?

        25          MR. MELLIN:  Objection.

1          THE COURT:  You may have it.  Go ahead, you may answer

2     it.

3          THE WITNESS:  No, sir, they do fly into Colorado

4     Springs.

5     BY MR. WATKINS:

6     Q.   As you mentioned, the cheapest fare being into Denver,

7     Denver is two and a half, three hours -- how long?

8     A.   Two and a half hours from Florence.

9     Q.   And that's not including construction on I25.  Is that

01:34 10    correct?

11    A.   No, sir, I made it in two and a half hours yesterday.  It

12    was a good drive.

13    Q.   And you talked about visits being more than one person --

14    with more than one person at a time.  Is that more than one

15    adult at a time?

16    A.   No, sir, it is not.

17    Q.   Under the SAMs and H unit, visits are only with one adult

18    at one time, right?

19    A.   Yes, sir.

01:34 20    Q.   So, for example, a family of three comes here from Boston

21    to visit an inmate, only one would be able to visit at a time,

22    right?

23    A.   Yes, sir.  We would stage the other two upstairs, bring

24    one down, let them visit, and then escort the others on a

25    rotational basis so they could all visit.

1    Q.   And those visits have to be scheduled weeks in advance?

2    At least two weeks in advance, right?

3    A.   Yes, sir.  We would try to coordinate the visits to ensure

4    the inmates' families that are traveling, they'll have the

5    opportunity to visit with the inmate.

6    Q.   One of the reasons you have to coordinate is because you

7    can only use one visiting room at any given time for social

8    visits, right, on each unit?

9    A.   Yes, sir, that's correct.

01:35 10   Q.   So if one of the other 29 has visits scheduled that same

11   day, the people coming from Boston are -- I can't visit on that

12   day, right?

13   A.   No, sir.  We take the duration of the people coming in

14   from long distances to try to make accommodations for visits

15   [*sic*].

16   Q.   But I guess my point is they have to be scheduled in that

17   way because all of the inmates are trying to use that one

18   visiting room?

19   A.   Yeah, we -- yes, sir.  We try to get everybody an

01:35 20   opportunity to visit there.

21   Q.   Those visits, they are live monitored by the FBI?

22   A.   Yes, sir, they are.

23   Q.   They are live monitored by the Bureau of Prisons?

24   A.   Yes, sir, they are.

25   Q.   That means somebody is there listening to every word

1    that's said during those visits?

2    A.   Yes, sir, they are.

3    Q.   If something untoward goes on there, the visit will be

4    immediately stopped?

5    A.   We'll stop the visit, yes, sir.

6    Q.   And if it's serious, you'll report a breach?

7    A.   Yes, sir, we will.

8    Q.   As far as letters and other correspondence going out, each

9    one of those unlimited letters is reviewed by the Bureau of

01:36 10   Prisons?

11    A.   Yes, sir, it is.  Social letters, yes.

12    Q.   Nonlegal mail?

13    A.   Nonlegal mail, yes, sir.

14    Q.   Each and every one of those letters is examined by the

15    Bureau of Prisons?

16    A.   Yes, sir, it is.

17    Q.   Each and every one of those letters is examined by the

18    FBI?

19    A.   Yes, sir, they are.

01:37 20   Q.   If a letter is in a foreign language, it will take a while

21    for the Bureau of Prisons and the FBI to analyze those letters,

22    right?

23    A.   Not necessarily.  We have linguists that review the

24    letters that are going out, so we try to expedite those.

25    Q.   "We try," but that's an extra layer that sometimes will

1    delay mail, right?

2    A.   Yes, sir, it can.

3    Q.   Of both incoming and outgoing mail?

4    A.   Yes, sir, it can.

5    Q.   Mr. Mellin asked you about writing a book.  If an inmate

6    wrote a book and sent it to the outside, BOP would read that

7    book, right?

8    A.   Yes, sir, we would.

9    Q.   And if there was anything that was untoward in there,

01:37 10   created a security issue, either for the Bureau of Prisons,

11   national security or anything else, that book would not be

12   delivered, right?

13   A.   No, it would not.

14   Q.   The FBI would also look at that book and analyze it,

15   right?

16   A.   Yes, sir, they would.

17   Q.   The FBI is also part of a larger organization of

18   intelligence units.  They would all look at that book to decide

19   whether there was anything that threatened national security

01:38 20   there, right?

21   A.   Yes, sir, they would.

22   Q.   Finally, phone calls.  Those start at two a month, 15

23   minutes each?

