UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Crim. No.13-10200-GAO |
| ) | |
| DZHOKHAR A. TSARNAEV, ) | |
| Defendant ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL UNSEALING OF NON-SEATED PROSPECTIVE JURORS' QUESTIONNAIRES

The United States of America, by and through its undersigned counsel, respectfully opposes Defendant Dzhokhar Tsarnaev's Motion for Partial Unsealing of Non-Seated Prospective Jurors' Questionnaires (Doc. 1738). This Court should continue to keep under seal the questionnaires of the 1,355 prospective jurors who did not serve as jurors or alternates because the compelling interest in their privacy outweighs Tsarnaev's Sixth Amendment interest in making the questionnaires public, and there is no narrowly tailored way to unseal the questionnaires while also protecting jurors' anonymity and private information.

## Background

In preparation for Tsarnaev's trial, 1,373 prospective jurors appeared before this Court and completed a written questionnaire. The questionnaire instructed prospective jurors to "answer the questions as candidly as possible." Doc. 1178 (blank questionnaire) at 2. The instructions emphasized that "honesty and candor are of the utmost importance" because "[t]he integrity of the process depends upon your truthfulness." *Id.*

The questionnaire contained 100 questions, many of which revealed information that could lead to the jurors' identification, could be considered private, or touched on divisive issues that could subject the jurors to embarrassment or harassment. The questionnaire required jurors

1

to provide detailed personal information, including their date of birth, gender, race, city or town of residence (and length of residence), city of birth, education history, employment history, marital status, and spouse's education level. Doc. 1178 (Questions 1-6, 12-13, 22, 26). It asked the jurors to list any medications they were taking that might affect their ability to serve. *Id.* (Question 11). It asked for information about prospective jurors' parents and children, including their occupations, places of residence, and whether they had ever experienced mental health or addiction problems. *Id.* (Questions 14-16, 21). It asked whether the prospective juror, a family member, or a close friend had ever "committed a crime and/or been arrested, accused of a crime, [or] charged with a crime" or "been the victim of a crime." *Id.* (Questions 40-41). It asked whether "you, or anyone close to you[,] has participated in a group that takes positions on political or social issues." *Id.* (Question 51). It asked what religion(s) the jurors were "born into" and "currently practice[ed]," how religious they considered themselves, and how often they attended a place of worship. *Id.* (Questions 53-56). It asked whether the prospective jurors had "strongly positive or negative views about law enforcement officers"; had "strongly held thoughts or opinions about Muslims or about Islam"; believed that the war on terror "unfairly targets Muslims" or "is overblown or exaggerated"; believed that "the United States government acts unfairly towards Muslims"; believed that the U.S. "allows too many Muslims, or too many people from Muslim countries, to immigrate *legally* to the United States"; or had any beliefs or attitudes toward people from Kyrgyzstan, Russia, Chechnya, or Dagestan. *Id.* (Questions 46, 59, 61-65). Finally, it asked their views on the death penalty (Questions 88-92), including whether their views were "informed by [their] religious, philosophical, or spiritual beliefs." *Id.* (Question 92).

2

While not specifically guaranteeing confidentiality, neither the Court's instructions nor the questionnaire itself "contemplated" (Def. Mot. 2) that prospective jurors' answers would necessarily become public.  Question 100 asked prospective jurors to list "any specific question above that you deem private or sensitive that you request not be made public at this time."  Doc. 1178 (Question 100).  And the Court told them, "If you would prefer to answer a sensitive question orally rather than in writing, you may write[ ] 'Private' in response to that question." 1/5/15 a.m. Tr. 13.  But the questionnaire stated that "[t]he information that you provide in this questionnaire will be *used by the Court and the parties* to select a qualified jury," Doc. 1178 at 2 (emphasis added), and assured prospective jurors that the "questionnaire and the jury selection process" were "not meant to be intrusive," *id.*  The Court told prospective jurors that "[t]he filled out questionnaires will not become part of the public record unless and until I determine whether they include any sensitive information that should be kept confidential permanently."  1/5/15 a.m. Tr.  7-8.  "And if they do, I intend to keep that information and any possible further questioning about it from being available to the public."  *Id.* at 8.  This Court made the initial determination to keep the juror questionnaires under seal in order "to maintain the integrity of the proceedings and to protect the privacy of jurors."  Dkt. Entry 983.

