UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10200-GAO

UNITED STATES OF AMERICA

v.

DZHOKHAR A. TSARNAEV,
Defendant.

OPINION AND ORDER
December 6, 2018

O'TOOLE, D.J.

Pending before the Court are two motions concerning the potential unsealing of the written questionnaires that all prospective jurors completed at the outset of the voir dire process in this case. First, the parties have jointly moved that the questionnaires completed by the eighteen jurors who participated in the trial (twelve jurors and six alternates) be unsealed with redactions. (Joint Mot. to Unseal Specified Trs. & Pleadings (dkt. no. 1737).) The defendant has separately moved that the questionnaires completed by the remaining 1355 potential jurors who did not participate in the trial also be unsealed, with relatively few redactions. (Mot. for Partial Unsealing of Non-Seated Prospective Jurors' Questionnaires (dkt. no. 1738).) The government has opposed the defendant's request as to the potential jurors who were not seated.

In his request, the defendant relies in large part on Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984). Press-Enterprise involved the pre-trial objection of a media representative to a six-week jury voir dire that was entirely closed to the public for all but three days. The facts of Press-Enterprise are not similar to the facts of this case. The full jury selection procedure followed in this case, designed with the participation of the parties as well as representatives of other

constituencies, including the press, is a matter of record. It is sufficient to recall that it was generally conducted openly. Persons physically present in the courtroom during voir dire included the defendant, the defense and prosecution teams, up to ten members of the public selectively invited by the parties, two rotating pool reporters, and two sketch artists, with live video and audio feeds streaming to the press and public in overflow courtrooms. There were some limited and carefully circumscribed temporary "closures" consistent with the sidebar procedure typically employed in jury selection in criminal cases. The parties themselves had complete unredacted access to information about prospective jurors, including their juror questionnaires. The defendant expressed satisfaction at the time with the arrangement under the First and Sixth Amendments.[1] See United States v. Tsarnaev, Crim. No. 13-10200-GAO, 2015 WL 631330, at *2 (D. Mass. Feb. 13, 2015).

Relying on Press Enterprise, the defendant contends that disclosure of all 1373 completed juror questionnaires is required. The defendant argues that both constitutional and common-law presumptions of public access to court proceedings or judicial documents should apply to the completed jury questionnaires, regardless of whether an individual's questionnaire was ever actually considered by the Court or parties, whether the potential juror was subjected to individual voir dire, whether the contents of the questionnaire influenced any judicial decision, and whether the juror participated in the trial and verdict. That is a very broad proposition that requires nuanced consideration. At the very least, the proposition is not compelled by Press Enterprise. Indeed, the

---

[1] Indeed, the defendant initially proposed conducting voir dire in a closed session, arguing that closure would provide a setting to facilitate candor and would therefore help protect his Sixth Amendment right to a fair and impartial trial. See id. at *1. He did not then nor does he now argue that his public trial right was infringed by the procedures. (See e.g., Def. Position on Outstanding Issues Regarding Jury Selection & Jury Questionnaire (dkt. no. 907) ("[T]he defense will waive on the record any possible public trial objection.").)

fact that the defendant relies on a case as inapposite in its facts as Press Enterprise tellingly suggests the absence of settled principles regarding the issues presented. That said, the Court assumes, without deciding, that there is a presumption of public access to at least some of the responses in some of the completed questionnaires.

**I.     Questionnaires of Jurors Not Seated**

As to the 1355 citizens who filled out questionnaires but were not selected to serve on the jury, the Court concludes that the presumption in favor of public access is outweighed, at least at this post-verdict stage of the case, by substantial privacy interests of the persons who were required to complete the questionnaires. Moreover, the integrity of the judicial system, including particularly the right to trial by jury, is strengthened by the encouragement of future veniremen to be candid when participating in voir dire.

The Court in Press-Enterprise recognized that citizens called to serve as jurors have to some degree a "legitimate privacy interest" in personal sensitive information. See 464 U.S. at 512. That interest may not necessarily be safeguarded in the adversarial process by two parties who have their own priorities and interests. The consequences of disclosure of personal information are especially acute in a high-profile case in an era where viral—and apparently permanent—dissemination by the Internet is a fact of life, a factor the Press-Enterprise Court most certainly did not face. See, e.g., Internet Archive: Wayback Machine, https://archive.org.

Protecting jurors' legitimate privacy interests strengthens the justice system. See Press Enterprise, 464 U.S. at 515 (Blackmun, J., concurring) ("The State has a similar interest in protecting juror privacy, even after the trial—to encourage juror honesty in the future—that almost always will be coextensive with the juror's own privacy interest."). A prospective juror summoned for service who is aware that intimate and identifiable information about former jurors has been

spread online and in the press might expectedly be reluctant to be candid when asked in voir dire to provide personal information. This sort of chilling effect would implicate—and perhaps jeopardize—a future defendant's Sixth Amendment right to a fair trial.

