(Slip Opinion) OCTOBER TERM, 2021 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* TSARNAEV

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–443. Argued October 13, 2021—Decided March 4, 2022

On April 15, 2013, brothers Dzhokhar and Tamerlan Tsarnaev planted and detonated two homemade pressure-cooker bombs near the finish line of the Boston Marathon, killing three and wounding hundreds. Three days later, as investigators began to close in, the brothers fled. In the process, they murdered a Massachusetts Institute of Technology campus police officer, carjacked a graduate student, and fought a street battle with police during which Dzhokhar inadvertently ran over and killed Tamerlan. Dzhokhar eventually abandoned the vehicle and hid in a covered boat being stored in a nearby backyard. He was arrested the following day.

Dzhokhar was indicted for 30 crimes, including 17 capital offenses. To prepare for jury selection, the parties proposed a 100-question screening form, which included several questions regarding whether media coverage may have biased prospective jurors. The District Court declined to include a proposed question that asked each prospective juror to list the facts he had learned about the case from the media and other sources. According to the District Court, the question was too "unfocused" and "unguided." Following three weeks of in-person questioning, a jury was seated. The jury found Dzhokhar guilty on all counts, and the Government sought the death penalty.

At sentencing, Dzhokhar sought mitigation based on the theory that Tamerlan had masterminded the bombing and pressured Dzhokhar to participate. In an attempt to show Tamerlan's domineering nature, Dzhokhar sought to introduce the statements of Ibragim Todashev, who had alleged during an FBI interview that, years earlier, Tamerlan had participated in a triple homicide in Waltham, Massachusetts. The Government asked the trial court to exclude any reference to the Wal-

Syllabus

tham murders on the grounds that the evidence either lacked relevance or, alternatively, lacked probative value and was likely to confuse the issues. The Government also pointed out that, because FBI agents had killed Todashev in self-defense after he attacked them during the interview, there were no living witnesses to the Waltham murders. The District Court excluded the evidence, and the jury concluded that 6 of Dzhokhar's crimes warranted the death penalty.

The Court of Appeals vacated Dzhokhar's capital sentences on two grounds. First, the court held that the District Court abused its discretion during jury selection by declining to ask about the kind and degree of each prospective juror's media exposure, as required by that court's decision in *Patriarca* v. *United States*, 402 F. 2d 314. Second, the court held that the District Court abused its discretion during sentencing when it excluded evidence concerning Tamerlan's possible involvement in the Waltham murders.

*Held*: The Court of Appeals improperly vacated Dzhokhar's capital sentences. Pp. 8–20.

(a) The District Court did not abuse its discretion by declining to ask about the content and extent of each juror's media consumption regarding the bombings. Jury selection falls "particularly within the province of the trial judge," *Skilling* v. *United States,* 561 U. S. 358, 386, whose broad discretion in this area includes deciding what questions to ask prospective jurors, see *Mu'Min* v. *Virginia,* 500 U. S. 415, 427. Here, the District Court did not abuse that discretion when, recognizing the significant pretrial publicity concerning the bombings, the court refused to allow the question at issue because it wrongly emphasized what a juror knew before coming to court, rather than potential bias. That decision was reasonable and well within the court's discretion.

The rest of the jury-selection process in this case dispels any remaining doubt. The District Court used the 100-question juror form—which asked prospective jurors what media sources they followed and whether any of that information had caused them to form an opinion about Dzhokhar's guilt or punishment—to cull down the number of prospective jurors. The District Court then subjected those remaining prospective jurors to three weeks of individualized *voir dire*, including questions that probed for bias. Finally, the court instructed the prospective jurors during *voir dire*, and the seated jurors during trial, that their decisions must be based on the evidence presented at trial and not any other source.

The Court of Appeals erred when it concluded that the District Court abused its discretion by failing to put Dzhokhar's proposed media-content question to the jury. Following its decision in *Patriarca*, the court concluded that it had "supervisory authority" to require the District

Syllabus

Court, as a matter of law, to ask the jurors that specific question. The supervisory power of federal courts, however, does not extend to the creation of prophylactic supervisory rules that circumvent or supplement legal standards set out in decisions of this Court. See *United States* v. *Payner,* 447 U. S. 727, 733–737. Pp. 8–13.

(b) Nor did the District Court abuse its discretion in excluding from the sentencing proceedings evidence of the Waltham murders. The Federal Death Penalty Act provides that, at the sentencing phase of a capital trial, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor." 18 U. S. C. §3593(c). But the district court may exclude information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Ibid.* Such evidentiary decisions are reviewed for abuse of discretion. See *United States* v. *Abel,* 469 U. S. 45, 54. Here, Dzhokhar sought to introduce evidence linking Tamerlan to the unsolved Waltham murders to support his mitigation defense that Tamerlan was the ringleader of the bombing. That evidence, however, did not allow the jury to confirm or assess Tamerlan's alleged role in the Waltham murders. The District Court did not abuse its discretion when it reasonably excluded the evidence for its lack of probative value and potential to confuse the jury. Dzhokhar's counterarguments are unconvincing. First, §3593(c) does not violate the Eighth Amendment. That provision falls well within the the Federal Government's "'traditional authority'" "to decide that certain types of evidence may have insufficient probative value to justify their admission," *Skipper* v. *South Carolina,* 476 U. S. 1, 11, 15 (Powell, J., concurring in judgment), and "to set reasonable limits upon the evidence a [capital] defendant can submit, and control the manner in which it is submitted," *Oregon* v. *Guzek,* 546 U. S. 517, 526. Section 3593(c) sets up a highly permissive regime that allows criminal defendants to introduce a wide range of normally inadmissible evidence and channels that evidence through an individualized balancing test that affords a capital defendant every reasonable opportunity to place relevant mitigation evidence before the penalty-phase jury. Here, the bare inclusion of the Waltham-murders evidence risked producing a confusing mini-trial where the only witnesses who knew the truth were dead. That the evidence excluded by the District Court was considered reliable enough to include in a search warrant has no bearing here, where the District Court was free to evaluate the information independently when deciding whether to admit it under §3593(c).

The dissent recognizes that the District Court enjoyed significant discretion over its evidentiary decisions. But because this is a death penalty case, the dissent scrutinizes those decisions with particular care to find that the District Court abused its discretion. In doing so,

4                    UNITED STATES *v.* TSARNAEV

Syllabus

the dissent ignores the traditional abuse-of-discretion standard, which calls for a reviewing court to defer to the sound judgment of a district court unless the decision was "manifestly erroneous." *General Elec. Co.* v. *Joiner*, 522 U. S. 136, 142. More specifically, the dissent suggests that a district court presiding over death-penalty proceedings should be more hesitant to find that evidence risked confusing the jury. But nothing in §3593(c) suggests that Congress intended for any such hesitancy. Ultimately, the District Court reasonably decided to exclude the evidence under §3593(c)'s balancing test. Pp. 13–20.

968 F. 3d 24, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. BARRETT, J., filed a concurring opinion, in which GORSUCH, J., joined. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined except as to Part II–C.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–443

UNITED STATES, PETITIONER *v.*
DZHOKHAR A. TSARNAEV

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[March 4, 2022]

JUSTICE THOMAS delivered the opinion of the Court.

On April 15, 2013, Dzhokhar and Tamerlan Tsarnaev planted and detonated two homemade pressure-cooker bombs near the finish line of the Boston Marathon. The blasts hurled nails and metal debris into the assembled crowd, killing three while maiming and wounding hundreds. Three days later, the brothers murdered a campus police officer, carjacked a graduate student, and fired on police who had located them in the stolen vehicle. Dzhokhar attempted to flee in the vehicle but inadvertently killed Tamerlan by running him over. Dzhokhar was soon arrested and indicted.

A jury found Dzhokhar guilty of 30 federal crimes and recommended the death penalty for 6 of them. The District Court accordingly sentenced Dzhokhar to death. The Court of Appeals vacated the death sentence. We now reverse.

## I

### A

The Tsarnaev brothers immigrated to the United States in the early 2000s and lived in Massachusetts. Little more than a decade later, they were actively contemplating how

Opinion of the Court

to wage radical jihad. They downloaded and read al Qaeda propaganda, and, by December of 2012, began studying an al Qaeda guide to bomb making.

On April 15, 2013, the brothers went to the Boston Marathon finish line on Boylston Street. They each brought a backpack containing a homemade pressure-cooker bomb packed with explosives inside a layer of nails, BBs, and other metal scraps. Tamerlan left his backpack in a crowd of spectators and walked away. Dzhokhar stood with his backpack outside the Forum, a nearby restaurant where spectators watched the runners from the sidewalk and dining patio. For four minutes, Dzhokhar surveyed the crowd. After speaking with Tamerlan by phone, Dzhokhar left his backpack among the spectators. Tamerlan then detonated his bomb. While the crowd at the Forum looked toward the explosion, Dzhokhar walked the other way. After a few seconds, he detonated his bomb.

