UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 13-cr-10200-GAO |
| | FILED UNDER SEAL |
| DZHOKHAR TSARNAEV | |

**DEFENDANT DZHOKHAR TSARNAEV'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RECUSAL AND FOR DISCLOSURE**

On behalf of Dzhokhar Tsarnaev, the defense submits this memorandum of law in support of its motion for recusal and disclosure. This Court should: (i) recuse itself; and (ii) if it declines to do so on the basis of the record currently available to the defense, disclose the dates, circumstances, and substance of all public comments that Your Honor has made about this case, as well as the dates, circumstances, and substance of all ex parte communications with the jurors, pursuant to 28 U.S.C. §§ 455(a) and 455(e), the Fifth Amendment's Due Process Clause, and the Eighth Amendment's Cruel and Unusual Punishments Clause.

Over the past eight years, during the pendency of Mr. Tsarnaev's appeal, Your Honor has made multiple public statements about this case. These statements have come in various settings (for example, panel discussions and a podcast), and have concerned matters with direct relevance to the remand proceedings, including the adequacy of the jury selection process, the seated jurors' compliance with this Court's instructions, their ultimate fitness to serve, and the fundamental fairness of this capital prosecution. Among other remarks, Your Honor has praised the seated jurors' "remarkable" "public-spiritedness," assured audiences that Mr. Tsarnaev received a "fully fair" trial, and said that Your Honor has no "lingering questions or doubts" about the "trial outcome"—a death sentence. These statements contravened Canon 3(A)(6) of the

1

Code of Conduct for United States Judges, which generally bars "public comment on the merits of a matter pending or impending in any court." They ran afoul of In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001), which granted mandamus and held that comments far more innocuous than these compelled disqualification under § 455(a). And they violated the constitutional imperative that a judge—especially one presiding over a capital case—satisfy the appearance of impartiality. See, e.g., In re Murchison, 349 U.S. 133, 136 (1955). This Court should therefore recuse itself.

If the Court declines to recuse itself on the existing record available to the defense, this Court should provide to the parties the dates, circumstances, and substance of any other public comments that Your Honor has made about this case, as well as any ex parte communications with the jurors, pursuant to § 455(e), which "requires full disclosure by the judge" of potential bases for disqualification. United States v. Sampson, 148 F. Supp. 3d 75, 116 (D. Mass. 2015). Disclosure is necessary so that the parties can make a fully informed assessment of the need for recusal, so that Mr. Tsarnaev is assured a constitutionally adequate opportunity to litigate this issue, and so that the public can have "confidence in the integrity of the judicial process" in this case. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 858 n.7 (1988).

## RELEVANT BACKGROUND

1.    Mr. Tsarnaev was charged with 30 offenses arising from the 2013 Boston Marathon bombing. DE.58. During jury selection, the defense moved to strike Jurors 138 and 286 for cause, or in the alternative, for further voir dire, on the basis of discrepancies between the jurors' social media posts and their voir dire responses. See United States v. Tsarnaev, 96 F.4th 441, 452, 460–61 (1st Cir. 2024). This Court denied the motions and seated both jurors. See id.

at 452, 461. The jury convicted Mr. Tsarnaev and sentenced him to death. See id. at 446. He filed

a notice of appeal on January 29, 2016. DE.1628.

2.      While the appeal was pending, Your Honor discussed the case in several public

appearances. After diligent research, the defense has identified the following:

April 6, 2016. Your Honor participated in a panel discussion at Boston College Law

School attended by the public and the media. See Phillip Martin, Tsarnaev Trial Judge Revisits

Issues of Race, the Death Penalty, and Fairness, WGBH.org (April 7, 2016),

https://www.wgbh.org/news/local/2016-04-07/tsarnaev-trial-judge-revisits-issues-of-race-the-

death-penalty-and-fairness. Drawing on this Court's experience in this case and United States v.

Mehanna, No. 09-cr-10017-GAO (D. Mass.), Your Honor addressed "issues regarding the trial

management that arise in what we might call high-profile cases, and particularly issues affecting

jury management." See Exh. A (April 6, 2016 Tr.), at 2. Specifically, Your Honor explained

"how in the two cases we managed the mechanics and logistics of the trials to assure that the

defendant, in each case, was given what the Sixth Amendment guarantees, a public trial that is

fully fair." Id. at 2 (emphasis added). Your Honor described jury selection in detail, including the

layout and seating arrangements in the main and overflow courtrooms; issuing summonses to

prospective jurors and having them complete questionnaires; and conducting individual voir dire

sufficient to yield 75 provisionally qualified jurors. See id. at 4–6.