24   A.   Yes, sir, in Phase 1.

25   Q.   Those phone calls, if they are -- they can be to another

1  country if an inmate has approved contacts in another country,

2  right?

3  A.   Yes, sir, that is correct.

4  Q.   If a bad connection stops that phone after six or seven

5  minutes, that's the end of that 15-minute call, right?

6  A.   The call will be -- the call will be cut off at that point

7  because they hang up or the call is cut, but we will look at

8  the call to see what happened and determine whether it was a

9  technical malfunction to see if we can reengage a phone call

01:39 10  for the inmate.

11  Q.   And if you can't, that would be the end of that 15-minute

12  phone call, right?

13  A.   That is correct.

14  Q.   I forgot to ask, but the hypothetical book we were talking

15  about that could be written by somebody and sent to the

16  outside, of course that can be only sent to approved contacts

17  that have been approved under the SAMs.  Is that right?

18  A.   Yes, sir, it is.

19  Q.   And that person on the outside is themselves barred from

01:39 20  further disseminating that book, right?

21  A.   Are you talking about giving an abolishment as far as not

22  being able to do that?

23  Q.   Yes.

24  A.   I don't know that to be true.

25  Q.   Just to get back to calls for just a moment.  I think you

          1    did already answer my question.  Once it's cut off or otherwise

          2    hung up, if you can't re-connect there, that is the end of that

          3    social call, right?

          4    A.   That social call ends, but we will go back and look to see

          5    the reason behind it, and we may grant the inmate another phone

          6    call if it was a technical issue.

          7    Q.   And those phone calls again for a person in H unit,

          8    they're only very specific people identified by the Department

          9    of Justice that the inmate can call?

01:40   10    A.   At the inmate's request, yes, sir.

         11         MR. WATKINS:  That's all I have, your Honor.

         12                      REDIRECT EXAMINATION

         13    BY MR. MELLIN:

         14    Q.   Warden, you were asked about social visits and whether or

         15    not BOP or the FBI listens in on social visits.  That entire

         16    line of questioning dealt with someone on a SAMs.  Is that

         17    right?

         18    A.   Yes, sir, it did.

         19    Q.   So if someone is not on a SAMs, what happens?

01:41   20    A.   They will visit in the institution, and a lot of times we

         21    will -- we have the capabilities of monitoring them as well.

         22    Q.   Does anyone listen to legal visits?

         23    A.   No, sir, we do not.

         24    Q.   Are you entitled to listen to legal visits?

         25    A.   No, sir, we are not.

```
 1   Q.   Social mail.  When it comes in, how is it processed by
 2   BOP?
 3   A.   When a letter comes in, the letter is opened -- social
 4   mail, the letter is opened.  It is photocopied, scanned and
 5   sent to the FBI, and then the FBI reviews it.  If it's approved
 6   for the submission to the inmate, they'll send us a message
 7   that it's been approved.  The staff member then takes the
 8   letter and gives it to the inmate.
 9   Q.   And what about outgoing social mail?  What is the process
10   on that?
11   A.   Same thing.  The inmate will give us the letter.  We'll
12   scan the -- read it and scan it, send it to the FBI.  And the
13   FBI will approve it or disapprove it, and then it either goes
14   back to the inmate or it is sent off to its destination.
15   Q.   What happens with the mail where the inmate writes "legal
16   mail" on it?
17   A.   The legal mail, if it's an attorney that's an affirmed
18   attorney, the mail will be brought to the staff member and then
19   it will be sent out.  It will not be opened.
20   Q.   It will not be opened?
21   A.   It will not be opened.
22   Q.   Mr. Watkins asked you about the hypothetical book.  If an
23   inmate is not on SAMs, is anyone going to see that book if it
24   is mailed out?
25   A.   Yes, sir.  We review all the mail that's going out of ADX.
```

```
 1    Q.   No, not on SAMs.  I'm sorry.
 2    A.   Yes, sir, we still review all the mail that goes out of
 3    ADX.
 4    Q.   What about if they're in another facility?
 5             MR. WATKINS:  Objection.
 6    BY MR. MELLIN:
 7    Q.   Well, you mentioned ADX has a certain general population,
 8    in response to Mr. Watkins' question.  And there's also other
 9    general population, correct?
01:43 10    A.   Yes, sir, there are.
11    Q.   Okay.  And if they're in that other general population, is
12    anyone going to know if that book is sent out?
13             MR. WATKINS:  Objection.
14             THE COURT:  Sustained.
15    BY MR. MELLIN:
16    Q.   A book can be sent under legal mail and BOP would not know
17    about it, correct?
18             MR. WATKINS:  Objection.
19             THE COURT:  You may answer that.
01:43 20             THE WITNESS:  Yes, sir, it may be sent out as legal
21    mail.  We would not know about it.
22    BY MR. MELLIN:
23    Q.   You were asked about the various phases and you said that
24    the intent is to place someone in a less restrictive
25    environment.  Do you remember making that comment?
```

```
 1   A.   Yes, sir, I do.

 2   Q.   Why is that?

 3   A.   One of the things we try to do is --

 4        MR. WATKINS:  Objection, your Honor.

 5        MR. MELLIN:  Specifically what was brought out on

 6   cross-examination, your Honor.

 7        MR. WATKINS:  It's very cumulative at this point, your

 8   Honor.

 9        MR. MELLIN:  Your Honor, if I can just lead.

10        THE COURT:  Yes, you may lead him on this question.

11        MR. MELLIN:  Okay.

12   BY MR. MELLIN:

13   Q.   The Bureau of Prisons is making an attempt to -- at all

14   times to lessen restrictions on inmates.  Is that fair to say?

15   A.   Yes, sir, it is.

16   Q.   You said that you don't have to be in Phase 3 to be moved

17   out of the H unit.  What did you mean by that?

18   A.   That regardless of what phase you're in in the special

19   security unit, that once a SAM is removed, the inmate will be

20   removed from the unit regardless of what phase he's in, whether

21   it's Phase 1, Phase 2 or Phase 3.

22   Q.   And if that happens, is it required that that inmate go to

23   ADX general population or can he be transferred out?

24   A.   He can be transferred out.

25   Q.   Mr. Watkins asked you about individuals on SAMs and if
```