For 1,117 prospective jurors, their involvement in this case ended with answering the questionnaire.  Only 256 prospective jurors were summoned for *voir dire*, and only 18 served as jurors or alternates.  The parties have agreed to the unsealing (with limited redactions) of the 18 jurors and alternates, and the joint motion to unseal is pending before the Court.  Doc. 1737. Tsarnaev now seeks to make public the questionnaires of the 1,355 prospective jurors who did not serve as jurors or alternates.  Doc. 1738.  For the reasons stated below, the Court should deny

3

his motion.

## Discussion

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This right to a public trial "extends to the *voir dire* of prospective jurors." *Presley v. Georgia*, 558 U.S. 209, 213 (2010). The right, however, is not absolute and "may give way in certain cases to other rights or interests" such as the "interest in inhibiting disclosure of sensitive information." *Id.* (quoting *Waller v. Georgia*, 467 U.S. 39, 45 (1984)). A court may deny access to court proceedings to prevent the disclosure of sensitive information if "the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."[1] *Global Newspaper Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S. 596, 606-07 (1984); *see also Press-Enterprise Co. v. Super. Ct. of Cal., Riverside Cty.*, 464 U.S. 501, 510 (1984) (*Press-Enterprise I*). In doing so, the court must "articulate . . . with the requisite specificity" the protectable privacy interests and consider alternatives to complete closure. *Press-Enterprise I*, 464 U.S. at 513.

Most courts have treated written jury questionnaires as subject to the same presumption of openness that applies to in-court *voir dire*. *See In re Jury Questionnaires*, 37 A.3d 879, 886 (D.C. 2012) (citing cases). But courts have also recognized that jury questionnaires can include private information to which there is not right of public access. *See United States v. Bruno*, 700 F. Supp. 2d 175, 184 (N.D.N.Y. 2010) ("To the extent the questionnaires disclosed personal

---

[1] Privacy interests may also overcome the common-law presumption of public access to judicial documents. *See In re Boston Herald, Inc.*, 321 F.3d 174, 189-91 (1st Cir. 2003) (even if CJA eligibility forms were judicial documents, privacy interests nonetheless rebutted the common-law presumption of public access).

4

details pertinent to the court's pre-screening function, that information is not traditionally public."). Thus, a number of federal courts have concluded that jury questionnaires—even those of seated jurors—should remain under seal or be individually redacted by the court. *See United States v. Brown*, 250 F.3d 907, 921-22 (5th Cir. 2001) (upholding continued sealing of seated jurors' questionnaires); *Bruno*, 700 F. Supp. 2d at 184 (denying motion for public disclosure of seated jurors' questionnaires); *In re Washington Post*, No. 91-0521 (RCL), 1992 WL 233354 at *4 (D.D.C. July 23, 1992) (releasing questionnaires of 51 prospective jurors who were called back for individual *voir dire* only after the court reviewed and redacted each questionnaire). *Cf. United States v. King*, 140 F.3d 76, 83 (2d Cir. 1998) (affirming district court's decision not to release redacted questionnaires until jury was empaneled).

Moreover, some federal courts assure prospective jurors that their questionnaires will remain under seal. *See United States v. Mikhel*, 889 F.3d 1003, 1031 (9th Cir. 2018) (questionnaire said the information would "be kept confidential" and "[n]either your identities nor your answers will be released to the general public or the media"); *United States v. Barragan*, 871 F.3d 689, 713 (9th Cir. 2017) (same); *Brown*, 250 F.3d at 912 (questionnaires "assured the jurors that all information would remain confidential and that the court would not breach this confidentiality agreement"); *In re South Carolina Press Ass'n*, 946 F.2d 1037, 1041 (4th Cir. 1991) (assuring prospective jurors that the information provided in the questionnaire was "confidential" and "when the case is concluded, the questionnaire will be destroyed"). In the *Sampson* case in this district, the court told the jurors "that they could request that certain of their answers be kept permanently out of the public record or, alternatively, that they could respond to a question by writing 'private,'" which would result in that information being elicited

5

in a closed session if the person was "called back for individual voir dire." *United States v. Sampson*, 820 F. Supp. 2d 151, 182 (D. Mass. 2011). Although the D.C. Court of Appeals has concluded such assurances are improper and not necessarily enforceable, *see In re Jury Questionnaires*, 37 A.3d at 889, the government is unaware of any federal district court or court of appeals that has reached a similar conclusion.