As an alternative to the full sealing or unsealing of the completed questionnaires of the unseated voir dire members, the defendant proposes that redactions be made to their names[2] and answers to specific questions, including Questions #1 (date of birth), #9 (medical, physical, psychological, or emotional problem, issue, or condition), #11 (medication affecting fitness to serve), #15 and #16 (sex, age, occupation, and place of residence of children, step-children, siblings, and step-siblings), #21 (mental health and addiction problems of juror or close family members), #41 (details about whether, how, and when a juror, family member, or close friend had ever been a victim of crime), and #100 (responses designated to be private or sensitive). The defendant, citing <u>Press-Enterprise</u>, contends that his proposal implements two forms of tailoring: (1) withholding of the prospective jurors' names and birthdates to anonymize the questionnaires, and (2) redaction of sensitive material. In reality, however, his proposal does neither.

First, simply releasing the questionnaires without the first page would not adequately protect the anonymity of the unseated members of voir dire and those in their close circles. The questionnaires, even if released without the names, are not truly anonymous given the extensive identifying information provided in the responses, including the juror's sex, city of residence, city of birth, education history, and occupation history. Simple Internet searches using some of the data points in specific questionnaires will result in the identification of many of the jurors. Furthermore,

---

[2] The names appear on the first and last pages of the questionnaire. The defendant has proposed only redacting the first page.

many veniremen listed names in response to questions about their spouses, parents, and other personal or family matters.

The mechanical application of redactions to a specified list of questions without individual review of the entire collection of questionnaires would not reliably protect that sensitive material that the defendant apparently recognizes warrants confidentiality. For example, he agrees that information about the voir dire members' medical, physical, psychological, or emotional problems, issues, or conditions described in Question # 9 should remain confidential, but many individuals describe medical needs or mental health as a hardship that would make it difficult to serve in response to Question #10, a question the defendant has not proposed redacting. Similarly, the defendant proposes that redactions be made to the answers to Question #1 to protect against disclosure of prospective jurors' birthdates.[3] But he overlooks the possibility that a person may have written that same information in response to other questions. For instance, seated Juror #487 wrote her date of birth not only in response to Question #1, but also in response to Questions #10 and #101. This was a questionnaire carefully examined by both parties and for which they jointly recommended redactions, including to dates of birth, but both parties missed the fact that the juror's birthdate was decipherable in two other places and partly revealed in another. (Joint Mot. to Unseal Specified Trs. & Pleadings 5 (agreeing to redact "DOBs of juror"); Joint Mot. to Seal Attachs. to Joint Mot. to Unseal Specified Trs. & Pleadings, Ex. A (dkt. no. 1739) (redacting date of birth of Juror #487 in response to Question #1 but not to Questions #10, #75, #101).)

Furthermore, while the defendant identifies some of the questions that probe sensitive topics for jurors, he omits others. The questionnaire requested information about a broad range of

---

[3] Regardless of the parties' positions, the Federal Rules prohibit the public filing of such personal identifiers. Fed. R. Cr. P. 49.1(a).

topics that are personal not just for the persons called to serve but also for their family members and close friends. One example is Question #10, which asked about special hardships that would make it difficult or impossible for the juror to serve. That question commonly yielded information about financial circumstances and health conditions of both jurors' and members of their families. There are many other examples throughout the questionnaire.[4]

Jurors were asked in Question #100 to list any responses that were particularly private or sensitive. Some did, but they did so without much practical opportunity to reflect on the matter, consult others for advice, or consider their comfort with their choices in light of the ensuing national and international coverage of the trial. Had they had time to consider that their extensive responses, written in their own handwriting, might be copied and put on the Internet for the world to view for all time, there very likely would have been more specific designations in response to Question #100—or, less complete, if not inaccurate, responses to the remaining ninety-nine.

The Court has also considered the alternative of individually studying and redacting all of questionnaires. This is impractical. Each questionnaire was twenty-eight pages long and contained 101 questions, many with subparts, for each of the 1355 potential jurors who completed the form but were never seated as jurors.[5] The answers are handwritten on documents that the Court is informed have been scanned as individual, separate files and without optical character recognition, rendering them digitally unsearchable. The individual review of over 140,000 handwritten answers

---

[4] It bears noting that some of this information may have been beneficial for the parties to know in the shaping and presentation of their cases, but much of it had little to do with whether an individual was qualified to serve.