Each detonation sent fire and shrapnel in all directions. The blast from Tamerlan's bomb shattered Krystle Campbell's left femur and mutilated her legs. Though bystanders tried to save her, she bled to death on the sidewalk. Dzhokhar's bomb ripped open the legs of Boston University student Lingzi Lu. Rescuers tried to stem the bleeding by using a belt as a makeshift tourniquet. She too bled to death.

Eight-year-old Martin Richard absorbed the full blast of Dzhokhar's bomb. BBs, nails, and other metal fragments shot through his abdomen, cutting through his aorta, spinal cord, spleen, liver, pancreas, left kidney, and large intestines. The blast propelled shrapnel with such force that it exited his back. Other shrapnel nearly severed his left hand. The explosion also caused third-degree burns. Martin ultimately died from blood loss.

Dzhokhar's and Tamerlan's bombs maimed and wounded hundreds of other victims. Many people lost limbs, including Martin's 6-year-old sister, Jane. Many more would

Opinion of the Court

have died if not for the swift action of citizens and first responders.

After fleeing the scene, the brothers returned to their normal lives. Dzhokhar attended his college classes the next day. He went to the gym with friends. He posted online that he was "a stress free kind of guy." App. 145. Several days later, on April 18, after the Federal Bureau of Investigation (FBI) released images of the suspected bombers, a friend saw the images and texted Dzhokhar. Dzhokhar responded: "Better not text me my friend. Lol." *Id.*, at 146.

Recognizing that investigators were closing in on them, Dzhokhar met up with Tamerlan that evening. The brothers collected more homemade bombs and a handgun and loaded them into Tamerlan's car. While driving past the Massachusetts Institute of Technology, they saw 27-year-old campus police officer Sean Collier sitting in his patrol car. They approached his car and shot him five times at close range, including once between the eyes. With Collier dead, the brothers tried to steal his service pistol but were unable to remove it from the holster. They then carjacked and robbed another man, Dun Meng, who was driving his SUV home from work. When the brothers forced Meng to stop at a gas station for fuel and snacks, he fled on foot. The brothers briefly chased him but gave up and made off with Meng's SUV.

Meng contacted the police, who used the SUV's GPS device to track the Tsarnaevs. When officers found the brothers in Watertown a few hours later, a street battle ensued. Tamerlan fired on the officers with a handgun, while Dzhokhar threw homemade bombs. When Tamerlan's handgun ran out of ammunition, officers subdued him. As they tried to handcuff Tamerlan, Dzhokhar returned to the SUV and sped towards the officers. They evaded the SUV. Tamerlan did not. Dzhokhar ran over Tamerlan and dragged him roughly 30 feet down the road. Tamerlan disentangled from the undercarriage when Dzhokhar rammed a police

cruiser before escaping. Tamerlan died soon after from his injuries.

Dzhokhar abandoned the SUV a few blocks away. He found a covered boat in a nearby backyard. Taking shelter inside, he carved the words "stop killing our innocent people, and we will stop" into the planking. *Id.*, at 151. He also wrote a manifesto in pencil on the bulkhead of the boat's cockpit justifying his actions and welcoming his expected martyrdom. The next day, the boat's owner found him. Police eventually forced Dzhokhar out of the boat and arrested him.

### B

A federal grand jury indicted Dzhokhar for 30 crimes, 17 of which were capital offenses. In preparation for jury selection, the parties jointly proposed a 100-question form to screen the prospective jurors. The District Court adopted almost all of them, including many that probed for bias. For example, some of the District Court's questions asked whether a prospective juror had a close association with law enforcement. Others asked whether a prospective juror had strong feelings about Islam, Chechens, or the several Central Asian regions with which the Tsarnaevs were connected. Still others asked whether the prospective juror had a personal connection to the bombing.

Several questions also probed whether media coverage might have biased a prospective juror. One question asked if the prospective juror had "formed an opinion" about the case because of what he had "seen or read in the news media." App. to Pet. for Cert. 373a. Others asked about the source, amount, and timing of the person's media consumption. Still another asked whether the prospective juror had commented or posted online about the bombings.

The District Court did reject one media-related question. The proposed questionnaire had asked each prospective juror to list the facts he had learned about the case from the

Opinion of the Court

media and other sources. Concerned that such a broad, "unfocused" question would "cause trouble" by producing "unmanageable data" of minimal value that would come to dominate the entire *voir dire*, the District Court declined to include it in the questionnaire. App. 480–481. After Dzhokhar objected to the removal, the District Court further explained that the question was "too unguided." *Id.*, at 486.

Recognizing the intense public interest in the case, the District Court summoned an expanded jury pool. In early January 2015, the court called 1,373 prospective jurors for the first round of jury selection. After reviewing their answers to the questionnaire, the court reduced the pool to 256. As jury selection began in earnest, Dzhokhar renewed his request that the court ask each juror about the content of the media he had consumed. The District Court again refused Dzhokhar's blanket request and instead permitted counsel to ask appropriate followup questions about a prospective juror's media consumption based on the answers to questions in the questionnaire or at *voir dire*. Several times, the court permitted Dzhokhar's attorneys to follow up on a prospective juror's earlier answers with specific questions about what the juror had seen or heard in the news. Over the course of three weeks of in-person questioning, the District Court and the parties reduced the 256 prospective jurors down to 12 seated jurors.

After the District Court seated the jury, the case went to trial. Dzhokhar did not contest his guilt and the jury thus returned a guilty verdict on all counts. During the sentencing phase, the Government argued that Dzhokhar's crimes warranted the death penalty. Dzhokhar's mitigation theory centered on the idea that Tamerlan masterminded the bombing. According to Dzhokhar, he was not sufficiently culpable to warrant the death penalty because his older brother had pressured him to participate.

To prove Tamerlan's domineering nature, Dzhokhar sought to introduce hearsay evidence of a crime Tamerlan

Opinion of the Court

allegedly had committed years earlier. Specifically, FBI agents investigating the bombings had come to suspect that Tamerlan's friend, Ibragim Todashev, possessed information about an unsolved triple homicide in Waltham, Massachusetts, where a non-Muslim acquaintance of Tamerlan's and two others were found bound, robbed, and murdered with a knife. When agents went to interview Todashev about a month after the bombings, Todashev initially denied any involvement. Yet, when pressed, he told the agents that Tamerlan had hatched a plan to rob the three Waltham victims of drug proceeds on the night of September 11, 2011. According to Todashev, he and Tamerlan traveled to Waltham, held the men at gunpoint, and duct-taped their hands, feet, and mouths. After taking the money, Tamerlan insisted on killing the three men. According to Todashev, after he disagreed, Tamerlan told him to wait outside while Tamerlan cut their throats with a knife. The agents offered Todashev a pen and paper to write out his confession. Todashev instead attacked the agents, who killed him in self-defense. The FBI later used Todashev's statement to obtain a search warrant for a follow-on search of Tamerlan's car.

In the lead-up to trial, the prosecution told Dzhokhar's counsel what Todashev had said but did not turn over the recording of the interview or the FBI reports. The prosecution also disclosed that Dias Kadyrbayev, a friend of Dzhokhar's facing federal obstruction charges in connection with the bombing, told the investigators that Dzhokhar knew about Tamerlan's involvement in the murders. Meanwhile, Government analysts found evidence that someone had searched for information about the Waltham murders from Tamerlan's wife's computer a week after they took place. Government investigators also found jihadi propaganda advocating theft from non-Muslim "infidels." *Id.*, at 639.

Before trial, Dzhokhar filed a motion to compel produc-

tion of the evidence, which the court denied. The Government filed a motion *in limine* to exclude any reference to the Waltham murders, contending that the evidence was irrelevant, or at least so lacking in probative value and so likely to confuse the issues that the court should exclude it. The District Court granted the Government's motion *in limine*. As the District Court saw things, the evidence did not show what Tamerlan's role was and, with Todashev dead, no further line of inquiry remained. The available information was "without any probative value" and "would be confusing to the jury and a waste of time." *Id.*, at 650.

When the sentencing proceedings finished, the jury concluded that Dzhokhar warranted the death penalty for 6 of the 17 death-penalty-eligible crimes, despite Dzhokhar's argument that Tamerlan was more culpable. The District Court accordingly sentenced Dzhokhar to death.

### C

The Court of Appeals vacated Dzhokhar's capital sentence on two grounds. See 968 F. 3d 24, 35 (CA1 2020). First, the Court of Appeals held that the District Court abused its discretion during jury selection by declining to ask every prospective juror what he learned from the media about the case. *Id.*, at 54–62. According to the panel, such questions were required by that court's 1968 decision in *Patriarca* v. *United States*, 402 F. 2d 314 (CA1), which had mandated this *voir dire* rule "in the exercise of [the court of appeals'] discretionary supervisory powers, not as a matter of constitutional law." 968 F. 3d, at 60. The Court of Appeals ruled that the District Court's failure to comply with *Patriarca* was "an error of law and so an abuse of discretion." 968 F. 3d, at 59. Second, the panel held that the District Court abused its discretion when it excluded from sentencing the evidence concerning Tamerlan's possible involvement in the Waltham murders. *Id.*, at 63–73. The panel believed that the evidence was sufficiently probative

Opinion of the Court

of Tamerlan's ability to influence Dzhokhar. *Id.*, at 69–70. We granted certiorari, 592 U. S. ___ (2021).