Your Honor then turned to issues that have now taken center stage—the jurors' fitness to

serve, in particular in light of their exposure to prejudicial information on social media. Your

Honor began with effusive praise for the jurors in this case: "I have to say, by the way, I'll just

take this opportunity to say, the public-spiritedness of these jurors was remarkable throughout,

both the ones who were selected and the ones who were not." Id. at 6 (emphases added). As to

social media, Your Honor observed: "[J]urors' use of social media is a concern for courts everywhere. There is a danger that jurors will either do independent research on issues, or people, in the case, or that they will be involuntarily subjected by others, like Facebook friends, to improper information, which they shouldn't have." Id. (emphasis added). This is the very circumstance that prompted the defense's motion to strike Juror 138, as well as the First Circuit's remand order: Juror 138 falsely stated that none of his Facebook friends had been "commenting about this trial" when, in fact, one of them had urged him: "Play the part so u get on the jury then send him to jail where he will be taken care of." Tsarnaev, 96 F.4th at 451, 458. Similarly, social media use was central to the defense's motion to strike Juror 286, and to the Circuit's decision to remand. Among other things, she falsely denied having viewed, tweeted, and retweeted Twitter posts about the bombings, one of which called Mr. Tsarnaev a "piece of garbage." Id. at 459–62.

Yet Your Honor told the Boston College Law School audience that this Court had ensured that no jurors in this case engaged in problematic social media activity: "We simply tell [the jurors] the importance of limiting their information that will be the basis for their verdict to what is formally offered in the trial. ... Every morning, we asked if they had avoided extraneous information, whether sought out or imposed by someone else. And every evening we reminded them of their commitment to abide by their duty. By the way, I have no doubt that the parties were at least spot-checking social media sites to watch for any indication of breach of duty, and we heard of none." Exh. A, at 6–7 (emphasis added). Your Honor expressed confidence in the jurors' compliance with its instructions:  "[B]eyond exhortation and constant reminders and maybe check-ups, appeals to their better natures, I'm not sure much can be done. We ask them to do their duty, and I think they do." Id. at 7 (emphasis added).

4

According to the WGBH.org article about the event (which does not include audio of this portion of the event), at the conclusion of Your Honor's prepared remarks, during a question-and-answer session, Your Honor "was asked if he has any lingering questions or doubts about the Boston Marathon Bombing trial outcome. He said no. He had moved on." Martin, supra.

To be sure, Your Honor prefaced Your Honor's remarks by stating: "I'm not going to talk about the merits of the Mehanna or the Tsarnaev cases. With respect to the latter in particular, I will not address the merits of any of the legal issues in the case. As you know, the case is in the very early stages of an appeal, and it would be very inappropriate for me to make any comments about any potential appellate issues." Exh. A, at 1–2. However, as just shown, Your Honor did discuss the merits of the issues now up for adjudication on remand. Your Honor opined that Mr. Tsarnaev had received a "fully fair" trial, such that Your Honor had no "lingering questions or doubts about the ... outcome." As to any seated jurors' "breach[es] of duty" involving exposure to prejudicial information on social media, Your Honor said that it had "heard of none. " The jurors, Your Honor "think[s]," "do their duty." Their "public-spiritedness" was "remarkable." At the very least, a reasonable person could understand these statements as opinions on the merits or as indicia of apparent partiality on the key issues of whether the jurors in question in fact "breach[ed] their duty" by falsely answering questions during voir dire, concealing expressions of bias against the defendant, and improperly engaging with case-related social media posts. See Boston's Children First, 244 F.3d at 168, 170 (requiring recusal even though "it [was] not at all clear that [the district judge] was commenting on the merits," because "the comments were sufficiently open to misinterpretation so as to create the appearance of partiality"); infra § I.B.