01:44 (line 10)
01:44 (line 20)

1    they're all at ADX.  Can someone be on a SAMs and not be at

2    ADX?

3    A.   Yes, sir, they can.

4    Q.   Are there inmates who are actually -- that are on SAMs who

5    are not at ADX?

6    A.   Yes, sir, there are.

7              MR. MELLIN:  Thank you.

8              Thank you, your Honor.

9              MR. WATKINS:  Nothing else.

01:45 10             THE COURT:  Nothing else?

11             All right.  Thank you, Mr. Oliver.  You may step down.

12             We'll take the morning recess.

13             THE CLERK:  All rise for the Court and jury.  The

14   Court will take the morning recess.

15             (The Court and jury exit and there is a recess in the

16   proceedings at 11:20 a.m.)

17             THE CLERK:  All rise for the Court and the jury.

18             (The Court and jury enter the courtroom at 12:06 p.m.)

19             THE CLERK:  Be seated.

02:31 20             THE COURT:  Mr. Weinreb?

21             MR. WEINREB:  The government rests, your Honor.

22             THE COURT:  The government has rested its rebuttal

23   part of the case.  That means that the evidence presentation

24   has concluded in this phase.  The next steps, as you would

25   expect, would be some further instructions about the

responsibilities you will have in your deliberations as to this
phase of the case and the final arguments that will be
presented by both sides.

There are some preparations that the lawyers and I
have to do, as you've come to expect, with respect to that.
We're going to adjourn now for the day and resume on Wednesday
morning.  We will skip your part of the trial tomorrow, but
we'll proceed on the usual schedule on Wednesday when we will
have the closing instructions and the closing arguments by the
parties.  You'll commence your deliberations as of Wednesday at
the conclusion of those events in the courtroom.  So please
plan accordingly.

Once your deliberations have begun, they will continue
day to day until finished, and that will include Fridays as an
exception to the normal schedule we've been following, all
right?

So I strongly caution you now against any discussion
of the case with yourselves, among yourselves, with anybody
else.  Don't try to form any conclusions yourself individually
about any of the issues in the case.  It's important that first
you have my instructions about those matters and of course that
you discuss those matters among yourselves as a deliberating
jury.  And please continue to avoid any exposure to media
accounts of the case.

With that, we will recess for the day.

1           THE CLERK:  All rise for the Court.  The Court and

2    jury will be in recess.

3           (The Court and jury exit the courtroom and the

4    proceedings adjourned at 12:08 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 13-10200-GAO,

 8     United States of America v. Dzhokhar A. Tsarnaev.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  5/11/15
13

14

15

16

17

18

19

20

21

22

23

24

25
```