As the Supreme Court has recognized, a prospective juror has a compelling interest in keeping their *voir dire* answers private "when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain." *Press-Enterprise I*, 464 U.S. at 512; *see id.* at 514 (Blackmun, J., concurring) ("[A] juror has a valid interest in not being required to disclose to all the world highly personal or embarrassing information simply because he is called do his public duty."). The Court observed that a prospective juror would have a "legitimate privacy interest[ ]" in discussing a personal experience with rape because "of the embarrassment and emotional trauma from the very disclosure of the episode." 464 U.S. at 512. And lower courts have recognized that prospective jurors have a privacy interest in their *voir dire* answers about race relations, *King*, 140 F.3d at 83, as well as "information disclosed for pre-screening purposes" like their medical conditions and criminal history, *Bruno*, 700 F. Supp. 2d at 183. Protecting jurors against disclosure of personal or potentially embarrassing information "strengthens the integrity of our justice system by assuring [the juror's] rights to safety and privacy and by encouraging the candor of impaneled and prospective jurors and future venire." *Bruno*, 700 F. Supp. 2d at 182. *See Press-Enterprise I*, 464 U.S. at 515 (Blackmun, J., concurring) (noting that the interest in juror privacy extends "even after the trial . . . to encourage juror honesty in the future").

6

The prospective jurors in this case have a compelling interest in the "deeply personal matters" they divulged to this Court. *Press-Enterprise I*, 464 U.S. at 511. The questionnaire asks whether the prospective juror, a family member, or a close friend had ever "committed a crime and/or been arrested, accused of a crime, [or] charged with a crime." Doc. 1178 (Question 40). It asks about prospective jurors' participation in political or social groups and about their religious affiliation and practice. *Id.* (Questions 51, 53-56). It asks them about their views on highly sensitive issues, including whether they have "strongly held thoughts or opinions about Muslims or about Islam," believe that the United States "acts unfairly towards Muslims," or believe that the United States "allows too many Muslims . . . to immigrate legally." *Id.* (Questions 59, 60, 64) (emphasis omitted). It asks whether they have "strong feelings about our laws or government policies concerning legal immigration." *Id.* (Question 63) (emphasis omitted). And it asks a series of detailed questions regarding the prospective jurors' views on the death penalty, including whether those views are "informed by [their] religious, philosophical, or spiritual beliefs." *Id.* (Question 92). Answers to some or all of these questions are deeply personal, potentially embarrassing, and could harm a person socially or professionally if they became public.

The privacy interest of these prospective jurors is especially strong given that, even with Tsarnaev's proposed redactions, members of the news media or the public would be able to discern their identities. *See Bruno*, 700 F. Supp. 2d at 182 ("[J]urors' rights to security and privacy unquestionably outweigh the media's need for a roadmap to their doorsteps."). Tsarnaev suggests (Def. Mot. 8) that redacting the prospective jurors' names and birthdates is sufficient to maintain their anonymity. This is wholly inadequate. Simply making public a juror's gender,

city of residence, city of birth, education history, and occupational history is a trail of crumbs that could easily be used to identify a particular juror. Many prospective jurors can easily be identified based on their employment and educational history alone. *See, e.g.*, Juror Qnrs. 4 (Questions 22, 25), 10 (Questions 22, 26), 11 (Questions 26, 28). For example, Googling the undergraduate university and current employment for prospective juror 35 produces that person's LinkedIn page as the top result. And many prospective jurors included identifying information in response to a variety of questions. Many included their spouse's or parents' names in response to Questions 13 and 14. *See, e.g.*, Juror Qnrs. 1, 4, 6, 9, 10, 14, 16, 20. And some mentioned names or other identifying information in response to other questions. *See, e.g.*, Qnrs. 1 (Question 80), 4 (Question 80), 10 (Question 31);

The government has agreed with Tsarnaev to unseal the lightly redacted questionnaires of the seated jurors and alternates. Doc. 1737. The Court has already disclosed the names and hometowns of those jurors, Doc. 1639, so they no longer have an expectation of anonymity. Their bias or lack thereof is a central issue in this case. And their questionnaires do not contain the type of embarrassing information or inflammatory viewpoints included in some prospective jurors' questionnaires. By contrast, many of the prospective jurors in this case were not even called back for *voir dire*, much less seated on the jury, yet Tsarnaev seeks to have their private viewpoints and extensive identifying information released permanently into the public record.