[5] One could theoretically treat the jurors who were called back and further questioned differently than the pool members who were not considered after completing their questionnaires or whose questionnaires were never reviewed. Neither party has suggested that approach. Additionally, for recalled veniremen, the transcripts of individual oral voir dire—where the parties were able to inquire about answers on the questionnaires—have been released with some limited redactions.

across almost 38,000 pages in 1355 different files and the application of numerous discrete redactions to each is not a burden the Court can (or should) reasonably assume, especially in light of the very limited utility of such review in the present posture of the case.

The only personal detriment the defendant identifies as a consequence of maintaining the questionnaires of the non-serving jurors under seal is some possible inconvenience in the manner in which he files and presents his materials in the Court of Appeals.[6] That inconvenience is surely less than the inconvenience of full review of each questionnaire. The defendant is not restricted in the scope or content of his arguments on appeal on the basis of the sealed materials. The questionnaires in this case are and have always been available to him and to the government. They are available to the Court of Appeals. The parties and Court of Appeals may arrange for the appropriate treatment of sealed and unsealed material in the course of the defendant's appeal, as they have in many other cases. Indeed, despite his claimed concerns in this motion about having to manage both sealed and unsealed materials in his appellate filings, it appears from a more recent submission in this Court that the defendant is seeking to maintain under seal other materials that will be the subject of his appeal. (See Sealed Mot. (dkt. nos. 1750, 1750-1, 1750-2 (under seal)).)

For these reasons, the defendant's motion to unseal (even with redactions) the completed juror questionnaires for the veniremen who were not seated as trial jurors is DENIED.

## **II.** **Questionnaires of Trial Jurors**

The eighteen jurors who were selected, have completed their service, and were publicly identified several years ago can reasonably be treated as a different category. The parties have

---

[6] The only specific example the defendant cites is the use of the percentage of all veniremen who had heard or read about the case and who had formed an opinion as to his guilt or the appropriate punishment. The Court does not interpret the seal to prohibit reference to the numeric aggregation of data. To the extent relief is needed to do that, permission is granted to cite in percentages statistical data sourced in the questionnaires.

jointly moved to unseal, with certain redactions, the trial jurors' completed questionnaires. The agreed-upon redactions include references to the date of birth of each juror; full address; the age, occupation, and residence of juror's children and siblings; and anything marked "private." The Court agrees with the parties that with respect to most information in the seated juror questionnaires—in particular, their positions on the more salient issues in the case, such as their attitudes about the death penalty—the seated jurors' privacy interests are diminished at this stage in the proceedings, and with that diminution, the risk of chilling the candor and participation of future jurors.

However, as the parties have at least implicitly acknowledged by their agreed-upon redactions, that is not the case for jurors' uninvolved family members and friends who are described or referred to in the questionnaires. In some cases those persons are identified with personal details concerning such matters as substance abuse and addiction, medical conditions and mental health issues, criminal records, and experiences with domestic violence or sexual assault. These are the kinds of personal details about themselves and persons close to them that jurors routinely address in private at sidebar. Therefore, the Court adopts the parties' proposed redactions and, after review of the questionnaires, adds a few more. The redactions are shown in the following table:

| All Jurors | Names on pages 1 and 28 (including signatures) |
|---|---|
| Juror No. 35 | #41 |
| Juror No. 102 | #13 – names of current and former partners; #14 – names of parents and step-parents; #40; #41 |
| Juror No. 138 | #14 – names current employers of parents; #21 |
| Juror No. 229 | #21 |
| Juror No. 286 | #15;[7] #21; #40 |
| Juror No. 349 | #14 – names of parents; #40 |
| Juror No. 395 | #13 – names of partners; # 19 |

---

[7] The parties agreed to the unsealing of information about this juror's children, but did not provide any justification for the incongruity.

| Juror No. 441 | #21; #40 |
| Juror No. 487 | #10 – last sentence; #13 – partner's name; #21; #40; #41; #42 – second sentence; # 75 – second sentence; #101 – last sentence |
| Juror No. 552 | #43 |
| Juror No. 567 | #21 |
| Juror No. 588 | #9 |
| Juror No. 598 | #13 – name of spouse; #40 |
| Juror No. 608 | #21; #41 |
| Juror No. 638 | #21 |

The parties shall make the further redactions and jointly submit in paper form the eighteen redacted juror questionnaires.[8] After they are reviewed for consistency in accordance with this Opinion and Order, they will be maintained in hard-copy in the juror records maintained by the Jury Commissioner of the District.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

---

[8] The parties shall not electronically file copies of the redacted juror questionnaires.