## II

The Government argues that the Court of Appeals improperly vacated Dzhokhar's capital sentences based on the juror questionnaire and the Waltham evidence. We agree.

### A

The Sixth Amendment guarantees "the accused" the right to a trial "by an impartial jury." The right to an "impartial" jury "does not require *ignorance*." *Skilling* v. *United States*, 561 U. S. 358, 381 (2010). Notorious crimes are "almost, as a matter of necessity, brought to the attention" of those informed citizens who are "best fitted" for jury duty. *Reynolds* v. *United States*, 98 U. S. 145, 155–156 (1879). A trial court protects the defendant's Sixth Amendment right by ensuring that jurors have "no bias or prejudice that would prevent them from returning a verdict according to the law and evidence." *Connors* v. *United States*, 158 U. S. 408, 413 (1895).

We have repeatedly said that jury selection falls "'particularly within the province of the trial judge.'" *Skilling*, 561 U. S., at 386 (quoting *Ristaino* v. *Ross*, 424 U. S. 589, 595 (1976)); see also, *e.g.*, *Mu'Min* v. *Virginia*, 500 U. S. 415, 424 (1991); *Connors*, 158 U. S., at 413. That is so because a trial "judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record," such as a "prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling*, 561 U. S., at 386. A trial court's broad discretion in this area includes deciding what questions to ask prospective jurors. See *Mu'min*, 500 U. S., at 427 ("our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity").

A court of appeals reviews the district court's questioning

Opinion of the Court

of prospective jurors only for abuse of discretion. See, *e.g.*, *Skilling*, 561 U. S., at 387, n. 20; *Mu'Min*, 500 U. S., at 427; *Rosales-Lopez* v. *United States*, 451 U. S. 182, 189 (1981) (plurality opinion); *Ristaino*, 424 U. S., at 594; *Ham* v. *South Carolina*, 409 U. S. 524, 527 (1973); *Connors*, 158 U. S., at 413. That discretion does not vanish when a case garners public attention. Indeed, "[w]hen pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense.'" *Skilling*, 561 U. S., at 386 (quoting *Mu'Min*, 500 U. S, at 427; alteration in *Skilling*). After all, "the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'" *Ibid.* (quoting *Mu'Min*, 500 U. S., at 427). Because conducting *voir dire* is committed to the district court's sound discretion, there is no blanket constitutional requirement that it must ask each prospective juror what he heard, read, or saw about a case in the media. *Mu'Min*, 500 U. S., at 417. Instead, as in any case, the district court's duty is to conduct a thorough jury-selection process that allows the judge to evaluate whether each prospective juror is "to be believed when he says he has not formed an opinion about the case." *Id.*, at 425.

The District Court did not abuse its broad discretion by declining to ask about the content and extent of each juror's media consumption regarding the bombings. The court recognized the significant pretrial publicity concerning the bombings, and reasonably concluded that the proposed media-content question was "unfocused," risked producing "unmanageable data," and would at best shed light on "preconceptions" that other questions already probed. App. 480–481. At *voir dire*, the court further explained that it did not want to be "too tied to a script" because "[e]very juror is different" and had to be "questioned in a way that [was] appropriate" to the juror's earlier answers. *Id.*, at

498. The court was concerned that a media-content question had "the wrong emphasis," focusing on what a juror knew before coming to court, rather than on potential bias. *Id.*, at 502. Based on "years" of trial experience, the court concluded that jurors who came in with some prior knowledge would still be able to act impartially and "hold the government to its proof." *Id.*, at 502–503. The District Court's decision was reasonable and well within its discretion, as our precedents make clear. See *Mu'Min*, 500 U. S., at 427.

If any doubt remained, the rest of the jury-selection process dispels it. The District Court summoned an expanded jury pool of 1,373 prospective jurors and used the 100-question juror form to cull that down to 256. The questionnaire asked prospective jurors what media sources they followed, how much they consumed, whether they had ever commented on the bombings in letters, calls, or online posts, and, most pointedly, whether any of that information had caused the prospective juror to form an opinion about Dzhokhar's guilt or punishment. The court then subjected those 256 prospective jurors to three weeks of individualized *voir dire* in which the court and both parties had the opportunity to ask additional questions and probe for bias. Dzhokhar's attorneys asked several prospective jurors what they had heard, read, or seen about the case in the media. The District Court also provided "'emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court.'" *Skilling*, 561 U. S., at 388, n. 21 (quoting *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 564 (1976)). The court reminded the prospective jurors that they "must be able to decide the issues in the case based on the information or evidence that is presented in the course of the trial, not on information from any other sources," App. 283, an instruction the court gave during *voir dire* and repeated during the trial. In sum,

Opinion of the Court

the court's jury selection process was both eminently reasonable and wholly consistent with this Court's precedents.

The Court of Appeals erred in holding otherwise. As it saw things, its decision nearly 50 years prior in *Patriarca* had, pursuant to its "supervisory authority," required district courts presiding over high-profile cases to ask about the "'kind and degree of [the prospective juror's] exposure to the case or the parties.'" 968 F. 3d, at 57 (quoting *Patriarca*, 402 F. 2d, at 318; emphasis deleted). And because *Patriarca* purportedly set forth a "rule," the District Court's failure to follow it was "an error of law and so an abuse of discretion." 968 F. 3d, at 59.

It is true that some of our precedents describe a "supervisory authority" that inheres in federal courts. See, *e.g.*, *McNabb* v. *United States*, 318 U. S. 332, 343–345 (1943); *Cupp* v. *Naughten*, 414 U. S. 141, 146 (1973).[1] But the Court's precedents have also identified clear limits when lower courts have purported to invoke that authority. For example, supervisory rules cannot conflict with or circumvent a constitutional provision or federal statute. *Thomas* v. *Arn*, 474 U. S. 140, 148 (1985). Nor can they conflict with or circumvent a Federal Rule. *Carlisle* v. *United States*, 517 U. S. 416, 426 (1996). Finally, and most relevant here, lower courts cannot create prophylactic supervisory rules that circumvent or supplement legal standards set out in

---

[1] Some jurists have questioned this Court's supervisory authority over lower courts. See, *e.g.*, *Western Pacific R. Corp.* v. *Western Pacific R. Co.*, 345 U. S. 247, 273 (1953) (Jackson, J., dissenting) (questioning "this Court's exercise of its vague supervisory powers over federal courts"); *Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 264 (1988) (Scalia, J., concurring) ("I do not see the basis for any direct authority to supervise lower courts"). Others have questioned whether the courts of appeals enjoy the same power. See, *e.g.*, *United States* v. *Strothers*, 77 F. 3d 1389, 1397–1399 (CADC 1996) (Sentelle, J., concurring). The Government does not challenge the general existence of the Court of Appeals' supervisory power. See Tr. of Oral Arg. 11. Hence, we need not address that issue here.

decisions of this Court. *United States* v. *Payner*, 447 U. S. 727, 733–737 (1980).

*Payner* exemplifies this last limit. There, a Federal District Court asserted supervisory power to suppress illegally seized evidence even when the seizure violated a third party's Fourth Amendment rights, and the Court of Appeals affirmed the decision. *Id.*, at 733. This Court reversed, explaining that its Fourth Amendment jurisprudence had "established beyond any doubt" that a defendant could not assert a third party's Fourth Amendment injury in order to suppress evidence. *Id.*, at 735. "Were we to accept this use of the supervisory power," the Court reasoned, "we would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing." *Id.*, at 737. Simply put, "the supervisory power does not extend so far." *Ibid.*

Nor does any supervisory power extend as the Court of Appeals appears to suggest in this case. This Court has held many times that a district court enjoys broad discretion to manage jury selection, including what questions to ask prospective jurors. See, *e.g.*, *Skilling*, 561 U. S., at 387, n. 20; *Mu'Min*, 500 U. S., at 427; *Ristaino*, 424 U. S., at 594; *Ham*, 409 U. S., at 527; *Connors*, 158 U. S., at 413. As the Court of Appeals acknowledged, our cases establish that a reviewing court may set aside a district court's questioning only for an abuse of discretion. See 968 F. 3d, at 56. The Court of Appeals declined to apply that settled standard of review. Rather than ask whether media-content questions were necessary in light of the District Court's exhaustive *voir dire*, the Court of Appeals resurrected *Patriarca*, handed down a purported legal rule that media-content questions are required in all high-profile cases, and then concluded that the District Court committed a legal error when it failed to comply with that rule. See 968 F. 3d, at 57–59. But a court of appeals cannot supplant the district court's broad discretion to manage *voir dire* by prescribing

specific lines of questioning, and thereby circumvent a well-established standard of review. Whatever the "supervisory power" entails, it does not countenance the Court of Appeals' use of it.

## B

The Court of Appeals' second reason for vacating Dzhokhar's capital sentences—that the District Court erred in excluding from the sentencing proceedings evidence of the Waltham murders—fares no better.