November 17, 2016. Your Honor participated in a panel discussion sponsored by the Administrative Office of the United States Courts. U.S. Courts, Knowledge Seminar—An Inside

Look at Jury Trials, https://www.youtube.com/watch?v=OEudQAY9c6Q. Your Honor was introduced as having handled "many cases, but very prominently, the Tsarnaev Marathon bomber case." Id. at 00:37–00:47. Once again, Your Honor expressed faith in jurors' compliance with the Court's instructions to avoid exposure to prejudicial information on social media: "[W]e impress upon them the need not to do any independent investigation, not to Google things, not to go on social media ... with respect to issues in the case. ... I often tell them they are actually being unfair not only to the parties but to each other if they go beyond the scope of the evidence. And by and large my experience has been jurors take their responsibility seriously and they try to do, to live by those guidelines." Id. at 35:00–35:38 (emphasis added). Your Honor also voiced sympathy for the seated jurors in this case, who "were exposed to some gruesome evidence and it was very powerful and very emotional." Id. at 45:50–46:00. Although "[b]y and large they handled it well," Your Honor recounted that this Court had taken the unusual step of "enter[ing] an administrative order continuing their service as jurors after the verdict had been rendered and they were formally discharged ... for a period of 90 days so that they would be eligible to take part in our Employee Assistance Program and to seek counseling and help if they needed it." Id. at 46:00–46:32. See also DE.1426. One of the other panelists noted that Your Honor had "gotten positive national attention for being so aware that these individuals who are doing a great service to the country and to Massachusetts needed that extra help. ... [I]t's something that the court system really needs to start paying attention to." Id. at 47:02–47:20.

May 12, 2023. A few months after the First Circuit heard oral argument for the second time on appeal—an argument during which the sole issue discussed was Mr. Tsarnaev's juror-misconduct claim—Your Honor appeared as a guest on the "Criminal" podcast, in an episode entitled "Did We Get It Right?" https://thisiscriminal.com/episode-218-did-we-get-it-right-5-12-

2023/. Your Honor was introduced as having "presided over the trial of Dzhokhar Tsarnaev, one of the two brothers who placed bombs near the finish line of the Boston Marathon." Exh. B (May 12, 2023 Tr.), at 4. As in Your Honor's prior public appearances, Your Honor vouched for jurors' compliance with instructions to avoid extraneous information: "[M]ostly, they take their work very seriously. And when we say that this is really important that you [confine] yourself only to what you've heard here in the courtroom and not on any private investigation you've done, any comments that other people have made, tell your family members you just can't talk about it. And they do. They follow through on it." Id. (emphases added). Your Honor also reprised the theme of the emotional impact of the evidence in this case on the jurors, noting the "autopsy pictures" of Martin Richard, which had been admitted because "the jury really had an obligation to understand the horror of the events." Id. at 6. Your Honor agreed with the host's observation that the jurors "ha[d] really been through the [w]ringer," and once again noted the 90-day counseling order, explaining: "Because of the emotional impact of the evidence that they'd seen and because we expected that when they no longer had each other, the jurors, they might be home by themselves and have memories of awful images that they've had .... And so we wanted to allow those people who thought it would be helpful to them to have some counseling about how to handle their emotions and their memories." Id. at 6–7.[1]

---

[1] Despite diligent efforts, the defense has not been able to obtain a transcript or recording of the full program on April 6, 2016, at Boston College Law School, only the audio clips available in the above-cited article, which do not include all of the question-and-answer session. Likewise, we have identified at least one other public presentation by Your Honor for which we not been able to obtain any transcript or recording: a November 7, 2017 presentation at the Harvard Club of Boston entitled "Current Issues Being Presented to the Judiciary for Decision." See https://www.harvardclub.com/wp-content/uploads/2017/10/November-Bulletin-2017-FINAL-Digital.pdf (p.6). These gaps in the evidentiary record, as well as the possible existence of other presentations or public comments of which we are not aware, form the basis for our request for additional disclosure. See infra § II.

3.      These extraordinary extrajudicial public expressions of affinity, praise, and solicitude align with actions and statements made in court. See, e.g., In re United States, 666 F.2d 690, 697 (1st Cir. 1981) (in case of "widespread" public interest, "tak[ing] one additional step and look[ing] at the judge's conduct at trial to see whether it reveals any grounds that might cause an observer to doubt his impartiality"); infra n.2. On March 3, 2015, after the parties had exercised their peremptory challenges but before the jury had been sworn, Your Honor met ex parte with the selected jurors and alternates and told them: "You and I are in this together. We're on the same side here." DE.1133, at 20. Your Honor said: "[T]he Supreme Court of the United States has a very interesting tradition. Before they go out on the bench to hear argument and before they conference a case, they all shake hands with each other, and I thought we'd do that because we're now teammates." DE.1133, at 22. Your Honor then shook the jurors' hands.