Tsarnaev contends that *Press-Enterprise I* "compels" this Court to unseal the questionnaires and redact only those questions that jurors "themselves flagged as sensitive." Def. Mot. 6. He is incorrect. *Press-Enterprise I* did indicate that the best practice is to require an "affirmative request" from a prospective juror before closing the courtroom during *voir dire*.

*Press-Enterprise I*, 464 U.S. at 512. But it did not suggest that juror questionnaires must be unsealed. *Press-Enterprise I* involved the blanket closure of six weeks of *voir dire* where the judge did not "consider[ ] alternatives to closure," "provided no explanation why his broad order . . . was not limited to information that was actually sensitive," and did not "consider whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved." *Id.* at 513. Keeping questionnaires of non-seated jurors sealed, even without an affirmative request from the prospective juror, is not tantamount to a total closing of *voir dire*. *See King*, 140 F.3d at 82 (rejecting the argument that *Press-Enterprise I* required the district court to ascertain whether each juror wished to be heard *in camera* before closing voir dire to the public); *In re Washington Post*, 1992 WL 233354 at *5 (declining to limit redactions to answers flagged as private because this limitation would "punish[ ]" prospective jurors for "failing to respond in the affirmative to the last of seventy questions" and would "undermine one of the primary reasons for conducting voir dire"—"encourag[ing] candid and complete answers to the questions of the court and counsel so that the parties may select a fair and impartial jury"). Even Tsarnaev apparently recognizes that Question 100 failed to weed out sensitive information, considering that he suggests redacting the answers to Questions 1, 9, 11, 15, 16, 21, and 41, regardless of whether prospective jurors referenced those questions in Question 100. Def. Mot. 1.

Reliance on Question 100 is particularly inappropriate in light of the Court's statements to prospective jurors that the questionnaires would "not become part of the public record unless and until [the Court] determine[s] whether they include any sensitive information that should be kept confidential permanently." 1/5/15 a.m. Tr. 8. The Court assured them that, if the

9

questionnaires did contain sensitive information, it would "keep that information and any possible further questioning about it from being available to the public." *Id.* In light of these assurances, the prospective jurors could easily assume that their answers would not be made public even if they left Question 100 blank. That was the understanding of at least one juror. *See* Jury Qnr. 18 (Question 100). And while some prospective jurors answered Question 100 in detail, *see, e.g.*, Jury Qnr. 937, others provided this Court with personal or potentially embarrassing information but then answered "no" to Question 100, *see, e.g.*, Jury Qnrs. 2 (answers to Questions 40, 59, 65, and 100); 24 (answers to Questions 98 and 100). Question 100 is neither an accurate indication of what the prospective jurors would want to shield from public disclosure nor a sufficient safeguard for the public interest in ensuring candid jurors.

The government recognizes that extensive redactions would afford greater protection to the prospective jurors' privacy interests. But the necessary redactions would be so time-consuming as to be impracticable. Tsarnaev seeks the unsealing of 1,355 questionnaires, each of which contains 100 questions. *Compare In re Washington Post*, 1992 WL 233354, at *5-*6 (court individually redacted 51 questionnaires containing 70 questions each). Although it may be possible to preserve anonymity by redacting enough questions, Tsarnaev has not proposed such redactions. As explained above, ensuring anonymity would require redaction of at least the prospective jurors' gender, city of residence, place of birth, educational history, employment history, and Questions 13-16 (in which jurors frequently listed names). It would also require redaction on a questionnaire-by-questionnaire basis of other answers that include identifying information.

Even with full anonymity, many potential jurors would likely be surprised to find that

their highly personal political and religious views—explained in their own handwriting—will be forever in the public record. Redacting all of this private or embarrassing information would require a line-by-line review of all the questionnaires. Thus, to the extent that the juror questionnaires could be made public, the necessary redactions would require enormous judicial resources and produce questionnaires that are so heavily redacted they are effectively sealed.