The Federal Death Penalty Act (FDPA) sets out a comprehensive scheme by which federal district courts adjudicate, review, and impose death sentences. See 18 U. S. C. §§3591 *et seq.* Section 3593 provides that, at the sentencing phase of a capital trial, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor." §3593(c). "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials." *Ibid.*

That said, FDPA proceedings are not evidentiary free-for-alls. The district court may exclude information under the FDPA "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Ibid.* We review these evidentiary exclusions for abuse of discretion. See, *e.g.*, *United States* v. *Abel*, 469 U. S. 45, 54 (1984); *Sprint/United Management Co.* v. *Mendelsohn*, 552 U. S. 379, 384 (2008); 1 R. Mosteller et al., McCormick on Evidence §185, p. 1125 (8th ed. 2020).

Here, during sentencing, Dzhokhar sought to introduce evidence linking Tamerlan to the unsolved Waltham murders. He argued that the evidence supported his mitigation defense that Tamerlan was the ringleader. The District Court acknowledged Dzhokhar's rationale but excluded the evidence because it was "without any probative value" and "would be confusing to the jury." App. 650. See 18 U. S. C. §3593(c).

14  UNITED STATES *v.* TSARNAEV

That conclusion was reasonable and not an abuse of the District Court's discretion. Dzhokhar sought to divert the sentencing jury's attention to a triple homicide that Tamerlan allegedly committed years prior, though there was no allegation that Dzhokhar had any role in that crime. Nor was there any way to confirm or verify the relevant facts, since all of the parties involved were dead. As the District Court explained, "there simply [was] insufficient evidence to describe [any] participation Tamerlan may have had" or "tel[l] who played what role, if they played roles." App. 650. The District Court did not abuse its discretion when finding that the evidence lacked probative value, would confuse the jury, and ultimately would be nothing more than "a waste of time." *Ibid.*

Dzhokhar and the dissent offer several counterarguments, none of which is convincing. First, Dzhokhar suggests that §3593(c) violates the Eighth Amendment if its balancing test operates to exclude any relevant mitigating evidence. See Brief for Respondent 17, 31; Tr. of Oral Arg. 85–88. His argument depends on a line of cases rooted in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982),[2] which "requir[e] the sentencer to consider mitigating circumstances when deciding whether to impose the death penalty." *Jones* v. *Mississippi*, 593 U. S. ___, ___ (2021) (slip op., at 17). Dzhokhar suggests that a district court violates the Eighth Amendment under these precedents if it excludes any marginally relevant mitigating evidence that fails the §3593(c) balancing test. See Tr. of Oral Arg. 85–88.

———————

[2] Some have argued that these cases and their progeny do not reflect the original meaning of the Eighth Amendment, whose prohibition "relates to the character of the punishment, and not the process by which it is imposed." *Gardner* v. *Florida*, 430 U. S. 349, 371 (1977) (Rehnquist, J., dissenting); see also, *e.g.*, *Miller* v. *Alabama*, 567 U. S. 460, 505–506, and n. 3 (2012) (THOMAS, J., dissenting). Neither party here asks us to revisit that question and we decline to do so.

Opinion of the Court

Our cases do not support Dzhokhar's extreme position. "'*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all.'" *Johnson* v. *Texas*, 509 U. S. 350, 361 (1993) (quoting *McKoy* v. *North Carolina*, 494 U. S. 433, 456 (1990) (Kennedy, J., concurring in judgment)). We read that principle to coexist with the overarching goal "that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Saffle* v. *Parks*, 494 U. S. 484, 493 (1990); accord, *California* v. *Brown*, 479 U. S. 538, 541 (1987). Thus, "[o]ur capital sentencing jurisprudence seeks to reconcile [these] two competing . . . principles"—"to allow mitigating evidence to be considered and to guide the discretion of the sentencer." *Johnson*, 509 U. S., at 373. To effectively reconcile these objectives, "[w]e need only conclude that it is consistent with the Eighth Amendment for [the Federal Government] to channel the sentencer's consideration of a defendant's arguably mitigating evidence so as to limit the relevance of that evidence in any reasonable manner, so long as the [Federal Government] does not deny the defendant a full and fair opportunity to apprise the sentencer of all constitutionally relevant circumstances." *Graham* v. *Collins*, 506 U. S. 461, 498–499 (1993) (THOMAS, J., concurring).

Because the States and the Federal Government "retain 'the traditional authority'" "to decide that certain types of evidence may have insufficient probative value to justify their admission," they may enact reasonable rules governing whether specific pieces of evidence are admissible. *Skipper* v. *South Carolina*, 476 U. S. 1, 11, 15 (1986) (Powell, J., concurring in judgment) (quoting *Lockett*, 438 U. S., at 604, n. 12). Moreover, we have expressly held that "the

Eighth Amendment does not deprive" a sovereign "of its authority to set reasonable limits upon the evidence a [capital] defendant can submit, and control the manner in which it is submitted." *Oregon* v. *Guzek*, 546 U. S. 517, 526 (2006).

Congress' passage of §3593(c) falls well within that traditional authority. Section 3593(c) sets up a highly permissive regime that allows criminal defendants to introduce a wide range of normally inadmissible evidence. The statute channels that evidence through an individualized balancing test that affords a capital defendant every reasonable opportunity to place relevant mitigating evidence before the penalty-phase jury. Unlike the statute challenged in *Lockett* or the sentencer's decision challenged in *Eddings*, §3593(c) does not put any category of mitigating evidence beyond the sentencer's purview. Rather, §3593(c) preserves the traditional gatekeeping function of district court judges to consider and assess specific pieces of relevant evidence in light of its probative value and the risks it poses to the jury's truth-seeking function. The court weighs all proffered evidence to determine whether it will assist the jury in considering any grounds for mitigation.

Put simply, §3593(c) "does not deny the defendant a full and fair opportunity to apprise the sentencer of all constitutionally relevant circumstances." *Graham*, 506 U. S. at 498–499 (THOMAS, J., concurring). It therefore does not offend the Eighth Amendment.

Dzhokhar alternatively disagrees with the balance that the District Court struck here under §3593(c), arguing that the Waltham evidence was "highly probative" to his mitigation defense. Brief for Respondent 17. On his telling, the evidence showed that Tamerlan was a leader who pressured others to commit violence. But the District Court considered that argument and rejected it after reasonably explaining that "[t]here's just no way of telling who played what role, if they played roles," from the sparse and unreliable information before the court. App. 650. It was "as

Opinion of the Court

plausible . . . that Todashev was the bad guy and Tamerlan was the minor actor." *Ibid.* In other words, the evidence did not tend to show that Tamerlan acted as the leader who pressured Todashev into committing the crime. And it certainly did not show that, almost two years later, Tamerlan led and dominated Dzhokhar in a manner that would mitigate Dzhokhar's guilt.

Dzhokhar further opines that he might have reduced juror confusion by putting the information before the jury in a "streamlined" manner. Brief for Respondent 32. But "[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule" rather than "indulge in review by hindsight." *Old Chief* v. *United States*, 519 U. S. 172, 182, n. 6 (1997). Here, Dzhokhar did not alert the District Court to any possible "streamlined" approach, instead suggesting that, if the court admitted the Waltham evidence, he would submit additional evidence and possibly seek third-party discovery. Moreover, Dzhokhar could not have unilaterally dictated how the proceeding would progress because the Government would have been "permitted to rebut any information received at the hearing" with evidence of its own. 18 U. S. C. §3593(c). So no matter how Dzhokhar presented the evidence, its bare inclusion risked producing a confusing mini-trial where the only witnesses who knew the truth were dead. The District Court did not abuse its discretion by declining to lead the jury into this evidentiary detour.

Finally, Dzhokhar argues that since the Government apparently considered Todashev's statement to the FBI agents reliable enough to justify its reference in a search warrant affidavit, Todashev's statements were necessarily reliable enough to be presented to the jury as mitigating evidence. See Brief for Respondent 27–28; see also *post*, at 8 (BREYER, J., dissenting) (contending that the warrant "strongly suggests" the District Court abused its discretion). We fail to see why. The District Court here did not

Opinion of the Court

sign the warrant or the affidavit. Whatever probable-cause
assessment the FBI agent and the Magistrate Judge made,
the District Court was free to evaluate the information in-
dependently when deciding whether to admit it under
§3593(c). As explained, that evaluation was not an abuse
of discretion.

For its part, the dissent subjects the District Court's de-
cision to exclude the Waltham evidence to a more stringent
standard of review and, based on its independent review of
the record, would reverse. *Post,* at 5–16. While the dissent
acknowledges that district courts enjoy "significant discre-
tion" when making evidentiary decisions, *post,* at 5, it nev-
ertheless argues that the death penalty context here re-
quires us to scrutinize the District Court's decision with
"particular judicial care," *post,* at 15.