On May 15, 2015, after the jury returned the penalty-phase verdict of death, this Court praised the jurors: "The seriousness and responsibility with which you have performed your service as jurors should stand as a model for future juries." DE.1661, at 17. This Court continued: "Your service as jurors in this case has been the very antithesis of mob law. The issues have been thoroughly presented to you, and you have thoughtfully resolved them. Obviously, the facts and circumstances of this case arouse powerful emotions, but on behalf of a community seriously aggrieved, you have demonstrated convincingly that even in such circumstances, men and women of honesty and goodwill can set aside emotions and make careful, rational and solemn judgments about guilt or innocence and life or death. You can, you should, be justly proud of your service." DE.1661, at 17. And as Your Honor mentioned in two of the above-discussed appearances, this Court took the atypical step of continuing the jurors' service for 90 days so that they could receive counseling at federal expense.

On June 24, 2015, at the oral imposition of sentence, this Court again praised those seated jurors and alternates, by this point discharged, who had returned to court at Your Honor's invitation. This Court "[took] this occasion again to thank the now-former jurors for their exceptional service. ... [W]e asked them, as they acted to perform their high duty, to be utterly fair and impartial in their deliberations. Their careful verdict satisfies me that they did what they were asked to do." DE.1476, at 4. This Court continued: "That they performed their duty so well and faithfully came as no surprise to me. ... I had no doubt that we could select a jury for this case that would accept and perform their high duty conscientiously and justly. The proof is in the pudding"—i.e., the verdict convicting Mr. Tsarnaev and sentencing him to death. DE.1476, at 4.

## ARGUMENT

### I.    This Court Should Recuse Itself.

#### A.    Legal Framework

28 U.S.C. § 455(a) provides: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." See Code of Conduct for United States Judges, Canon 3(C)(1) (same). Section 455(a) "is automatic, mandatory, and self-executing." United States v. Chantal, 902 F.2d 1018, 1023 (1st Cir. 1990). Disqualification under § 455(a) is "appropriate" "when the charge is supported by a factual basis, and when the facts asserted 'provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.'" Boston's Children First, 244 F.3d at 167 (quoting In re United States, 666 F.2d at 695). Impartiality under § 455(a) is "evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." Liteky v. United States, 510 U.S. 540, 548 (1994) (emphasis in original); see also Chantal, 902 F.2d at 1023 (§ 455(a) "attacks the

appearance of bias, not just bias in fact"). "This general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case." H.R. Rep. 93–1453, 1974 U.S.C.C.A.N. 6351, 6355. District courts have discretion in deciding whether to recuse, but "should exercise that discretion with the understanding that, 'if the question of whether § 455(a) requires recusal is a close one, the balance tips in favor of recusal.'" Boston's Children First, 244 F.3d at 167 (quoting Nichols v. Alley, 71 F.3d 347, 352 (10th Cir. 1995)); see also United States v. Snyder, 235 F.3d 42, 46 (1st Cir. 2000) ("[The] duty to recuse and the duty to sit do not exert equal pull; in close cases, 'doubts ordinarily ought to be resolved in favor of recusal.'" (quoting In re United States, 158 F.3d 26, 30 (1st Cir. 1998))).

Similarly, the Fifth Amendment requires not just actual impartiality but the appearance of impartiality. "The Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, justice must satisfy the appearance of justice.'" Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986) (quoting Murchison, 349 U.S. at 136). The Eighth Amendment applies this constitutional imperative with particular rigor in capital cases. See, e.g., Rippo v. Baker, 580 U.S. 285, 287 (2017) (per curiam) (in capital case, reiterating that "the Due Process Clause may sometimes demand recusal even when a judge 'ha[s] no actual bias'" (quoting Aetna, 475 U.S. at 825)); Williams v. Pennsylvania, 579 U.S. 1, 14 (2016) (judge's personal involvement as prosecutor in earlier stage of capital case "gave rise to an unacceptable risk of actual bias" that "so endangered the appearance of neutrality that his

participation in the case 'must be forbidden if the guarantee of due process is to be adequately implemented'" (quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975))).

That is the general rule. When it comes to the precise issue here—Your Honor's public comments about this case—the canons and First Circuit precedent impose even tighter restrictions. Canon 3(A)(6) provides: "A judge should not make public comment on the merits of a matter pending or impending in any court," except that "[t]he prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education." The "admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete." Canon 3(A)(6) cmt. Moreover, where, as here, "the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2(A)." <u>Id.</u> Canon 3(A)(6) is "straightforward and easily understood." <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 112 (D.C. Cir. 2001). "[T]he Canon is clear in indicating that a judge never may discuss the merits of a pending case in a non-judicial forum, especially when he has reason to know that the parties to the litigation may appear before him again for further judgment in the case. Indeed, ... this principle is so straightforward and unequivocal under the Code of Conduct that its breach will almost always give rise to a legitimate claim for disqualification under section 455(a)." <u>In re Barry</u>, 946 F.2d 913, 917 (D.C. Cir. 1991) (Edwards, J., dissenting).