Tsarnaev points to the "complications" that would arise from keeping the questionnaires sealed, observing that he will need to "cite" or "refer to" them in his opening brief on appeal. Def. Mot. 3-4. He points out that he must "determine the percentage of all venirepersons who knew about the case, and the percentage who believed, based on pretrial publicity, that Mr. Tsarnaev was guilty or should receive the death penalty." *Id.* at 3. He also asserts that he will "refer to the non-seated prospective jurors' questionnaires in presenting separate issues related to the overall jury selection process." *Id.*

Contrary to Tsarnaev's suggestion, his opening brief can discuss the questionnaires' contents in general terms, including the percentage of prospective jurors who answered questions a certain way, even if the questionnaires remain under seal. First Circuit Rule 11.0(d)(2) says that "counsel are expected not to disclose the substance" of sealed material in an unsealed brief. But both counsel and the First Circuit regularly refer to the contents of sealed material, such as presentence reports, in a way that does not disclose the material's sensitive substance. *See, e.g.*, *United States v. Morales-De Jesus*, --- F.3d ---, 2018 WL 3454464 (1st Cir. 2018) (presentence report and addendum); *United States v. Anonymous Defendant*, 629 F.3d 68, 71 & n.\* (1st Cir. 2010) (resolving an appeal in which "much of the record . . . remain[ed] under seal" without identifying the defendant and "describ[ing] his activities only in generalities"). And in the

*Sampson* collateral review litigation, the appellate briefing and the First Circuit's opinion discussed the contents of a seated juror's questionnaire even though the questionnaire remained under seal. *See Sampson v. United States*, 724 F.3d 150, 162-63 (1st Cir. 2013); Brief for the United States, 2012 WL 4831217, at *1 n.1, *11-*12 (citing Joint Sealed Appendix (JSA)). Other circuits have followed a similar practice. *See also, e.g., Mikhel*, 889 F.3d at 1029-30 (discussing questionnaires in detail); Brief for the United States at 2 n.1, 197, 229-33, *United States v. Mikhel*, Nos. 07-99008 & 07-99009 (9th Cir. Sep. 9, 2016) (discussing questionnaires, which were in a Sealed Joint Excerpts of Record (SJER)).

Tsarnaev can include all of the prospective jurors' questionnaires in a sealed appendix. Although this will require him to file a separate paper volume of the appendix, *see* Def. Mot. 3, paper copies are required for unsealed appendices as well, 1st Cir. Rule 30.0(a). If he makes only general references to the sealed questionnaires, he would not, as he suggests (Def. Mot. 3), be required to file a separate, sealed volume of his brief. To the extent he intends to quote answers in specific questionnaires, he may be able to do that as well. *See Sampson*, 724 F.3d at 162-63. In discussions with Tsarnaev's counsel, the government proposed seeking guidance from the First Circuit regarding the extent to which Tsarnaev could refer to sealed questionnaires in a public filing. The government believes it would be possible to reach a satisfactory arrangement with that court. *See Anonymous Defendant*, 629 F.3d at 68 n.* ("Because much of the record in this case remains under seal, we adhere to an arrangement to which the parties have agreed . . . ."). But Tsarnaev rejected that proposal in favor of moving to unseal the questionnaires.

If this Court denies Tsarnaev's motion, and if the First Circuit prohibits him from quoting

or discussing the sealed questionnaires in a public brief, the worst that will happen is that Tsarnaev will be required to file a sealed (as opposed to unsealed) appendix and a separate, sealed volume of his brief.  That is hardly an inconvenience serious enough to justify disclosing the personal information and sensitive political and religious views of 1,355 Bay Staters who showed up for jury duty but were not selected to serve.

## Conclusion

For the reasons above, the government respectfully requests that this Court deny Tsarnaev's motion to unseal the questionnaires completed by prospective jurors who were neither seated nor selected as alternates.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division, U.S. Dep't of Justice

By:  /s/ Nadine Pellegrini
NADINE PELLEGRINI
Assistant U.S. Attorney

Date: July 30, 2018

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Nadine Pellegrini
NADINE PELLEGRINI
Assistant U.S. Attorney