In doing so, the dissent ignores our traditional standard
for appellate review of evidentiary determinations.[3] Defer-
ence is the "hallmark of [the] abuse-of-discretion review"
applicable to such decisions. *General Elec. Co.* v. *Joiner,*

---

[3] None of the dissent's cases, see *post,* at 16, supports applying height-
ened scrutiny to evidentiary decisions in death-penalty cases. The lan-
guage the dissent cites from *Kyles* v. *Whitley,* 514 U. S. 419, 422 (1995),
about our "'duty to search for constitutional error,'" *post,* at 14, in capital
cases is inapposite; it concerned our decision to grant review to engage
in fact-bound error correction, not the applicable standard for deciding
whether an error had in fact occurred. See 514 U. S., at 422, n. 1. Mean-
while, the language from *Zant* v. *Stephens,* 462 U. S. 862, 885 (1983),
about "careful scrutiny" concerned our review of the jury's "deliberative
process" leading to the imposition of a capital sentence, not the consid-
ered evidentiary decisions of a District Court. Finally, *Gregg* v. *Georgia,*
428 U. S. 153, 187 (1976) (joint opinion of Stewart, Powell, Stevens, JJ.),
scrutinized whether procedural "safeguard[s]" were honored, not
whether the District Court's evidentiary rulings were substantively rea-
sonable. All told, not one of these cases addressed, let alone altered, the
abuse-of-discretion standard traditionally applicable to a district court's
evidentiary decisions. See *General Elec. Co.* v. *Joiner,* 522 U. S. 136, 141
(1997) ("We have held that abuse of discretion is the proper standard of
review of a district court's evidentiary rulings").

Opinion of the Court

522 U. S. 136, 143 (1997). A "reviewing court" applying that standard "must not substitute its judgment for that of the district court." *Horne* v. *Flores*, 557 U. S. 433, 493 (2009) (BREYER, J., dissenting). Rather, an appellate court must defer to the lower court's "sound judgment," so long as its decision falls within its "wide discretion," *Abel*, 469 U. S., at 54, and is not "'manifestly erroneous,'" *Joiner*, 522 U. S., at 142 (quoting *Spring Co.* v. *Edgar*, 99 U. S. 645, 658 (1879)). Even in the death penalty context, this traditional abuse-of-discretion standard applies.

Yet here, the dissent proposes to independently reevaluate the District Court's decision to exclude the Waltham evidence under §3593(c). In particular, the dissent joins Dzhokhar in critiquing the District Court's conclusion that the risk of confusing the jury outweighed the probative value of that evidence. See *post,* at 10–15. The dissent thinks it was the "District Court's strongest reason" for excluding the evidence, *post*, at 10, but it discounts the District Court's conclusion for two reasons. Neither is compelling, especially under the deferential abuse-of-discretion standard.

First, the dissent suggests that because "death penalty proceedings are special," district courts should be more hesitant to find a risk of confusion in this context than in others. *Post*, at 11. But the dissent identifies nothing in the text of the FDPA to support its position. Congress defined what considerations district courts must balance when making admissibility determinations under §3593(c), and it chose to define one using a term familiar in the law of evidence—"confusing the issues." Compare §3593(c) with Federal Rule of Evidence 403; see also Mosteller, McCormick on Evidence §185, at 1119 (noting "common law power of the judge to exclude relevant evidence" to forestall "'confusion of the issues'"). Nothing suggests that Congress intended district courts to evaluate that concern differently under the FDPA.

Opinion of the Court

Second, the dissent points out that district courts sometimes allow the Government to present evidence of a capital defendant's past bad acts during sentencing proceedings, despite the risk of evidentiary minitrials. See *post*, at 13–15. But many of those cases focused on the defendant's own conduct, not someone else's. See *ibid.* In such cases, the Government need only put on evidence tending to show that the defendant committed the past bad act. See, *e.g., United States* v. *Umaña*, 750 F. 3d 320, 348–349 (CA4 2014). Here, the evidentiary showing would be substantially more complex and confusing. No one alleges that Dzhokhar participated in the Waltham murders, and, as the District Court reasonably concluded, the evidence available sheds little light on what role (if any) Tamerlan actually played. See App. 650. To make his point at sentencing, then, Dzhokhar would first have to show, without any surviving witnesses, what role Tamerlan actually played. Then, he would have to establish that he learned of the Waltham crimes before planning the bombings. Finally, he would have to explain how his knowledge of Tamerlan's role in a nearly 2-year-old violent robbery affected his own role in the bombings. Whatever other courts might think about an inquiry into a defendant's own prior bad acts, this District Court reasonably thought that the Waltham murder inquiry risked confusing the jury in these proceedings. We see no basis to disturb that conclusion.

### III

Dzhokhar Tsarnaev committed heinous crimes. The Sixth Amendment nonetheless guaranteed him a fair trial before an impartial jury. He received one. The judgment of the United States Court of Appeals for the First Circuit is reversed.

*It is so ordered.*

Cite as: 595 U. S. ____ (2022)          1

BARRETT, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–443

———————

## UNITED STATES, PETITIONER *v.*
## DZHOKHAR A. TSARNAEV

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[March 4, 2022]

JUSTICE BARRETT, with whom JUSTICE GORSUCH joins, concurring.

In this case, the First Circuit asserted "supervisory power" to impose a procedural rule on the District Court. Because that rule (which required a district court to ask media-content questions on request in high-profile prosecutions) conflicts with our cases (which hold that a district court has broad discretion to manage jury selection), I agree with the Court that the First Circuit erred.

I write separately to note my skepticism that the courts of appeals possess such supervisory power in the first place. Article III's grant of "[t]he judicial Power" imbues each federal court with the inherent authority to regulate its *own* proceedings. U. S. Const., Art. III, §1; *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 43 (1991) ("It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others'" (quoting *United States* v. *Hudson*, 7 Cranch 32, 34 (1812))). This authority permits federal courts to handle a range of matters, big and small, that fall in the gaps of governing statutes and formally adopted procedural rules. See, *e.g.*, *Link* v. *Wabash R. Co.*, 370 U. S. 626 (1962) (a district court can dismiss a case *sua sponte* for failure to prosecute);

2                 UNITED STATES *v.* TSARNAEV

BARRETT, J., concurring

*Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U. S. 238
(1944) (a court of appeals can vacate its judgment upon dis-
covering fraud). But here, the First Circuit did not adopt a
rule regulating its own proceedings—it adopted a blanket
rule that all district courts in its jurisdiction must follow on
pain of reversal.

In fairness to the First Circuit, we have suggested that
the courts of appeals possess authority to dictate procedural
rules for district courts. See, *e.g.*, *Cuyler* v. *Sullivan*, 446
U. S. 335, 346, n. 10 (1980) (citing Courts of Appeals deci-
sions requiring district courts to inquire into potential con-
flicts of interest and referring to this as "a desirable prac-
tice"); *Cupp* v. *Naughten*, 414 U. S. 141, 146 (1973)
(suggesting in dicta that a court of appeals may require a
district court "to follow procedures deemed desirable from
the viewpoint of sound judicial practice although in nowise
commanded by statute or by the Constitution").\* Under-
standably, then, the First Circuit followed our lead. But
before we go further down this road, we should reexamine
the map. Not only have we failed to identify a source for

———————

\*In dissent, JUSTICE BREYER asserts that "our precedents clearly rec-
ognize the existence of" the courts of appeals' supervisory power. *Post*,
at 17. But the cases cited by JUSTICE BREYER reflect our sometimes im-
precise use of the term "supervisory power." Rather than using the term
to refer to a court of appeals' authority to impose procedures on an infe-
rior court, two of the cited cases use it to refer to a court's power to "su-
pervise" its *own* proceedings. See *Ortega-Rodriguez* v. *United States*, 507
U. S. 234, 249–250 (1993) (addressing a court of appeals' ability to dis-
miss an appeal of a former fugitive); *Thomas* v. *Arn*, 474 U. S. 140, 142
(1985) (a court of appeals may "establish a rule that the failure to file
objections to the magistrate's report waives the right to appeal the dis-
trict court's judgment"). And in the third case, *United States* v. *Hasting*,
461 U. S. 499 (1983), the Court operated on the assumption that the
Court of Appeals had exercised "its supervisory powers to discipline *the
prosecutors* of its jurisdiction," not to regulate district courts. *Id.*, at 505
(emphasis added). The bottom line is that these cases do not address,
much less endorse, the kind of supervisory authority that the First Cir-
cuit asserted here.

BARRETT, J., concurring

this supposed authority, it is unclear that any exists.

To be sure, *this* Court has squarely asserted supervisory power to regulate procedure in lower federal courts. See *McNabb* v. *United States*, 318 U. S. 332 (1943). While we have not justified this power either, it has an at least arguable basis: the Constitution's establishment of this Court as "supreme," as distinct from the "inferior Courts" that Congress has discretion to create. Art. III, §1. Much like the grant of "[t]he judicial Power" carries with it inherent authority over local procedure, this Court's designation as "supreme" might carry with it some inherent authority to prescribe procedural rules for inferior federal courts. But see *ante*, at 11, n. 1. In the end, this argument might be unsupported by the Constitution's structure and history. Still, the text of Article III makes it plausible.