In <u>Boston's Children's First</u>, the First Circuit, applying § 455(a) and Canon 3(A)(6), granted mandamus and required a district court to recuse itself based on comparatively anodyne public comments about a pending case. In that case, which arose from a lawsuit asserting a race-

based challenge to Boston's elementary school student assignment process, plaintiffs' counsel made "provocative" statements to the <u>Boston Herald</u> criticizing the district judge's views on plaintiffs' standing and plaintiffs' pending motion for class certification. 244 F.3d at 165–66. Responding to what she believed to be "inaccuracies" in the <u>Herald</u>'s article, the district judge gave her own interview to the newspaper, in which she explained that the issue of standing was "more complex" in the instant case than in another case cited by plaintiffs' counsel, where the same judge had found standing and certified a class. <u>Id.</u> at 166. The plaintiffs moved to recuse on the basis of the district judge's comments in the interview, but the judge denied the motion, characterizing her statements as "explanatory and educational" "attempts to correct a record suffering from gross misrepresentations" by plaintiffs' counsel. <u>Id.</u> at 166, 168 n.8.

The First Circuit granted mandamus and ordered recusal. At the outset, the Circuit observed that "[j]udges are generally loath to discuss pending proceedings with the media," that doing so was "'an unusual thing for a judge to do,'" and admonished that "when a judge makes public comments to the press regarding a pending case, he or she invites trouble." <u>Id.</u> at 169 (quoting <u>United States v. Cooley</u>, 1 F.3d 985, 995 (10th Cir. 1995)), 171. Following <u>Cooley</u>, the Circuit explained that a judge's public comments convey "'[t]wo messages'"—the "'words actually spoken'" and "the judge's expressive conduct in deliberately making the choice to appear'" in a public forum to address a pending matter at all. <u>Id.</u> at 169 (quoting <u>Cooley</u>, 1 F.3d at 995). "'Together, these messages unmistakably conveyed an uncommon interest and degree of personal involvement in the subject matter.'" <u>Id.</u> (quoting <u>Cooley</u>, 1 F.3d at 995).

The Circuit then concluded that recusal was necessary in light of three factors, all present in this case. First, "the Boston school assignment program is a matter of significant local concern," and "in newsworthy cases where tensions may be high, judges should be particularly

cautious about commenting on pending litigation." Id. at 169–70. That is because "[w]ith such public attention to a matter, even ambiguous comments may create the appearance of impropriety that § 455(a) is designed to address. In fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias." Id. at 170. Second, the district judge's comments "were sufficiently open to misinterpretation so as to create the appearance of partiality," because a "reasonable person" might have construed them "as a preview of a ruling on the merits of [the plaintiffs'] motion for class certification." Id. And third, the judge's comments "might be interpreted as a defense of her procedural approach to this litigation," implicating the concern that "a judge's defense of her own orders, prior to the resolution of appeal, may create the appearance of partiality." Id. at 170.

Numerous decisions accord with Boston's Children First and require § 455(a) recusal based on judges' public comments about pending cases. See, e.g., Ligon v. City of New York, 736 F.3d 118 (2d Cir. 2013); Hathcock v. Navistar Int'l Trans. Corp., 53 F.3d 36, 41 (4th Cir. 1995); Microsoft Corp., 253 F.3d at 107–118; In re IBM Corp., 45 F.3d 641 (2d Cir. 1995); Cooley, 1 F.3d 985; see also, e.g., United States v. South Fla. Water Mgmt. Dist., 290 F. Supp. 2d 1356, 1359–61 (S.D. Fla. 2003). As one judge has put it: "The integrity of the judicial process would be seriously doubted if judges were free to air their views on pending cases outside of the appropriate judicial forum. Whenever such an occurrence arises, a judge should recuse himself to protect the sanctity of the judicial process." Barry, 946 F.2d at 917 (Edwards, J., dissenting).