Yet whatever the status of this Court's supervisory authority, it is difficult, if not impossible, to find any comparable constitutional hook for such power in the courts of appeals. Nor does any statute grant them this general authority. And while it is tempting to roll supervisory authority into the power of appellate review, the two are analytically distinct. A court engaged in appellate review in this context determines whether a lower court exceeded its inherent authority to make a procedural choice. A court asserting supervisory authority imposes its own procedural choice on the lower court. In other words, supervisory authority is not necessarily a lesser included power of appellate review.

This case does not require us to resolve whether the courts of appeals have supervisory authority over district courts. Either way, the First Circuit erred. At some point in the future, however, it would be worth revisiting our dicta.

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–443

_____

## UNITED STATES, PETITIONER *v.*
## DZHOKHAR A. TSARNAEV

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[March 4, 2022]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join except as to Part II–C, dissenting.

During the sentencing phase of his murder trial, Boston Marathon bomber Dzhokhar Tsarnaev argued that he should not receive the death penalty primarily on the ground that his older brother Tamerlan took the leading role and induced Dzhokhar's participation in the bombings. Dzhokhar argued that Tamerlan was a highly violent man, that Tamerlan radicalized him, and that Dzhokhar participated in the bombings because of Tamerlan's violent influence and leadership. In support of this argument, Dzhokhar sought to introduce evidence that Tamerlan previously committed three brutal, ideologically inspired murders in Waltham, Massachusetts. The District Court prohibited Dzhokhar from introducing this evidence. The Court of Appeals held that the District Court abused its discretion by doing so. 968 F. 3d 24, 73 (CA1 2020).

This Court now reverses the Court of Appeals. In my view, the Court of Appeals acted lawfully in holding that the District Court should have allowed Dzhokhar to introduce this evidence. See *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion) (criminal defendant charged with capital crime has constitutional right to present "any aspect of [his] character or record and any of the circumstances of

the offense that the defendant proffers as a basis for a sentence less than death"); *Eddings* v. *Oklahoma*, 455 U. S. 104, 110 (1982) (adopting *Lockett*'s plurality rule). Consequently, I dissent.

## I

During the guilt phase of Dzhokhar's trial, Dzhokhar acknowledged that he participated in the Boston Marathon bombings. He conceded that he and his older brother Tamerlan planted bombs along the route of the Patriot's Day Marathon and that the bombs killed or injured many innocent people. Given Dzhokhar's concession, his trial focused almost exclusively on sentencing, in particular whether Dzhokhar should receive the death penalty. Dzhokhar argued in mitigation that his conduct was less serious than Tamerlan's and that Tamerlan's radicalizing influence was a major reason that Dzhokhar participated in the bombings. See *Sears* v. *Upton*, 561 U. S. 945, 950 (2010) (*per curiam*) (older brother's criminal record and introduction of defendant "to a life of crime" supported mitigation theory that defendant "may have desired to follow in the footsteps" of his older brother); *Lockett*, 438 U. S., at 608 ("defendant's comparatively minor role in the offense" is relevant mitigating factor).

In support of this theory, the District Court allowed Dzhokhar to argue that: (1) Dzhokhar "acted under the influence of his older brother" Tamerlan; (2) Dzhokhar "would not have committed the crimes but for [his] older brother Tamerlan"; (3) Dzhokhar "was particularly susceptible to his older brother's influence," "[w]hether because of Tamerlan's age, size, aggressiveness, domineering personality, privileged status in the family, traditional authority as the eldest brother, or other reasons"; (4) Tamerlan "planned, led, and directed the Marathon bombing"; and (5) Tamerlan "became radicalized first, and then encouraged his younger brother to follow him." App. 614, 616 (boldface omitted).

BREYER, J., dissenting

The District Court also allowed Dzhokhar to introduce certain evidence in support of this mitigation theory. This included evidence that Tamerlan had behaved aggressively in the past, and that Dzhokhar looked up to Tamerlan. But the court did not allow Dzhokhar to introduce evidence of Tamerlan's participation in the Waltham murders.

The "Waltham murders" refers to the killing of three drug dealers in Waltham, Massachusetts. The murders took place on September 11, 2011, the 10th anniversary of the 9/11 terrorist attacks, and about a year and a half before the Boston Marathon bombings. The evidence relating to the Waltham murders came primarily from FBI agent interviews of Ibragim Todashev, a friend of Tamerlan's. During the FBI interviews, Todashev (who attacked the agents and was killed midinterview) initially denied participating in the murders but later said that he and Tamerlan had committed them.

In particular, Todashev said that it was Tamerlan's idea to rob the drug dealers, one of whom was Tamerlan's close friend. Todashev said that they both went to the drug dealers' house, threatened the drug dealers at gun point, bound them with duct tape, and searched the house for money. Tamerlan then beat up the dealers and, in an attempt to get more money, threatened to stab them. Todashev also said that Tamerlan insisted on killing the drug dealers (even though Todashev "'begged him not to'"), and that Todashev, feeling like he had no "way out," waited outside the house while Tamerlan slit their throats. *Id.*, at 915, 948. Finally, Todashev said that Tamerlan called him back inside to help clean up after the drug dealers were dead and that the two left with about $40,000 of stolen money.

The FBI relied on Todashev's statements to obtain a search warrant for Tamerlan's car, which agents believed was the car used to drive to and from the drug dealers' house. An FBI affidavit attached to the search warrant request stated that Todashev had

"confessed that he and Tamerlan participated in the Waltham murders. He said that he and Tamerlan had agreed initially just to rob the victims, whom they knew to be drug dealers . . . . Todashev said that Tamerlan had a gun, which he brandished to enter the residence. Tamerlan decided that they should eliminate any witnesses to the crime, and then Todashev and Tamerlan bound the victims, who were ultimately murdered." *Id.*, at 998.

Based on this and other less significant evidence, the FBI agent asserted that there was "probable cause to believe that Todashev and Tamerlan planned and carried out" the Waltham Murders. *Id.*, at 996. A federal judge agreed, and issued a warrant.

Other evidence uncovered during the FBI's investigation of the Boston Marathon bombings also related to the Waltham murders. Dias Kadyrbayev, a friend of Dzhokhar's, stated that a few months before the bombings Dzhokhar learned of Tamerlan's involvement in the Waltham murders. Kadyrbayev said that Dzhokhar described Tamerlan's participation in the murders as "'commit[ting] jihad.'" *Id.*, at 584. Investigators also found al Qaeda propaganda on Tamerlan's computer that advocated stealing money from non-Muslims as a way to support jihadist principles.

Dzhokhar was prohibited from introducing any of this evidence during the sentencing phase of his trial. At the end of his sentencing proceeding, and without hearing any evidence about the Waltham murders, eight jurors found that Tamerlan had become radicalized before Dzhokhar and encouraged Dzhokhar to follow his example. *Id.*, at 616. Three found that Tamerlan planned, led, and directed the bombings. *Id.*, at 614. Three also found that Dzhokhar acted under Tamerlan's influence, that he was particularly susceptible to Tamerlan's influence, and that he would not have committed the bombings but for Tamerlan. *Ibid.* The

BREYER, J., dissenting

jury nonetheless unanimously recommended the death penalty for Dzhokhar in respect to those counts involving the bomb that he himself—and he alone—had placed. The District Court then sentenced Dzhokhar to death.

Dzhokhar appealed. As the Court explains, the Court of Appeals held that the District Court had to conduct a new sentencing proceeding for two independent reasons. *Ante*, at 7. First, the trial court had not adequately questioned potential jury members about the content of the pretrial publicity they had seen. Second, the trial court did not permit Dzhokhar to introduce evidence about the Waltham murders during the sentencing phase of his trial. I disagree with the Court's decision (and I agree with the Court of Appeals) at least as to the second reason.

## II

### A

The Federal Death Penalty Act sets forth the legal standards governing the admissibility of mitigating evidence during a capital sentencing. See 18 U. S. C. §3591 *et seq.* The statute provides an admissibility standard unique to death penalty cases. It says that in death penalty sentencing proceedings, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor." §3593(c). And that is so whether that "information" is or is not admissible "under the rules governing admission of evidence at criminal trials." *Ibid.* The statute also provides that a trial court "may" exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Ibid.*

As the majority points out, district courts have significant discretion in deciding how to apply and weigh the statute's factors. *Ante*, at 13–14. But "abuse-of-discretion review is not toothless; and it is entirely proper for a reviewing court

to find an abuse of discretion when important factors . . . are 'slighted.'" *Gall* v. *United States*, 552 U. S. 38, 72 (2007) (ALITO, J., dissenting) (quoting *United States* v. *Taylor*, 487 U. S. 326, 337 (1988)); see also *American Paper Institute, Inc.* v. *American Elec. Power Service Corp.*, 461 U. S. 402, 413 (1983) (to decide whether action was abuse of discretion, "we must determine whether the [court] adequately considered the factors relevant" to the question); *Highmark Inc.* v. *Allcare Health Management System, Inc.*, 572 U. S. 559, 564, n. 2 (2014) ("The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's . . . clearly erroneous assessment of the evidence" (internal quotation marks omitted)). And here, we review for abuse of discretion in the context of "a matter so grave as the determination of whether a human life should be taken or spared." *Gregg* v. *Georgia*, 428 U. S. 153, 189 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). I therefore apply the standard with care. Cf. *id.,* at 187 ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed"); *Zant* v. *Stephens*, 462 U. S. 862, 885 (1983) ("[T]he severity of the [capital] sentence mandates careful scrutiny in the review of any colorable claim of error").