B.    This Court's Public Comments Create An Appearance Of Partiality Requiring Recusal.

"Public comment bearing specifically on pending or impending litigation is an activity that jurists should ordinarily scrupulously avoid." Flamm, Judicial Disqualification § 62.3, at 976

(Banks & Jordan 3d ed. 2017); see also United States v. Haldeman, 559 F.2d 31, 134 (D.C. Cir. 1976). Nonetheless, in numerous public settings during the pendency of Mr. Tsarnaev's appeal, Your Honor has opined, in detail and at length, about the very matters that are the subject of the remand proceedings—whether seated jurors Jurors 138 and 286 gave honest or dishonest answers during voir dire, whether they followed or disobeyed this Court's instructions to avoid prejudicial information on social media, whether they honored their oath to decide this case impartially or suffered from disqualifying bias, and whether Mr. Tsarnaev received a fair or an unfair trial. See Tsarnaev, 96 F.4th at 475 (remanding for "an appropriate investigation of the potential bias suggested by the apparent discrepancies between the answers of Jurors 138 and 286 to the court's inquiries in jury selection and the information contained in their social media communications"). These comments contravened Canon 3(A)(6) and the binding guidance in Boston's Children First, and they created an appearance of partiality sufficient to require disqualification under § 455(a) and the Fifth and Eighth Amendments. At a minimum, the question is "close" enough that this Court should "resolve" any "doubts ... in favor of recusal." Snyder, 235 F.3d at 46; see also Boston's Children First, 244 F.3d at 167.

First, putting the substance of the remarks aside, Your Honor "invite[d] trouble" by choosing to discuss this highest of high-profile cases in public at all. Boston's Children First, 244 F.3d at 171. Reasonable observers "might well consider [this Court's] actions as expressing an undue degree of interest in the case." Id. at 170; see also Cooley, 1 F.3d at 995 (public comment was "an unusual thing for a judge to do" and it "conveyed an uncommon interest and degree of personal involvement in the subject matter"). Indeed, "[i]t has been argued that any 'public comment by a judge concerning the facts, applicable law, or merits of a case that is sub judice in his court ... would raise grave doubts about the judge's objectivity and his willingness to reserve

14

judgment until the close of the proceeding.'" <u>Microsoft</u>, 253 F.3d at 114 (quoting Ross,

<u>Extrajudicial Speech: Charting the Boundaries of Propriety</u>, 2 Geo. J. Legal Ethics 589, 598

(1989)). Not only was this Court's choice uncommon, <u>see</u> <u>Boston's Children First</u>, 244 F.3d at

170 (noting the "rarity of such public statements"), but it was also avoidable. <u>Cf.</u> <u>In re Allied-</u>

<u>Signal Inc.</u>, 891 F.2d 967, 971 (1st Cir. 1989) (Breyer, J.) ("[O]ther things being equal, the more

common a potentially biasing circumstance and the less easily avoidable it seems, the less that

circumstance will appear to a knowledgeable observer as a sign of partiality."). This Court was

not correcting misrepresentations by counsel, as in <u>Boston's Children First</u>, or addressing

provocative actions by a litigant, as in <u>Cooley</u>. Nor were Your Honor's remarks necessary to the

disposition of the case. <u>Cf.</u> <u>Allied Signal Inc.</u>, 891 F.2d at 972 ("[O]ther things being equal, the

greater the extent to which the potentially disqualifying circumstance facilitates the just and

efficient resolution of a case, the less likely a knowledgeable observer will consider it a sign of

judicial partiality."). It was "no excuse that the Judge may have intended to 'educate' the public

about the case" because "he could have held his tongue until all appeals were concluded."

<u>Microsoft</u>, 253 F.3d at 112. Thus in <u>Microsoft</u>, the government declined "'to defend the District

Judge's decision to discuss this case publicly while it was pending on appeal.'" <u>Id.</u> at 108.

      Second, the remarks themselves reflect, or at the very least could to a reasonable observer

suggest, views on the merits of the remand issues that create the appearance of prejudgment

inconsistent with the obligation of impartiality. With full knowledge of the factual and legal

bases for Mr. Tsarnaev's juror-misconduct claim (<u>see</u> DE.1100), Your Honor said that the

"public-spiritedness of [the] jurors ... who were selected" "was remarkable throughout." Your