The District Court here excluded the Waltham evidence for the following four reasons:

> "[T]here simply is [1] insufficient evidence to describe what participation Tamerlan may have had in those events. . . . From my review of the evidence, . . . it is as plausible, which is not very, that Todashev was the bad guy and Tamerlan was the minor actor. There's just no way of telling who played what role, if they played roles. So it simply would be [2] confusing to the jury and [3] a waste of time, I think, without very—[4] without any probative value." App. 650.

I have reviewed the record keeping in mind the reasons the

BREYER, J., dissenting

District Court gave: (1) no probative value; (2) insufficient evidence to corroborate Tamerlan's role in the murders; (3) waste of time; and (4) jury confusion. Reading the record in light of these factors, I believe that the Court of Appeals was correct that the District Court abused its discretion by excluding the Waltham evidence. The record does not adequately support exclusion for the District Court's stated reasons.

Consider the factors that the District Court directly and indirectly took into account.

### 1. Relevance/Probative Value

The District Court was wrong when it described the Waltham evidence as lacking "any probative value." The evidence met the "threshold for relevance" applicable here. *Tennard* v. *Dretke*, 542 U. S. 274, 285 (2004); *id.,* at 284 ("Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value" (internal quotation marks omitted)). And it possessed probative value.

The Waltham evidence tended to show that Tamerlan was involved in a brutal triple murder, possibly over Todashev's objections, a year and a half before the bombings. The evidence tended to show that Tamerlan committed these murders for ideological reasons. This is true (though to a lesser degree) even if Tamerlan played a secondary, rather than the primary, role in the Waltham killings. Evidence that Tamerlan participated in (and potentially orchestrated) one set of ideologically motivated murders in 2011 supports the claim that Tamerlan was the violent, radicalizing force behind the ideologically motivated bombings a year and a half later.

### 2. Corroboration/Reliability

The Waltham evidence was corroborated and sufficiently

BREYER, J., dissenting

reliable to warrant presentation to the jury. Dzhokhar's friend Kadyrbayev said that Dzhokhar believed Tamerlan was involved in the Waltham killings. Kadyrbayev also said that Dzhokhar told him that Tamerlan "had committed jihad" in Waltham. Relatedly, Tamerlan had al Qaeda propaganda on his computer that advocated stealing money from non-Muslims as a way to support jihadist principles. There was also evidence that a week or so after the Waltham killings, someone ran internet searches on Tamerlan's wife's computer for "3 men killed in Waltham," "men kill in Waltham," and "tamerlan tsarnaev." App. 590. Tamerlan's wife also confirmed that Tamerlan was close friends with one of the drug dealers, and there was evidence that Tamerlan did not attend that friend's funeral, which some thought strange given their close relationship.

Further, the Waltham evidence was sufficiently reliable for the Government to conclude (via FBI affidavit) that it helped to establish probable cause that Tamerlan committed the Waltham murders. It was reliable enough for a federal judge to issue a search warrant for Tamerlan's car to look for evidence of those murders. It is of course true, as the majority points out, that the District Court was free to make an independent assessment of the reliability of the evidence. *Ante,* at 17–18. But the fact that both the Government and a federal judge found the evidence sufficiently reliable to establish probable cause that Tamerlan committed the murders strongly suggests that the District Court here abused its discretion in concluding that the same evidence was so *unreliable* that Dzhokhar could not use it as mitigating evidence to establish the same proposition. Cf. *Florida* v. *Harris*, 568 U. S. 237, 243 (2013) (probable cause exists when facts "would warrant a person of *reasonable caution* in the belief that contraband or evidence of a crime is present" (internal quotation marks and brackets omitted; emphasis added)).

BREYER, J., dissenting

### 3. Waste of Time/Need

The Waltham evidence was not simply cumulative of other mitigation evidence. And it was critically important to Dzhokhar's mitigation defense. Apart from the Waltham evidence, the evidence of Tamerlan's aggressive nature and violent tendencies consisted of evidence showing (1) that Tamerlan physically abused his then-girlfriend (later wife); (2) that he twice became disruptive and shouted at an Imam during prayers; (3) that he poked someone in the chest during an argument; (4) that he punched a man in the street after the man said something Tamerlan did not like; (5) that Tamerlan yelled at a local butcher who was selling halal turkey for Thanksgiving; and (6) that Tamerlan was disruptive at his boxing gym. Participation in a robbery and triple murder is much stronger evidence of Tamerlan's violent nature than any of these incidents. Cf. *Skipper* v. *South Carolina*, 476 U. S. 1, 8 (1986) (reversible error where excluded mitigating evidence had "greater weight" than evidence supporting same mitigating factors).

Similarly, the evidence introduced to show Tamerlan's influence over Dzhokhar consisted of evidence showing (1) their age difference (Tamerlan was 26 at the time of the bombings, Dzhokhar 19); (2) the fact that Dzhokhar looked up to and followed his older brother; (3) that in the brothers' Chechen culture, Tamerlan, as the older sibling, held a position of authority and superiority vis-à-vis Dzhokhar; (4) that Tamerlan sent Dzhokhar articles containing extremist propaganda; and (5) that Tamerlan traveled to Russia in 2012 as part of an unsuccessful effort to wage "jihad." But the Waltham evidence showed (if the jury believed Todashev's account) that Tamerlan had previously exerted such influence over Todashev as to make him an unwilling accomplice to a triple murder. This is much stronger evidence of Tamerlan's capacity to influence than any evidence that the jury heard.

BREYER, J., dissenting

 Moreover, Dzhokhar had particular need for the Waltham evidence in the context of his sentencing. As both counsel emphasized during closing argument, the critical mitigation issue was the two brothers' comparative responsibility. Dzhokhar's counsel argued, for example, that "if not for Tamerlan, this wouldn't have happened. Dzhokhar would never have done this but for Tamerlan." App. 839–840. The prosecution similarly told the jury that "the bulk of [Dzhokhar's] mitigation case comes down to a single proposition: 'His brother made him do it.'" *Id.*, at 857. The prosecution also told the jury that it should reject this proposition because Dzhokhar's mitigation evidence merely showed that Tamerlan was "loud," "bossy," and "sometimes lost his temper." *Id.*, at 861, 864. Would the prosecution have made the same argument had the evidence required it to add, "and perhaps slit the throats of three people"? Cf. *Clemons* v. *Mississippi*, 494 U. S. 738, 753 (1990) (erroneous jury instruction reversible error where "repeatedly emphasized and argued" by prosecution); *Skipper*, 476 U. S., at 5, n. 1 (exclusion of evidence reversible error when evidence related to issue "underscored . . . by the prosecutor's closing argument").

 The prosecution went on to argue that Tamerlan and Dzhokhar were "equals," and that it was only once Dzhokhar "made the decision to become a terrorist, that Tamerlan was able to go into action." App. 873–874. Would the prosecution have made that same claim in the face of evidence that Tamerlan had taken "action" a year and a half before the bombings, on the anniversary of 9/11, and that Dzhokhar characterized this action as "jihad"? The excluded evidence went to the heart of these critical sentencing issues.

### 4. Jury Confusion

 In my view, the District Court's strongest reason for ex-

BREYER, J., dissenting

cluding the Waltham evidence, and the majority's best argument for reversing the Court of Appeals, is that admitting the evidence might have confused the jurors by prompting a "minitrial" about what actually happened in Waltham and what role Tamerlan played. The Federal Death Penalty Act says that a court "may" exclude relevant evidence "if its probative value is outweighed by the danger of . . . confusing the issues, or misleading the jury." §3593(c). Given the trial judge's discretionary authority to admit or exclude evidence, could the possibility of juror confusion overcome the pro-admission factors I have so far discussed? Two reasons convince me that it could not, and that, concerns about jury confusion notwithstanding, the District Court abused its discretion by excluding the evidence.

First, death penalty proceedings are special. Unlike evidentiary determinations made in other contexts, a trial court's decision to admit or exclude evidence during a capital sentencing proceeding is made against the backdrop of a capital defendant's constitutional right to argue against the death penalty. See *Tennard*, 542 U. S., at 285 ("[T]he Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence" (internal quotation marks omitted)). So, although the Federal Death Penalty Act incorporates some of the features that ordinarily guide a trial judge's discretionary decision to admit or exclude evidence, see Fed. Rule Evid. 403, it also provides a special admissibility standard unique to the capital sentencing context. Specifically, the statute says that "information may be presented as to *any* matter relevant to the sentence, including any mitigating or aggravating factor," regardless of whether that information would be admissible under normal evidentiary rules. §3593(c) (emphasis added). The statute thus tips the balance in favor of admitting mitigating evidence, even if ad-

mission means increasing the length of a proceeding by inviting some "minitrials" over subsidiary issues. Cf. *McKoy* v. *North Carolina*, 494 U. S. 433, 442 (1990) ("The Constitution *requires* States to allow consideration of mitigating evidence in capital cases"); see also *Smith* v. *Texas*, 543 U. S. 37, 44 (2004) (*per curiam*). This weighted scale makes sense in the context of capital proceedings, in a way it would not make sense in run-of-the-mill evidentiary disputes, "[g]iven that the imposition of death . . . is so profoundly different from all other penalties." *Lockett*, 438 U. S., at 605 (plurality opinion). Indeed, because "the penalty of death is qualitatively different from" all other punishments, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion). And a jury's decision to impose the death penalty is more reliable if it is made after considering relevant mitigation evidence that counsels against imposing such a sentence. See *Lockett*, 438 U. S., at 605 (emphasizing the need in capital cases to give "independent mitigating weight to aspects of the . . . circumstances of the offense proffered in mitigation").