Honor had "heard of no[]" "indication of [jurors'] breach of duty" to avoid extraneous

information on social media, and thus was confident that the jurors had "follow[ed] through" on

their duty and had "take[n] their responsibility seriously." This was notwithstanding that the defense had brought to the Court's attention significant concerns about Jurors 138 and 286's social media exposure and use, before they were sworn, and the Court had refused to voir dire them further. Your Honor emphasized that Your Honor had no "lingering questions or doubts" about the trial's outcome. These comments, made on several occasions over the course of many years, are far more indicative of prejudgment than the district judge's single observation, in Boston's Children First, that the standing issue in that case was "more complex" than the standing issue in another case. An objective observer could take Your Honor's fulsome praise for the "public-spirited[]" seated jurors "as a preview of a ruling on the merits" (244 F.3d at 170) of the remand question whether those same jurors "suffered from a disqualifying bias" (Tsarnaev, 96 F.4th at 475)—especially since this Court knew of the allegations of misconduct when it delivered that praise. Moreover, as highlighted in Boston's Children First, Your Honor's extended discussion and justification of its jury selection procedures—"custom-designed" to "assure that the defendant ... was given ... a public trial that is fully fair," Exh. A, at 2, 5—as well as the bona fides of the jurors, could be viewed as an anticipatory "defense of [its] own order" denying the motion to strike and refusing further voir dire "prior to the resolution of appeal." 244 F.3d at 170. Such comments, the First Circuit squarely stated, "may create the appearance of partiality." Id. In high-profile, emotionally charged cases such as this, "even ambiguous comments may create the appearance of impropriety that § 455(a) is designed to address." Id. And Your Honor's comments were far from ambiguous.

Third, this Court's statements and actions in the courtroom buttress the case for recusal.[2] As trial began, this Court told the jurors, ex parte, that he and they were "in this together," "on the same side," and "teammates." That figurative (and literal) handshake was not consistent with the constitutional design. "There is not one shred of doubt ... about the Framers' paradigm for criminal justice: ... limited state power accomplished by strict division of authority between judge and jury." Blakely v. Washington, 542 U.S. 296, 313 (2004); see also, e.g., United States v. Mehanna, 735 F.3d 32, 50 (1st Cir. 2013) (discussing "the distinct roles of judge and jury in our system of justice"). As trial ended, this Court told the "model" jurors that they had performed their service with "seriousness and responsibility" before affording them three months of counseling. And at sentencing, this Court said that their service had been "exceptional."

In court and out, in words and actions, Your Honor has time and again demonstrated extraordinary solicitude for these "remarkabl[y]" "public-spirited[]" jurors—the Court's "teammates"—who had given no "indication" of "breach of duty" and had rendered "exceptional service," performing their "high duty conscientiously and justly." An objective observer could reasonably question whether this Court, having "invite[d] trouble" by taking these "unusual" public steps, can now impartially decide whether two of these jurors lied in order to sentence Mr. Tsarnaev to death. The question is at least close, so § 455(a) and due process demand recusal.

---

[2] To be clear, the defense contends that Your Honor's public comments, standing alone, suffice for disqualification. However, this Court's in-court comments and actions also support this result. See In re United States, 666 F.2d at 697 (considering both extrajudicial and in-court actions); IBM, 45 F.3d at 645 (explaining, post-Liteky, that judicial actions "can surely" "warrant recusal ... when accompanied by extrajudicial actions"). Thus, this is not a case, like Liteky, where the sole basis for recusal is in-court conduct. Moreover, this Court's comments, although occurring in the courtroom, were not rulings or judicial actions integral to the trial. One occurred ex parte before the jurors were sworn, another occurred after the jury returned its verdict and was polled, and another occurred after the jurors had been discharged.

II.     **If This Court Does Not Recuse Itself, It Should Disclose All Public Comments That It Has Made About This Case And The Substance Of Any <u>Ex Parte</u> Communications With The Jurors.**

   A.     <u>Legal Framework</u>

   Section 455(e) provides: "Where the ground for [a judge's] disqualification arises only under subsection (a), waiver [from the parties] may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." Although the statute "does not ... provide for discovery," it does "require[] full disclosure by the judge" of any potential bases for recusal. <u>Sampson</u>, 148 F. Supp. 3d at 116; <u>see</u> <u>also</u>, <u>e.g.</u>, Canon 3(D) (noting that a judge disqualified on the ground that his "impartiality might reasonably be questioned" "may," in lieu of withdrawal, "disclose on the record the basis of disqualification" and allow the parties to consider waiving disqualification); Am. Bar Ass'n, Model Code of Judicial Conduct R. 2.11 cmt.5 ("A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification."); <u>Williams</u>, 579 U.S. at 13–14 (discussing "the utility of professional codes of conduct" such as the ABA's Model Code).