At the same time, a trial judge normally can control the presentation of evidence to avoid unwarranted detours and to ensure a trial does not extend beyond reasonable limits. See, *e.g.,* Fed. Rule Evid. 105 (court can instruct jury that it may consider evidence for one purpose but not another); *Geders* v. *United States*, 425 U. S. 80, 86–87 (1976) ("Within limits, the judge . . . may refuse to allow cumulative, repetitive, or irrelevant testimony, and may control the scope of examination of witnesses" (citations omitted)). In the context of capital sentencing, then, concerns about juror "waste of time" or the risk of "confusion" are less justifiable bases on which to exclude an entire category of evidence that may have significant mitigating value.

Breyer, J., dissenting

Second, and perhaps of greater importance, a sampling of other death penalty proceedings indicates that the prosecution often introduces evidence of a defendant's prior criminal behavior in support of the death penalty, including evidence that poses a similar risk of jury confusion. Trial judges admit this evidence under the same admissibility standard that governs the admission of mitigating evidence. See §3593(c) (governing admissibility of evidence supporting "aggravating," as well as "mitigating," factors). And trial courts admit this evidence not because the defendant's past criminal behavior is directly relevant to the crime at issue but because it supports an "aggravating" death-penalty-related factor such as a defendant's risk of future dangerousness. If courts admit evidence of past criminal behavior, unrelated to the crime at issue, to show aggravating circumstances, why should they not do the same to show mitigating circumstances?

Moreover, capital sentencing courts routinely admit this kind of evidence even if the past criminal behavior did not result in formal charges or convictions (and thus has not been proved to a jury or judge). See, *e.g., United States* v. *Gabrion*, 719 F. 3d 511, 518 (CA6 2013) (District Court admitted evidence of defendant's "likely role in the disappearance (and presumably murder) of three other people"); *United States* v. *Runyon*, 707 F. 3d 475, 504–505 (CA4 2013) (District Court did not abuse its discretion in admitting evidence of defendant's assault charges that were later dismissed); *United States* v. *Snarr*, 704 F. 3d 368, 395 (CA5 2013) (District Court admitted evidence that defendant "participated in a drive-by shooting and allegedly murdered a man"); *United States* v. *Lighty*, 616 F. 3d 321, 341 (CA4 2010) (District Court admitted evidence that defendant was involved in driveby shooting for which he was never charged); *United States* v. *Brown*, 441 F. 3d 1330, 1368 (CA11 2006) (District Court admitted evidence that "defendant has committed an array of other criminal acts,

some but not all of which have resulted in conviction").

Further, trial courts admit this evidence despite claims that the evidence is not reliable (thus risking "minitrials"). See, *e.g., United States* v. *Coonce*, 932 F. 3d 623, 641 (CA8 2019); *United States* v. *Umaña*, 750 F. 3d 320, 348–349 (CA4 2014); *United States* v. *Hager*, 721 F. 3d 167, 201 (CA4 2013); *United States* v. *Higgs*, 353 F. 3d 281, 323 (CA4 2003).

The evidentiary showing Dzhokhar attempted to make here was not, as the majority asserts, any more complex or confusing than the evidentiary showing the Government makes in these situations. Cf. *ante,* at 20. To the contrary, just as the Government introduces evidence of a defendant's prior unproved bad conduct to show a defendant's dangerousness, so too did Dzhokhar seek to introduce evidence of Tamerlan's prior unproved bad conduct to show Tamerlan's dangerousness. The fact that the evidence was about Tamerlan's character instead of Dzhokhar's did not render the evidence beyond the jury's ability to comprehend. The District Court implicitly recognized as much when it allowed Dzhokhar to introduce other evidence of Tamerlan's past conduct—conduct in which Dzhokhar did not participate.

Indeed, this Court has rejected concerns that distracting minitrials should preclude *the Government* from introducing evidence about a nondefendant third party to show aggravation. See *Payne* v. *Tennessee*, 501 U. S. 808, 823 (1991) (rejecting reasoning that victim impact evidence should be excluded from sentencing proceeding because it would "creat[e] a mini-trial on the victim's character" (internal quotation marks omitted)). Why then should the same concern preclude *a defendant* from introducing similar evidence in mitigation? After all, the Government, unlike a defendant, has no constitutional right to present evidence during a capital sentencing proceeding. Cf. *Tennard*, 542 U. S., at 285 ("[T]he Eighth Amendment requires that

BREYER, J., dissenting

the jury be able to consider and give effect to a capital defendant's mitigating evidence" (internal quotation marks omitted)).

I conclude, then, that the reasons the District Court gave do not justify excluding the Waltham murder evidence, and it was an abuse of discretion to do so. Nor was the exclusion harmless. See §3595(c)(2)(C) (death sentence can be vacated if Government fails to prove beyond a reasonable doubt that an error was harmless). Dzhokhar conceded his guilt. The only issue was whether he deserved to die. Tellingly, the jury's nuanced verdict reflected close attention to the relationship between the brothers: The jury did not recommend the death penalty for the charges related to the actions Dzhokhar took together with Tamerlan, and only recommended death for the charges related to the actions Dzhokhar took alone. The Waltham evidence supported Dzhokhar's theory that Tamerlan's violent and radicalizing influence induced *all* of the actions Dzhokhar took in connection with the Boston Marathon bombings. This evidence may have led some jurors to conclude that Tamerlan's influence was so pervasive that Dzhokhar did not deserve to die for any of the actions he took in connection with the bombings, even those taken outside of Tamerlan's presence. And it would have taken only one juror's change of mind to have produced a sentence other than death, even if a severe one. See §3593(e) (death verdict must be unanimous).

B

Three courts including this Court have now examined this record with care. Why? Why are appellate courts so deeply involved in what is, after all, a trial-based evidentiary matter? The reason, in my view, lies in part in the nature of the underlying proceeding. It is a death penalty proceeding. And where death is at stake, the courts (and Congress) believe that particular judicial care is required. See §3593 (detailing unique procedures applicable to the

"[s]pecial hearing to determine whether a sentence of death is justified" (boldface omitted)); Cf. *Kyles* v. *Whitley*, 514 U. S. 419, 422 (1995) ("[O]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case" (internal quotation marks omitted)); *Zant*, 462 U. S., at 885 ("[T]he severity of the [death] sentence mandates careful scrutiny in the review of any colorable claim of error"); *Gregg*, 428 U. S., at 187 (joint opinion) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed"); *Glossip* v. *Gross*, 576 U. S. 863, 937 (2015) (BREYER, J., dissenting) ("[I]t is difficult for judges, as it would be difficult for anyone, *not* to apply legal requirements punctiliously when the consequences of failing to do so may well be death"). That same care applies on abuse-of-discretion review, just as it does for any other standard. The extra time that close examination takes is part of the procedural price that a judicial system allowing the death penalty will inevitably exact.

### C

I have written elsewhere about the problems inherent in a system that allows for the imposition of the death penalty. See, *e.g., id.*, at 909–938. This case provides just one more example of some of those problems.

### III

In my view, the Court of Appeals was correct in its Waltham evidence conclusion. For that reason, the District Court should conduct a new sentencing proceeding. I need not, and do not, reach the pretrial publicity question. I note, however, that when considering that issue, the Court refers to the power of the federal appeals courts to promulgate supervisory rules. See *ante*, at 11. Like the Court (and JUSTICE BARRETT), I recognize that the Government "does not challenge the general existence of the Court of Appeals'

BREYER, J., dissenting

supervisory power." *Ibid.,* n. 1. I would add that our precedents clearly recognize the existence of such a power. See, *e.g., Thomas* v. *Arn*, 474 U. S. 140, 146 (1985) ("It cannot be doubted that the courts of appeals have supervisory powers that permit, at the least, the promulgation of procedural rules governing the management of litigation"); *United States* v. *Hasting*, 461 U. S. 499, 505 (1983) ("[I]n the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress"). I would also add that "[o]ur review of rules adopted by the courts of appeals" pursuant to this power "is limited in scope." *Ortega-Rodriguez* v. *United States*, 507 U. S. 234, 244 (1993). And I do not find that surprising. A degree of authority for the courts of appeals, closer to the fray, to issue at least some supervisory rules facilitates the flexibility needed in our geographically dispersed multicircuit system.

\*          \*          \*

For these reasons, with respect, I dissent.