   Thus, in <u>Sampson</u>, the district judge disclosed that he had participated in a film screening and panel discussion with a potential defense witness on issues generally relevant to the capital retrial over which the judge was presiding. <u>See</u> Lobby Conf. Tr. 6–7, <u>United States v. Sampson</u>, No. 01-cr-10384-MLW (D. Mass. June 19, 2015), DE.1978; <u>see</u> <u>also</u> Hr'g Tr. 4–5, <u>ibid.</u>, DE.1984. Based on that disclosure, the government sought and obtained, directly from the district judge, fulsome information concerning the event, including video of the film and the panel discussion, the substance of the judge's comments that were not captured on video, and information concerning the judge's private communications with the witness and other judges in

attendance. See Gov't Resp., ibid. (D. Mass. June 22, 2015), DE.1980 (government's request to question judge about event); Hr'g Tr., supra, 14–15, 17, 25–26, 30–31 (government requesting judge's remarks at screening, video of event, copy of film, substance of judge's private communications with witness, information concerning how witness came to participate in event, and substance of judge's private communications with other judges who attended event); Order, ibid., DE.1983 (furnishing parties with partial video of event and disclosing substance of judge's unrecorded remarks); see also Sampson, 148 F. Supp. 3d at 81 (judge "obtained and provided to the parties the ... film and a video of the panel that did not include all of my opening remarks, and conducted two hearings"). On the basis of these disclosures, the government moved to recuse under § 455(a). See id. at 79. The same judicial transparency is appropriate here.

B.     This Court Should Disclose All Its Public Comments About This Case And The Substance Of Any Ex Parte Communications With The Jurors.

As noted above (supra n.1), the defense has undertaken diligent efforts to identify all of this Court's public comments about this case, but our information is incomplete. We believe that the public comments of which we are aware require recusal under § 455(a). However, we cannot determine whether any public comments of which we are unaware (for example, those made during the question-and-answer session at the April 6, 2016 event at Boston College Law School) also require recusal, absent further information from this Court. See § 455(e); see also Canon 3(D); R. 2.11 cmt.5. Accordingly, we move for disclosure of the dates, circumstances, and substance of all comments that this Court has made about this case, including—but not limited to—any transcripts, recordings, or notes relating to the April 6, 2016 event at Boston College Law School, and the November 7, 2017 event at the Harvard Club of Boston.

In addition, this Court should disclose the dates, circumstances, and substance of all ex parte communications with the jurors. Here, we are aware that this Court engaged in one ex parte

conference with the jurors after they were selected (the "teammates" conference, see supra

Background § 3), and at least one more after they returned their verdict. See DE.1476, at 3

(sentencing) (this Court acknowledging presence of jurors who were "here at my invitation," and

explaining that "[i]t is my practice, after a verdict in every criminal trial, to talk informally with

the discharged jurors, principally to thank them again personally for their service"). The defense

does not know if there were other such colloquies. During trial, "ex parte communications

between the judge the jury may raise concerns under Federal Rule of Criminal Procedure 43(a)

and the Fifth and Sixth Amendments." United States v. Rivera-Rodriguez, 617 F.3d 581, 603

(1st Cir. 2010). "When an ex parte communication relates to some aspect of the trial, the trial

judge generally should disclose the communication to counsel for all parties." Rushen v. Spain,

464 U.S. 114, 119 (1982) (per curiam). Moreover, the post-trial private conversation that

occurred here may have direct bearing on this recusal motion. Accordingly, this Court should

divulge it, and all others.

## CONCLUSION

This Court should recuse itself. If not, this Court should disclose all public comments that

it has made about this case, as well as all ex parte communications with the jurors.

Respectfully submitted,

DZHOKHAR TSARNAEV

by his attorneys:

/s/ *Deirdre von Dornum*

Deirdre D. von Dornum, Esq.
Mia Eisner-Grynberg, Esq.
Daniel Habib, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor

20

Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org
mia_eisner-grynberg@fd.org
daniel_habib@fd.org

David Patton, Esq.
*Pro Hac Vice*
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
dpatton@heckerfink.com

William Fick, Esq.
Fick & Marx, LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
wfick@fickmarx.com

**<u>Certificate of Service</u>**

  I hereby certify that this document and the attached exhibits will be served by email on counsel for the government on **September 3, 2024.**

<u>/s/ *Deirdre von Dornum*</u>
Deirdre D. von Dornum, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org